**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **SAM and TONY M., by Next Friend Gregory C. Elliott; CAESAR S., by Next Friend Kathleen J. Collins; DAVID T., by Next Friend Mary Melvin; BRIANA, ALEXIS, CLARE, and DEANNA H., by Next Friend Gregory C. Elliott; and DANNY and MICHAEL B., by Next Friend Gregory C. Elliott; for themselves and those similarly situated*,** | |
| **Plaintiffs,** | CA 07 241L |
| **v.** | **Class Action** **Civil Action No. ________** |
| **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island; JANE A. HAYWARD, in her official capacity as Secretary of the Executive Office of Health & Human Services; and PATRICIA MARTINEZ, in her official capacity as Director of the Department of Children, Youth and Families,** | |
| **Defendants.** | |

**COMPLAINT**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**
**AND REQUEST FOR CLASS ACTION**

* pseudonyms are used for all minor named plaintiffs.

## TABLE OF CONTENTS

Page No.


I. Introduction ........ 4

II. Jurisdiction and Venue ........ 7

III. Class Action Allegations ........ 7

IV. The Parties ........ 10

A. The Named Plaintiffs ........ 10

B. The Defendants ........ 35

V. The Rhode Island Child Welfare System ........ 36

VI. Defendants Have Long Known That Rhode Island's Child Welfare System Cannot Fulfill Its Duties to Plaintiff Children Without Urgent, Systemic Reform ........ 38

A. The 2003 System of Care Task Force Report Concluded that the Child Welfare System Was Harming Children and That Systemic Reform Was Necessary ........ 38

B. The 2004 Federal Child Welfare Review Identified Widespread Problems in Rhode Island's Child Welfare System ........ 40

C. The 2005 T.J. Wright Child Fatality Report Called for Systemic Reform ........ 42

D. The Child Advocate's 2006 Report Found Little Progress Had Been Made ........ 43

E. A 2006 Federal Regional Review Revealed Little to No Progress in Improving the Child Welfare System ........ 43

F. The Rhode Island Senate Has Recognized the Child Welfare System's Chronic Failings ........ 44

VII. Current Systemic Child Welfare Failings and the Resulting Harm to Children ........ 45

A. Plaintiff Children Are Abused and Neglected in Foster Care ........ 45

B. Defendants Place Plaintiff Children in Homes and Institutions that Do Not Meet Their Needs and That Do Not Comply With Reasonable Professional Standards ........ 47

1. Defendants Have Failed to Develop and Maintain a Sufficient Array of Foster Care Placements ....47

2. Defendants Unnecessarily Place Children in Shelters and Institutions, Where They Stay for Too Long ....48

3. Defendants Send Children in Foster Care Far from Their Homes and Communities ....50

4. Because Children Are Placed in Inappropriate Homes and Institutions, Their Placements Frequently Disrupt, and Children Deteriorate as They Get Moved from Place to Place ....51

5. Defendants Separate Siblings in Foster Care Because They Have Failed to Develop an Adequate Placement Array ....54

C. Defendants Fail in Their Duty to Meet Plaintiff Children's Service Needs ....55

1. Defendants Do Not Provide Plaintiff Children with Required Timely and Appropriate Assessments or Case Plans ....55

2. Defendants Violate Plaintiff Children's Rights to Timely and Safe Reunification with Their Families When Reunification Is Appropriate ....56

3. Defendants Violate Plaintiff Children's Rights to Permanency by Pursuing Reunification with Parents When Not Appropriate ....58

4. Defendants Fail to Timely Place Children Who Cannot Return Home with Permanent Adoptive Families, Allowing Them Instead to Languish in Foster Care ....59

5. Defendants Violate Plaintiff Children's Health Care Rights ....62

D. Defendants' Mismanagement of Rhode Island's Foster Care System Harms Plaintiff Children ....65

1. Defendants Assign Excessive Caseloads to Caseworkers, Making It Impossible for the Caseworkers to Ensure That Children Are Safe and Having Their Needs Met ....65

2. Caseworkers Fail to Make Required Child Visits ....68

3. The DCYF Licensing Unit Fails Applicable Standards, Resulting in a Chronic Shortage of Licensed Placements and Providers ....69

E. Defendants' Fiscal Mismanagement of the Child Welfare System Harms Children ....72

1. Defendants Forfeit Available Federal Funds ....72

2. Defendants Waste Limited Funds on Harmful, Costly Institutional Placements ....73

3. Defendants Do Not Provide Adequate Foster Care Maintenance Payments to Foster Parents ....74

VIII. Causes of Action ....75

IX. Prayer for Relief ....82

## I. Introduction

1. On October 31, 2004, a three-year-old Rhode Island boy named T.J. Wright was beaten to death by his foster parents. The State of Rhode Island's Department of Children, Youth and Families (DCYF), the agency responsible for protecting abused and neglected Rhode Island Children, had removed T.J. from his parents' care and placed him with the foster parents who killed him: a twenty-year-old maternal aunt and her live-in boyfriend who already had two young children. DCYF placed T.J. and his two brothers with these young parents without screening or licensing them. There were now five children living in the home, all under the age of nine. Both foster parents had histories of drug abuse and involvement in drug trafficking. Both were unemployed.

2. T.J. Wright's death was all the more tragic because DCYF could easily have prevented it by taking simple steps, mandated under DCYF's own policies, to ensure T.J.'s safety before placing him in their care, such as screening the prospective foster parents for criminal and DCYF histories and checking their references. DCYF had a duty to protect T.J. Wright. Instead, it placed him with the people who killed him.

3. The T.J. Wright homicide put DCYF in the spotlight, revealing serious systemic failures. An official investigation into his death produced a series of urgent recommendations for long-overdue reform. Nevertheless, now nearly three years since T.J.'s death, DCYF is still unable to provide basic safety for the abused and neglected children whom it removes from home and takes into its legal custody for their own protection.

4. This civil rights class action is brought on behalf of those vulnerable children. Plaintiffs seek declaratory and injunctive relief to remedy Defendants' violations of

their legal rights and to prevent Defendants, by their actions and inactions, from continuing to harm the abused and neglected children who rely on Defendants for care and protection.

5. DCYF is plagued by fundamental, systemic failings of great depth and scope. For example:

- **DCYF fails to protect children from abuse and neglect in foster care:**
    - In five of the six years from 2000 through 2005, Rhode Island was the worst state in the nation in its rate of maltreatment or neglect occurring to children in State foster care; in the sixth year, Rhode Island was second-worst.[1]
    - For years, children under the protection of the state in foster care custody in Rhode Island have suffered abuse or neglect at a higher rate than have children living in the state's general population.
- **DCYF fails to assess and address children's needs and fails to place them with families where their needs will be met and where they will be safe:** In all aspects of case planning and management, DCYF fails to exercise reasonable professional judgment. DCYF fails to identify children's safety, medical, mental health, education and permanency needs and fails to develop and implement plans to ensure that children and families receive necessary services to meet those needs. DCYF does not develop case plans or choose placements for children on the basis of their individual situation. DCYF regularly places children in settings that are ill-suited to their individual needs. As a result, these placements predictably disrupt, and DCYF shuffles children unnecessarily from one placement to another. With each successive inappropriate placement, children become increasingly damaged.
- **DCYF returns children to their parents without making a reasoned determination that the children will be safe and without identifying or providing services needed to ensure the children's safety:** More than 15 percent of the children entering Rhode Island foster care in the first quarter of 2006 had been in foster care less than a year earlier. This means that these children had been returned by the State to their parents, only to be abused or neglected again and returned to State foster care.
- **DCYF fails to engage in the planning necessary for children in their care to achieve permanency, causing many children to languish in foster care for years:** DCYF fails to timely plan for adoption when children cannot be safely returned home. DCYF frequently places children in institutions and with families that will not adopt. For children who cannot be reunified with

[1] Data on 2006 are not yet available.

their families, this effectively keeps children languishing in care with no move towards finding a permanent home.

- **DCYF fails to maintain an adequate number of foster homes, instead placing and leaving children in institutions simply because nothing else is available:** Federal law and reasonable professional standards require that children in foster care be placed in the least restrictive, most family-like setting suited to their needs. In Rhode Island, however, 35 percent to 40 percent of the children in State foster care custody live in expensive emergency shelters, group homes, and other institutions, many simply because Rhode Island has not developed more appropriate and less harmful placements for them. The rate at which Rhode Island institutionalizes children in its foster care custody is twice the national average of 19 percent. In the most recent year for which data are available, 2004, Defendants placed 18.9 percent of children in foster care under 12 years old in group homes and institutions; this is more than twice the national median of 8.6 percent. Such placements are harmful, especially to young children, except in very rare cases.

- **DCYF assigns excessive caseloads to its caseworkers, making it impossible for them to visit the children in DCYF's custody:** DCYF caseworkers labor under caseloads that far exceed reasonable professional standards. As a result, caseworkers make only a fraction of required visits with the children assigned to them. As of June 2007, only 39 percent of all Plaintiff Children had received a face-to-face visit with their caseworker within the last 30 days. Without caseworkers visiting children on a regular basis, it is impossible for DCYF to ensure that children in foster care are safe and are having their basic needs met.

