one's neighborhood minimizes that trauma by helping children maintain ties with parents and siblings and by avoiding unnecessary separation from friends, school, and local supports.

143. Nevertheless, DCYF sends most children in foster care to live in placements that are distant from their homes, schools, and communities. As of June 12, 2007, fully 52.28 percent of children in foster care were living in placements outside their home region. Though some children are placed out of their home region so they can live with relatives elsewhere in the state, the prevalence of out-of-region placements is directly tied to DCYF's failure to recruit and retain a sufficient array of suitable placements throughout the state. One child, whose family is already having difficulty visiting him in a remote in-state placement, was moved to an out-of-state facility because there is no facility in Rhode Island that can provide the required services.

144. Additionally, DCYF assigns caseworkers to children based on the region in which the children lived prior to entering foster care, not based on the region in which they are placed. As a result, many caseworkers are responsible for children who are placed in remote areas of the state. The need for caseworkers to travel to other regions to perform in-home visits, combined with their already unmanageable caseloads, means that many caseworkers cannot make the in-home visits necessary to ensure that children are safe and that their needs are being met. This leaves children who are placed remotely at even greater risk of being abused, neglected, or languishing in care without having their needs met.

### 4. Because Children Are Placed in Inappropriate Homes and Institutions, Their Placements Frequently Disrupt, and Children Deteriorate as They Are Moved from Place to Place

145. Reasonable professional standards provide that children in foster care should not be moved from one foster home or facility to another unless moving is in their best

interests. Unnecessary moves increase the instability in the lives of children in foster care, often leading to attachment problems, defiance, and other mental health issues due to feelings of loss, rejection, and trauma. Research has shown that placement instability has a significant impact on children's behavioral well-being, in addition to the impact of the trauma caused by suffering abuse and neglect and being placed into foster care. For this reason, reasonable professional standards provide that agency staff, foster parents, and others involved in a child's care should "work actively to achieve stability of care with the foster family. . . . Proactive efforts should continually promote stability and avoid disruptions in foster care."

146. Children in Rhode Island foster care routinely experience multiple placements during their stays in state custody, largely because of inappropriate placements and Defendants' failure to deliver necessary services to support children in their placements. The 2004 federal review concluded that placement stability in Rhode Island was the area of "greatest concern." The CFSR found that during the review period, 31 percent of children whose cases were reviewed experienced multiple placement moves that were not in their best interests.

147. More recently, DCYF shuffles children from place to place, with even greater frequency. In FFY 2006, 14 percent of the 2,153 children who had been in out-of-home care for less than 12 months had already experienced three or more placements. Of those children who had been in care between 12 and 23 months, 33 percent had gone through three or more placements. And of those children who had been in care for more than 24 months, 67 percent had experienced three or more placements. According to DCYF, fully 24.2 percent of children in foster care experienced three or more placements during the 12 months leading up to March 31, 2006. Put another way, only 75.8 percent of foster children had two or fewer

placements within the previous 12 months, far short of the national benchmark of at least 86.7 percent.

148. Although these data do not specify how many placements children experience beyond three, children often suffer far more than three placements during their time in foster care. One child had 15 placements over the course of only two years, with six occurring in a single 16-day period. Caesar is only five years old and has already had eight placements. Tony and Sam have already been placed in ten or more placements in the eight years they have been in DCYF custody. There is a growing pool of two- and three-year-old children in foster care who are living in shelters and have already been through multiple placements, in some cases multiple adoptive placements, in their short lives.

149. The longer children remain in DCYF foster care, the more moves and disruptions they experience. These moves are directly due to Defendants' acts and omissions in failing to develop an adequate placement array, placing children in the first available bed rather than exercising reasonable professional judgment by basing placement decisions on the best interests of the children, and failing to assess children's needs and to deliver services to meet those needs.

150. Defendants' failure to provide placement stability to the children in their care causes harm to those children. Each new placement creates or exacerbates emotional trauma for children and results in behavioral, developmental, intellectual, and attachment problems. Moving children through multiple homes and institutions also often disrupts their education by forcing them to move to new schools. It frays the ties between children in foster care and their parents and siblings, friends, and community.

### 5. Defendants Separate Siblings in Foster Care Because They Have Failed to Develop an Adequate Placement Array

151. Both reasonable professional standards and DCYF policy emphasize the importance of keeping siblings together when they are taken into foster care, unless one or more of the children has a serious need that justifies separation. Separating siblings should be the exception, not the rule.

152. However, the 2004 federal review found that in 25 percent of cases, such as in the case of Named Plaintiffs Danny and Michael, DCYF had failed to place children in foster care with all of their siblings when separation was not warranted by the individual children's safety or treatment needs. In some cases, sibling separation was "due to the agency not making concerted efforts to ensure that sufficient placement resources are available to accommodate siblings." In other cases, "insufficient efforts were made to ensure that siblings remained together." One child who entered care at age two with his two brothers has been separated from them during the entire twelve years they have been in DCYF custody.

153. DCYF's practice of separating siblings who do not need to be separated results in needless harm to children. Sibling relationships are often the main source of stability in the life of a child in foster care and can be essential to minimizing the lasting ill effects of a child's time in state custody.

154. Defendants compound the harm of sibling separation by failing to ensure that siblings who are not placed together at least have regular and frequent visits with one another. The CFSR concluded that "DCYF does not make sufficient efforts to ensure that . . . visitation between children and their parents and siblings in foster care is of sufficient frequency . . . [or that] children's connections to their families are preserved."

