**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **SAM and TONY M., by Next Friend Gregory C. Elliott; CAESAR S., by Next Friend Kathleen J. Collins; DAVID T., by Next Friend Mary Melvin; BRIANA, ALEXIS, CLARE, and DEANNA H., by Next Friend Gregory C. Elliott; and DANNY and MICHAEL B., by Next Friend Gregory C. Elliott; for themselves and those similarly situated*,** | |
| **Plaintiffs,** | |
| **v.** | **Class Action**<br>**Civil Action No. 1:07-cv-00241-L-LDA** |
| **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island; JANE A. HAYWARD, in her official capacity as Secretary of the Executive Office of Health & Human Services; and PATRICIA MARTINEZ, in her official capacity as Director of the Department of Children, Youth and Families,** | |
| **Defendants.** | |

**AMENDED COMPLAINT**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**
**AND REQUEST FOR CLASS ACTION**

* pseudonyms are used for all minor named plaintiffs.

# TABLE OF CONTENTS

Page No.

I. Introduction....................................................................................................4

II. Jurisdiction and Venue....................................................................................7

III. Class Action Allegations.................................................................................7

IV. The Parties ....................................................................................................10

A. The Named Plaintiffs ...................................................................................10

B. The Defendants ............................................................................................35

V. The Rhode Island Child Welfare System.......................................................36

VI. Defendants Have Long Known That Rhode Island's Child Welfare System Cannot Fulfill Its Duties to Plaintiff Children Without Urgent, Systemic Reform ...........38

A. The 2003 System of Care Task Force Report Concluded that the Child Welfare System Was Harming Children and That Systemic Reform Was Necessary ..........................................................................................38

B. The 2004 Federal Child Welfare Review Identified Widespread Problems in Rhode Island's Child Welfare System..............................................40

C. The 2005 T.J. Wright Child Fatality Report Called for Systemic Reform ...........42

D. The Child Advocate's 2006 Report Found Little Progress Had Been Made.........43

E. A 2006 Federal Regional Review Revealed Little to No Progress in Improving the Child Welfare System ..................................................43

F. The Rhode Island Senate Has Recognized the Child Welfare System's Chronic Failings.........................................................................................44

VII. Current Systemic Child Welfare Failings and the Resulting Harm to Children................45

A. Plaintiff Children Are Abused and Neglected in Foster Care...............................45

B. Defendants Place Plaintiff Children in Homes and Institutions that Do Not Meet Their Needs and That Do Not Comply With Reasonable Professional Standards..........................................................................................47

1. Defendants Have Failed to Develop and Maintain a Sufficient Array of Foster Care Placements ....47

2. Defendants Unnecessarily Place Children in Shelters and Institutions, Where They Stay for Too Long ....48

3. Defendants Send Children in Foster Care Far from Their Homes and Communities ....50

4. Because Children Are Placed in Inappropriate Homes and Institutions, Their Placements Frequently Disrupt, and Children Deteriorate as They Get Moved from Place to Place ....51

5. Defendants Separate Siblings in Foster Care Because They Have Failed to Develop an Adequate Placement Array ....54

C. Defendants Fail in Their Duty to Meet Plaintiff Children's Service Needs ....55

1. Defendants Do Not Provide Plaintiff Children with Required Timely and Appropriate Assessments or Case Plans ....55

2. Defendants Violate Plaintiff Children's Rights to Timely and Safe Reunification with Their Families When Reunification Is Appropriate ....56

3. Defendants Violate Plaintiff Children's Rights to Permanency by Pursuing Reunification with Parents When Not Appropriate ....58

4. Defendants Fail to Timely Place Children Who Cannot Return Home with Permanent Adoptive Families, Allowing Them Instead to Languish in Foster Care ....59

5. Defendants Violate Plaintiff Children's Health Care Rights ....62

D. Defendants' Mismanagement of Rhode Island's Foster Care System Harms Plaintiff Children ....65

1. Defendants Assign Excessive Caseloads to Caseworkers, Making It Impossible for the Caseworkers to Ensure That Children Are Safe and Having Their Needs Met ....65

2. Caseworkers Fail to Make Required Child Visits ....68

3. The DCYF Licensing Unit Fails Applicable Standards, Resulting in a Chronic Shortage of Licensed Placements and Providers ....69

E. Defendants' Fiscal Mismanagement of the Child Welfare System Harms Children........72

1. Defendants Forfeit Available Federal Funds........72

2. Defendants Waste Limited Funds on Harmful, Costly Institutional Placements........73

3. Defendants Do Not Provide Adequate Foster Care Maintenance Payments to Foster Parents........74

VIII. Causes of Action........75

IX. Prayer for Relief........82

## I. Introduction

1. On October 31, 2004, a three-year-old Rhode Island boy named T.J. Wright was beaten to death by his foster parents. The State of Rhode Island's Department of Children, Youth and Families (DCYF), the agency responsible for protecting abused and neglected Rhode Island Children, had removed T.J. from his parents' care and placed him with the foster parents who killed him: a twenty-year-old maternal aunt and her live-in boyfriend who already had two young children. DCYF placed T.J. and his two brothers with these young parents without screening or licensing them. There were now five children living in the home, all under the age of nine. Both foster parents had histories of drug abuse and involvement in drug trafficking. Both were unemployed.

2. T.J. Wright's death was all the more tragic because DCYF could easily have prevented it by taking simple steps, mandated under DCYF's own policies, to ensure T.J.'s safety before placing him in their care, such as screening the prospective foster parents for criminal and DCYF histories and checking their references. DCYF had a duty to protect T.J. Wright. Instead, it placed him with the people who killed him.

3. The T.J. Wright homicide put DCYF in the spotlight, revealing serious systemic failures. An official investigation into his death produced a series of urgent recommendations for long-overdue reform. Nevertheless, now nearly three years since T.J.'s death, DCYF is still unable to provide basic safety for the abused and neglected children whom it removes from home and takes into its legal custody for their own protection.

4. This civil rights class action is brought on behalf of those vulnerable children. Plaintiffs seek declaratory and injunctive relief to remedy Defendants' violations of

their legal rights and to prevent Defendants, by their actions and inactions, from continuing to harm the abused and neglected children who rely on Defendants for care and protection.

5. DCYF is plagued by fundamental, systemic failings of great depth and scope. For example:

- **DCYF fails to protect children from abuse and neglect in foster care:**
  - In five of the six years from 2000 through 2005, Rhode Island was the worst state in the nation in its rate of maltreatment or neglect occurring to children in State foster care.[1]
  - For years, children under the protection of the state in foster care custody in Rhode Island have suffered abuse or neglect at a higher rate than have children living in the state's general population.
- **DCYF fails to assess and address children's needs and fails to place them with families where their needs will be met and where they will be safe:** In all aspects of case planning and management, DCYF fails to exercise reasonable professional judgment. DCYF fails to identify children's safety, medical, mental health, education and permanency needs and fails to develop and implement plans to ensure that children and families receive necessary services to meet those needs. DCYF does not develop case plans or choose placements for children on the basis of their individual situation. DCYF regularly places children in settings that are ill-suited to their individual needs. As a result, these placements predictably disrupt, and DCYF shuffles children unnecessarily from one placement to another. With each successive inappropriate placement, children become increasingly damaged.
- **DCYF returns children to their parents without making a reasoned determination that the children will be safe and without identifying or providing services needed to ensure the children's safety:** More than 15 percent of the children entering Rhode Island foster care in the first quarter of 2006 had been in foster care less than a year earlier. This means that these children had been returned by the State to their parents, only to be abused or neglected again and returned to State foster care.
- **DCYF fails to engage in the planning necessary for children in its care to achieve permanency, causing many children to languish in foster care for years:** DCYF fails to timely plan for adoption when children cannot be safely returned home. DCYF frequently places children in institutions and with families that will not adopt. For children who cannot be reunified with their

[1] Data on 2006 are not yet available.

families, this effectively keeps children languishing in care with no move towards finding a permanent home.

- **DCYF fails to maintain an adequate number of foster homes, instead placing and leaving children in institutions simply because nothing else is available:** Federal law and reasonable professional standards require that children in foster care be placed in the least restrictive, most family-like setting suited to their needs. In Rhode Island, however, 35 percent to 40 percent of the children in State foster care custody live in expensive emergency shelters, group homes, and other institutions, many simply because Rhode Island has not developed more appropriate and less harmful placements for them. The rate at which Rhode Island institutionalizes children in its foster care custody is twice the national average of 19 percent. In the most recent year for which data are available, 2004, Defendants placed 18.9 percent of children in foster care under 12 years old in group homes and institutions; this is more than twice the national median of 8.3 percent in 2003, the last period for which data are available. Such placements are harmful, especially to young children, except in very rare cases.

- **DCYF assigns excessive caseloads to its caseworkers, making it impossible for them to visit the children in DCYF's custody:** DCYF caseworkers labor under caseloads that far exceed reasonable professional standards. As a result, caseworkers make only a fraction of required visits with the children assigned to them. As of June 2007, only 39 percent of all Plaintiff Children had received a face-to-face visit with their caseworker within the last 30 days. Without caseworkers visiting children on a regular basis, it is impossible for DCYF to ensure that children in foster care are safe and are having their basic needs met.

- **DCYF places children in unlicensed homes:** As of May 2007, there were 233 children in DCYF's legal custody who were living in unlicensed foster homes. DCYF did not take reasonably necessary steps to ensure that these homes were safe and appropriate placements before leaving children in them.

6. These harms to children are the direct result of a child welfare system that has long been poorly managed, that misdirects funds, and that has failed to develop necessary and appropriate placements and services for children.

7. This civil rights class action seeks declaratory and injunctive relief to compel Defendants—the Governor of the State of Rhode Island, the Secretary of the Executive Office of Health and Human Services, and the Director of the Department of Children, Youth

and Families—to meet their legal obligations to care for and protect Rhode Island's abused and neglected children in state custody by reforming the State's dysfunctional child welfare system.

## II. Jurisdiction and Venue

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution, federal statutes, and federal common law. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

9. Venue is proper here pursuant to 28 U.S.C. § 1391(b). The claims arise in this district.

## III. Class Action Allegations

10. This action is properly maintained as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

11. The class is defined as "all children who are or will be in the legal custody of the Rhode Island Department of Children, Youth and Families due to a report or suspicion of abuse or neglect" ("Plaintiff Children"). As of January 2007, approximately 3,000 children were in the legal custody of DCYF for foster care services due to reported or substantiated allegations of abuse or neglect. The Class is sufficiently numerous to make individual joinder impracticable.

12. The questions of law and fact raised by the Named Plaintiffs' claims are common to and typical of those of the Plaintiff Children they seek to represent. Named Plaintiffs are all children in Defendants' legal custody who rely on Defendants for their safety and well-being. They are at risk of harm by the systemic and legal deficiencies of Rhode Island's child welfare system.

13. Questions of fact common to the Class include:

a. Whether Defendants fail to provide Plaintiff Children with safe, appropriate, and stable foster care placements, causing significant harm to their health and well-being;

b. Whether Defendants fail to prevent the abuse or neglect of Plaintiff Children while in Defendants' custody, causing significant harm to their health and well-being;

c. Whether Defendants fail to place Plaintiff Children in the least restrictive and most family-like settings suited to their needs, including by unnecessarily institutionalizing them, causing significant harm to their health and well-being;

d. Whether Defendants fail to provide Plaintiff Children with legally required services necessary to keep them safe and properly cared for, and to prevent them from deteriorating physically, psychologically, or otherwise while in custody, as required by law and reasonable professional judgment, causing significant harm to their health and well-being;

e. Whether Defendants unsafely return Plaintiff Children to caretakers who abuse or neglect them again, causing significant harm to their health and well-being;

f. Whether Defendants unnecessarily move Plaintiff Children from placement to placement, causing significant harm to their health and well-being;

g. Whether Defendants fail to provide Plaintiff Children and their families with reasonable decision-making as well as timely services necessary to ensure the safe and successful reunification of children with their families when appropriate, causing significant harm to their health and well-being;

h. Whether Defendants fail to provide Plaintiff Children with timely and reasonable decision-making as well as services necessary to ensure that when Plaintiff Children cannot be reunited with their families safely, they are promptly freed for adoption and placed in permanent homes, causing significant harm to their health and well-being; and

i. Whether Defendants fail to provide Plaintiff Children with the supports necessary to maintain family relationships where appropriate, including placing siblings together as well as

providing parent and sibling visits, causing significant harm to their health and well-being.

14. Questions of law common to the Class include:

a. Whether Defendants' actions and inactions violate Plaintiff Children's substantive due process rights to be free from harm while in state custody, guaranteed by the Fourteenth Amendment to the United States Constitution;

b. Whether Defendants' actions and inactions violate Plaintiff Children's rights to family integrity, guaranteed by the First, Ninth, and Fourteenth Amendments to the United States Constitution;

c. Whether Defendants' actions and inactions violate Plaintiff Children's rights to mandated foster care and adoption services, established by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, and relevant federal regulations;

d. Whether Defendants' actions and inactions violate Plaintiff Children's rights to adequate foster care maintenance payments, established by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, and relevant federal regulations;

e. Whether Defendants' actions and inactions violate Plaintiff Children's third-party beneficiary rights under the Title IV-E plan executed between Rhode Island and the federal government; and

f. Whether Defendants' actions and inactions violate Plaintiff Children's rights to procedural due process, guaranteed by the Fourteenth Amendment to the United States Constitution.

15. Named Plaintiffs will fairly and adequately protect the interests of the class they seek to represent.

16. Named Plaintiffs and Plaintiff Children are represented by:

a. Jametta O. Alston, the Child Advocate of the State of Rhode Island, a public official empowered to bring legal action to protect abused and neglected children in DCYF's care, acting in her official and individual capacities;

b. John Dineen, a licensed Rhode Island attorney with substantial experience litigating civil rights matters in the federal courts;

c. Attorneys employed by Children's Rights, a nonprofit legal organization whose attorneys have substantial experience and expertise in child welfare class actions nationally; and

d. Weil, Gotshal & Manges LLP, a global private law firm with extensive experience in complex civil litigation including class action litigation and a non-litigation office in Providence.

17. The attorneys and entities listed above have investigated all claims in this action and have committed sufficient resources to represent the Class.

18. Each Named Plaintiff appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's (or children's) situation to fairly and adequately represent the child's (or children's) interests in this litigation.

19. Defendants have acted or failed to act on grounds generally applicable to the Class, necessitating declaratory and injunctive relief for the Class. Plaintiffs' counsel know of no conflicts between or among members of the Class.

