**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SAM and TONY M., by Next Friend Gregory c. Elliot; CEASER S., by Next Friend Kathleen J. Collins; DAVID T., by Next Friend Mary Melvin; BRIANA, ALEXIS, CLARE and DEANNE H., by Next Friend Gregory C. Elliott; and DANNY and MICHAEL B., by Next Friend Gregory C. Elliott; for themselves and those similarly situated** | : | |
| **v.** | : | **C.A. 07-241L** |
| **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island; JANE HAYWARD, in her official capacity as Secretary of the Executive Office of Health & Human Services; and PATRICIA MARTINEZ, in her official capacity as Director of the Department of Children, Youth and Families** | : | |

**DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(1) AND (6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Now come the Defendants Donald L. Carcieri, in his official capacity as Governor of the State of Rhode Island, Jane Hayward, in her official capacity as Secretary of the Executive Office of Health & Human Services, and Patricia Martinez, in her official capacity as Director of the Department of Children, Youth And Families (hereinafter "State" Defendants) and move to dismiss Plaintiffs' Complaint pursuant to pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Defendants submit that this Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction as: (a) the named plaintiffs' "next friends" lack standing; (b) this Court should abstain from rendering a decision that would invade the province of the State of

Rhode Island's Family Court (***Younger*** and ***Rooker-Feldman*** abstention doctrines); and (c) the claims of three (3) of the named Plaintiffs are moot.

For these reasons, as well as those set forth in the accompanying memorandum of law.

Respectfully submitted

DEFENDANTS
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ James R. Lee

JAMES R. LEE (4305)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

/s/ Brenda D. Baum

BRENDA D. BAUM (5184)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

On Behalf of PATRICIA MARTINEZ,
in her Official Capacity as Director of the
Department of Children, Youth and Families

/s/ Kevin A. Aucoin

KEVIN AUCOIN (3019)
Executive Counsel
R.I. Department of Children, Youth &
Families
101 Friendship Street
Providence, RI 02903
Tel: (401) 528-3579
Fax: (401) 525-3566
Kevin.Aucoin@dcyf.ri.gov

On behalf of JANE HAYWARD,
in her Official Capacity as Secretary of the
Executive Office of Health & Human
Services,

/s/ Jane Morgan

JANE MORGAN (4024)
Assistant Director of Legal Services
R.I. Department of Elderly Affairs
Benjamin Rush Building
35 Howard Avenue
Cranston, RI 02920
Tel: (401) 462-0524
Fax: (401) 462-0503
jmorgan@dea.state.ri.us

## CERTIFICATION

I hereby certify that pursuant to Court Order 33 I have electronically mailed the foregoing document on this 17th day of October 2007 to the attorney(s) of record listed below:

**John William Dineen, Esq.**
jwdineen1@yahoo.com

**Jametta O. Alston, Esq.**
jalston@gw.doa.state.ri.us

**Susan Lambiase**
slambiase@childrensrights.org

**Vernon Winters**
vern.winters@weil.com

**Marcia Robinson Lowry**
mlowry@childrensrights.org

**/s/ Brenda D. Baum**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SAM and TONY M., by Next Friend Gregory c. Elliot; CAESAR S., by Next Friend Kathleen J. Collins; DAVID T., by Next Friend Mary Melvin; BRIANA, ALEXIS, CLARE and DEANNE H., by Next Friend Gregory C. Elliott; and DANNY and MICHAEL B. , by Next Friend Gregory C. Elliott; for themselves and those similarly situated** | : | |
| **v.** | : | **C.A. 07-241L** |
| **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island; JANE HAYWARD, in her official capacity as Secretary of the Executive Office of Health & Human Services; and PATRICIA MARTINEZ, in her official capacity as Director of the Department of Children, Youth and Families** | : | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

## I. INTRODUCTION

This case is before this Honorable Court in the posture of Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Defendants submit that this Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction as: (a) the named plaintiffs' "next friends" lack standing; (b) this Court should abstain from rendering a decision that would invade the province of the State of Rhode Island's Family Court (*Younger* and *Rooker-Feldman* abstention doctrines); and (c) the claims of three (3) of the named Plaintiffs are moot.

The Defendants further submit that, in the alternative, this Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

**Plaintiffs' Amended Complaint**

The instant Amended Complaint, and similar versions thereof, have been filed in various states throughout the country by *Children's Rights* and local counsel. The allegations in the amended complaint against Rhode Island are strikingly similar to those asserted against Nebraska, which were dismissed by the United States District Court for the District of Nebraska in ***Foreman v. Heineman***, 240 F.R.D. 456 (D.Neb. 2007). The ***Foreman*** Court's reasoning for denying the motion to certify a class, its application of the ***Younger*** Doctrine and its determination that the AACWA did not create a private right of action compel a dismissal of the instant action.

In the Amended Complaint against Rhode Island, the ten (10) named plaintiffs are minors who have purportedly filed this Amended Complaint entitled "Class Action" through their "next friends" Gregory C. Elliot, Kathleen J. Collins and Mary Melvin. Amended Complaint at ¶¶ 34, 55, 69, 82 and 96. The Amended Complaint seeks declaratory and injunctive relief under 42 U.S.C. §1983 against Donald L. Carcieri, Governor of the State of Rhode Island, Jane A. Hayward, in her official capacity as the Secretary of the Executive Office of Health and Human Services for the State of Rhode Island and Patricia Martinez, in her official capacity as Director of the Department of Children, Youth and Families ("DCYF") (hereinafter collectively referred to as the "State"). The Amended Complaint alleges that the named plaintiffs Sam M., Tony M., David T., Briana H., Alexis H., Clare H., Deanna H. Danny B. and Michael B. are

children in the legal custody of DCYF due to a report or suspicion of abuse or neglect. Amended Complaint ¶¶11-12.

The named plaintiffs seek "declaratory and injunctive relief to compel Defendants … to meet the legal obligations to care for and protect Rhode Island's abused and neglected children in state custody by reforming the State's dysfunctional child welfare system." Amended Complaint ¶7. They request this Court to certify this case as a class action described as "all children who are or will be in the legal custody of the Rhode Island Department of Children, Youth and Families due to a report or suspicion of abuse or neglect." Amended Complaint ¶ 11. In short, this case asks that the Federal Court take control of significant aspects of Rhode Island's child protective system and that it second guess past, current and future decisions of the Rhode Island Family Court. It is noteworthy that none of the decisions of the Family Court under attack here were ever contested by the Child Advocate in said Court.

Plaintiffs' allege that the State (1) violated their substantive due process rights (Amended Complaint ¶¶ 219-223 (Count I) and ¶¶ 224-227 (Count II)); (2) violated their rights guaranteed under the First, Ninth and Fourteenth Amendments to the United States Constitution (Amended Complaint ¶¶228-229 (Count III)); violated the Adoption Assistance and Child Welfare Act of 1980 (Amended Complaint ¶¶ 230-231 (Count IV)); deprived them of procedural due process (Amended Complaint ¶¶ 232-235 (Count V)); and breached Rhode Island's State Plan with the federal government regarding the provision of child welfare, foster care and adoption services (Amended Complaint ¶¶ 236-238 (Count VI)).

Plaintiffs allege, similar to ***Foreman***, that Rhode Island's actions or inactions violate their substantive due process rights by:

- failing to protect "children in the legal custody of DCYF for foster care services due to reported or substantiated allegations of abuse or neglect" from physical, mental and emotional harm;
- allowing their condition to deteriorate or be harmed physically or psychologically by failing to provide safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring a permanent placement and adequate medical, dental, psychiatric, psychological and educational services;
- requiring them to remain in state custody longer than necessary;
- failing to provide treatment and services in accordance with accepted, reasonable professional judgment;
- failing to place them in the least restrictive placement; and
- reuniting children with their parents or placing them in placements which pose an imminent risk of harm.

Amended Complaint ¶¶223, 225, 226.

As plaintiffs did in ***Foreman***, plaintiffs herein also allege that the State violated certain provisions of the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§620-29(i), 670-679b (collectively the "Adoption Assistance Act") and regulations promulgated there under, 45 C.F.R. 1355-57. Amended Complaint ¶¶ 230-231. Similar to ***Foreman***, the plaintiffs claim the defendants violated these statutes and regulations by failing:

- to formulate and implement a timely case plans containing mandated elements;
- to place the child in foster homes or other settings that conform to reasonable professional standards;
- to timely file petitions to terminate parental rights, or having a documented and compelling reason for failing to do so in accordance with statutory standards.
- to provide planning and services for permanent placement of children whose permanency goal is adoption;
- to facilitate the child's return to the family home or the permanent placement of the child in an alternative permanent home;
- to provide services to protect the child's safety and health;

- to have health and education records reviewed, updated and supplied to foster parents or other foster care providers with whom the child is placed at the time of placement;
- to pay maintenance payments to foster parents in an amount that covers the actual cost of food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation with family and other expenses.

Again, as in ***Foreman***, these plaintiffs allege that the State deprived them of their rights to familial association in violation of the First, Ninth, and Fourteenth Amendments to the United States Constitution. Amended Complaint ¶ 229.

Again, as in ***Foreman***, plaintiffs also claim that the State deprived them of constitutionally protected property and liberty interests in federal and state entitlements arising from the Adoption Assistance Act and R.I. Gen. Laws §42-72-4(b)(14), §42-72-10(b), §47-72-5(b)(7), §42-72-10(a) and §42-72-11, §42-72-10(c), §42-72-5(24) and §42-72-5.2, §42-72-13(a), §42-72-5(b)(22) and §42-72-15(o) and §42-72.8-1 *et seq*. without affording them the procedural due process requires under the Constitution. Amended Complaint ¶ 233-235.

Lastly, again as in ***Foreman***, plaintiffs claim that they are intended third party beneficiaries of Title IV-B and IV-E of the Social Security Act and the State Plan entered into between the State and the United States Government and that they have been deprived of the services and benefits under this "contract". Amended Complaint ¶¶237-238.

**Named Plaintiffs**

The plaintiffs are ten children who are or were committed to the care, custody and control of DCYF. The ten children originate from five different families. Each child is or was in Rhode Island's foster care system and is (or was) subject to the on-going

jurisdiction of the Rhode Island Family Court as required by statute. ***R.I. Gen. Laws §§ 8-10-3, 14-1-32, and 40-11-7.***

**Attorneys for Plaintiffs**

The Amended Complaint was filed by Jametta O. Alston, the Child Advocate for the State of Rhode Island and John Dineen, a Rhode Island Attorney, Marcia Robinson Lowry and Susan Lambiase, attorneys with an organization entitled ***Children's Rights*** and Vernon M. Winters, an attorney with ***Weil, Gotshal & Manges*** LLP in Redwood Shores, California. It is significant to note that ***Children's Rights*** has been a participant in many lawsuits against states virtually identical to the instant lawsuit in some or all respects. Most recently in ***Foreman v. Heineman***, 240 F.R.D. 456 (D.Neb. 2007) the United States District Court for the District of Nebraska dismissed the lawsuit and denied the motion to certify a class.

The Amended Complaint alleges that these attorneys and entities have "investigated all claims in this action". Amended Complaint ***at ¶17.*** It is also represented that each next friend "is sufficiently familiar with the facts of this child's (or children's) situation to fairly and adequately represent the child's (or children's) interests in this litigation." Amended Complaint ***at ¶ 18.***

## II. MATERIAL FACTS

### A. The Named Children

This Amended Complaint has been filed in the name of ten (10) children who are or were in the custody of the Rhode Island Department of Children, Youth and Families.[1] The children, some siblings, have come into the DCYF's care based on their own specific

---

[1] It is asserted in the Amended Complaint that pseudonyms have been used for all minor named plaintiffs.

and individual life experiences. Seven (7) of these children have an open case with the Rhode Island Family Court with specific dates for review by Judges of said Court. Three (3) of the children were adopted, with the Family Court approval, on September 24, 2007 and, as such, their cases at the Family Court and DCYF are closed. Each of the seven (7) remaining children have a Court Appointed Special Advocate Attorney (CASA) or a Court Appointed Guardian ad Litem representing their interests in the proceedings pending before the Family Court. (See ***R.I. Gen. Laws §40-11-14 - A child's right to legal representation in child abuse and neglect proceeding which are brought before the Family Court).*** The legal guardians appear at each and every Family Court hearing to represent the children. Despite each child having open cases pending before the Rhode Island Family Court and a court appointed legal representative, three individuals, all unrelated to these children and not heretofore appointed to any supervisory role by any Court, have dubbed themselves the "next friends" of these children for the sole purpose of this lawsuit. For Purposes of this Motion to Dismiss, the Defendants will limit the history to the Rhode Island Family Court's hearings and rulings affecting the children's lives. The Defendants ask this Court to take judicial notice of the Family Court orders and decrees pertaining to the ten (1) plaintiff children and have been submitted, under seal, as exhibits..

**i. Briana, Alexis, Clare and Deanna H.**

In September 2003 DCYF received a call from the children's maternal aunt relating that Briana and Alexis had been residing with her for several weeks without assistance from their parents as their mother was incarcerated and their father was homeless. After conducting an investigation, DCYF filed an ex parte petition with the

Family Court. (See Exhibits A-1 and A-97). On January 8, 2004, the Family Court ordered that DCYF fund substance abuse screens and that the girls' mother participate in a substance abuse treatment program. (See Exhibits A-8 and A-105). On May 17, 2004, the parents admitted sufficient facts to support a finding of neglect and the Family Court committed the two children to DCYF care. (See Exhibits A-12 and A-109). Briana and Alexis's father complied with the case plan and was reunified with his daughters on June 30, 2004. On September 9, 2004, the Family Court issued an order which approved of the Department's plan of reunification of the children with their father. (See Exhibits A-17 and A-114). The Family Court closed the case on April 13, 2005 as Briana and Alexis were being well cared for by their father.

In June 2005 DCYF received a call reporting that the girls' father was using drugs in their presence. The Woonsocket Police Department responded to Briana and Alexis' home at the request of DCYF and issued a forty-eight (48) hour hold pursuant to ***R.I. Gen. Laws §40-11-5***. DCYF filed an ex parte petition and on June 9, 2005. (See Exhibits A-21, A-119, and A-120). The Family Court ordered that (1) Briana and Alexis be placed in the protective custody of the DCYF and (2) that DCYF arrange for the children to be placed in the care of a maternal aunt, J.P. The Court also assigned a CASA attorney to represent Briana and Alexis's interests. (See Exhibits A-23 and A-122). The Court set the case down for pretrial and permanency hearings.

In July of 2005 Clare was born. The hospital issued a seventy-two (72) hour hold on Clare pursuant to ***R.I. Gen. Laws § 40-11***-5 and DCYF filed an ex parte petition with the Family Court. (See Exhibits A-60 and A-61). On or about July 18, 2005 the Family Court placed Clare in the temporary custody of the DCYF. (See Exhibit A-62).On or

about July 25, 2005, the Family Court ordered that (1) DCYF place Clare with a maternal aunt, G.B and (2) Clare's mother be provided visitation with her child. (See Exhibit A-63).

On November 22, 2005, the children's parents entered a plea to allegations of neglect before the Family Court and Briana, Alexis and Clare were committed to the care custody and control of DCYF. (See Exhibits A-28, A-28(A), A-65, A-66, A-67, A-126, and A-128). At the time of commitment, the Court ordered that Briana and Alexis be placed with the maternal Aunt G.B. on the condition that the aunt's house was suitable to accommodate the two children. Thereafter, DCYF authorized placement of Briana and Alexis with the maternal aunt, G.B. In January of 2006, the DCYF filed a motion for review and clarification of the outstanding Family Court orders on the children's placement. (See Exhibits A-29, A-68, and A-129). On February 6, 2006, the Family Court vacated its' previous order directing placement of Alexis and Briana with maternal aunt G.B. and granted DCYF placement discretion. (See Exhibits A-32, A-33, A-71, and A-132). The parents filed an appeal of the Family Court's order of February 6, 2007 to the Rhode Island Supreme Court. The case was scheduled to be heard before the Rhode Island Supreme Court for an emergency hearing on February 8, 2006. Prior to the hearing before the Rhode Island Supreme Court,

The parties reached an agreement which allowed the children to remain in the care of the maternal Aunt G.B. On March 1, 2006, it was agreed by all the parties, including the children's CASA attorney, to have a parent/child evaluation performed by a licensed clinical practitioner. The evaluation was intended to address the relationships between the three children, the two aunts and the children's parents.

A permanency hearing was held by the Family Court on June 13, 2006. At the conclusion of the hearing the Family Court approved of DCYF's case plan. Additionally, the Family Court ruled that the permanency plan of reunification was appropriate and that DCYF had documented a compelling reason to continue efforts to work towards reunification. (See Exhibits A-39, A-40, A-78, A-79, and A-138). In September of 2006, the Family Court judge noted on the Court disposition sheet that DCYF would be filing a termination of parental rights petition. (See Exhibits A-41 and A-139). ,In January of 2007, DCYF filed involuntary termination of parental rights petitions with respect to Alexis, Clare and Briana. (See Exhibit A-47, A-85, A-145).

In October of 2006, the mother of the above named three children gave birth to a baby girl named Deanna. The DCYF immediately filed a request for an *ex parte* Order of Detention with the Family Court in connection with the infant, Deanna. The Family Court issued an order of temporary custody and Deanna was placed in foster care with a non-relative caretaker. (See Exhibits A-157 and A-158). Shortly after birth, the infant's mother indicated that it was her intent to give Deanna up for adoption. In January of 2007, the DCYF case-worker filed termination of parental rights petitions on all four (4) children: Alexis, Briana, Clare and Deanna. (See Exhibit A-173).

On February 6, 2007, the Family Court terminated the parental rights of the father as to Alexis, Clare and Briana. (See Exhibits A-49,A-50, A-87, A-88, A-147, and A-148). The Family Court dismissed the Termination of Parental Rights petition as to Deanna. (See Exhibits A-175 and A-176). On the Court disposition form, a Family Court judge noted that the child, Deanna's date of birth as xx-xx-06. (See Exhibit A-175). In addition, the Family Court made a finding that there was sufficient evidence to

believe that Deanna was neglected as to the father and the Deanna was ordered to the care custody and control of the DCYF. Infant Deanna continued to be placed in non-relative foster care under the supervision and jurisdiction of the Family Court. (See Exhibits A-49, A-50, A-87, A-88, A-147, A-148, A-174, A-175, and A-176).

On September 24, 2007, the Family Court granted the adoption of Briana, Alexis and Clare. As a result, Briana, Alexis, and Clare, are no longer in DCYF custody and their Family Court file is closed. (See Exhibits A-58, A-59, A-95, A-96, A-155, A-156).

Deanna's case continues to be subject to the Family Court jurisdicton. On June 20, 2007, a permanency hearing was held before the Family Court. At the conclusion of the hearing, an order was entered which approved of DCYF's case plan and included a finding that DCYF had documented a compelling reason to continue efforts to work toward a case plan goal of reunification. (See Exhibit A-168). Thereafter, on August 3, 2007, the Family Court made findings that the Mother has neglected Deanna. (See Exhibits A-171, A-172, and A-172(a)). Deanna's case has been assigned for review and permanency hearing by the Family Court to October 17, 2007. (See Exhibit A-171, A-172 and A-172(a)).

**ii. Danny and Michael B.**

In March of 2005, DCYF filed a neglect petition on behalf of Danny and Michael B. The petition alleged that the children where neglected based upon issues of substance abuse and domestic violence within the family home. (See Exhibits B-1 and B-2). On April 6, 2005, the neglect petition was arraigned by the Family Court. At the arraignment, the Family Court ordered the children's mother to provide a urine screen that day and, if it was positive, the Court would order that the children be removed. The

children's mother admitted to the Court that the urine screen would be positive. As a result, the Family Court ruled that DCYF immediately assume protective custody of the Danny and Michael. (See Exhibits B-3 and B-4).

The Family Court assigned DCYF's neglect petition for a trial date in September of 2005. On September 14, 2005 Danny and Michael's mother entered an admission of facts to support a finding of neglect. The children's father was defaulted, as he did not appear for the trial. The Family Court entered an order committing Michael and Danny to the care, custody and control of DCYF. (See Exhibits B-5 & B-6).

The Family Court held a permanency hearing on March 29, 2006. At the conclusion of the permanency hearing, the Family Court ordered that DCYF's permanency plan goal of reunification was appropriate and that DCYF had made reasonable efforts to work toward reunification with the parents. In addition, the Family Court concluded that DCYF had documented a compelling reason to continue efforts to work toward reunification and that DCYF was required to continue to make such reasonable efforts to achieve the goal of reunification by September of 2006. (See Exhibits B-7, B-8, B-9 and B-10).

On May 10, 2006, the Family Court held a status review of Danny and Michael's case. At that hearing, the Family Court ordered that DCYF initiate a termination of parental rights petition. (See Exhibits B-11 and B-12). DCYF filed a termination of parental rights petition with respect to Danny and Michael on June 14, 2006. (See Exhibits B-13 and B-14).

On July 28, 2006, DCYF removed Danny from his foster home when it learned of allegations that he was sexually abused by an older child in the home. On July 31, 2006,

DCYF placed Danny with his maternal great grandparents home at their request. In September, 2006, DCYF was asked to remove Danny from his maternal great grandparents' home and placed him at Family Connections in Newport; the move was precipitated by Danny's sexual acting out behavior.

On September 20, 2006, the parents failed to appear for a pre-trial hearing in the Family Court and were defaulted. (See Exhibits B-15 and B-16). On November 1, 2006, the parents failed to appear for trial. (See Exhibits B-17 & B-18). As a result, the matter was scheduled for proof to November 8, 2008. (See Exhibits B-19 & B-20). On November 8, 2006, the Family Court granted the Department's termination of parental rights petition. As a result, Danny and Michael were placed in the legal guardianship of DCYF and the Family Court ordered that DCYF is the sole party to give or withhold consent to the adoption of these children. (See Exhibit B-19 and B-20).