- **DCYF places children in unlicensed homes:** As of May 2007, there were 233 children in DCYF's legal custody who were living in unlicensed foster homes. DCYF did not take reasonably necessary steps to ensure that these homes were safe and appropriate placements before leaving children in them.

6. These harms to children are the direct result of a child welfare system that has long been poorly managed, that misdirects funds, and that has failed to develop necessary and appropriate placements and services for children.

7. This civil rights class action seeks declaratory and injunctive relief to compel Defendants—the Governor of the State of Rhode Island, the Secretary of the Executive Office of Health and Human Services, and the Director of the Department of Children, Youth

and Families—to meet their legal obligations to care for and protect Rhode Island's abused and neglected children in state custody by reforming the State's dysfunctional child welfare system.

**II. Jurisdiction and Venue**

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution, federal statutes, and federal common law. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

9. Venue is proper here pursuant to 28 U.S.C. § 1391(b). The claims arise in this district.

**III. Class Action Allegations**

10. This action is properly maintained as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

11. The class is defined as "all children who are or will be in the legal custody of the Rhode Island Department of Children, Youth and Families due to a report or suspicion of abuse or neglect" ("Plaintiff Children"). As of January 2007, approximately 3,000 children were in the legal custody of DCYF for foster care services due to reported or substantiated allegations of abuse or neglect. The Class is sufficiently numerous to make individual joinder impracticable.

12. The questions of law and fact raised by the Named Plaintiffs' claims are common to and typical of those of the Plaintiff Children they seek to represent. Named Plaintiffs are all children in Defendants' legal custody who rely on Defendants for their safety and well-being. They are at risk of harm by the systemic and legal deficiencies of Rhode Island's child welfare system.

13. Questions of fact common to the Class include:

a. Whether Defendants fail to provide Plaintiff Children with safe, appropriate, and stable foster care placements, causing significant harm to their health and well-being;

b. Whether Defendants fail to prevent the abuse or neglect of Plaintiff Children while in Defendants' custody, causing significant harm to their health and well-being;

c. Whether Defendants fail to place Plaintiff Children in the least restrictive and most family-like settings suited to their needs, including by unnecessarily institutionalizing them, causing significant harm to their health and well-being;

d. Whether Defendants fail to provide Plaintiff Children with legally required services necessary to keep them safe and properly cared for, and to prevent them from deteriorating physically, psychologically, or otherwise while in custody, as required by law and reasonable professional judgment, causing significant harm to their health and well-being;

e. Whether Defendants unsafely return Plaintiff Children to caretakers who abuse or neglect them again, causing significant harm to their health and well-being;

f. Whether Defendants unnecessarily move Plaintiff Children from placement to placement, causing significant harm to their health and well-being;

g. Whether Defendants fail to provide Plaintiff Children and their families with reasonable decision-making as well as timely services necessary to ensure the safe and successful reunification of children with their families when appropriate, causing significant harm to their health and well-being;

h. Whether Defendants fail to provide Plaintiff Children with timely and reasonable decision-making as well as services necessary to ensure that when Plaintiff Children cannot be reunited with their families safely, they are promptly freed for adoption and placed in permanent homes, causing significant harm to their health and well-being; and

i. Whether Defendants fail to provide Plaintiff Children with the supports necessary to maintain family relationships where appropriate, including placing siblings together as well as

providing parent and sibling visits, causing significant harm to their health and well-being.

14. Questions of law common to the Class include:

a. Whether Defendants' actions and inactions violate Plaintiff Children's substantive due process rights to be free from harm while in state custody, guaranteed by the Fourteenth Amendment to the United States Constitution;

b. Whether Defendants' actions and inactions violate Plaintiff Children's rights to family integrity, guaranteed by the First, Ninth, and Fourteenth Amendments to the United States Constitution;

c. Whether Defendants' actions and inactions violate Plaintiff Children's rights to mandated foster care and adoption services, established by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, and relevant federal regulations;

d. Whether Defendants' actions and inactions violate class Plaintiff Children's rights to adequate foster care maintenance payments, established by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, and relevant federal regulations;

e. Whether Defendants' actions and inactions violate Plaintiff Children's third-party beneficiary rights under the Title IV-E plan executed between Rhode Island and the federal government; and

f. Whether Defendants' actions and inactions violate Plaintiff Children's rights to procedural due process, guaranteed by the Fourteenth Amendment to the United States Constitution.

15. Named Plaintiffs will fairly and adequately protect the interests of the class they seek to represent.

16. Named Plaintiffs and Plaintiff Children are represented by:

a. Jametta O. Alston, the Child Advocate of the State of Rhode Island, a public official empowered to bring legal action to protect abused and neglected children in DCYF's care, acting in her official and individual capacities;

b. John Dineen, a licensed Rhode Island attorney with substantial experience litigating civil rights matters in the federal courts;

c. Attorneys employed by Children's Rights, a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally; and

d. Weil, Gotshal & Manges LLP, a global private law firm with extensive experience in complex civil litigation including class action litigation and a non-litigation office in Providence.

17. The attorneys and entities listed above have investigated all claims in this action and have committed sufficient resources to represent the Class.

18. Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's (or children's) situation to fairly and adequately represent the child's (or children's) interests in this litigation.

19. Defendants have acted or failed to act on grounds generally applicable to the Class, necessitating declaratory and injunctive relief for the Class. Plaintiffs' counsel know of no conflicts between or among members of the Class.

## IV. The Parties

### A. The Named Plaintiffs

**SAM AND TONY M.**

20. SAM and TONY M., ages 13 and 9, respectively, are siblings currently in DCYF custody. Over the past eight years, DCYF has repeatedly failed in its most basic obligation to keep these children safe. Instead, these boys have been subject to physical and sexual abuse, moved at least ten times each to unstable and inappropriate placements, returned several times to abusive parents who further maltreated them, and denied critically needed medical evaluations and mental health services. Although DCYF has been involved in Sam's

life since he was four, and in Tony's since he was an infant, it has yet to take the steps necessary to help these children achieve permanency.

21. Sam and Tony first entered foster care in May 1999, when Sam was four years old and Tony an infant. DCYF was aware when it removed them from their parents' home that their father had a domestic assault record and that their mother had significant substance abuse and mental health issues. Her second suicide attempt prompted the children's removal. DCYF initially placed Sam and Tony in a home with a family friend. While in this home, one of the boys was found with cigarette burns on his body.

22. In June 1999, Sam revealed that his father had sexually abused him, which was relayed to his DCYF caseworker. DCYF failed to arrange for Sam to undergo a sexual abuse evaluation, even though health professionals working with Sam recommended such an evaluation in June, August, September, and again in October. In October, his father, the alleged perpetrator, rescinded his consent for the evaluation.

23. In January 2000, DCYF still had not fully investigated Sam's allegation of sexual abuse by his father, and there was no indication that the parents had undertaken all that was required of them by DCYF to safely regain custody of their children. DCYF nonetheless returned Sam and Tony to their parents without taking adequate steps to ensure that the boys would be safe. The very next month, DCYF received a report that the boys were again being abused and that one had a quarter-sized mark on his neck and one had a bruise around his eye. Their father was reported to be abusing alcohol. Sam had witnessed his father abuse his mother. At one point, Sam's father threatened to kill Sam and his mother. DCYF conducted two investigations in the home, one in July 2000 and one in March 2001, but left the children at home.

24. The boys remained with their mother for the next two years, until February 2003. During that time their father left the family, and their mother remarried. In July 2002, when Tony was four and Sam seven, their stepfather brutally sexually and physically abused Tony. At the time, their stepfather was on "home confinement" for assaulting Tony's mother, for which he had been criminally charged twice.

25. After Tony's sexual abuse by his stepfather, he was taken to a sexual trauma and resource center, but DCYF failed to ensure that a sexual abuse evaluation was performed. Sam and Tony then moved with their mother to the home of their maternal grandparents, which was already overcrowded with other family members and their children.

26. In January 2003, DCYF investigated a report that the boys' grandfather had hit one of them with a cane. The next month, the boys' mother was in a car accident while under driving the influence of narcotics with eight-year-old Sam in the car with her. Following this incident, DCYF again removed Sam and Tony and placed them in a foster home. The foster parent requested a sexual abuse evaluation for one of the boys because he began to act out sexually, but the evaluation was not scheduled to occur until six months later. This foster placement became unstable, and DCYF moved the boys to a third foster home.

27. In October 2003, DCYF again reunified Sam and Tony with their mother. By this time, DCYF had investigated and confirmed approximately eight reports that the children were being harmed in her care; in six other reports, DCYF issued "early warning" reports. In January 2003 alone, DCYF investigated and confirmed three reports that Sam and Tony were being maltreated.

28. In May 2004, within six months of DCYF returning the boys to their mother, DCYF removed them again because of substance abuse and domestic violence problems.

DCYF again assigned the boys a permanency goal of reunification with their mother. This remained the goal even after DCYF caseworkers found that their mother could not manage the boys even during supervised visits. This time, DCYF failed to place the boys in a family setting and instead placed them in a group care facility.