### C. Defendants Fail in Their Duty to Meet Plaintiff Children's Service Needs

#### 1. Defendants Do Not Provide Plaintiff Children with Required Timely and Appropriate Assessments or Case Plans

155. When DCYF takes a child into foster care custody, it assumes a duty to provide services to meet the child's basic needs, including his or her educational, medical, dental, and mental health needs. DCYF's failure to provide services that meet the needs of Plaintiff Children results in very real harm to those children.

156. A critical first step in providing the services to meet an individual child's basic needs is for a caseworker, in consultation with the child's parents and other knowledgeable individuals, to prepare a case plan that identifies the child's needs and permanency goal and that specifies the services that will be provided in order to meet those needs and achieve that goal. Federal law and DCYF policy both require that a case plan be timely prepared and that it include a description of the service requirements that have been identified for the child.

157. Nevertheless, DCYF does not have a system in place to assure the timely preparation of appropriate case plans. As of June 12, 2007, over 36 percent of the children managed by a Region II caseworker had either an expired case plan or no case plan at all. The figures for children in Regions I, III, and IV were 24.59 percent, 23.77 percent, and 21.46 percent, respectively. And even when case plans are timely prepared or updated, key players are often excluded from the planning process. For example, the 2004 CFSR found that DCYF fails to involve children (where appropriate) and parents in the case planning process.

158. Instead of services being delivered to children in accordance with a properly formulated plan, children generally receive services, if at all, only in response to immediate crises. In a report issued on April 27, 2007, a DCYF Financial Review Team commissioned by Defendant Carcieri commented that services "appear to be extremely

reactive," with decisions about the provision of services "made on [the basis of] availability." "Often the exigencies of the day compel the practicum of 'placement equals treatment,'" the Financial Review Team reported. When service needs are identified, children are often put on waiting lists without regard to the urgency of their needs, because of Defendants' failure to develop an adequate service array for these children.

159. Because DCYF fails in its duty to identify the individual needs of children in state foster care custody and fails in its duty to provide services that meet those needs, children do not get their physical, dental, mental health, and educational needs met. Due to the basic nature of these needs, the damage to children is often irreversible.

**2. Defendants Violate Plaintiff Children's Rights to Timely and Safe Reunification with Their Families When Reunification Is Appropriate**

160. Reasonable professional standards require that child welfare agencies pursue reunification as the first and preferred permanency outcome for the children they place in foster care. Where safe reunification is a reasonable possibility, DCYF is required to develop and implement a case plan and a family services plan for each child and family in order to achieve family reintegration as soon as reasonably possible.

161. DCYF does not meet its obligation to facilitate appropriate and timely reunifications. The 2004 Child and Family Services Review found that only 66.2 percent of children who were reunified with their parents had achieved reunification within 12 months of initial removal, compared to the national norm of at least 76.2 percent.

162. The chronic failure of DCYF to achieve timely and appropriate reunifications is the direct result of a combination of known and preventable shortcomings. First, DCYF fails to exercise reasonable professional judgment in deciding whether it is appropriate and in the individual child's best interests to attempt reunification in the first place.

Second, DCYF fails to make timely and appropriate assessments of the services children and families will need in order for reunification to succeed. Third, basic reunification support services for parents, such as parenting classes and substance abuse counseling and treatment, are in short supply and often subject to long waiting lists. Fourth, even when reunification support services are provided, they typically begin only after the child has already been returned to the home; little or nothing is done to create the conditions for successful reunification in advance of the child's return home. Fifth, the services, even when provided, are inadequate to sufficiently support parents with the demands and stresses of parenting emotionally and behaviorally challenged children. And finally, high worker caseloads preclude the regular parent-child visits needed to support the reunification process, since visits must generally be arranged and supervised by a caseworker.

163. Reasonable social work practice and DCYF policy require that regular visits between parents and their children in foster care occur in order to successfully reunify the parent and child. DCYF requires parent-child visits to occur once every two weeks, unless specific exceptions relating to the safety and well-being of the child apply. However, as of June 12, 2007, in Region III, only 46.20 percent of children had seen their parent or parents within the preceding 30 days. In Regions I, II, and IV, the numbers were 24.69 percent, 39.66 percent, and 40.41 percent, respectively. These low rates of visitation are partly the consequence of DCYF's practice of routinely placing Plaintiff Children outside their home region. Out-of-region foster care placements make it extraordinarily difficult for many biological parents to visit regularly with their children and to sustain the connections on which successful reunification depends.

164. When parent-child visits do occur, they often take place without DCYF supervision, even where required. DCYF's failure to supervise parent-child visits when such

supervision is mandated poses unacceptable risks for the children that DCYF is duty-bound to protect.

165. DCYF also fails to determine what services are necessary to support safe reunification and then fails to provide those services. This sets families up for failure, subjects children to additional abuse or neglect by parents who are unprepared for reunification, and results in children being removed again and placed back in state foster care custody.

**3. Defendants Violate Plaintiff Children's Rights to Permanency by Pursuing Reunification with Parents When Not Appropriate**

166. As a matter of practice, DCYF usually does not consider alternatives to reunification for at least the first 15 months that a child spends in foster care custody, regardless of whether reunification is an appropriate goal for the individual child. Often DCYF maintains the goal of reunification for children for significantly longer periods of time. In one instance, a child who entered foster care less than a month after birth remained in foster care for almost three years because DCYF refused to seek a permanent adoptive home for the child, notwithstanding the clear unwillingness of the child's parents to take the child back. Another child's permanency goal remains reunification, even though she has lived in a foster home for 8 years and is now 10 years old.