## IV. The Parties

### A. The Named Plaintiffs

**SAM AND TONY M.**

20. SAM and TONY M., ages 12 and 9, respectively, are siblings currently in DCYF custody. Over the past eight years, DCYF has repeatedly failed in its most basic obligation to keep these children safe. Instead, these boys have been subject to physical and sexual abuse, moved at least ten times each to unstable and inappropriate placements, returned several times to abusive parents who further maltreated them, and denied critically needed medical evaluations and mental health services. Although DCYF has been involved in Sam's

life since he was four, and in Tony's since he was an infant, it has yet to take the steps necessary to help these children achieve permanency.

21. Sam and Tony first entered foster care in May 1999, when Sam was four years old and Tony an infant. DCYF was aware when it removed them from their parents' home that their father had a domestic assault record and that their mother had significant substance abuse and mental health issues. Her second suicide attempt prompted the children's removal. DCYF initially placed Sam and Tony in a home with a family friend. While in this home, one of the boys was found with cigarette burns on his body.

22. In June 1999, Sam revealed that his father had sexually abused him, which was relayed to his DCYF caseworker. DCYF failed to arrange for Sam to undergo a sexual abuse evaluation, even though health professionals working with Sam recommended such an evaluation in June, August, September, and again in October. In October, his father, the alleged perpetrator, rescinded his consent for the evaluation.

23. In January 2000, DCYF still had not fully investigated Sam's allegation of sexual abuse by his father, and there was no indication that the parents had undertaken all that was required of them by DCYF to safely regain custody of their children. DCYF nonetheless returned Sam and Tony to their parents without taking adequate steps to ensure that the boys would be safe. The very next month, DCYF received a report that the boys were again being abused and that one had a quarter-sized mark on his neck and one had a bruise around his eye. Their father was reported to be abusing alcohol. Sam had witnessed his father abuse his mother. At one point, Sam's father threatened to kill Sam and his mother. DCYF conducted two investigations in the home, one in July 2000 and one in March 2001, but left the children at home.

24. The boys remained with their mother for the next two years, until February 2003. During that time their father left the family, and their mother remarried. In July 2002, when Tony was four and Sam seven, their stepfather brutally sexually and physically abused Tony. At the time, their stepfather was on "home confinement" for assaulting Tony's mother, for which he had been criminally charged twice.

25. After Tony's sexual abuse by his stepfather, he was taken to a sexual trauma and resource center, but DCYF failed to ensure that a sexual abuse evaluation was performed. Sam and Tony then moved with their mother to the home of their maternal grandparents, which was already overcrowded with other family members and their children.

26. In January 2003, DCYF investigated a report that the boys' grandfather had hit one of them with a cane. The next month, the boys' mother was in a car accident while driving under the influence of narcotics with eight-year-old Sam in the car with her. Following this incident, DCYF again removed Sam and Tony and placed them in a foster home. The foster parent requested a sexual abuse evaluation for one of the boys because he began to act out sexually, but the evaluation was not scheduled to occur until six months later. This foster placement became unstable, and DCYF moved the boys to a third foster home.

27. In October 2003, DCYF again reunified Sam and Tony with their mother. By this time, DCYF had investigated and confirmed approximately eight reports that the children were being harmed in her care; in six other reports, DCYF issued "early warning" reports. In January 2003 alone, DCYF investigated and confirmed three reports that Sam and Tony were being maltreated.

28. In May 2004, within six months of DCYF returning the boys to their mother, DCYF removed them again because of substance abuse and domestic violence problems.

DCYF again assigned the boys a permanency goal of reunification with their mother. This remained the goal even after DCYF caseworkers found that their mother could not manage the boys even during supervised visits. This time, DCYF failed to place the boys in a family setting and instead placed them in a group care facility.

29. Both Sam and Tony were moved to a residential treatment facility in November 2005. Only one month later, when Tony was 7 years old and Sam was almost 11, the boys were each hospitalized in separate out-of-state psychiatric hospitals. This was the eighth placement to which DCYF had subjected these children. Although this was the first time Sam and Tony had ever lived apart from each other, DCYF failed to arrange for the boys to visit one another for four months. DCYF allowed both boys to languish apart from one another in these highly restrictive hospitals well past the time it was therapeutically appropriate, simply because DCYF had no other placement for them. The boys experienced even further trauma while still separated when their teenaged first cousin died while institutionalized in DCYF foster care custody.

30. In October 2006, while living in another residential treatment center, Tony's two roommates tried to involve him in sexual activity. Staff at the facility, which was licensed and supervised by DCYF, were aware of the incident but failed to protect Tony by separating him from his roommates, apparently because the center did not have any available rooms. Four months later, in January 2007, Tony was sexually molested by another roommate. Because the facility still had no open beds in which to move either Tony or his roommate perpetrator, the only measure it took to protect Tony from further abuse was for a staff member to sleep in the room next to Tony. Neither the facility nor DCYF reported either incident for investigation.

31. Sam and Tony remain separated and institutionalized. Tony, only nine years old, is currently living in his twelfth placement. He has not lived in a home since 2004. Sam is in his tenth placement. There is no indication that DCYF is working towards finding a family placement for either Sam or Tony, and, while their father's rights were finally terminated in February 2006, their mother's rights have not yet been. DCYF has not taken any steps to find permanent families for these boys.

32. As a result of Defendants' actions and inactions, Sam and Tony have been and continue to be irreparably harmed. DCYF has repeatedly returned these children to an abusive home environment without taking any of the measures necessary to protect the children from further maltreatment in that home. Rather than meet its obligation to provide the brothers with a stable family environment, DCYF has cycled these boys through a number of overly restrictive institutions where Tony suffered further abuse that could have been prevented if the facility had acted with reasonable professional judgment. Defendants have taken virtually no steps to move these children out of foster care and into a safe and stable family that they can call their own. The ongoing failure by DCYF to provide these children with any stability or prospect of a permanent home has caused and continues to cause them serious psychological harm.

33. Defendants have violated Sam's and Tony's constitutional and statutory rights by failing to protect them from harm; by failing to provide them with medical and mental health evaluations and services necessary to prevent their health from deteriorating while in DCYF custody; by failing to provide them with appropriate, least-restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services, all of which are required by law and reasonable professional judgment.

34. Named Plaintiffs SAM and TONY M. appear through their Next Friend, Gregory C. Elliott. Professor Elliott is Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliott is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and he is currently writing a book on how adolescents come to believe that their lives matter to others

**CAESAR S.**

35. CAESAR S., only six years old, has been moved through eight DCYF placements, many unlicensed and inappropriate, and has been lingering in DCYF custody for virtually his entire life. He was removed from home due to his mother's neglect in December 2002, when he was 15 months old. Despite his parents' substance abuse, failure to comply with treatment requirements, and clear inability to parent Caesar, he was not freed for adoption until June 2007. DCYF has cycled Caesar from inappropriate placement to inappropriate placement without looking for a safe, loving, permanent home for him, and has allowed him to deteriorate in foster care. For the last two years, Caesar has lived in an inappropriate home where he cannot live permanently.

36. Caesar's family has had a long history with DCYF. His mother, Rhonda [all names are pseudonyms], and her mother, Caesar's grandmother, were both known to DCYF when they were children. Even before Caesar was born, DCYF was providing services to Rhonda's family and making regular visits to their home. When Rhonda gave birth to Caesar at age 15, DCYF already knew that she had displayed signs of depression, anxiety, anger, and stress and had engaged in such harmful behaviors as substance abuse and shoplifting.

37. Since 1981, there have been 61 DCYF investigations into Caesar's maternal grandmother's home, 19 of which concluded that abuse or neglect had occurred. Despite this, even after DCYF filed a neglect petition against Caesar's grandmother on behalf of Rhonda and her two siblings in March 2002, and after Caesar's mother Rhonda herself admitted neglecting Caesar in September 2002, DCYF placed Caesar with Rhonda in this maternal grandmother's home, where Caesar and his mother lived until December 2002. There was no crib in this home as of July 2002.

38. In December 2002, DCYF removed 16-month-old Caesar from Rhonda's care after he was found sitting on top of a kitchen table with no adult in the room. Rhonda and Caesar had moved from his grandmother's home to a rooming house occupied by Rhonda's two sisters, a boyfriend who had previously committed physical abuse, and another adult with a history of sex offenses against children. Rhonda explained that she and Caesar had left Caesar's grandmother's house—which she described as a crack house—because a pedophile was living there. Rhonda was reported to leave the rooming house at night and leave Caesar unattended, and she admitted to using marijuana and alcohol.

39. After this removal, DCYF initially placed Caesar in an emergency shelter, where he remained for two days, and then moved him to a foster home where he remained for one month. In January 2003, DCYF placed Caesar with his paternal aunt Laura and her two young children. DCYF subsequently received reports that Laura was smoking marijuana and leaving the children with her sister, a known substance abuser. Nonetheless, Caesar stayed in this home for a year and a half, even while Laura advised DCYF repeatedly that she was having difficulty taking care of him. DCYF did nothing to support this placement or help this aunt; it simply arranged two weekend respite placements. Predictably, Caesar was eventually removed

because Laura was overburdened and unable to care for him. During this period Caesar was also having supervised biweekly visits with his father.

40. In September 2004, DCYF placed Caesar with his great-aunt, even though a son living in the home had a criminal drug record. Caesar was kept in the house for nine days, and DCYF removed him only after confirmation that that the great-aunt and her son were selling marijuana.

41. DCYF then placed Caesar in yet another foster home, where he spent about a month. Caesar was also forced to change daycare when he moved to this home. While in this foster home, Caesar's foster parent asked Caesar to sit by her. Caesar asked her whether she was going to beat him.

42. In October 2004, DCYF moved Caesar back to his aunt Laura, despite having previously removed him from her care and knowing that she was unsuitable and unable to care for him. When Caesar was told he was being sent back there, he told his caseworker that Laura and her children punched and hit him. Nonetheless, DCYF placed him in this home. While there throughout 2005, Caesar began to exhibit serious behavioral problems, which DCYF should have addressed and which should have alerted DCYF that Caesar was having trouble in the home. DCYF left Caesar in this home for eleven months.

43. In September 2005, this inappropriate placement predictably ran into trouble. Caesar had bruises and marks on his arms where he had clearly been hit with a belt, and Caesar reported that his penis hurt and that his cousin had touched him there. A physician confirmed that a belt caused the bruises and that excessive force had been used. The DCYF caseworker reported that a preponderance of the evidence confirmed the allegations against

Laura, but then declared the investigation to be unfounded. DCYF did not order an evaluation or counseling for Caesar's possible sexual abuse.

44. Caesar has lived in the unlicensed and inappropriate home of his paternal grandmother since September 2005. DCYF placed Caesar in his grandmother's home despite serious warning signs—in 2004 DCYF had found the home unacceptable for Caesar, because an aunt in the home had a criminal record and had been investigated by DCYF for substance abuse, and in June 2005, Caesar had reported that this grandmother had hit him and that the aunt who lived in the home had also hit him with a belt. Caesar's therapist recommended that this abuse report be investigated before Caesar was placed in the home, but DCYF ignored her recommendation and placed Caesar there anyway.

45. When DCYF placed Caesar in his grandmother's home in September 2005, nothing in the home had changed to make it acceptable. The aunt with the criminal record was still living there and Caesar was left in her care when his grandmother went on vacation in May 2006. In addition, DCYF knew that Caesar's father, Jason, who was only allowed to spend time with Caesar during supervised visits, had been living in the home.

46. In December 2005, DCYF staff reported that the grandmother was overwhelmed. The grandmother stated that DCYF had never given her any information about the rules and regulations governing foster parenting. New allegations against the home were investigated in December 2005.

47. Caesar's grandmother will not adopt Caesar, nor is she an appropriate adoptive resource. It does not appear that DCYF provided Caesar or his grandmother any services to support this troubled placement.

48. In April 2006, Caesar told a teacher at the YMCA that he had been sexually molested by a child at the Providence Center, a DCYF-licensed facility. However, it appears that this incident was never reported, in violation of law and DCYF's own policies. In addition, it appears that Caesar did not receive any counseling or other services regarding this incident until February 2007, ten months after he was molested.

49. Caesar was diagnosed with reactive attachment disorder in September 2006. As of May 2007, Caesar's psychiatrist noted that Caesar still needs stability and intensive individual therapy.

50. Caesar has been required to visit with his parents his entire life, despite their evident inability to care for him or keep him safe and their inappropriate behavior with him. While Caesar has been in DCYF custody, both parents have been arrested for assault and have engaged in extensive substance abuse. Both have frequently missed court dates and visits with Caesar, with Caesar left waiting for them. When they have shown up for visits, they have interacted only minimally with Caesar. When he was just two years old, Caesar was very verbal while driving to visits, but became very quiet when he saw either parent. By August 2004, Caesar had gone from "eager and excited" to having a sad expression and becoming very quiet at parental visits. After one visit in January 2005, Caesar stated, "they didn't hug me." As recently as April 2007, Rhonda was still missing scheduled visits with Caesar.

51. DCYF first filed a petition to terminate Caesar's parents' rights in 2005. But, despite Caesar's having been in DCYF custody for his entire life, and despite his parents' clear inability to parent him, their untreated substance abuse, and their failure to comply with their DCYF case plans, Caesar was only legally freed for adoption in June 2007.

52. Currently, Caesar is described as loving, funny, and engaging, while extremely hyperactive and very distrustful of adults. Although freed for adoption now, there is no indication that DCYF has made any efforts to find a permanent home for Caesar.

53. As a direct result of Defendants' actions and inactions, Caesar has been and continues to be irreparably harmed. Only six years old, Caesar has been placed in dangerous, inappropriate, and unlicensed homes, where he has been subjected to abuse that DCYF could have prevented. For the last two years, DCYF has left him in a home that will not become a permanent adoptive home for him, and DCYF has made no effort to move him to a more permanent home. He has been continually traumatized by visits with his parents, who treat him inappropriately. His prospects of adoption should be excellent, yet he languishes in foster care limbo. DCYF's failure to provide a permanent home for Caesar causes him harm.

54. Defendants have violated Caesar's constitutional and statutory rights by failing to protect him from harm while in state custody; by knowingly placing him in inappropriate living arrangements; by failing to provide him with mental health services necessary to prevent his mental health from deteriorating while in DCYF custody; by failing to provide him with appropriate, least-restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services, all of which are required by law and reasonable professional judgment.

55. Named Plaintiff CAESAR S. appears through his Next Friend Kathleen J. Collins. Ms. Collins has a Master of Science degree in School Psychology and a Bachelor of Arts degree in Psychology from the University of Rhode Island. For the past 17 years, Ms. Collins has worked for the Providence School Department as a school psychologist. Ms. Collins currently serves as the school psychologist for two elementary schools in Providence. She has

known Caesar S. since he entered one of the schools in September 2006. Ms. Collins resides in Foster, Rhode Island.