Subsequent to the granting of the petition terminating parental rights, the Family Court continued to conduct case reviews and permanency hearings on Michael and Danny. A stipulation was filed with the Court in November of 2006 by Attorneys for DCYF and the children's CASA attorney acknowledging DCYF's efforts to work toward Adoption and continuing the case for a permanency hearing. (See Exhibit B-21). A permanency hearing was held on March 28, 2007. (See Exhibits B-22 and B-23). At the permanency hearing, the Family Court approved of DCYF's case plan goal of adoption for Danny and Michael. Additionally, the Court ruled that the permanency plan goal of adoption or guardianship was appropriate and that DCYF had made reasonable efforts to achieve this permanency plan. Thereafter, DCYF's caseworker continued to work diligently in attempting to identify an appropriate adoptive home for the two boys. On

June 27, 2007, a lawyer for the DCYF and the children's CASA attorney submitted a stipulation in the Family Court that acknowledged DCYF's efforts towards having the boys adopted. (See Exhibit B-24). Danny and Michael's case was reviewed by the Family Court on September 12 of 2007. (See Exhibits B-25 and B-26). The Family Court has scheduled a permanency hearing in March 2008.

**iii. <u>Caesar S.</u>**

In March 2002 DCYF filed a neglect petition on behalf of the child, Caesar. The petition alleged that Caesar S. was neglected based upon issues of substance abuse within his family home. (See Exhibit C-1). At the time of filing the petition, Caesar resided with his mother. His parents were arraigned by the Family Court on this petition on April 11, 2002. (See Exhibit C-2). Caesar's case was heard by the Family Court for pre-trial and/or trial on May 6, 2002, June 10, 2002, September 9, 2002 and September 16, 2002. (See Exhibits C-3, C-4, and C-5). On September 16, 2002, DCYF amended the child protective petition to include an allegation of "dependency." Caesar's mother entered a plea to the amended petition. Based upon this plea, the Family Court found that Caesar was a "dependent child"[2] and committed him to the care, custody and control of DCYF. Additionally, the Family Court ordered that Caesar continue to be placed with his mother

---

[2] The Family Court found Caesar to be a "dependant child" pursuant to R.I. Gen. Laws §14-1-1, <u>*et seq*</u>. R.I. Gen. Laws § 14-1-3(6) defines a "dependent" child to mean: "Dependent" means any child who requires the protection and assistance of the court when his or her physical or mental health or welfare is harmed or threatened with harm due to the inability of the parent or guardian, through no fault of the parent or guardian, to provide the child with a minimum degree of care or proper supervision because of: (i) The death or illness of a parent; or (ii) The special medical, educational, or social service needs of the child which the parent is unable to provide. It is significant to note that the Family Court did not adjudicate Caesar as an abused or neglected child.

and that his mother was ordered to cooperate with DCYF. Caesar's case was continued for a permanency hearing to April 7, 2003. (See Exhibits C-6, C-7, and C-8).

Prior to the next scheduled hearing, on December 6, 2002, DCYF filed an Emergency Motion for Change of Placement for Caesar following an investigation into allegations that Caesar's mother was living with her two sisters, without permission of the landlord, and that Caesar had been found unattended in a car seat several days earlier. (See Exhibit C-9). DCYF's motion to change placement was heard and granted by the Family Court on December 13, 2002. The Family Court ordered that Caesar be removed from his mother's care and placed in the protective custody of DCYF. (See Exhibit C-10).

Between December 13, 2002 and February 9, 2004 the Family Court heard DCYF's child protective petition on approximately ten (10) occasions in the nature of case review and/or permanency hearings. (See Exhibits C-10 through C-21). At each review and hearing, DCYF submitted a report to the Family Court detailing Caesar's parents' progress towards the case plan goal of reunification. At conclusion of various hearings, the Family Court entered a number of Orders pertaining to Caesar's well being. By way of example:

- On December 13, 2002 the Family Court ordered DCYF to explore placement of mother and Caesar together in a residential treatment program. (See Exhibit C-10).
- On March 14, 2003 the Family Court gave DCYF discretion to increase visitation between Caesar and his mother. (See Exhibit C-11).
- On April 14, 2003, the Family Court approved DCYF's case plan and ordered that DCYF continue to pursue placement with a relative. (See Exhibit C-13).
- On June 9, 2003 the Family Court ordered that DCYF arrange parent/child evaluations and psychological assessments for both parents. (See Exhibit 15).

- On November 18, 2003 the Family Court ordered DCYF to arrange visitation between Caesar and his maternal grandmother. (See Exhibit C-19).

Thereafter, the Family Court continued to review Caesar's case on a regular basis. Following the permanency hearing of May 10, 2004, the Family Court entered an order approving DCYF's case plan. In addition, the Court concluded that the case plan goal of reunification was appropriate and that DCYF had made reasonable efforts to facilitate reunification of Caesar with his parents. Additionally, the Family Court found that DCYF had documented a compelling reason to continue efforts to work toward a case plan goal of reunification. Finally, it ordered that DCYF was required to continue to make efforts to reunify Caesar with his mother until August of 2004. (See Exhibits C-22 and C-23).

On December 13, 2004, DCYF informed the Family Court that alternate permanency planning for Caesar would be explored over the next 3 months. On January 31, 2005, DCYF filed an Involuntary Termination of Parental Rights petition on behalf of Caesar. (See Exhibit C-24). Caesar's parents were arraigned on the TPR petitions on February 28, 2005. Denials were entered by both parents and the matter was continued to March 28, 2005. (See Exhibit C-25). Between March 28, 2005 and September 12, 2005 the Family Court held hearings on thirteen different days. Of significance:

- On May 26, 2005 Caesar's foster mother advised the Court that she had decided not to adopt Caesar. The Court instructed DCYF to explore Caesar's paternal grandmother and his maternal great grandmother as possible adoptive placements for him and to submit a report to the Court. (See Exhibit C-30).
- On July 14, 2005 DCYF informed the Court of its concerns regarding placement of Caesar with his paternal grandmother because he had made negative comments about his grandmother; there was a question as to whether or not his father resided in the home; and his paternal aunt, who also resided there, was due to deliver a baby anytime. The Family Court

gave DCYF six additional weeks to complete its exploration of this potential placement. (See Exhibit C-33).

- On September 12, 2005 the Court granted DCYF's request to dismiss the TPR petitions without prejudice, with the condition that the parents waived their right to have DCYF make reasonable efforts to reunify the child with one of the parents from that day forward and that the TPR resume priority status if it were re-filed. DCYF's child protective petition was continued to December 12, 2005 for Court review. (See Exhibit C-38).

On November 14, 2005 the Family Court conducted a permanency hearing. At that time the Court ordered:

- A case plan goal of reunification was not appropriate; reasonable efforts to reunify were not required;
- The creation of a new case plan, with a goal of adoption;
- The matter to be continued to November 20, 2006 for further permanency hearing. (See Exhibit C-39).

DCYF filed a second Termination of Parental Rights petition on behalf of the child, Caesar on August 3, 2006. (See Exhibit C-40). On August 30, 2006 the TPR petition was arraigned by the Family Court as to both parents. (See Exhibit C-41). The Court scheduled the TPR petition for a case management conference on October 5, 2006. (See Exhibit C-42). Between October 5, 2006 and June 1, 2007 Caesar's case was heard by the Family Court on the TPR petitions and the Department's child protective petitions on six (6) separate occasions. Of significance:

- On November 20, 2006 the Court held a permanency hearing. At the conclusion of the hearing, the Court approved DCYF's case plan. In addition, it found that the case plan goal of adoption or guardianship was appropriate and that DCYF had made reasonable efforts to finalize the permanency plan goal of adoption or guardianship. (See Exhibit C-44).
- On June 1, 2007 the Court granted DCYF's Termination of Parental Rights petitions as to Caesar's mother and father. Caesar was placed under the legal guardianship of DCYF and DCYF was the sole legal guardian to consent to adoption of this child. The Court further ordered DCYF to make efforts to secure an adoptive family willing to enter into an open adoption with Caesar's mother and father; visits to continue until such time as an adoptive home is identified; and that the matter would be

continued for case review before the Family Court on August 31, 2007. (See Exhibit C-48).

Caesar's case was reviewed by the Family Court on the Department's petition on August 31, 2007 and is scheduled for a permanency hearing on November 5, 2007. (See Exhibits C-44 and C-49). At the present time DCYF continues to work with Adoption Rhode Island to prepare Caesar for adoption and to identify and appropriate adoptive resource for this child.

**iv. <u>Sam and Tony M.</u>**

In December of 1998, DCYF filed child protective petitions in the Family Court on behalf of Sam and Tony M. based upon a report from an Associate Justice of the Family Court that one of the parents was attempting to dismiss a domestic abuse restraining order. (See Exhibits D-1 & D-34). Sam and Tony M. were allowed to remain in their mother's care and DCYF offered services to the family. On March 11, 1999, the children's mother entered an admission to allegations of "dependency" and the children's father entered an admission to allegations of "neglect." As a result, Sam and Tony were committed to the care, custody and control of DCYF and remained in their mother's home. (See Exhibits (D-2 & D35).

In May of 1999, Sam and Tony were placed in the protective custody of DCYF after a DCYF caseworker found the children in the care of their mother – who appeared to be intoxicated  unable to care for the two boys. The Family Court authorized the removal of Sam and Tony from their mother's home and DCYF arranged for the children to remain in the care of a family friend. (See Exhibits D-3 and D-36). Thereafter, DCYF offered both parents the opportunity to participate in treatment services.

In January of 2000, the Children were allowed to return to the care of the Parents under supervision of the Family Court. In March, 2000, a the children's father left the family home. On June 15, 2000, the Family Court entered an Order suspending all visits between the father and the children. (See Exhibits D-5 and D-38).

Sam and Tony's case remained open in the Family Court through November of 2001. At the case review of December 14, 2000, a Family Court judge noted on the Court disposition form that the Mother and the children were doing well and that the Mother intended to obtain domestic custody. (See Exhibit D-39). Thereafter, the Family Court continued to conduct regular case reviews. (See Exhibits D-7, D-7, D-8, D-9, D-40, D-41, D-42, and D-43). On November 21, 2001, the Family Court closed the DCYF child protective petition after it awarded sole custody of Sam and Tony to their mother. (See Exhibit D-44).

In July of 2002 DCYF filed a second child protective petition on behalf of Sam and Tony M. (See Exhibits D-10 and D-45). The petition was filed based upon allegations that the children's stepfather had sexually abused one of the children. The Family Court permitted the children to remain in the care of their mother and issued a restraining order prohibiting the mother from having the children in the care of the stepfather. (See Exhibits D-11, D-46, and D-47). On January 2, 2003 the Family Court closed the DCYF child protective petition. (See Exhibits D-14, D-15 and D-50).

At the end of January of 2003, Tony was admitted to Butler Hospital following an incident in which he chased his mother with a knife. On February 3, 2003, DCYF filed a third child protective petition on behalf of Sam and Tony following an auto accident in which their mother was allegedly driving the vehicle under the influence of alcohol and

Sam was a passenger in the vehicle. (See Exhibits D-16 and D-51). Based upon this report, the Family Court ordered Sam and Tony into the protective custody of the DCYF.

Thereafter the child protective petitions were processed through the Family Court. On October 23, 2003 the children's mother entered an admission of sufficient facts to support a finding of neglect. The Court ordered Sam and Tony committed to the care custody and control of DCYF. (See Exhibits D-17 and D-55). Subsequent to the October 23, 2003 hearing, the Children, Sam and Tony were reunified with their Mother under the supervision of the DCYF.

In May of 2004 DCYF filed an Emergency Motion to Change Placement on behalf of Sam and Tony. (See Exhibits D-18 and D-56). The motion was based, in part, on allegations that the children's mother was using illegal drugs in the home. The Family Court authorized the removal of the children from their mother's home on May 20, 2004. The Court also ordered that the children's mother cooperate with in-patient substance abuse counseling. (See Exhibits D-19 and D-57). Further, the Court approved of DCYF's case plan for Sam and Tony, and found that the permanency plan goal of reunification was appropriate and that DCYF had documented a compelling reason to continue efforts to work toward a case plan goal of reunification. Lastly, the Court ordered that DCYF shall not file a TPR petition at that point in time. (See Exhibits D-20 and D-58).

At the case review of February 3, 2005, the Court ordered DCYF to file a termination of parental rights petitions on behalf of Sam and Tony. The Court also ordered that DCYF continue to provide services to the children's mother in an effort to pursue reunification with Sam and Tony. (See Exhibits D-21, D-22, and D-59).

DCYF filed the Termination of Parental Rights petitions in October of 2005. (See Exhibits D-29 and D-63). During a pre-trial hearing on the petition for termination of parental right, a Family Court judge noted that the maternal grandparents were actively involved with Sam and Tony while in residential placement. (See Exhibits D-30 and D-64). In February of 2006, the Court defaulted the father on the termination of parental rights petition. (See Exhibits D-31 and D-65). On July 6, 2006, DCYF withdrew the termination of parental rights petition as to the children's mother on the condition that the she agreed to execute a direct consent adoption petition when Sam and Tony were placed in a pre-adoptive home. On that date, the Family Court also ordered that DCYF begin overnight visitation for Sam and Tony with their maternal grandparents. (See Exhibits D-33 and D-67).

The Family Court conducted permanency hearings on DCYF's child protective petitions involving Sam and Tony on July 6, 2006 and January 11, 2007. At the conclusion of the permanency hearings, the Family Court issued Orders that included a finding that the permanency goal of reunification was not appropriate and that the permanency goal of adoption or guardianship was an appropriate permanency goal for both children. Significantly, the Family Court found that DCYF was making reasonable efforts to finalize a permanency goal of adoption or guardianship on behalf of both Sam and Tony. (See Exhibits D-26, D-27, D-60, and D-61).

At present, the child welfare petitions filed by DCYF on behalf of Sam and Tony M. remain active before the Family Court. A permanency hearing is schedule for January 10, 2008. (See Exhibits D-27, D-28, D-61 and D-62). The DCYF continues to work

toward effectuating a goal of integrating Sam and Tony into the home of the maternal grandparents under the supervision of the Family Court.

**v. <u>David T.</u>**

In January of 1996, David T. was placed in the protective custody of DCYF by order of the Rhode Island Family Court. The placement was based, in part, upon documentation that David's siblings had been removed from their mother's care by authorities in Michigan and in Massachusetts based upon incidents of physical and sexual abuse involving her six other children and the fact that his mother was without adequate housing. (See Exhibits E-1 and E-2). On March 5, 1996 the Family Court issued an Order in which it concluded that there was probable cause to maintain David in the temporary custody of DCYF. (See Exhibit E-5 & E-6). Thereafter, on October 2, 1996, the Family Court issued an Order in which it found that David was neglected by his mother and committed him to the care custody and control of the of DCYF. (See Exhibit E-10 and E-11). The Family Court conducted a review of David's case on November 14, 1996 and May 16, 1997. (See Exhibits E-12 and E-13). At the November 14, 1996 review, the Family Court ordered that DCYF could increase visitation between David and his mother to weekly. (See Exhibit E-12). On September 3, 1997, the Family Court granted the DCYF Motion to suspend visitation between David and his Mother. (See Exhibit E-16).

In November of 1997, DCYF filed an involuntary termination of parental rights petition on behalf David T. (See Exhibit E-46). On April 2, 1998 the Family Court issued an Order granting the termination of parental rights petition and placing David in the legal guardianship of DCYF. (See Exhibits E-48 and E-49).

Subsequent to April 2, 1998, the Family Court has continued to exercise jurisdiction over David's case through the present time. In February 1999, the Family Court issued an Order authorizing David's placement with a relative in Massachusetts. (See Exhibit E-19). Regrettably, David's behavior became unmanageable and DCYF arranged placement for David into a residential program in Rhode Island. In July of 2000, the residential program discharged David due to an increase in aggressive behavior. Thereafter, David was admitted to Butler Hospital. In August of 2000, David's Court Appointed Special Advocate filed a motion to review David's placement. (See Exhibit E-53). The Motion was heard before the Court on August 29, 2000. (See Exhibit E-54). Following the August 29th hearing, the Family Court regularly reviewed DCYF's efforts to facilitate residential placement referrals for David. The Family Court conducted reviews on David's case on September 12, September 18 and October 10, 1999 for purposes of determining the status of placement referrals made by DCYF. (See Exhibits E-55, E-56, and E-57). On December 4, 2000, a Family Court judge noted on the Court disposition form that David was showing signs of institutionalization and as a result approved placement of David in an out of state residential placement. (See Exhibit E-58).

Based upon the Family Court's order to secure out of state placement, DCYF arranged for David to be placed in a residential program located in Fall River, Massachusetts. At the time of his admission, David was diagnosed with Oppositional Defiant Disorder, reactive Attachment Disorder, Euresis and Expressive Language Disorder. The Family Court conducted permanency hearings on David's case in March, 2001, October 2001, and October of 2002. (See Exhibits E-24, E-25, and E29). At the

conclusion of the October 2002 hearing, the Family Court issued an Order approving DCYF's case plan agreement and found that DCYF has made reasonable efforts to finalize a permanency plan goal of adoption, guardianship or another planned living arrangement for David. (See Exhibit E-31).

David continued in the residential treatment program located in Fall River, Massachusetts until January of 2003. At that time, David was transferred to a more structured residential treatment program located in Lenox, Massachusetts. The Family Court conducted status court reviews of David's case in January, July and October of 2003. (See Exhibits E-32, E-33, and E-34). During the Court reviews, DCYF reported on David's status in the residential treatment program. In November of 2004, the Family Court conducted a permanency hearing on behalf of David. (See Exhibits E-69 and E-36). At the hearing, the Family Court Justice approved DCYF's new case plan. At the time, the Court noted that David was experiencing "severe problems" in residential treatment. (See Exhibits E-69 and E-36). The Court additionally found that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative was not an appropriate permanency plan goal for David. The Court held that the goal of another planned living arrangement was the most appropriate permanency plan goal for David. Lastly, it held that DCYF had not made reasonable efforts to finalize the permanency plan goal of another planned alternative living arrangement. (See Exhibits E-37 and E-70.

In November of 2005, the Family Court conducted another permanency hearing on David's case. (See Exhibits E-38 and E-71). Once again, the Family Court found that: DCYF had documented a reason why return home, adoption, guardianship or

placement with a relative was not an appropriate permanency plan goal for David; the goal of another planned living arrangement was the most appropriate permanency plan goal in this case; and directed that DCYF provide the Court with information of the status of DCYF's efforts to identify a new placement for Daniel. (See Exhibits E-39 and E-72). The case was continued to January 9, 2006 for review. On January 9, 2006, the Family Court ordered DCYF to arrange for an immediate independent assessment of David's medication treatment. Additionally, the Court ordered that David's Court Appointed Special Advocate investigate residential placement for David at a program named, Center Point. (See Exhibit E-73). On February 6, 2006, the Family Court noted on the Court disposition form that DCYF was awaiting approval from Massachusetts to place David at Merrimack Center. (See Exhibit E-74). The Court ordered DCYF to proceed with this placement forthwith. David was placed in the Merrimack Center program on March 14, 2006.A permanency hearing was held in the Family Court on November 27, 2006. (See Exhibit E-42). At the conclusion of this hearing, the Family Court issued an Order approving DCYF's case plan. The Court found that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative is not an appropriate permanency plan goal for David. Further, the Court held that the goal of another planned living arrangement was the most appropriate permanency plan goal for David and that DCYF had made reasonable efforts to finalize the permanency goal of another planned alternative living arrangement. (See Exhibit E-43). In addition, the Family Court Judge noted on the Court disposition form that David continued to be placed at Merrimack Center and that he was not enrolled in an educational component. The Judge further noted that DCYF was pursuing placement for Daniel at Swansea

Woods or Meadow Ridge; two residential treatment programs located within Massachusetts. (See Exhibit E-75). In June of 2007 DCYF reported to the Family Court that David was placed in the Swansea Woods program on May 9, 2007. The Family Court continued the case for a case review and permanency hearing of David's case on November 26, 2007. (See Exhibits E-45 and E-77).

**B. Next Friends**

Three individuals, Gregory C. Elliot, Katherine J. Collins and Mary Melvin have filed this suit as the "next friend" of these children.

Gregory C. Elliot has filed this lawsuit as the "Next Friend" of siblings Sam and Tony M., siblings Briana, Alexis, Clare, and Deanna H. and siblings Danny and Michael B. *Amended Complaint at ¶¶ 34, 82 and 96.* The Amended Complaint represents that Gregory C. Elliot is an:

> Associate Professor of Sociology at Brown University in Providence, Rhode Island, where he has taught for the last 24 years. Professor Elliot is a social psychologist, specializing in the social development of the individual. In his work he has dealt with issues of child maltreatment, and is currently writing a book on how adolescents come to believe that their lives matter to others.

***Id***. The Amended Complaint is devoid of any explanation why Associate Professor Elliot is an appropriate "next friend" for any of the children named in the Amended Complaint.

Kathleen J. Collins is the "next friend" for Caesar S. *See Amended Complaint at ¶ 55.* The Amended Complaint represents that Ms. Collins:

> has a Master of Science degree in School Psychology and a Bachelor of Arts degree in Psychology from the University of Rhode Island. For the past 17 years, Ms. Collins has worked in the Providence School Department as a school psychologist. Ms. Collins currently serves as the school psychologist for two elementary schools in Providence. She has known Caesar S. since he entered one of the schools in September 2006. MS. Collins resides in Foster, Rhode Island.

***Id***. The Amended Complaint is devoid of any specific interaction or relationship between Ms. Collins and Caesar other than she works at a school the child attends.