29. Both Sam and Tony were moved to a residential treatment facility in November 2005. Only one month later, when Tony was 7 years old and Sam was almost 11, the boys were each hospitalized in separate out-of-state psychiatric hospitals. This was the eighth placement to which DCYF had subjected these children. Although this was the first time Sam and Tony had ever lived apart from each other, DCYF failed to arrange for the boys to visit one another for four months. DCYF allowed both boys to languish apart from one another in these highly restrictive hospitals well past the time it was therapeutically appropriate, simply because DCYF had no other placement for them. The boys experienced even further trauma while still separated when their teenaged first cousin died while institutionalized in DCYF foster care custody.

30. In October 2006, while living in another residential treatment center, Tony's two roommates tried to involve him in sexual activity. Staff at the facility, which was licensed and supervised by DCYF, were aware of the incident but failed to protect Tony by separating him from his roommates, apparently because the center did not have any available rooms. Four months later, in January 2007, Tony was sexually molested by another roommate. Because the facility still had no open beds in which to move either Tony or his roommate perpetrator, the only measure it took to protect Tony from further abuse was for a staff member to sleep in the room next to Tony. Neither the facility nor DCYF reported either incident for investigation.

31. Sam and Tony remain separated and institutionalized. Tony, only nine years old, is currently living in his twelfth placement. He has not lived in a home since 2004. Sam is in his tenth placement. There is no indication that DCYF is working towards finding a family placement for either Sam or Tony, and, while their father's rights were finally terminated in February 2006, their mother's rights have not yet been. DCYF has not taken any steps to find permanent families for these boys.

32. As a result of Defendants' actions and inactions, Sam and Tony have been and continue to be irreparably harmed. DCYF has repeatedly returned these children to an abusive home environment without taking any of the measures necessary to protect the children from further maltreatment in that home. Rather than meet its obligation to provide the brothers with a stable family environment, DCYF has cycled these boys through a number of overly restrictive institutions where Tony suffered further abuse that could have been prevented if the facility had acted with reasonable professional judgment. Defendants have taken virtually no steps to move these children out of foster care and into a safe and stable family that they can call their own. The ongoing failure by DCYF to provide these children with any stability or prospect of a permanent home has caused and continues to cause them serious psychological harm.

33. Defendants have violated Sam's and Tony's constitutional and statutory rights by failing to protect them from harm; by failing to provide them with medical and mental health evaluations and services necessary to prevent their health from deteriorating while in DCYF custody; by failing to provide them with appropriate, least-restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services, all of which are required by law and reasonable professional judgment.

34. Named Plaintiffs SAM and TONY M. appear through their Next Friend, Gregory C. Elliott. Professor Elliott is Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliott is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and he is currently writing a book on how adolescents come to believe that their lives matter to others

**CAESAR S.**

35. CAESAR S., only five years old, has been moved through eight DCYF placements, many unlicensed and inappropriate, and has been lingering in DCYF custody for virtually his entire life. He was removed from home due to his mother's neglect in December 2002, when he was 15 months old. Despite his parents' substance abuse, failure to comply with treatment requirements, and clear inability to parent Caesar, he was not freed for adoption until June 2007. DCYF has cycled Caesar from inappropriate placement to inappropriate placement without looking for a safe, loving, permanent home for him, and has allowed him to deteriorate in foster care. For the last two years, Caesar has lived in an inappropriate home where he cannot live permanently.

36. Caesar's family has had a long history with DCYF. His mother, Rhonda [all names are pseudonyms], and her mother, Caesar's grandmother, were both known to DCYF when they were children. Even before Caesar was born, DCYF was providing services to Rhonda's family and making regular visits to their home. When Rhonda gave birth to Caesar at age 15, DCYF already knew that she had displayed signs of depression, anxiety, anger, and stress and had engaged in such harmful behaviors as substance abuse and shoplifting.

37. Since 1981, there have been 61 DCYF investigations into Caesar's maternal grandmother's home, 19 of which concluded that abuse or neglect had occurred. Despite this, even after DCYF filed a neglect petition against Caesar's grandmother on behalf of Rhonda and her two siblings in March 2002, and after Caesar's mother Rhonda herself admitted neglecting Caesar in September 2002, DCYF placed Caesar with Rhonda in this maternal grandmother's home, where Caesar and his mother lived until December 2002. There was no crib in this home as of July 2002.

38. In December 2002, DCYF removed 16-month-old Caesar from Rhonda's care after he was found sitting on top of a kitchen table with no adult in the room. Rhonda and Caesar had moved from his grandmother's home to a rooming house occupied by Rhonda's two sisters, a boyfriend who had previously committed physical abuse, and another adult with a history of sex offenses against children. Rhonda explained that she and Caesar had left Caesar's grandmother's house—which she described as a crack house—because a pedophile was living there. Rhonda was reported to leave the rooming house at night and leave Caesar unattended, and she admitted to using marijuana and alcohol.

39. After this removal, DCYF initially placed Caesar in an emergency shelter, where he remained for two days, and then moved him to a foster home where he remained for one month. In January 2003, DCYF placed Caesar with his paternal aunt Laura and her two young children. DCYF subsequently received reports that Laura was smoking marijuana and leaving the children with her sister, a known substance abuser. Nonetheless, Caesar stayed in this home for a year and a half, even while Laura advised DCYF repeatedly that she was having difficulty taking care of him. DCYF did nothing to support this placement or help this aunt; it simply arranged two weekend respite placements. Predictably, Caesar was eventually removed

because Laura was overburdened and unable to care for him. During this period Caesar was also having supervised biweekly visits with his father.

40. In September 2004, DCYF placed Caesar with his great-aunt, even though a son living in the home had a criminal drug record. Caesar was kept in the house for nine days, and DCYF removed him only after confirmation that that the great-aunt and her son were selling marijuana.

41. DCYF then placed Caesar in yet another foster home, where he spent about a month. Caesar was also forced to change daycare when he moved to this home. While in this foster home, Caesar's foster parent asked Caesar to sit by her. Caesar asked her whether she was going to beat him.

42. In October 2004, DCYF moved Caesar back to his aunt Laura, despite having previously removed him from her care and knowing that she was unsuitable and unable to care for him. When Caesar was told he was being sent back there, he told his caseworker that Laura and her children punched and hit him. Nonetheless, DCYF placed him in this home. While there throughout 2005, Caesar began to exhibit serious behavioral problems, which DCYF should have addressed and which should have alerted DCYF that Caesar was having trouble in the home. DCYF left Caesar in this home for eleven months.

43. In September 2005, this inappropriate placement predictably ran into trouble. Caesar had bruises and marks on his arms where he had clearly been hit with a belt, and Caesar reported that his penis hurt and that his cousin had touched him there. A physician confirmed that a belt caused the bruises and that excessive force had been used. The DCYF caseworker reported that a preponderance of the evidence confirmed the allegations against

Laura, but then declared the investigation to be unfounded. DCYF did not order an evaluation or counseling for Caesar's possible sexual abuse.

44. Caesar has lived in the unlicensed and inappropriate home of his paternal grandmother since September 2005. DCYF placed Caesar in his grandmother's home despite serious warning signs—in 2004 DCYF had found the home unacceptable for Caesar, because an aunt in the home had a criminal record and had been investigated by DCYF for substance abuse, and in June 2005, Caesar had reported that this grandmother had hit him and that the aunt who lived in the home had also hit him with a belt. Caesar's therapist recommended that this abuse report be investigated before Caesar was placed in the home, but DCYF ignored her recommendation and placed Caesar there anyway.

45. When DCYF placed Caesar in his grandmother's home in September 2005, nothing in the home had changed to make it acceptable. The aunt with the criminal record was still living there and Caesar was left in her care when his grandmother went on vacation in May 2006. In addition, DCYF knew that Caesar's father, Jason, who was only allowed to spend time with Caesar during supervised visits, had been living in the home.

46. In December 2005, DCYF staff reported that the grandmother was overwhelmed. The grandmother stated that DCYF had never given her any information about the rules and regulations governing foster parenting. New allegations against the home were investigated in December 2005.

47. Caesar's grandmother will not adopt Caesar, nor is she an appropriate adoptive resource. It does not appear that DCYF provided Caesar or his grandmother any services to support this troubled placement.

48. In April 2006, Caesar told a teacher at the YMCA that he had been sexually molested by a child at the Providence Center, a DCYF-licensed facility. However, it appears that this incident was never reported, in violation of law and DCYF's own policies. In addition, it appears that Caesar did not receive any counseling or other services regarding this incident until February 2007, ten months after he was molested.

49. Caesar was diagnosed with reactive attachment disorder in September 2006. As of May 2007, Caesar's psychiatrist noted that Caesar still needs stability and intensive individual therapy.