167. One principal reason why children in Rhode Island remain in foster care for many years with the nominal goal of reunification is that Defendants allow parents to be noncompliant or minimally compliant with reunification case plans for years, even in the face of obvious evidence that parents will never complete their case plans and will never be able to handle the responsibilities of parenting. Defendants do not abandon the ostensible goal of reunification even in cases where the parents' rights to their multiple other children have already been terminated, such as in the case of Named Plaintiffs Briana, Alexis, Clare, and Deanna;

where the parents do not visit their children, such as in the case of Named Plaintiffs Danny and Michael; and where the parents have made no discernible effort to complete the requirements of their reunification plans, such as in the cases of Named Plaintiffs Caesar, Sam, and Tony.

168. DCYF frequently returns children home even when it is not in that child's best interest to do so, in part because of the scarcity of foster homes in the state.

169. Inappropriate reunification is unsafe and is likely to be unsuccessful, often leading to another removal of the child from his or her home. One girl was reunified with her abusive mother five times, each time suffering a new episode of physical abuse, followed by another removal.

170. Of the children who DCYF removed into foster care between April 1, 2005, and March 31, 2006, fully 15.2 percent had been in foster care within the 12 months prior to their removal. This 12-month re-entry rate—nearly twice the national standard of 8.6 percent set by the federal government—is concrete evidence of the systemic pattern of poor DCYF decision-making with regard to whether a family is ready and able to keep a child who will be reunified safe and well. DCYF returns children to their parents in cases where it is clearly inappropriate and dangerous to do so.

**4. Defendants Fail to Timely Place Children Who Cannot Return Home with Permanent Adoptive Families, Allowing Them Instead to Languish in Foster Care**

171. Reasonable professional standards emphasize that the primary purpose of foster care is to provide children with protection, care, and nurturing for a limited period of time only. By definition, foster care should be a temporary arrangement. Reasonable professional standards and federal law both require that when children in foster care cannot be safely reunited with their parents, they must be freed for adoption without delay and not left lingering in foster

care indefinitely. Federal law requires child welfare agencies to file a petition to terminate the parental rights of a child's parents, and to concurrently pursue the goal of adoption, if the child has been in state foster care custody for 15 of the most recent 22 months, unless certain exceptions are documented.

172. Indeed, Defendant Martinez told the Rhode Island Senate Committee on Health and Human Services on December 13, 2006, "It's a moral responsibility of us in the Department" to develop alternative permanency plans for children who cannot be reunified with their parents. Defendant Martinez conceded: "Children are staying in the system too long. . . . Many of these children don't go home."

173. For children to be adopted, prospective adoptive parents must be recruited, screened, trained, and licensed. DCYF's efforts in all these areas are deficient and ineffective. For example, DCYF placed a moratorium on trainings for prospective adoptive parents in 2007. Thus, even when DCYF recruits people interested in adopting children in its custody, its failure to follow through with training and licensing in a timely manner negates its success in recruitment.

174. Adoptions are also prevented or hindered by DCYF's failure to provide an adequate adoption subsidy for children with special needs, as required by Rhode Island law. Under federal law, adoption subsidies may not exceed the child's monthly foster care maintenance payment at the time of the adoptive placement. DCYF at times reduces the foster care maintenance payment for children living with families that are ready to adopt them, in order to reduce or eliminate the adoption subsidy after adoption is finalized. Often, the failure to provide an adoption subsidy makes the adoption unfeasible for the family and sets the child up for another failed placement and further instability.

175. Adoptions are also delayed because DCYF fails to finalize adoptions in a timely manner. It is common to wait many months just for the "home study" of an adoptive home to take place. One adoption was not finalized for three years, long after the child had been freed for adoption.

176. Further delays result from Defendants' failure to engage in concurrent planning, the process of searching for potential adoptive families while simultaneously working towards family reunification, as required by federal law and reasonable professional judgment. DCYF's continued pursuit of reunification for families even after it has become obviously inappropriate delays children from moving to permanent homes, and this delay is only exacerbated by DCYF's failure to plan for adoption concurrently.

177. Defendants have not effectively trained caseworkers to implement adoption policies. Even when DCYF caseworkers follow procedure and make sure that a child has been freed for adoption, they often fail to refer the child to the Adoption Unit, effectively putting the child in limbo until the case is rediscovered, often months later.

178. Because of all these systemic failings, children who cannot be safely reunited with their families commonly spend years in foster care without DCYF making any progress toward finding a safe and appropriate adoptive home for them. Eventually DCYF disclaims its responsibility to find permanent outcomes for them by declaring that they have been in care for too long to be "adoptable," such as with Named Plaintiff David. Rather than pursuing individualized adoption strategies for these children, DCYF leaves them to languish in foster care.

**5. Defendants Violate Plaintiff Children's Health Care Rights**

179. By taking Plaintiff Children into foster care custody, Defendants assume the duty to provide for their medical, dental, and mental health needs. Despite this clear duty, the 2004 CFSR concluded that "DCYF was not consistently effective in meeting children's physical and mental health needs." In nearly a quarter of applicable cases, DCYF had not made concerted efforts to address children's physical health needs. DCYF's failure to address children's mental health needs was even starker: "in 39 percent of the applicable cases, reviewers determined that DCYF had not made concerted efforts to address the mental health needs of children." The CFSR Final Report noted "particular concern" with respect to the mental health needs of children, finding that DCYF often "did not respond appropriately in situations in which presenting or underlying issues warranted a mental health assessment and/or mental health services."

180. As victims of abuse or neglect, children entering foster care often have experienced significant trauma, resulting in physical, emotional, or behavioral issues that require medical or mental health treatment. Thus, reasonable professional standards require initial health screenings for all children when they enter foster care. Those screenings should include assessments of mental health issues that are common among children in foster care, including depression, risk of suicide, severe behavioral problems, serious emotional disturbance, and substance abuse. Reasonable professional standards also require that each child have a service plan that includes treatment for any conditions diagnosed in these assessments and that access to such treatment is assured.