**DAVID T.**

56. DAVID T. is a 13-year-old boy who has been in DCYF's custody for 11 years. DCYF has cycled him through more than 14 placements, all but two of them shelters or other institutions. When David was four years old, a potential adoptive placement fell through, and David experienced loss and trauma that should have been treated. Instead, DCYF moved David to a shelter. David has not lived in a home since, and his lifetime of living in institutions, compounded with the stress of his disrupted adoptive placement, has caused his mental health to steadily deteriorate. David entered care when he was only two years old, and finding him a permanent, loving family was completely feasible. Yet DCYF has denied him the appropriate decision-making, services, and planning necessary to find him a permanent home. DCYF has done nothing to prepare David to live in a real home, and for the last decade it has not taken any of the necessary steps toward finding David a family with whom to live.

57. DCYF removed David from his mother in 1996 due to neglect. DCYF had previously taken his older brother into custody on grounds of neglect and possible sexual abuse by his mother. By the time David entered foster care, his mother had already been deemed unfit to care for at least one of David's siblings and had lost her parental rights. Despite clear indications that David had been sexually abused while in his mother's care, DCYF failed to ensure that he received a sexual abuse evaluation or appropriate treatment upon his entry into foster care or thereafter.

58. DCYF first placed David with a foster mother with whom he lived for two years and to whom he became attached. This was the first—and last—loving, lasting, stable

home David would experience for the next 11 years. At the age of four, David was removed from the foster mother he referred to as "Mommy Mary" because she was unable to continue to care for him. Despite its obligation to place David in a family-like environment, DCYF moved the young child to a shelter. DCYF next moved David, not to a foster home, but to another shelter. By this time, David's mother's parental rights had been terminated, leaving him free for adoption. David spent a total of three months in shelters while DCYF tried to locate an adoptive home.

59. DCYF next sent David to an aunt in Michigan who expressed interest in adopting him. The aunt willingly cared for David, but encountered housing problems and other difficulties. Instead of supporting the aunt so that she could keep David, DCYF brought him back to Rhode Island and put him in a shelter where he had previously stayed. When he arrived there, he refused to get out of the car and pleaded with the caseworker to bring him back to "Mommy Mary." Shelter staff approached the car and told four-year-old David, "the rules here have not changed." David silently got out of the car and walked into the shelter. This was at least the fifth placement David experienced before his fifth birthday.

60. David's behavior deteriorated while living at the shelter. Although his school indicated that David needed services to address his increasingly disruptive behavior, DCYF failed to provide them. At times DCYF failed to fulfill its responsibility to transport David to school, leaving him to spend entire days in the shelter with nothing to do. David's behavior grew worse, and after several months the shelter asked DCYF to move him. DCYF then sent David to yet another institution, where he was injured because he did not receive proper supervision. David was severely scalded there when, at the age of five, he tried to heat water in a microwave oven.

61. When another of David's aunts expressed interest in caring for David, DCYF failed to pursue this opportunity. By 2000, four years after assuming custody of David, DCYF still had no viable plan for finding a permanent home for him. DCYF was aware that David's emotional state was steadily declining, but it failed to provide the therapeutic services he needed. When the facility where David was residing informed DCYF that it could not meet his needs, DCYF nevertheless left David in that institution for several months, aware that his mental health needs were only worsening.

62. DCYF placed David in a psychiatric hospital when he was six years old. Although he was scheduled to be released from the hospital within a month, DCYF left David in this highly restrictive placement for five months, until July 2001, simply because it had no other placement option for him. DCYF finally moved David to St. Vincent's Home, a residential treatment facility where he lived for the next two years until he was eight years old. While at St. Vincent's, David was sexually abused by a roommate, began to act out sexually, and started to wet his bed almost nightly. David's mental health deteriorated to such an extent that in 2003 DCYF moved him to yet another institution where he required one-on-one supervision. Although DCYF's case plan for David indicated that he would spend only three to six months at this institution, after which he would need to live with a family, David remained at the institution for three years, and he has yet to be placed with a family.

63. Over a four-month period in 2003, David was restrained 105 times by facility staff. That year, DCYF decided that, at the age of 10, after eight years in DCYF custody, David had become "too damaged for placement." DCYF finally permitted adoption recruitment staff to meet David in 2004, eight years after it registered him for adoption. However, later that

year it was decided that adoption would be inappropriate for David and suspended efforts to find an adoptive home for him.

64. In 2006, DCYF moved David to a residential treatment facility out of state. Although David was only 12 years old, he was placed with an 18-year-old roommate. While at this facility, David engaged in sexual self-mutilation. When facility staff asked DCYF if sexual abuse was an issue for David, DCYF erroneously reported that there was no history of sexualized behavior and no known sexual abuse. Between 2005 and 2006, David gained over 50 pounds.

65. Despite DCYF's obligation to ensure the safety and well-being of Plaintiff Children through frequent caseworker visits, five different DCYF case workers met with David a total of only 12 times from 2001 to 2005, including only one visit per year in 2004 and 2005. David has had no adult continuously involved in his life. Because DCYF has moved David so many times, his education has been fragmented and disrupted. David attended three different kindergartens and was moved to new schools four more times between the first and seventh grades.

66. Today, David lives in an institution in Massachusetts, where DCYF sent him in May 2007. Health care professionals have documented that his acute service needs result in part from his history of multiple placements. David is now diagnosed with bipolar disorder, mild mental retardation, and "environmental/situational influences, including his history of neglect and his multiple placements." DCYF has taken few, if any, steps to prepare David for life outside an institution. David has an older brother who has also come forward to care for him, but DCYF has not taken the necessary steps to determine whether the brother would be a suitable permanent caretaker.

67. As a direct result of Defendants' actions and inactions, David has been and continues to be irreparably harmed. Having entered foster care at the age of two, he is still languishing in care 11 years later. DCYF's failure to provide David with permanency causes him harm. David now has serious psychological problems that DCYF has exacerbated by moving him from placement to placement and by failing to provide mental health services to treat his problems as they emerged when he was a young boy. DCYF has also caused David harm by not providing his mental health professionals with his full history, depriving them of information necessary for his proper treatment.

68. Defendants have violated David's constitutional and statutory rights by failing to protect him from harm while in state custody; by failing to provide him with mental health services necessary to prevent his mental health from deteriorating while in DCYF custody; by failing to provide him with appropriate, least-restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services, all of which are required by law and reasonable professional judgment.

69. Named Plaintiff DAVID T. appears through his Next Friend, Mary Melvin. Ms. Melvin currently works as a Senior Companion in the Senior Companion Program at the Department of Elderly Affairs in Cranston, Rhode Island. Previously, Ms. Melvin worked for many years at a nursing home for the elderly and handicapped in Providence, Rhode Island. Ms. Melvin served as a foster parent for at least 25 children in Rhode Island's foster care system over a 20-year period. In 1993 and 1997, she received the Rhode Island Foster Parent of the Year Award. Ms. Melvin was a foster parent to David T. from 1996 to 1998, and she continued to be a resource for him after he left her care. Ms. Melvin resides in North Providence, Rhode Island.

**BRIANA, ALEXIS, CLARE, and DEANNA H.**

70. BRIANA (seven), ALEXIS (five), CLARE (two), and DEANNA (ten months), are sisters in DCYF custody. DCYF has pursued the goal of reunification for each of these children without considering alternative goals, notwithstanding their parents' significant history of maltreating children and despite clear evidence that the children cannot be safely returned to their parents' care. Throughout the years these young girls have been in foster care, only Deanna has lived with a family that has any prospect of becoming permanent. Briana, Alexis, and Clare all currently reside in the unlicensed home of their aunt, who has not expressed interest in adopting them. According to DCYF records, the girls' half brother, who lives with them in their aunt's home, poses a risk to their safety.

71. DCYF placed Briana and Alexis in foster care in September 2003 because their mother, Ms. H., had been incarcerated on drug charges and their father, Mr. H., could not be located. At the time, DCYF was familiar with Mr. H.'s and Ms. H.'s long history of child neglect, which had previously resulted in the termination of Ms. H.'s parental rights to five of her older children, and the termination of Mr. H.'s rights to three children. Despite this history, DCYF assigned Briana and Alexis a permanency goal of reunification with their parents without establishing a plan of services and treatment that would make reunification a viable option. Upon Ms. H.'s release from prison in October 2003, DCYF referred both parents to parenting classes and to mental health and substance abuse evaluations.

72. DCYF first placed Briana and Alexis in the home of their Aunt J. Seven months later, in March 2004, Ms. H. was again incarcerated, this time for theft, larceny, and possibly cocaine possession. DCYF did not change the girls' permanency goals or the service

plan for Ms. H. following this change in circumstances. The girls were sporadically taken to visit their mother in prison.

73. In June 2004, DCYF returned Briana and Alexis to the care of their father without first determining whether he could provide a safe and appropriate home for the girls or even whether he had complied with the service plan that DCYF had established. In September 2004, Ms. H. was released from prison and moved back home with Mr. H. and the two girls, despite DCYF's failure to evaluate whether the girls could be safely reunified with their mother or whether Ms. H. had met any of the obligations DCYF had set for her. Within two months of Ms. H.'s return, she was discharged from a substance abuse program for noncompliance. Within seven months, in February 2005, she was again incarcerated for larceny. In April 2005, DCYF closed the family's case completely, without putting any plan in place to ensure the children's safety upon Ms. H.'s eventual release from prison and without setting any conditions on her reunification with the family.

74. In June 2005, DCYF again took custody of Briana and Alexis, then five and four, after Mr. H. smoked crack cocaine in their presence. The girls also disclosed that an adult male who had been living in the home had sexually touched them. DCYF placed Briana and Alexis with a maternal aunt, Aunt J. There is no indication that DCYF had the girls examined for possible sexual abuse or took any other measures to address the children's revelation.

75. In July 2005, Ms. H., who had recently been released from prison, gave birth to her eighth child, Clare. Sometime before this date, DCYF had discontinued the visits it had allowed Ms. H. to have with Briana and Alexis. DCYF took immediate custody of Clare and placed her in the home of Aunt G., another maternal aunt who had previously adopted three of

Ms. H.'s older children. DCYF never licensed Aunt G. as a foster parent, nor did it conduct a safety assessment, although there were clear indications that DCYF knew of safety risks in the home. Upon placing Clare in the home, DCYF instructed Aunt G. that she could never allow her oldest adopted son to be alone with the infant.

76. DCYF arranged regular supervised visits between Briana and Alexis and their parents. The parents missed many of these visits, and during one visit Mr. H. was observed holding Alexis upside down by her leg. Following scheduled visits that the parents missed, the girls were angry and their behavior was troubled. Yet DCYF continued to pursue reunification for the family.

77. Upon the request of Ms. H., in November 2005, DCYF moved Briana and Alexis out of Aunt J.'s home, where they had been thriving for two years, and into to the home of their Aunt G., where Clare was living. At the time DCYF placed the girls in the home, Aunt G. was still not a licensed foster parent. DCYF again told Aunt G. not to permit her eldest adopted son to be alone with the girls. There is no indication that DCYF provided any support to Aunt G. such that she could ensure, with six children to care for, that none of the three girls were ever alone with her son; nor is there any indication that DCYF pursued any other, possibly permanent, home for the girls. DCYF continued to permit the girls' parents to visit, under Aunt G.'s supervision. Aunt G. has made it clear to DCYF that she has no intention of adopting Briana, Alexis, or Clare.

78. Throughout 2006, Ms. H. and Mr. H. only sporadically visited their daughters, and failed to appear at important hearings involving their children. DCYF nonetheless pursued a plan of reunification for all of the girls. In October 2006, Ms. H. gave birth to her ninth child, Deanna. Ms. H. had still not undergone substance abuse treatment, so

DCYF took immediate custody of the infant and placed her in a foster home. DCYF assigned Deanna the same permanency goal assigned to her sisters: reunification with her parents.

79. In February 2007, more than three years after Briana and Alexis first entered foster care, their father's parental rights were terminated as to them and their sister Clare. Although DCYF filed a petition to terminate Ms. H.'s parental rights at the same time, it never pursued approval of the petition. Instead, over the next months the agency continually asked Ms. H. to consent to the termination, all the while allowing her to visit her daughters. In March 2007, both Ms. H. and Mr. H. were arrested yet again. Upon Ms. H.'s release shortly thereafter, DCYF resumed her visits with her daughters and is awaiting her consent to termination rather than actively pursuing the petition to terminate her rights involuntarily. It was not until May 2007 that DCYF finally referred two of her daughters for adoption. DCYF continues to maintain a permanency goal of reunification for Deanna, despite the lack any evidence that her parents have addressed any of the issues that led to the loss of all of their previous children.

80. As a result of Defendants' actions and inactions, Briana, Alexis, Clare, and Deanna have been and continue to be harmed. DCYF maintained a manifestly inappropriate permanency plan of reunification for Briana, Alexis, and Clare for years. During this time Briana and Alexis were returned to a clearly unsuitable home environment, in which they suffered further neglect and possible sexual abuse. DCYF has left Briana, Alexis, and Clare to languish without appropriate permanency services in an unlicensed and overcrowded foster home which DCYF knows will not be permanent and in which their safety is in constant jeopardy. DCYF's steadfast pursuit of reunification, along with the temporary nature of the girls' placements, has caused and continues to cause them psychological harm. DCYF remains committed to a reunification plan for Deanna, even though the infant has never lived with her

parents and there is little reason to believe that the goal can be achieved. The real effect of DCYF's plan for Deanna is to deny her the opportunity for a permanent home.

81. Defendants have violated, and continue to violate, Briana, Alexis, Clare, and Deanna's constitutional and statutory rights by failing to protect them from harm while in care and by failing to develop and implement an appropriate permanency plan in a timely manner to allow them to secure a permanent home, all of which are required by law and reasonable professional judgment.

82. Named Plaintiffs BRIANA, ALEXIS, CLARE, and DEANNA H. appear through their Next Friend, Gregory C. Elliott. Professor Elliott is Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliott is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and he is currently writing a book on how adolescents come to believe that their lives matter to others.

**DANNY and MICHAEL B.**

83. DANNY and MICHAEL B. are brothers, ages six and five, respectively. They have been in DCYF custody for over three years, but have been known to DCYF for most of their young lives because of their mother's chronic neglect of them. In the years that they have been in custody, they have resided in what DCYF knows can only be temporary and inappropriate placements, in one of which Danny was seriously abused. Throughout their time in care, DCYF has failed to provide timely psychological services to address Danny and Michael's mental health problems, which are becoming more acute as these young boys remain without a permanent home.