Mary Melvin is the "next friend" of David T. *See Amended Complaint at ¶69.* The Amended Complaint represents that:

> Ms. Melvin currently works as a Senior Companion in the Senior Companion Program at the Department of Elderly Affairs in Cranston, Rhode Island. Previously Ms. Melvin worked for many years at a nursing home for the elderly and handicapped in Providence, Rhode Island. Ms. Melvin served as a foster parent for at least 25 children in Rhode Island's foster care system over a 20-year period. In 1993 and 1997, she received the Rhode Island Foster Parent of the Year Award. Ms. Melvin was a foster parent to David T. from 1996 to 1998, and she continued to be a resource for him after he left her care. Ms. Melvin resides in North Providence, Rhode Island.

***Id***. The Amended Complaint is devoid of specific information regarding any relationship between Ms. Melvin and David T. after 1998 other than the abstract assertion that she was a "resource."

**B. The Department of Children Youth and Families and The Rhode Island Family Court**

It is the policy of the State of Rhode Island "to protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the mandatory reporting of known or suspected child abuse and neglect, investigation of those reports by a social agency, and provision of services, where needed, to the child and family." *R.I. Gen. Laws §40-11-1.*

Indeed, the enabling legislation of the Family Court identifies the primary function of the Court to ensure that "…families whose unity or well-being is threatened

shall be assisted and protected, and restored, if possible, as secure units of law-abiding members; that each child coming within the jurisdiction of the family court shall receive the care, guidance and control which will conduce to his or her welfare and the best interests of the state; and that when a child is removed from the control of his or her parents, the family court shall secure for him or her care as nearly as possible equivalent to that which his or her parents should have given him or her." R.I. Gen. Laws § 8-10-2. The Department of Children, Youth and Families is required to process its child protective petitions within the Family Court system for purposes of seeking to ensure the health and welfare of abused and neglected children are adequately protected under the law.

Plaintiffs in this action seek certification of the following class of children:

> All children who are or will be in the legal custody of the Rhode Island Department of Children, Youth and Families due to a report or suspicion of abuse or neglect.

Amended Complaint ¶11. The very definition and reference to "legal custody" necessarily invokes the authority, review and approval of the Rhode Island Family Court. The plaintiffs' allegations regarding DCYF's inadequacies in areas of placement of children, termination of parental rights, visitation with family, individual plans, etc. are not recommendations or decisions unfettered by judicial review and approval. On the contrary, each such decision *as was done in this case*, is subject to Family Court review with the benefit of an independent review by (at a minimum) a CASA attorney or guardian ad litem who represent *only* the best interests of the child. Moreover, the Child Advocate by statute and case law is an "appropriate person" to raise concerns to the Family Court regarding children who are alleged to be abused or negelected. *R.I. Gen.*

*Laws §42-73-7(8). See also* *In re: R.J.P., 445 A.2d 286 (R.I.1982).* It is beyond argument that the Child Advocate has a responsibility to raise issues as alleged herein with the Family Court. *Yet to date, she has never done so on behalf of any named party to this action.*

In asking this Honorable Court to dismiss this Complaint based upon the *Younger* and *Rooker-Feldman* abstention doctrines, it is only fair to provide a review of the statutory authority that grants the Family Court's active oversight and involvement in the decisions affecting the lives of abused and neglected children.

### i. Jurisdiction of the Rhode Island Family Court

The Rhode Island Family Court has *exclusive original jurisdiction* in proceedings:

> (1) Concerning any child residing or being within the state who is: (i) delinquent; (ii) wayward; (iii) dependent; (iv) neglected; or (v) mentally disabled, except that any person aged seventeen (17) years of age or older who is charged with a delinquent offense involving murder, first degree sexual assault, or assault with intent to commit murder shall not be subject to the jurisdiction of the family court if, after a hearing, the family court determines that probable cause exists to believe that the offense charged has been committed and that the person charged has committed the offense. The family court shall conduct a hearing within ten (10) days of the arraignment on the charge(s), unless the time for the hearing is extended by the court for good cause shown;
>
> (2) Concerning adoption of children;
>
> (3) To determine the paternity of any child alleged to have been born out of wedlock and to provide for the support and disposition of that child in case that child or its mother has residence within the state;
>
> (4) Relating to child marriages, as prescribed by §15-2-11; and
>
> (5) Referred to the court in accordance with the provisions of §14-1-28.

Emphasis Added. *R.I. Gen. Laws § 14-1-5.* The Rhode Island Family Court describes itself as:

> … being created to focus special attention on individual and social problems concerning families and children. Consequently, its goals are to assist, to protect, and if possible, to restore families whose unity or well-being is threatened.
>
> …being charged with assuring that children within its jurisdiction receive care, guidance and control conducive to their welfare and the best interest of the state. Additionally, if children are removed from the control of their parents the court seeks to secure care equivalent to that which their parents should have provided.
>
> ***
>
> …[having] jurisdiction over matters relating to delinquent, wayward, dependent, neglected, abused, or mentally deficient or mentally disordered children. In addition, it has jurisdiction over adoptions, child marriages, paternity proceedings, and a number of other matters involving domestic relations and juveniles.
>
> Appeals from decisions of the Family Court are taken directly to the state Supreme Court.

http:// *www.courts.state.ri.us/family/overview.htm*.

**ii. Temporary Custody of Children Who Are Suspected of Being Abused or Neglected**

**a. Emergency Hold**

A child who is suspected of being abused or neglected may be removed from his or her parents'/guardians' custody for a period of forty-eight (48) to seventy-two (72) hours without a Family Court Order. R.I. Gen. Laws § 40-11-5 permits:

> (a) Any physician or duly certified registered nurse practitioner treating a child who has suffered physical injury that appears to have been caused by other than accidental means or a child suffering from malnutrition or sexual molestation shall have the right to keep the child in the custody of a hospital or any licensed child care center or facility for no longer than seventy-two (72) hours, with or without the consent of the child's parents or guardian, *pending the filing of an ex-parte petition to the family court.* The expense for that temporary care shall be paid by the parents or legal guardian of the child or, if they are unable to pay, by the department.
>
> (b) Any police or law enforcement officer may take a child into protective

> custody without the consent of the parents, or others exercising control over the child.
>
> (c) If the officer has reasonable cause to believe that there exists an imminent danger to the child's life or health, unless he or she is taken into protective custody, the officer shall immediately notify, and place the child with the director of the department of children, youth, and families or his or her designated agent who shall care for the child; provided, however, that *no child may be detained in protective custody longer than forty-eight (48) hours without the express approval of a justice of the family court.*
>
> (d) Any child protective investigator or social caseworker II employed by the department, may take a child into temporary protective custody without the consent of his or her parent or other person responsible for the welfare of the child, if the investigator or social caseworker II has reasonable cause to believe that the child or his or her sibling has been abused and/or neglected and that continued care of the child by his or her parent or other person responsible for the child's welfare will result in imminent further harm to the child. The investigator or social caseworker II shall have the child examined by a licensed physician or duly certified registered nurse practitioner within twenty-four (24) hours in accordance with the provisions of § 40-11-6(c) and provide further that *the child shall not be detained in protective custody longer than forty-eight (48) hours without the expressed approval of a justice of the family court.*

However, if the Family Court does not render an order on custody before the conclusion of the respective forty-eight (48) hour or seventy-two (72) hour holds, then custody terminates and the child is to be returned to his or her parents, guardian or caretaker.

**b. Reports of Abuse or Neglect**

DCYF receives initial reports of children who are suspected as suffering abuse or neglect from many different sources.[3] *See R.I. Gen. Laws §§ 40-11-3, 40-11-5, 40-11-6, 40-11-9, etc.* DCYF investigates each report to determine the circumstances surrounding the alleged abuse or neglect and the cause thereof. *R.I. Gen. Laws §40-11-7(a)*. If, after

---

[3] The State Defendants will not go into an in-depth review of all the different sources that it receives reports of abuse and neglect from in this pleading. .

conducting an investigation, DCYF believes the child is or has been abused or neglected[4] there are two (2) courses of action: (1) if the "circumstances of the child's family or otherwise do not require the removal of the child for his or her protection, …[DCYF] may allow the child to remain at home and shall *petition the family court* for an order for

---

[4] *R.I. Gen. Laws §40-11-2(1)* defines an "Abused and/or neglected child" as "a child whose physical or mental health or welfare is harmed or threatened with harm when his or her parent or other person responsible for his or her welfare:

> (i) Inflicts or allows to be inflicted upon the child physical or mental injury, including excessive corporal punishment; or
> (ii) Creates or allows to be created a substantial risk of physical or mental injury to the child, including excessive corporal punishment; or
> (iii) Commits or allows to be committed, against the child, an act of sexual abuse; or
> (iv) Fails to supply the child with adequate food, clothing, shelter, or medical care, though financially able to do so or offered financial or other reasonable means to do so; or
> (v) Fails to provide the child with a minimum degree of care or proper supervision or guardianship because of his or her unwillingness or inability to do so by situations or conditions such as, but not limited to, social problems, mental incompetency, or the use of a drug, drugs, or alcohol to the extent that the parent or other person responsible for the child's welfare loses his or her ability or is unwilling to properly care for the child; or
> (vi) Abandons or deserts the child; or
> (vii) Sexually exploits the child in that the person allows, permits or encourages the child to engage in prostitution as defined by the provisions in § 11-34-1 et seq., entitled "Prostitution and Lewdness"; or
> (viii) Sexually exploits the child in that the person allows, permits, encourages or engages in the obscene or pornographic photographing, filming or depiction of the child in a setting which taken as a whole suggests to the average person that the child is about to engage in or has engaged in, any sexual act, or which depicts any such child under eighteen (18) years of age, performing sodomy, oral copulation, sexual intercourse, masturbation, or bestiality; or
> (ix) Commits or allows to be committed any sexual offense against the child as such sexual offenses are defined by the provisions of chapter 37 of title 11, entitled "Sexual Assault", as amended; or
> (x) Commits or allows to be committed against any child an act involving sexual penetration or sexual contact if the child is under fifteen (15) years of age; or if the child is fifteen (15) years or older, and (1) force or coercion is used by the perpetrator, or (2) the perpetrator knows or has reason to know that the victim is a severely impaired person as defined by the provisions of § 11-5-11, or physically helpless as defined by the provisions of § 11-37-6. "

the provision of treatment of the family and child" or (2) DCYF may "*petition the family court* for removal of the child from the care and custody of the parents, or any other person having custody or care of the child in cases where it is felt that a particular child has suffered abuse or neglect that continued care and custody by that person might result in further harm to the child." *R.I. Gen. Laws §40-11-7 (b) and (c)*. Emphasis added. Either course requires the Family Court's involvement and approval of DCYF's proposed course of action for the child. Either course is subject to review by the Child Advocate and, if she believes it to be inappropriate, intervention by her in Family Court. Again, no such challenge was ever raised by the Child Advocate in any of these cases.

**iii. The Family Court's Obligations to Children Suspected of Being Abused or Neglected Upon the Filing of an Ex Parte Petition**

Upon the filing of an ex parte petition, which identifies the specific facts surrounding the allegations of the abuse or neglect suffered by the child, it is the Family Court, not DCYF, that is statutorily obligated to make decisions and enter court orders regarding the custody and placement of a child suspected of being abused or neglected. R.I. Gen. Laws 40-11-7.1(a) requires that:

> The family court shall, upon the filing of an ex parte petition, hereunder, immediately take any action it deems necessary or appropriate for the protection of the child, or children, suspected of being abused or neglected, including the removal of the child, or children, from the custody of the parent or parents, or other person suspected of the abuse or neglect.

A hearing before the Family Court must commence within seven (7) days of filing the petition. R.I. Gen. Laws §40-11-7.1(b). At this initial hearing the Family Court has a minimum of eight obligations for the child. It must, at the very least:

(1) Advise the parent or parents or other person having care of the child of the allegations contained in the petition;

(2) Enter either a denial or admission of the allegations contained in the petition;

(3) Assure that a guardian ad litem and/or a court appointed special advocate has been appointed to represent the child;

(4) Appoint an attorney to represent the parent or parents or any other person having care of the child alleged to have abused or neglected a child when the parent or custodian is unable to afford representation, as determined by the court;

(5) Advise the parent or parents or any other person having care of the child of his or her right to a probable cause hearing on the ex parte petition to be held as soon as practicable but no later than ten (10) days from the date of the request;

(6) Make inquiry of the mother of the child to determine the identity of the biological father of the child, if necessary;

(7) In the event that a person named as a putative father appears and denies that he is the biological father of the child, the court shall direct that any such putative father execute a written denial of paternity setting forth the implications of such denial in a form to be adopted by the family court in accordance with the provisions of this section. Execution of such a document by the putative father shall constitute prima facie evidence of his denial of paternity. Upon execution of the denial of paternity form, the court shall find that the department has no duty to make reasonable efforts to strengthen and encourage the relationship between the child and that putative father and the lack of such efforts may not be cited for any purpose by the putative father in any future proceeding conducted pursuant to the provisions of this chapter, the provisions of title 15 chapter 7 or title 15 chapter 8;

(8) Make any interim orders in its discretion respecting the rights of the child.

*R.I. Gen. Laws §40-11-7.1(b)*.

The Family Court also has the authority, with the consent of the parties, to refer the child protection issue to mediation. *R.I. Gen. Laws § 40-11-7.3.*

**iv. Legal Representation for the Child**

The Family Court is statutorily required to appoint legal representation for a child when a petition has been filed alleging abuse or neglect. ***R.I. Gen. Laws §§40-11-7.1(b) and 40-11-14***. The guardian ***ad litem*** or court-appointed special advocate ("CASA") represents solely the child and advocates for his/her best interest at every court hearing. Once the court appoints a guardian ***ad litem*** or CASA attorney to represent the child's best interest in court proceedings that representation continues until an adoption petition is granted. ***In re Christina D.***, 525 A.2d 1306 (RI 1987).

The Court Appointed Special Advocate ("CASA") was developed "as a volunteer program by the Family Court in 1978 in answer to the need for advocacy for those children who had been abused and/or neglected, and who, through no fault of their own, found themselves involved with the Department of Children, Youth and Families and the Rhode Island Family Court." http://www.courts.state.ri.us/family/casa.htm. "Since its inception, CASA has grown from a solely volunteer-based program to a fully-staffed program that includes full-time staff attorney Guardians ad litem and social workers who work in conjunction with the volunteers to provide effective advocacy for the best interest of Rhode Island's most vulnerable children. CASA tries to insure that these children do not "fall through the cracks" of the system that is put in place to help them." ***Id***.

Each of the named plaintiffs has a court-appointed guardian ad litem or CASA attorney to represent their best interests before the Family Court.

**v. Family Court Adjudication**

If, after a hearing, the Family Court finds the child is abused or neglected it shall

by a formal decree:

> (b) Place the child under the supervision of the department in his or her own home if the court makes a determination that the child will be safely maintained in the home or award the care, custody, and control of the child to the department upon such terms as the court shall determine. The court may place the custody of the child in the department until such time as it finds that the child may be returned to the parents or other person previously having custody or care of the child under circumstances consistent with the child's safety.
>
> (c) The court may require the parent or person previously having custody to undertake a program of counseling, including psychiatric evaluation and/or treatment as a prerequisite to the return of the child to his or her custody.
>
> (d) When a child has been placed in the care, custody and control of the department pursuant to the provisions of this chapter or of chapter 1 of title 14 the court shall have the power to appoint a guardian of the person of the child.
>
> (e) No petition for guardianship shall be granted unless it contains the written consent of the parent or parents previously having custody of the child and of the department of children, youth and families.
>
> (f) The entry of a decree of guardianship pursuant to this section shall terminate the award of custody to the department and the involvement of the department with the child and the child's parents. The court may revoke a guardianship awarded pursuant to this section if the court finds after a hearing on a motion for revocation that continuation of said guardianship is not in the best interests of the child.
>
> (g) Notice of any hearing on such motion shall be provided by the moving party to the department of children, youth and families, the court appointed special advocate, the parent or guardian and any and all other interested parties.

*R.I. Gen. Laws §40-11-12. See also RIGL 14-1-32 and 14-1 34.* This process does not occur at a one time hearing before the Family Court. Thus, as the case comes before the Family Court prior to entry of this formal decree, the Family Court reviews specific information related to the child (i.e. placement, treatment, services, etc.) and addresses

any issues that may have arisen in the interim whether raised by DCYF, the CASA attorney or guardian ad litem and/or the Child Advocate.

Moreover, after the Family Court rules that the child is abused or neglected and it is not in the best interest of the child to be returned to the custody of their parent or other person having custody, "the court shall direct … [DCYF] to sumit within thirty (30) days a written plan for care and treatment… .The court shall thereupon approve or modify such plan, or shall remand the plan to …[DCYF] for further development or resubmission." *Rhode Island Family Court Rules of Juvenile Proceedins Rule 17*. Upon approval of this individualized plan, the Court shall direct DCYF to "review such plan and report thereon to the court not later than six (6) months thereafter." ***Id***.

**vi. The Family Court's Review of Reunification and Case Plan**

Although DCYF may draft a case plan that addresses the placement and needs of a child found to be abused or neglected, they do not have unfettered discretion and authority. At every regularly scheduled Family Court Review and/or dispositional hearing of a child found to be abused or neglected, DCYF must provide a written reunification or permanency plan for the Family Court's review and approval. *R.I. Gen. Laws §40-11-12.2(a)*. The Court is provided with information concerning when, if appropriate, the child will be returned to the parent, placed for adoption, referred for legal guardianship or placed with a fit and willing relative. ***Id***. If such placements are inappropriate because of the specific facts of the child's case – DCYF must, by statute, provide compelling reasons why such placements or referrals are not in the child's best interest. ***Id***. The Family Court will review and consider another planned permanent living arrangement. ***Id***. "The plan shall clearly set forth the goals and obligations of the

department, parent(s), child and all other parties." ***Id***. The Family Court, ***at its discretion***, may approve or modify the proposed plan. ***R.I. Gen. Laws §40-11-12.2(a)***. This plan will be ***incorporated into the orders of the Family Court***. ***Id***. Again, the Child Advocate has full access to this information and has the ability, if not the obligation, to advise the Family Court of any alleged shortcomings in the Department's plan. To date she has not done so for any named plaintiff.

The Family Court is required to consider the child's health and safety to be the paramount concern when determining "reasonable efforts to be made with respect to a child". ***R.I. Gen. Laws §40-11-12.2(b)***. "[R]easonable efforts shall me made to preserve and reunify families: (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home - which efforts shall include placement of the child with a blood relative or other family member if such placement is in the best interest of the child; and (ii) to make it possible for a child to safely return to the child's home. ***R.I. Gen. Laws §40-11-12.2(c).*** While such efforts are underway, reasonable efforts may be simultaneously made to place the child for adoption or with a legal guardian. ***R.I. Gen. Laws §40-11-12.2(g).***

The Family Court may rule that "reasonable efforts" for reunification need not be expended if it has determined that:

> (i) the parent has subjected any child to conduct of a cruel or abusive nature;
>
> (ii) The parent has:
>
>> (I) committed murder of another child of the parent; or
>>
>> (II) subjected the child to aggravating circumstances, which circumstances shall be abandonment, torture, chronic abuse and sexual abuse; or

> (III) committed voluntary manslaughter of another child of the parent; or
>
> (IV) aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter; or
>
> (V) committed a felony assault that results in serious bodily injury to the child or another child of the parent; or
>
> (iii) the parental rights of the parent to a sibling have been terminated involuntarily.

*R.I. Gen. Laws §40-11-12.2(e).* If the Family Court determines that "reasonable efforts" for reunification are not necessary, a permanency hearing should commence within thirty (30) days. *R.I. Gen. Laws §40-11-12.2(f).*

If the permanency plan for a child is adoption or placement in another permanent home, DCYF must provide the Family Court with documentation describing: "the steps …[DCYF] is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship." *R.I. Gen. Laws §40-11-12.2(h).*

**vii. Permanency Hearing**

The Family Court also has the responsibility to conduct a permanency hearing. *R.I. Gen. Laws §40-11-12.1* This hearing occurs within a period of twelve (12) months after a child has been placed in the care of DCYF and the child has resided in foster care or an out-of-home program. *R.I. Gen. Laws §40-11-12.1(a).* DCYF provides notice of this hearing to the foster parents, any pre-adoptive parent or relative providing care for the child, so that they may attend the hearing and present a report to the Court, including any recommendations that may be in the best interest of the child. *R.I. Gen. Laws §40-*

*11-12.1(c)*. In determining an order of permanency, the Family Court shall consider, in addition to other relevant factors:

> (1) The appropriateness of the department's plan for service to the child and parent;
>
> (2) What services have been offered to strengthen and reunite the family;
>
> (3) Where return home of the child is not likely, what efforts have been or should be made to evaluate or plan for other modes of care;
>
> (4) Any further efforts which have been or will be made to promote the best interests of the child; and
>
> (5) The child's health and safety shall be the paramount concern.

*R.I. Gen. Laws §40-11-12.1(d)*. At the conclusion, the Family Court enters, in accordance with the best interest of the child, an order of permanency:

> (1) In the case of a child whose care and custody have been transferred to the department of children, youth and families, direct that the child be returned to and safety maintained in the home of the parent, guardian, or relative; or
>
> (2) Direct that the child's placement in foster care continue on a long-term basis or that the child be placed in an independent living facility; or
>
> (3) Direct that foster care of the child and reunification efforts be continued if the department of children, youth, and families, after a hearing, has demonstrated to the court that continuation of the child in foster care and continued reunification efforts for a determinate period is in the child's best interests. If the court does not return the child to the care and custody of the parent, guardian or relative and the court does not direct that foster care of the child and reunification efforts be continued, the department shall institute a proceeding within thirty (30) days of the permanency hearing pursuant to chapter 7 of title 15 to legally free the child for adoption; or
>
> (4) In the case of a child with an emotional, behavioral, or mental disorder or developmental or physical disability who has, pursuant solely to §§ 42-72-14 and 14-1-11.1, been placed in an out-of-home program which provides services for children with disabilities, including, but not limited to, residential treatment programs, residential counseling centers, and therapeutic foster care programs, shall determine whether the continuation

of such placement is in the best interest of the child; or

(5) For a child who has been placed in foster care by the department for a period of twelve (12) consecutive months, the court shall order that the department institute proceedings for adoption of the child except in the event that the court determines it is not in the best interest of the child due to one or more of the following factors:

(i) There is a substantial probability that the child shall be returned to the parent within the next three (3) months; or

(ii) The parent has maintained regular and consistent visitation and contact with the child, there is a relationship that is beneficial to the child, and there is a substantial probability that the child shall be returned to the parent within the next three (3) months; or

(iii) The child is in the care of a relative and the relative is not willing to adopt the child but is willing and capable of providing the child with a stable and permanent environment; or

(iv) Any other significant factor, which the court finds would not be in the best interest of the child.
(v) The department has documented in the case plan, which shall be presented to the court, a compelling reason for determining that filing a petition for termination of parental rights and a petition for adoption would not be in the best interests of the child; or

(vi) The department has not provided to the family of the child, consistent with the time period in the case plan, such services as the department deems necessary for the safe return of the child to the child's home, if reasonable efforts are required to be made.