50. Caesar has been required to visit with his parents his entire life, despite their evident inability to care for him or keep him safe and their inappropriate behavior with him. While Caesar has been in DCYF custody, both parents have been arrested for assault and have engaged in extensive substance abuse. Both have frequently missed court dates and visits with Caesar, with Caesar left waiting for them. When they have shown up for visits, they have interacted only minimally with Caesar. When he was just two years old, Caesar was very verbal while driving to visits, but became very quiet when he saw either parent. By August 2004, Caesar had gone from "eager and excited" to having a sad expression and becoming very quiet at parental visits. After one visit in January 2005, Caesar stated, "they didn't hug me." As recently as April 2007, Rhonda was still missing scheduled visits with Caesar.

51. DCYF first filed a petition to terminate Caesar's parents' rights in 2005. But, despite Caesar's having been in DCYF custody for his entire life, and despite his parents' clear inability to parent him, their untreated substance abuse, and their failure to comply with their DCYF case plans, Caesar was only legally freed for adoption this month, in June 2007.

52. Currently, Caesar is described as loving, funny, and engaging, while extremely hyperactive and very distrustful of adults. Although freed for adoption now, there is no indication that DCYF has made any efforts to find a permanent home for Caesar.

53. As a direct result of Defendants' actions and inactions, Caesar has been and continues to be irreparably harmed. Only five years old, Caesar has been placed in dangerous, inappropriate, and unlicensed homes, where he has been subjected to abuse that DCYF could have prevented. For the last two years, DCYF has left him in a home that will not become a permanent adoptive home for him, and DCYF has made no effort to move him to a more permanent home. He has been continually traumatized by visits with his parents, who treat him inappropriately. His prospects of adoption should be excellent, yet he languishes in foster care limbo. DCYF's failure to provide a permanent home for Caesar causes him harm.

54. Defendants have violated Caesar's constitutional and statutory rights by failing to protect him from harm while in state custody; by knowingly placing him in inappropriate living arrangements; by failing to provide him with mental health services necessary to prevent his mental health from deteriorating while in DCYF custody; by failing to provide him with appropriate, least-restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services, all of which are required by law and reasonable professional judgment.

55. Named Plaintiff CAESAR S. appears through his Next Friend Kathleen J. Collins. Ms. Collins has a Master of Science degree in School Psychology and a Bachelor of Arts degree in Psychology from the University of Rhode Island. For the past 17 years, Ms. Collins has worked for the Providence School Department as a school psychologist. Ms. Collins currently serves as the school psychologist for two elementary schools in Providence. She has

known Caesar S. since he entered one of the schools in September 2006. Ms. Collins resides in Foster, Rhode Island.

**DAVID T.**

56. DAVID T. is a 13-year-old boy who has been in DCYF's custody for 11 years. DCYF has cycled him through more than 14 placements, all but two of them shelters or other institutions. When David was four years old, a potential adoptive placement fell through, and David experienced loss and trauma that should have been treated. Instead, DCYF moved David to a shelter. David has not lived in a home since, and his lifetime of living in institutions, compounded with the stress of his disrupted adoptive placement, has caused his mental health to steadily deteriorate. David entered care when he was only two years old, and finding him a permanent, loving family was completely feasible. Yet DCYF has denied him the appropriate decision-making, services, and planning necessary to find him a permanent home. DCYF has done nothing to prepare David to live in a real home, and for the last decade it has not taken any of the necessary steps toward finding David a family with whom to live.

57. DCYF removed David from his mother in 1996 due to neglect. DCYF had previously taken his older brother into custody on grounds of neglect and possible sexual abuse by his mother. By the time David entered foster care, his mother had already been deemed unfit to care for at least one of David's siblings and had lost her parental rights. Despite clear indications that David had been sexually abused while in his mother's care, DCYF failed to ensure that he received a sexual abuse evaluation or appropriate treatment upon his entry into foster care or thereafter.

58. DCYF first placed David with a foster mother with whom he lived for two years and to whom he became attached. This was the first—and last—loving, lasting, stable

home David would experience for the next 11 years. At the age of four, David was removed from the foster mother he referred to as "Mommy Mary" because she was unable to continue to care for him. Despite its obligation to place David in a family-like environment, DCYF moved the young child to a shelter. DCYF next moved David, not to a foster home, but to another shelter. By this time, David's mother's parental rights had been terminated, leaving him free for adoption. David spent a total of three months in shelters while DCYF tried to locate an adoptive home.

59. DCYF next sent David to an aunt in Michigan who expressed interest in adopting him. The aunt willingly cared for David, but encountered housing problems and other difficulties. Instead of supporting the aunt so that she could keep David, DCYF brought him back to Rhode Island and put him in a shelter where he had previously stayed. When he arrived there, he refused to get out of the car and pleaded with the caseworker to bring him back to "Mommy Mary." Shelter staff approached the car and told four-year-old David, "the rules here have not changed." David silently got out of the car and walked into the shelter. This was at least the fifth placement David experienced before his fifth birthday.

60. David's behavior deteriorated while living at the shelter. Although his school indicated that David needed services to address his increasingly disruptive behavior, DCYF failed to provide them. At times DCYF failed to fulfill its responsibility to transport David to school, leaving him to spend entire days in the shelter with nothing to do. David's behavior grew worse, and after several months the shelter asked DCYF to move him. DCYF then sent David to yet another institution, where he was injured because he did not receive proper supervision. David was severely scalded there when, at the age of five, he tried to heat water in a microwave oven.

61. When another of David's aunts expressed interest in caring for David, DCYF failed to pursue this opportunity. By 2000, four years after assuming custody of David, DCYF still had no viable plan for finding a permanent home for him. DCYF was aware that David's emotional state was steadily declining, but it failed to provide the therapeutic services he needed. When the facility where David was residing informed DCYF that it could not meet his needs, DCYF nevertheless left David in that institution for several months, aware that his mental health needs were only worsening.

62. DCYF placed David in a psychiatric hospital when he was six years old. Although he was scheduled to be released from the hospital within a month, DCYF left David in this highly restrictive placement for five months, until July 2001, simply because it had no other placement option for him. DCYF finally moved David to St. Vincent's Home, a residential treatment facility where he lived for the next two years until he was eight years old. While at St. Vincent's, David was sexually abused by a roommate, began to act out sexually, and started to wet his bed almost nightly. David's mental health deteriorated to such an extent that in 2003 DCYF moved him to yet another institution where he required one-on-one supervision. Although DCYF's case plan for David indicated that he would spend only three to six months at this institution, after which he would need to live with a family, David remained at the institution for three years, and he has yet to be placed with a family.

63. Over a four-month period in 2003, David was restrained 105 times by facility staff. That year, DCYF decided that, at the age of 10, after eight years in DCYF custody, David had become "too damaged for placement." DCYF finally permitted adoption recruitment staff to meet David in 2004, eight years after it registered him for adoption. However, later that

year it was decided that adoption would be inappropriate for David and suspended efforts to find an adoptive home for him.

64. In 2006, DCYF moved David to a residential treatment facility out of state. Although David was only 12 years old, he was placed with an 18-year-old roommate. While at this facility, David engaged in sexual self-mutilation. When facility staff asked DCYF if sexual abuse was an issue for David, DCYF erroneously reported that there was no history of sexualized behavior and no known sexual abuse. Between 2005 and 2006, David gained over 50 pounds.

65. Despite DCYF's obligation to ensure the safety and well-being of Plaintiff Children through frequent caseworker visits, five different DCYF case workers met with David a total of only 12 times from 2001 to 2005, including only one visit per year in 2004 and 2005. David has had no adult continuously involved in his life. Because DCYF has moved David so many times, his education has been fragmented and disrupted. David attended three different kindergartens and was moved to new schools four more times between the first and seventh grades.

66. Today, David lives in an institution in Massachusetts, where DCYF sent him in May 2007. Health care professionals have documented that his acute service needs result in part from his history of multiple placements. David is now diagnosed with bipolar disorder, mild mental retardation, and "environmental/situational influences, including his history of neglect and his multiple placements." DCYF has taken few, if any, steps to prepare David for life outside an institution. David has an older brother who has also come forward to care for him, but DCYF has not taken the necessary steps to determine whether the brother would be a suitable permanent caretaker.

67. As a direct result of Defendants' actions and inactions, David has been and continues to be irreparably harmed. Having entered foster care at the age of two, he is still languishing in care 11 years later. DCYF's failure to provide David with permanency causes him harm. David now has serious psychological problems that DCYF has exacerbated by moving him from placement to placement and by failing to provide mental health services to treat his problems as they emerged when he was a young boy. DCYF has also caused David harm by not providing his mental health professionals with his full history, depriving them of information necessary for his proper treatment.

68. Defendants have violated David's constitutional and statutory rights by failing to protect him from harm while in state custody; by failing to provide him with mental health services necessary to prevent his mental health from deteriorating while in DCYF custody; by failing to provide him with appropriate, least-restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services, all of which are required by law and reasonable professional judgment.

69. Named Plaintiff DAVID T. appears through his Next Friend, Mary Melvin. Ms. Melvin currently works as a Senior Companion in the Senior Companion Program at the Department of Elderly Affairs in Cranston, Rhode Island. Previously, Ms. Melvin worked for many years at a nursing home for the elderly and handicapped in Providence, Rhode Island. Ms. Melvin served as a foster parent for at least 25 children in Rhode Island's foster care system over a 20-year period. In 1993 and 1997, she received the Rhode Island Foster Parent of the Year Award. Ms. Melvin was a foster parent to David T. from 1996 to 1998, and she continued to be a resource for him after he left her care. Ms. Melvin resides in North Providence, Rhode Island.