181. Although Defendants have made efforts to build a medical care infrastructure that will meet the needs of all Plaintiff Children, including the enrollment of

children in foster care in the state's managed-care program, RIte Care, insufficient coordination and integration among children's health services and family preservation programs, poor case planning, and poor worker visitation render these efforts ineffective for many children.

182. For example, the "Baseline Oral Health Indicators" report prepared for the Rhode Island State Action for Oral Health Access Project in April 2005 determined that, "of the approximately 889 children ages 3 and over who were living in licensed foster homes and who had RIte Care coverage in 2004, 714 (80.3 percent) were reported by their foster parents to have needed dental care" and "239 (33.5 percent) of these children had problems obtaining dental care." Rhode Island dentists commonly refuse the fee-for-service Medicaid and RIte Smiles dental coverage that DCYF provides to children in its foster care custody. Defendants' systematic failure to ensure that children in foster care have their dental needs met is the direct result of Defendants' actions and inactions in failing to develop an adequate array of dental service providers.

183. The need for mental health services for children in DCYF foster care custody is particularly great. "There has never been a time when more kids had mental health needs that need to be addressed," Associate Justice Michael B. Forte of the Rhode Island Family Court told the Rhode Island House Finance Committee on April 4, 2007, during hearings on the FY 2008 budget for DCYF. "Numerous studies and recommendations have called on the department [DCYF] to institute a better coordinated and managed approach to the behavioral health needs of children," the Rhode Island Senate declared in a March 22, 2007, resolution. This resolution came almost three years after the federal review that found that Rhode Island was not making concerted efforts to meet the mental health needs of children in foster care. That need continues to go unaddressed due to Defendants' actions and inactions in failing to develop

an adequate array of mental health providers who will treat children in foster care throughout Rhode Island.

184. The absence of an adequate mental and behavioral health delivery system for Rhode Island's foster care population was well-documented in the "Rhode Island Mental Health National Outcome Measures" for 2005, issued by the federal Center for Mental Health Services. That year, only 148 children residing in family foster homes and 125 children residing in institutions received state-supplied mental health services. These low figures, the most recent available, mean that DCYF regularly fails to meet the serious and pervasive mental health needs of the children in its foster care custody. For example, one 15-year-old Plaintiff Child who is slightly mentally retarded never received any mental health counseling after she was sexually molested by her stepfather. Two years later, she is now sexually reactive. Although she has not received any therapeutic treatment for these problems, DCYF plans to reunify her with her biological father and five brothers. Other children, such as Named Plaintiffs Caesar and David, deteriorate while in care because of DCYF's failure to provide adequate mental health services.

185. Foster parents report that DCYF is unresponsive to their efforts to obtain necessary mental and physical health care services for the children they foster, encountering such resistance and even hostility from DCYF that they have begun to fear retaliation if they do not limit their demands on behalf of the children they foster. The failure of DCYF to provide needed medical and mental health care for Plaintiff Children sometimes leads foster parents to go outside the system in an attempt to obtain those services on their own for the children they foster. When DCYF refused one foster parent's request for an evaluation of a Plaintiff Child with autistic tendencies, the foster parent had to obtain an independent evaluation of the child. That outside evaluation led to a diagnosis of Asperger Syndrome.

186. DCYF also fails to make sure that Plaintiff Children's medical records follow them from place to place and fails to inform foster parents about the mental health and other medical histories of the children they foster. As a result, caregivers are unable to help ensure that the needs of children in foster care are met. Failing to inform foster parents about mental health issues, particularly those due to a child's having been sexually abused or involving a child's propensity for violence, also puts children in foster care and members of foster families at risk.

### D. Defendants' Mismanagement of Rhode Island's Foster Care System Harms Plaintiff Children

#### 1. Defendants Assign Excessive Caseloads to Caseworkers, Making It Impossible for the Caseworkers to Ensure That Children Are Safe and Having Their Needs Met

187. No child welfare system can perform its basic functions without a well-trained, substantially experienced, adequately staffed, and appropriately evaluated workforce. When, as is the case in Rhode Island, caseworkers are inadequately trained, experienced, reviewed, or supervised, or when they are overburdened by unmanageable caseloads, a child welfare system predictably breaks down and children suffer reasonably foreseeable harms as a result.

188. Because of the vital role played by caseworkers, reasonable professional standards prescribe caseloads of between 12 and 15 children per worker for foster care services and between 10 and 12 children per worker for adoption services. Reasonable professional standards also prescribe supervisory ratios of one supervisor for every five caseworkers.

189. In disregard of these reasonable professional standards, DCYF policy sets the target caseload cap at 14 families (each of which may have more than one child) per worker for foster care services, with an absolute maximum of 28 children—nearly twice the professional

standard. In practice, however, DCYF caseworkers consistently carry caseloads well in excess of 14 families or 28 children. Currently, individual caseloads for foster care workers greatly vary in size, with many exceeding 30 children and some even exceeding 40 children.

190. Caseworkers carry such unmanageable caseloads simply because Defendants do not employ enough caseworkers to adequately serve all the children that DCYF takes into foster care custody. This has been clear for years. In its 2003 Statewide Assessment, DCYF admitted that "[t]he current level of vacancies across all line staff positions is the most severe that the Department has experienced for many years. As we seek to comply with [applicable] performance measures to achieve conformity, we will be hard pressed to change existing practices and/or implement new practice with an already overburdened staff."

191. More recently, Defendant Martinez acknowledged in testimony to the Rhode Island Senate Health and Human Services Committee on December 13, 2006, that DCYF faces staff shortages and high turnover among its child welfare caseworkers. Defendant Martinez further advised the committee that 31 caseworker positions had been eliminated by the General Assembly in the FY 2007 budget cycle. She also told the committee that 37 social caseworkers had left DCYF since July 2006.