84. Danny and Michael were first reported to DCYF as being neglected by their mother in January 2004. DCYF investigated the report and decided to take no action. The boys again came to the attention of DCYF four months later when, at ages three and two, they were found wandering unsupervised outside their home at 6 a.m. When the children were returned to their home, their mother, who has an extensive arrest record, was found unconscious from alcohol abuse. DCYF left the children in the home, but required the mother to agree to certain services.

85. In January 2005, the boys were again reported wandering unsupervised outside the home. DCYF investigated the report, but again decided to take no action. The next month, DCYF visited the home and found it to be unfit for human habitation, with human feces all over the bedroom and nowhere for the children to sleep; the mother was again intoxicated. DCYF left Danny and Michael in this wretched home. In March 2005, DCYF received a report that Danny and Michael were again wandering the streets. Despite these repeated reports, DCYF did not remove Danny and Michael from this harmful environment until April 2005. When DCYF did remove Danny and Michael from their mother's home, it assigned them the goal of reunification.

86. DCYF first placed the brothers in the unlicensed home of their maternal great-grandmother, without first conducting a safety and background check. The great-grandmother told DCYF that she could only care for Danny and Michael temporarily and the brothers had to be moved within the week because of the great-grandmother's poor health. Instead of locating another home where the brothers could be together, DCYF separated Danny and Michael and placed them in separate foster homes.

87. In July 2005, DCYF placed Danny in the home of a foster mother with a DCYF history of abuse complaints dating back to 1999. These reports included allegations that she had left children she was fostering with an unapproved caretaker for over a week, during which time the children were beaten with a wire hanger and other objects. This is the home in which Danny was later sexually assaulted.

88. DCYF returned Michael to his maternal great-grandmother, who DCYF had by then licensed, even though she told DCYF that she could not take either of the children for the long term and that she did not want Danny to live with her. For months, DCYF failed to provide the great-grandmother with Michael's medical card, without which she could not obtain services for him.

89. During 2005, both Danny and Michael suffered mental health problems which DCYF failed to timely address. Although DCYF knew that Danny was in need of specialized services, it did not provide them to him until the end of August 2005. At that time, the children's great-grandmother alerted DCYF to Michael's need for mental health services as well, but DCYF did not provide mental health services to Michael until the end of the year. By the end of 2005, DCYF had evidence that Danny needed a sexual abuse evaluation.

90. Throughout 2005, Danny and Michael's mother made no progress towards addressing the problems that had led to the boys' removal. By May 2005, she was not complying with drug treatment, had tested positive for drugs, and was missing visits with her sons, causing Danny significant distress. By June, she had been arrested twice for drug possession and had stabbed herself in the chest in a suicide attempt. By August, she was homeless. At none of these junctures did DCYF change the boys' permanency goal from reunification to another, more viable and appropriate goal. In December 2005, DCYF was

directed to free Danny and Michael for adoption by terminating their mother's parental rights if no progress was being made toward reunification by March 2006. Although no progress was made, DCYF failed to file termination petitions until July 2006.

91. In July 2006 five-year-old Danny was sexually assaulted in the home of the foster mother whose prior dangerous history was known to DCYF. The foster mother's 15-year-old grandson, who lived in the home, was seen emerging from the bathroom of the house, his penis erect, when he grabbed Danny, pulled him into a bedroom, and locked the door. Danny screamed, "Don't touch me!" When the grandson opened the door, Danny's pants were down. Danny was immediately removed from this foster home, and the foster home was closed the same day. Danny told investigators that the grandson had sexually exposed himself on approximately four prior occasions. During a previous intervention in the home, DCYF had instructed the foster mother to ensure that the grandson sleep in a bedroom separate from another child.

92. After this episode of sexual abuse, DCYF placed Danny in yet another temporary foster home. In August 2006, DCYF reunited him with his brother in the home of his maternal great-grandmother, who was unable to offer the boys a permanent home. Upon being placed together, both boys began to exhibit sexualized behaviors. Within a month, DCYF removed Danny from his great-grandmother's home because of these issues. DCYF sent Danny to a group home in Middletown, where he remains to this day.

93. Excluding respite placements, Danny has been in at least six placements while in DCYF custody and Michael has been in at least four, including DCYF's original placement of the brothers with their mother for in-home services. Despite the fact that they are

only six and five years old and have been in care since 2004, the brothers remain separated with no prospect of adoption.

94. As a result of Defendants' actions and inactions, Danny and Michael have been and continue to be irreparably harmed. Danny has been sexually abused in an unfit foster home and now, at the age of six, has been institutionalized to address his acute mental health problems. Michael has been left to languish with an elderly relative who has made it clear that she cannot permanently care for him. Because DCYF has not provided proper permanency planning, neither of these very young boys has any current prospect of growing up in a loving and permanent home. The lack of any prospect of growing up in a safe and stable home is psychologically harmful. Both Danny and Michael have experienced mental health problems which DCYF has failed to adequately address.

95. Defendants have violated, and continue to violate, Danny and Michael's constitutional and statutory rights by failing to protect them from harm while in care; by failing to develop and implement an appropriate permanency plan in a timely manner to allow them to secure a permanent home; and by failing to timely address their mental health needs, all of which are required by law and reasonable professional judgment.

96. Named Plaintiffs DANNY and MICHAEL B. appear through their Next Friend, Gregory C. Elliott. Professor Elliott is Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliott is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and he is currently writing a book on how adolescents come to believe that their lives matter to others.

**B. The Defendants**

97. Defendant DONALD L. CARCIERI is the Governor of Rhode Island and is sued in his official capacity. Pursuant to Article IX, Section 1 of the Constitution of Rhode Island of 1986, the executive power of the state is vested in the Governor. Pursuant to Article IX, Section 2 of the Constitution of Rhode Island of 1986, the Governor is responsible for ensuring that all executive departments and agencies within the state, including DCYF, faithfully execute and comply with applicable federal and state law. Governor Carcieri maintains his principal office at the Office of the Governor, State House, Room 115, Providence, Rhode Island, 02903.

98. Defendant JANE A. HAYWARD is the Secretary of the Executive Office of Health and Human Services in Rhode Island and is sued in her official capacity. The Executive Office of Health and Human Services provides common strategic planning, fiscal management, and related policy and programmatic oversight to and across designated human services departments within the Rhode Island executive branch, including DCYF. Secretary Hayward maintains her principal office at the Pastore Complex, Hazard Building, 74 West Road, Cranston, Rhode Island, 02920.

99. Defendant PATRICIA MARTINEZ is the Director of the Department of Children, Youth and Families and is sued in her official capacity. Pursuant to section 42-72-1 of the Rhode Island General Laws, Director Martinez is responsible for administering certain child welfare services and programs, including services and programs provided and administered by DCYF, and assuring that all such services and programs operate in conformity with constitutional, statutory, and regulatory requirements. Director Martinez serves by appointment

of the Governor. Director Martinez maintains her principal office at the Department of Children, Youth and Families, 101 Friendship Street, Providence, Rhode Island, 02903.

## V. The Rhode Island Child Welfare System

100. The Department of Children, Youth and Families is responsible for ensuring the safety and well-being of the children it takes into custody in response to allegations of abuse or neglect. Its Director, Defendant Martinez, is responsible for administering and managing all child welfare staff and services statewide and for reporting to the Governor, Defendant Carcieri.

101. DCYF has the duty to deliver child protective services, which include the investigation and assessment of reports of abuse and neglect occurring in family homes and in foster care placements, and the implementation of timely, appropriate corrective steps, including a child's removal from home or a foster care placement if warranted to keep the child safe when abuse or neglect of the child may have occurred.

102. DCYF also has the duty to ensure that children in state foster care custody are safe and to provide state-supervised services that meet the basic needs of children in its foster care custody. Such services include placing children in screened, licensed foster homes or other appropriate placements and providing children counseling to help them deal with the trauma that caused them to be removed from their homes and with the further trauma associated with being separated from their families. Foster care services also include the development and implementation of appropriate permanency plans designed to return children home quickly and safely, or, if that is not possible, timely providing children another permanent home, usually through adoption. In addition, as the legal custodian for children in state foster care custody,

DCYF is responsible for ensuring that all children in foster care receive medical, dental, and mental health treatment; education; and assistance with developmental needs.

103. DCYF operates four regional offices responsible for case management and planning and for ensuring the delivery of necessary services to children and families; a statewide Adoptions Unit responsible for adoption-related functions such as recruiting adoptive parents, matching children with adoptive families, and coordinating with private agencies that contract with DCYF to provide specialized and targeted adoption planning and support; and a statewide Licensing Unit responsible for licensing and monitoring foster homes, adoptive homes, and group homes, including relative and child-specific placements. Licenses must be reviewed every six months and must be renewed annually to remain valid.

104. DCYF contracts with private child-placing agencies in Rhode Island for the provision of many foster care services, including the operation of shelters, group homes, residential treatment centers, and therapeutic foster homes. DCYF remains legally responsible for every Plaintiff Child who receives foster care services from a child-placing agency.

105. The Licensing Unit is also responsible for licensing child-placing agencies, promulgating the rules governing them and the standards that they must meet in furnishing contracted services, and monitoring their compliance with all applicable rules and standards. The Licensing Unit is also responsible for investigating regulatory violations and enforcing child-placing agencies' compliance with DCYF regulations and policies.

## VI. Defendants Have Long Known That Rhode Island's Child Welfare System Cannot Fulfill Its Duties to Plaintiff Children Without Urgent, Systemic Reform

### A. The 2003 System of Care Task Force Report Concluded that the Child Welfare System Was Harming Children and That Systemic Reform Was Necessary

106. In 2001, the State of Rhode Island created a System of Care Task Force ("Task Force") to study existing child welfare services in the state and "to design a full system of services that will provide effective supports and services to children and their families." The Task Force's January 2003 report confirmed that the state's foster care system was "disorganized and fragmented" and identified widespread systemic failings and inadequacies in the system. The report concluded that abused and neglected children in state custody were being harmed as a direct result of these failings.

107. The Task Force report documented that DCYF unlawfully allowed children to languish in foster care for years: "[N]early 3 in 10 children spend more than 3 years in care and nearly 1 in 8 spends 6 or more years in care. This data contradicts the mandate that 'foster care' should be used as a temporary solution to perilous problems with families. Federal and state law prescribe shorter time periods in which to achieve permanency for children."

108. The report found that DCYF failed to maintain an appropriate array of suitable placements for children in foster care: "Additional foster home resources, particularly for those 'hard to place' groups, are necessary in order to meet the needs of children entering placement." Instead of "actually choosing a home on the basis of suitability" for the individual child, placements were dictated by whatever bed happened to be available at the time. The inadequacy of the placement array was due, in part, to inadequate reimbursement rates for foster parents and service providers and to the common perception of DCYF "as bureaucratic, unwieldy, insensitive and lacking in a child centered staff who can respond to foster families'

need for service in a timely fashion. Personal styles of both administration and line staff have been described over a range from 'caring to cruel.'" This perception, along with the low reimbursement rates, was driving needed resources out of the system: "Over approximately a five year period, an alarming decline in the total number of licensed foster homes has been evident."

109. The Task Force report found major deficiencies in the system's delivery of essential services to children in foster care and their families, problems it attributed, in part, to low reimbursement rates for service providers: "The State lacks sufficient out-patient services for children and families. This has been attributed to minimal supply, despite the demand, reflecting inadequate reimbursement rates." " Psychiatric care for [DCYF-involved] children and youth in Rhode Island… has been primarily driven by our system of reimbursement for care, rather than the individual needs and best interest of the patient." DCYF's failure to coordinate services for children in the foster system also hindered timely access to psychiatric services.

110. The Task Force also identified significant unmet workforce needs that directly resulted in harm to children: "Training for line staff is needed on gathering and communicating the types of child specific information that is critical for matching purposes. . . . Numerous foster placements are disrupted and resources lost due to poor communication." Other personnel problems identified in the report included insufficient supervisory resources: "Due to the high volume of licenses that are processed on a daily basis and the number of social caseworkers that must be supervised, the need for additional support for the supervisor remains a necessity."

111. The Task Force concluded that children in state foster care custody were suffering physical and mental harm and trauma as a direct result of the child welfare system's

failings and deficiencies. Increasing numbers of children in foster care were being admitted to psychiatric hospitals in Rhode Island because of limited alternative treatment opportunities. Those children and youth suffered from a wide spectrum of mental illnesses, including adjustment disorder, major depression, post-traumatic stress disorder, and bipolar disorder. The Task Force found that children and their families had to endure excessive waits for necessary care because the system lacked outpatient mental health services and because mental health services were fragmented and lacked coordination. Similarly, the Task Force found that youth who had been discharged from in-patient treatment had to be readmitted because the system did not provide sufficient treatment alternatives to psychiatric hospitalization for youth with mental illness. This issue disproportionately affected adolescents in foster care.

112. The Task Force found that children were being harmed by being moved repeatedly among inappropriate DCYF placements. One manifestation of this harm was in education: “When children experience multiple and/or frequent moves from one placement to another, their academic progress is interrupted and gaps in their education develop. It is common among youth who spend a significant amount of time roaming around the placement system to be 2 or 3 years behind their peers in their education; many leave the system without a high school diploma.”

113. The Task Force report made clear that Defendants’ child welfare system was beset by systemic problems that were causing harm to children.

### B. The 2004 Federal Child Welfare Review Identified Widespread Problems in Rhode Island’s Child Welfare System

114. Because Rhode Island receives federal funding to operate its child welfare system, it is subject to periodic reviews, Child and Family Service Reviews (“CFSRs”), conducted by a division of the United States Department of Health and Human Services

("HHS"). These reviews are meant to assess whether states are in substantial conformity with certain federal child welfare requirements in the areas of child safety, permanency, and well-being, to determine what is actually happening to children and families receiving child welfare oversight and services, and to assist states to better help these children and families.

115. Rhode Island's CFSR was completed in 2004. In nearly every area reviewed, Rhode Island failed to meet federal standards, often by a wide margin. Rhode Island failed in the following areas: protecting children from abuse and neglect; safely maintaining children at home when possible and appropriate; providing permanency and stability in children's living situations; preserving continuity of family relationships and connections; enhancing families' capacity to provide for children's needs; ensuring that children receive services to meet their educational needs; and ensuring that children receive services to meet their physical and mental health needs. The CFSR found that, in 39 percent of cases, caseworkers failed to make monthly visits with children on their caseloads. These visits are essential to ensuring that children are safe. The CFSR further found that, in 66 percent of cases reviewed, caseworkers failed to make required visits with parents of Plaintiff Children, a key element in successful reunification of children and their parents. Finally, the CFSR found that children were not receiving adequate services to meet all of their physical and mental health needs 39.6 percent of the time.