(6) In the case of a child who has been in foster care under the temporary custody or custody of the department for fifteen (15) of the most recent twenty-two (22) months, or if the court has determined a child to be abandoned or has made a determination that the parent has engaged in conduct toward any child of a cruel and abusive nature or that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the department shall file a petition to terminate the parental rights of the child's parents, and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless:
(i) the child is being cared for by a relative;

> (ii) the department has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or
>
> (iii) the department has not provided to the family of the child, consistent with the time period in the case plan, such services as the department deems necessary for the safe return of the child to the child's home, if reasonable efforts are required to be made with respect to the child; or

*R.I. Gen. Laws §40-11-12.1(e)*. The Family Court maintains jurisdiction in the case of children who continue to be in foster care or out-of-home programs. *R.I. Gen. Laws §40-11-12.1(f)*. The Family Court must conduct a further permanency hearing whenever it deems desirable or necessary but not less than at least every twelve (12) months. "Each child continued in foster care shall be afforded a permanency hearing not less frequently than every twelve (12) months during the continuation of foster care, which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent or placed for adoption with the state filing a petition for termination of parental rights, or referred for legal guardianship, or that the child be placed in another planned permanent living arrangement in cases where the department has documented to the court a compelling reason for determining that it would not be in the best interests of the child to return home, or be referred for termination of parental rights, or be placed for adoption, or be placed with a fit and willing relative, or with a legal guardian." *R.I. Gen. Laws § 40-11-12.1(g)*. Again, the Child Advocate has full access to this information and has the ability, if not the obligation to advise the Family Court of any alleged shortcomings in the proposal.

**viii. Termination of Parental Rights**

In appropriate circumstances the DCYF may file a petition with the Rhode Island Family Court to terminate the legal rights of a parent to the child. ***R.I. Gen. Laws § 15-7-7***. The Family Court shall conduct a hearing. ***Id***. If the Family Court determines, by a standard of clear and convincing evidence that:

> (1) The parent has willfully neglected to provide proper care and maintenance for the child for a period of at least one year where financially able to do so. In determining whether the parent has willfully neglected to provide proper care and maintenance for the child, the court may disregard contributions to support which are of an infrequent and insubstantial nature; or
>
> (2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child[5]; such as, but not limited to, the following:

---

[5] This includes but is not limited to the following situations:
(i) Institutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time;
(ii) Conduct toward any child of a cruel or abusive nature;
(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem;
(iv) The child has been placed with the department for children, youth, and families and the court has previously involuntarily terminated parental rights to another child of the parent and the parent continues to lack the ability or willingness to respond to services which would rehabilitate the parent and provided further that the court finds it is improbable that an additional period of services would result in reunification within a reasonable period of time considering the child's age and the need for a permanent home;
(v) The parent has subjected the child to aggravated circumstances, which circumstances shall be abandonment, torture, chronic abuse and sexual abuse;
(vi) The parent has committed murder or voluntary manslaughter on another of his or her children or has committed a felony assault resulting in serious bodily injury on that child or another of his or her children or has aided or abetted, attempted, conspired or solicited to commit such a murder or voluntary manslaughter; or
(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an

> (3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home; or
>
> (4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion. In the event that parents of an infant have had no contact or communication with the infant for a period of six (6) months the department shall file a petition pursuant to this section and the family court shall conduct expedited hearings on the petition.

It may grant the petition and terminate the legal rights of the parent. *R.I. Gen. Laws § 15-7-7.* In considering whether to legally terminate the child-parent relationship, the Family Court shall consider "the physical, psychological, mental, and intellectual needs of the child. *R.I. Gen. Laws § 17-7-7(c)(1).* The Family Court's jurisdiction over this child does not end upon entry of a decree terminating parental rights.

If the Family Court enters an order terminating the parental rights of a child and "the child has not been placed by the agency in the home of a person or persons with the intention of adopting the child within thirty (30) days from the date of the final termination decree, the family court shall review the status of the child." *R.I. Gen. Laws § 15-7-7. See also* In re: David L., 877 A.2d 667 (RI 2005). DCYF must provide the Family Court with a "report that documents the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a

---

extended period of time;

minimum, this documentation shall include child specific recruitment efforts, such as the use of state, regional and national adoption exchanges, including electronic exchange system." *Id*. Again, the child Advocate has full access to this information and has the ability, if not the obligation, to advise Family Court of any alleged shortcomings in the proposal.

**ix. Child Advocate Office**

The Rhode Island Office of the Child Advocate is created by state law. R*.I. Gen. Laws §42-73-1.* The Child Advocate has access to information, "including the right to inspect, copy and/or subpoena records held by the clerk of the family court, law enforcement, agencies, and institutions, public or private, and other agencies, or persons with whom a particular child has been either voluntarily or otherwise placed for care, or has received treatment within or without the state. *R.I. Gen. Laws § 42-73-9.* The Child Advocate has access to DCYF records concerning: (1) the names of all children in protective services, treatment, or other programs under the jurisdiction of DCYF, and their location if in custody; (2) all written reports of child abuse and neglect; and (3) all current records required to be maintained under the provisions of § 42-72-1 *et seq*. *R.I. Gen. Laws § 42-73-8.*

The Child Advocate has the duty to review orders of the Family Court relating to juveniles with power to request reviews as required by the best interests of the child. *R.I. Gen. Laws § 42-73-7(8).* She is also considered an appropriate person under *Rhode Island General Laws §§ 14-1-10 and 14-1-11*, to bring information to the Family Court to initiate a preliminary investigation or file a petition alleging a child is dependent, abuse and/or neglected. *In re R. J. P.*, 445 A.2d 286 (1982). *R.I. Gen. Laws § 8-10-2.*

The Rhode Island State Legislature provided that certain "appropriate persons" are designated as having the authority to bring information to the Rhode Island Family Court or to file petitions alleging a child to be dependent abused and/or neglected. *R.I. Gen. Laws § 14-1-10*. The Statute specifically provides that:

> (e)xcept in case of emergency detention, whenever any appropriate person shall give to the court information in his or her possession that a child is within the provisions of this chapter, it shall be the duty of the court to make a preliminary investigation to determine whether the interests of the public or of the child require that further action be taken, and to report its findings together with a statement of the facts to the judge. The inquiry may include a preliminary investigation of the home and environmental situation of the child, his or her previous history, and the circumstances which were the subject of the information. To avoid duplication of effort and to take full advantage of all existing facilities, the report of any public agency, or of any private social agency licensed by the department of children, youth, and families, may be accepted by the court as sufficient evidence for the filing of a petition.

*R.I. Gen. Laws § 14-1-10.*

In *In re R. J. P*, the Rhode Island Supreme Court held that although the Child Advocate is not specifically listed by designation in the statutory definition of an "appropriate person", he/she is the head of an agency that meets the requirements set forth in Rhode Island General Laws section 14-1-3(1)(5). The Statute defines "appropriate persons" to include "(a)ny duly authorized representative of any public or duly licensed private agency or institution established for purposes similar to…" the statutory purpose contained in Rhode Island General Laws section 8-10-2.

As the Child Advocate is required by statute "(t)o take all possible action …to secure and ensure the legal, civil and special rights of children…" independently of DCYF. The Rhode Island Supreme Court found that the Child Advocate has the statutory authority and duty to act as an "appropriate person" and bring information and

formal legal action on behalf of children before the Rhode Island Family Court. *In re R.J.P.*, 445 A.2d at 287, 288; R.I. Gen. Laws § 42-73-7(6).

Despite her statutory mandates, duties and broad authority to report problems and issues concerning Rhode Island children, the Child Advocate has failed to intervene in the pending Family Court matters for any of the children listed in her Amended Complaint. The Child Advocate has an affirmative statutory duty to intervene in their pending Family Court actions and bring to the Court's attention those facts and circumstances which supported the allegations and conclusions contained in the Amended Complaint if she believed they merited judicial intervention. The Child Advocate has never informed the Family Court of her claim that there does not exist an appropriate permanency plans for the Plaintiffs. Further the Child Advocate has failed to apprise the Family Court of her alleged concerns regarding the safety of children placed in overcrowded and unlicensed and/or unsuitable foster homes.

On July 9, 2007, DCYF Executive Legal Counsel Kevin Aucoin contacted the Child Advocate specifically instructing her to exercise her statutory authority and intervene in pending Family Court matters concerning three of the Plaintiffs who she alleges are in "constant jeopardy." See Exhibit F-1. Attorney Aucoin further requested that in the alternative Ms. Alston provide DCYF with a written report that DCYF would forward to the Family Court for consideration. In correspondence dated July 9, 2007, Ms. Alston responded to Attorney Aucoin's requests and declined to act upon her statutory duties and mandates by intervening in pending Family Court matters. Ms. Alston declined to report to the court serious allegations about the health and safety of children in state custody and specifically stated that:

> …the Child Advocate recognizes the Family Court's authority to make decisions in individual cases and we will not interfere with the Court's decision-making process. Based upon the information that the Department of Children, Youth and Families has access to review, the Office of the Child Advocate would assert that it is your executive duty to make appropriate decisions regarding the children's permanency and safety as well as to fully inform the court and the children's CASA attorney of the housing situation as it currently exists at the proposed placement; and any danger that may be presented by individuals living in the home of the maternal aunt as noted in the records maintained by the Department.

See Exhibit F-2.

The Child Advocate is one of the attorneys representing the ten (10) plaintiff children in this lawsuit. Despite making claims that each of these children have suffered abuse and reside in "constant jeopardy" or are languishing while in the care of DCYF, there is no indication or representation that Child Advocate Alston ever questioned any decision by DCYF or the Family Court related to these children or that she appeared at any of the Family Court hearings and made any concerns known to the Family Court justice presiding over any of these cases. Moreover, when asked to do so by DCYF legal counsel, she declined. It appears that Child Advocate Alston has abdicated her statutory authority to intervene in pending Family Court proceedings in these cases and is deferring to DCYF with the review and authority of the Family Court to make decisions regarding the placement and permanency needs of these children.

**x. State Case Law**

The Rhode Island Supreme Court has repeatedly recognized the Family Court's authority to issue orders in the best interest of the child.

In ***In re: Carlos F.***, 849 A.2d 364 (RI 2004) the Family Court ordered that the children should remain in their current placements rather than be placed with the maternal grandmother. DCYF became involved with children Carlos and Neisha when

they were with their mother Luzcelina Feliciano ("Feliciano") was arrested and charged with possession of heroin with intent to deliver. 849 A.2d at 365. After entering a ***nolo contendere*** plea to the charge, Feliciano was sentenced to six (6) months to serve at the Adult Correctional Institution ("ACI"). ***Id***. Carlos and Neisha were placed in the custody of DCYF. Sometime later, Feliciano informed the DCYF caseworker that she had three (3) other children who were being cared for by a friend. ***Id***. Feliciano reclaimed these children upon her release from the ACI. ***Id***. The Family Court ultimately removed the three (3) children from Feliciano's custody after she refused to cooperate with substance abuse treatment. ***Id***.

Feliciano identified her mother, Mildred Vargas, as a possible caretaker of the five (5) children. ***Id***. Before seriously entertaining the idea of placing the children with the maternal Grandmother – Vargas, a home study relative to the suitability of Vargas and the conditions of her home were necessary through the Interstate Compact on Placement of Children ("ICPC"). ***Id***. Although the DCYF caseworker made the request of the social service agency in Puerto Rico and subsequently followed up on the status of the home study, the Puerto Rican authorities never forwarded DCYF a completed report. ***Id***.

The Family Court ultimately terminated Feliciano's parental rights as she failed to complete a single substance abuse treatment program and repeatedly missed scheduled visits with her children. ***Id***. The Family Court rejected Feliciano's argument that R.I. Gen. Laws §14-1-2 and the "codified public policy of this state *** to conserve and strengthen the child's family ties wherever possible" supported the placement of the children with their Grandmother Vargas. ***Id***. at 366. The trial court found that the

evidence Feliciano presented in support of placement with Vargas was insufficient to sustain her burden of proof. ***Id***. The Rhode Island Supreme Court ruled that [t]he trial justice acted within his discretion in determining that the best interest of the children would be served by enabling them to remain in their respective placements in the stable and familiar pre-adoptive homes in which they were residing." ***Id***. at 366-367.

In ***In re: Christina V.***, 749 A.2d 1105, 1107 (RI 2000), the Family Court in granting the petition to terminate parental rights expressly found that DCYF had made reasonable efforts to reunite Christina with her parents. The Rhode Island Supreme Court repeatedly acknowledges in this decision the Family Court's authority to enter orders regarding placement, counseling of parents, etc. that are in the best interest of the child.

In ***Engelhardt v. Bergeron***, 113 R.I. 50, 317 A.2d 877 (1974), the Rhode Island Supreme Court affirmed the Family Court's award of custody to the children's aunt and uncle. The children came to live with their aunt and Uncle, Eveline and Paul Engelhardt, after their mother was murdered. 113 R.I. at 52, 317 A.2d at 879. The children's father was charged with this crime but released on bail pending a trial. ***Id***. Bergeron, the children's father, objected to the Engelhardts' petition for custody of the children claiming that as their natural father he was entitled to full custody of the children. ***Id***. After a hearing, the Family Court awarded custody of the children to the aunt and uncle. Bergeron claimed that the Family Court exceeded its authority in awarding custody of his children to the Engelhardts. ***Id***.

The Rhode Island Supreme Court rejected Bergeron's arguments. 113 R.I. at 53, 317 A.2d at 880. The RI Supreme Court stated that the Family Court had authority to award custody of children determined to be abused or neglected under R.I. Gen. Laws,

§14-1-32 to some appropriate agency. 113 R.I. at 54-55, 317 A.2d at 880-881. The RI Supreme Court reasoned that "[I]n such cases, the Family Court stands in loco parentis, charged by the Legislature with the responsibility of placing children who come within its protection in the custody of a person or agency qualified to provide them with the care and consideration they should have received from their parents." I113 R.I. at 55, 317 A.2d at 881.

In ***Carr v. Prader***, 725 A.2d 291 (R.I. 1999) the Rhode Island Supreme Court ruled that the Family Court and not a probate court was the appropriate judicial body to decide a petition of guardianship that is opposed by a parent. The ***Carr*** Court explained that:

> The Family Court is likewise " a statutory tribunal possessing only such jurisdiction as was explicitly conferred upon it by the Legislature," ***Fox v. Fox,*** 115 R.I. 593, 596, 350 A.2d 602, 603 (1976), but is vested with the power to terminate parental rights, G .L.1956 § 15-7-7, and award custody of an abused, delinquent, wayward, neglected, or dependant child to any suitable person or agency. G.L.1956 § 14-1-32 and G.L.1956 § 40-11-12. However, the Family Court may only terminate parental rights or custody in limited statutorily-dictated circumstances.***294** *See*§ 15-7-7 (parental rights may be terminated only upon a showing of, *inter alia,* willful neglect, abandonment, desertion, or parental unfitness demonstrated by " cruel or abusive nature" or " chronic substance abuse" ); *see also*§ 14-1-32 (court may place delinquent, wayward, neglected, or dependant child in custody of appropriate person or agency); § 40-11-12 (child may be placed in custody of the Department of Children, Youth, and Families upon a showing of abuse or neglect).
>
> The laws of Rhode Island express a preference for keeping children with their parents. " The public policy of this state is *** to strengthen the family." Section 40-11-1. The Family Court Act seeks to secure for children " such care, guidance, and control, preferably in his or her own home" and " [t]o conserve and strengthen the child's family ties wherever possible, removing him [the child] from the custody of his [or her] parents only when his or her welfare *** cannot be adequately safeguarded." Section 14-1-2.
>
> If the Family Court makes a finding of neglect or abuse, the court can

> either place the child back in his or her home under Department of Children, Youth, and Families (DCYF) supervision or grant custody to DCYF " until such time as it finds that the child may be returned to the parents *** under circumstances consistent with the child's safety." Section 40-11-12(b). The statute allows the court to require the parent to undergo " counseling, including psychiatric evaluation and/or treatment as a prerequisite to the return of the child to his or her custody." *Id.* Within twelve months after the child has been placed in DCYF's care, the court will review, *inter alia,*" [t]he appropriateness of the department's plan for service to the child and parent" along with " [w]hat services have been offered to strengthen and reunite the family," and only " [w]here return home *** is not likely" are alternative modes of care considered. Section 40-11-12.1. Unless the court finds egregious behavior on the parent's part, " reasonable efforts shall be made to preserve and unify families." Section 40-11-12.2(c).[FN1] The Family Court may not grant a petition for guardianship unless: (1) the parents previously having custody have consented in writing, § 40-11-12(b), or (2) had their parental rights terminated, § 15-7-7. Furthermore, minimum due process requires clear and convincing evidence of unfitness before parental rights may be terminated. ***Santosky v. Kramer***, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599, 617 (1982). *See also*§15-7-7; ***In re Jonathan***, 415 A.2d 1036, 1039 (R.I.1980).

***Id***. at 293-294.

Rhode Island case law is replete with instances demonstrating that the Family Court and not DCYF or any other named Defendant in this case has the ultimate authority to make decisions and enter orders addressing the custody, placement, treatment, etc, of children found to have been abused or neglected.

## III. LEGAL STANDARD

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), a Court must construe the complaint liberally, treat all well-pleaded facts as true, and indulge all reasonable inferences in favor of the Plaintiff. ***See Aversa v. United States***, 99 F.3d 520, 522 (1[St] Cir. 1996). "A plaintiff, however, may not rest merely on 'unsupported conclusions or interpretations of law.' ***Washington Legal Found.***

*V. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993).'[S]ubjective characterizations or conclusory descriptions of a general scenario which *could* be dominated by unpleaded facts' will not defeat a motion to dismiss. *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992)(internal quotations omitted)." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). "'…[I]n ruling on a Rule 12(b)(1) motion, a court is not limited to the face of the pleadings, A court may consider any evidence it deems necessary to settle the jurisdictional question.'" *Morey v. State of Rhode Island*, 359 F.Supp.2d 71, 74-75 (D.R.I. 2005) (citing *Palazzolo v. Ruggiano*, 993 F. Supp. 45, 46 (D.R.I.1998). In fact, '[t]he Court can look beyond pleadings – to affidavits and depositions – in order to determine jurisdiction." *White v. Comm'r of Internal Revenue*, 899 F.Supp. 767, 771 (D.Mass.1995). In considering this motion to dismiss under Rules 12(b)(1) and 12(b)(6), the Court may take judicial notice of the prior Family Court orders and decrees. *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir.1990) (" It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.") Additionally, "courts have made a narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). It is the Plaintiff's burden to prove the existence of subject matter jurisdiction. *Murphy v. United States*, 45 F.3d at 522.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the allegations in the light most favorable to the plaintiff. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988). A complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-56 (1957). The Court must accept all well-pled factual averments as true, and draw all reasonable inferences there from in Plaintiff's favor. *Gooley*, 851 F.2d at 514. However,

> The court, however, is not required to credit " bald assertions, unsupportable conclusions, and opprobrious epithets." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989)(internal quotation marks omitted) (quoting *Chongris v. Bd. Of Appeals*, 811 F.2d 36, 37 (1st Cir. 1987). Rule 12(b)(6) is forgiving, but it " is not entirely a toothless tiger." *Campagna v. Massachusetts Dep't of Envtl. Prot.*, 334 F.3d 150, 155 (1st Cir. 2003) (quoting *Dartmouth Review*). A plaintiff must allege facts in support of " each material element necessary to sustain recovery under some actionable legal theory." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d at 16 (quoting *Gooley v. Mobile Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1998)).

*Morey v. State of Rhode Island*, 359 F.Supp.2d at 75.

## IV. ARGUMENT

### A. THE FEDERAL COURT SHOULD ABSTAIN FROM RENDERING A DECISION THAT WOULD INVADE THE PROVINCE OF THE RHODE ISLAND STATE COURTS OR ITS PAST AND FUTURE DECISIONS.

#### i. ABSTENTION BASED ON THE YOUNGER DOCTRINE

Plaintiffs allege that they have been denied federal statutory rights and violated their First, Ninth and Fourteenth Amendment rights. The Plaintiffs seek injunctive and declaratory relief. Without addressing the merits of the specific claims of each Plaintiff, the Defendants submit that principles of comity support this Court's abstention from interfering with the Plaintiffs' cases pending before the Rhode Island Family Court.