**BRIANA, ALEXIS, CLARE, and DEANNA H.**

70. BRIANA (six), ALEXIS (five), CLARE (one), and DEANNA (eight months), are sisters in DCYF custody. DCYF has pursued the goal of reunification for each of these children without considering alternative goals, notwithstanding their parents' significant history of maltreating children and despite clear evidence that the children cannot be safely returned to their parents' care. Throughout the years these young girls have been in foster care, only Deanna has lived with a family that has any prospect of becoming permanent. Briana, Alexis, and Clare all currently reside in the unlicensed home of their aunt, who has not expressed interest in adopting them. According to DCYF records, the girls' half brother, who lives with them in their aunt's home, poses a risk to their safety.

71. DCYF placed Briana and Alexis in foster care in September 2003 because their mother, Ms. H., had been incarcerated on drug charges and their father, Mr. H., could not be located. At the time, DCYF was familiar with Mr. H.'s and Ms. H.'s long history of child neglect, which had previously resulted in the termination of Ms. H.'s parental rights to five of her older children, and the termination of Mr. H.'s rights to three children. Despite this history, DCYF assigned Briana and Alexis a permanency goal of reunification with their parents without establishing a plan of services and treatment that would make reunification a viable option. Upon Ms. H.'s release from prison in October 2003, DCYF referred both parents to parenting classes and to mental health and substance abuse evaluations.

72. DCYF first placed Briana and Alexis in the home of their Aunt G. Seven months later, in March 2004, Ms. H. was again incarcerated, this time for theft, larceny, and possibly cocaine possession. DCYF did not change the girls' permanency goals or the service

plan for Ms. H. following this change in circumstances. The girls were sporadically taken to visit their mother in prison.

73. In June 2004, DCYF returned Briana and Alexis to the care of their father without first determining whether he could provide a safe and appropriate home for the girls or even whether he had complied with the service plan that DCYF had established. In September 2004, Ms. H. was released from prison and moved back home with Mr. H. and the two girls, despite DCYF's failure to evaluate whether the girls could be safely reunified with their mother or whether Ms. H. had met any of the obligations DCYF had set for her. Within two months of Ms. H.'s return, she was discharged from a substance abuse program for noncompliance. Within seven months, in February 2005, she was again incarcerated for larceny. In April 2005, DCYF closed the family's case completely, without putting any plan in place to ensure the children's safety upon Ms. H.'s eventual release from prison and without setting any conditions on her reunification with the family.

74. In June 2005, DCYF again took custody of Briana and Alexis, then five and four, after Mr. H. smoked crack cocaine in their presence. The girls also disclosed that an adult male who had been living in the home had sexually touched them. DCYF placed Briana and Alexis with a maternal aunt, Aunt J. There is no indication that DCYF had the girls examined for possible sexual abuse or took any other measures to address the children's revelation.

75. In July 2005, Ms. H., who had recently been released from prison, gave birth to her eighth child, Clare. Sometime before this date, DCYF had discontinued the visits it had allowed Ms. H. to have with Briana and Alexis. DCYF took immediate custody of Clare and placed her in the home of Aunt G., another maternal aunt who had previously adopted three of

Ms. H.'s older children. DCYF never licensed Aunt G. as a foster parent, nor did it conduct a safety assessment, although there were clear indications that DCYF knew of safety risks in the home. Upon placing Clare in the home, DCYF instructed Aunt G. that she could never allow her oldest adopted son to be alone with the infant.

76. DCYF arranged regular supervised visits between Briana and Alexis and their parents. The parents missed many of these visits, and during one visit Mr. H. was observed holding Alexis upside down by her leg. Following scheduled visits that the parents missed, the girls were angry and their behavior was troubled. Yet DCYF continued to pursue reunification for the family.

77. Upon the request of Ms. H., in November 2005, DCYF moved Briana and Alexis out of Aunt J.'s home, where they had been thriving for two years, and into to the home of their Aunt G., where Clare was living. At the time DCYF placed the girls in the home, Aunt G. was still not a licensed foster parent. DCYF again told Aunt G. not to permit her eldest adopted son to be alone with the girls. There is no indication that DCYF provided any support to Aunt G. such that she could ensure, with six children to care for, that none of the three girls were ever alone with her son; nor is there any indication that DCYF pursued any other, possibly permanent, home for the girls. DCYF continued to permit the girls' parents to visit, under Aunt G.'s supervision. Aunt G. has made it clear to DCYF that she has no intention of adopting Briana, Alexis, or Clare.

78. Throughout 2006, Ms. H. and Mr. H. only sporadically visited their daughters, and failed to appear at important hearings involving their children. DCYF nonetheless pursued a plan of reunification for all of the girls. In October 2006, Ms. H. gave birth to her ninth child, Deanna. Ms. H. had still not undergone substance abuse treatment, so

DCYF took immediate custody of the infant and placed her in a foster home. DCYF assigned Deanna the same permanency goal assigned to her sisters: reunification with her parents.

79. In February 2007, more than three years after Briana and Alexis first entered foster care, their father's parental rights were terminated as to them and their sister Clare. Although DCYF filed a petition to terminate Ms. H.'s parental rights at the same time, it never pursued approval of the petition. Instead, over the next months the agency continually asked Ms. H. to consent to the termination, all the while allowing her to visit her daughters. In March 2007, both Ms. H. and Mr. H. were arrested yet again. Upon Ms. H.'s release shortly thereafter, DCYF resumed her visits with her daughters and is awaiting her consent to termination rather than actively pursuing the petition to terminate her rights involuntarily. It was not until May 2007 that DCYF finally referred two of her daughters for adoption. DCYF continues to maintain a permanency goal of reunification for Deanna, despite the lack any evidence that her parents have addressed any of the issues that led to the loss of all of their previous children.

80. As a result of Defendants' actions and inactions, Briana, Alexis, Clare, and Deanna have been and continue to be harmed. DCYF maintained a manifestly inappropriate permanency plan of reunification for Briana, Alexis, and Clare for years. During this time Briana and Alexis were returned to a clearly unsuitable home environment, in which they suffered further neglect and possible sexual abuse. DCYF has left Briana, Alexis, and Clare to languish without appropriate permanency services in an unlicensed and overcrowded foster home which DCYF knows will not be permanent and in which their safety is in constant jeopardy. DCYF's steadfast pursuit of reunification, along with the temporary nature of the girls' placements, has caused and continues to cause them psychological harm. DCYF remains committed to a reunification plan for Deanna, even though the infant has never lived with her

parents and there is little reason to believe that the goal can be achieved. The real effect of DCYF's plan for Deanna is to deny her the opportunity for a permanent home.

81. Defendants have violated, and continue to violate, Briana, Alexis, Clare, and Deanna's constitutional and statutory rights by failing to protect them from harm while in care and by failing to develop and implement an appropriate permanency plan in a timely manner to allow them to secure a permanent home, all of which are required by law and reasonable professional judgment.

82. Named Plaintiffs BRIANA, ALEXIS, CLARE, and DEANNA H. appear through their Next Friend, Gregory C. Elliott. Professor Elliott is Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliott is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and he is currently writing a book on how adolescents come to believe that their lives matter to others.

**DANNY and MICHAEL B.**

83. DANNY and MICHAEL B. are brothers, ages six and five, respectively. They have been in DCYF custody for over three years, but have been known to DCYF for most of their young lives because of their mother's chronic neglect of them. In the years that they have been in custody, they have resided in what DCYF knows can only be temporary and inappropriate placements, in one of which Danny was seriously abused. Throughout their time in care, DCYF has failed to provide timely psychological services to address Danny and Michael's mental health problems, which are becoming more acute as these young boys remain without a permanent home.

84. Danny and Michael were first reported to DCYF as being neglected by their mother in January 2004. DCYF investigated the report and decided to take no action. The boys again came to the attention of DCYF four months later when, at ages three and two, they were found wandering unsupervised outside their home at 6 a.m. When the children were returned to their home, their mother, who has an extensive arrest record, was found unconscious from alcohol abuse. DCYF left the children in the home, but required the mother to agree to certain services.

85. In January 2005, the boys were again reported wandering unsupervised outside the home. DCYF investigated the report, but again decided to take no action. The next month, DCYF visited the home and found it to be unfit for human habitation, with human feces all over the bedroom and nowhere for the children to sleep; the mother was again intoxicated. DCYF left Danny and Michael in this wretched home. In March 2005, DCYF received a report that Danny and Michael were again wandering the streets. Despite these repeated reports, DCYF did not remove Danny and Michael from this harmful environment until April 2005. When DCYF did remove Danny and Michael from their mother's home, it assigned them the goal of reunification.

86. DCYF first placed the brothers in the unlicensed home of their maternal great-grandmother, without first conducting a safety and background check. The great-grandmother told DCYF that she could only care for Danny and Michael temporarily and the brothers had to be moved within the week because of the great-grandmother's poor health. Instead of locating another home where the brothers could be together, DCYF separated Danny and Michael and placed them in separate foster homes.