192. At times, the turnover rate among caseworkers has been as high as 40 percent. High caseworker turnover requires those remaining on staff to carry additional cases on their already overflowing caseloads to cover for the vacancies. A rapid exodus of caseworkers in Region IV recently has meant that caseworkers in Regions II and III have had to take over the cases of Plaintiff Children in Region IV. Assigning the cases of children in foster care in one region to overburdened caseworkers in another part of the state makes it that much more difficult for those children to receive caseworker visits and have their needs met.

193. Caseworkers are demoralized and frustrated by their inability to do their job because of staggering caseloads and endless paperwork. "The reality is that as the situation stands now, even if one is good at this work, it is impossible to do well. When you cannot do this job well, children and their families suffer," DCYF caseworker Pamela McElroy told the Rhode Island Senate Health and Human Services Committee in December 2006. McElroy told the committee that after six years she had decided to leave her job at DCYF because of her heavy caseload. "The constant feeling that I am letting families down and that there is no relief in sight is my breaking point," she said. Former DCYF caseworker John Campopiano expressed similar frustrations in a televised interview on February 25, 2007, and stated that "it's absolutely impossible" to perform proper quality casework at existing DCYF caseload levels. Mr. Campopiano carried a caseload of 40 families—and far more individual children—before recently resigning his position out of frustration and burnout.

194. In a November 6, 2006, letter to Defendant Martinez, 42 supervisors from the DCYF Family Services Unit—the unit charged with providing social services and case management for children in foster care—warned that caseloads in their unit were rising so rapidly that they feared for the safety of children in DCYF foster care custody. The 42 signatories told Defendant Martinez that it was "imperative" that she immediately fill all social caseworker vacancies and restore Family Services Unit positions that had been eliminated.

195. Thereafter, on November 22, 2006, Defendant Carcieri received a letter from the Rhode Island Children's Policy Coalition[2] that made reference to the above November 6, 2006, letter to Defendant Martinez, stating, "[i]t is an extraordinary indicator of the depth of the problems and the lack of progress at [DCYF] that supervisory staff feel compelled to

[2] Children's Policy Coalition is a child welfare policy and advocacy organization whose membership includes almost every significant private child placing agency and children's services provider in Rhode Island.

collectively put into writing their concern for the safety of the children being served by the Department." The letter urged Defendant Carcieri "to make child safety a priority by taking whatever steps are necessary within the state personnel system to insure that staffing at [DCYF] is adequate and vacancies filled in a timely manner."

196. Despite the urgent need to restore the caseworker positions that have been eliminated and to hire new caseworkers in order to bring caseloads down to manageable levels, Defendants failed to seek funding for a single additional caseworker position in their FY 2008 budget requests.

**2. Caseworkers Fail to Make Required Child Visits**

197. Regular caseworker visits are necessary for checking on a child's safety and well-being, identifying the child's needs, and arranging and monitoring the delivery of services to meet those needs. That is why DCYF policy requires the caseworkers to meet "face-to-face. . . at least monthly" with the Plaintiff Children on their caseloads and with those children's caregivers, and to visit foster homes at least monthly.

198. Nevertheless, the 2004 Child and Family Services Review found that fully 39 percent of children in Rhode Island's foster care system were not receiving adequate face-to-face visits from their caseworkers. Recent data show that this problem has considerably worsened. As of June 12, 2007, 75.31 percent of children in Region II had not received face-to-face caseworker visits within the last 30 days. The figures for children in Regions I, III, and IV were 60.34 percent, 53.8 percent, and 59.59 percent, respectively. Statewide, 60.94 percent of all children in foster care had not received a face-to-face caseworker visit within the last 30 days.

199. Worse still, as of June 12, 2007, 43.28 percent of Plaintiff Children in Region II had not had a caseworker visit within the last 90 days. On this measure, the figures for

children in Regions I, III, and IV were 34.87 percent, 25.23 percent, and 27.25 percent. Statewide, 31.75 percent of all children in foster care had not received a face-to-face caseworker visit within the last 90 days.

200. As bad as they are, these percentages do not tell the whole story. One child had only a single visit with his DCYF caseworker during a three-year period. Named Plaintiff David had only one visit annually with his caseworker during 2004 and 2005, and only 10 visits during the previous three years. Some foster parents report that they have not seen a caseworker in over a year. When caseworkers do visit children in foster care, it is often because the foster parents request the visits and drive the children to a designated meeting place, rather than the caseworkers initiating the visits and going to the foster homes themselves. Foster parents report experiencing great difficulty contacting DCYF caseworkers. Caseworkers do not answer their telephones or return calls and their voicemail boxes are frequently full, unable to accept more messages.

201. With such low caseworker-child visitation rates, it is simply impossible for DCYF to ensure that the children in its foster care custody are safe and that their basic needs are being met. Indeed, as the persistently high rates of abuse in care show, children in foster care in Rhode Island are not safe. Nor are their basic needs for things such as mental health care consistently met. The harmful and dangerous situation in which children in foster care find themselves is the direct result of DCYF's failure to ensure that caseworkers regularly visit them.

**3. The DCYF Licensing Unit Fails Applicable Standards, Resulting in a Chronic Shortage of Licensed Placements and Providers**

202. DCYF has established a Licensing Unit charged with (1) processing applications submitted by prospective foster parents and foster care providers seeking licensure to furnish foster care services in Rhode Island, (2) ensuring that DCYF-licensed family foster

homes, group homes, and institutions where children are placed for foster care services comply with minimum state safety requirements, and (3) responding to reports of licensure or regulatory violations involving DCYF-authorized family foster homes, group homes, or institutions.