116. Rhode Island also failed to meet federal requirements for five out of six "outcome measures" reviewed: repeat maltreatment; maltreatment while in foster care; re-entry into foster care; timely reunification; and multiple placements. For example, the CFSR reported that 1.1 percent of children in foster care were being reabused or neglected while in foster care, far above the then-national norm of 0.57 percent. The CFSR also found that 19.2 percent of

Rhode Island children who were discharged from foster care re-entered DCYF custody within 12 months, compared to the accepted national norm of 8.6 percent.

117. Rhode Island also failed to meet federal requirements for six of seven "systemic factors" reviewed: its case review system; its quality assurance system; its training; its service array; its responsiveness to the community; and its licensing, recruitment, and retention of foster and adoptive parents.

**C. The 2005 T.J. Wright Child Fatality Report Called for Systemic Reform**

118. After T.J. Wright was killed by foster parents chosen by DCYF, a Child Fatality Panel conducted a full investigation into the matter. The Child Fatality Panel issued its report in October 2005, concluding that the Rhode Island child welfare system had serious, systemic, and pervasive problems. Among them:

- Background checks and other due diligence necessary to assure basic safety before placing a child in a kinship home were not being performed;
- Children were being placed in homes that were not licensed by DCYF to care for foster children, either because the homes had never been licensed or because the license had expired;
- Foster care home license applications were pending for unacceptable periods of time;
- "The caseloads of the social workers" were "untenable" and "social workers [were] unable to visit the very children they pledge to protect;" and
- Supervisors were not providing adequate supervision to caseworkers.

119. The Child Fatality Panel's Report made 15 specific recommendations, including:

- The DCYF Director of Licensing or the Director of a Family Support Unit should be required to authorize the placement of a child in a kinship foster home since many children were being placed in relative care before licensure was completed;

- Social worker caseloads should be reduced to no more than 14 families per social caseworker;
- DCYF should implement an active supervision plan to remedy the failure of supervisors to actively supervise their caseworkers;
- The DCYF Licensing Unit should establish a firm six-month timetable for completing the licensure process on any family foster home; and
- Kinship placements should receive the background checks and other due diligence performed on third-party foster homes to assure basic safety before a child is placed in a kinship home.

### D. The Child Advocate's 2006 Report Found Little Progress Had Been Made

120. On October 31, 2006, the Rhode Island Child Advocate reported on DCYF's progress in implementing the recommendations of the Child Fatality Panel. The Child Advocate concluded that DCYF had not reduced social worker caseloads and had not implemented performance evaluations or other reasonable means of supervising social workers and assuring accountability. As a result of these shortcomings, children in foster care remained in peril.

### E. A 2006 Federal Regional Review Revealed Little to No Progress in Improving the Child Welfare System

121. After failing its Child and Family Service Review in 2004, Rhode Island was required to submit a Program Improvement Plan (PIP) to the federal government. The PIP, approved in August 2005, requires that DCYF make quarterly reports to the federal government on its progress in achieving the goals set out in its plan. The federal government also conducts regional reviews of such progress. In June 2006, DCYF submitted its "Annual Progress and Services Report" to HHS, revealing that its ability to keep children safe had *worsened* since 2004, with an increase in both the recurrence of maltreatment to children and the incidence of child abuse or neglect experienced by children in DCYF care.

122. Children's permanency and stability had also worsened, with increases in the percentage of children who experienced two or more placements during their first 12 months in care. DCYF also reported that, nearly two years after failing to meet the federal standards in 2004, DCYF was *less* effective at promoting reunification with parents, at securing guardianship or permanent placement with relatives for children, at supporting the relationship of child and parents, and at placing children in homes located near their siblings and parents. Caseworker visits with children had also decreased since 2004.

123. According to DCYF's sixth quarterly report on the status of its progress between November 18, 2006 and February 12, 2007, Rhode Island continues to fail to meet the national accepted norm for the incidence of child abuse and neglect in foster care.

### F. The Rhode Island Senate Has Recognized the Child Welfare System's Chronic Failings

124. On March 22, 2007, after a legislative investigation and hearing, the Rhode Island Senate passed Senate Resolution 07-R128, in which it articulated numerous concerns in a series of findings. For example, the combination of rising caseloads and staff turnover was "creating a downward cycle of effectiveness and morale" among DCYF social workers.

125. The Resolution noted that DCYF's problems were not new: "Numerous studies and recommendations have called on the department to institute a better coordinated and managed approach to the behavioral health needs of children." The Senate declared that "DCYF must develop outcome and quality measures to guide funding and program design for child welfare prevention and support services, including the use of performance-based contracting with providers of care."

126. Based on these and other findings, the Rhode Island Senate formally requested ongoing monthly reports from DCYF to address the Senate's concerns about

caseloads, overtime hours and costs, and "[t]he Adoption and Foster Care Unit's performance and outcome measurements, including numbers of homes licensed, awaiting training, and awaiting licensure by type of home (therapeutic, foster, kinship, pre-adoptive)."

127. Referring to the outcome measures used in the federal review, the Senate also formally requested biannual reporting of "progress toward achieving standards for the specific measures. . . [for] safety, permanency and well-being." Finally, the Resolution requested biannual reports of "[t]he percentage of contracts issued by DCYF that report on specific family and child-focused outcomes, and include independent evaluations of the contracted-services effectiveness; and [s]ystem changes made to address the behavioral health needs of children in the most appropriate settings."

## VII. Current Systemic Child Welfare Failings and the Resulting Harm to Children

128. Defendants have failed to take appropriate steps to reform Rhode Island's dysfunctional child welfare system, despite clear evidence that the system's failings have deepened, have hurt children, and are putting children at further risk of harm.

### A. Plaintiff Children Are Abused and Neglected in Foster Care

129. When DCYF takes a child into state foster care custody, it is responsible for the child's safety and well-being as long as the child remains in custody. DCYF has failed to develop and provide the range of services and systems necessary to ensure the safety and well-being of the children in its foster care custody. Plaintiff Children suffer harm as a direct consequence of this failure. There is no clearer example of this than the abuse or neglect of children while in foster care, such as the abuse suffered by Named Plaintiffs Danny, Tony, and David.

130. In five of the six years from Federal Fiscal Year (FFY) 2000 through FFY 2005, Rhode Island recorded the single highest rate of substantiated child abuse or neglect occurring to children in foster care among all states that reported data. Not only has Rhode Island's rate of abuse or neglect of children in foster care remained at or near the worst in the nation, it has consistently far exceeded benchmarks set by the federal government. In FFY 2004, 1.32 percent of children in foster care in Rhode Island were abused or neglected, more than twice the federal benchmark of a maximum rate of abuse or neglect of 0.57 percent for children in foster care. The following year, FFY 2005, the incidence of abuse or neglect of children in foster care in Rhode Island rose to 1.59 percent, or 2.79 times the federal benchmark.

131. Things have only gotten worse recently. For example, DCYF Region III recorded a 2.01 percent rate of abuse or neglect in care in May 2006. At the same time as Rhode Island's rate of abuse in care has risen, the federal benchmark has been revised to reflect a lower acceptable rate of abuse in care nationwide; in June 2006, the federal government published a new benchmark of 0.32 percent or less. In February 2007 alone, DCYF reported eight substantiated instances of abuse or neglect in care by a foster parent or facility staff. If abuse and neglect continues at this pace, Rhode Island would have a rate of abuse or neglect in care of 3.1 percent for the year 2007, or almost ten times the new federal benchmark.

132. The rate of abuse or neglect of children in foster care in Rhode Island is so high that children in Defendants' care are actually more likely to suffer abuse or neglect than their peers in the general population. In 2005, the most recent year for which data are available, the rate of abuse or neglect for children in the general population was 1.37 percent but the rate of abuse or neglect for children in foster care was 1.59 percent.

133. The high rates of abuse or neglect of children in DCYF care are the direct consequence of Defendants' actions or inactions. DCYF assigns such large caseloads to its social caseworkers that they are unable to make the regular face-to-face visits to Plaintiff Children that are essential to ensuring that these children are safe. DCYF has so few foster homes that it places children in homes without licenses, depriving them of basic protections of foster parent background checks and training. DCYF also allows licenses to lapse without taking any additional steps to ensure that Plaintiff Children in homes with lapsed licenses are safe. The shortage of foster homes forces DCYF workers to make poor decisions when faced with a choice of, for example, whether to place a child in an unlicensed, unsafe home, or in an inappropriate institution. DCYF fails to monitor or support foster parents who are managing difficult and stressful situations involving the children they parent. DCYF also fails to provide the treatment and services necessary to ensure that children's behavior does not deteriorate in foster care. Instead of appropriately investigating and addressing abuse or neglect in foster placements, DCYF continues to rely on foster care settings known to pose a risk of harm to children. The high incidence of abuse or neglect in foster care is the predictable consequence of such conduct by Defendants.

## B. Defendants Place Plaintiff Children in Homes and Institutions that Do Not Meet Their Needs and That Do Not Comply With Reasonable Professional Standards

### 1. Defendants Have Failed to Develop and Maintain a Sufficient Array of Foster Care Placements

134. In the Statewide Assessment that DCYF submitted in 2003 as part of its federal review, it admitted that it was "not able to assure that children are placed in the types of placements that are the most family like and most appropriate for their individual needs, both at the time of initial entry and throughout their stay, because of a serious lack of foster family

homes, resulting in demand for and use of all other types of placements. One of Rhode Island's critical needs is for a sufficient number and type of foster homes so that the first placement in foster care is an appropriate match. We all too often place a child in a less than ideal placement at the time of entry, which later increases the likelihood that a subsequent placement will need to be made."

135. DCYF's chronic shortage of a sufficient number and variety of placements is due, in part, to its failure to recruit, license, train, and support prospective foster parents. Further, under DCYF's current system, potential foster parents may have to wait for more than a year to be licensed by DCYF. The inadequate payments DCYF makes to foster parents to provide for children's room and board are another contributing factor. DCYF also has trouble retaining foster parents, in part because foster parents can feel ill-treated by the agency.

136. Because DCYF does not have enough suitable foster care placements, it typically places Plaintiff Children in the next available bed, regardless of whether that placement meets children's needs and regardless of whether they will receive adequate care and supervision. DCYF places children in homes or institutions specifically known to be mismatched to their needs, and often the first placement DCYF makes for a child, even an infant, is in a shelter, where a child can then linger for months.

**2. Defendants Unnecessarily Place Children in Shelters and Institutions, Where They Stay for Too Long**

137. Under federal law and reasonable professional standards, children taken into foster care custody must be placed in the least restrictive and most family-like environment possible, taking into account the child's particular needs. Most children need to live with families and not in institutions. Nevertheless, DCYF places an extraordinary number of Plaintiff Children in group homes, emergency shelters, and other institutions, even when such placements

are not warranted by children's individual needs. In FY 2004, the last period for which data are available, Rhode Island placed 36 percent of children in its foster care custody in group or institutional settings—almost twice the national average of 19 percent. The situation today is even worse. In February 2007, DCYF placed 29 percent of the children newly removed from their homes in shelters, and DCYF placed a total of 48 percent in group or institutional settings. Many remain in these inappropriate placements for months or years.

138. Because DCYF typically places children in the next available bed, many children in state foster care custody end up spending time in emergency shelters. DCYF's reliance on shelter placements results in multiple short-term placements, even for young children who suffer the most from this instability. Although emergency shelters are designed to be temporary placements lasting no more than 90 days, DCYF frequency exceeds this maximum, leaving children in emergency shelters for extended periods of time that can last a year or more. For example, Named Plaintiff David spent three months in a shelter when he was just four years old. Shelters are rarely, if ever, appropriate placements for children. They are not safe, nurturing, or healthy environments. Furthermore, it is far more expensive to maintain children in shelters than to maintain them with foster families.

139. Absent circumstances where children require specialized care, institutions do not meet children's developmental and emotional needs and can cause them trauma. Institutions are particularly damaging to infants and young children, causing a variety of harms, including: delayed language development; poor mental development and adaptive skills; an increased risk of serious infectious illness; less stability; lower rates of adoption; and a greater likelihood of remaining in care.

140. Yet DCYF routinely places large numbers of infants and young children in institutions. In FY 2004, the last period for which data are available, DCYF placed 18.9 percent of children in its custody below the age of 12 in group and institutional settings, more than twice the national median of 8.3 percent in 2003, the last period for which data are available. Although even temporary placements in such settings are harmful to young children, it is not uncommon for young children in Rhode Island's foster care system to spend long stretches of time in group placements, such as Named Plaintiff David, who has been living in institutions for the past 9 years, since the age of four. One four-year-old girl who was put in a group home for a 90-day placement ultimately spent a year in that facility before she was transferred to a therapeutic placement.

141. Paradoxically, suitable institutional settings for those children who could benefit from congregate care are often unavailable when needed. For example, the Rhode Island Supreme Court has recognized "the chronic shortage of adequate juvenile residential 'step-down' alternatives to psychiatric hospitalization." *In re Stephanie B.*, 826 A.2d 985, 990 (R.I. 2003). As the Court noted, DCYF has admitted to keeping children, such as Named Plaintiff Sam, hospitalized in mental health institutions even when medically unnecessary because it lacked suitable residential placements. Unnecessary confinement to a psychiatric hospital is dangerous and harmful to anyone, particularly a child.

### 3. Defendants Send Children in Foster Care Far from Their Homes and Communities

142. Both reasonable professional standards and DCYF policy require that children in foster care whose permanency goal is reunification be placed near their homes. Removal from home and placement in foster care is inherently traumatic for children. Living in

one's neighborhood minimizes that trauma by helping children maintain ties with parents and siblings and by avoiding unnecessary separation from friends, school, and local supports.

143. Nevertheless, DCYF sends most children in foster care to live in placements that are distant from their homes, schools, and communities. As of June 12, 2007, at least 47.71 percent of children in foster care were living in placements outside their home region. Though some children are placed out of their home region so they can live with relatives elsewhere in the state, the prevalence of out-of-region placements is directly tied to DCYF's failure to recruit and retain a sufficient array of suitable placements throughout the state. One child, whose family is already having difficulty visiting him in a remote in-state placement, was moved to an out-of-state facility because there is no facility in Rhode Island that can provide the required services.

144. Additionally, DCYF assigns caseworkers to children based on the region in which the children lived prior to entering foster care, not based on the region in which they are placed. As a result, many caseworkers are responsible for children who are placed in remote areas of the state. The need for caseworkers to travel to other regions to perform in-home visits, combined with their already unmanageable caseloads, means that many caseworkers cannot make the in-home visits necessary to ensure that children are safe and that their needs are being met. This leaves children who are placed remotely at even greater risk of being abused, neglected, or languishing in care without having their needs met.