The seminal case calling for a Federal Court to abstain from interfering with a pending state court case is *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.ed.2d 669

(1971). "The *Younger* Doctrine is based on principles of comity, and unless there are extraordinary circumstances, it instructs federal courts not to 'interfere with ongoing state-court litigation, or, in some cases, with state administrative proceedings.'" *Rossi v. Gemma*. 489 F.3d 26, 34 (1st Cir. 2007)(citing *Maymó-Meléndez v. Álvarez-Ramírez*, 364 F.3d 27, 31 (1st Cir. 2004)). The First Circuit has articulated the "basic analytical framework for Younger abstention", premised on the United States Supreme Court's decision in *Middlesex County Ethics Comm. V. Garden State Bar Ass'n*., 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). *Rossi*, 489 F.3d at 34-35. "Abstention is appropriate when the requested relief would interfere (1) with an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge." *Id*. Where a case meets the *Younger* criteria, a district court has no discretion to provide injunctive relief and must abstain. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 816 fn22, 96 S.Ct. 1236,1 246 fn.22, 47 L.Ed.2d 483 (1976). *See also J.B. ex rel. Valdez*, 186 F.3d 1280, 1291 (10th Cir.1999)("*Younger* abstention is not discretionary once the above conditions are met absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims." *Seneca-Cayuga Tribe v. Oklahoma*, 874 F.2d 709, 711 (10th Cir. 1989)).

These Defendants submit that: (1) there are or were[6] ongoing proceedings before the Rhode Island Family Court; (2) an important state interest is implicated; and (3) there

---

[6] On September 24, 2007 the Family Court granted an adoption petition involving the children, Briana, Alexis and Clare. As a result, the children are no longer in foster care and their case is now closed to the Family Court

is an adequate opportunity for the plaintiffs to advance their federal constitutional claims. Having satisfied the ***Younger*** criteria, the Defendants submit that this Court must decline exercising jurisdiction and dismiss the federal claims.

**a. The Federal Litigation Would Interfere with Ongoing Proceedings Before the Rhode Island Family Court**

The Family Court has original and exclusive original jurisdiction over children neglected children residing or being in the State. *R.I. Gen. Laws, §14-1-5.* A child suspected of being abused or neglected may initially be removed from their parents or guardians care for a period of forty-eight (48) to seventy-two (72) hours[7] without a court order; however, beyond that time it is the Family Court that determines the child's custody placement. *R.I. Gen. Laws § 40-11-7.*

The Family Court has seven (7) days to commence a hearing on DCYF's filing of *ex parte* petition that alleges a child has been neglected or abused. *R.I. Gen. Laws § 40-11-7.* At this initial hearing the Family Court may "make any interim orders in its discretion respecting the rights of the child." *R.I. Gen. Laws § 40-11-7.1.* If, after a hearing, the Family Court determines that a child has been abused or neglected, it will enter a formal decree that either returns the child to their own home (if it is safe), albeit under the supervision of DCYF, or award care custody and control of the child to DCYF upon such terms as the Court shall determine. *R.I. Gen. Laws § 40-11-12.* At every regularly scheduled Family Court Review and/or dispositional hearing, DCYF must provide a written reunification or permanency plan for the Family Court's review and approval. R.I. Gen. Laws § 40-11-12.2. The Family Court, at its discretion, may approve or modify the proposed plan. *Id*. The Family Court must conduct a permanency hearing

[7] Removal would be pursuant to *R.I. Gen. Laws § 40-11-5*.

within a period of twelve (12) months after the child has been placed in the care of DCYF and the child has resided in a foster care or out of home placement. ***R.I. Gen. Laws § 40-11-12.1.*** The Child Advocate has full access to the orders of the family court relating to juveniles as well as to DCYF's records and has the power to request reviews as required by the best interest of the child. ***R.I. Gen. Laws § 42-73-7.***

The facts and Family Court Orders provided to this Court demonstrate that there are ongoing Family Court proceedings for seven (7) of the ten (10) named plaintiffs. The three (3) remaining Plaintiffs – Briana, Alexis and Clare – were adopted on September 24, 2007 and therefore, are no longer in DCYF custody or foster care and their Family Court case is closed.

A strikingly similar Amended Complaint to this one was filed against Nebraska and imputed similar deficiencies in their child welfare and foster system. The United States District Court for the District of Nebraska ruled that the ***Younger*** abstention doctrine required dismissal of the complaint. In addressing the first ***Middlesex*** factor – ongoing State proceedings – the District Court of Nebraska reasoned that:

> Each of the plaintiffs, and every child adjudicated under Neb.Rev.Stat. 3(a) or 3(b) and in HHS legal custody, is subject to the continuing jurisdiction of the Nebraska juvenile court system. Following adjudication, the court conducts a disposition hearing to determine the child's placement and the rights of the parties in the action. In re Interest of Joshua M., 256 Neb. 596, 591 N.W.2d 557 (1999). The court must determine where the child will be placed and must review this dispositional order for each child at least once every six months to reaffirm the order or direct another disposition of the child. ***Neb.Rev.Stat.§43-1313.*** As such, the named plaintiffs, and all members of the putative class, are subject to ongoing state proceedings before the Nebraska juvenile court system. *31 Foster Children,* 329 F.3d at 1277 (holding that state proceedings were ongoing where the state court holds an initial adjudicatory hearing regarding a potential foster child, " retains continuing jurisdiction over a dependency case and reviews the child's status at least every six months," must approve the case plan, and may amend the plan); ***J.B.***, 186 F.3d at 1291 ("

> We hold that the continuing jurisdiction of the Children's Court to modify a child's disposition, ... coupled with the mandatory six-month periodic review hearings, ... constitutes an ongoing state judicial proceeding." ); ***Laurie Q. v. Contra Costa County***, 304 F.Supp.2d 1185, 1204 (N.D.Cal2004)(" [T]he substantial oversight role that the Juvenile Court must play during the pendency of a child's care within the foster system is sufficient to create an ongoing judicial proceeding for the purposes of Younger." ); ***Olivia Y. ex rel. Johnson v. Barbour***, 351 F.Supp.2d 543, 567-68 (S.D.Miss2004)(" In view of the continuing nature of the duties and responsibilities statutorily imposed upon the state's youth courts, ... [the] proceedings may fairly be said to be ' ongoing' in the case of each child over whom the youth courts have assumed jurisdiction." ).

***Foreman***, 420 F.R.D. at 523.

Similar to ***Foreman***, at the very least a child in DCYF's custody in foster care is mandated by statute to have a permanency hearing every twelve (12) months. As is apparent from these cases, however, the Family Court has more than yearly interaction with the children, as is evident by the facts relating to each of the ten (10) Plaintiffs.

The ***Foreman*** Court also addressed the issue of whether the Federal Court action would interfere with the ongoing state proceedings. As they did in this case, the ***Foreman*** plaintiffs' did not request any specific type of injunctive relief[8]. 240 F.R.D. at 524. Rather, "[t]he prayer for relief in their complaint essentially requests the court to enter an order requiring the defendants to cease violating the plaintiffs' constitutional rights and comply with federal statutory requirements. Under circumstances such as this,

---

[8] In ***31 Foster Children v. Bush***, 329 F.3d 1255, 1279 (11th Cir.2003) the plaintiffs' Complaint (filed by Children's Rights Attorney Maria Lowery, and Florida local counsel) similarly asserted civil rights violations arising out of Florida's foster care system. The plaintiffs in that case expressly requested as part of their desired relief that the district court appoint a panel and give it authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan. The District Court and Eleventh Circuit were able to concretely analyze how this requested relief would interfere with the state proceedings and was a basis for abstaining under ***Younger***. Subsequently, in ***Foreman*** and in this case, plaintiffs phrased their requested relief is very broad and abstract terms – one can only assume in an attempt to avoid the application of ***Younger***.

some courts have refused to abstain under ***Younger*** because, absent a specific request for injunctive relief, they could not conclude that a federal order would necessarily interfere with ongoing state proceedings." ***Id***. at 524-525 (*citing to* ***Olivia Y. ex rel. Johnson v. Barbour***, 351 F.Supp2d 543, 570 (S.D.Miss.2004); ***Kenny A. ex. Rel. Winn v. Perdue***, 218 F.R.D. 277, 286 fn.5. However, the ***Foreman*** Court was not swayed by the plain face of the requested relief, but rather conducted its analysis so as to be dutiful to the Supreme Court's stated purpose of ***Younger*** – to preserve the principles of comity and Federalism. The ***Foreman*** Court held that:

> The plaintiffs' artful pleading and lack of specificity should not serve to circumvent the principles of comity protected by ***Younger*** abstention; that is, the plaintiffs' failure to identify the specific relief requested should not assist them in defeating defendants' motion to dismiss on the basis of Younger abstention. Therefore, rather than relying on the plaintiffs' prayer for relief to determine what injunctive remedy the plaintiffs may request, the court will rely on the allegations of the amended complaint, the presumption being that the plaintiffs will ultimately request an order remedying each allegedly wrongful action or inaction performed by HHS.
>
> Based on the specific allegations of the amended complaint, it appears the plaintiffs will request an injunction requiring the State to:
>
> - Change its policies applicable to locating, relocating, and selecting placements for children; specifically,
>   - Move children less frequently and to more appropriate placements;
>   - Provide transitional support to children moving from one placement to another;
>   - Limit the placement time spent in emergency shelters and other temporary facilities;
>   - Eliminate or sparingly use emergency shelters and other temporary facilities for placement of small children;
>   - Limit the number of children placed in a particular foster home;
>   - Screen foster homes;
>   - Limit the use of institutional placements for children;
>   - Use institutional placements and therapeutic foster homes when warranted;
>   - Segregate dangerous or sexually reactive children from

other foster children;
  - Adequately train, prepare, inform, or support foster parents; and
  - Pay foster care providers amounts which are sufficient to cover the expenses of the child's necessary care, (filing 64 (Amended Complaint).
- Reduce the length of stay in state custody by developing and implementing better case plans and terminating parental rights more quickly.
- Adopt policies aimed at providing better supervision of children in its care; specifically,
  - Limit HHS caseworker caseloads, and provide caseworkers with more experience and training,
  - Monitor foster homes and supervise biological parents more closely during reunification or visitation.
- Provide basic health services for foster children, such as services necessary to address acute health problems, and basic medical examinations and dental health services,
- Afford access to visitation with family members
- Perform all the foregoing and upgrade its computerized information systems so that Nebraska can reach the compliance levels and reporting requirements of its federally approved Child and Family Services Plan (CFSP), (see 45 C.F.R. §§284.11, 1355.32-1355.33 and any program improvement plan (PIP)), (45 C.F.R. §1355.32(B)(2) & 1355.35, and thereby secure federal funding.

> Assuming the Plaintiffs request each of the foregoing types of relief, the question is whether a federal order granting such relief will interfere with the ongoing proceedings in the Nebraska juvenile courts. This determination, in turn, depends on the extent to which Nebraska juvenile court judges are already vested with oversight responsibility and authority to consider the impact of the foregoing complaints with respect to each child and enter orders for the benefit of such children under their jurisdiction.

***Id***. at 525-526 (Footnote omitted and citations to Amended Complaint omitted). The ***Foreman*** Court analyzed the authority of the Nebraska Juvenile Courts, the statutory authority and the actual role the state courts have in the lives of foster children. ***Id***. at 526-529. The Eleventh Circuit affirmed the District Court's determination that:

> that injunctive orders by this court which attempt to impose parameters on HHS for determining where a child should be placed; if and how often a

> child should be moved to another placement; the child's length of stay in HHS custody; the methods employed and attention given to parental rights termination proceedings; the supervision of the children while in HHS custody; the level of training, experience, and workload capability of HHS caseworkers assigned to a child; the level of reporting provided to the court by HHS; the rights to visitation with family or former foster families; and the types of medical, dental, mental health, and behavioral treatment a child may need, would both directly and indirectly interfere with the plenary jurisdictional and decision-making authority of the Nebraska juvenile courts. The injunctive relief ordered would give the federal district court an oversight role over Nebraska's child welfare program, and would give it direct control over decisions currently vested in the juvenile court. ***J.B***., 186 F.3d at 1292.
>
> In this case, the plaintiffs are seeking relief that would interfere with the ongoing state dependency proceedings by placing decisions that are now in the hands of the state courts under the direction of the federal district court. The declaratory judgment and injunction that they request would interfere with the state proceedings in numerous ways. The federal and state courts could well differ, issuing conflicting orders about what is best for a particular plaintiff, such as whether a particular placement is safe or appropriate or whether sufficient efforts are being made to find an adoptive family. The federal court relief might effectively require an amendment to a child's case plan that the state court would not have approved, and state law gives its courts the responsibility for deciding upon such an amendment. .... To say the least, taking the responsibility for a state's child dependency proceedings away from state courts and putting it under federal court control constitutes " federal court oversight of state court operations, even if not framed as direct review of state court judgments" that is problematic, calling for ***Younger*** abstention.... The relief that the plaintiffs seek would interfere extensively with the ongoing state proceedings for each plaintiff.
>
> ***31 Foster Children***, 329 F.3d at 1278-1279 (dismissing plaintiffs' substantive and procedural due process claims, constitutional claims for denial of family association, claims based on alleged violations of the AACWA and EPSDT on the basis of ***Younger*** abstention). See also ***J.B***., 186 F.3d at 1291-92. (concluding ***Younger*** abstention was required because the plaintiffs' federal action would interfere with the proceedings of New Mexico's Children's Court in that the federal court would, in effect, assume an oversight role over the entire state program for children with disabilities).

***Id***. at 529.

The ***Foreman*** plaintiffs argued that its Amended Complaint was not directed at

the state courts but, rather, at Nebraska's Department of Health and Human Services ("HHS")–the agency that cares for the foster children. ***Id***. The ***Foreman*** plaintiffs further argued that "any federal court order would assist rather than interfere with the juvenile court by imposing higher standards on HHS". ***Id***. The ***Foreman*** Court disagreed, reasoning that:

> Article V, §27 of the Nebraska Constitution authorized the Nebraska legislature to " establish courts to be known as juvenile courts, with such jurisdiction and powers as the Legislature may provide." Neb. Const. Art. V., §27. Consistent with this authority, the legislature enacted Neb.Rev.Stat. §43-285 which states:
>
> When the court awards a juvenile to the care of the Department of Health and Human Services, an association, or an individual in accordance with the Nebraska Juvenile Code, the juvenile shall, unless otherwise ordered, become a ward and be subject to the guardianship of the department, association, or individual to whose care he or she is committed. Any such association and the department shall have authority, *by and with the assent of the court,* to determine the care, placement, medical services, psychiatric services, training, and expenditures on behalf of each juvenile committed to it.
>
> Neb.Rev.Stat. §43-285(1)(LEXIS 2005)(emphasis added). Accordingly, " [e]ven though any remedial order would run against the Department, state law makes it a duty of state courts to decide whether to approve a case plan, and to monitor the plan to ensure it is followed." ***31 Foster Children***, 329 F.3d at 1279. Exercising federal court oversight over HHS' conduct on behalf of a child would serve to duplicate the authority already afforded to the Nebraska juvenile court by the Nebraska legislature. Federal court injunctive orders against HHS would undermine and interfere with the Nebraska juvenile court's ability to exercise the full extent of its authority over juvenile court proceedings.

***Id***. at 529-530.

As the requested relief is similarly broad and sweeping in this case, it is necessary for the Defendants to provide an analysis similar to ***Foreman*** to demonstrate how this lawsuit would interfere with the Plaintiff's ongoing Family Court cases. Based on their Amended Complaint, these Plaintiffs would be asking this Court to issue an injunction

requiring the State of Rhode Island to:

- Change its policies applicable to locating, relocating, and selecting placements for children; specifically,
  - o Place children in licensed foster homes and expedite the licensing of kinship foster homes, (Amended Complaint ¶¶ 5, 133, 205 );
  - o Place siblings in same foster care (Amended Complaint ¶153);
  - o Ensure renewal of licenses of foster homes (Amended Complaint ¶ 133, 205, 209);
  - o Move children less frequently and to more appropriate placements, (Amended Complaint ¶5, 142, 145, 149-150);
  - o Delay in reunifying children with their parents without providing services needed to ensure the children's safety, (Amended Complaint ¶5, 168);
  - o Limit the use of institutional placement for children, (Amended Complaint ¶¶ 5, 137, 140);
  - o Limit the placement time spent in emergency shelters and other temporary facilities, (Amended Complaint ¶¶138);
  - o Adequately train, prepare, inform, support or monitor foster homes and institutions (Amended Complaint ¶¶ 133, 136, 185-186);
  - o Pay foster care providers amounts which are sufficient to cover the expenses of the child's necessary care, (Amended Complaint ¶¶ 135, 216-218);
- Reduce the length of stay in state custody by developing and implementing better case plans, terminating parental rights more quickly, and recruiting prospective adoptive parents (Amended Complaint ¶5, 161-162, 166-167, 173, 178);
- Adopt policies aimed at providing better supervision of children in its care; specifically,
  - o Limit HHS caseworker caseloads, and provide caseworkers with more experience and training (Amended Complaint ¶¶ 5, 144, 157, 177, 187-189, 197),
  - o Monitor foster homes and supervise biological parents more closely during reunification or visitation, (Amended complaint ¶¶ 129, 164),
- Develop and implement case plans that address children's safety, medical, mental health, education and permanency needs, (Amended Complaint ¶¶ 5, 155-156, 179-181, 183);
- Afford access to visitation with family members, (Amended Complaint ¶154)
- Place children in foster homes as oppose to more costly institutions so that Rhode Island Title IV-V funding from the Federal Government (Amended Complaint ¶¶ 210-215).

Assuming this was the requested relief sought by the plaintiffs, this Court, similar to Nebraska, must determine whether a federal court order would interfere with ongoing proceedings before the Rhode Island Family Court. The Defendants submit that the answer to this question is in the affirmative.

**b. The Child Welfare System Is An Important State Interest**

There does not appear to be a dispute that the child welfare and its foster program implicate an important state interest. "'Family relations are a traditional area of state concern." ***Moore v. Sims***, 442 U.S. 415, 435, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). The state has a compelling interest in quickly and effectively removing victims of child abuse and neglect from their parents and placing them in safe and suitable homes. State conduct performed and proceedings instituted to protect children from abuse implicate sufficiently important state interests to justify ***Younger*** abstention. ***Moore***, 442 U.S. at 435, 99 S.Ct. 2371 (applying Younger abstention to case challenging the state's temporary removal of a child from an allegedly abusive home environment).'" ***Foreman***, 240 F.R.D. at 524. *See also, **Office of Child Advocate v. Lindgren***, 296 F.Supp.2d 178, 193 (D.R.I.2004).

**c. The Plaintiffs Have An Adequate Opportunity To Advance Their Federal Constitutional Claims Before the Family Court.**

This last ***Middlesex*** factor requires this Court to determine whether the Rhode Island Family Court proceedings provides these federal plaintiffs the opportunity to raise their alleged federal claims. The Defendants submit that the Family Court provides each of these named plaintiffs the ability to address the various claims and, therefore, the Federal Court should abstain.

The issue before this Court is "not whether plaintiffs' claims were raised in the pending state proceedings, but whether they could have been raised." ***Foreman***, 240 F.R.D. at 530. It is the plaintiffs' burden to prove to this Court that their individual claims could not be adequately raised before the Rhode Island Family Court. ***Id***. *citing* ***Moore v. Sims***, 442 U.S. 415, 425, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979)("holding the district court should have abstained under ***Younger*** from considering a constitutional challenge to portions of Texas statutory scheme for investigating suspected child abuse, though not every issue, including whether its computerized system for collecting and disseminating child-abuse information was constitutional, had been raised in a state judicial proceeding.") Specifically, "[t]he plaintiffs must prove they could not have obtained a juvenile court ruling protecting them from …[DCYF's] allegedly unlawful conduct which caused them harm or the imminent risk of future harm, either because the …[Family Court] had no jurisdiction to consider the federal questions raised in this case, had no authority to award a remedy, or because the plaintiffs lacked adequate representation in that forum." ***Id***. at 531. The plaintiffs cannot make this showing and sustain their burden.

The ***Foreman*** Court recognized that:

> [t]he Nebraska juvenile court can exercise substantial control over HHS for the protection of a child, can issue rulings governing HHS' conduct on behalf of that child, and can modify or reject HHS's recommendations regarding a child's care and placement while in HHS custody. The plaintiffs each have a court-appointed guardian ad litem to assist in the juvenile court proceedings-an attorney and officer of the court statutorily obligated to act for the plaintiff and protect his or her interests. Neb.Rev.Stat. 43—272. (Footnote omitted).

***Id***. at 532. The Court found it of importance that each plaintiff child had a court appointed guardian ad litem to act in their best interest. Each plaintiff in this case has a

court appointed guardian ad litem or CASA attorney representing their best interests at each and every Family Court hearing. The ***Foreman*** Court specifically distinguished the situation in Nebraska from a case filed by *Children's Rights* in Georgia. In its decision, the Court noted that the right to legal representation was not available in the Georgia Childrens' Rights case of ***Kenny A***., ***Id***. at fn 47. Additionally, the Nebraska Juvenile Court had the ability to address claims challenging the constitutionality of statutes. ***Id***. at 531. Based on its analysis, the ***Foreman*** Court determined that each of its individual plaintiffs could have raised the issues presented before the State's Juvenile Court. ***Id***. at 532.

Similar to Nebraska, the Rhode Island Family Court is a court of limited jurisdiction; however, it also has "very broad power to issue rulings for the protection and welfare of children." *Foreman*, 240 F.R.D. at 531. *See In re: Stephanie B*., 826 A.2d 985, 992 (RI2003)("Generally, the Family Court is vested with broad powers over matters affecting children."); *Carr v. Prader*, 725 A.2d 291 (RI 1999). The Family Court has the authority to address constitutional claims that come before it. The Family Court has in the past ruled that DCYF has not made "reasonable efforts" at reunification and, based on this determination has dismissed DCYF's petition to terminate parental rights. *See In re Manuel P.*, 889 A.2d 192 (2006)(The Family Court denied DCYF's petition to terminate parental rights of her two sons as the court found that DCYF failed to make referrals for alternative services recommended by evaluating professionals). The Family Court is also empowered to address issues implicating constitutional dimensions. *See In re: Destiny D.*, 922 A.2d 168 (RI 2007)(Issue of the parent's Fifth Amendment privilege raised and addressed) see also In re: Stephanie B., 826 A.2d 985 (RI2003)(The Rhode

Island Supreme Court agreed with non-party that its due process rights violated by a Family Court procedure.).