87. In July 2005, DCYF placed Danny in the home of a foster mother with a DCYF history of abuse complaints dating back to 1999. These reports included allegations that she had left children she was fostering with an unapproved caretaker for over a week, during which time the children were beaten with a wire hanger and other objects. This is the home in which Danny was later sexually assaulted.

88. DCYF returned Michael to his maternal great-grandmother, who DCYF had by then licensed, even though she told DCYF that she could not take either of the children for the long term and that she did not want Danny to live with her. For months, DCYF failed to provide the great-grandmother with Michael's medical card, without which she could not obtain services for him.

89. During 2005, both Danny and Michael suffered mental health problems which DCYF failed to timely address. Although DCYF knew that Danny was in need of specialized services, it did not provide them to him until the end of August 2005. At that time, the children's great-grandmother alerted DCYF to Michael's need for mental health services as well, but DCYF did not provide mental health services to Michael until the end of the year. By the end of 2005, DCYF had evidence that Danny needed a sexual abuse evaluation.

90. Throughout 2005, Danny and Michael's mother made no progress towards addressing the problems that has led to the boys' removal. By May 2005, she was not complying with drug treatment, had tested positive for drugs, and was missing visits with her sons, causing Danny significant distress. By June, she had been arrested twice for drug possession and had stabbed herself in the chest in a suicide attempt. By August, she was homeless. At none of these junctures did DCYF change the boys' permanency goal from reunification to another, more viable and appropriate goal. In December 2005, DCYF was directed to free Danny and Michael

for adoption by terminating their mother's parental rights if no progress was being made toward reunification by March 2006. Although no progress was made, DCYF failed to file termination petitions until July 2006.

91. In July 2006 five-year-old Danny was sexually assaulted in the home of the foster mother whose prior dangerous history was known to DCYF. The foster mother's 15-year-old grandson, who lived in the home, was seen emerging from the bathroom of the house, his penis erect, when he grabbed Danny, pulled him into a bedroom, and locked the door. Danny screamed, "Don't touch me!" When the grandson opened the door, Danny's pants were down. Danny was immediately removed from this foster home, and the foster home was closed the same day. Danny told investigators that the grandson had sexually exposed himself on approximately four prior occasions. During a previous intervention in the home, DCYF had instructed the foster mother to ensure that the grandson sleep in a bedroom separate from another child.

92. After this episode of sexual abuse, DCYF placed Danny in yet another temporary foster home. In August 2006, DCYF reunited him with his brother in the home of his maternal great-grandmother, who was unable to offer the boys a permanent home. Upon being placed together, both boys began to exhibit sexualized behaviors. Within a month, DCYF removed Danny from his great-grandmother's home because of these issues. DCYF sent Danny to a group home in Middletown, where he remains to this day.

93. Excluding respite placements, Danny has been in at least six placements while in DCYF custody and Michael has been in at least four, including DCYF's original placement of the brothers with their mother for in-home services. Despite the fact that they are

only six and five years old and have been in care since 2004, the brothers remain separated with no prospect of adoption.

94. As a result of Defendants' actions and inactions, Danny and Michael have been and continue to be irreparably harmed. Danny has been sexually abused in an unfit foster home and now, at the age of six, has been institutionalized to address his acute mental health problems. Michael has been left to languish with an elderly relative who has made it clear that she cannot permanently care for him. Because DCYF has not provided proper permanency planning, neither of these very young boys has any current prospect of growing up in a loving and permanent home. The lack of any prospect of growing up in a safe and stable home is psychologically harmful. Both Danny and Michael have experienced mental health problems which DCYF has failed to adequately address.

95. Defendants have violated, and continue to violate, Danny and Michael's constitutional and statutory rights by failing to protect them from harm while in care; by failing to develop and implement an appropriate permanency plan in a timely manner to allow them to secure a permanent home; and by failing to timely address their mental health needs, all of which are required by law and reasonable professional judgment.

96. Named Plaintiffs DANNY and MICHAEL B. appear through their Next Friend, Gregory C. Elliott. Professor Elliott is Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliott is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and he is currently writing a book on how adolescents come to believe that their lives matter to others.

**B. The Defendants**

97. Defendant DONALD L. CARCIERI is the Governor of Rhode Island and is sued in his official capacity. Pursuant to Article IX, Section 1 of the Constitution of Rhode Island of 1986, the executive power of the state is vested in the Governor. Pursuant to Article IX, Section 2 of the Constitution of Rhode Island of 1986, the Governor is responsible for ensuring that all executive departments and agencies within the state, including DCYF, faithfully execute and comply with applicable federal and state law. Governor Carcieri maintains his principal office at the Office of the Governor, State House, Room 115, Providence, Rhode Island, 02903.

98. Defendant JANE A. HAYWARD is the Secretary of the Executive Office of Health and Human Services in Rhode Island and is sued in her official capacity. The Executive Office of Health and Human Services provides common strategic planning, fiscal management, and related policy and programmatic oversight to and across designated human services departments within the Rhode Island executive branch, including DCYF. Secretary Hayward maintains her principal office at the Pastore Complex, Hazard Building, 74 West Road, Cranston, Rhode Island, 02920.

99. Defendant PATRICIA MARTINEZ is the Director of the Department of Children, Youth and Families and is sued in her official capacity. Pursuant to section 42-72-1 of the Rhode Island General Laws, Director Martinez is responsible for administering certain child welfare services and programs, including services and programs provided and administered by DCYF, and assuring that all such services and programs operate in conformity with constitutional, statutory, and regulatory requirements. Director Martinez serves by appointment

of the Governor. Director Martinez maintains her principal office at the Department of Children, Youth and Families, 101 Friendship Street, Providence, Rhode Island, 02903.

**V. The Rhode Island Child Welfare System**

100. The Department of Children, Youth and Families is responsible for ensuring the safety and well-being of the children it takes into custody in response to allegations of abuse or neglect. Its Director, Defendant Martinez, is responsible for administering and managing all child welfare staff and services statewide and for reporting to the Governor, Defendant Carcieri.

101. DCYF has the duty to deliver child protective services, which include the investigation and assessment of reports of abuse and neglect occurring in family homes and in foster care placements, and the implementation of timely, appropriate corrective steps, including a child's removal from home or a foster care placement if warranted to keep the child safe when abuse or neglect of the child may have occurred.

102. DCYF also has the duty to ensure that children in state foster care custody are safe and to provide state-supervised services that meet the basic needs of children in its foster care custody. Such services include placing children in screened, licensed foster homes or other appropriate placements and providing children counseling to help them deal with the trauma that caused them to be removed from their homes and with the further trauma associated with being separated from their families. Foster care services also include the development and implementation of appropriate permanency plans designed to return children home quickly and safely, or, if that is not possible, timely providing children another permanent home, usually through adoption. In addition, as the legal custodian for children in state foster care custody,

DCYF is responsible for ensuring that all children in foster care receive medical, dental, and mental health treatment; education; and assistance with developmental needs.

103. DCYF operates four regional offices responsible for case management and planning and for ensuring the delivery of necessary services to children and families; a statewide Adoptions Unit responsible for adoption-related functions such as recruiting adoptive parents, matching children with adoptive families, and coordinating with private agencies that contract with DCYF to provide specialized and targeted adoption planning and support; and a statewide Licensing Unit responsible for licensing and monitoring foster homes, adoptive homes, and group homes, including relative and child-specific placements. Licenses must be reviewed every six months and must be renewed annually to remain valid.

104. DCYF contracts with private child-placing agencies in Rhode Island for the provision of many foster care services, including the operation of shelters, group homes, residential treatment centers, and therapeutic foster homes. DCYF remains legally responsible for every Plaintiff Child who receives foster care services from a child-placing agencies.

105. The Licensing Unit is also responsible for licensing child-placing agencies, promulgating the rules governing them and the standards that they must meet in furnishing contracted services, and monitoring their compliance with all applicable rules and standards. The Licensing Unit is also responsible for investigating regulatory violations and enforcing child-placing agencies' compliance with DCYF regulations and policies.

## VI. Defendants Have Long Known That Rhode Island's Child Welfare System Cannot Fulfill Its Duties to Plaintiff Children Without Urgent, Systemic Reform

### A. The 2003 System of Care Task Force Report Concluded that the Child Welfare System Was Harming Children and That Systemic Reform Was Necessary

106. In 2001, the State of Rhode Island created a System of Care Task Force ("Task Force") to study existing child welfare services in the state and "to design a full system of services that will provide effective supports and services to children and their families." The Task Force's January 2003 report confirmed that the state's foster care system was "disorganized and fragmented" and identified widespread systemic failings and inadequacies in the system. The report concluded that abused and neglected children in state custody were being harmed as a direct result of these failings.

107. The Task Force report documented that DCYF unlawfully allowed children to languish in foster care for years: "[N]early 3 in 10 children spend more than 3 years in care and nearly 1 in 8 spends 6 or more years in care. This data contradicts the mandate that 'foster care' should be used as a temporary solution to perilous problems with families. Federal and state law prescribe shorter time periods in which to achieve permanency for children."