203. Rhode Island statute provides that no non-kin foster care provider may furnish care for a child without holding a valid, current license. To secure a license in Rhode Island, the foster care provider must satisfy a set of mandatory eligibility requirements that include undergoing a criminal background check, a home safety study, training and orientation as a caretaker, and a medical clearance.

204. To be caregivers of children in DCYF custody, relatives must be certified, which involves meeting essentially the same standards as required to be a licensed foster parent. Yet in the aftermath of T.J. Wright's death in 2005, a DCYF official candidly admitted that "[i]t's not uncommon to see a child placed in the care of relatives while the licensing [i.e., certification] process is ongoing." The dangerous practice of placing children in relative homes while certification is pending continues. Four months after Named Plaintiff Caesar was placed in his grandmother's home, the home was still unlicensed.

205. A properly administered licensing process would enable DCYF to screen out potentially unsafe or unsuitable foster care providers. However, the DCYF licensing workforce is inadequately trained, severely understaffed, and responsible for onerous caseloads. There are only six full-time licensing caseworkers in the Licensing Unit, and they are responsible for all aspects of foster care as well as day care licensing throughout the state. The caseworkers carry caseloads regularly exceeding 200 cases per worker. As a result, the licensing process for a non-kin foster home currently takes more than a year.

206. The licensing staff maintains a chronic backlog of hundreds of license applications. This backlog exists even though DCYF does not have enough foster homes to meet current needs. The backlog persists not only because the Licensing Unit is understaffed but also because Licensing Unit workers are not subject to any system of worker accountability. Because these workers are not subject to performance reviews, they are under no meaningful pressure to catch up with the licensure backlog.

207. As of March 2007, the Licensing Unit had a backlog of 423 licensing applications, most of which—295—were for homes that had children in foster care living in them despite their unlicensed status. This means approximately 10 percent of all children in DCYF foster care custody were living in unlicensed homes. In May 2007, 233 children in DCYF foster care custody were living in 164 unlicensed foster homes. Placing hundreds of children in unlicensed homes is not only a departure from the established licensing process in Rhode Island and from basic notions of good practice, it constitutes a fundamental failure to assure children's safety.

208. The Licensing Unit is also charged with the licensure of the child placing agencies with which DCYF contracts for the provision of foster care services and placements such as independent living arrangements, supervised apartment living, residential group care facilities, family foster homes, and adoptive homes. As of June 12, 2007, only 69 percent of the child placing agencies in Rhode Island had active licenses; the rest had expired or pending licenses. By continuing to use child placing agencies that are not properly licensed, DCYF exposes children in foster care to unnecessary and unacceptable risks.

209. DCYF also does not provide the oversight necessary to ensure that licensed homes remain safe and appropriate for children. In the case of one foster home from

which DCYF had previously removed Plaintiff Children, when the foster parent began experiencing mental health problems and refused to make use of available services for Plaintiff Children, DCYF did not revoke the foster parent's license. Instead, DCYF simply reduced the allowable number of children in the home from three to two, and subsequently placed two children in that home.

### E. Defendants' Fiscal Mismanagement of the Child Welfare System Harms Children

210. DCYF is required by state law to seek, accept, and take advantage of all available federal aid. Nevertheless, Defendants fail to take advantage of available federal funding for foster care, leaving the child welfare system needlessly underfunded. Defendants then spend too much of Rhode Island's limited child welfare funds on expensive institutional placements for children who do not need institutionalization, while at the same time inadequately reimbursing the foster parents who provide the family placements that most children in foster care need. This fiscal mismanagement results in harm to Plaintiff Children.

#### 1. Defendants Forfeit Available Federal Funds

211. Defendants forfeit millions of dollars in federal matching funds by failing to collect Title IV-E funds for eligible children.[3] Rhode Island is entitled to receive federal dollars to offset the costs of maintaining abused and neglected children in foster care, as long as the state complies with certain requirements. One requirement that Defendants routinely fail to meet is ensuring that children are placed in licensed foster care settings. Defendant Carcieri admitted in his FY 2008 budget proposal for DCYF that the State would forfeit $1.5 million in federal funds for the coming year simply because of Defendants' widespread use of unlicensed

[3] To receive federal funding under Titles IV-B and IV-E of the Social Security Act, Rhode Island has entered into contracts with the federal government, known as "State Plans," under which the State agrees to provide child welfare, foster care, and adoption services to children in foster care in accordance with specific state and federal statutes, regulations, and policies as a condition for receiving federal funds.

placements. This forfeiture of available federal funding is one reason why Rhode Island's child welfare system is underfunded and unable to protect children in foster care or provide for their basic needs.

212. In FFY 2000, Rhode Island received Title IV-E reimbursements for 31.9 percent of the children in DCYF foster care custody. By FFY 2004, the last year for which data are available, that figure had fallen to only 16.8 percent. In contrast, the national mean that same year was 46.43 percent.

### 2. Defendants Waste Limited Funds on Harmful, Costly Institutional Placements

213. DCYF makes excessive use of expensive placements such as institutions, group homes, and emergency shelters for children who do not need them, rather than developing and supporting an adequate array of appropriate foster homes and specialized foster homes, such as therapeutic, behavioral, or medical foster homes. Institutional placements are inappropriate for all children except the minority of children who have special circumstances that are best addressed in an institutional setting. And shelters are categorically inappropriate placements for all children.

214. Not only do institutional placements harm children who do not need them, they are not cost effective. Most children are best cared for in standard foster homes, but those children whose special needs preclude placement in regular foster homes can often have their needs met in a family-like setting by therapeutic foster care providers for a fraction of the cost of institutional care. Therapeutic foster care providers in Rhode Island receive on average $123 per day, compared to an average daily cost of $245 per day for in-state institutional care and $353 for out-of-state institutional care.