#### 4. Because Children Are Placed in Inappropriate Homes and Institutions, Their Placements Frequently Disrupt, and Children Deteriorate as They Are Moved from Place to Place

145. Reasonable professional standards provide that children in foster care should not be moved from one foster home or facility to another unless moving is in their best

interests. Unnecessary moves increase the instability in the lives of children in foster care, often leading to attachment problems, defiance, and other mental health issues due to feelings of loss, rejection, and trauma. Research has shown that placement instability has a significant impact on children's behavioral well-being, in addition to the impact of the trauma caused by suffering abuse and neglect and being placed into foster care. For this reason, reasonable professional standards provide that agency staff, foster parents, and others involved in a child’s care should “work actively to achieve stability of care with the foster family. . . . Proactive efforts should continually promote stability and avoid disruptions in foster care.”

146. Children in Rhode Island foster care routinely experience multiple placements during their stays in state custody, largely because of inappropriate placements and Defendants’ failure to deliver necessary services to support children in their placements. The 2004 federal review concluded that placement stability in Rhode Island was the area of “greatest concern.” The CFSR found that during the review period, 31 percent of children whose cases were reviewed experienced multiple placement moves that were not in their best interests.

147. More recently, DCYF shuffles children from place to place, with even greater frequency. In FFY 2006, 14 percent of the 2,153 children who had been in out-of-home care for less than 12 months had already experienced three or more placements. Of those children who had been in care between 12 and 23 months, 33 percent had gone through three or more placements. And of those children who had been in care for more than 24 months, 67 percent had experienced three or more placements. According to DCYF, fully 24.2 percent of children in foster care experienced three or more placements during the 12 months leading up to March 31, 2006. Put another way, only 75.8 percent of foster children had two or fewer

placements within the previous 12 months, far short of the national benchmark of at least 86.7 percent.

148. Although these data do not specify how many placements children experience beyond three, children often suffer far more than three placements during their time in foster care. One child had 15 placements over the course of only two years, with six occurring in a single 16-day period. Caesar is only five years old and has already had eight placements. Tony and Sam have already been placed in ten or more placements in the eight years they have been in DCYF custody. There is a growing pool of two- and three-year-old children in foster care who are living in shelters and have already been through multiple placements, in some cases multiple adoptive placements, in their short lives.

149. The longer children remain in DCYF foster care, the more moves and disruptions they experience. These moves are directly due to Defendants' acts and omissions in failing to develop an adequate placement array, placing children in the first available bed rather than exercising reasonable professional judgment by basing placement decisions on the best interests of the children, and failing to assess children's needs and to deliver services to meet those needs.

150. Defendants' failure to provide placement stability to the children in their care causes harm to those children. Each new placement creates or exacerbates emotional trauma for children and results in behavioral, developmental, intellectual, and attachment problems. Moving children through multiple homes and institutions also often disrupts their education by forcing them to move to new schools. It frays the ties between children in foster care and their parents and siblings, friends, and community.

### 5. Defendants Separate Siblings in Foster Care Because They Have Failed to Develop an Adequate Placement Array

151. Both reasonable professional standards and DCYF policy emphasize the importance of keeping siblings together when they are taken into foster care, unless one or more of the children has a serious need that justifies separation. Separating siblings should be the exception, not the rule.

152. However, the 2004 federal review found that in 25 percent of cases, such as in the case of Named Plaintiffs Danny and Michael, DCYF had failed to place children in foster care with all of their siblings when separation was not warranted by the individual children's safety or treatment needs. In some cases, sibling separation was "due to the agency not making concerted efforts to ensure that sufficient placement resources are available to accommodate siblings." In other cases, "insufficient efforts were made to ensure that siblings remained together." One child who entered care at age two with his two brothers has been separated from them during the entire twelve years they have been in DCYF custody.

153. DCYF's practice of separating siblings who do not need to be separated results in needless harm to children. Sibling relationships are often the main source of stability in the life of a child in foster care and can be essential to minimizing the lasting ill effects of a child's time in state custody.

154. Defendants compound the harm of sibling separation by failing to ensure that siblings who are not placed together at least have regular and frequent visits with one another. The CFSR concluded that "DCYF does not make sufficient efforts to ensure that . . . visitation between children and their parents and siblings in foster care is of sufficient frequency . . . [or that] children's connections to their families are preserved."

### C. Defendants Fail in Their Duty to Meet Plaintiff Children's Service Needs

#### 1. Defendants Do Not Provide Plaintiff Children with Required Timely and Appropriate Assessments or Case Plans

155. When DCYF takes a child into foster care custody, it assumes a duty to provide services to meet the child's basic needs, including his or her educational, medical, dental, and mental health needs. DCYF's failure to provide services that meet the needs of Plaintiff Children results in very real harm to those children.

156. A critical first step in providing the services to meet an individual child's basic needs is for a caseworker, in consultation with the child's parents and other knowledgeable individuals, to prepare a case plan that identifies the child's needs and permanency goal and that specifies the services that will be provided in order to meet those needs and achieve that goal. Federal law and DCYF policy both require that a case plan be timely prepared and that it include a description of the service requirements that have been identified for the child.

157. Nevertheless, DCYF does not have a system in place to assure the timely preparation of appropriate case plans. As of June 12, 2007, over 36 percent of the children managed by a Region II caseworker had either an expired case plan or no case plan at all. The figures for children in Regions I, III, and IV were 24.59 percent, 23.77 percent, and 21.46 percent, respectively. And even when case plans are timely prepared or updated, key players are often excluded from the planning process. For example, the 2004 CFSR found that DCYF fails to involve children (where appropriate) and parents in the case planning process.

158. Instead of services being delivered to children in accordance with a properly formulated plan, children generally receive services, if at all, only in response to immediate crises. In a report issued on April 27, 2007, a DCYF Financial Review Team commissioned by Defendant Carcieri commented that services "appear to be extremely

reactive," with decisions about the provision of services "made on [the basis of] availability." "Often the exigencies of the day compel the practicum of 'placement equals treatment,'" the Financial Review Team reported. When service needs are identified, children are often put on waiting lists without regard to the urgency of their needs, because of Defendants' failure to develop an adequate service array for these children.

159. Because DCYF fails in its duty to identify the individual needs of children in state foster care custody and fails in its duty to provide services that meet those needs, children do not get their physical, dental, mental health, and educational needs met. Due to the basic nature of these needs, the damage to children is often irreversible.

**2. Defendants Violate Plaintiff Children's Rights to Timely and Safe Reunification with Their Families When Reunification Is Appropriate**

160. Reasonable professional standards require that child welfare agencies pursue reunification as the first and preferred permanency outcome for the children they place in foster care. Where safe reunification is a reasonable possibility, DCYF is required to develop and implement a case plan and a family services plan for each child and family in order to achieve family reintegration as soon as reasonably possible.

161. DCYF does not meet its obligation to facilitate appropriate and timely reunifications. The 2004 Child and Family Services Review found that only 66.2 percent of children who were reunified with their parents had achieved reunification within 12 months of initial removal, compared to the national norm of at least 76.2 percent.

162. The chronic failure of DCYF to achieve timely and appropriate reunifications is the direct result of a combination of known and preventable shortcomings. First, DCYF fails to exercise reasonable professional judgment in deciding whether it is appropriate and in the individual child's best interests to attempt reunification in the first place.

Second, DCYF fails to make timely and appropriate assessments of the services children and families will need in order for reunification to succeed. Third, basic reunification support services for parents, such as parenting classes and substance abuse counseling and treatment, are in short supply and often subject to long waiting lists. Fourth, even when reunification support services are provided, they typically begin only after the child has already been returned to the home; little or nothing is done to create the conditions for successful reunification in advance of the child's return home. Fifth, the services, even when provided, are inadequate to sufficiently support parents with the demands and stresses of parenting emotionally and behaviorally challenged children. And finally, high worker caseloads preclude the regular parent-child visits needed to support the reunification process, since visits must generally be arranged and supervised by a caseworker.

163. Reasonable social work practice and DCYF policy require that regular visits between parents and their children in foster care occur in order to successfully reunify the parent and child. DCYF requires parent-child visits to occur once every two weeks, unless specific exceptions relating to the safety and well-being of the child apply. However, as of June 12, 2007, in Region II, only 24.69 percent of children had seen their parent or parents within the preceding 30 days. In Regions I, III, and IV, the numbers were 39.66 percent, 46.20 percent, and 40.41 percent, respectively. These low rates of visitation are partly the consequence of DCYF's practice of routinely placing Plaintiff Children outside their home region. Out-of-region foster care placements make it extraordinarily difficult for many biological parents to visit regularly with their children and to sustain the connections on which successful reunification depends.

164. When parent-child visits do occur, they often take place without DCYF supervision, even where required. DCYF's failure to supervise parent-child visits when such

supervision is mandated poses unacceptable risks for the children that DCYF is duty-bound to protect.

165. DCYF also fails to determine what services are necessary to support safe reunification and then fails to provide those services. This sets families up for failure, subjects children to additional abuse or neglect by parents who are unprepared for reunification, and results in children being removed again and placed back in state foster care custody.

**3. Defendants Violate Plaintiff Children's Rights to Permanency by Pursuing Reunification with Parents When Not Appropriate**

166. As a matter of practice, DCYF usually does not consider alternatives to reunification for at least the first 15 months that a child spends in foster care custody, regardless of whether reunification is an appropriate goal for the individual child. Often DCYF maintains the goal of reunification for children for significantly longer periods of time. In one instance, a child who entered foster care less than a month after birth remained in foster care for almost three years because DCYF refused to seek a permanent adoptive home for the child, notwithstanding the clear unwillingness of the child's parents to take the child back. Another child's permanency goal remains reunification, even though she has lived in a foster home for 8 years and is now 10 years old.

167. One principal reason why children in Rhode Island remain in foster care for many years with the nominal goal of reunification is that Defendants allow parents to be noncompliant or minimally compliant with reunification case plans for years, even in the face of obvious evidence that parents will never complete their case plans and will never be able to handle the responsibilities of parenting. Defendants do not abandon the ostensible goal of reunification even in cases where the parents' rights to their multiple other children have already been terminated, such as in the case of Named Plaintiffs Briana, Alexis, Clare, and Deanna;

where the parents do not visit their children, such as in the case of Named Plaintiffs Danny and Michael; and where the parents have made no discernible effort to complete the requirements of their reunification plans, such as in the cases of Named Plaintiffs Caesar, Sam, and Tony.

168. DCYF frequently returns children home even when it is not in that child's best interest to do so, in part because of the scarcity of foster homes in the state.

169. Inappropriate reunification is unsafe and is likely to be unsuccessful, often leading to another removal of the child from his or her home. One girl was reunified with her abusive mother five times, each time suffering a new episode of physical abuse, followed by another removal.

170. Of the children who DCYF removed into foster care between April 1, 2005, and March 31, 2006, fully 15.2 percent had been in foster care within the 12 months prior to their removal. This 12-month re-entry rate—nearly twice the national standard of 8.6 percent set by the federal government—is concrete evidence of the systemic pattern of poor DCYF decision-making with regard to whether a family is ready and able to keep a child who will be reunified safe and well. DCYF returns children to their parents in cases where it is clearly inappropriate and dangerous to do so.

### 4. Defendants Fail to Timely Place Children Who Cannot Return Home with Permanent Adoptive Families, Allowing Them Instead to Languish in Foster Care

171. Reasonable professional standards emphasize that the primary purpose of foster care is to provide children with protection, care, and nurturing for a limited period of time only. By definition, foster care should be a temporary arrangement. Reasonable professional standards and federal law both require that when children in foster care cannot be safely reunited with their parents, they must be freed for adoption without delay and not left lingering in foster

care indefinitely. Federal law requires child welfare agencies to file a petition to terminate the parental rights of a child's parents, and to concurrently pursue the goal of adoption, if the child has been in state foster care custody for 15 of the most recent 22 months, unless certain exceptions are documented.

172. Indeed, Defendant Martinez told the Rhode Island Senate Committee on Health and Human Services on December 13, 2006, "It's a moral responsibility of us in the Department" to develop alternative permanency plans for children who cannot be reunified with their parents. Defendant Martinez conceded: "Children are staying in the system too long. . . . Many of these children don't go home."

173. For children to be adopted, prospective adoptive parents must be recruited, screened, trained, and licensed. DCYF's efforts in all these areas are deficient and ineffective. For example, DCYF placed a moratorium on trainings for prospective adoptive parents in 2007. Thus, even when DCYF recruits people interested in adopting children in its custody, its failure to follow through with training and licensing in a timely manner negates its success in recruitment.

174. Adoptions are also prevented or hindered by DCYF's failure to provide an adequate adoption subsidy for children with special needs, as required by Rhode Island law. Under federal law, adoption subsidies may not exceed the child's monthly foster care maintenance payment at the time of the adoptive placement. DCYF at times reduces the foster care maintenance payment for children living with families that are ready to adopt them, in order to reduce or eliminate the adoption subsidy after adoption is finalized. Often, the failure to provide an adoption subsidy makes the adoption unfeasible for the family and sets the child up for another failed placement and further instability.

175. Adoptions are also delayed because DCYF fails to finalize adoptions in a timely manner. It is common to wait many months just for the "home study" of an adoptive home to take place. One adoption was not finalized for three years, long after the child had been freed for adoption.

176. Further delays result from Defendants' failure to engage in concurrent planning, the process of searching for potential adoptive families while simultaneously working towards family reunification, as required by federal law and reasonable professional judgment. DCYF's continued pursuit of reunification for families even after it has become obviously inappropriate delays children from moving to permanent homes, and this delay is only exacerbated by DCYF's failure to plan for adoption concurrently.

177. Defendants have not effectively trained caseworkers to implement adoption policies. Even when DCYF caseworkers follow procedure and make sure that a child has been freed for adoption, they often fail to refer the child to the Adoption Unit, effectively putting the child in limbo until the case is rediscovered, often months later.

178. Because of all these systemic failings, children who cannot be safely reunited with their families commonly spend years in foster care without DCYF making any progress toward finding a safe and appropriate adoptive home for them. Eventually DCYF disclaims its responsibility to find permanent homes for them by declaring that they have been in care for too long to be "adoptable," such as with Named Plaintiff David. Rather than pursuing individualized adoption strategies for these children, DCYF leaves them to languish in foster care.

**5. Defendants Violate Plaintiff Children's Health Care Rights**

179. By taking Plaintiff Children into foster care custody, Defendants assume the duty to provide for their medical, dental, and mental health needs. Despite this clear duty, the 2004 CFSR concluded that "DCYF was not consistently effective in meeting children's physical and mental health needs." In nearly a quarter of applicable cases, DCYF had not made concerted efforts to address children's physical health needs. DCYF's failure to address children's mental health needs was even starker: "in 39 percent of the applicable cases, reviewers determined that DCYF had not made concerted efforts to address the mental health needs of children." The CFSR Final Report noted "particular concern" with respect to the mental health needs of children, finding that DCYF often "did not respond appropriately in situations in which presenting or underlying issues warranted a mental health assessment and/or mental health services."