Most recently, the Family Court denied DCYF's petition to terminate involvement of the agency with Kennth K., a twenty-year old individual who had been placed in DCYF's custody. DCYF filed such a petition based on statutory enactment H5300, sub.A., (P.L. 07-073-22, Art.22), the State Appropriates Act that amended the jurisdictional language pertaining to the Family Court that arguably terminates DCYF's and the court's jurisdiction over an individual upon the age of eighteen (18). One of the arguments raised by Kenneth K.'s court appointed ***Guardian Ad Litem*** argued to the Family Court that Article 22 could not be applied retroactively to any child that came under DCYF's protection before the enactment of the legislation. An argument raised by Kenneth's Guardian on his behalf was that the enacted statute violated the Equal Protection Clause of the United States Constitution. Ultimately, the Family Court ruled that statute was not to be applied retroactively. ***In re Kenneth K.***, F.C. 1990-01456-01/P1995-03-6883. This case is on Appeal to the Rhode Island Supreme Court. ***In re Kenneth K.***, M.P. 07-249.

As framed by the ***Foreman*** Court, "… the precise question is not whether a … [Rhode Island Family Court] can be called upon to issue a ruling declaring that specific … [DCYF] policies violate the constitution or federal law. Rather, the plaintiffs must prove the …[family court] cannot adequately consider evidence of … [DCYF's] conduct or likely future conduct toward the individual plaintiffs, determine if such conduct violates their rights under federal constitutional or statutory law, and enter orders

protecting the plaintiffs from …[DCYF's] allegedly unlawful conduct." 240 F.R.D. at 531. This Court should be mindful that:

> [a] " federal court should assume that the state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." ***Pennzoil Co.***, 481 U.S. at 14, 107 S.Ct. 1519. The court " will not engage any presumption ' that the state courts will not safeguard federal constitutional rights.'" ***Norwood***, 409 F.3d at 904 (quoting ***Neal v. Wilson***, 112 F.3d 351, 357 8th Cir.1997)(quoting ***Middlesex County Ethics Comm.***, 457 U.S. at 431, 102 S.Ct. 2515)).

***Id***. Like ***Foreman***, plaintiffs lack any evidence that Rhode Island's Family Court and its judges are unaware of or unable to interpret the federal statutory or constitutional laws governing or impacting their rulings and procedures, nor to the extent a party claims federal law was violated at the juvenile court level, that appellate review is not available in the Rhode Island Supreme Court. ***Id***. Indeed, since the Child Advocate has never intervened for any of the named plaintiffs in any Family Court proceeding, she cannot even allege that such matters were presented to the Family Court, let alone rejected by them.

**d. *Office of Child Advocate v. Lindgren***

This ***Younger*** analysis would not be complete without addressing the case of ***Office of Child Advocate v. Lindgren***, 296 F.Supp.2d 178 (D.R.I. 2004). The Plaintiffs may attempt to paint the ***Lindgren*** Court's decision with a broad brush and apply it to this Complaint. However, the ***Lindgren*** case is so factually distinguishable from this case as to be inapposite.

In ***Lindgren***, the defendant filed a motion to vacate a consent decree (pursuant to F.R.C.P. 60(b)) that had been entered into twelve (12) years before. One of the grounds that defendant relied on in support of the motion to vacate was the ***Younger*** Doctrine.

Ultimately the ***Lindgren*** Court rejected *Younger* abstention, however, it expressly stated that it concluded that "no federal abstention rules relate to a basis for vacating the … [consent decree] in any event." 296 F.Supp.2d at 189. Additionally, the ***Lindgren*** Court determined that the facts of its case did not warrant abstention because there was no known pending state proceeding with which the Court's judgment would interfere. ***Id***. at 190. In ***Lindgren***, the suit was filed in the name of the Child Advocate and not individual minor plaintiffs as is the present case. The children named in the motion to adjudge the defendant in contempt did not have a case pending before the Rhode Island Family Court and, in fact, they were no longer minors. The ***Lindgren*** Court stated that:

> Defendant has not made a showing that there is a pending state proceeding regarding any child involved in this case. That is obviously because Plaintiff has not brought the motion to adjudge in contempt on behalf of any specific child in DCYF custody. Although the question of abstention may recur when the Court hears that motion on its merits, it is not an issue now. One thing is clear. Although the Family Court retains jurisdiction over children in state custody, that Court has no present jurisdiction over any of the three children referred to in Plaintiff's Complaint because those children are presently in their thirties. All that this Court can say now in view of the present posture of this case, is that enforcing the SACD will not interfere with any known Family Court proceeding or decision. Since there is no known ongoing state proceeding regarding any child involved in the case at present, there is no basis for this Court to abstain under *Younger v. Harris* at this time.

***Id***. at 191.

Unlike the ***Lindgren*** case, the ten (10) named Plaintiffs have or had current and ongoing cases pending before the Rhode Island Family Court; each Plaintiff is still a minor; each Plaintiff has a CASA attorney or *guardian ad litem* acting in their best interest in the Family Court proceedings; the Child Advocate has a right if not a duty to intervene on behalf of each plaintiff if she believes there is a need to do so; and the federal court proceedings or a ruling thereon would interfere with the ongoing Family

Court proceedings. Moreover, this case is before the Court in the procedural posture of a motion to dismiss the complaint under F.R.C.P. 12(b)(1) rather than a twelve (12) year old consent decree.

Based on the foregoing, the ***Lindgren*** decision should not be used as a sword to defeat the instant motion to dismiss this Complaint.

**ii. ABSTENTION BASED ON THE ROOKER-FELDMAN DOCTRINE**

The Defendants submit that this Court lacks subject matter jurisdiction and, therefore, should abstain from entertaining Plaintiff's Complaint based upon the ***Rooker-Feldman Doctrine***. The ***Rooker-Feldman*** Doctrine precludes a federal court from entertaining federal claims that are "inextricabley intertwined" with a state court's adjudication of an issue. ***Alwyn v. Duval***, 26 FedAppx. 17, 19, 2001 WL 1379861 (C.A.1 (N.H 2001.)). The Plaintiffs in this case ask this Court to issue declaratory and injunctive relief; however to reach the remedy portion, this Court must find that the Rhode Island Family Court's decisions regarding placement, case plans, etc. for the ten (10) named plaintiffs were unsound, placed them in positions of peril and violated their rights.

The ***Rooker-Feldman*** Doctrine originated from two (2) United States Supreme Court cases: ***Rooker v. Fidelity Trust Co.***, 263 U.S.413, 44 S.Ct. 149, 68 L.Ed.362 (1923) and ***District of Columbia Court of Appeals v. Feldman***, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

> In ***Rooker***, the Court was asked to declare a judgment of the Indiana state courts null and void as a violation of the Contract, Due Process, and Equal Protection Clauses of the United States Constitution. The Court affirmed the district court's conclusion that jurisdiction was lacking, stating that: " Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the judgment [of a state court] for errors of that character." ***Rooker***, 263 U.S. at 416, 44 S.Ct. 149.

The *Feldman* case expanded in some significant ways upon the relatively non-controversial principle that only the Supreme Court has jurisdiction to review decisions of state courts. The plaintiffs, Marc Feldman and Edward Hickey, Jr., had both sought admission to the District of Columbia bar. ***Feldman***, 460 U.S. at 465, 471, 103 S.Ct. 1303. Standing in their way was an admissions rule requiring applicants to have graduated from an ABA-approved law school, ***id***. at 464, 103 S.Ct. 1303; Feldman had pursued an apprenticeship-type program with a practicing attorney in Virginia, ***id***. at 465, 103 S.Ct. 1303, while Hickey had attended a non-accredited law school, ***id***. at 470, 103 S.Ct. 1303. After being denied admission by the Committee on Admissions of the District of Columbia Bar, Feldman petitioned for a waiver of the requirement to the District of Columbia Court of Appeals. ***Id***. at 465-66, 103 S.Ct. 1303. Hickey also petitioned for a waiver. ***Id***. at 471, 103 S.Ct. 1303. Both requests were denied in ***per curiam*** orders. ***Id***. at 468, 472, 103 S.Ct. 1303.

Feldman and Hickey then filed suit in federal district court challenging the denials of their waiver petitions and the constitutionality of the admission rule. ***Id.*** The district court dismissed the complaint, holding that it lacked subject matter jurisdiction. The Court of Appeals for the District of Columbia Circuit reversed, ***Feldman v. Gardner***, 661 F.2d 1295 (D.C.Cir.1981), and appeal followed to the Supreme Court.

After making a preliminary determination that the District of Columbia Court of Appeals' denials of the waiver petitions were judicial proceedings, ***Feldman***, 460 U.S. at 479, 103 S.Ct. 1303, the Supreme Court held that the district court lacked jurisdiction to review issues that were either resolved by the waiver decisions or " inextricably intertwined" with those issues that were decided:

If the constitutional claims presented to a United States District Court are inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar, the District Court is in essence to review the state court decision. This the District Court may not do.

***Id.*** at 482 & n. 16, 103 S.Ct. 1303. On the other hand, the district court ***did*** have subject matter jurisdiction over the general constitutional challenge to the bar admission rule, provided that no review of Feldman or Hickey's individual denials resulted. ***Id.*** at 486, 103 S.Ct. 1303. The Supreme Court remanded the case for a determination on the merits on the issue of whether the requirement that Bar members have degrees from ABA-approved schools was unconstitutional. ***Id.*** at 487-88, 103 S.Ct. 1303.

*Wilson v. Shumway*, 264 F.3d 120, 123 (1st Cir.2001). Footnote omitted. The First

Circuit has held that *Rooker-Feldman* bars a federal court's jurisdiction not only over those claims adjudicated in the state court but also over federal claims that a party does not actually raise but are "inextricably intertwined" with the claims adjudicated in the state proceedings. *Alwyn v. Duval*, 26 FedAppx. 17, 19, 2001 WL 1379861 (C.A.1 (N.H.))(*citing* *Sheehan v. Marr*, 207 F.3d 35, 40 (1st Cir.2000)). For point of clarification, "[a] federal claim is inextricably intertwined with the state court claims 'if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.'" *Alwyn*, 26 Fed.Appx at 19 (*citing* *Hill v. Town of Conway*, 193 F.3d 33, 39 (1st Cir.1999)). In 2005, the United State Supreme Court gave further guidance on the *Rooker-Feldman* Doctrine in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S.Ct. 1517, 1526, 161, L.Ed.2d 454 (2005). Since *Exxon Mobile*, the First Circuit has held that "the *Rooker-Feldman* doctrine now applies only in the ' limited circumstances' where ' the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." ' *Federaciòn de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico* , 410 F.3d 17, 23-24 (1st Cir. 2005).

Although rendered prior to *Exxon Mobile*, the First Circuit's reasoning and application of the *Rooker-Feldman* Doctrine in both *Alwyn* and *Wilson* are sound and support its application to the instant case and a dismissal of the Amended Complaint. In *Alwyn*, local police responded to a call that two children were missing. 26 Fed.Appx at 18. After protracted discussion with the parents of the missing children, Michael and Simone-Alys, permitted the police into their house. *Id*. The children were later found;

however, the police took the children into protective custody and placed them in foster homes because of the deplorable living conditions in the home. *Id*. at 18. The New Hampshire DCYF filed child neglect petitions in the Concord District Court. *Id*. at 19. After conducting a full evidentiary hearing the Concord District Court entered a finding of neglect. *Id*. The Court also issued a dispositional order authorizing DCYF to continue legal supervision over the children. *Id*. The parents appealed. *Id*. As the conditions set forth in the original neglect petition had been corrected, DCYF agreed to terminate the neglect petition if the parents agreed to terminate their appeal. *Id*.

Thereafter the Alwyns filed a civil rights action against the two police officers. *Id*. at 17. The Alwyns claimed that the officers violated their constitutional rights by misrepresenting the condition of their apartment and resulted in their children being temporarily removed from their custody. *Id.* The First Circuit affirmed the District Court for the District of New Hampshire's dismissal of the Alwyns' complaint. The First Circuit held that the federal court lacked subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Id*. at 17-18. The First Circuit agreed with the District Court's decision that:

> … pursuant to the *Rooker-Feldman* doctrine, it had no subject matter jurisdiction to hear the Alwyns' misrepresentation claim in light of the Concord District Court's February 13, 1997 finding of neglect. The district court reasoned that, in order for appellants' claim to succeed, the fact-finder would have to reject the officers' testimony regarding the condition of the Alwyns' home, which would directly contradict the determination already made by the state tribunal. Consequently, the district court dismissed the count.

*Id*. at 19-20.

In *Wilson v. Shumway*, 264 F.3d 120 (1st Cir. 2001), it was determined that the federal court lacked subject matter jurisdiction based on the *Rooker-Feldman* doctrine.

The plaintiff David Wilson, who suffered from a mental illness, threatened his neighbor with a loaded gun. ***Wilson***, 264 F.3d at 121. The Merrimack County Probate Court ordered that Wilson be involuntarily confined to New Hampshire Hospital for up to three (3) years. ***Id***. During the hospitalization, the State of New Hampshire petitioned the probate court to appoint a guardian for Wilson as he refused to take his anti-psychotic medications. ***Id***. A guardian was appointed, who also made decisions relating to Wilson's living arrangements and medical treatment options. ***Id***.

Wilson filed a complaint in federal court claiming that his constitutional rights were violated because he was forced to take anti-psychotic medication. ***Id***. Thereafter Wilson filed before the probate court a motion to terminate his guardianship. ***Id***. at 122. The probate court denied his petition finding that Wilson continued to be incapacitated and incapable of exercising the rights that had been assigned to the guardian. ***Id***.

In an attempt to avoid dismissal, Wilson characterized his complaint as a general constitutional challenge regarding New Hampshire's procedure for permitting a guardian to authorize the involuntary administration of anti-psychotic drugs. Id. at 124. Artfully, Wilson fashioned his argument that:

> …the current statutory scheme relating to involuntary medication lacks constitutionally-guaranteed procedural due process mechanisms. Specifically, Wilson claims that before a recommendation that a ward be forcibly medicated can be submitted to a guardian for authorization, a ward is entitled to: (1) notice that such a recommendation will be made, with legal and factual reasons for the recommendation explicitly provided; (2) notice of a right to a hearing before an impartial arbiter in which the need for medication must be proven beyond a reasonable doubt; and (3) notice of the right to be represented by counsel at that hearing.

***Id***. Defendant State of New Hampshire characterized Wilson's argument for what it was – an attempt to avoid the *Rooker-Feldman* Doctrine. Defendant State argued that:

> Wilson's federal complaint as nothing more than a thinly-veiled attack on

> the state guardianship proceeding. Because Wilson's federal complaint focuses on forcible medication as applied to him, and seeks personal, rather than general, relief, appellees charge that Wilson's claim of a " general" challenge is merely an attempt to avoid the ***Rooker-Feldman*** bar to jurisdiction. Finally, appellees argue that the injury Wilson complains of would not exist if not for the probate court's determination that guardianship was appropriate. His federal case, then, seeks to undo the consequences of the state court judgment, and such jurisdiction is prohibited under ***Rooker-Feldman***.

***Id***. at 124-125. The District Court and First Circuit agreed with the State Defendants. The First Circuit stated that:

> After reviewing the arguments of both sides, as well as Wilson's amended complaint, we conclude that the district court was correct in dismissing Wilson's complaint for lack of jurisdiction. In so holding, we are unpersuaded by Wilson's claim that he has mounted a general constitutional challenge to the New Hampshire provisions for authorizing the involuntary administration of anti-psychotic drugs. We turn first to the non-procedural claims alleged in Wilson's complaint, and then proceed to his primary appellate argument.

***Id***. at 125. The First Circuit ruled that the District Court "properly refrained from deciding whether the forcible administration of drugs to Wilson violates the Constitution and/or the ADA, because retaining jurisdiction would have put the district court in the position of reviewing the probate court's decision. " ***Id***.

The State defendants acknowledge that the Tenth Circuit declined to apply the ***Rooker-Feldman*** Doctrine in the ***Foreman*** case as it opined that its plaintiffs did not seek reversal of any prior juvenile court rulings. 240 F.R.D. at 522. The ***Foreman*** Court reasoned that plaintiffs "requested injunction seeks HHS policy changes that may affect the outcome of future juvenile court review proceedings, but this requested relief will not effectively reverse past rulings" and as such was not attempting to appeal a state court judgment. ***Id***. at 522-523. The First Circuit, however, as is evidenced by the ***Alwyn*** and ***Wilson*** decisions, has a more expansive view of the ***Rooker-Feldman*** Doctrine. The First

Circuit has invoked the doctrine, despite artfully termed complaints, to avoid placing a federal court in a position where it would review a state court's decision. *See* ***Wang v. New Hampshire Board of Registration in Medicine***, 55 F.3d 698, 703 (1st Cir.1995)("Constitutional claims presented to a United States district court, and found to be "inextricably intertwined" with state court proceedings, impermissibly invite the federal district court, "in essence," to review a final state court decision. ***Feldman***, 460 U.S. at 482 n.16, 103 S.Ct. at 1315. Lower federal courts are without subject matter jurisdiction to sit in direct review of state court decisions. *Id.").* *See also,* ***Davison v. The Government of Puerto Rico-Puerto Rico Firefighters Corps***, 471 F.3d 220 (1st Cir. 2006).

There are numerous examples in this case where the plaintiffs are claiming an injury from a Family Court order and are asking this Court to find the Family Court was wrong. Although the plaintiffs frame this Amended Complaint as seeking prospective relief – in order for this Court to grant this remedy it must find that the Family Court was wrong in its orders and plaintiffs suffered injuries as a result.

In the case of Briana, Alexis and Clare, Plaintiffs claim that the children were allowed "to languish without appropriate permanency services in an unlicensed and overcrowded foster home which DCYF knows will not be permanent and in which their safety is in constant jeopardy." Amended Complaint ¶80. In seeking prospective relief, Plaintiffs ask this Court to make such a finding. If this Court were to take this action, however, it would be finding[9] that the Family Court's orders placing or approving of DCYF's placement of Briana, Alexis and Clare with Aunt G.B. were wrong and actually

[9] Obviously, to do so this Court would have to hold an individualized, contested hearing in this case and in every other case in which it is asked to overrule the Family Court.

caused the children harm. This Court is precluded by the ***Rooker-Feldman*** doctrine from taking such action.

By way of another example, Plaintiffs allege that David T.'s constitutional and statutory rights were violated by failing to provide him with appropriate, least-restrictive placements and by failing to provide necessary and appropriate permanency and adoptive services." Amended Complaint ¶68. In seeking prospective relief, Plaintiffs ask this Court to make such a finding. If this Court were to take this action, however, it would be finding that the Family Court's orders approving of DCYF's placements of David and the Family Court's findings "that DCYF had documented a reason why return home, adoption or guardianship placement with a relative was not an appropriate permanency goal" were wrong and actually caused the child harm. This Court is precluded by the ***Rooker-Feldman*** doctrine from taking such action.

By way of another example, plaintiffs allege that Defendants have violated Sam and Tony's constitutional and statutory rights by failing to provide necessary and appropriate permanency and adoptive services. Amended Complaint ¶33. In seeking prospective relief, Plaintiffs ask this Court to make such a finding. If this Court were to take this action, however, it would be finding that the Family Court's orders of July 6, 2006 and January 11, 2007 which found that DCYF was making reasonable efforts to finalize a permanency goal of adoption or guardianship for both children were wrong or resulted in harm to the brothers. This Court is precluded by the ***Rooker-Feldman*** doctrine from taking such action.

By way of another example, plaintiffs allege that Defendants have violated Danny and Michael's constitutional and statutory rights by failing to develop and implement an

appropriate permanency plan in a timely manner to allow them to secure a permanent home. Amended Complaint ¶95. In seeking prospective relief, Plaintiffs ask this Court to make such a finding. If this Court were to take this action, however, it would be finding that: the Family Court's findings at November 29, 2006 and March 28, 2007 hearings that DCYF was making reasonable efforts to finalize a permanency goal of adoption or guardianship for both children were wrong or resulted in harm to the brothers. This Court is precluded by the *Rooker-Feldman* doctrine from taking such action.

Wherefore, the Defendants submit that this Court should abstain and dismiss this case based on the *Rooker-Feldman* Doctrine.

**iii. THE COURT LACKS JURISDICTION OVER SOME PLAINTIFFS' AS THEIR CLAIMS ARE MOOT**

The Court should dismiss the claims of Plaintiffs Brianna, Alexis and Clare based on mootness. On September 24, 2007, the Family Court approved the adoption of Brianna, Alexis and Clare.

Article III of the Constitution restricts the jurisdiction of federal courts to the resolution of actual cases and controversies. *Overseas Military Sales Corporation, Ltd. v. Giralt–Armada*, --- F.3d ---, 2007 WL 2685153 (1st Cir. Sept.14, 2007). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). "The case or controversy requirement ensures that courts do not render advisory opinions. Put another way, 'those words limit the business of federal courts to questions presented in an adversary context.'" *Giralt–Armada*, --- F.3d ---, 2007 WL 2685153 at p.3 (*citing*, *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)).

Plaintiffs claims brought on behalf of Brianna, Alexis and Clare must be dismissed based on mootness. On September 24, 2007, the Family Court approved the adoption of Brianna, Alexis and Clare. These three plaintiffs are no longer in the legal custody of DCYF or its foster care system and, therefore, will not be subject to placement or permanency issues, allegedly overcrowded or unlicensed foster homes. As plaintiffs' complaint only seeks prospective injunctive relief, no live case or controversy exists between Brianna, Alexis and Clare and the State Defendants. Thus, Brianna, Alexis and Clare do not have a legally cognizable interest in the outcome of this lawsuit and, therefore, their claims are moot. *See* *31 Foster Children*, 329 F.3d 1255, 1263.