108. The report found that DCYF failed to maintain an appropriate array of suitable placements for children in foster care: "Additional foster home resources, particularly for those 'hard to place' groups, are necessary in order to meet the needs of children entering placement." Instead of "actually choosing a home on the basis of suitability" for the individual child, placements were dictated by whatever bed happened to be available at the time. The inadequacy of the placement array was due, in part, to inadequate reimbursement rates for foster parents and service providers and to the common perception of DCYF "as bureaucratic, unwieldy, insensitive and lacking in a child centered staff who can respond to foster families'

need for service in a timely fashion. Personal styles of both administration and line staff have been described over a range from 'caring to cruel.'" This perception, along with the low reimbursement rates, was driving needed resources out of the system: "Over approximately a five year period, an alarming decline in the total number of licensed foster homes has been evident."

109. The Task Force report found major deficiencies in the system's delivery of essential services to children in foster care and their families, problems it attributed, in part, to low reimbursement rates for service providers: "The State lacks sufficient out-patient services for children and families. This has been attributed to minimal supply, despite the demand, reflecting inadequate reimbursement rates." " Psychiatric care for [DCYF-involved] children and youth in Rhode Island … has been primarily driven by our system of reimbursement for care, rather than the individual needs and best interest of the patient." DCYF's failure to coordinate services for children in the foster system also hindered timely access to psychiatric services.

110. The Task Force also identified significant unmet workforce needs that directly resulted in harm to children: "Training for line staff is needed on gathering and communicating the types of child specific information that is critical for matching purposes. . . . Numerous foster placements are disrupted and resources lost due to poor communication." Other personnel problems identified in the report included insufficient supervisory resources: "Due to the high volume of licenses that are processed on a daily basis and the number of social caseworkers that must be supervised, the need for additional support for the supervisor remains a necessity."

111. The Task Force concluded that children in state foster care custody were suffering physical and mental harm and trauma as a direct result of the child welfare system's

failings and deficiencies. Increasing numbers of children in foster care were being admitted to psychiatric hospitals in Rhode Island because of limited alternative treatment opportunities. Those children and youth suffered from a wide spectrum of mental illnesses, including adjustment disorder, major depression, post-traumatic stress disorder, and bipolar disorder. The Task Force found that children and their families had to endure excessive waits for necessary care because the system lacked outpatient mental health services and because mental health services were fragmented and lacked coordination. Similarly, the Task Force found that youth who had been discharged from in-patient treatment had to be readmitted because the system did not provide sufficient treatment alternatives to psychiatric hospitalization for youth with mental illness. This issue disproportionately affected adolescents in foster care.

112. The Task Force found that children were being harmed by being moved repeatedly among inappropriate DCYF placements. One manifestation of this harm was in education: "When children experience multiple and/or frequent moves from one placement to another, their academic progress is interrupted and gaps in their education develop. It is common among youth who spend a significant amount of time roaming around the placement system to be 2 or 3 years behind their peers in their education; many leave the system without a high school diploma."

113. The Task Force report made clear that Defendants' child welfare system was beset by systemic problems that were causing harm to children.

**B. The 2004 Federal Child Welfare Review Identified Widespread Problems in Rhode Island's Child Welfare System**

114. Because Rhode Island receives federal funding to operate its child welfare system, it is subject to periodic reviews, Child and Family Service Reviews ("CFSRs"), conducted by a division of the United States Department of Health and Human Services

("HHS"). These reviews are meant to assess whether states are in substantial conformity with certain federal child welfare requirements in the areas of child safety, permanency, and well-being, to determine what is actually happening to children and families receiving child welfare oversight and services, and to assist states to better help these children and families.

115. Rhode Island's CFSR was completed in 2004. In nearly every area reviewed, Rhode Island failed to meet federal standards, often by a wide margin. Rhode Island failed in the following areas: protecting children from abuse and neglect; safely maintaining children at home when possible and appropriate; providing permanency and stability in children's living situations; preserving continuity of family relationships and connections; enhancing families' capacity to provide for children's needs; ensuring that children receive services to meet their educational needs; and ensuring that children receive services to meet their physical and mental health needs. The CFSR found that, in 39 percent of cases, caseworkers failed to make monthly visits with children on their caseloads. These visits are essential to ensuring that children are safe. The CFSR further found that, in 66 percent of cases reviewed, caseworkers failed to make required visits with parents of Plaintiff Children, a key element in successful reunification of children and their parents. Finally, the CFSR found that children were not receiving adequate services to meet all of their physical and mental health needs 39.6 percent of the time.

116. Rhode Island also failed to meet federal requirements for five out of six "outcome measures" reviewed: repeat maltreatment; maltreatment while in foster care; re-entry into foster care; timely reunification; and multiple placements. For example, the CFSR reported that 1.09 percent of children in foster care were being reabused or neglected while in foster care, far above the then-national norm of 0.57 percent. The CFSR also found that 21.3 percent of

Rhode Island children who were discharged from foster care re-entered DCYF custody within 12 months, compared to the accepted national norm of 8.6 percent.

117. Rhode Island also failed to meet federal requirements for six of seven "systemic factors" reviewed: its case review system; its quality assurance system; its training; its service array; its responsiveness to the community; and its licensing, recruitment, and retention of foster and adoptive parents.

**C. The 2005 T.J. Wright Child Fatality Report Called for Systemic Reform**

118. After T.J. Wright was killed by foster parents chosen by DCYF, a Child Fatality Panel conducted a full investigation into the matter. The Child Fatality Panel issued its report in October 2005, concluding that the Rhode Island child welfare system had serious, systemic, and pervasive problems. Among them:

- Background checks and other due diligence necessary to assure basic safety before placing a child in a kinship home were not being performed;
- Children were being placed in homes that were not licensed by DCYF to care for foster children, either because the homes had never been licensed or because the license had expired;
- Foster care home license applications were pending for unacceptable periods of time;
- "The caseloads of the social workers" were "untenable" and "social workers [were] unable to visit the very children they pledge to protect;" and
- Supervisors were not providing adequate supervision to caseworkers.

119. The Child Fatality Panel's Report made 15 specific recommendations, including:

- The DCYF Director of Licensing or the Director of a Family Support Unit should be required to authorize the placement of a child in a kinship foster home since many children were being placed in relative care before licensure was completed;

- Social worker caseloads should be reduced to no more than 14 families per social caseworker;
- DCYF should implement an active supervision plan to remedy the failure of supervisors to actively supervise their caseworkers;
- The DCYF Licensing Unit should establish a firm six-month timetable for completing the licensure process on any family foster home; and
- Kinship placements should receive the background checks and other due diligence performed on third-party foster homes to assure basic safety before a child is placed in a kinship home.

### D. The Child Advocate's 2006 Report Found Little Progress Had Been Made

120. On October 31, 2006, the Rhode Island Child Advocate reported on DCYF's progress in implementing the recommendations of the Child Fatality Panel. The Child Advocate concluded that DCYF had not reduced social worker caseloads and had not implemented performance evaluations or other reasonable means of supervising social workers and assuring accountability. As a result of these shortcomings, children in foster care remained in peril.

### E. A 2006 Federal Regional Review Revealed Little to No Progress in Improving the Child Welfare System

121. After failing its Child and Family Service Review in 2004, Rhode Island was required to submit a Program Improvement Plan (PIP) to the federal government. The PIP, approved in August 2005, requires that DCYF make quarterly reports to the federal government on its progress in achieving the goals set out in its plan. The federal government also conducts regional reviews of such progress. In June 2006, DCYF submitted its "Annual Progress and Services Report" to HHS, revealing that its ability to keep children safe had *worsened* since 2004, with an increase in both the recurrence of maltreatment to children and the incidence of child abuse or neglect experienced by children in DCYF care.

122. Children's permanency and stability had also worsened, with increases in the percentage of children who experienced two or more placements during their first 12 months in care. DCYF also reported that, nearly two years after failing to meet the federal standards in 2004, DCYF was *less* effective at promoting reunification with parents, at securing guardianship or permanent placement with relatives for children, at supporting the relationship of child and parents, and at placing children in homes located near their siblings and parents. Caseworker visits with children had also decreased since 2004.

123. According to DCYF's sixth quarterly report on the status of its progress between November 18, 2006 and February 12, 2007, Rhode Island continues to fail to meet the national accepted norm for the incidence of child abuse and neglect in foster care.

### F. The Rhode Island Senate Has Recognized the Child Welfare System's Chronic Failings

124. On March 22, 2007, after a legislative investigation and hearing, the Rhode Island Senate passed Senate Resolution 07-R128, in which it articulated numerous concerns in a series of findings. For example, the combination of rising caseloads and staff turnover was "creating a downward cycle of effectiveness and morale" among DCYF social workers.

125. The Resolution noted that DCYF's problems were not new: "Numerous studies and recommendations have called on the department to institute a better coordinated and managed approach to the behavioral health needs of children." The Senate declared that "DCYF must develop outcome and quality measures to guide funding and program design for child welfare prevention and support services, including the use of performance-based contracting with providers of care."