215. Defendants' reliance on institutional placements translates directly into fewer dollars available for ensuring that children in foster care are safe and that their needs are being met in the least restrictive, most family-like setting that is appropriate to their needs.

**3. Defendants Do Not Provide Adequate Foster Care Maintenance Payments to Foster Parents**

216. To comply with federal law and reasonable professional standards, DCYF must pay maintenance payments to family foster care providers that cover the costs associated with caring for children in foster care, including "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." By these standards, the maintenance payments that Defendants pay foster parents are inadequate.

217. The standard daily board rates paid to foster parents by DCYF are $14.39 for children up to 3 years of age, $13.64 for children between 4 and 11 years old, and $15.79 for children ages 12 and older. These rates are less than half what the United States Department of Agriculture estimates the average middle-income, two-parent family in the urban Northeast spent to care for children in 2006 (not including health care costs). The USDA estimates, for example, that such families spend $34.92 per day on 2-year-olds, $35.54 on 9-year-olds, and $38.83 on 16-year-olds. If anything, the USDA underestimates the cost of caring for a child.

218. This disparity translates into harm and risk of harm to Plaintiff Children, since financially overburdened foster parents are less able to provide proper care. It also drives away potential foster parents, thus placing a greater burden on the limited array of foster family homes and contributing to the high rate of needless and harmful institutionalization of children in foster care.

## VIII. Causes of Action

**First Cause of Action**

**(Substantive Due Process Under the United States Constitution)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

219. Each and every allegation of the Complaint is incorporated herein as if fully set forth.

220. A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm when it takes that child into its foster care custody.

221. The foregoing actions and inactions of Defendants, in their official capacities, constitute a failure to meet the affirmative duty to protect from harm all Named Plaintiffs and class members, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs and class members.

222. The forgoing actions and inactions of Defendants, in their official capacities, constitute a policy, pattern, practice, or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being harmed and deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

223. These substantive due process rights include, but are not limited to: the right to protection from unnecessary harm while in government custody; the right to a living environment that protects Plaintiff Children's physical, mental, and emotional safety and well-

being; the right to services necessary to prevent Plaintiff Children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that the child can leave foster care and grow up in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services; the right to treatment and care consistent with the purpose of the assumption of custody by the Department of Children, Youth and Families; the right not to be maintained in custody longer than is necessary to accomplish the purposes of taking the child into custody; the right to receive care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; and the right to be placed in the least restrictive placement according to a Plaintiff Child's needs.

## Second Cause of Action

**(Substantive Due Process Under the United States Constitution: State-Created Danger)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

224. Each and every allegation of the Complaint is incorporated herein as if fully set forth.

225. Defendants' acts of removing Plaintiff Children from their caretakers and placing them in placements that Defendants know or should know pose an imminent risk of harm to these children constitute to a policy, pattern, practice, or custom that is inconsistent with the exercise of professional judgment and that amounts deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. 42 U.S.C. § 1983.

226. Likewise, Defendants' acts of returning Plaintiff Children to their parents when Defendants know or should know that doing so poses an imminent risk of harm to these children constitute to a policy, pattern, practice, or custom that is inconsistent with the exercise of professional judgment and that amounts deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members.

227. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being harmed and deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. 42 U.S.C. § 1983.

## Third Cause of Action

**(First, Ninth, and Fourteenth Amendments to the United States Constitution)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

228. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

229. The foregoing actions and inactions of the Defendants, in their official capacities, amount to a policy, pattern, practice, or custom of failing to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights. As a result of Defendants' conduct, all Named Plaintiffs and class members have been and are being severely harmed and deprived of the liberty interests, privacy interests, and associational rights not to be deprived of a child-parent or a child-sibling family relationship, guaranteed by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

**Fourth Cause of Action**

**(The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq.)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

230. Each and every allegation of the Complaint is incorporated herein as if fully set forth.

231. As a result of the foregoing actions and omissions by Defendants, in their official capacities, Defendants are engaging in a policy, pattern, practice, or custom of depriving all Named Plaintiffs and class members of rights conferred on them by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 620-29(i), 670-679b (collectively the "Adoption Assistance Act") and the regulations promulgated thereunder, 45 C.F.R. Parts 1355–57. These rights include, but are not limited to: the right to timely written case plans containing mandated elements, and to the implementation of these plans; the right to placement in foster homes or other settings that conform to reasonable professional standards and are subject to a uniformly applied set of standards; the right to have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified, statutory standards and time frames; the right of children whose permanency goal is adoption to planning and services to obtain a permanent placement, including documentation of the steps taken to secure permanency; the right to services to facilitate the child's return to his family home or the permanent placement of the child; the right to services that protect children's safety and health; the right to have health and educational records reviewed, updated, and supplied to foster parents or foster care providers with whom the child is placed at the time of placement; the right to receive services in a child welfare system that has an information system adequate to permit the State to make fully informed decisions concerning each Plaintiff Child's best interests; and the right of each Plaintiff

Child to foster care maintenance payments paid to the foster parents or foster care providers with whom the child is placed that cover the actual cost of (and the cost of providing) the Plaintiff Child's food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation with family, and other expenses. 42 U.S.C. §§ 671(a)(10); 671(a)(16); 671(a)(22); 672(b) and (c); 675(1); 675(5)(D); 675(5)(E); 622(b)(10)(B); 45 C.F.R. § 1355.20.