180. As victims of abuse or neglect, children entering foster care often have experienced significant trauma, resulting in physical, emotional, or behavioral issues that require medical or mental health treatment. Thus, reasonable professional standards require initial health screenings for all children when they enter foster care. Those screenings should include assessments of mental health issues that are common among children in foster care, including depression, risk of suicide, severe behavioral problems, serious emotional disturbance, and substance abuse. Reasonable professional standards also require that each child have a service plan that includes treatment for any conditions diagnosed in these assessments and that access to such treatment is assured.

181. Although Defendants have made efforts to build a medical care infrastructure that will meet the needs of all Plaintiff Children, including the enrollment of

children in foster care in the state's managed-care program, RIte Care, insufficient coordination and integration among children's health services and family preservation programs, poor case planning, and poor worker visitation render these efforts ineffective for many children.

182. For example, the "Baseline Oral Health Indicators" report prepared for the Rhode Island State Action for Oral Health Access Project in April 2005 determined that, "of the approximately 889 children ages 3 and over who were living in licensed foster homes and who had RIte Care coverage in 2004, 714 (80.3 percent) were reported by their foster parents to have needed dental care" and "239 (33.5 percent) of these children had problems obtaining dental care." Rhode Island dentists commonly refuse the fee-for-service Medicaid and RIte Smiles dental coverage that DCYF provides to children in its foster care custody. Defendants' systematic failure to ensure that children in foster care have their dental needs met is the direct result of Defendants' actions and inactions in failing to develop an adequate array of dental service providers.

183. The need for mental health services for children in DCYF foster care custody is particularly great. "There has never been a time when more kids had mental health needs that need to be addressed," Associate Justice Michael B. Forte of the Rhode Island Family Court told the Rhode Island House Finance Committee on April 4, 2007, during hearings on the FY 2008 budget for DCYF. "Numerous studies and recommendations have called on the department [DCYF] to institute a better coordinated and managed approach to the behavioral health needs of children," the Rhode Island Senate declared in a March 22, 2007, resolution. This resolution came almost three years after the federal review that found that Rhode Island was not making concerted efforts to meet the mental health needs of children in foster care. That need continues to go unaddressed due to Defendants' actions and inactions in failing to develop

an adequate array of mental health providers who will treat children in foster care throughout Rhode Island.

184. The absence of an adequate mental and behavioral health delivery system for Rhode Island's foster care population was well-documented in the "Rhode Island Mental Health National Outcome Measures" for 2005, issued by the federal Center for Mental Health Services. That year, only 148 children residing in family foster homes and 125 children residing in institutions received state-supplied mental health services. These low figures, the most recent available, mean that DCYF regularly fails to meet the serious and pervasive mental health needs of the children in its foster care custody. For example, one 15-year-old Plaintiff Child who is slightly mentally retarded never received any mental health counseling after she was sexually molested by her stepfather. Two years later, she is now sexually reactive. Although she has not received any therapeutic treatment for these problems, DCYF plans to reunify her with her biological father and five brothers. Other children, such as Named Plaintiffs Caesar and David, deteriorate while in care because of DCYF's failure to provide adequate mental health services.

185. Foster parents report that DCYF is unresponsive to their efforts to obtain necessary mental and physical health care services for the children they foster, encountering such resistance and even hostility from DCYF that they have begun to fear retaliation if they do not limit their demands on behalf of the children they foster. The failure of DCYF to provide needed medical and mental health care for Plaintiff Children sometimes leads foster parents to go outside the system in an attempt to obtain those services on their own for the children they foster. When DCYF refused one foster parent's request for an evaluation of a Plaintiff Child with autistic tendencies, the foster parent had to obtain an independent evaluation of the child. That outside evaluation led to a diagnosis of Asperger Syndrome.

186. DCYF also fails to make sure that Plaintiff Children's medical records follow them from place to place and fails to inform foster parents about the mental health and other medical histories of the children they foster. As a result, caregivers are unable to help ensure that the needs of children in foster care are met. Failing to inform foster parents about mental health issues, particularly those due to a child's having been sexually abused or involving a child's propensity for violence, also puts children in foster care and members of foster families at risk.

### D. Defendants' Mismanagement of Rhode Island's Foster Care System Harms Plaintiff Children

#### 1. Defendants Assign Excessive Caseloads to Caseworkers, Making It Impossible for the Caseworkers to Ensure That Children Are Safe and Having Their Needs Met

187. No child welfare system can perform its basic functions without a well-trained, substantially experienced, adequately staffed, and appropriately evaluated workforce. When, as is the case in Rhode Island, caseworkers are inadequately trained, experienced, reviewed, or supervised, or when they are overburdened by unmanageable caseloads, a child welfare system predictably breaks down and children suffer reasonably foreseeable harms as a result.

188. Because of the vital role played by caseworkers, reasonable professional standards prescribe caseloads of between 12 and 15 children per worker for foster care services and between 10 and 12 children per worker for adoption services. Reasonable professional standards also prescribe supervisory ratios of one supervisor for every five caseworkers.

189. In disregard of these reasonable professional standards, DCYF policy sets the target caseload cap at 14 families (each of which may have more than one child) per worker for foster care services, with an absolute maximum of 28 children—nearly twice the professional

standard. In practice, however, DCYF caseworkers consistently carry caseloads well in excess of 14 families or 28 children. Currently, individual caseloads for foster care workers greatly vary in size, with many exceeding 30 children and some even exceeding 40 children.

190. Caseworkers carry such unmanageable caseloads simply because Defendants do not employ enough caseworkers to adequately serve all the children that DCYF takes into foster care custody. This has been clear for years. In its 2003 Statewide Assessment, DCYF admitted that "[t]he current level of vacancies across all line staff positions is the most severe that the Department has experienced for many years. As we seek to comply with [applicable] performance measures to achieve conformity, we will be hard pressed to change existing practices and/or implement new practice with an already overburdened staff."

191. More recently, Defendant Martinez acknowledged in testimony to the Rhode Island Senate Health and Human Services Committee on December 13, 2006, that DCYF faces staff shortages and high turnover among its child welfare caseworkers. Defendant Martinez further advised the committee that 31 caseworker positions had been eliminated by the General Assembly in the FY 2007 budget cycle. She also told the committee that 37 social caseworkers had left DCYF since July 2006.

192. At times, the turnover rate among caseworkers has been as high as 40 percent. High caseworker turnover requires those remaining on staff to carry additional cases on their already overflowing caseloads to cover for the vacancies. A rapid exodus of caseworkers in Region IV recently has meant that caseworkers in Regions II and III have had to take over the cases of Plaintiff Children in Region IV. Assigning the cases of children in foster care in one region to overburdened caseworkers in another part of the state makes it that much more difficult for those children to receive caseworker visits and have their needs met.

193. Caseworkers are demoralized and frustrated by their inability to do their job because of staggering caseloads and endless paperwork. "The reality is that as the situation stands now, even if one is good at this work, it is impossible to do well. When you cannot do this job well, children and their families suffer," DCYF caseworker Pamela McElroy told the Rhode Island Senate Health and Human Services Committee in December 2006. McElroy told the committee that after six years she had decided to leave her job at DCYF because of her heavy caseload. "The constant feeling that I am letting families down and that there is no relief in sight is my breaking point," she said. Former DCYF caseworker John Campopiano expressed similar frustrations in a televised interview on February 25, 2007, and stated that "it's absolutely impossible" to perform proper quality casework at existing DCYF caseload levels. Mr. Campopiano carried a caseload of 40 families—and far more individual children—before recently resigning his position out of frustration and burnout.

194. In a November 6, 2006, letter to Defendant Martinez, 42 supervisors from the DCYF Family Services Unit—the unit charged with providing social services and case management for children in foster care—warned that caseloads in their unit were rising so rapidly that they feared for the safety of children in DCYF foster care custody. The 42 signatories told Defendant Martinez that it was "imperative" that she immediately fill all social caseworker vacancies and restore Family Services Unit positions that had been eliminated.

195. Thereafter, on November 22, 2006, Defendant Carcieri received a letter from the Rhode Island Children's Policy Coalition[2] that made reference to the above November 6, 2006, letter to Defendant Martinez, stating, "[i]t is an extraordinary indicator of the depth of the problems and the lack of progress at [DCYF] that supervisory staff feel compelled to

---

[2] The Children's Policy Coalition is a child welfare policy and advocacy organization whose membership includes almost every significant private child placing agency and children's services provider in Rhode Island.

collectively put into writing their concern for the safety of the children being served by the Department." The letter urged Defendant Carcieri "to make child safety a priority by taking whatever steps are necessary within the state personnel system to insure that staffing at [DCYF] is adequate and vacancies filled in a timely manner."

196. Despite the urgent need to restore the caseworker positions that have been eliminated and to hire new caseworkers in order to bring caseloads down to manageable levels, Defendants failed to seek funding for a single additional caseworker position in their FY 2008 budget requests.

### 2. Caseworkers Fail to Make Required Child Visits

197. Regular caseworker visits are necessary for checking on a child's safety and well-being, identifying the child's needs, and arranging and monitoring the delivery of services to meet those needs. That is why DCYF policy requires the caseworkers to meet "face-to-face. . . at least monthly" with the Plaintiff Children on their caseloads and with those children's caregivers, and to visit foster homes at least monthly.

198. Nevertheless, the 2004 Child and Family Services Review found that fully 39 percent of children in Rhode Island's foster care system were not receiving adequate face-to-face visits from their caseworkers. Recent data show that this problem has considerably worsened. As of June 12, 2007, 75.31 percent of children in Region II had not received face-to-face caseworker visits within the last 30 days. The figures for children in Regions I, III, and IV were 60.34 percent, 53.8 percent, and 59.59 percent, respectively. Statewide, 60.94 percent of all children in foster care had not received a face-to-face caseworker visit within the last 30 days.

199. Worse still, as of June 12, 2007, 43.28 percent of Plaintiff Children in Region II had not had a caseworker visit within the last 90 days. On this measure, the figures for

children in Regions I, III, and IV were 34.87 percent, 25.23 percent, and 27.25 percent. Statewide, 31.75 percent of all children in foster care had not received a face-to-face caseworker visit within the last 90 days.

200. As bad as they are, these percentages do not tell the whole story. One child had only a single visit with his DCYF caseworker during a three-year period. Named Plaintiff David had only one visit annually with his caseworker during 2004 and 2005, and only 10 visits during the previous three years. Some foster parents report that they have not seen a caseworker in over a year. When caseworkers do visit children in foster care, it is often because the foster parents request the visits and drive the children to a designated meeting place, rather than the caseworkers initiating the visits and going to the foster homes themselves. Foster parents report experiencing great difficulty contacting DCYF caseworkers. Caseworkers do not answer their telephones or return calls and their voicemail boxes are frequently full, unable to accept more messages.

201. With such low caseworker-child visitation rates, it is simply impossible for DCYF to ensure that the children in its foster care custody are safe and that their basic needs are being met. Indeed, as the persistently high rates of abuse in care show, children in foster care in Rhode Island are not safe. Nor are their basic needs for things such as mental health care consistently met. The harmful and dangerous situation in which children in foster care find themselves is the direct result of DCYF's failure to ensure that caseworkers regularly visit them.

### 3. The DCYF Licensing Unit Fails Applicable Standards, Resulting in a Chronic Shortage of Licensed Placements and Providers

202. DCYF has established a Licensing Unit charged with (1) processing applications submitted by prospective foster parents and foster care providers seeking licensure to furnish foster care services in Rhode Island, (2) ensuring that DCYF-licensed family foster

homes, group homes, and institutions where children are placed for foster care services comply with minimum state safety requirements, and (3) responding to reports of licensure or regulatory violations involving DCYF-authorized family foster homes, group homes, or institutions.

203. Rhode Island statute provides that no non-kin foster care provider may furnish care for a child without holding a valid, current license. To secure a license in Rhode Island, the foster care provider must satisfy a set of mandatory eligibility requirements that include undergoing a criminal background check, a home safety study, training and orientation as a caretaker, and a medical clearance.

204. To be caregivers of children in DCYF custody, relatives must be certified, which involves meeting essentially the same standards as required to be a licensed foster parent. Yet in the aftermath of T.J. Wright's death in 2005, a DCYF official candidly admitted that "[i]t's not uncommon to see a child placed in the care of relatives while the licensing [i.e., certification] process is ongoing." The dangerous practice of placing children in relative homes while certification is pending continues. Four months after Named Plaintiff Caesar was placed in his grandmother's home, the home was still unlicensed.

205. A properly administered licensing process would enable DCYF to screen out potentially unsafe or unsuitable foster care providers. However, the DCYF licensing workforce is inadequately trained, severely understaffed, and responsible for onerous caseloads. There are only six full-time licensing caseworkers in the Licensing Unit, and they are responsible for all aspects of foster care as well as day care licensing throughout the state. The caseworkers carry caseloads regularly exceeding 200 cases per worker. As a result, the licensing process for a non-kin foster home currently takes more than a year.

206. The licensing staff maintains a chronic backlog of hundreds of license applications. This backlog exists even though DCYF does not have enough foster homes to meet current needs. The backlog persists not only because the Licensing Unit is understaffed but also because Licensing Unit workers are not subject to any system of worker accountability. Because these workers are not subject to performance reviews, they are under no meaningful pressure to catch up with the licensure backlog.

207. As of March 2007, the Licensing Unit had a backlog of 423 licensing applications, most of which—295—were for homes that had children in foster care living in them despite their unlicensed status. This means approximately 10 percent of all children in DCYF foster care custody were living in unlicensed homes. In May 2007, 233 children in DCYF foster care custody were living in 164 unlicensed foster homes. Placing hundreds of children in unlicensed homes is not only a departure from the established licensing process in Rhode Island and from basic notions of good practice, it constitutes a fundamental failure to assure children's safety.

208. The Licensing Unit is also charged with the licensure of the child placing agencies with which DCYF contracts for the provision of foster care services and placements such as independent living arrangements, supervised apartment living, residential group care facilities, family foster homes, and adoptive homes. As of June 12, 2007, only 69 percent of the child placing agencies in Rhode Island had active licenses; the rest had expired or pending licenses. By continuing to use child placing agencies that are not properly licensed, DCYF exposes children in foster care to unnecessary and unacceptable risks.

209. DCYF also does not provide the oversight necessary to ensure that licensed homes remain safe and appropriate for children. In the case of one foster home from which

DCYF had previously removed Plaintiff Children, when the foster parent began experiencing mental health problems and refused to make use of available services for Plaintiff Children, DCYF did not revoke the foster parent's license. Instead, DCYF simply reduced the allowable number of children in the home from three to two, and subsequently placed two children in that home.