**iv. THE COURT LACKS JURISDICTION BASED ON LACK OF STANDING FOR PLAINTIFFS' "NEXT FRIENDS"**

Three individuals, Professor Gregory Elliot, Kathleen Collins and Mary Melvin have instituted this lawsuit as the "next friends" of the ten (10) named Plaintiff children. The Defendants submit that these individuals do not have standing as "next friends" to bring this Amended Complaint. The Defendants further submit that these three individuals have failed to demonstrate to this Court that they meet the requirements to act in this capacity.

It is pursuant to Fed.R.Civ.P. 17(c) that Professor Gregory Elliot, Kathleen Collins and Mary Melvin bring this suit on behalf of the ten named children. Rule 17(c) provides that:

> Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make

> such other order as it deems proper for the protection of the infant or incompetent person.

The Federal Courts have held that there are three essential elements that must be satisfied for "next friend" standing. "First, a 'next friend' must provide an adequate explanation- such as inaccessibility, mental incompetence, or other disability – why the real party in interest cannot appear on his own behalf to prosecute the action." ***Whitmore v. Arkansas***, 495 U.S. 149, 163, 110 S.Ct. 1717, 1727, 109 L.Ed.2d 135 (1990). "Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." ***Whitmore***, 495 U.S. at 163, 110 S.Ct. 1717. Third, it is generally accepted that "a 'next friend' must have some significant relationship with the real party in interest." ***Id***. It is the 'next friend's" burden of proof to "establish the propriety of his status and thereby justify the jurisdiction of the court." ***Id***.

The Defendants submit that Elliot, Collins and Melvin cannot satisfy the three elements to obtain "next friend" standing in this case. All the Plaintiff children already have an appropriate "next friend" – the Family Court appointed guardian ad litem or CASA attorney representing their legal interests. Elliot, Collins and Melvin cannot demonstrate that they are "truly dedicated" to the best interests of the child/children on whose behalf they seek to litigate. Elliot, Collins and Melvin cannot demonstrate that they have some significant relationship with the child/children – the real parties in interest. Accordingly, Elliot, Collins and Melvin do not have standing to invoke this Court's jurisdiction.

The Plaintiffs make a broad, yet otherwise unsupported, assertion to this Court that "each friend is sufficiently familiar with the facts of the child's (or children's) situation to fairly and adequately represent the child's (or children's) interest in this

litigation. Even if this Court were to accept Plaintiffs' representation on its face, it still would not be sufficient to demonstrate that they are truly dedicated to the best interests of the children on whose behalf they seeks to litigate and have some significant relationship with the children – the real parties in interest.

There has been no evidence presented as to how these self-proclaimed "next friends" have "become familiar" with the each child or their placements, medical treatments, schooling etc. There have been no representations to this Court that Professor Elliot has spoken with Sam and Tony M., Briana, Alexis, Clare, and Deanna H. and Danny and Michael B, their caseworkers, their relatives, their court-appointed guardian ad litems, etc. Moreover, there is no indication how Professor Elliot could have obtained or can obtain during this lawsuit the necessary information about these children without a violation of Rhode Island's confidentiality statutes. See R.I. Gen. Laws §9-10-21, 5-37.3-10 and 42-72-8.

There is no evidence why Professor Elliot should serve as "next-friend" for Tony and Sam M and Deanna H. when their respective mothers <u>continue to retain parental rights</u>[10] and the children have a Court Appointed Special Advocate appointed to represent their interests. Simply stated, there is no evidence that would allow this Court to conclude that Professor Elliott: (1) is truly dedicated to the best interests of Sam and Tony M., Briana, Alexis, Clare, and Deanna H. and Danny and Michael B. on whose behalf he seeks to litigate or (2) that he has some significant relationship with Sam and Tony M., Briana, Alexis, Clare, and Deanna H. and Danny and Michael B..

---

[10] Since the mother retains parental rights it appears that the proposed "next friend" who may have been given confidential information about the children in violation of Rhode Island Law, brings this action to second guess the actions of the child's parent as well as the Family Court.

Moreover, there is no evidence as to why Briana, Alexis and Clare – who were legally adopted on September 24, 2007 – even need a "next friend" to pursue this litigation or that Professor Elliot even qualifies as a "next friend" under the plain language of Rule 17(c). Briana, Alexis and Clare have an appropriate legal guardian – the person who adopted them on September 24, 2007. Allowing Professor Elliot to prosecute this case as the "next friend" of Briana, Alexis and Clare flies in the face of "the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." ***Troxel v. Granville***, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

Similarly, there has been no representations or evidence presented to this Court why Ms. Collins, a psychologist in the school Caesar attends, is an appropriate "next friend." There has been no representations to the Court that Ms. Collins has spoken with Caesar's caseworker, his relatives, his court-appointed guardian ad litem, and/or his educational advocate. There is no indication how Ms. Collins could have obtained or can obtain during this lawsuit the necessary information about Caesar without a violation of Rhode Island's confidentiality statutes. See R.I. Gen. Laws §9-10-21, 5-37.3-10 and 42-72-8.

There is no evidence that Ms. Collins has appeared before the Family Court and presented any concerns that she has regarding Caesar's living arrangements, mental health treatment, etc.[11] In fact, as a school official, Ms Collins is arguably an "appropriate

[11] The Amended Complaint ¶ 54 alleges that "Defendants have violated Caesar's constitutional and statutory rights by failing to protect him from harm while in state custody; by knowingly placing him in inappropriate living arrangements; by ailing to provide him with mental health services necessary to prevent his mental health from deteriorating while in DCYF custody; by failing to provide him with appropriate' least

person" to bring information to the Family Court's attention. *See R.I. Gen. Laws §14-1-3.* There is no evidence that allows this Court to conclude that Ms. Collins (1) is truly dedicated to the best interests of Caesar or (2) that she has some significant relationship with Caesar other than working at the school he attends.

Again, there has been no representations or evidence presented to this Court why Ms. Melvin is currently in a position to be an appropriate "next friend" for David T. Admittedly Ms. Melvin was David's foster parent for a period of time. However, this Court has not been presented with any evidence of contact between Ms. Melvin and David T. after their separation in 1998. Moreover, there is no indication how Ms. Melvin could have obtained or can obtain during this lawsuit the necessary information about David T. without a violation of Rhode Island's confidentiality statutes. See R.I. Gen. Laws §9-10-21, 5-37.3-10 and 42-72-8.

Rather, Plaintiffs make a blanket statement that Ms. Melvin was a "resource" for David. The Defendants submit that Ms. Melvin has failed to demonstrate to the Court that she satisfies the three elements necessary to be considered a "next friend".

The ***Foreman*** Court addressed the issue of appropriate "next friends." In ***Foreman***, the United States District Court for the District of Nebraska found that:

> The self-appointed next friends in this case are not family members, conservators, or other guardians of the named plaintiffs. Before this suit was filed, the next friends had little prior or no recent contact, and in some cases no contact at all, with the named plaintiffs they seek to represent. (240 F.R.D. at 518).
>
> ***
>
> The next friends have made little, if any, effort to communicate with

---

restrictive placements; and by failing to provide necessary and appropriate permanency and adoption services."

> members of the community who may have relevant information concerning the named plaintiffs' well being. (240 F.R.D. at 518).
>
> ***
>
> The evidence supports a finding that each of these next friends have " an ideological stake" in the named plaintiffs' case; their primary objective appears to be changing Nebraska's child welfare system. (240 F.R.D. at 519).
>
> ***
>
> There is also reason to question the "good faith" motivation, initiative, fortitude, and dedication of these next friends to represent the named plaintiffs' interests. The record reflects that the next friends expended little, if any, effort to seek out sources and discover the current circumstances or the potential risk of harm faced by their assigned named plaintiff. They filed a complaint on behalf of the child without this knowledge; and as of the time their depositions were taken (at least three months after this suit was filed), they still lacked the information necessary to assess the state's current efforts on behalf of the child, and had little, if any, reliable information concerning the circumstances and suitability of the child's current placement. Whatever concerns they did have were not voiced to the juvenile court, guardians ad litem, county attorneys, HHS caseworkers, or the Foster Care Review Board. The evidence currently before me indicates that while each next friend may have sincere empathy for her named plaintiff's plight, her goal in this litigation is system change on behalf of others and not advocating the individual interests of her named plaintiff. Footnote omitted. (240 F.R.D. at 519-520).

The Defendants in this case submit that the proposed "next friends" in this case have similarly not demonstrated to this Court a specific knowledge and understanding of the plaintiff children they propose to represent.

The ***Foreman*** Court was reluctant to dismiss their case based on the lack of standing of the next friends as it reasoned that children in foster care may not have family or established a "significant relationship" with an adult to litigate on their behalf. 240 F.R.D. at 520. The ***Foreman*** Court stated that if the case survived the abstention – which it did not – then new next friends should be appointed by the Court. ***Id***. at 551.

For the foregoing reason, the Defendants request that this Court find that Professor Elliot, Ms. Collins and Ms. Melvin have failed to sustain their burden of proof and demonstrate that they have standing as "next friends" for the named plaintiff children.

### B. THE FEDERAL COURT SHOULD GRANT DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) AS NO PRIVATE RIGHT OF ACTION EXISTS

Plaintiffs claim that the Defendants violated the rights conferred upon them by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§621-629(i), 670-679(b) and its regulations promulgated under the Code of Federal Regulations (hereinafter referred to as "AACWA"). The AACWA falls within the provisions of the federal Medicaid Act. The Eleventh Circuit in ***31 Foster Children*** and the District Court for the District of Nebraska in ***Foreman*** conducted extensive analysis of similar claims brought by foster children in their states by Children's Rights and local counsel and found that the AACWA did not confer a right that is enforceable under 42 U.S.C. §1983. As such, the claims were dismissed. The instant Amended Complaint is very similar to that brought in Nebraska; however, Rhode Island Plaintiffs attempt to distinguish themselves by adding a few additional sections of the AACWA. The Defendants submit that regardless of the addition, the legal analysis set forth in ***31 Foster Children*** and ***Foreman*** remains sound, applies to this case and compels a dismissal of the claims.

A plaintiff asserting a claim under 42 U.S.C. §1983 may not rest on mere allegations of a pure violation of federal statute; rather, the plaintiff must demonstrate a violation of a federal right. ***Blessing v. Freestone***, 520 U.S. 329, 329, 117 S.Ct. 1353,

1354, 137 L.Ed.2d 569 (1997). "'The [United States Supreme] Court in ***Wilder v. Virginia Hosp.Ass'n***, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), summarized previous decisions and held that determining whether a statute creates a " federal right" enforceable under §1983 " turns on whether the provision in question was intend[ed] to benefit the putative plaintiff.... If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, ... or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.' ***Wilder***, 496 U.S. at 510-511, 110 S.Ct. 2510." ***Foreman***, 240 F.R.D. at 533.

The United States Supreme Court established essentially a test to determine whether a federal private right of action existed, which has been deemed the ***Blessing*** test. ***Foreman***, 240 F.R.D. at 534. The ***Blessing*** test requires a plaintiff to demonstrate "three principal factors determine whether a statutory provision creates a privately enforceable right: (1) whether the plaintiff is an intended beneficiary of the statute; (2) whether the plaintiff's asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce; and (3) whether the statute imposes a binding obligation on the State." ***Blessing***, 520 U.S. 329, 329-330, 117 S.Ct. 1353, 1354, 137 L.Ed.2d 569 (1997).

In ***Gonzaga University v. Doe***, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) the Supreme Court provided applied the ***Blessing*** test to determine whether a federal statutory spending provision created a private right of action. In ***Gonzaga***, John Doe, a former undergraduate of Gonzaga University, needed an affidavit of good moral character from a dean of the school as a prerequisite for a teaching position at a

Washington public school. 536 U.S. at 277, 122 S.Ct. at 2272. Gonzaga University declined to provide this attestation and in fact contacted the Washington public school system and discussed its reasons for its position. ***Id***. Doe filed a lawsuit alleging state tort and contract claims, but also a claim under the Family Educational Rights and Privacy Act of 1974 ("FERPA"). ***Id***. The Washington Court of Appeals reversed a jury verdict in favor of Doe on the FERPA claim; in so doing it found that FERPA did not create individual rights and was not enforceable under §1983. 536 U.S. at 278, 122 S.Ct. at 2272. On appeal the Washington Supreme Court disagreed and held that FERPA's nondisclosure provision provided a federal right enforceable under §1983. ***Id***.

The United States Supreme Court explained: "Congress enacted FERPA under its spending power to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records. The Act directs the Secretary of Education to withhold federal funds from any public or private 'educational agency or institution' that fails to comply with these conditions." 536 U.S. at 278, 122 S.Ct. at 2272-2273.

> In holding that FERPA does not create a right enforceable under §1983, the Supreme Court explained that the act lacks " rights-creating" language critical to showing congressional intent to create new rights. Instead, the act speaks only to the Secretary of Education, directing him to withhold funds if the prohibited practice exists. *Gonzaga*, 536 U.S. at 287, 122 S.Ct. at 2277. The Court contrasted FERPA's language that " [n]o funds shall be made available," with the individually focused language of Titles VI and IX, which mandate that " [n]o person ... shall ... be subjected to discrimination," statutes that do create enforceable rights, ***see*** *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The Court concluded in *Gonzaga* that the focus of FERPA is " two steps removed from the interests of individual students and parents." 536 U.S. at 287, 122 S.Ct. at 2277. Instead of creating an enforceable duty on the part of the school, the act only imposed a duty on the part of the federal government-the duty to withhold funds.

> A second reason the Supreme Court gave in *Gonzaga* for concluding that FERPA does not create enforceable rights is that its nondisclosure provisions speak only in terms of institutional policy and practice, not about " individual instances of disclosure." *Id*. at 288, 122 S.Ct. at 2278. The provisions therefore have an aggregate focus, instead of a concern for " whether the needs of any particular person have been satisfied." *Id.* (citation omitted). Also thought significant is the fact that institutions can avoid funding termination under FERPA by substantial compliance with the act's requirements; compliance in every case is not necessary to avoid loss of funding. *Id.*
>
> Finally, the Supreme Court considered in *Gonzaga* the mechanism that Congress chose to provide for enforcing the provisions of FERPA. The act expressly authorizes the Secretary of Education to " deal with violations" of it and to establish a review board for investigating and adjudicating such violations. 20 U.S.C. §1232G(f). The Secretary's regulations create an office to act as a review board, and students can file individual written complaints with that office. This review mechanism, the Court concluded, evidences a congressional intent to avoid the multiple interpretations of FERPA that might arise if the act created enforceable individual rights. *Gonzaga*, 536 U.S. at 289-90, 122 S.Ct. at 2278-79.

*31 Foster Children*, 329 F.3d at 1269-1270.

> The Eleventh Circuit stated that the lesson it was taking from *Gonzaga* was:
>
> … to look at the text and structure of a statute in order to determine if it unambiguously provides enforceable rights. If the text and structure " provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." *Id*. at 286, 122 S.Ct. at 2277. If they provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite " clear voice." Ambiguity precludes enforceable rights. *Id*. at 280, 122 S.Ct. at 2273. The first *Blessing* requirement, which is what *Gonzaga* addressed, is that Congress must have intended that the provision in question benefit the plaintiff. Factors to consider in determining if it did include whether the statute: (1) contains " rights-creating" language that is individually focused; (2) addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus; and (3) lacks an enforcement mechanism through which an aggrieved individual can obtain review.

*31 Foster Children*, 329 F.3d at 1270. The Eleventh Circuit provided this degree of analysis to the plaintiff foster children's claim that Florida's DCF system violated their

rights under §§675(5)(D) and (E) of the AACWP in *31 Foster Children*. The Eleventh Circuit held that §§675(5)(D) and (E): did "have the kind of focused-on-the-individual, rights creating language required by ***Gonzaga***" that would create a private right nor did the AACWA contain a mechanism by which aggrieved individuals could enforce its provisions. ***Id***. at 1272.

Subsequent to ***Gonzaga***, the Eighth Circuit in the case of ***Lankford v. Sherman***, 451 F.3d 496 (8th Cir.2006) applied the ***Blessing*** test to determine whether Spending Clause legislation, like the AACWA, created a private right of action enforceable under 42 U.S.C § 1983. ***Foreman***, 240 F.R.D. at 534.

> In ***Lankford,*** the plaintiffs, who were disabled adult Medicaid recipients, sought an injunction prohibiting the Missouri Director of Social Services from enforcing a new state regulation which curtailed providing durable medical equipment (" DME" ) to Medicaid recipients other than blind persons, pregnant women, needy children, or those who receive home health care services under the state plan. The plaintiffs sought to enjoin enforcement of the Missouri regulation because it allegedly violated federal comparability and reasonable-standards laws requiring states to treat Medicaid recipients equally and with reasonable, non-discriminatory standards. 42 U.S.C. §§1396(a)(10)(B), (a)(17).
>
> ***Lankford*** held that the plaintiffs had no individualized federal right to reasonable Medicaid standards enforceable under 42 U.S.C. §1983. ***Lankford*** explained:
>
>> For legislation enacted pursuant to Congress's spending power, like the Medicaid Act, a state's non-compliance typically does not create a private right of action for individual plaintiffs, but rather an action by the federal government to terminate federal matching funds. See ***Pennhurst State Sch & Hosp. V. Halderman***, 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). While the Supreme Court has rarely found enforceable rights in spending clause legislation, it has not foreclosed the possibility that individual plaintiffs may sue to enforce compliance with such legislation. See ***Wright v. City of Roanoke Redevelopment & Hous. Auth.***, 479 U.S. 418, 430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)(Federal Housing Act supports a cause of action under section 1983); ***Wilder v. Va. Hosp. Ass'n.***, 496 U.S. 498, 510, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)(Medicaid providers had an individual right to reasonable reimbursement rates

> > under the now-repealed Boren Amendment). Still, the Court has since limited the circumstances where a private right of action is found under section 1983. See *Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)(no private right of action under the Adoption Assistance and Child Welfare Act, which requires states to make " reasonable efforts" to keep children out of foster homes); *Blessing v. Freestone*, 520 U.S. 329, 344-45, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)(no private right of action under Title IV-D of the Social Security Act, which requires states to " substantially comply" with requirements designed to ensure timely payment of child support); *Gonzaga*, 536 U.S. at 290, 122 S.Ct. 2268 [,153 L.Ed.2d 309](no private right of action under the Family Educational Rights and Privacy Act, which prohibits federal funding of educational institutions that have a policy of releasing confidential records to unauthorized persons).
>
> *Lankford*, 451 F.3d at 508. (citing and affirming continued use of the *Blessing* test). If so, it is presumably enforceable under §1983. This presumption is rebutted if Congress explicitly or implicitly forecloses section 1983enforcement, but the availability of administrative mechanisms alone cannot defeat the plaintiffs' claim under §1983 if the other requirements of the three-part test are met. *Lankford*, 451 F.3d at 508(citing *Blessing*, 520 U.S. at 341, 347, 117 S.Ct. 1353).

*Foreman*, 240 F.R.D. at 535.

The federal statutory provision that these plaintiffs bring their claims under is the AACWA. The AACWA was enacted under the spending clause. "[It] .. comprises Parts B and E of Title IV of the Social Security Act and is a federal funding statute that establishes a program of payments to states for foster care and adoption assistance. 42 U.S.C. §§620-628, 670-679a." *31 Foster Children*, 329 F.3d at 1270. "A State will be reimbursed by the Federal Government for certain expenses it incurs in administering foster care and adoption services, if it submits a plan for approval by the Secretary of Health and Human Services." *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 1362, 118 L.Ed.2d 1 (1992). "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause

of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga University v. Doe*, 556 U.S. 273, 279, 122 S.Ct. 2268, 2273, 153 L.Ed.2d 309 (2002)(*citing Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2w 694 (1981)). As it pertains to legislation enacted pursuant to the spending power, the United States Supreme Court has unequivocally stated that "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by §1983. *Gonzaga*, 556 U.S. at 279, 122 S.Ct. at 2273.

The *Foreman* Court conducted an extensive and individual analysis of the fifteen (15) provisions[12] of the AACWP that the Nebraska plaintiffs alleged provided them enforceable rights that were violated by the Nebraska equivalent of our DCYF. After applying the Blessing test to each of these provisions, the *Foreman* Court found that the provisions did not create a private right of action that could be enforceable and dismissed them pursuant to F.R.C.P. 12(b)(6). The Rhode Island Defendants submit that the *Foreman*'s Court's analysis is applicable to the same allegations asserted in this Amended Complaint and, similarly, compel a dismissal.

**ii. 42 U.S.C. §§ 671(a)(1), 672(a)-(c) and 675(4)(A)**

Similar to *Foreman*, the plaintiffs allege a private right of action under §671(a)(1), §672 (although in this Amended Complaint they limit it to subsections (a) –

[12] The *Foreman* plaintiffs alleged that the AACWP sections: 42 U.S.C. §§ 622(b)(10)(B), 627(b)(2), 671(a)(10)*, 671(a)(11)*, 671(a)(15), 671(a)(16)*, 671(a)(19), 671(a)(22)*, 672*, 675(1)*, 675(4)*, 675(5)(B)*, 675(5)(D), 675(5)(E), and 45C.F.R. Parts 1355-1357* created private rights capable of enforcement. The sections that have been asterisked have been similarly plead in whole or in part against the Rhode Island State Defendants.

(c)) and §675(4) (also limited to subsection (A)). The Defendants submit that the ***Foreman*** Court properly found that plaintiffs failed to satisfy the first and second elements of the ***Blessing*** test and the claims should be dismissed pursuant to Rule 12(b)(6). The Defendants submit that the instant allegations should similarly be dismissed.

> Under 42 U.S.C. §671(a)(1), the state's federally approved plan must provide " for foster care maintenance payments in accordance with section 672 of this title and for adoption assistance in accordance with section 673 of this title." Section 672 outlines the eligibility requirements and circumstances under which the state must pay foster care maintenance payments. "The term ' foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." 42 U.S.C. §675(4)(A).