126. Based on these and other findings, the Rhode Island Senate formally requested ongoing monthly reports from DCYF to address the Senate's concerns about caseloads, overtime hours and costs, and "[t]he Adoption and Foster Care Unit's performance and outcome measurements, including numbers of homes licensed, awaiting training, and awaiting licensure by type of home (therapeutic, foster, kinship, pre-adoptive)."

127. Referring to the outcome measures used in the federal review, the Senate also formally requested biannual reporting of "progress toward achieving standards for the specific measures. . . [for] safety, permanency and well-being." Finally, the Resolution requested biannual reports of "[t]he percentage of contracts issued by DCYF that report on specific family and child-focused outcomes, and include independent evaluations of the contracted-services effectiveness; and [s]ystem changes made to address the behavioral health needs of children in the most appropriate settings."

## VII. Current Systemic Child Welfare Failings and the Resulting Harm to Children

128. Defendants' have failed to take appropriate steps to reform Rhode Island's dysfunctional child welfare system, despite clear evidence that the system's failings have deepened, have hurt children, and are putting children at further risk of harm.

### A. Plaintiff Children Are Abused and Neglected in Foster Care

129. When DCYF takes a child into state foster care custody, it is responsible for the child's safety and well-being as long as the child remains in custody. DCYF has failed to develop and provide the range of services and systems necessary to ensure the safety and well-being of the children in its foster care custody. Plaintiff Children suffer harm as a direct consequence of this failure. There is no clearer example of this than the abuse or neglect of

children while in foster care, such as the abuse suffered by Named Plaintiffs Danny, Tony, and David.

130. In five of the six years from Federal Fiscal Year (FFY) 2000 through FFY 2005, Rhode Island recorded the single highest rate of substantiated child abuse or neglect occurring to children in foster care among all states that reported data. Not only has Rhode Island's rate of abuse or neglect of children in foster care remained at or near the worst in the nation, it has consistently far exceeded benchmarks set by the federal government. In FFY 2004, 1.32 percent of children in foster care in Rhode Island were abused or neglected, more than twice the federal benchmark of a maximum rate of abuse or neglect of 0.57 percent for children in foster care. The following year, FFY 2005, the incidence of abuse or neglect of children in foster care in Rhode Island rose to 1.59 percent, or 2.79 times the federal benchmark.

131. Things have only gotten worse recently. For example, DCYF Region III recorded a 2.01 percent rate of abuse or neglect in care in May 2006. At the same time as Rhode Island's rate of abuse in care has risen, the federal benchmark has been revised to reflect a lower acceptable rate of abuse in care nationwide; in June 2006, the federal government published a new benchmark of 0.32 percent or less. In February 2007 alone, DCYF reported eight substantiated instances of abuse or neglect in care by a foster parent or facility staff. If abuse and neglect continues at this pace, Rhode Island would have a rate of abuse or neglect in care of 3.1 percent for the year 2007, or almost ten times the new federal benchmark.

132. The rate of abuse or neglect of children in foster care in Rhode Island is so high that children in Defendants' care are actually more likely to suffer abuse or neglect than their peers in the general population. In 2005, the most recent year for which data are available,

the rate of abuse or neglect for children in the general population was 1.37 percent but the rate of abuse or neglect for children in foster care was 1.59 percent.

133. The high rates of abuse or neglect of children in DCYF care are the direct consequence of Defendants' actions or inactions. DCYF assigns such large caseloads to its social caseworkers that they are unable to make the regular face-to-face visits to Plaintiff Children that are essential to ensuring that these children are safe. DCYF has so few foster homes that it places children in homes without licenses, depriving them of basic protections of foster parent background checks and training. DCYF also allows licenses to lapse without taking any additional steps to ensure that Plaintiff Children in homes with lapsed licenses are safe. The shortage of foster homes forces DCYF workers to make poor decisions when faced with a choice of, for example, whether to place a child in an unlicensed, unsafe home, or in an inappropriate institution. DCYF fails to monitor or support foster parents who are managing difficult and stressful situations involving the children they parent. DCYF also fails to provide the treatment and services necessary to ensure that children's behavior does not deteriorate in foster care. Instead of appropriately investigating and addressing abuse or neglect in foster placements, DCYF continues to rely on foster care settings known to pose a risk of harm to children. The high incidence of abuse or neglect in foster care is the predictable consequence of such conduct by Defendants.

### B. Defendants Place Plaintiff Children in Homes and Institutions that Do Not Meet Their Needs and That Do Not Comply With Reasonable Professional Standards

#### 1. Defendants Have Failed to Develop and Maintain a Sufficient Array of Foster Care Placements

134. In the Statewide Assessment that DCYF submitted in 2003 as part of its federal review, it admitted that it was "not able to assure that children are placed in the types of

placements that are the most family like and most appropriate for their individual needs, both at the time of initial entry and throughout their stay, because of a serious lack of foster family homes, resulting in demand for and use of all other types of placements. One of Rhode Island's critical needs is for a sufficient number and type of foster homes so that the first placement in foster care is an appropriate match. We all too often place a child in a less than ideal placement at the time of entry, which later increases the likelihood that a subsequent placement will need to be made."

135. DCYF's chronic shortage of a sufficient number and variety of placements is due, in part, to its failure to recruit, license, train, and support prospective foster parents. Further, under DCYF's current system, potential foster parents may have to wait for more than a year to be licensed by DCYF. The inadequate payments DCYF makes to foster parents to provide for children's room and board are another contributing factor. DCYF also has trouble retaining foster parents, in part because foster parents can feel ill-treated by the agency.

136. Because DCYF does not have enough suitable foster care placements, it typically places Plaintiff Children in the next available bed, regardless of whether that placement meets children's needs and regardless of whether they will receive adequate care and supervision. DCYF places children in homes or institutions specifically known to be mismatched to their needs, and often the first placement DCYF makes for a child, even an infant, is in a shelter, where a child can then linger for months.

**2. Defendants Unnecessarily Place Children in Shelters and Institutions, Where They Stay for Too Long**

137. Under federal law and reasonable professional standards, children taken into foster care custody must be placed in the least restrictive and most family-like environment possible, taking into account the child's particular needs. Most children need to live with

families and not in institutions. Nevertheless, DCYF places an extraordinary number of Plaintiff Children in group homes, emergency shelters, and other institutions, even when such placements are not warranted by children's individual needs. In FY 2004, the last period for which data are available, Rhode Island placed 36 percent of children in its foster care custody in group or institutional settings—almost twice the national average of 19 percent. The situation today is even worse. In February 2007, DCYF placed 30 percent of the children newly removed from their homes in shelters, and DCYF placed another 45 percent in group or institutional settings. Many remain in these inappropriate placements for months or years.

138. Because DCYF typically places children in the next available bed, many children in state foster care custody end up spending time in emergency shelters. DCYF's reliance on shelter placements results in multiple short-term placements, even for young children who suffer the most from this instability. Although emergency shelters are designed to be temporary placements lasting no more than 90 days, DCYF frequency exceeds this maximum, leaving children in emergency shelters for extended periods of time that can last a year or more. For example, Named Plaintiff David spent three months in a shelter when he was just four years old. Shelters are rarely, if ever, appropriate placements for children. They are not safe, nurturing, or healthy environments. Furthermore, it is far more expensive to maintain children in shelters than to maintain them with foster families.

139. Absent circumstances where children require specialized care, institutions do not meet children's developmental and emotional needs and can cause them trauma. Institutions are particularly damaging to infants and young children, causing a variety of harms, including: delayed language development; poor mental development and adaptive skills; an

increased risk of serious infectious illness; less stability; lower rates of adoption; and a greater likelihood of remaining in care.

140. Yet DCYF routinely places large numbers of infants and young children in institutions. In FY 2004, the last period for which data are available, DCYF placed 18.9 percent of children in its custody below the age of 12 in group and institutional settings, more than twice the national median of 8.6 percent. Although even temporary placements in such settings are harmful to young children, it is not uncommon for young children in Rhode Island's foster care system to spend long stretches of time in group placements, such as Named Plaintiff David, who has been living in institutions for the past 9 years, since the age of four. One four-year-old girl who was put in a group home for a 90-day placement ultimately spent a year in that facility before she was transferred to a therapeutic placement.

141. Paradoxically, suitable institutional settings for those children who could benefit from congregate care are often unavailable when needed. For example, the Rhode Island Supreme Court has recognized "the chronic shortage of adequate juvenile residential 'step-down' alternatives to psychiatric hospitalization." *In re Stephanie B.*, 826 A.2d 985, 990 (R.I. 2003). As the Court noted, DCYF has admitted to keeping children, such as Named Plaintiff Sam, hospitalized in mental health institutions even when medically unnecessary because it lacked suitable residential placements. Unnecessary confinement to a psychiatric hospital is dangerous and harmful to anyone, particularly a child.

### 3. Defendants Send Children in Foster Care Far from Their Homes and Communities

142. Both reasonable professional standards and DCYF policy require that children in foster care whose permanency goal is reunification be placed near their homes. Removal from home and placement in foster care is inherently traumatic for children. Living in