**Fifth Cause of Action**

**(Procedural Due Process)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

232. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

233. The foregoing actions and inactions of the Defendants amount to a policy, pattern, practice, or custom of failing to exercise reasonable professional judgment and of deliberate indifference to the constitutional rights of Plaintiffs, and are the cause of the violation of such rights. As a result of Defendants' conduct, Plaintiffs have been and are being harmed and deprived of both federal and state-created liberty or property rights without due process of law, in violation of their constitutional rights.

234. Defendants' actions and inactions have resulted and are continuing to result in deprivations of federal-law entitlements arising from the Adoption Assistance Act and the accompanying regulations promulgated by the United States Department of Health and Human Services, to which Plaintiff Children have a constitutionally protected interest.

235. Defendants' actions and inactions have resulted, and are continuing to result, in deprivations of the following state-law entitlements to which each Plaintiff Child has a constitutionally protected interest:

a. The entitlements, arising from section 42-72-4(b)(14) of the Rhode Island General Laws, to suitable treatment, rehabilitation, and care in the least restrictive placement, within the child's community wherever feasible;

b. The entitlement, arising from section 42-72-10(b) of the Rhode Island General Laws, to have the child's health and safety be the paramount concern in making reasonable efforts toward reunification;

c. The entitlement, arising from section 47-72-5(b)(7) of the Rhode Island General Laws, to placement in a home or facility that is licensed, approved, monitored, and evaluated by DCYF;

d. The entitlements, arising from sections 42-72-10(a) and 42-72-11 of the Rhode Island General Laws, to a written, regularly updated service plan that addresses the child's needs for care, treatment, and placement;

e. The entitlements, arising from section 42-72-10(c) of the Rhode Island General Laws, for children whose permanency goal is adoption or placement in another permanent home, to a written service plan documenting the specific steps DCYF is taking to find and recruit an adoptive family or other permanent placement, to place the child in such a family or placement, and to finalize permanency;

f. The entitlement, arising from sections 42-72-5(24) and 42-72-5.2 of the Rhode Island General Laws, to appropriate mental health services;

g. The entitlement, arising from section 42-72-13(a) of the Rhode Island General Laws, to have the costs of the child's care, support, and maintenance paid by DCYF; and

h. The entitlements, arising from sections 42-72-5(b)(22) and 42-72-15(o) of the Rhode Island General Laws, to receive a free and appropriate education in accordance with state and federal law; to be enrolled in a school program; and to have state and local educational agencies coordinate their efforts in order to provide timely initiation and continuation of educational services;

i. The entitlements, arising from the Children's Right to Freedom from Restraint Act, sections 42-72.9-1 et seq. of the Rhode Island General Laws, to freedom from abuse, corporal punishment, involuntary seclusion, or any physical or chemical restraints that

are not medically necessary or used as a means of coercion, discipline, convenience, or retaliation; and to the protection of all procedural safeguards set out at section 42-72.9-4(c) of the Rhode Island General Laws when restraint is necessary for the safety of the child or others.

## Sixth Cause of Action

**(Breach of Federal Contractual Obligations to Third Party Beneficiaries)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

236. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

237. Under Titles IV-B and IV-E of the Social Security Act, states receive certain federal monies so long as they enter into plans approved by HHS and comply with their terms. Rhode Island receives federal funding under Titles IV-B and IV-E of the Social Security Act and has submitted such State Plans to the federal government, which are legal contracts between the federal government and the State, and such plans have been approved. In these State Plan contracts, the State agrees to provide child welfare, foster care, and adoption services to Plaintiffs in accordance with specific statutes, regulations, and policies and all applicable federal regulations and other official issuances of United States Department of Health and Human Services.

238. As a result of their foregoing actions and inactions, Defendants have breached and continue to breach their obligations under Rhode Island's State Plan contracts, and all Plaintiffs, as the intended direct third-party beneficiaries to these State Plan contracts, are (i) being denied their rights under law to the services and benefits that the State of Rhode Island is obligated to provide to them under such contracts, and (ii) being harmed thereby.

## IX. Prayer for Relief

239. WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

a. Assert jurisdiction over this action;

b. Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

i. Defendants' violation of Plaintiff Children's rights under the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution;

ii. Defendants' violation of Plaintiff Children's rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

iii. Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq.;

iv. Defendants' violation of Plaintiff Children's right to procedural due process under the Fourteenth Amendment to the United States Constitution; and

v. Defendants' breach of their contractual obligations to Plaintiff Children under the State of Rhode Island's Title IV-E and Title IV-B state plans.

d. Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights;

e. Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Children, except as to any relief granted in *Office of Child Advocate v. Martinez*, Civ. No. 1:86-cv-00723-L;

f. Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecution of this action, including reasonable

attorneys' fees, pursuant to 42 U.S.C. §§ 1920 and 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g. Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm by Defendants.

DATED: June 28, 2007

Respectfully Submitted:

JAMETTA O. ALSTON (Bar No. 3909)
CHILD ADVOCATE OF
THE STATE OF RHODE ISLAND
272 West Exchange Street, Suite 301
Providence, RI 02903
Phone: (401) 222-1690
Facsimile: (401) 222-6652
Email: jalston@doa.state.ri.us

JOHN W. DINEEN (Bar No. 2346)
305 South Main Street
Providence, RI 02903
Phone: (401) 223-2397
Facsimile: (401) 223-2399
Email: jwdineen1@yahoo.com

MARCIA ROBINSON LOWRY (Bar No. 1187053 (NY); *pro hac vice* application pending)
SUSAN LAMBIASE (Bar No. 2099489 (NY); *pro hac vice* application pending)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, NY 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
Email: mlowry@childrensrights.org

VERNON M. WINTERS (Bar No. 130128 (CA); *pro hac vice* application pending)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA
Phone: (650) 802-3005
Facsimile: (650) 802-3100
Email: vernon.winters@weil.com