### E. Defendants' Fiscal Mismanagement of the Child Welfare System Harms Children

210. DCYF is required by state law to seek, accept, and take advantage of all available federal aid. Nevertheless, Defendants fail to take advantage of available federal funding for foster care, leaving the child welfare system needlessly underfunded. Defendants then spend too much of Rhode Island's limited child welfare funds on expensive institutional placements for children who do not need institutionalization, while at the same time inadequately reimbursing the foster parents who provide the family placements that most children in foster care need. This fiscal mismanagement results in harm to Plaintiff Children.

#### 1. Defendants Forfeit Available Federal Funds

211. Defendants forfeit millions of dollars in federal matching funds by failing to collect Title IV-E funds for eligible children.[3] Rhode Island is entitled to receive federal dollars to offset the costs of maintaining abused and neglected children in foster care, as long as the state complies with certain requirements. One requirement that Defendants routinely fail to meet is ensuring that children are placed in licensed foster care settings. Defendant Carcieri admitted in his FY 2008 budget proposal for DCYF that the State would forfeit $1.5 million in federal funds for the coming year simply because of Defendants' widespread use of unlicensed

[3] To receive federal funding under Titles IV-B and IV-E of the Social Security Act, Rhode Island has entered into contracts with the federal government, known as "State Plans," under which the State agrees to provide child welfare, foster care, and adoption services to children in foster care in accordance with specific state and federal statutes, regulations, and policies as a condition for receiving federal funds.

placements. This forfeiture of available federal funding is one reason why Rhode Island's child welfare system is underfunded and unable to protect children in foster care or provide for their basic needs.

212. In FFY 2000, Rhode Island received Title IV-E reimbursements for 31.9 percent of the children in DCYF foster care custody. By FFY 2004, the last year for which data are available, that figure had fallen to only 16.8 percent. In contrast, the national mean that same year was 46.43 percent.

### 2. Defendants Waste Limited Funds on Harmful, Costly Institutional Placements

213. DCYF makes excessive use of expensive placements such as institutions, group homes, and emergency shelters for children who do not need them, rather than developing and supporting an adequate array of appropriate foster homes and specialized foster homes, such as therapeutic, behavioral, or medical foster homes. Institutional placements are inappropriate for all children except the minority of children who have special circumstances that are best addressed in an institutional setting. And shelters are categorically inappropriate placements for all children.

214. Not only do institutional placements harm children who do not need them, they are not cost effective. Most children are best cared for in standard foster homes, but those children whose special needs preclude placement in regular foster homes can often have their needs met in a family-like setting by therapeutic foster care providers for a fraction of the cost of institutional care. Therapeutic foster care providers in Rhode Island receive on average $123 per day, compared to an average daily cost of $245 per day for in-state institutional care and $353 for out-of-state institutional care.

215. Defendants' reliance on institutional placements translates directly into fewer dollars available for ensuring that children in foster care are safe and that their needs are being met in the least restrictive, most family-like setting that is appropriate to their needs.

### 3. Defendants Do Not Provide Adequate Foster Care Maintenance Payments to Foster Parents

216. To comply with federal law and reasonable professional standards, DCYF must pay maintenance payments to family foster care providers that cover the costs associated with caring for children in foster care, including "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." By these standards, the maintenance payments that Defendants pay foster parents are inadequate.

217. The standard daily board rates paid to foster parents by DCYF are $14.39 for children up to 3 years of age, $13.64 for children between 4 and 11 years old, and $15.79 for children ages 12 and older. These rates are less than half what the United States Department of Agriculture estimates the average middle-income, two-parent family in the urban Northeast spent to care for children in 2006 (not including health care costs). The USDA estimates, for example, that such families spend $34.92 per day on 2-year-olds, $35.54 on 9-year-olds, and $38.83 on 16-year-olds. If anything, the USDA underestimates the cost of caring for a child.

218. This disparity translates into harm and risk of harm to Plaintiff Children, since financially overburdened foster parents are less able to provide proper care. It also drives away potential foster parents, thus placing a greater burden on the limited array of foster family homes and contributing to the high rate of needless and harmful institutionalization of children in foster care.

## VIII. Causes of Action

### First Cause of Action

**(Substantive Due Process Under the United States Constitution)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

219. Each and every allegation of the Complaint is incorporated herein as if fully set forth.

220. A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm when it takes that child into its foster care custody.

221. The foregoing actions and inactions of Defendants, in their official capacities, constitute a failure to meet the affirmative duty to protect from harm all Named Plaintiffs and class members, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs and class members.

222. The forgoing actions and inactions of Defendants, in their official capacities, constitute a policy, pattern, practice, or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being harmed and deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

223. These substantive due process rights include, but are not limited to: the right to protection from unnecessary harm while in government custody; the right to a living environment that protects Plaintiff Children's physical, mental, and emotional safety and well-

being; the right to services necessary to prevent Plaintiff Children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that the child can leave foster care and grow up in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services; the right to treatment and care consistent with the purpose of the assumption of custody by the Department of Children, Youth and Families; the right not to be maintained in custody longer than is necessary to accomplish the purposes of taking the child into custody; the right to receive care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; and the right to be placed in the least restrictive placement according to a Plaintiff Child's needs.

## Second Cause of Action

**(Substantive Due Process Under the United States Constitution: State-Created Danger)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

224. Each and every allegation of the Complaint is incorporated herein as if fully set forth.

225. Defendants' acts of removing Plaintiff Children from their caretakers and placing them in placements that Defendants know or should know pose an imminent risk of harm to these children constitute to a policy, pattern, practice, or custom that is inconsistent with the exercise of professional judgment and that amounts deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. 42 U.S.C. § 1983.

226. Likewise, Defendants' acts of returning Plaintiff Children to their parents when Defendants know or should know that doing so poses an imminent risk of harm to these children constitute to a policy, pattern, practice, or custom that is inconsistent with the exercise of professional judgment and that amounts deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members.

227. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being harmed and deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. 42 U.S.C. § 1983.

## Third Cause of Action

**(First, Ninth, and Fourteenth Amendments to the United States Constitution)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

228. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

229. The foregoing actions and inactions of the Defendants, in their official capacities, amount to a policy, pattern, practice, or custom of failing to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights. As a result of Defendants' conduct, all Named Plaintiffs and class members have been and are being severely harmed and deprived of the liberty interests, privacy interests, and associational rights not to be deprived of a child-parent or a child-sibling family relationship, guaranteed by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

## Fourth Cause of Action

**(The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

230. Each and every allegation of the Complaint is incorporated herein as if fully set forth.

231. As a result of the foregoing actions and omissions by Defendants, in their official capacities, Defendants are engaging in a policy, pattern, practice, or custom of depriving all Named Plaintiffs and class members of rights conferred on them by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 621-629i, 670-679b (collectively the "Adoption Assistance Act"), and the regulations promulgated thereunder, 45 C.F.R. §§ 1355–57. These rights include but are not limited to: the right to timely written case plans containing mandated elements, and to a case review system to ensure the implementation of these plans; the right to placement in foster homes or other settings that conform to reasonable professional standards and are subject to a uniformly applied set of standards; the right to have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified, statutory standards and time frames; the right of children whose permanency goal is adoption to planning and services to obtain a permanent placement, including documentation of the steps taken to secure permanency; the right to services to facilitate the child's return to his family home or the permanent placement of the child; the right to services that protect children's safety and health; the right to have health and educational records reviewed, updated, and supplied to foster parents or foster care providers with whom the child is placed at the time of placement; and the right of each Plaintiff Child to foster care maintenance payments paid to the foster

parents or foster care providers with whom the child is placed that cover the actual cost of (and the cost of providing) the Plaintiff Child's food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation with family, and other expenses. 42 U.S.C. §§ 622(b)(8)(A)(ii)-(iii), 622(b)(15), 629a(a)(1)(A)(i)-(ii), 629a(a)(7)-(8), 671(a)(1), 671(a)(10)-(11), 671(a)(16), 671(a)(22), 672(a)-(c), 675(1), 675(4)(A), 675(5)(A), 675(5)(D)-(E); 45 C.F.R. §§ 1355.20, 1355.25, 1356.21(f)-(g), 1356.21(i), 1356.21(m), 1357.10(c)(4)-(6).

## Fifth Cause of Action

**(Procedural Due Process)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

232. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

233. The foregoing actions and inactions of the Defendants amount to a policy, pattern, practice, or custom of failing to exercise reasonable professional judgment and of deliberate indifference to the constitutional rights of Plaintiffs, and are the cause of the violation of such rights. As a result of Defendants' conduct, Plaintiffs have been and are being harmed and deprived of both federal and state-created liberty or property rights without due process of law, in violation of their constitutional rights.

234. Defendants' actions and inactions have resulted and are continuing to result in deprivations of federal-law entitlements arising from the Adoption Assistance Act and the accompanying regulations promulgated by the United States Department of Health and Human Services, to which Plaintiff Children have a constitutionally protected interest.

235. Defendants' actions and inactions have resulted, and are continuing to result, in deprivations of the following state-law entitlements to which each Plaintiff Child has a constitutionally protected interest:

a. The entitlements, arising from section 42-72-4(b)(14) of the Rhode Island General Laws, to suitable treatment, rehabilitation, and care in the least restrictive placement, within the child's community wherever feasible;

b. The entitlement, arising from section 42-72-10(b) of the Rhode Island General Laws, to have the child's health and safety be the paramount concern in making reasonable efforts toward reunification;

c. The entitlement, arising from section 47-72-5(b)(7) of the Rhode Island General Laws, to placement in a home or facility that is licensed, approved, monitored, and evaluated by DCYF;

d. The entitlements, arising from sections 42-72-10(a) and 42-72-11 of the Rhode Island General Laws, to a written, regularly updated service plan that addresses the child's needs for care, treatment, and placement;

e. The entitlements, arising from section 42-72-10(c) of the Rhode Island General Laws, for children whose permanency goal is adoption or placement in another permanent home, to a written service plan documenting the specific steps DCYF is taking to find and recruit an adoptive family or other permanent placement, to place the child in such a family or placement, and to finalize permanency;

f. The entitlement, arising from sections 42-72-5(24) and 42-72-5.2 of the Rhode Island General Laws, to appropriate mental health services;

g. The entitlement, arising from section 42-72-13(a) of the Rhode Island General Laws, to have the costs of the child's care, support, and maintenance paid by DCYF; and

h. The entitlements, arising from sections 42-72-5(b)(22) and 42-72-15(o) of the Rhode Island General Laws, to receive a free and appropriate education in accordance with state and federal law; to be enrolled in a school program; and to have state and local educational agencies coordinate their efforts in order to provide timely initiation and continuation of educational services;

i. The entitlements, arising from the Children's Right to Freedom from Restraint Act, sections 42-72.9-1 et seq. of the Rhode Island General Laws, to freedom from abuse, corporal punishment, involuntary seclusion, or any physical or chemical restraints that

> are not medically necessary or used as a means of coercion, discipline, convenience, or retaliation; and to the protection of all procedural safeguards set out at section 42-72.9-4(c) of the Rhode Island General Laws when restraint is necessary for the safety of the child or others.

## Sixth Cause of Action

**(Breach of Federal Contractual Obligations to Third Party Beneficiaries)**
**(Asserted by All Named Plaintiffs and Plaintiff Children)**

236. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

237. Under Titles IV-B and IV-E of the Social Security Act, states receive certain federal monies so long as they enter into plans approved by HHS and comply with their terms. Rhode Island receives federal funding under Titles IV-B and IV-E of the Social Security Act and has submitted such State Plans to the federal government, which are legal contracts between the federal government and the State, and such plans have been approved. In these State Plan contracts, the State agrees to provide child welfare, foster care, and adoption services to Plaintiffs in accordance with specific statutes, regulations, and policies and all applicable federal regulations and other official issuances of United States Department of Health and Human Services.

238. As a result of their foregoing actions and inactions, Defendants have breached and continue to breach their obligations under Rhode Island's State Plan contracts, and all Plaintiffs, as the intended direct third-party beneficiaries to these State Plan contracts, are (i) being denied their rights under law to the services and benefits that the State of Rhode Island is obligated to provide to them under such contracts, and (ii) being harmed thereby.

## IX. Prayer for Relief

239. WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

a. Assert jurisdiction over this action;

b. Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

   i. Defendants' violation of Plaintiff Children's rights under the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution;

   ii. Defendants' violation of Plaintiff Children's rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

   iii. Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq.;

   iv. Defendants' violation of Plaintiff Children's right to procedural due process under the Fourteenth Amendment to the United States Constitution; and

   v. Defendants' breach of their contractual obligations to Plaintiff Children under the State of Rhode Island's Title IV-E and Title IV-B state plans.

d. Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights;

e. Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Children;

f. Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. §§ 1920 and 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g. Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm by Defendants.

DATED: September 7, 2007

Respectfully Submitted:

/s/ Jametta O. Alston________________
JAMETTA O. ALSTON (Bar No. 3909)
CHILD ADVOCATE OF
THE STATE OF RHODE ISLAND
John O. Pastore Complex
57 Howard Avenue, 4th Floor
Providence, RI 02920
Phone: (401) 462-4300
Facsimile: (401) 462-4305
Email: jalston@doa.state.ri.us

/s/ John W. Dineen___________________
JOHN W. DINEEN (Bar No. 2346)
305 South Main Street
Providence, RI 02903
Phone: (401) 223-2397
Facsimile: (401) 223-2399
Email: jwdineen1@yahoo.com

MARCIA ROBINSON LOWRY (Bar No. 1187053 (NY); *pro hac vice* application pending)
SUSAN LAMBIASE (Bar No. 2099489 (NY); *pro hac vice* application pending)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, NY 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
Email: mlowry@childrensrights.org

VERNON M. WINTERS (Bar No. 130128 (CA); *pro hac vice* application pending)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA
Phone: (650) 802-3005
Facsimile: (650) 802-3100
Email: vernon.winters@weil.com

**CERTIFICATION**

I hereby certify that on September 7, 2007, I electronically mailed the foregoing document to the attorney(s) of record listed below:

Brenda D. Baum, Esq.
Assistant Attorney General
Rhode Island Department of the Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel: (401) 274-4400 x 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

Kevin Aucoin, Esq.
DCYF Chief Legal Counsel
101 Friendship Street
Providence, RI 02903-3716
Tel: (401) 528-3570
Kevin.Aucoin@dcyf.ri.gov

/s/ John W. Dineen_______________
JOHN W. DINEEN (Bar No. 2346)
305 South Main Street
Providence, RI 02903
Phone: (401) 223-2397
Facsimile: (401) 223-2399
Email: jwdineen1@yahoo.com