***Foreman***, 240 F.R.D. at 536.

Identical to ***Foreman***, the Rhode Island Plaintiffs' Amended Complaint alleges that the Defendants' policies, patterns, practices or customs deprived them of their rights to have " foster care maintenance payments paid to the foster parents or foster care providers with whom the child is placed that cover the actual cost of (and the cost of providing) the Plaintiff child's food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation with family, and other expenses." Amended Complaint at ¶231.

The Defendants submit that the ***Foreman*** Court correctly reasoned that Plaintiffs failed to satisfy the first element of the ***Blessing*** test as:

> [f]oster children do not directly receive the benefit of a claim brought under §672, and while adequate foster care maintenance payments may enhance the likelihood of increasing the available pool of foster parents, such indirect benefits do not support a private right of action in favor of the named plaintiffs. See ***Blessing***, 520 U.S. at 344-345, 117 S.Ct. 1353 (holding that compliance with Title IV-D's detailed requirements for state

> data processing systems and staffing in exchange for federal funding of the state's child support payment collection system did not create a federal right enforceable against the state under §1983). The link between increased foster care maintenance payments and the services provided to any particular child " is far too tenuous" to support the notion that Congress meant to give each and every Nebraska juvenile in foster care a right to have foster care providers paid at a sufficient level. See ***Blessing***, 520 U.S. at 345, 117 S.Ct. 1353. For the purpose of determining if a federal private right of action exists, the named plaintiffs are not the intended beneficiaries of 42 U.S.C. §§671(a)(1), 672 [(a) – (c)], and 674(4)(A).

***Id***. at 539-540. The Defendants further submit that the ***Foreman*** Court correctly reasoned that Plaintiffs failed to satisfy the second element of the ***Blessing*** test as:

> … the plaintiffs' claims were indistinguishable from the type of claims asserted in [***Wilder v. Virginia Hosp. Assn.***, 496 U.S. 498, 110 S.Ct. 2510 (1990)]. ***Wilder*** held that under federal Medicaid statutes and regulations, health care providers had an enforceable right to reimbursement at " reasonable and adequate rates," but the statutes and regulations under consideration in ***Wilder*** included specific factors to be considered in determining the methods for calculating rates. ***Wilder***, 496 U.S. at 519, 110 S.Ct. 2510. For example, ***Wilder*** noted:
> [W]hen determining methods for calculating rates that are reasonably related to the costs of an efficient hospital, a State must consider: (1) the unique situation (financial and otherwise) of a hospital that serves a disproportionate number of low income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long-term care at a nursing home would be sufficient but is unavailable.
>
> *Wilder*, 496 U.S. at 520 n.17, 110 S.Ct. 2510. ***Suter***, decided two years later, noted that the specific statutory and regulatory methods for calculating rates in ***Wilder*** supported finding a private right of action for the health care providers. However, no private right of action existed in ***Suter*** because §671(a)(15) and its regulations provided no guidance as to how the " reasonable efforts" required under §671(a)(15) were to be measured.
>
> With respect to " foster care maintenance payments," neither §672 nor the definition of that term in §675(4)(A) provide any language for discerning how rates should be set for paying foster care providers the " cost" of caring for a foster child, and in the case of institutional care, "' the reasonable costs of administration and operation of such institution as are necessarily required' to care for a foster child." 42 U.S.C. §675(4)(A). ….

> [The plaintiffs cite no specific regulations governing the calculation of foster care maintenance payments.] …. [L]ike §671(a)(15), and in accord with the analysis of ***Suter***, the plaintiffs' asserted right to foster care maintenance payments is too " vague and amorphous" to support a federal right enforceable under §1983. Compare ***ASW v. Oregon***, 424 F.3d 970, 975-76 n.9 (9th Cir.2005)(holding §673 created an individual right to adequate adoption assistance payments where the statute required an individualized process with each family to determine the amount by mutual agreement with the state which could be readjusted only " with the concurrence of the adopting parents, depending upon changes" in the circumstances. " Unlike foster care maintenance payments, codified in a standardized rate schedule, § 673(a)(3) explicitly creates a right to individualized payment determinations for adoption assistance payments." ***Id***. at 976 n.9).

***Id***. at 540-541. Accordingly, Plaintiffs' claims brought under 42 U.S.C. §§ 671(a)(1), 672(a)-(c) and 675(4)(A) should be dismissed under Rule 12(b)(6).

**iii. 42 U.S.C. §671(a)(10) - (11).**

Identical to ***Foreman***, the plaintiffs allege a private right of action under §671(a)(10)-(11). The Defendants submit that the ***Foreman*** Court properly found that plaintiffs failed to satisfy the second element of the ***Blessing*** test and the claims should be dismissed pursuant to Rule 12(b)(6). The Defendants submit that the instant allegations should similarly be dismissed.

> 42 U.S.C. §671(a)(10) requires federally approved state plans to provide for the " establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes," and to provide that " the standards so established shall be applied by the State to any foster family home or child care institution receiving funds...." $2 U.S.C. § 671(a)(11) requires periodic review of these standards.

Similar to ***Foreman***, the Plaintiffs' Amended Complaint alleges the defendants violated and continue to violate their right "to placement in foster homes or other settings that conform to reasonable professional standards and are subject to a uniformly applied set of

standards." Amended Complaint, ¶ 231.

The Defendants submit that the ***Foreman*** Court correctly reasoned that Plaintiffs failed to satisfy the second element of the ***Blessing*** test as:

> Section §671(a)(10) does not create an individual federal right enforceable under §1983. ***White by White v. Chambliss***, 112 F.3d 731, 739 (4th Cir.1997).
>
> > The requirement that a state's plan be " reasonably in accord with recommended standards of national organizations," is no more specific than section 671(a)(15)'s " reasonable efforts" requirement. Furthermore, the AACWA provides no " statutory guidance" to clarify the meaning of the requirements of 671(a)(10). Lastly, section 671(a)(10) is enforceable through the same alternative enforcement mechanism provided for section 671(a)(15). As the Supreme Court noted in ***Suter***, " [t]he Secretary [of Health and Human Services] has the authority to reduce or eliminate payments to a State on finding that the State's plan no longer complies with § 671(a) or that ' there is a substantial failure' in the administration of a plan such that the State is not complying with its own plan." ... ***Suter*** thus forecloses the argument that section 671(a)(10) of the AACWA provides the source for an enforceable right through section 1983.
>
> ***White***, 112 F.3d at 739. See also ***Yvonne L., By and Through Lewis v. New Mexico Dept. of Human Services***, 959 F.2d 883, 889 (10th Cir.1992)(holding § 671(a)(10)'s reference to " standards of national organizations concerned with standards for such institutions or [foster] homes," ... " is the type of vague and amorphous language identified in ***Wilder***, 110 S.Ct. at 2517, and ***Wright***, 479 U.S. at 431-32, 107 S.Ct. at 774-75, that cannot be judicially enforced." ); ***Olivia Y.***, 351 F.Supp.2d at 563 (holding § 671(a)(10) does not create a federal right enforceable under § 1983); ***Charlie H. v. Whitman***, 83 F.Supp.2d 476, 491 (D.N.J.2000)( " 42 U.S.C. § 671(a)(10) is too vague and amorphous under the *Blessing* test to be enforced pursuant § 1983." ); ***Whitley v. New Mexico Children, Youth & Families Dept***. 184 F.Supp.2d 1146, 1165 (D.N.M.2001)(" [T]he language of § 671(a)(10) ... [is] too vague and amorphous to support a cause of action under § 1983." ); ***Del A. v. Roemer***, 777 F.Supp. 1297, 1310 (E.D.La.1991)(§ 671(10)'s " provision requiring placement in foster homes and institutions that are ' reasonably in accord with' national standards is vague and unenforceable." ).

***Id***. at 541-542. Accordingly, Plaintiffs' claims brought under 42 U.S.C. §§ 671(a)(10)-(11) should be dismissed under Rule 12(b)(6).

**iv. 42 U.S.C. §671(a)(22).**

Identical to ***Foreman***, the plaintiffs allege a private right of action under §671(a)(22). The Defendants submit that the ***Foreman*** Court properly found that plaintiffs' claim was too amorphous and should be dismissed pursuant to Rule 12(b)(6). The Defendants submit that the instant allegations should similarly be dismissed.

> Section 671(a)(22) requires the State to develop and implement standards to ensure that children in foster care placements are provided " quality services that protect the safety and health of the children."

***Id***. at 542. Verbatim from ***Foreman***, the plaintiffs allege the defendants' policies and practices violate the " right of each Plaintiff child to services that protect the child's safety and health." Amended Complaint, ¶ 231. The Defendants submit that the ***Foreman*** Court correctly reasoned that:

> Section 671(a)(22) contains no definition or criteria for determining whether the state is providing " quality services" to the child. The language of §671(a)(10) is too vague and amorphous to support a cause of action under §1983. ***Whitely***, 184 F.Supp.2d at 1164-65.

***Id***. As such, Plaintiffs' claim under §671(a)(22) should be dismissed under Rule 12(b)(6).

**v. 42 U.S.C. §§ 671(a)(16) and 675(5)(D)-(E).**

Similar to ***Foreman***, the plaintiffs allege a private right of action under §671(a)(16) and §675(5)(D)-(E). The Defendants submit that the ***Foreman*** Court properly found that claims should be dismissed pursuant to Rule 12(b)(6). The Defendants submit that the instant allegations should similarly be dismissed.

> 42 U.S.C. §671(a)(16) requires that all federally approved state plans provide " for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provide[ ] for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child." The term " case plan" means a written document which

> includes:
> (A) a description of the type of home or institution in which a child is to be placed and the reasons for that decision;
> (B) a plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents;
> (C) to the extent available and accessible, the health and education records of the child;
> (D) where appropriate, for a child age 16 or over, a written description of the programs and services which will help such child prepare for the transition from foster care to independent living; and
> (E) in the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship.
>
> ***
>
> 42 U.S.C. § 675(5)(D) requires that all case review plans include a procedure assuring that a child's health and education record is reviewed, updated, and supplied to the child's foster parent or foster care provider at the time of each placement. 42 U.S.C. § 675(5)(E) requires case review plans to include procedures which acknowledge that in the absence of a compelling reason, a relative placement, or the potential for reunification, petitions to terminate parental rights must be filed under certain circumstances and within certain time frames.

***Id***. at 542-543. The Plaintiffs allege that the Defendants policies and practices violate their rights to "timely written case plans containing mandated elements" and "have health and educational records reviewed, updated, and supplied to foster parents or foster care providers with whom the child is placed at the time of placement." Amended Complaint ¶231.

> Moreover, the plaintiffs' claims under §§ 671(a)(16) and 622 fail the first prong of the ***Blessing*** test). Under 42 U.S.C. § 1320a-2, the Secretary " in consultation with the State agencies administering the State programs ... shall promulgate regulations for the review of such programs to determine whether [they] are in substantial conformity with-(1) State plan requirements under such parts B and E, (2) implementing regulations promulgated by the Secretary, and (3) the relevant approved State plans."

> 42 U.S.C. § 1320a-2. Section 1320a-2 requires the regulations to specify a timetable for conformity reviews of State programs, including when the initial review will occur, when any follow up review will occur if the state program is not in substantial conformity, and the schedule for less frequent reviews if the state program is in substantial conformity. The regulations must address the criteria used to measure conformity, and the withholding of federal funds when a state program does not substantially conform. 42 U.S.C. § 1320a-2 (1-4).
>
> Federal statutes requiring operation of a program in " substantial compliance" with federal law are not intended to benefit individuals, and cannot create federal rights. *Blessing,* 520 U.S. at 343, 117 S.Ct. 1353. ***Blessing*** held that a provision in Title IV-D of the Social Security Act which required a state receiving federal child-welfare funds to " operate its child support program in ' substantial compliance' with Title IV-D was not intended to benefit individual children and custodial parents, and therefore [did] not constitute a federal right." ***Blessing***, 520 U.S. at 343, 117 S.Ct. 1353.
>
> [T]he requirement that a State operate its child support program in " substantial compliance" with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right. Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State's Title IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied.
>
> ***Blessing***, 520 U.S. at 343, 117 S.Ct. 1353. Based on that determination, the Secretary can increase the frequency of audits and reduce the state's federal grant to induce or improve the state's systemwide performance level, both of which are reasonable means for enforcing a Spending Clause statutory scheme. ***Blessing***, 520 U.S. at 343-44, 117 S.Ct. 1353.
>
> Though the case plans and reviews contemplated under §§ 622 and 671(a)(16) are specific to each child, Congress expects the states to " substantially comply" with these statutes in exchange for federal funds. 42 U.S.C. §§ 622(b)(10)(B), 671(a)(16), 675(1), and 675(5)(B), (D), and (E) have an " aggregate" focus. They are not concerned with " whether the needs of any particular person have been satisfied," and they cannot " give rise to individual rights." ***Gonzaga***, 536 U.S. at 288-289, 122 S.Ct. 2268. Where the federal statute focuses on the aggregate practices of the states in establishing reasonable Medicaid services and not on individual entitlement to medical services, the first requirement of the ***Blessing*** test is not met. ***Lankford***, 451 F.3d at 509.

***Id***. at 542-544. Accordingly, Plaintiffs' claims under 42 U.S.C.§§671(a)(16) and

675(5)(D)-(E) should be dismissed under Rule 12(b)(6).

**vi. 42 U.S.C. §622(b)(8)(A)(ii)-(iii)**

An allegation not raised in ***Foreman***, the plaintiffs allege a private right of action under 42 U.S.C. §622(b)(8)(A)(ii)-(iii). The Defendants submit that this claim should be dismissed as it fails to satisfy the first and second elements of the ***Blessing*** test.

Section 622(b)(8)(A)(ii)-(iii) requires that all federally approved state plans:

> (8) provide assurances that the State –
> (A) is operating, to the satisfaction of the Secretary –
> (i) a statewide information system from which can be readily determined the status, demographic characteristics, location, and goals for the placement of every child who is (or, within the immediately preceding 12 months, as been) in foster care;
> (ii) a case review system (as defined by section 675(5) of this title) for each child receiving foster care under the supervision of the State;
> (iii) a service program designed to help children-
> (I) where safe and appropriate, return to families from which they have been removed; or
> (II) be placed for adoption, with a legal guardian, or, if adoption or legal guardianship is determined not to be appropriate for a child, in some other planned, permanent living arrangement, which may include a residential educational program.

The Plaintiffs allege that the Defendants policies and practices violate their rights to "a case review system to ensure the implementation of "case plans" and "to services to facilitate the child's return to his family home or a permanent placement of the child". Amended Complaint ¶231. As previously stated in response to another section, "[f]ederal statutes requiring operation of a program in 'substantial compliance' with federal law are not intended to benefit individuals, and cannot create federal rights. ***Blessing***, 520 U.S. at

343, 117 S.Ct. 1353." ***Foreman***, 240 F.R.D. at 542-544. This provision is not intended to benefit individual children and, therefore, does not constitute a federal right. ***Blessing***, 520 U.S. at 343, 117 S.Ct. 1353. It does not create an individual entitlement to services; but rather, is simply a yardstick for the Secretary to measure the systemwide performance of a state's plan. ***Foreman***, 240 F.R.D. at 543-544. Thus, plaintiffs' claim under 42 U.S.C. §622(b)(8)(A)(ii)-(iii) fails to satisfy the first element of the ***Blessing*** test.

Additionally, plaintiffs' claim under §622(b)(8)(A)(ii)-(iii) also fails the second prong of the ***Blessing*** test. Although the section may talk about a "service program" and "safe and appropriate" are too "vague and amorphous" to create a private remedy sought. ***Suter***, 503 U.S. at 362-364, 112 S.Ct. 1360; *cf* ***Pennhurst State School and Hospital v. Halderman***, 451 U.S. 1, 25, 101 S.Ct. 1531, 1544, 67 L.Ed.2d 694(1981)("It is difficult to know what is meant by 'appropriate treatment' in the 'least restrictive setting,' and it is unlikely that a State would have accepted federal funds had it known that it would be bound to provide such treatment.")

**vii. 42 U.S.C. §622(b)(15)**

The plaintiffs allege a private right of action under §622(b)(15). The Defendants submit that this claim should be dismissed as they do not create an enforceable right under §1983.

Section §622(b)(15) requires that all federally approved state plans "describe how the State actively consults with and involves physicians or other appropriate medical professions in (A) assessing the health and well-being of children in foster care under the responsibility of the State; and (B) determining appropriate medical treatment for the children. The Plaintiffs allege that the Defendants policies and practices violate their

rights to "services that protect the children's safety and health". Amended Complaint ¶231.

Once again, this claim fails to satisfy the first and second elements of the ***Blessing*** test. As explained in response to previous allegations brought under the AACWP, §622(b)(15) does not create an individual enforceable right. It once again speaks to the content of the state plan rather than defining a right. It is yet another "yardstick" for the Secretary to use when evaluating a state's plan that is tied to federal funding. §622(b)(15) does not speak in clear and unambiguous language and defines a right as is required by Blessing and its progeny. Thus, plaintiffs' claim under §622(b)(15) should be dismissed under Rule 12(b)(6).

**viii. 42 U.S.C. §629a(a)(7)-(8)**

The plaintiffs allege a private right of action under 42 U.S.C. §629a(a)((7)-(8) – a claim not raised in ***Foreman***. The Defendants submit that this claim should be dismissed as the section is definitional in nature and does not create a right enforceable under §1983.

Section §629a(a)(7)-(8) states:

> (a) In general
> As used in this subpart:
> (7)Time-limited family reunification services
> A. In general
> The term "time-limited family reunification services" means the services and activities described in subparagraph (B) that are provided to a child that is removed from the child's home and placed in a foster family home or a child care institution and to the parents pr primary caregiver of such a child, in order to facilitate the reunification of the child safely and appropriately within a timely fashion, but only during the 15-month period that begins on the date that the child, pursuant to section 675(5)(F) of this title is considered to have entered foster care.

B. Services and activities described
The services and activities described in this subparagraph are the following:

(i) Individual, group, and family counseling.
(ii) Inpatient, residential, or outpatient substance abuse treatment services.
(iii) Mental health services.
(iv) Assistance to address domestic violence.
(v) Services designed to provide temporary child care and therapeutic services for families, including crisis nurseries.
(vi) Transportation to or from any of the services and activities described in this subparagraph.

8. Adoption promotion and support services
The term "adoption promotion and support services" means services and activities designed to encourage more adoptions out of the foster care system, when adoptions promote the best interests of children, including such activities as pre- and post-adoptive services ad activities designed to expedite the adoption process and support adoptive families.

The Plaintiffs allege that the Defendants policies and practices violate their rights to "have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified, statutory standards and time frames," "to planning and services to obtain permanent placement, including documentation of steps taken to secure permanency" and "services to facilitate a child's return to his family home or the permanent placement of a child." Amended Complaint ¶ 231.

Section 629a(a)((7)-(8) are definitional provisions and, as such, "alone cannot and do not supply a basis for conferring rights enforceable under §1983". ***31 Foster Children***, 329 F.3d at 1271 (citing ***Gonzaga***, 536 U.S. at 280, 122 S.Ct. at 2273). Accordingly, Plaintiffs' claims under 42 U.S.C. §629a(a)((7)-(8) should be dismissed under Rule 12(b)(6).

## V. **CONCLUSION**

"[C]hild welfare and protection is an important state interest, the injunctive relief at issue in this case, if granted, will interfere with the ongoing jurisdiction and proceedings for each plaintiff in the … [Rhode Island Family Court], and that court provides an adequate opportunity to raise the federal claims asserted in this action." ***Foreman***, 240 F.R.D. at 532. Thus, the ***Younger*** Doctrine compels abstention and a dismissal of this case. Additionally, the relief requested actually places this Court in a position of reviewing and reversing state Family Court decisions and orders addressing the named plaintiff children. Thus, the ***Rooker-Feldman*** Doctrine compels abstention and a dismissal of this case. Moreover, the claims of Briana, Alexis and Clare are clearly moot, the three self-proclaimed "next friends" do not have standing and the AACWA based claims do not confer a private right of action enforceable under 42 U.S.C. §1983.

Wherefore, the Defendants pray that this Court grant their motion to dismiss.

Respectfully submitted
DEFENDANTS
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ James R. Lee

JAMES R. LEE (4305)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

/s/ Brenda D. Baum

BRENDA D. BAUM (5184)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

On Behalf of PATRICIA MARTINEZ,
in her Official Capacity as Director of the
Department of Children, Youth and Families

/s/ Kevin Aucoin

KEVIN AUCOIN (3019)
Executive Counsel
R.I. Department of Children, Youth &
Families
101 Friendship Street
Providence, RI 02903
Tel: (401) 528-3579
Fax: (401) 525-3566
Kevin.Aucoin@dcyf.ri.gov

On behalf of JANE HAYWARD,
in her Official Capacity as Secretary of the Executive Office of Health & Human Services,

/s/ Jane Morgan

JANE MORGAN (4024)
Assistant Director of Legal Services
R.I. Department of Elderly Affairs
Benjamin Rush Building
35 Howard Avenue
Cranston, RI 02920
Tel: (401) 462-0524
Fax: (401) 462-0503
jmorgan@dea.state.ri.us

## CERTIFICATION

I hereby certify that pursuant to Court Order 33 I have electronically mailed the foregoing document on this 17th day of October 2007 to the attorney(s) of record listed below:

**John William Dineen, Esq.**
jwdineen1@yahoo.com

**Jametta O. Alston, Esq.**
jalston@gw.doa.state.ri.us

**Susan Lambiase**
slambiase@childrensrights.org

**Vernon Winters**
vern.winters@weil.com

**Marcia Robinson Lowry**
mlowry@childrensrights.org

**/s/ Brenda D. Baum**