**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SAM and TONY M., *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Class Action** |
| **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island, *et al.*,** | ) | **Civil Action No. 1:07-cv-00241-L-LDA** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OBJECTION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ v

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 4

DEFENDANTS ARE LEGALLY RESPONSIBLE FOR THE CARE AND CUSTODY OF PLAINTIFF CHILDREN, AND THE NAMED PLAINTIFF CHILDREN'S INJURIES ARE THE DIRECT RESULT OF DEFENDANTS' ACTIONS AND INACTIONS ........ 4

ARGUMENT ........ 9

I. LEGAL STANDARD FOR A MOTION TO DISMISS ........ 9

II. THIS COURT HAS JURISDICTION TO ADJUDICATE PLAINTIFF CHILDREN'S CLAIMS, WHICH ARE BROUGHT BY PROPER NEXT FRIENDS ........ 10

A. Plaintiff Children are Properly Represented by Next Friends ........ 11

B. Plaintiff Children's Next Friends are Appropriate ........ 14

III. THE COURT SHOULD NOT ABSTAIN UNDER *YOUNGER v. HARRIS* ........ 20

A. Plaintiff Children's Complaint Poses No Threat to Comity Because Rhode Island Has Voluntarily Agreed to Federal Oversight of its Child Welfare System in Exchange for Federal Funding ........ 22

B. This Court Should Not Abstain Because, as a Threshold Matter, *Río Grande* Precludes the Application of *Younger* to Plaintiff Children's Complaint ........ 24

1. No State Enforcement Action is Implicated by This Federal Lawsuit ........ 24

2. The Relief Sought Will Not Interfere With Any Family Court Proceedings ........ 29

C. Abstention is Not Warranted Under the *Middlesex* Test ........ 35

1. The Family Court Proceedings are Not Ongoing Proceedings Within the Meaning of *Younger* ........ 35

2. Plaintiff Children's Claims Do Not Intrude Upon Any Exclusive Area of Important State Interest ........ 37

3. Plaintiff Children Do Not Have an Adequate Opportunity to Present Their Federal Claims in Their Family Court Proceedings ........................................................................38

IV. THERE IS NO BASIS TO ABSTAIN UNDER *ROOKER-FELDMAN* ................44

V. THE RIGHTS ASSERTED IN PLAINTIFF CHILDREN'S FOURTH CAUSE OF ACTION ARE PRIVATELY ENFORCEABLE ...............................47

A. Congress Has Clearly Signaled That It Intended "State Plan" Provisions of the Social Security Act to be Privately Enforceable.............49

B. The Legal Standard for Determining the Existence of Individual Statutory Rights ..........................................................................................52

C. The Specific AACWA Provisions on Which Plaintiff Children Rely All Create Enforceable Rights ....................................................................56

1. Plaintiff Children Have an Enforceable Right to Timely Written Case Plans Containing Mandated Elements, and to a Case Review System to Ensure the Implementation of Those Plans, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1) and 675(5)(A).........................................................................56

2. Plaintiff Children Have an Enforceable Right to Have a Timely Petition to Terminate Parental Rights Filed, Pursuant to 42 U.S.C §§ 622(b)(8)(A)(ii) and 675(5)(E) ......................................63

3. Plaintiff Children Have an Enforceable Right to Have Their Health and Educational Records Reviewed, Updated and Supplied to the Foster Care Providers with Whom They Are Placed at the Time of Placement, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1)(C) and 675(5)(D)..................68

4. Plaintiff Children Have an Enforceable Right to Services to Protect Their Safety and Health, Pursuant to 42 U.S.C. §§ 622(b)(15), 671(a)(22) and 675(1)(B) ............................................70

5. Plaintiff Children Have an Enforceable Right to Planning and Services to Facilitate Their Safe Return Home or Permanent Placement, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(iii), 629a(a)(1)(A), 629a(a)(7), 629a(a)(8), 675(1)(B) and 675(1)(E)....72

6. Plaintiff Children Have an Enforceable Right to Foster Care Maintenance Payments Made on Their Behalf That Cover the Cost of Food, Clothing, Shelter, Daily Supervision, School Supplies, Reasonable Travel to Family Visitation and Other

Expenses, Pursuant to 42 U.S.C. §§ 671(a)(1), 671(a)(11), 672 and 675(4)(A)....................75

7. Plaintiff Children Have an Enforceable Right to Placements That Conform to Reasonable Professional Standards, Pursuant to 42 U.S.C. §§ 671(a)(10) and 671(a)(11)....................79

D. Plaintiff Children's Federal Statutory Claims Should Not Be Dismissed....................81

CONCLUSION....................81

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .......... 59, 62

*Blessing v. Freestone*, 520 U.S. 329 (1997) .......... *passim*

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) .......... 53, 56, 68, 71, 77

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) .......... 20

*Conley v. Gibson*, 355 U.S. 41 (1957) .......... 9

*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) .......... 3, 44–47

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005) .......... 44–46

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) .......... *passim*

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) .......... 21

*Lance v. Dennis*, 546 U.S. 459 (2006) .......... 45

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) .......... 9

*Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) .......... *passim*

*Moore v. Sims*, 442 U.S. 415 (1979) .......... 38, 43

*New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) .......... *passim*

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) .......... 3, 44–47

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .......... 9

*South Dakota v. Dole*, 483 U.S. 203 (1987) .......... 24

*Suter v. Artist M.*, 503 U.S. 347 (1992) .......... 49–51

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002) .......... 46

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .......... 16, 17

*Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990) .......... *passim*

*Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987)....52, 54, 55

*Younger v. Harris*, 401 U.S. 37 (1971)....20, 21

**<u>First Circuit Cases</u>**

*Adames v. Fagundo*, 198 F. App'x 20 (1st Cir. 2006)....45

*Aversa v. United States*, 99 F.3d 1200 (1st Cir. 1996)....9

*Barrios-Velazquez v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487 (1st Cir. 1996)....9

*Bettencourt v. Board of Registration in Medicine of Massachusetts*, 904 F.2d 772 (1st Cir. 1990)....28

*Brooks v. New Hampshire Supreme Court*, 80 F.3d 633 (1st Cir. 1996)....28, 38

*Bryson v. Shumway*, 308 F.3d 79 (1st Cir. 2002)....80, 81

*Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252 (1st Cir. 1993)....28

*Coyne v. City of Somerville*, 972 F.2d 440 (1st Cir. 1992)....9

*Cruz v. Melecio*, 204 F.3d 14 (1st Cir. 2000)....38

*Developmental Disabilities Advocacy Center, Inc. v. Melton*, 689 F. 2d 281 (1st Cir. 1982)....12, 14

*Diaz v. Stathis*, 576 F.2d 9 (1st Cir. 1978)....28

*Diva's Inc. v. City of Bangor*, 411 F.3d 30 (1st Cir. 2005)....46

*Doe v. Donovan*, 747 F.2d 42 (1st Cir. 1984)....28

*Douglas v. New Hampshire Supreme Court Professional Conduct Commission*, 187 F.3d 621 (1st Cir. 1998) (unpublished table decision)....28

*Duty Free Shop, Inc. v. Administración de Terrenos de Puerto Rico*, 889 F.2d 1181 (1st Cir. 1989)....28

*Esso Standard Oil Co. v. Cotto*, 389 F.3d 212 (1st Cir. 2004)....28

*Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17 (1st Cir. 2005)....45

*Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306 (1st Cir. 1986)....40

*Gooley v. Mobil Oil Corp.*, 851 F.2d 513 (1st Cir. 1988)....................9

*Guiney v. Roache*, 833 F.2d 1079 (1st Cir. 1987)....................38

*In re Justices of the Superior Court Department of the Massachusetts Trial Court*, 218 F.3d 11 (1st Cir. 2000)....................28

*Jackson v. García*, 665 F.2d 395 (1st Cir. 1981)....................28

*Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50 (1st Cir. 2004)....................53

*Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983).................... *passim*

*Mandel v. Town of Orleans*, 326 F.3d 267 (1st Cir. 2003)....................28

*Maymó-Meléndez v. Álvarez-Ramírez*, 364 F.3d 27 (1st Cir. 2004)....................21, 28

*Nieves-Márquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003)....................24

*Río Grande Community Health Center v. Rullan*, 397 F.3d 56 (1st Cir. 2005).................... *passim*

*Rivera-Puig v. García-Rosario*, 983 F.2d 311 (1st Cir. 1992)....................37

*Rolland v. Romney*, 318 F.3d 42 (1st Cir. 2003)....................53, 56, 59, 71

*Rossi v. Gemma*, 489 F.3d 26 (1st Cir. 2007)....................28, 29

*United Books, Inc. v. Conte*, 739 F.2d 30 (1st Cir. 1984)....................28

*Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7 (1st Cir. 1990)....................20

*Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962 (1st Cir. 1993)....................9

**Other Federal Cases**

*31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003).................... *passim*

*Ad Hoc Committee of Concerned Teachers v. Greenburgh #11 Union Free School District*, 873 F.2d 25 (2d Cir. 1989)....................12, 15, 16

*ASW v. Oregon*, 424 F.3d 970 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 51 (2006)....................78

*Baby Neal v. Casey*, 821 F. Supp. 320 (E.D. Pa. 1993)....................36

*B.H. v. Johnson*, 715 F. Supp. 1387 (N.D. Ill. 1989)....................48, 51, 55, 63

*Bowen v. Rubin*, 213 F. Supp. 2d 220 (E.D.N.Y. 2001)....................14–17

*Brian A. v. Sundquist*, 149 F. Supp. 2d 941 (M.D. Tenn. 2000).......................................... *passim*

*California Alliance of Child & Family Services v. Allenby*, 459 F. Supp. 2d 919 (N.D. Cal. 2006).......................................................................................................78

*Carson P. v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007) .................................................. *passim*

*Charlie H. v. Whitman*, 83 F. Supp. 2d 476 (D.N.J. 2000)..........................................................36

*Child v. Beame*, 412 F. Supp. 593 (S.D.N.Y. 1976) ...........................................................16

*Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428 (D. Nev. May 14, 2007) ....................................................................................48, 63, 69, 71

*Colonial Penn Group, Inc. v. Colonial Deposit Co.*, 654 F. Supp. 1247 (D.R.I. 1987) .......................................................................................................40

*Davani v. Virginia Department of Transportation*, 434 F.3d 712 (4th Cir. 2006) ........................46

*Del A. v. Edwards*, No. 86-0801, 1988 WL 19284 (E.D. La. Mar. 2, 1988).....................48, 51, 63

*Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920 (E.D. Mich. Apr. 17, 2007) ................................................................................................... *passim*

*Gardner v. Parson*, 874 F.2d 131 (3d Cir. 1989) ...........................................................10, 13, 14

*Gilbert v. Ferry*, 413 F.3d 578 (6th Cir. 2005).................................................................46

*Hoblock v. Albany County Board of Elections*, 422 F.3d 77 (2d Cir. 2005) ................................46

*Hoffert v. General Motors*, 656 F.2d 161 (5th Cir. 1981) .........................................................12

*Inmates of Boys' Training School v. Affleck*, 346 F. Supp. 1354 (D.R.I. 1972)...........................27

*J.B. v. Valdez*, 186 F.3d 1280 (10th Cir. 1999)........................................................32–34

*Jeanine B. v. McCallum*, No. 93-C-0547, 2001 WL 748062 (E.D. Wis. June 19, 2001) ...............................................................................................48, 65, 68

*Jeanine B. v. Thompson*, 877 F. Supp. 1268 (E.D. Wis. 1995) .................................48, 63, 70, 80

*Joseph A. v. Ingram*, 275 F.3d 1253 (10th Cir. 2002) .........................................................30, 34

*Joseph A. v. New Mexico Department of Human Services*, 575 F. Supp. 346 (D.N.M. 1983).......................................................................................................51

*Joseph A. v. New Mexico Department of Human Services*, No. Civ. 80-623 JC/DJS, slip op. (Jan. 16, 2003).................................................................................30

*Kenny A. v. Perdue*, 218 F.R.D 277 (N.D. Ga. 2003)........................................................ *passim*

*LaShawn A. v. Dixon*, 762 F. Supp. 959 (D.D.C. 1991)...................................................... *passim*

*LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993) ..............................................36, 39, 48, 51

*L.H. v. Jamieson*, 643 F.2d 1351 (9th Cir. 1981) ...........................................................30, 36, 39

*L.J. v. Massinga*, 838 F.2d 118 (4th Cir. 1988)...............................................................48, 51, 63

*Marisol A. v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996) .................................31, 36, 38, 48, 80

*Marisol A. v. Giuliani*, No. 95 Civ. 10533, 1998 WL 265123 (S.D.N.Y. May 22, 1998) ..........................................................................................................14–16, 18

*Missouri Child Care Ass'n v. Cross*, 294 F.3d 1034 (8th Cir. 2002) ...........................................24

*Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032 (W.D. Mo. 2003) .....................55, 78

*Mosby v. Ligon*, 418 F.3d 927 (8th Cir. 2005)...........................................................................46

*Nicholson v. Williams*, 203 F. Supp. 2d 153 (E.D.N.Y. 2002) ....................................................31

*Norman v. McDonald*, 930 F. Supp. 1219 (N.D. Ill. 1996) .............................................48, 63, 70

*Norman v. Johnson*, 739 F. Supp. 1182 (N.D. Ill. 1990).................................................48, 55, 63

*Occean v. Kearney*, 123 F. Supp. 2d 618 (S.D. Fla. 2000)..............................................48, 63, 70

*Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178 (D.R.I. 2004)...................... *passim*

*Olivia Y. v. Barbour*, 351 F. Supp. 2d 543 (S.D. Miss. 2004).........................................30, 32, 36

*Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. (S.D. Miss. Mar. 11, 2005)................15, 18, 19

*Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. (S.D. Miss. Aug 29, 2006).......................30, 36

*Passa v. Derderian*, 308 F. Supp. 2d 43 (D.R.I. 2004).........................................................37, 38

*People United for Children v. City of New York*, 108 F. Supp. 2d 275 (S.D.N.Y. 2000) ..................................................................................................................................39

*R.C. v. Hornsby*, No. 88-D-1170-N, slip op. (M.D. Ala. Apr. 19, 1989) ....................................51

*Rubin v. Smith*, 882 F. Supp. 212 (D.N.H. 1995) ...............................................................12, 13

*Southern Union Co. v. Lynch*, 321 F. Supp. 2d 328 (D.R.I. 2004)..............................................38

*United States v. Lewis*, 936 F. Supp. 1093 (D.R.I. 1996) ..........................................................29

*Wexler v. Lepore*, 385 F.3d 1336 (11th Cir. 2004) ........ 41

*White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997) ........ 51

**State Cases**

*Britt v. Britt*, 383 A.2d 592 (R.I. 1978) ........ 40

*DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474 (R.I. 2004) ........ 40

*In re Doe*, 390 A.2d 390 (R.I. 1978) ........ 27

*In re Jane Doe*, 533 A.2d 523 (R.I. 1987) ........ 13

*In re Stephanie B.*, 826 A.2d 985 (R.I. 2003) ........ 26, 27

*Waldeck v. Piner*, 488 A.2d 1218 (R.I. 1985) ........ 40

**Constitutional Amendments**

U.S. Const. amend. I ........ 1

U.S. Const. amend. IX ........ 1

U.S. Const. amend. XIV ........ 1

**Federal Statutes, Regulations, Rules**

Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, § 103(c), 111 Stat. 2115 (1997) (codified at 42 U.S.C. § 675 note) ........ 65, 66

42 U.S.C. §§ 621 *et seq.* (2006) ........ 47

42 U.S.C. § 622 (2006) ........ 61

42 U.S.C. § 622(b)(8)(A)(ii) (2006) ........ *passim*

42 U.S.C. § 622(b)(8)(A)(iii) (2006) ........ 72, 74

42 U.S.C. § 622(b)(10)(B)(ii) (2000) ........ 60

42 U.S.C. § 622(b)(15) (2006) ........ 70

42 U.S.C. § 627 (1996) ........ 49

42 U.S.C. § 629a(a)(1)(A) (2006) ........ 72

42 U.S.C. § 629a(a)(7) (2006) ........................................................................72–74

42 U.S.C. § 629a(a)(8) (2006) ........................................................................72–74

42 U.S.C. §§ 670 *et seq.* (2006)........................................................................47

42 U.S.C. § 671(a) (2006)........................................................................66

42 U.S.C. § 671(a)(1) (2006)........................................................................75

42 U.S.C. § 671(a)(10) (2006)........................................................................51, 79, 80

42 U.S.C. § 671(a)(11) (2006)........................................................................75, 79, 80

42 U.S.C. § 671(a)(15) (2006)........................................................................49, 50, 64

42 U.S.C. § 671(a)(16) (2006)........................................................................ *passim*

42 U.S.C. § 671(a)(22) (2006)........................................................................70

42 U.S.C. § 672 (2006)........................................................................75

42 U.S.C. § 672(a)(1) (2006)........................................................................57

42 U.S.C. § 675(1) (2006) ........................................................................56–59, 71

42 U.S.C. § 675(1)(A) (2006)........................................................................69

42 U.S.C. § 675(1)(B) (2006)........................................................................58, 70–73

42 U.S.C. § 675(1)(C) (2006)........................................................................68, 69

42 U.S.C. § 675(1)(E) (2006) ........................................................................60, 72–74

42 U.S.C. § 675(4)(A) (2006)........................................................................75, 76

42 U.S.C. § 675(5) (2006) ........................................................................58–60, 63, 66

42 U.S.C. § 675(5)(A) (2006)........................................................................56, 58, 59

42 U.S.C. § 675(5)(C) (2006)........................................................................26

42 U.S.C. § 675(5)(D) (2006)........................................................................60, 68, 69

42 U.S.C. § 675(5)(E) (2006) ........................................................................ *passim*

42 U.S.C. § 1320a-2 (1994) ....................................................................................50

42 U.S.C. § 1320a-2a (2007) ..............................................................................61, 62

42 U.S.C. § 1320a-10 (1994) ..................................................................................50

42 U.S.C. § 1983 (2006) ........................................................................................ *passim*

45 C.F.R. §§ 1355–57 (2001) ..................................................................................47

45 C.F.R. § 1355.20(a) (2001)...........................................................................76, 77

45 C.F.R. § 1356.21(g) (2001)...........................................................................59, 60

45 C.F.R. § 1356.21(g)(3) (2001)...........................................................................27

45 C.F.R. § 1356.21(i) (2001)............................................................................67, 68

45 C.F.R. § 1356.21(m) (2001).........................................................75, 76, 79, 80

45 C.F.R. § 1357.10(c) (1996)...........................................................................71, 73

Federal Rules of Civil Procedure 12(b)(1) (2006).......................................1, 9, 47

Federal Rules of Civil Procedure 12(b)(6) (2006).......................................1, 9, 47

Federal Rules of Civil Procedure 17(c) (2006)...................................10–12, 14, 15

**<u>State Statutes, Regulations, Rules</u>**

R.I. Gen. Laws § 11-9-5.1...........................................................................................5

R.I. Gen. Laws § 14-1-6.............................................................................................5

R.I. Gen. Laws § 14-1-32.......................................................................................7, 26

R.I. Gen. Laws § 14-1-34....................................................................................4, 7, 12

R.I. Gen. Laws § 14-1-35.......................................................................................4, 12

R.I. Gen. Laws § 15-7-7......................................................................................5, 7, 26

R.I. Gen. Laws § 15-7-11...........................................................................................5

R.I. Gen. Laws § 15-7-25...........................................................................................5

R.I. Gen. Laws § 40-11-3....................................................................................................5

R.I. Gen. Laws § 40-11-5....................................................................................................5

R.I. Gen. Laws § 40-11-6....................................................................................................5

R.I. Gen. Laws § 40-11-7....................................................................................................5

R.I. Gen. Laws § 40-11-12.....................................................................................4, 7, 26

R.I. Gen. Laws § 40-11-12.1.................................................................................5, 26, 35

R.I. Gen. Laws § 40-11-12.2.......................................................................................5, 26

R.I. Gen. Laws § 40-11-12.3................................................................................................5

R.I. Gen. Laws § 40-11-14..................................................................................................44

R.I. Gen. Laws § 42-72-2....................................................................................................4

R.I. Gen. Laws § 42-72-4................................................................................................6, 7

R.I. Gen. Laws § 42-72-5................................................................................................4–7

R.I. Gen. Laws § 42-72-10....................................................................................................5

R.I. Gen. Laws § 42-72-11....................................................................................................5

R.I. Gen. Laws § 42-72-13....................................................................................................5

R.I. Gen. Laws § 42-72.1-1....................................................................................................5

R.I. Gen. Laws § 42-72.9-7....................................................................................................5

R.I. Gen. Laws § 42-73-7....................................................................................................41

Rhode Island Rule of Juvenile Procedure 17.......................................................26, 35

Rhode Island Superior Court Rule of Civil Procedure 23 .............................................40

**<u>Books</u>**

6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1570 (3d ed. 2005) ..........................................................................14

6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1572 (2d ed. 1990) ........................................................................................................15

*Black's Law Dictionary* (6th ed. 1990) ............................................................................13

**<u>Legislative Materials</u>**

H.R. Rep. No. 102-631 (1992) ........................................................................................49–51

## PRELIMINARY STATEMENT

Named Plaintiff Children bring this civil rights action on behalf of themselves and other children similarly situated (collectively, "Plaintiff Children") against Defendants, the Governor of Rhode Island, the Secretary of the Executive Office of Health and Human Services (HHS) and the Director of the Department of Children, Youth and Families (DCYF). Defendants are responsible for administering a child welfare system that is so understaffed, mismanaged and unresponsive that it harms the abused and neglected children it is mandated to protect.

Nowhere in Defendants' 107-page brief do they raise, let alone address, Plaintiff Children's claims that the collapse of the State's child welfare system causes them injury in violation of their rights arising under the First, Ninth and Fourteenth Amendments to the United States Constitution, and federal common law, as set forth in the First, Second, Third, Fifth and Sixth Causes of Action in the Amended Complaint.[1] Instead, Defendants claim that they are legally unaccountable to Plaintiff Children — the approximately 3,000 abused and neglected Rhode Island children in the legal custody of DCYF — who suffer from the predictable and inevitable consequences of DCYF's long-standing systemic deficiencies.

Those consequences are significant and all too often irreparable. They are caused by nothing less than Defendants' failure to meet their legal obligations to the children

[1] In their Memorandum of Law in Support of their Motion to Dismiss, Defendants request dismissal of the *entire* Amended Complaint under Rules 12(b)(1) and 12(b)(6) (Defs.' Mem. at 5-6), yet their Memorandum only presents arguments for dismissal of the Fourth Cause of Action on Rule 12(b)(6) grounds. (Defs.' Mem at 89-106.) In the actual Motion to Dismiss that their memorandum supports, Defendants fail to move to dismiss *any* claim in Plaintiff Children's Amended Complaint under Rule 12(b)(6).

they are mandated to protect. Because of Defendants' actions in administering this executive branch agency, Plaintiff Children have been abused and neglected while in state custody at a rate higher than in any other state in the country. Because of Defendants' failures, Plaintiff Children are repeatedly shuffled between their parents' homes and foster care, and among foster homes and expensive, inappropriate institutions, causing emotional harm and needlessly placing them at risk of further physical abuse. Defendants' actions also cause children to linger unnecessarily in costly state custody without receiving necessary services to meet their mental health and developmental needs or to provide them with a permanent family. These violations of Plaintiff Children's federal rights and the resulting harm to these children cannot be remedied without overall systemic reform of the Rhode Island child welfare system.

Defendants attempt to avoid responsibility for their stark failures to meet their legal obligations to Plaintiff Children, yet those obligations fall squarely within the purview of the executive branch. Defendants' invitation to this Court to abdicate its responsibility to adjudicate Plaintiff Children's claims rests on misstatements of the operative legal standards and ignores relevant Supreme Court, First Circuit and other federal district court authority. This Court should reject Defendants' challenge to the Named Plaintiff Children's Next Friends because the Next Friends meet all the requirements for representing the children on whose behalf they appear and because, even if they did not, dismissal is still not warranted as the remedy would be to replace them with other Next Friends. This Court should also deny Defendants' request that it abstain under the *Younger* doctrine. *Younger* abstention is inappropriate here because: (1) Plaintiff Children's Amended Complaint poses no threat to comity, as Rhode Island

has voluntarily submitted itself to federal oversight of its child welfare system; (2) consistent with the First Circuit's decision in *Río Grande*, the instant proceeding does not impinge on any state enforcement actions or interfere with Family Court proceedings; and (3) there are no ongoing state court proceedings that implicate important state interests and in which Plaintiff Children have an adequate opportunity to raise their federal claims. Defendants also seek to invoke the *Rooker-Feldman* abstention doctrine to shield their conduct from this Court's review, but that doctrine does not apply here; Plaintiff Children are not losing parties to a state court action and are not requesting this Court to review and reject any state court judgment. Finally, this Court should deny Defendants' request to dismiss Plaintiff Children's federal statutory claims because, as the Court of Appeals for the First Circuit and many other federal courts have held, the statutes on which Plaintiff Children rely are intended to benefit precisely these children and are privately enforceable.

Because Plaintiff Children are properly before this Court to vindicate their well-established federal constitutional and statutory rights, they respectfully request that this Court deny Defendants' Motion to Dismiss in its entirety.[2]

[2] Plaintiffs agree to withdraw the claims of three of the original Named Plaintiffs -- Briana, Alexis, and Clare H. -- since they have been adopted and are no longer members of the putative class.

## BACKGROUND

### DEFENDANTS ARE LEGALLY RESPONSIBLE FOR THE CARE AND CUSTODY OF PLAINTIFF CHILDREN, AND THE NAMED PLAINTIFF CHILDREN'S INJURIES ARE THE DIRECT RESULT OF DEFENDANTS' ACTIONS AND INACTIONS

Defendants are mandated by Rhode Island statute to protect and promote Plaintiff Children's well-being. *See* R.I. Gen. Laws § 42-72-2.[3] Defendants contend that the Family Court, and not Defendants, has the "ultimate authority" for Plaintiff Children's placement, care and treatment. (Defs.' Mem. at 56.) However, the Rhode Island Family Court's role in approving or disapproving Defendants' actions concerning Plaintiff Children in no way diminishes or replaces Defendants' numerous obligations to the children. As the statutes themselves demonstrate, the day-to-day obligations to Plaintiff Children rest with executive branch Defendants alone. These executive branch responsibilities, not the review functions of the Family Court, are the subject of this case.

The Rhode Island General Assembly has charged DCYF with numerous responsibilities as the legal custodian and guardian of the abused and neglected children in its care. First and foremost, Plaintiff Children have been committed to DCYF's "care, custody and control." R.I. Gen. Laws § 40-11-12; *accord* R.I. Gen. Laws §§ 14-1-34, 14-1-35. DCYF is statutorily mandated to develop services, the purpose of which is "to ensure the opportunity for children *to reach their full potential*." R.I. Gen. Laws § 42-72-5 (emphasis added). DCYF is further exclusively responsible for:

---

[3] Defendants also have bound themselves to federal law that mandates certain responsibilities. *See infra* Part III A.

- Ensuring that the children in DCYF's care are safe;[4]
- Providing care and services to the children in DCYF custody;[5]
- Achieving permanency for each child in DCYF custody;[6]
- Protecting children while investigating reports of abuse or neglect;[7] and
- Providing transition services for children exiting care.[8]

DCYF Director, Defendant Martinez, is mandated to fulfill additional obligations, including:

---

[4] DCYF is required to license, approve, monitor, and evaluate all residential and non-residential child care institutions, group homes, foster homes and programs, R.I. Gen. Laws §§ 42-72-5(b)(7), 42-72.1-1 *et seq*.; to pay for the support and maintenance of any child placed by DCYF in an institution, R.I. Gen. Laws § 42-72-13; and to ensure that staff and agencies with which DCYF contracts restrain children only when necessary, R.I. Gen. Laws § 42-72.9-7.

[5] DCYF is required to provide protective services for children, R.I. Gen. Laws § 42-72-11; and to develop a service plan for each child in custody to determine the child's treatment and placement, R.I. Gen. Laws § 42-72-10.

[6] DCYF is required to ensure that each child's service plan be geared to finding a permanent plan for the child within a time frame of one year, and require a review and evaluation for all children for whom a plan has been developed, R.I. Gen. Laws § 42-72-11; to develop a permanency plan, specifying the efforts to be made to support reunification with the child's family or adoption, and file a request for a permanency hearing, at which DCYF shall present the permanency plan, R.I. Gen. Laws §§ 40-11-12.1, 40-11-12.2(a); to institute proceedings to legally free the child for adoption if the court does not direct foster care or reunification or where the child has been in custody for the last 15 of 22 months, R.I. Gen. Laws § 40-11-12.1(e); to recruit adoptive families for those children for whom reunification is not an option, R.I. Gen. Laws § 15-7-7; to investigate any potential adoptive home, R.I. Gen. Laws § 15-7-11(a); and to make funds available to guardians and adoptive parents, R.I. Gen. Laws § 15-7-25; *see also* R.I. Gen. Laws § 40-11-12.3.

[7] DCYF is required to immediately investigate all reports of abuse or neglect, R.I. Gen. Laws §§ 11-9-5.1, 40-11-3, 40-11-6, 40-11-7; to provide a medical examination for all children entering custody within 24 hours, R.I. Gen. Laws §§ 40-11-5(d), 40-11-6(c); and to petition the Family Court for a child's removal from their parents/guardian where warranted, R.I. Gen. Laws § 40-11-7(c).

[8] R.I. Gen. Laws § 14-1-6.

- Ensuring that each child in DCYF custody receives "suitable treatment, rehabilitation, and care" by "pursuing the least restrictive placement,"[9] and providing a program "for the placement, care, and treatment" of children committed to the custody of DCYF;[10]

- Administering all DCYF-run institutions and facilities;[11]

- Ensuring that each caseworker has a minimum of at least 20 hours of training per year;[12]

- Establishing facilities for emergency treatment, relocation and physical custody of abused or neglected children, including specialized foster family programs, day care services and group homes;[13]

- "[S]eek[ing], accept[ing] and otherwise tak[ing] advantage of all federal aid available;"[14]

- Establishing goals of the maximum number of children who will remain in foster care for a period in excess of two years;[15]

- Being responsible for the education of all children placed in DCYF's custody; [16]

- Ensuring that seriously emotionally disturbed children receive appropriate mental health services and developing a network of programs and services to meet the needs of those children;[17]

---

[9] R.I. Gen. Laws § 42-72-4(b)(14).

[10] R.I. Gen. Laws § 42-72-4(b)(17).

[11] R.I. Gen. Laws § 42-72-4(b)(16).

[12] R.I. Gen. Laws § 42-72-5(b)(10).

[13] R.I. Gen. Laws § 42-72-5(b)(3); *see also Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178, 190 (D.R.I. 2004) (citing statutory provision and noting that "DCYF then has wide discretion as to where to place the child.").

[14] R.I. Gen. Laws § 42-72-5(b)(16).

[15] R.I. Gen. Laws § 42-72-5(b)(19).

[16] R.I. Gen. Laws § 42-72-5(b)(22).

[17] R.I. Gen. Laws § 42-72-5(b)(24).

- Developing and maintaining a comprehensive continuum of care that is family-centered and community-based;[18] and

- Creating a case management information system.[19]

Defendants' argument that the Rhode Island Family Court has the primary or even exclusive responsibility for supervision and care of the Plaintiff Children is contrary to the mandates of Rhode Island law.[20] The very nature of the Family Court's reviewing role assumes, at its core, DCYF's exercise of its own authority. Defendants seek to utilize the fact that they have abdicated the lawful exercise of this authority as support for their argument that this authority lies elsewhere. Rhode Island law makes clear that it does not.[21]

---

[18] R.I. Gen. Laws § 42-72-5(b)(25).

[19] R.I. Gen. Laws § 42-72-4(b)(15).

[20] Defendants also attempt to evade their own responsibilities to Plaintiff Children by wrongly asserting that the Child Advocate failed to undertake her statutory obligations by not intervening in individual family court cases. However, Defendants' duties are in no way lessened by the fact that the Rhode Island Child Advocate has her own duties with respect to these children. In fact, Child Advocate Alston, in carrying out her legal duty to vindicate the rights of Plaintiff Children, determined that Defendants' constitutional violations are so egregious and widespread that bringing the instant action pursuant to her statutory obligations was the most appropriate course of action. (Alston Decl., Ex. 1 at ¶¶ 4-5.) The Child Advocate concluded that it would be impractical to appear in the Family Court proceedings on behalf of each child in DCYF custody, and that their rights would be better and more efficiently protected through a federal class action requesting system-wide relief. (Alston Decl., Ex. 1 at ¶¶ 4-6.)

[21] The cases cited by Defendants regarding the Family Court's authority are in fact regarding its power to make custody determinations and terminate parental rights, and do not compel a contrary conclusion. (Defs.' Mem. at 52-56.) Rhode Island statute explicitly vests the Family Court with the authority to terminate parental rights, R.I. Gen. Laws § 15-7-7, and to "place the custody of the child in [DCYF] until such time as it finds that the child may be returned to the parents . . . under circumstances consistent with the child's safety," R.I. Gen. Laws § 40-11-12(b); *see also* R.I. Gen. Laws §§ 14-1-32, 14-1-34 (determining custody of children). These two traditional enforcement powers of the Family Court are not actions that are the subject of this case and do not negate DCYF's ultimate authority to be custodian of, *cont.*

As to the Named Plaintiff Children themselves, Defendants concede they are in "the care, custody and control of DCYF." (Defs.' Mem. at 9.) While Defendants offer a lengthy factual account of these children's lives, purportedly to demonstrate that the Family Court has ultimate responsibility over these children, their interpretation is not borne out by the Family Court orders in each Named Plaintiff child's case that Defendants have attached as exhibits in support of this contention. For example, there are simply no specific court orders that direct DCYF to move any of the Named Plaintiff Children through the numerous unsafe and unstable placements they have experienced.

Set forth in an Appendix, attached as Ex. 2, Plaintiff Children have compiled the factual scenarios as set forth by Defendants and compared them to the factual allegations from Plaintiff's Amended Complaint, as well as to Defendants' own exhibits. As demonstrated in the Appendix, Defendants' exhibits fail to support Defendants' contention that the Family Court has the "ultimate responsibility" for Plaintiff Children. Rhode Island and federal statutes, as well as these Family Court orders, in fact compel the conclusion that the executive branch Defendants are responsible for making the decisions and taking the actions necessary to protect the safety, well-being and permanency of the Named Plaintiff Children. Defendants have failed to do so.

---

*cont.*
and provide supervision, services and care to, Plaintiff Children while they remain in state custody.

## ARGUMENT

### I. LEGAL STANDARD FOR A MOTION TO DISMISS

In reviewing a motion to dismiss, a court must accept as true all factual averments set forth in a complaint. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). Defendants themselves concede that "[in] ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a Court must construe the complaint liberally, treat all well-pleaded facts as true and indulge all reasonable inferences in favor of the Plaintiff." (Defs.' Mem. at 56.) *See also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996).

The same is true as to a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Wash. Legal Found. v. Mass. Bar Found.*, 993 F. 2d 962, 971 (1st Cir. 1993); *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir. 1992). A plaintiff's threshold to defeat this motion is low, *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988), and Plaintiff Children's claims are to be construed liberally at this stage in the proceedings. *Barrios-Velazquez v. Asociación de Empleados del Estado Libre Asociado de P.R.*, 84 F.3d 487, 490 (1st Cir. 1996). A complaint should not be dismissed on this ground unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## II. THIS COURT HAS JURISDICTION TO ADJUDICATE PLAINTIFF CHILDREN'S CLAIMS, WHICH ARE BROUGHT BY PROPER NEXT FRIENDS

Defendants incorrectly challenge this Court's jurisdiction to hear this action, arguing that the Plaintiff Children's Next Friends lack standing. (Defs.' Mem. at 83.) Whether the Next Friends are appropriate representatives pursuant to Rule 17(c) of the Federal Rules of Civil Procedure, however, is not a jurisdictional issue warranting dismissal. *See Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178, 185-86 (D.R.I. 2004) (distinguishing between jurisdiction and standing); *Gardner v. Parson*, 874 F.2d 131, 140 (3d Cir. 1989) ("The purpose of Rule 17(c) is to further the child's interest in prosecuting or defending a lawsuit . . . . [It] was *not intended to be a vehicle for dismissing claims.*") (emphasis added).[22] Defendants also object to the Next Friends who appear on behalf of the infant Plaintiff Children, arguing that the Next Friends have failed to demonstrate a sufficiently long-standing and close relationship to the Plaintiff Children and first-hand knowledge of their claims. However, this objection is not supported by either the text of Rule 17(c) or case law applying the Rule in substantially similar cases.

Plaintiff Children suffer from a double incapacity. First, they are infants in state custody who are subject to the control of their custodians against whom they seek to raise

[22] Defendants do not challenge the Court's subject matter and personal jurisdiction over Plaintiff Children's claims, nor do they contest the Named Plaintiff Children's standing. Such challenges would have been unavailing. *See Office of the Child Advocate*, 296 F. Supp. 2d at 185 (finding personal and subject matter jurisdiction in suit brought against DCYF on behalf of Rhode Island children in DCYF custody which asserted federal claims); *see also Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *4 (E.D. Mich. Apr. 17, 2007) (holding that children in Michigan child welfare system had established standing to pursue injunctive relief against their state custodian where the complaint "alleges numerous system-wide failures in Michigan's child welfare system that have caused, and will cause . . . actual, particularized harms to Plaintiffs who are in that child welfare system").

claims of illegal conduct. Second, because of that very conduct, and the dysfunction in the Rhode Island child welfare system, Plaintiff Children have been denied the opportunity to develop stable and long-standing attachments to adults. Defendants seek to capitalize on this situation by urging this Court to apply an improper standard for qualifying next friends.

In this case, the Child Advocate for Rhode Island is counsel for the Plaintiff Children. The statutory mandate of the Office of the Child Advocate is to pursue the legal claims of children in DCYF custody, including those of the Named Plaintiff Children. That duty arises from the very fact that these children do not have a network of adults willing and able to vindicate their rights. This suit is properly brought by Next Friends whom the Child Advocate, in fulfilling her mandate, has approved, and who have no suggested or actual motive other than to pursue the legal rights of the children they represent.

**A. Plaintiff Children are Properly Represented by Next Friends**

Federal Rule of Civil Procedure 17(c) requires that an infant have a competent adult represent him or her in a federal action and provides that if the infant does not already have a representative such as a general guardian or conservator, then the infant may sue by a next friend or guardian ad litem.[23] Plaintiff Children brought this action

[23] Federal Rule of Civil Procedure 17(c) provides:

> *Infants or Incompetent Persons*. Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such

*cont.*

through Next Friends who meet the standards of Rule 17(c) and were selected by the Child Advocate.

The Named Plaintiff Children have been removed from the legal custody of their biological parents and placed in the legal custody of Defendants. *See* R.I. Gen. Laws §§ 14-1-34 to 14-1-35; Defs.' Exs. D-27, D-61, C-48, E-48, A-176, B-19 to 20. Since Plaintiff Children have brought suit challenging the actions of DCYF officials in their capacity as legal custodian, there is a clear conflict that makes any DCYF officials improper as the children's representative for Rule 17(c) purposes in this proceeding. Similarly, the Plaintiff Children's biological parents are not appropriate representatives, having each been adjudicated by the Family Court as not acting in the children's best interest. (Defs.' Exs. D-27, D-61, C-48, E-48, A-176, B-19 to 20.) In fact, the rights of David T.'s, Caesar S.'s and Danny and Michael B.'s parents have all been terminated. (*See* Defs. Exs. E-48, C-48, B-19 to 20.) Therefore, representation of these children through next friends is warranted. *See Dev. Disabilities Advocacy Ctr., Inc. v. Melton*, 689 F.2d 281, 285 (1st Cir. 1982) (recognizing federal court authority to appoint next friend "'when it appears that the minor's general representative has interests which may conflict with those of the person he is supposed to represent'") (quoting *Hoffert v. General Motors*, 656 F.2d 161, 164 (5th Cir. 1981)); *Ad Hoc Comm. of Concerned Teachers v. Greenburgh #11 Union Free School Dist.*, 873 F.2d 25, 29-30 (2d Cir. 1989) (holding that suit on behalf of children was properly brought by next friends rather than by the children's state custodian or biological parents); *Rubin v. Smith*, 882 F. Supp. 212,

---

*cont.*

other order as it deems proper for the protection of the infant or incompetent person.

216-217 (D.N.H. 1995) (holding that appointment of guardian was appropriate where "'minor's general representative has interests which may conflict with those of the person [she] is supposed to represent'") (citations omitted).[24]

While each of the Named Plaintiff Children has been represented by either a guardian ad litem (GAL) or Court-Appointed Special Advocate (CASA) in her or his individual Family Court reviews, Defendants present no legal authority to support their proposition that the GALs and CASAs have the authority to bring suit outside the confines of their Family Court appointment.[25] Moreover, to the extent that those Family Court representatives have participated in or approved of the DCYF actions challenged in this suit, they have, at a minimum, a potential conflict or appearance of conflict that makes them unsuitable. *See, e.g., Gardner*, 874 F.2d at 138 (finding that conflict existed necessitating appointment of next friend for plaintiff child whose state court representative was defendant in federal lawsuit).

---

[24] Incredibly, Defendants argue that siblings Tony and Sam M. as well as Deanna H. are most properly represented by their biological mothers, or that proper representation cannot occur absent their mothers' consent. (Defs.' Mem. at 85.) These children's mothers, however, have been deemed unfit and custody has been transferred to DCYF, (Defs.' Exs. D-27, D-61, A-176), rendering them per se inadequate representatives for Plaintiff Children and making their consent unnecessary. *See Gardner*, 874 F.2d at 139 (holding that infant's grandmother was not appropriate representative because Family Court had removed child from grandmother's care upon finding of dependency and/or neglect); *In re Jane Doe*, 533 A.2d 523, 526-27 (R.I. 1987) (finding that DCYF and not mother was appropriate decision-maker for young adult committed to custody of DCYF). Current foster parents of Plaintiff Children, staff in institutions where they reside, and caseworkers for DCYF or an agency that contracts with DCYF, all suffer the same actual or potential conflict, since the interests of all such individuals do not necessarily coincide with and may in fact conflict with the best interests of the Plaintiff Children.

[25] "A *guardian ad litem* is a special guardian appointed by the court in which a particular litigation is pending to represent an infant . . . *in that particular litigation*, and the status of guardian ad litem exists *only in that specific litigation in which the appointment occurs*." *Black's Law Dictionary* 706 (6th ed. 1990) (emphasis added).

Furthermore, nothing in the express language of Rule 17(c) or case law interpreting it precludes plaintiffs who have specific representation in a state court proceeding from appearing with different representation in an independent federal court case. *See generally* 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1570 (3d ed. 2005) (noting that "implicit" in Rule 17(c) is that a general representative may be replaced for purposes of federal litigation).[26] The mere existence of alternative individuals who might also have appeared as next friends casts no doubt on the appropriateness of the specific Next Friends that were chosen here. *See Bowen v. Rubin*, 213 F. Supp. 2d 220, 226-27 (E.D.N.Y. 2001) (holding that existence of kin or close friends who "might perhaps serve as better representatives" was not grounds for rejecting proposed next friends); *Marisol A. v. Giuliani*, No. 95 Civ. 10533(RJW), 1998 WL 265123, *9 (S.D.N.Y. May 22, 1998) (recognizing that possibility of minor having blood relatives or close friends was not sufficient basis for substituting those individuals as next friends).

### B. <u>Plaintiff Children's Next Friends are Appropriate</u>

The district court has "substantial discretion to decide who will act in the child's best interests." *Gardner*, 874 F.2d at 139; *accord Dev. Disabilities Advocacy Ctr., Inc. v. Melton*, 689 F.2d 281, 285 (1st Cir. 1982) (recognizing discretion of district court to appoint next friends). In the child welfare context, "[t]here are no special requirements

[26] There is also no evidence that the individual GALs or CASAs appointed for the Named Plaintiffs' Family Court proceedings would be willing to serve as next friends in this action, as Defendants suggest. Furthermore, although Defendants imply that the CASAs and GALs would necessarily have developed relationships with the children they represent in Family Court, the GAL for at least one of the Named Plaintiffs who has been in custody for many years had, at the time the Complaint was filed, never met the child. (Alston Decl., Ex. 1 at ¶ 8.)

for the person suing as next friend" pursuant to Rule 17(c). *Marisol A.*, 1998 WL 265123, at *9 (quoting 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1572 (2d ed. 1990)). The guiding principle is "the good faith of those claiming to speak for the infant," and the court need only "satisfy itself that the 'next friend' is motivated by a sincere desire to seek justice on the infant's behalf." *Ad Hoc Comm. of Concerned Teachers*, 873 F.2d at 30-31; *accord Marisol A.*, 1998 WL 265123, at *9; *see also Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. at 10 (S.D. Miss. Mar. 11, 2005) (order granting class certification) (rejecting defendants' "suggestion" that next friends to class of plaintiff foster children were "uninterested or inexperienced" and finding that "each is generally knowledgeable about the nature and purpose of this litigation, and has a good faith interest in the named plaintiffs' welfare and in the prosecution of this litigation") (attached as Ex. 3).

Whether a Next Friend has a pre-existing relationship to one of the Named Plaintiff Children must properly be understood *not* as a prerequisite to representation, as Defendants suggest (s*ee* Defs.' Mem. at 83-89), but rather as one means by which the Next Friend may demonstrate sufficient dedication to the best interest of the Plaintiff Child. *See Bowen*, 213 F. Supp. 2d at 227 ("a long-term relationship between a proposed next friend and the individual in need of representation is not required"). As noted by the Second Circuit in a case brought by children,

> The term ["next friend"] is broad enough to include any one who has an interest in the welfare of an infant who may have a grievance or a cause of action . . . . The right of access to courts by those who feel they are aggrieved should not be curtailed; and this is particularly so in the instance of children who, rightly or wrongly, attribute such grievances to their very custodians. Those who propose to speak for the plaintiffs have manifested an interest in their welfare and should, under the circumstances here presented, be allowed to proceed.

*Ad Hoc Comm. of Concerned Teachers*, 873 F.2d at 31 (quoting *Child v. Beame*, 412 F. Supp. 593, 599 (S.D.N.Y. 1976)).

The Named Plaintiff Children live unstable lives, in which DCYF has moved them from placement to placement and school to school. Many of these placements are short-term shelters and institutions far from the children's original communities, schools, churches and relatives. (*See* Am. Compl. at ¶¶ 134-50.) Consequently, the Plaintiff Children have been denied the opportunity to develop long-term and ongoing relationships with a network of adults who are familiar with their circumstances and sufficiently dedicated to their best interests to make the significant commitment to serve as their next friend. *See Dwayne B.* , 2007 WL 1140920, at *3 ("Because the named Plaintiffs, like other foster children, have been removed from home and have had their preexisting ties to family and friends effectively severed, they have few, if any, significant relationships with adults who are suitable and willing to act as 'next friends.'"); *Marisol A.*, 1998 WL 265123, at *9 (recognizing that "[i]n an ideal world, there would be concerned family members or friends to represent these children in court," but that given realities of New York City's foster care system, plaintiffs' next friends were adequate despite in some instances never having met the foster children they represented); *Child*, 412 F. Supp. at 599 (recognizing propriety of foster children being represented by next friend who had no previous relationship to them).

Defendants' reliance on *Whitmore v. Arkansas*, 495 U.S. 149 (1990), where a purported next friend was found to have no standing to pursue a writ of habeas corpus on behalf of a competent adult who had not authorized such representation, is obviously misplaced. *See Bowen*, 213 F. Supp. 2d at 228 ("*Whitmore* clearly does not hold that it is

improper to appoint [a person] with a limited prior or personal relationship with an individual to act as his next friend.”). Even *Carson P. v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007), the only other case relied upon by Defendants, noted that although the “significant relationship” requirement articulated in *Whitmore* has been extended to apply in some cases outside the habeas context, the realities of foster care may make such application inappropriate:

> Foster children likely have no “significant relationship” with any adult who can or will litigate on their behalf. Parents, adult family members, close adult friends, and general guardians often do not exist, are unmotivated to help, are irresponsible, or have a personal interest in the outcome. Where child welfare reform is the issue, caseworkers have a conflict of interest, and foster parents and HHS compensated service providers (e.g. therapists) likely have a conflict of interest . . . . Ultimately, a foster child’s access to this forum may rest with private citizens . . . irrespective of whether they know the individual child they agree to represent.

*Carson P.*, 240 F.R.D. at 520 (referred to as “*Foreman*” in Defs.’ Mem.).

The Rhode Island Child Advocate, with the statutory obligation to bring suit on behalf of the Named Plaintiff Children, selected the Next Friends after making diligent and extensive efforts to find next friends with close connections to the Named Plaintiff Children. (Alston Decl., Ex. 1 at ¶¶ 7-8.) Indeed, two of the three Next Friends do have established relationships with the Named Plaintiff Children they represent. Only one Next Friend, Professor Gregory Elliott, does not. Defendants have provided no basis for questioning that each of these adults is committed to and has a good-faith interest in the Named Plaintiff Children’s welfare, and there is no suggested or real conflict or personal agenda that threatens to subvert proper representation.

Kathleen J. Collins has known Caesar S., for whom she appears as Next Friend, for over a year. She has been a Providence Department School Psychologist for the past

17 years and first met Caesar when he began to attend one of the schools in which she works. (Am. Compl. at ¶ 55.) Although Caesar is only six years old, DCYF has already moved him through eight placements, some of these lasting less than a month. While Caesar has been placed by DCYF with his grandmother for the last two years, the Amended Complaint alleges that this home is inappropriate and unsafe, making Caesar's grandmother an inappropriate candidate for Next Friend. (*Id.* at ¶¶ 44-47.) Caesar's current school, where Ms. Collins works, has been one of the few constant elements in his life. Ms. Collins knows Caesar, and there is nothing in the record to cast doubt upon her asserted good-faith interest in pursuing his welfare through this litigation. *See e.g. Olivia Y.*, No. 3:04CV251LN, slip op. at 9-10 (S.D. Miss. Mar. 11, 2005) (finding suitable next friend who was friend of foster parent who had previously cared for named plaintiff); *Marisol A.*, 1998 WL 265123, at *9 n.14 (finding staff attorney who worked at teenage homeless shelter suitable next friend).

Mary Melvin appears on behalf of David T., for whom she was a foster mother for two years. David is currently 14 years old, has been in DCYF custody since the age of 2, and has been cycled through 14 separate placements, 12 of which have been shelters or other institutional settings and many of which have been out of state. (Am. Compl. at ¶¶ 56-66.) David called Ms. Melvin "Mommy Mary" during the time he lived with her, and her home was the only stable family living environment David has experienced in his entire life. (*Id.* at ¶ 58.) Ms. Melvin currently works as a Senior Companion in the Senior Companion Program at the Department of Elderly Affairs in Cranston, Rhode Island. She has served as a foster parent for Rhode Island children for at least 20 years, and on two separate occasions DCYF recognized her as Foster Parent of the Year. (*Id.* at

¶ 69.) After DCYF removed David from her care and placed him in a series of temporary placements, Ms. Melvin maintained contact with him. (*Id.* at ¶ 58-62, 64, 66, 69.) Caring for David in her own home at DCYF direction for two years, remaining in contact with him for some time thereafter, and embracing the prosecution of this lawsuit on his behalf more than sufficiently demonstrate Ms. Melvin's dedication to David's welfare and her suitability as his Next Friend. *Dwayne B.*, 2007 WL 1140920, at *3 (finding former foster mother of named plaintiff's sibling suitable as next friend); *Olivia Y.*, No. 3:04CV251LN, slip op. at 10 (S.D. Miss. Mar. 11, 2005) (finding former foster parent suitable as next friend).

Gregory Elliott, who serves as Next Friend to Sam and Tony M.,[27] Deanna H.,[28] and Danny and Michael B.,[29] is an Associate Professor of Sociology at Brown University, where he has taught for over two decades. Professor Elliott is a social psychologist specializing in social development and has worked on issues of child maltreatment and adolescent development. There is nothing to suggest that Professor Elliott is motivated by anything but a genuine desire to seek justice on the children's behalf, making him a

---

[27] Sam and Tony M. have been in DCYF custody for eight years. Sam, now 12 years old, has lived in more than 10 different settings and Tony, now just 9 years old, is in his 12th placement. These siblings have been separated and placed in institutions, further isolating them. (Am. Comp. at ¶¶ 20-31.)

[28] Deanna H. is an infant who has been in DCYF custody since she was born, but was not placed with any of her eight siblings. (Am. Compl. at ¶ 78.) Her current foster parents are plainly not suitable representatives because of their contractual relationship with DCYF and their potential interest in adopting Deanna that may or may not be in her best interest.

[29] Danny and Michael B. are ages six and five, respectively. In the three years that they have been in foster care, Danny has been moved at least seven times, and Michael has been moved at least four. (Am. Compl. at ¶¶ 84-88, 92-93.) DCYF has currently separated these siblings, placing Danny in an out-of-state institution, and leaving Michael in the care of a great-grandmother unsuited to safely or permanently care for him. (*Id.* at ¶¶ 88, 93.)

proper Next Friend. As the Child Advocate has established, absent Professor Elliott's participation, these children could not vindicate their federal civil rights as Named Plaintiff Children in this suit. (*See* Alston Decl., Ex. 1 at ¶ 7-8) (recounting dedicated efforts to identify next friends with relationship to children).

Through no fault of their own, each of the Named Plaintiff Children lacks a stable community of adults who are familiar with their case independent of DCYF and who could appear on their behalf in this action without potential conflict. For all the foregoing reasons, the Next Friends of the Named Plaintiff Children are appropriate to protect the rights they seek to vindicate. Should this Court find otherwise, the proper remedy would be the appointment of alternative next friends, not dismissal.

## III. THE COURT SHOULD NOT ABSTAIN UNDER *YOUNGER v. HARRIS*

Federal courts must exercise jurisdiction that is given to them. *New Orleans Public Svc., Inc. v. Council of New Orleans* (*NOPSI*), 491 U.S. 350, 358 (1989). "[O]nly exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.* at 368; *see also Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 915 F.2d 7, 13 (1st Cir. 1990) (noting the "heavy presumption favoring the exercise of jurisdiction"). "[U]nless a case falls into one of those exceptions . . . federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Río Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 68 (1st Cir. 2005) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). As this Court has noted:

> The Supreme Court has stated that federal courts must proceed to judgment and give redress to parties before them in every case to which their jurisdiction extends. Therefore, abstention is "an extraordinary and

> narrow exception" to a federal court's duty to hear controversies properly before it and only applies in exceptional circumstances.

*Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178, 189 (D.R.I. 2004) (citations omitted).

Defendants attempt to persuade this Court to abstain from exercising its original jurisdiction over Plaintiff Children's federal constitutional, statutory and common law claims pursuant to the inapplicable *Younger v. Harris* exception. 401 U.S. 37 (1971). *Younger* abstention is founded on the principle of federal-state comity – the principle that federal courts should not interfere with state functions. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601 (1975). In *Younger*, the Supreme Court, in order to protect the integrity of state criminal proceedings, prevented a state criminal defendant from seeking to enjoin his ongoing state criminal proceedings in federal court. *Younger*, 401 U.S. at 41. *Younger* has been extended beyond criminal proceedings to prevent a federal court from enjoining a pending state civil enforcement proceeding. *Huffman*, 420 U.S. at 603–7; *see also Maymó-Meléndez v. Álvarez-Ramírez*, 364 F.3d 27, 31–32 (1st Cir. 2004).

In this Circuit, a federal court may not abstain pursuant to the *Younger* doctrine unless the underlying rationale for its application exists. That rationale requires, first, that the state court proceeding at issue either be an "enforcement proceeding" or involve the "fundamental workings of the state's judicial system," and second, that "the relief asked of the federal court interfere with the state proceedings." *Río Grande* at 70 (internal quotation omitted). If both of these threshold requirements are met, then the court proceeds to a further analysis called the *Middlesex* test. Under that test, a federal court must abstain where the relief sought interferes with (1) an ongoing state court proceeding that (2) implicates an important state interest and (3) affords the federal

plaintiff an adequate opportunity to present his federal claims. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n.*, 457 U.S. 423, 432 (1981).

Abstention under *Younger* is not appropriate here because, first, traditional federal-state comity concerns are not at issue; Plaintiff Children's claims do not intrude upon the sovereign power of Rhode Island, which has submitted itself to federal oversight of its child welfare system by virtue of its voluntary participation in the federal Title IV-E funding program. Second, Plaintiff Children's federal claims do not even meet the threshold concerns giving rise to abstention, as set forth in *Río Grande*, since this federal case does not in any way involve any state enforcement action or the fundamental interests of the state Family Court system, and the relief Plaintiff Children are seeking does not interfere with any individual Plaintiff Child's Family Court proceedings. Finally, this case does not meet the three-part *Middlesex* test for *Younger* abstention.

### A. Plaintiff Children's Complaint Poses No Threat to Comity Because Rhode Island Has Voluntarily Agreed to Federal Oversight of its Child Welfare System in Exchange for Federal Funding

By exercising its jurisdiction over the instant case, this Court will in no way undermine or frustrate the traditional notions of federalism and comity upon which *Younger* abstention is based. Plaintiff Children's Amended Complaint invades no preserved field of unfettered state sovereignty, but instead seeks prospective injunctive relief strictly over those state agency officials responsible for operating Rhode Island's child welfare system in compliance with federal mandates.

As the First Circuit has already recognized, comity and federalism are not at issue when a challenged program "is jointly supported with federal and state funds and directly administered by state governments . . . . A state need not participate in [the program], but

once a state decides to participate, it must comply with all federal requirements." *Río Grande*, 397 F.3d at 61; *see also id.* at 68–71 (finding that state's compliance with federal mandates in administering its joint federal-state Medicaid program was appropriate for federal court adjudication and did not warrant abstention under *Younger*).

Completely analogous to *Río Grande*, the State's administration of its child welfare system under Title IV-E involves the same bargain of federal funding in exchange for an agreement to abide by federal mandates. Congress enacted the Title IV-E foster care program in 1980 based upon the carefully considered determination of federal lawmakers that states were failing in their individual efforts to protect and care for the nation's foster children. As stated by the United States Department of Health and Human Services (HHS) in its Program Regulation implementing Title IV-E in 1982:

> The impetus behind the passage of [Title IV-E] . . . was the belief of Congress, and most State child welfare administrators, supported by extensive research, that the public child welfare system responsible for serving children, youth and families had become a receiving or holding system for children living away from parents rather than a system that assists parents in carrying out their roles and responsibilities and provides alternative permanent placement for children who cannot return to their own homes. Studies show that under current policies and procedures thousands of children are stranded in the public foster care system with little hope of being reunited with their families or having a permanent home through adoption or other permanency planning, thereby causing harm to the children and high costs to the States . . . . The passage and enactment into law of [Title IV-E] . . . demonstrates a Federal commitment to provide financial and technical assistance to States to make changes in their child welfare service systems.

Title IV-E Program Regulation ACYF-PR-82-02, issued Aug. 13, 1982.

Rhode Island has voluntarily agreed to accept Title IV-E federal funding for the administration of its child welfare system. In exchange for the uncapped flow of federal entitlement dollars under Title IV-E, Rhode Island explicitly agreed "to administer the [child welfare] program in accordance with the provisions of [its] State plan, Title IV-E

of the Act and all applicable Federal regulations and other official issuances of [HHS].” Title IV-E Program Instruction ACYF-CB-PI-07-02, Attachment B – Title IV-E State Plan Pre-Print, issued Jan. 23, 2007 (attached as Ex. 4). Rhode Island has thus knowingly submitted to federal regulation and oversight, eliminating any alleged comity or federalism concerns.[30] *See Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *5 n.5 (E.D. Mich. Apr. 17, 2007) (“there are no ‘comity’ or ‘federalism’ concerns presented by this lawsuit because the State . . . has voluntarily agreed to federal oversight of its foster care system in exchange for federal funding”).

### B. This Court Should Not Abstain Because, as a Threshold Matter, *Río Grande* Precludes the Application of *Younger* to Plaintiff Children’s Complaint

#### 1. No State Enforcement Action is Implicated by This Federal Lawsuit

*Younger* abstention does not apply to this action, which exclusively seeks relief from state executive action. *See NOPSI*, 491 U.S. at 368. In *NOPSI,* a public utility brought parallel state and federal lawsuits seeking an injunction directing the New Orleans City Council to approve an electricity rate increase. The district court abstained from exercising its jurisdiction based upon *Younger,* and the Fifth Circuit affirmed. On writ of certiorari, the Supreme Court reversed, holding:

> Although our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain

[30] It is constitutionally permissible for Congress to regulate and limit the use of federal funds for state-administered social programs created under its Spending Clause power. *See South Dakota v. Dole*, 483 U.S. 203, 206–7 (1987); *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003); *see also Mo. Child Care Ass’n v. Cross*, 294 F.3d 1034, 1036 (8th Cir. 2002) (noting that Title IV-E was enacted by Congress pursuant to its Spending Clause powers and creates a joint federal-state child welfare program).

> orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions, *it has never been suggested that Younger requires abstention in deference to a state judicial proceeding reviewing legislative or executive action.* Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

*Id.* at 367–68 (internal citations omitted) (emphasis added). Because the ongoing state court proceeding in *NOPSI* involved judicial review of legislative action, rather than judicial enforcement of state law, *Younger* abstention did not apply.

The First Circuit applied *NOPSI*'s holding in *Río Grande*, where a federally qualified health center (FQHC) brought suit in federal court against the Puerto Rico Secretary of Health for his failure to make payments pursuant to federal Medicaid requirements, seeking declaratory and prospective injunctive relief. The plaintiff and other FQHCs also had a pending suit in state court seeking, *inter alia*, retroactive damages for missed payments.

On appeal, the First Circuit declined to abstain because "the ongoing state proceeding involved here is not the proper type of proceeding to require adherence to *Younger* principles." *Río Grande*, 397 F.3d at 69. The state court proceeding was not a

> quasi-criminal (or at least 'coercive') state civil proceeding[] . . . brought by the state as [an] enforcement action[] against an individual. . . . [I]n fact [the federal plaintiff] filed suit [in state court] against the Secretary in order to force the Commonwealth to fulfill its federal statutory obligations. Nor [we]re the fundamental workings of the state's judicial system (like its contempt process or method of enforcing judgments) put at risk by the relief asked of the federal court.

*Id.* at 69–70.[31] The court further explained:

---

[31] There is no contention that the "workings of the state's judicial system" are at all implicated by the relief sought in the instant lawsuit.

> Here, the state court action, like that in *NOPSI*, is *judicial review of executive action, rather than an enforcement proceeding*. As well, there was no administrative enforcement proceeding before the Commonwealth health agency that triggered the review. In fact there was no administrative proceeding at all involving [plaintiff]; *the state and federal challenges are to the [state] Secretary of Health's failure to implement a . . . [payment system], as federal law requires*. The state proceedings here do not trigger *Younger* abstention requirements.

*Id.* at 70 (emphasis added). Accordingly, *Younger* was inapplicable. The First Circuit did not even apply a further analysis, as enunciated in *Middlesex*, because the underlying state court action was not an enforcement proceeding and therefore, as a threshold matter, did not trigger the application of *Younger*. *Id.* at 68–71.

As in *NOPSI* and *Río Grande*, Plaintiff Children here do not seek to enjoin any state court enforcement action. In Rhode Island, the Family Court conducts some enforcement proceedings and holds regular periodic reviews concerning Plaintiff Children but, like in *Río Grande* and *NOPSI,* Plaintiff Children are asking the federal court to review executive actions, not to review any Family Court proceeding.[32] Plaintiff Children do not seek to overturn any Family Court decisions, but instead challenge the decisions made by the executive agency regarding the children's treatment, placement,[33]

---

[32] The Rhode Island Family Court plays two distinct roles in the state's child welfare system. First, upon petition by the State, the Family Court conducts *enforcement proceedings under state law* to determine whether a child is to be removed from his or her parents due to abuse or neglect and, later, whether to return the child to his or her parents or to terminate parental rights. *See* R.I. Gen. Laws §§ 40-11-12; 14-1-32; 15-7-7. Second, the Family Court conducts *periodic hearings to review executive action* by DCYF, as required under Titles IV-B and IV-E, which mandate, *inter alia*, that the Family Court review each child's permanency plan at least annually. *See* 42 U.S.C. §§ 622(b)(8)(A)(ii); 671(a)(16); 675(5)(C); *see also* R.I. Gen. Laws §§ 40-11-12.1, -12.2; R.I. R. Juv. P. 17.

[33] Indeed, the Family Court is precluded by both state and federal law from having *any* direct placement or care responsibility for children in DCYF custody, so it is not responsible for the actions actually challenged by Plaintiff Children. *See In re Stephanie B.*, 826 A.2d 985, 995 (R.I. 2003) ("[T]he Family Court . . . has no authority to order placement in a specific

*cont.*

and services while in the state's custody – decisions made outside the context of the state court proceedings, either the enforcement actions or the periodic reviews.[34] Ensuring the well-being of Plaintiff Children in the State's care, custody and control is squarely the responsibility of DCYF, not the Family Court. *See Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1358 (D.R.I. 1972) (finding *Younger* abstention unwarranted in institutional reform lawsuit that "d[id] not attack actions taken by the state legislature or by the state judiciary. Primarily under attack [we]re conditions resulting from decisions made in the administrative discretion of those defendants who are officials of the Boys Training School."); *Office of the Child Advocate*, 296 F. Supp. 2d at 192 (noting, in its review of validity of child welfare consent decree where children involved were no longer in state custody and thus not subject of Family Court proceedings, that "[e]ven if there were pending state proceedings," *Younger* abstention would be

---

*cont.*
facility"); *In re Doe*, 390 A.2d 390, 396 (R.I. 1978) ("Although [family] court may refer a juvenile to the appropriate state agency for treatment, *the court does not have the authority specifically to select a given facility. The setting of priorities among those who are deemed to be suitable candidates for treatment is most suitably performed by the administrative agency rather than by a court.*") (emphasis added); *Office of the Child Advocate*, 296 F. Supp. 2d at 192 (noting that DCYF Director has "broad discretion granted to [her] by Rhode Island law after the Family Court assigns a child to state custody"); *see also, e.g.*, Defs.' Ex. C-7 (committing Named Plaintiff Caesar to the "Care Custody & Control Of DCYF Director"; handwritten: "disc[retion] to place"); Defs.' Ex. D-54 ("DCYF has discretion as to placement" of Named Plaintiff Tony); Defs.' Ex. E-6 (temporarily placing Named Plaintiff David in custody of DCYF "with discretion as to placement"); 45 C.F.R. § 1356.21(g)(3) (federal funding under IV-E "is not available when a court orders a placement with a specific foster care provider").

[34] Plaintiff Children do not make a single averment regarding any state court enforcement decision or action to remove a child from his or her birth parents, to terminate parental rights, or to enforce any other right regarding an individual parent-child relationship. Nor do Plaintiff Children seek to disturb any Family Court decision or action in any individual abuse-or-neglect periodic review.

unwarranted since the Court would simply be reviewing executive agency action and any review would "not require this Court to direct or review the Family Court's decisions").

The First Circuit has *never* applied *Younger* abstention where, as here, the state court proceeding involved simply a review of executive action. In fact, the *only* cases where the First Circuit has abstained on *Younger* grounds have involved claims that would review or enjoin clear-cut enforcement proceedings.[35] While Defendants cite *Rossi v. Gemma*, 489 F.3d 26 (1st Cir. 2007), there too, consistent with all other First Circuit cases, the First Circuit abstained because it was asked to consider claims to

[35] *See Maymó-Meléndez v. Alvarez-Ramírez*, 364 F.3d 27 (1st Cir. 2004) (abstaining where plaintiff brought federal action to enjoin suspension of horse training license under state administrative proceedings); *Esso Std. Oil Co. v. Cotto*, 389 F.3d 212 (1st Cir. 2004) (upholding grant of abstention under *Younger*, where complaint sought to enjoin ongoing state board proceedings); *Mandel v. Town of Orleans*, 326 F.3d 267, 273 (1st Cir. 2003) (vacating on *Younger* abstention grounds order enjoining police from detaining plaintiff where plaintiff was serving home detention sentence pursuant to state court order on civil contempt); *In re Justices of the Superior Court Dep't of the Mass. Trial Court*, 218 F.3d 11 (1st Cir. 2000) (abstaining from considering pretrial habeas corpus petition where state court criminal proceedings were ongoing); *Brooks v. N.H. Supreme Court*, 80 F.3d 633 (1st Cir. 1996) (abstaining pursuant to *Younger* from suit seeking to enjoin (a) paternity suit, (b) state court suit initiated by federal plaintiff, and (c) contempt proceedings where plaintiff challenged attorney disciplinary proceedings); *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252 (1st Cir. 1993) (abstaining under *Younger* where state civil contempt proceeding regarding residential facility for elderly handicapped individuals was ongoing); *Bettencourt v. Bd. of Registration in Med. of Mass.*, 904 F.2d 772 (1st Cir. 1990) (abstaining under *Younger* where enforcement proceeding regarding revocation of medical license was ongoing); *Duty Free Shop, Inc. v. Administración de Terrenos de P.R.*, 889 F.2d 1181 (1st Cir. 1989) (abstaining under *Younger* where eminent domain proceedings in state court were ongoing); *Doe v. Donovan*, 747 F.2d 42, 44 (1st Cir. 1984) (abstaining from considering writ of habeas corpus to enjoin state court murder proceedings); *United Books, Inc. v. Conte*, 739 F.2d 30 (1st Cir. 1984) (abstaining under *Younger* from enjoining future criminal prosecutions); *Jackson v. Garcia*, 665 F.2d 395, 396 (1st Cir. 1981) (abstaining under *Younger* where plaintiff sought to enjoin pending criminal trial in state court); *Diaz v. Stathis*, 576 F.2d 9 (1st Cir. 1978) (affirming dismissal of claims brought by state court defendants that jury lists were compiled unconstitutionally); *Douglas v. N.H. Sup. Ct. Prof'l Conduct Comm.*, 187 F.3d 621 (unpublished table decision), at *1 (1st Cir. 1998) (affirming dismissal where plaintiff sought to enjoin the professional conduct committee from instituting disciplinary proceedings against her; finding that "the disciplinary investigations . . . are the sort of judicial proceedings that warrant abstention") (attached as Ex. 5).

review or enjoin a state court enforcement proceeding. 489 F.3d at 37 (abstaining pursuant to *Younger* from claims challenging enforcement of mechanics' lien).

Here, none of the Plaintiff Children's claims arise from any proceedings of the Rhode Island Family Court, including its enforcement proceedings. Each and every one of Plaintiff Children's claims alleges violations of executive agency decisions only. Accordingly, under *NOPSI* and *Río Grande*, abstention is not warranted here.

**2. The Relief Sought Will Not Interfere With Any Family Court Proceedings**

Another threshold issue in the First Circuit, before a district court can even reach the *Middlesex* test, is whether the prospective injunctive relief Plaintiff Children seek will unduly interfere with their Family Court proceedings. *See Rossi*, 489 F.3d at 35 (finding interference a threshold issue); *Río Grande*, 397 F.3d at 70 (noting that, for *Younger* purposes, interference is "usually expressed as a proceeding that either enjoins the state proceeding or has the practical effect of doing so") (internal quotation omitted). Here, the answer is clearly that no such state court injunction or interference is sought. *Younger* does not apply where the federal action "is merely related to issues involved in a pending state family court proceeding." *United States v. Lewis*, 936 F. Supp. 1093, 1108 (D.R.I. 1996).

Plaintiff Children do not in any way seek to enjoin any proceeding or have the federal court exercise any direct or indirect control over the Family Court, or over the judges who preside there. Plaintiff Children seek systemic injunctive relief, meant to remedy class-wide constitutional and federal law violations by the executive branch. No systemic, overall relief of this type or magnitude will in any way "enjoin" the Family

Court hearings that merely review an individual child's status and which will continue without interference, regardless of the relief granted in this suit.[36]

In similar cases challenging the system-wide administration of child welfare systems, federal courts around the country have found no interference and rejected the application of *Younger*. *See, e.g., L.H. v. Jamieson*, 643 F.2d 1351, 1354 (9th Cir. 1981) (finding *Younger* abstention unwarranted because relief sought did not "have the wholly disruptive consequences associated with enjoining a state judicial proceeding"); *Dwayne B.*, 2007 WL 1140920, at *6 (finding that relief sought would not interfere because "[t]he relief sought here is not directed at the juvenile courts. It is directed at the executive branch."); *Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. at 2 (S.D. Miss. Aug. 29, 2006) ("the court is not persuaded that *any* relief which this court may grant, in the event plaintiffs were to establish a constitutional violation, would *necessarily* impinge on the jurisdiction and prerogative of the state's Youth Courts.") (emphasis added) (attached as Exhibit 7); *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 570 (S.D. Miss. 2004) (stating that the court would be "hard-pressed to conclude that any specific relief plaintiffs seek in this action would necessarily interfere with ongoing youth court proceedings"); *Kenny A. v.*

---

[36] As cited by *Office of the Child Advocate*, 296 F. Supp. 2d at 191, the Tenth Circuit in *Joseph A. v. Ingram*, 275 F.3d 1253 (10th Cir. 2002), found that procedural provisions of a child welfare consent decree posed no problem under *Younger*, where the consent decree concerned a class of children in foster care who had open state Children's Court cases. *Joseph A.*, 275 F.3d at 1273. The Tenth Circuit found that those provisions, governing training of social workers, the development of a computerized management information system, and qualifications for social workers, did not appear to risk interference with state court proceedings. *Id*. Notably, on remand, the district court specifically found that those provisions, as well as all consent decree provisions concerning case planning and review and adoption processes, did not interfere with the decisions in the Children's Court and therefore did not implicate *Younger*. *Joseph A. v. N.M. Dep't of Human Servs.*, No. 80-623 JC/DJS, slip op. at 7–23 (D.N.M. Jan. 16, 2003) (attached as Exhibit 6).

*Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) (finding no interference because "the declaratory and injunctive relief plaintiffs seek is not directed at their [periodic juvenile court] review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at *executive* branch defendants to remedy their alleged failures as plaintiffs' custodians."); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) (observing that "nothing about this litigation seeks to interfere with or enjoin" ongoing state juvenile proceedings); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 687 (S.D.N.Y. 1996) (declining to abstain under *Younger* and *Burford* and noting in its rejection of *Burford* abstention that "plaintiffs neither ask the Court to make individualized findings of fact on plaintiffs' allegations nor to interfere with or alter the underlying policies of [the agency]"); s*ee also Nicholson v. Williams*, 203 F. Supp. 2d 153, 231 (E.D.N.Y. 2002) (declining to abstain pursuant to *Younger* in case challenging child welfare agency's policy of finding children neglected where parent was victim of domestic violence and finding no interference where "the injunctive relief this court grants targets general [agency] practices").

Ignoring this extensive body of case law, Defendants rely on a single nonbinding district court opinion from another circuit, *Carson P. v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007). However, *Carson P.* was wrongly decided and does not compel abstention here. The *Carson P.* court abstained pursuant to *Younger* because the court speculated as to the form an injunction might ultimately take and, based on that speculation alone, found *possible* future interference with state court proceedings.[37] Speculation as to relief

[37] Defendants similarly speculate, without any basis, as to the form of relief sought by Plaintiff Children in the present case. (Defs.' Mem. at 62–63.)

is improper and premature where it cannot be shown that a federal order will necessarily interfere with ongoing state proceedings. *See Olivia Y.*, 351 F. Supp. 2d at 570 (declining to abstain where "it [wa]s not apparent that *all* the relief plaintiffs might request would interfere . . . with ongoing youth court proceedings"); *Kenny A.*, 218 F.R.D. at 286 n.5 (noting that although "precise relief sought by plaintiffs remains somewhat unclear," nonetheless, "specific relief can be crafted that will not interfere with state court proceedings"). Numerous consent decrees have been entered regarding precisely these systemic problems without triggering *Younger* abstention. *See supra* note 36 and pp. 30-31.

Moreover, the *Carson P.* court had already declined to certify a class and, disregarding the weight of authority cited above, relied on *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), and *J.B. v. Valdez*, 186 F.3d 1280 (10th Cir. 1999), both of which are inapposite to the case at bar. In *31 Foster Children*, the Eleventh Circuit found that the plaintiffs sought nothing less than to "have the district court appoint a panel and give it authority to implement a system-wide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan." 329 F.3d at 1279. The court upheld *Younger* abstention after concluding that the plaintiffs sought a federal court takeover, not of the executive agency, but of the Florida dependency court system itself. No such relief is sought in the instant lawsuit or alleged by Defendants.

*31 Foster Children* was never certified as a class action, thus raising the same problem that the relief ordered on behalf of the individual named plaintiffs in the federal lawsuit and the relief granted by the relevant juvenile courts might conflict. This Court

has already distinguished *31 Foster Children* and found that the federal judicial review of DCYF executive action, at least in the context of a consent decree, does not implicate *Younger*. *Office of the Child Advocate*, 296 F. Supp. 2d at 191-92 ("Simply put, this Court's enforcement of the [consent decree] does not involve federal review of an essential part of state proceedings and does not raise the federalism concerns implicated by the *Younger* abstention doctrine."). The Court found that even if children affected by that case had still been the subjects of pending state court proceedings, which they were not, federal court review would "not require this Court to direct or review the Family Court's decisions. Rather, this Court will . . . review the actions of DCYF, an agency of the state executive branch." *Id.* at 192.

In *J.B.*, a putative class of developmentally disabled children filed suit against various New Mexico state agency officials employed by at least three separate state agencies. The district court denied class certification and dismissed the individual named plaintiffs' lawsuit on *Younger* abstention grounds. *J.B.*, 186 F.3d at 1283. The Tenth Circuit affirmed the denial of class certification and dismissed a number of the individual named plaintiffs' claims as moot. *Id*. at 1290. It was at this point – when only three individual plaintiffs remained – that the Tenth Circuit abstained on *Younger* grounds. *Id.* at 1293. The Tenth Circuit determined that the district court's consideration of the individual claims of the three remaining named plaintiffs was likely to interfere with the children's ongoing proceedings before the New Mexico Children's Court, given the drastically narrowed focus of the complaint and limited scope of potential injunctive relief. Permitting the case, as limited, to go forward in the district court would, in the Tenth Circuit's view, "place[] the federal court in the role of making dispositional

decisions such as whether to return the child to his parents in conjunction with state assistance or whether to modify a treatment plan." *Id.* at 1292.[38]

This case, by distinction, remains a putative class action, filed on behalf of a class of thousands of abused and neglected children in state custody, seeking *systemic class-wide* equitable relief that will not impinge on any state court proceedings as was feared in *J.B.*, *31 Foster Children*, and, wrongly, *Carson P.* Any injunctive relief ultimately obtained by Plaintiff Children here would not affect dispositions, custodial determinations, or the substance of any individual child's case plan, because the comprehensive relief would be fashioned to address systemic failings in the Rhode Island child welfare system as operated by Defendants. Nor would it require the federal court to oversee treatment of individual foster children. "[U]nlike the circumstances presented in *J.B.*, any prospective injunctive relief granted by this Court will not threaten interference with any particular Plaintiff's ongoing juvenile court proceedings or existing juvenile court procedures." *Dwayne B.*, 2007 WL 1140920, at *7. The system-wide relief requested here will in no way interfere with any ongoing Family Court proceedings, and accordingly abstention is not warranted.

[38] Notably, the Tenth Circuit subsequently decided *Joseph A.*, 275 F.3d 1253, *see* note 8, *infra*, addressing systemic child welfare remedies that might not interfere with the state court proceedings and therefore would not implicate *Younger*. For a full discussion of the distinction between the Tenth Circuit's refusal to reverse as an abuse of discretion the district court's failure to certify a class in *J.B.*, and the appropriateness of certifying a class in the present case, see the discussion at pp. 7–10 of Plaintiff Children's Reply to Defendants' Objection to Plaintiff Children's Motion for Class Certification and Appointment of Class Counsel.

### C. Abstention is Not Warranted Under the *Middlesex* Test

Even if the Court were to look beyond the threshold defects addressed above, which, standing alone, defeat Defendants' request for abstention, *Younger* abstention is not warranted here because the three-part *Middlesex* test is not met: the injunctive relief sought does not interfere with (1) ongoing state court proceedings that (2) implicate an important state interest and (3) in which there is an adequate opportunity for the federal plaintiffs to raise their federal claims. *Middlesex*, 457 U.S. at 432. Only if all three prongs are met is abstention appropriate. As none of the three prongs is met here, the Court should not abstain.

#### 1. The Family Court Proceedings are Not Ongoing Proceedings Within the Meaning of *Younger*

In support of abstention, Defendants argue first, that there are ongoing Family Court proceedings for the seven Named Plaintiff Children (Defs.' Mem. at 61) and, second, that this federal lawsuit would interfere with those proceedings. However, those Family Court proceedings, which are mandated by federal law, are not "ongoing" within the meaning of *Younger*, but are simply isolated points at which the Family Court "re-enters the proceeding" after awarding custody of the child to DCYF.[39] *Cf. Office of the Child Advocate*, 296 F. Supp. 2d at 191 (discussing Rhode Island Family Court proceedings in child welfare cases and noting that Family Court re-enters proceedings upon motion to modify or vacate custody arrangements). This is quite distinct from the ongoing unitary state criminal court proceedings or coercive civil enforcement proceedings where *Younger* abstention in a federal case is appropriate. It is notable that

[39] R.I. Gen. Laws § 40-11-12.1 (hearing to review permanency plan); R.I. R. Juv. P. 17 (court review of child's care and treatment plan).

these federally required regular state family court reviews existed in *every* child welfare class action challenge where the application of *Younger* was rejected by a circuit or district court.[40] Clearly the existence of state judicial safeguards required by the federal government through its oversight of Rhode Island's Title IV-E program does not require abstention under *Younger*, as Defendants suggest. The sound reasoning in those cases where abstention was rejected compels the conclusion that abstention is not necessary here.

---

[40] *See LaShawn A. v. Kelly*, 990 F.2d 1319, 1322–24 (D.C. Cir. 1993) (rejecting application of *Younger* abstention despite family court neglect proceedings, review hearings, and termination proceedings); *L.H. v. Jamieson*, 643 F.2d 1351, 1354 (9th Cir. 1981) (finding *Younger* abstention unwarranted where abused and neglected minor plaintiffs were not seeking to enjoin plaintiffs' juvenile court proceedings or prohibit state officials from enforcing any state law); *Dwayne B.*, 2007 WL 1140920, at *5–7 (rejecting *Younger* abstention in challenge to administration of Michigan's child welfare system where relief "will not require ongoing federal court interference with the daily operation of Michigan's juvenile courts."); *Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. at 2 (S.D. Miss. Aug. 29, 2006) (denying renewed motion for *Younger* abstention where district court was "not persuaded" that all possible relief it might enter would "necessarily" interfere with Mississippi youth court proceedings) (Exhibit 7); *Olivia Y. v. Barbour*, 351 F. Supp. 2d at 570 (S.D. Miss. 2004) (rejecting motion for *Younger* abstention where court was "hard-pressed to conclude" that any relief sought by plaintiff children would necessarily interfere with ongoing youth court proceedings); *Kenny A. v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) (finding *Younger* abstention improper because relief sought was directed solely at executive branch officials and would not necessarily interfere with juvenile court review hearings); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) (refusing to abstain under *Younger* where "nothing about this litigation seeks to interfere with or enjoin" "ongoing and pending state proceedings concerning individual [plaintiff] foster children"); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 514 (D.N.J. 2000) (refusing to apply *Younger* to class challenge of New Jersey's child welfare system); *Marisol A. v. Giuliani*, 929 F. Supp. at 688–89 (S.D.N.Y. 1996) (finding *Younger* abstention inapplicable where "defendants do not refer this Court to any pending state proceeding in which plaintiffs will have the opportunity to present the[ir] federal claims"); *Baby Neal v. Casey*, 821 F. Supp. 320, 332–33 (E.D. Pa. 1993) (same), *rev'd on other grounds*, 43 F.3d 48 (3d Cir. 1994).

### 2. Plaintiff Children's Claims Do Not Intrude Upon Any Exclusive Area of Important State Interest

Regarding the second *Middlesex* prong, Defendants cursorily state that "[t]here does not seem to be a dispute that the child welfare and its foster program [sic] implicate an important state interest," (Defs.' Mem. at 68), but fail to acknowledge that the administration of a child welfare system under Title IV-E is not an *exclusive* area of important state interest. Both the federal and state governments have interests in the administration of Rhode Island's joint federal-state child welfare program, as explained in section Part III A, *supra*. *Cf. Río Grande*, 397 F.3d at 61 (*Younger* abstention not warranted although federal lawsuit challenged Puerto Rico's operation of its own health care system, where Puerto Rico had elected to accept federal Medicaid funding in return for agreeing to operate its health system in accordance with federal law and with federal oversight).[41] As this Court has noted in a related context, Rhode Island's "interest in the administration of its child welfare system . . . does not rise to the level of a special sovereignty interest." *Office of the Child Advocate*, 296 F. Supp. 2d at 189 (considering exception to sovereign immunity).[42]

[41] The fact that the state court proceedings at issue are simply judicial review of executive action also militates against finding an important state interest that justifies abstention. In *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311 (1st Cir. 1992), the First Circuit declined to abstain under *Younger* where a newspaper reporter challenged a rule that closed preliminary criminal hearings. 983 F.2d at 314–15, 319–20. The court found *Younger* inapplicable because there were no ongoing state proceedings, but also noted: "Because the [state court] proceeding is not a criminal or civil enforcement case, and it is not 'uniquely in the furtherance of the state courts' ability to perform their judicial functions,' we doubt that the present case implicates the type of important state interest contemplated in *Middlesex* . . . ." *Id.* at 319 n.13 (quoting *NOPSI*, 491 U.S. at 368).

[42] Even where there are issues of particular state sensitivity, abstention is not warranted. In *Passa v. Derderian*, 308 F. Supp. 2d 43 (D.R.I. 2004), this Court found that, in the case of the nightclub fire in Rhode Island that left 100 dead and 200 injured, many of whom were *cont.*

While the State may have an exclusive interest in family relations, family law is not at issue in the instant lawsuit.[43] What is at issue is Defendants' failure to operate a constitutionally and statutorily adequate child welfare system, which is not a unique state interest. That Plaintiff Children solely assert federal claims also weighs heavily against surrender of federal jurisdiction. *See Cruz v. Melecio*, 204 F.3d 14, 25 (1st Cir. 2000).

### 3. Plaintiff Children Do Not Have an Adequate Opportunity to Present Their Federal Claims in Their Family Court Proceedings

Under the final *Middlesex* prong, plaintiffs must also have an adequate opportunity to present their federal claims in the state court proceeding. *Middlesex*, 457 U.S. at 432. "*Younger* abstention depends on the ability of the state tribunal to adjudicate the federal claims and defenses." *S. Union Co. v. Lynch*, 321 F. Supp. 2d 328, 337 (D.R.I. 2004) (citing *Brooks v. N.H. Supreme Court*, 80 F.3d 633, 638 (1st Cir. 1996)). The Family Court is not a forum in which Plaintiff Children can adjudicate or remedy the systemic constitutional violations that are harming them, and thus abstention is improper.

Although the Family Court conducts periodic reviews of individual foster care cases, as required by federal law, those reviews are not in a forum in which remedies can

---

*cont.*
Rhode Island citizens, "a state court's special sensitivity to particular issues is not a just cause for federal abstention." 308 F. Supp. 2d at 65 (citing *Guiney v. Roache*, 833 F.2d 1079, 1085 (1st Cir. 1987)).

[43] *But cf. Moore v. Sims*, 442 U.S. 415, 423–35 (1979) (5-4 decision) (finding abstention appropriate where plaintiffs challenged their children's removal into state custody and sought to *enjoin* state court abuse-and-neglect enforcement proceeding). In the instant lawsuit, Plaintiff Children do not seek to enjoin any state court proceeding or to overturn the judgment of a state court. *See Marisol A.*, 929 F. Supp. at 688 (distinguishing *Moore* and noting that "plaintiffs in child welfare cases where courts have abstained under *Younger* have all been enmeshed in state court proceedings and have attempted to use the federal courts to attack collaterally state court rulings").

be ordered that would correct the fundamental systemic failings and decision-making within DCYF that continue to impair the rights of abused and neglected children in DCYF custody. As recognized by numerous federal courts, individually focused foster care review proceedings are a manifestly inadequate forum in which to raise systemic constitutional challenges to a state's child welfare system. *See, e.g.*, *LaShawn A. v. Kelly*, 990 F.2d 1319, 1322–23 (D.C. Cir. 1993) (holding that family court neglect proceedings, periodic review hearings, and termination proceedings are inadequate for raising multifaceted, constitutional class action challenge to administration of child welfare system); *Dwayne B.*, 2007 WL 1140920, at *6 (holding that "there is no pending judicial proceeding which could serve as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief based on the Constitution and on federal and state law") (internal quotation omitted); *Brian A.*, 149 F. Supp. 2d at 957 (noting that "[a]lthough technically Plaintiffs could raise constitutional questions in their individual juvenile proceedings," no such proceeding could serve as an adequate forum for broad injunctive relief sought by class-action plaintiffs); *People United for Children v. City of New York*, 108 F. Supp. 2d 275, 291 (S.D.N.Y. 2000) ("the Court does not believe that the Family Court can adequately consider plaintiffs' claims in the context of a multi-faceted lawsuit challenging a system-wide policy rather than [agency] actions in individual cases."); s*ee also L.H.*, 643 F.2d at 1354 (noting that plaintiffs' claim was "not of a sort that would be presented during the normal course of a state proceeding"); *Kenny A.*, 218 F.R.D. at 287 (noting that "plaintiffs' very status as children combine[d] with their lack of adequate adult representation . . . create[s]

insurmountable procedural obstacles [and] preclude[s] them from using the juvenile courts to protect their rights.”).[44]

The Family Court reviews also provide an inadequate forum because the Rhode Island Family Court has no direct authority to hear class action lawsuits.[45] Any attempt to obtain the sort of relief sought here in individual Family Court cases would require each of the more than 3,000 individual children to bring, during their periodic Family Court review hearings, identical federal constitutional, statutory and common law claims seeking systemic relief. However, as this Court has found, “the desirability of avoiding piecemeal litigation is entitled to ‘great weight’ in assessing the propriety” of abstention. *Colonial Penn Group, Inc. v. Colonial Deposit Co.*, 654 F. Supp. 1247, 1253 (D.R.I. 1987) (citing *Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306, 309 (1st Cir. 1986), *aff’d*, 834 F.2d 229 (1st Cir. 1987)).

---

[44] Moreover, the Family Court proceedings do not afford Plaintiff Children an adequate opportunity to raise their federal claims because the attorneys who represent them each carry an average caseload of 400 children. *See* R.I. Family Court - Overview, http://www.courts.state.ri.us/family/overview.htm (last visited Nov. 1, 2007). Plaintiff Children ask the Court to take judicial notice of these caseloads listed on the Rhode Island Family Court website. Those caseloads are comparable to the attorney caseloads in Georgia of approximately 500 children, which the *Kenny A.* court found to render representation per se inadequate because such caseloads “ma[ke] it impossible for the children to have their voices heard and their claims raised in juvenile court.” *Kenny A.*, 218 F.R.D. at 287.

[45] There is no statute or regulation that authorizes the Family Court to hear class actions. “The Family Court lacks general equitable powers and cannot take action unless specific jurisdictional authority to act can be found in the Family Court Act. . . . [T]he Family Court, as a court of statutory origin, has no more powers than those expressly conferred upon it by the Legislature.” *Waldeck v. Piner*, 488 A.2d 1218, 1220 (R.I. 1985) (citing *Britt v. Britt*, 383 A.2d 592, 594 (R.I. 1978)). The only Rhode Island statute that authorizes state court class actions is Rule 23 of the Superior Court Rules of Civil Procedure, which expressly grants only the Superior Court jurisdiction to hear class actions. *See* R.I. Super. Ct. R. Civ. P. 23; *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474, 486 (R.I. 2004).

Neither federal nor state law requires that Plaintiff Children bring their federal claims in numerous duplicative individual Family Court hearings, instead of bringing a single class action lawsuit in federal court. *See, e.g.*, *Wexler v. Lepore*, 385 F.3d 1336, 1340 (11th Cir. 2004) (rejecting *Younger* abstention and noting that "we have found no binding precedent requiring federal plaintiffs to raise federal claims in pending state court proceedings where they are also plaintiffs"); *but see Carson P.*, 240 F.R.D. at 531. In fact, the Child Advocate, who is charged by statute with protecting and vindicating the rights of children in Rhode Island state custody and "[t]ak[ing] all possible action" to secure the rights of those children, R.I. Gen. Laws § 42-73-7, recognized that it would be both inefficient and ineffectual to raise these claims in myriad Family Court proceedings, and instead elected to bring the instant lawsuit in federal court. (*See* Alston Decl., Ex. 1 at ¶¶ 5–6.)[46]

Even if piecemeal litigation was initiated asserting federal constitutional, statutory and common law claims on behalf of 3,000 individual children in their 3,000 individual judicial reviews, those 3,000 individual claims could in no way provide the overarching systemic relief within DCYF requested in this case, which is directed at reforming numerous significant functions of the Rhode Island child welfare system. For example, in an individual Plaintiff Child's case, the Family Court could not order relief against the child welfare agency that would:

[46] Her charge to "[t]ake all possible action including . . . formal legal action," R.I. Gen. Laws § 42-73-7(6), in no way requires the Child Advocate to vindicate Plaintiff Children's rights first or solely in the context of individual Family Court proceedings, as suggested by Defendants. (*See* Defs. Mem. at 51-52, 73.)

- Require actions to lower caseworkers' caseloads;
- Require actions to lower the rate by which Plaintiff Children are abused and neglected while in DCYF custody;
- Provide additional placement resources so as to decrease the rate at which Plaintiff Children are institutionalized;
- Require actions to increase the number of adoptions for Plaintiff Children whose parents' rights have been terminated;
- Create a professional, mandatory training program for caseworkers;
- Create a professional, mandatory training program for foster parents;
- Require actions to implement an effective recruiting strategy for caseworkers;
- Assure a quality assurance system;
- Increase the quantity of medical, dental and mental health services available to abused and neglected children in DCYF's custody;
- Develop a new array of foster home placements for children; or
- Provide the accountability and management practices necessary to ensure that state policies and practices are followed.

With thousands of children in DCYF custody due to abuse and neglect, even in the unlikely event that the Family Court would order some type of corrective individualized relief in each and every putative class member's case, such relief would not be directed at remedying the systemic ills this case is meant to address,[47] and, in fact, would run the risk of creating conflicting directives from various judges within the Family Court system. As one court has observed when considering similar claims:

---

[47] It is of no moment that the Family Court can consider constitutional questions in individual cases (*see* Defs.' Mem. at 66–67), because the Family Court cannot order this relief on a class-wide or even a system-wide basis. Moreover, other cases cited by Defendants are inapposite because they challenge enforcement proceedings, such as the termination of parental rights or custody determinations, which are not at issue in the instant lawsuit.

> Even in individual cases, the juvenile court cannot order DFCS [Georgia's analogue to DCYF] to provide a particular placement for a child, develop new placements, or enter orders regarding staff training, caseloads, the creation of new resources or other issues affecting what happens to children who come before it.

*Kenny A.*, 218 F.R.D. at 287. Unlike the Rhode Island Family Court, however, this District Court can direct DCYF to make those systemic changes that are so crucial to avoiding harm to Plaintiff Children while they are in the state's custody.

In sum, in order to abstain pursuant to *Younger*, the Court would have to find that this is the type of proceeding to which *Younger* applies and, further, that all three prongs of the *Middlesex* test are met. None of those conditions is met here. Instead, Plaintiff Children's claims in this lawsuit are "the exact sort of disputes over citizens' rights with which the federal courts were created to deal." *Brian A.*, 149 F. Supp. 2d at 957 (citation omitted). As the First Circuit has affirmed, the Supreme Court "has never 'remotely suggest[ed]' that every pending state proceeding between a state and a private plaintiff justifies abstention if that private plaintiff then sues the state in federal court." *Río Grande*, 397 F.3d at 70 (quoting *Moore v. Sims*, 442 U.S. 415, 423 n.8 (1979)). In order to have their day in court, Plaintiff Children should be permitted to maintain their federal constitutional, statutory and common law claims in federal court, where they rightly belong.

## IV. THERE IS NO BASIS TO ABSTAIN UNDER *ROOKER-FELDMAN*

Defendants' mistaken assertion that the *Rooker-Feldman* abstention doctrine negates this Court's subject matter jurisdiction over Plaintiff Children's federal claims (Defs.' Mem. at 74-82) is directly contradicted by the Supreme Court's decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005). *See also D.C. Ct. App. v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). In *Exxon Mobil*, the Court made clear that the *Rooker-Feldman* doctrine applies only to the very limited circumstance in which the losing party to a state court action requests that a federal court review and reject that state court judgment. 544 U.S. at 284. The *Rooker-Feldman* doctrine has no application to this federal suit, which is brought by Plaintiff Children who have never before been a party—let alone a losing party—to an action in Family Court or any other related state court proceeding.[48] Plaintiff Children seek to vindicate constitutional and federal statutory rights that have not before been litigated, and the relief they seek would in no way reverse or call into doubt any previous state court judgments.

The Supreme Court's decision in *Exxon Mobil* made clear that the *Rooker-Feldman* doctrine occupies very "narrow ground" and can be evoked only where a party has "called upon the District Court to overturn an injurious state-court judgment." 544 U.S. at 284, 291-92. Admonishing the lower courts for "constru[ing] [the *Rooker-Feldman* doctrine] to extend far beyond the contours of the *Rooker* and *Feldman* cases,"

[48] In fact, Plaintiff Children are the subjects of, but not parties to, their state Family Court custodial proceedings. *See* R.I. Gen. Laws § 40-11-14 (providing for the appointment of a representative for "[a]ny child who is alleged to be abused or neglected as *a subject of* a petition filed in family court") (emphasis added).

the unanimous Court reasserted the doctrine's limited reach: "The *Rooker-Feldman* doctrine . . . *is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments* rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 283-84 (emphasis added); *see also Lance v. Dennis*, 546 U.S. 459, 466 (2006) (reiterating that *Rooker-Feldman* applies only in "'limited circumstances,'" where "a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court")(quoting *Exxon Mobil*, 544 U.S. at 291).

Defendants' claim that the First Circuit has taken an "expansive view" of the *Rooker-Feldman* doctrine (Defs.' Mot. at 79) is wrong because it is based on a body of law that predates *Exxon Mobil*. Their position is in fact entirely at odds with subsequent First Circuit decisions that have paid close heed to the admonishment in *Exxon Mobil* that the doctrine is of only very limited applicability. *See, e.g.*, *Federación de Maestros de P. R. v. Junta de Relaciones del Trabajo de P. R.*, 410 F.3d 17, 19-24 (1st Cir. 2005) (stating that *Exxon Mobil* "substantially altered our understanding of the *Rooker-Feldman* doctrine" and specifically limits it to cases where procedural posture is as in *Rooker* and *Feldman* themselves); *Adames v. Fagundo*, 198 F. App'x 20, 22 (1st Cir. 2006), *cert. denied*, 127 S. Ct. 1335 (Feb. 20, 2007).

The First Circuit has also found it error to dismiss a Section 1983 action pursuant to *Rooker-Feldman* when there was no direct federal court challenge by a party in a previous state court lawsuit to a specific injurious state court determination, despite a claim below that the *Rooker-Feldman* doctrine applied simply because a federal court decision could "effectively defeat or negate a state judgment to which the federal

claimant was a party." *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 42-43 (1st Cir. 2005).[49]

Defendants cannot identify any current federal, constitutional, or statutory claims that have been previously brought by Plaintiff Children and adjudicated in state judicial proceedings, because there are none. Nor can Defendants identify a single Family Court order that would be effectively reversed by the prospective injunctive relief that Plaintiff Children request, because there is none. Finally, as Plaintiff Children do not seek to overturn the Family Court orders cited by Defendants, but are asking this Court to review executive branch Defendants' actions, the *Rooker-Feldman* doctrine does not apply. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002) ("The [*Rooker-Feldman*] doctrine has no application to judicial review of executive action.").

As Defendants acknowledge, even *Carson P. v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007), upon which Defendants rely heavily to support the rest of their motion, held that *Rooker-Feldman* did not apply to this kind of case. 240 F.R.D. at 522-23[50] (noting

[49] Circuit courts across the country have joined the First Circuit in rejecting efforts to apply the *Rooker-Feldman* doctrine wherever a federal ruling might "effectively" invalidate a prior state court ruling. *See, e.g., Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 86 (2d Cir. 2005) (*Rooker-Feldman* "does not deprive a district court of subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court"); *Mosby v. Ligon*, 418 F.3d 927, 932 (8th Cir. 2005) ("[T]he *Rooker-Feldman* doctrine does not bar the district court from exercising jurisdiction over general challenges to the constitutionality of a State's disciplinary rules and processes."); *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 716-17 (4th Cir. 2006) (employee's civil rights claims against employer not barred by *Rooker-Feldman*, since claims did not challenge the underlying state court decision, even though favorable ruling could undermine the prior state court ruling that termination was not retaliatory or based on impermissible reason); *Gilbert v. Ferry*, 413 F.3d 578, 579 (6th Cir. 2005) (vacating district court dismissal of civil rights suit on *Rooker-Feldman* grounds in light of *Exxon Mobil*).

[50] The *Carson P*. Nebraska district court decision is mistakenly cited by Defendants as a Tenth Circuit case. (Defs.' Mem. at 79.)

that plaintiffs' requested injunction against the state child welfare agency did not seek reversal of previous juvenile court rulings). There is therefore no basis to apply the *Rooker-Feldman* doctrine to this case.

## V. THE RIGHTS ASSERTED IN PLAINTIFF CHILDREN'S FOURTH CAUSE OF ACTION ARE PRIVATELY ENFORCEABLE

Plaintiff Children allege in their Fourth Cause of Action that Defendants have engaged in a policy, pattern, practice, or custom of depriving Plaintiff Children of rights conferred on them by the Adoption Assistance and Child Welfare Act of 1980, as amended, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.* (collectively, AACWA[51]), and the regulations thereunder, 45 C.F.R. §§ 1355–57.[52] Defendants' challenge to Plaintiff Children's enforcement of their unambiguously conferred rights under AACWA ignores that the Social Security Act, which encompasses AACWA,[53] has a "legacy of private enforcement." *Lynch v. Dukakis*, 719 F.2d 504, 512 (1st Cir. 1983) (finding AACWA case plan and review provisions privately enforceable). Numerous federal court decisions, including by the Court of Appeals for the First Circuit, have found that the

---

[51] For purposes of convenience, the statutory provisions on which Plaintiff Children rely in their Fourth Cause of Action are collectively referred to herein as AACWA, though some of these provisions were enacted separately from the original Adoption Assistance and Child Welfare Act of 1980 and some courts have used other abbreviations for these same provisions, including "AAA," "AACA," and "CWA."

[52] In their Motion to Dismiss, Defendants "move to dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)." (Defs.' Mot. to Dismiss at 1.) They do not, however, move to dismiss any of the individual causes of action within the Complaint under Rule 12(b)(6), and only brief arguments in support of dismissing Plaintiff Children's Fourth Cause of Action under Rule 12(b)(6) in their Memorandum of Law. (*See* Defs.' Mem. at 89–106.)

[53] Defendants' assertion that "AACWA falls within the provisions of the federal Medicaid Act" (Defs.' Mem. at 89) is factually incorrect.

provisions on which Plaintiff Children rely confer rights on abused and neglected children in state custody and that these rights are privately enforceable through 42 U.S.C. § 1983.[54]

Instead of challenging AACWA's private enforceability under the operative legal standard in the First Circuit, as set out in *Río Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005), Defendants have simply copied and pasted extended passages from *Carson P. v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007), and, to a lesser degree, *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), and have strung them together with their own conclusory statements that the AACWA provisions at issue do not fully satisfy a legal test that the First Circuit has moved away from.[55] Not only are those two decisions from other jurisdictions not binding, but their analysis and conclusions are sharply at odds with the legion of contrary federal decisions, including by the Court of Appeals for the First Circuit.

---

[54] *See, e.g.*, *L.J. v. Massinga*, 838 F.2d 118 (4th Cir. 1988); *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428 (D. Nev. May 14, 2007); *Kenny A. v. Perdue*, 218 F.R.D. 277 (N.D. Ga. 2003); *Jeanine B. v. McCallum*, No. 93-C-0547, 2001 WL 748062 (E.D. Wis. June 19, 2001); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941 (M.D. Tenn. 2000); *Occean v. Kearney*, 123 F. Supp. 2d 618 (S.D. Fla. 2000); *Marisol A. v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997); *Norman v. McDonald*, 930 F. Supp. 1219 (N.D. Ill. 1996); *Jeanine B. v. Thompson*, 877 F. Supp. 1268 (E.D. Wis. 1995); *LaShawn A. v. Dixon*, 762 F. Supp. 959 (D.D.C. 1991), *aff'd sub nom. LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993); *Norman v. Johnson*, 739 F. Supp. 1182 (N.D. Ill. 1990); *B.H. v. Johnson*, 715 F. Supp. 1387 (N.D. Ill. 1989); *Del A. v. Edwards*, No. 86-0801, 1988 WL 19284 (E.D. La. Mar. 2, 1988), *aff'd*, 855 F.2d 1148 (5th Cir. 1988).

[55] The test laid out in *Blessing v. Freestone*, 520 U.S. 329 (1997), is discussed below at 51.

**A. Congress Has Clearly Signaled That It Intended "State Plan" Provisions of the Social Security Act to be Privately Enforceable**

In *Suter v. Artist M.*, 503 U.S. 347 (1992), the Supreme Court held that 42 U.S.C. § 671(a)(15), a single provision of AACWA which provides that "reasonable efforts shall be made to preserve and reunify families," and which is not at issue in this case, did not create a private right of action because it was too vague.[56] 503 U.S. at 363. The *Suter* Court also suggested in *dicta* that AACWA as a whole was privately unenforceable because the statute's requirement that States prepare and file a "plan" obviated any entitlement to rights secured under those plans. *See* 503 U.S. at 358–63. Concerned that "*Suter v. Artist M.* affects . . . the enforceability of the Adoption Assistance and Child Welfare Act" and that it "could result in the elimination of the ability of beneficiaries of the State plan titles of the Social Security Act, primarily *children* and families, to sue to enforce the Act's requirements," H.R. Rep. No. 102-631, at 365 (1992) (emphasis added), Congress unequivocally responded by enacting the "*Suter* fix," an amendment to the Social Security Act that disclaimed any intent to foreclose private rights of action under

[56] In a footnote in *Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178 (D.R.I. 2004), this Court considered in passing the implications of *Suter* for the validity of a consent decree in an action brought by the Child Advocate of Rhode Island on behalf of children in Rhode Island's foster care custody. 296 F. Supp. 2d at 185 n.4. The Fourth Cause of Action in the underlying complaint in that case had raised claims under 42 U.S.C. § 671(a)(15), the specific provision that the *Suter* Court held did not give rise to a private right of action, as well as § 627, which Congress repealed in 1994. Complaint at 11, *Office of the Child Advocate v. Collins*, No. CA86-0723-P (D.R.I. Nov. 25, 1986.) The Sixth Cause of Action had only raised claims under §§ 627 and 671(a)(16). *Id.* This Court concluded that when it entered the consent decree in 2001, "it lacked subject matter jurisdiction with regard to Counts 4 and 6 of the Complaint because the Supreme Court had held that 42 U.S.C. § 671(a)(15) does not give rise to a private right of action under § 1983." 296 F. Supp. 2d at 185 n.4 (citing *Suter*, 503 U.S. at 363). This Court concluded, however, that it nevertheless had subject matter jurisdiction under § 1983 when it entered the consent decree because of the viable underlying constitutional claims in the case. *Id.*

AACWA and the other "State plan" titles of the Social Security Act, *see* 42 U.S.C. §§ 1320a-2, 1320a-10.[57] Congress left intact *Suter*'s narrow holding that § 671(a)(15) itself was not privately enforceable. 42 U.S.C. §§ 1320a-2, 1320a-10.[58]

The legislative history of the "*Suter* fix" makes clear that Congress intended the provisions of AACWA (other than § 671(a)(15)) and other "State plan" programs to be privately enforceable, and that the purpose of the "*Suter* fix" was to confirm that intent:

> [The "*Suter* fix"] amends . . . the Social Security Act to provide that *each individual shall have the right not to be denied any service or benefit under this Act* as a result of the failure of any State to which Federal funds are paid under a title of this Act that includes plan requirements to . . . administer such a plan in accordance with such requirements.
>
> This provision confirms the more than two decades of Federal jurisprudence which has recognized that, in establishing "State plan" programs under the Social Security Act, Congress meant to . . . permit those injured by State officials' failure to . . . [administer those programs in accordance with federal statutory standards] (*including any failure . . . to comply with any provisions of, or any provision required to be included in, such a plan*) to challenge, through appropriate judicial actions, that failure.

H.R. Rep. No. 102-631, at 366 (emphasis added).

---

[57] The text of the amendment reads:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability: *Provided, however*, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. §§ 1320a-2, 1320a-10.

[58] Congress acknowledged that § 671(a)(15) was "too vague to be enforceable" in a private action. H.R. Rep. No. 102-631, at 366.

Congress's expressed intent "to restore to an aggrieved party the *right* to enforce, as it existed prior to . . . *Suter* . . . the Federal mandates of the State plan titles of the Social Security Act in the Federal courts," *id.* at 365 (emphasis added), was a ratification of the federal courts' pre-*Suter* decisions, including those of numerous federal courts that had found that AACWA conferred privately enforceable rights on children in foster care. *See, e.g., L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir. 1988) (finding rights to case plan, case review and licensing standards)[59]; *Lynch v. Dukakis*, 719 F.2d 504, 509-12 (1st Cir. 1983) (case plan and case review system); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 962-63, 988-89 (D.D.C. 1991) (case plan, health and education records and licensing standards), *aff'd sub nom. LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993); *B.H. v. Johnson*, 715 F. Supp. 1387, 1402 (N.D. Ill. 1989) (case plan and case review system); *R.C. v. Hornsby*, No. 88-D-1170-N, slip op. at 13-20 (M.D. Ala. Apr. 19, 1989) (AACWA) (attached as Exhibit 8); *Del A. v. Edwards*, No. 86-0801, 1988 WL 19284, *2 (E.D. La. Mar. 2, 1988) (case plan and case review system), *aff'd*, 855 F.2d 1148 (5th Cir. 1988); *Joseph A. v. New Mexico Dep't of Human Servs.*, 575 F. Supp. 346, 353 (D.N.M. 1983) (same).

[59] Later, the Fourth Circuit reversed its position on whether a private right of action exists with respect to § 671(a)(10), the provision that requires standards for foster placements that reasonably accord with recommended standards of national organizations, which is analyzed below. *See White v. Chambliss*, 112 F.3d 731, 739 (4th Cir. 1997). That decision, however, rests on a misreading of § 671(a)(10) as imposing a "requirement that a *state's plan* be 'reasonably in accord with recommended standards of national organizations,'" a requirement that is nowhere found in the text of § 671(a)(10). *White*, 112 F.3d at 739 (emphasis added).

### B. The Legal Standard for Determining the Existence of Individual Statutory Rights

The Supreme Court set the operative standard for determining whether a statute creates rights that can be enforced through § 1983 in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), and *Blessing v. Freestone*, 520 U.S. 329 (1997). "The ultimate question, in respect to whether private individuals may bring a lawsuit to enforce a federal statute, through 42 U.S.C. § 1983 . . . is a question of congressional intent." *Gonzaga*, 536 U.S. at 291 (Breyer, J., joined by Souter, J., concurring in judgment); *accord Río Grande*, 397 F.3d at 73 ("the ultimate inquiry is one of congressional intent").

In *Blessing*, the Supreme Court applied a three-part analysis to determine whether Congress intended a particular statutory provision to create an individual right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

520 U.S. at 340–41 (citing *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 510–11 (1990); *Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 430–32 (1987)).

Five years later, in *Gonzaga*, the Court again addressed the private enforceability of a federal statute under § 1983 and the determination of whether, in enacting a particular statute, "Congress *intended to create a federal right*." *Gonzaga*, 536 U.S. at 283. As the First Circuit has explained,

> *Gonzaga* . . . did not precisely follow the *Blessing* test but rather relied on several somewhat different factors in determining whether a right existed: whether the provision contains "rights-creating language," whether the provision ha[s] an aggregate as opposed to an individualized focus, and the other sorts of enforcement provisions that Congress has provided for.

*Río Grande*, 397 F.3d at 73 (citing *Gonzaga*, 536 U.S. at 287–90). Defendants' statement that the *Gonzaga* Court "applied the *Blessing* test" (Defs.' Mem. at 90) is inconsistent with the First Circuit's explicit interpretation articulated in *Río Grande*.

Defendants conspicuously ignore not only *Río Grande*, the leading case in the First Circuit, but *all* of the relevant First Circuit jurisprudence regarding private rights of action. The First Circuit has concluded that *Gonzaga* now provides the primary frame of analysis but that *Blessing* remains relevant. *See, e.g.*, *Río Grande*, 397 F.3d at 73 n.10 ("We apply the more recent analysis used in *Gonzaga* rather than the *Blessing* test. But it is evident from our analysis that the three factors in the *Blessing* test are all met . . . ."); *Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 57–59 (1st Cir. 2004) (applying *Gonzaga* analysis). The *Gonzaga* Court indicated that a statute contains "rights-creating language" when it is "'phrased in terms of the persons benefited,' . . . 'with an *unmistakable focus* on the benefited class.'" *Gonzaga*, 536 U.S. at 284 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691, 692 n.13 (1979)). Rights-creating language requires "individually focused terminology." *Gonzaga*, 536 U.S. at 287. "Rights-creating language has also been found in provisions that identify 'the class for whose *especial* benefit the statute was enacted.'" *Rolland v. Romney*, 318 F.3d 42, 52 (1st Cir. 2003) (quoting *Cannon*, 441 U.S. at 688 n.9). In *Río Grande*, the First Circuit concluded that the language in a particular section of the Medicaid Act "is rights-creating language because it is mandatory and has a clear focus on the benefitted [sic] . . . [class] rather than the regulated states." 397 F.3d at 74 (citing *Gonzaga*, 536 U.S. at 279, 287).

*Gonzaga* distinguished between statutes that have an individualized focus and those that have an "aggregate focus," stating that the latter "speak only in terms of

institutional policy and practice" and "are not concerned with 'whether the needs of any particular person have been satisfied.'" *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343). The First Circuit in *Río Grande* found evidence of an individual rather than aggregate focus in a Medicaid provision's use of "highly specific terms" that are "extremely clear and narrow" and that tell the State exactly what to do. 397 F.3d at 75. Such language is both indicative of an individualized rather than aggregate focus and it puts to rest concerns "of a right being too vague to easily enforce," one of the factors in *Blessing*. *Id*. The First Circuit also stated: "The mere fact that all the Medicaid laws are embedded within the requirements for a state plan does not, by itself, make all of the Medicaid provisions into ones stating a mere institutional policy or practice rather than creating an individual right." *Id.* at 74.

Finally, with regard to statutory enforcement mechanisms, the *Gonzaga* Court drew a sharp distinction between an administrative enforcement scheme under which "an aggrieved *individual* lack[s] any federal review mechanism" — as was the case with the statutes examined in *Wilder*, 496 U.S. at 522-23, and *Wright*, 479 U.S. at 426, where private rights of action were found — and one that provides individuals with some means, other than private actions, for having their grievances heard and redressed. *Gonzaga*, 536 U.S. at 280-81, 289-90 (emphasis added). The statute examined in *Gonzaga* provided an administrative avenue for individuals to have their grievances addressed, which the Court viewed as evidence that Congress did not intend to create individually enforceable private rights. *Id.* at 289-90. In contrast to the statute in *Gonzaga*, AACWA provides no mechanism for individual children in foster care to raise their grievances, placing it squarely in the same category as the statutes examined in

*Wilder* and *Wright*.[60] *See Kenny A. v. Perdue*, 218 F.R.D. 277, 303 (N.D. Ga. 2003) ("There is no mechanism for foster children to seek redress for violations of their rights under the statute [AACWA].")

When Congress "confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284; *accord Blessing*, 520 U.S. at 341. Defendants have failed to rebut this presumption, either by showing that Congress expressly foreclosed § 1983 actions under AACWA, which it did not, or by showing that Congress did so implicitly by creating a comprehensive enforcement scheme that is incompatible with private enforcement via § 1983, an argument that has already been rejected by the First Circuit in *Lynch* as well as by other federal courts. *See Lynch*, 719 F.2d at 510-12 (concluding that private enforcement of AACWA through § 1983 action is entirely compatible with statute's provision empowering Secretary of Health and Human Services to withhold funds from States that fail to meet their obligations under AACWA).[61]

[60] This final step in the *Gonzaga* analysis is identical for all provisions of AACWA on which Plaintiff Children rely. Therefore, to avoid needless redundancy, this portion of the *Gonzaga* analysis is not repeated in the discussion below of each individual right.

[61] *See also Kenny A.*, 218 F.R.D. at 303 ("the remedies available under the Adoption Act do not preclude a private enforcement action under 42 U.S.C. § 1983"); *Mo. Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1042 (W.D. Mo. 2003) ("there is not a process under the [AA]CWA where an aggrieved individual has access to any federal review mechanism"); *Norman*, 739 F. Supp. at 1209 ("the AA[CW]A's lack of a comprehensive remedial scheme supports the inference that Congress intended these provisions of the AA[CW]A to be privately enforced"); *B.H.*, 715 F. Supp. at 1402-4 (holding that AACWA's enforcement provisions do not foreclose private enforcement via § 1983); *cf. LaShawn A.*, 762 F. Supp. at 989 ("It would strain logic to hold that plaintiffs, as the intended beneficiaries of the Adoption Assistance Act, nevertheless are precluded from enforcing their rights under the Act.").

Despite the First Circuit's embrace of *Gonzaga*, Defendants' argument for dismissal of Plaintiff Children's statutory claims relies almost entirely on the erroneous interpretation and application of *Blessing* in *Carson P.*, a single decision from a foreign jurisdiction. All of the provisions of AACWA on which Plaintiff Children rely, however, meet *Gonzaga*'s standards for private enforceability, as demonstrated below: They contain rights-creating language; they have an individualized focus; they are highly specific; and they are directly concerned with whether the needs of individual children in foster care are met, not merely statements of institutional policy or practice.

### C. The Specific AACWA Provisions on Which Plaintiff Children Rely All Create Enforceable Rights

#### 1. Plaintiff Children Have an Enforceable Right to Timely Written Case Plans Containing Mandated Elements, and to a Case Review System to Ensure the Implementation of Those Plans, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1) and 675(5)(A)

Congress clearly intended to confer upon children in foster care a right to timely written case plans that contain specific mandated elements and to a case review system to ensure the implementation of those plans. AACWA's case-plan and case-review provisions are replete with the required rights-creating language, couched in "individually focused terminology," *Gonzaga*, 536 U.S. at 287, that clearly "identify 'the class for whose *especial* benefit the statute was enacted,'" i.e., children in foster care, *Rolland v. Romney*, 318 F.3d 42, 52 (1st Cir. 2003) (quoting *Cannon*, 441 U.S. at 688 n.9).

Section 671(a)(16) requires the State to develop a case plan "*for each child* receiving foster care maintenance payments" and to have a case review system "with

respect to *each such child*." *Id*. (emphasis added).[62] Section 675(1) defines with precision what each child's case plan must include.[63] A case plan must contain, among

---

[62] 42 U.S.C. § 671(a)(16) provides, in relevant part (emphasis added):

> (a) In order for a State to be eligible for payments under this part, it *shall* have a plan . . . which . . . (16) provides for the development of a case plan (as defined in section 675(1) of this title) *for each child* receiving foster care maintenance payments under the State plan and provides for a case review system . . . *with respect to each such child*; . . .

[63] 42 U.S.C. § 675(1) provides, in relevant part (emphasis added):

> (1) The term "case plan" means a written document which includes at least the following:
>
> (A) A description of the type of home or institution in which *a child* is to be placed, including a discussion of the safety and appropriateness of the placement and how the agency which is responsible for *the child* plans to carry out the . . . judicial determination made *with respect to the child* in accordance with section 672(a)(1) of this title.
>
> (B) A plan for assuring that *the child* receives safe and proper care and that services are provided *to the* . . . *child* . . . in order to . . . facilitate return of *the child* to his own safe home or the permanent placement of *the child*, and address *the needs of the child* while in foster care, including a discussion of the appropriateness of the services that have been provided *to the child* under the plan.
>
> (C) The health and education records of *the child*, including the most recent information available regarding—
>
> (i) the names and addresses of *the child's* health and educational providers;
>
> (ii) *the child's* grade level performance;
>
> (iii) *the child's* school record;
>
> (iv) assurances that *the child's* placement in foster care takes into account proximity to the school in which *the child* is enrolled at the time of placement;
>
> (v) a record of *the child's* immunizations;
>
> (vi) *the child's* known medical problems;

*cont.*

other things, a "plan for assuring that *the child* receives safe and proper care," as well as services that "address *the needs of the child*." § 675(1)(B) (emphasis added). Section 622(b)(8)(A)(ii) requires a case review system "*for each child* receiving foster care under the supervision of the State." *Id.* (emphasis added).[64] Section 675(5)(A) requires a case review system "for assuring that . . . *each child* has a case plan designed to achieve placement in a safe setting that is . . . consistent with the best interest and special needs of *the child*." *Id.* (emphasis added).[65]

---

*cont.*

> (vii) *the child's* medications; and
>
> (viii) any other relevant health and education information *concerning the child* determined to be appropriate by the State agency.
>
> (D) Where appropriate, for *a child* age 16 or over, a written description of the programs and services which will *help such child* prepare for the transition from foster care to independent living.
>
> (E) In the case of *a child* with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement *for the child*, to place *the child* with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include *child specific* recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems . . . .

[64] 42 U.S.C. § 622(b)(8)(A)(ii) provides, in relevant part:

> (b) Each plan for child welfare services under this subpart *shall* . . . (8) provide assurances that the State . . . (A) is operating . . . (ii) a case review system (as defined in section 675(5) of this title) *for each child* receiving foster care under the supervision of the State; . . .

[65] 42 U.S.C. § 675(5)(A) provides, in relevant part (emphasis added):

> (5) The term "case review system" means a procedure for assuring that — (A) *each child* has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting

*cont.*

It is thus clear that children in foster care are the intended beneficiaries of AACWA's case-plan and case-review provisions. Moreover, far from being vague or amorphous, as Defendants argue, the requirements of the provisions at issue here are highly specific, as further demonstrated by the definitional sections, 675(1) ("case plan") and 675(5) ("case review system"), as well as the implementing regulations at 45 C.F.R. § 1356.21(g),[66] making their enforcement well within judicial competence.

---

*cont.*

> available and in close proximity to the parents' home, consistent with the best interest and special needs of *the child*, which—
>
> (i) if *the child* has been placed in a foster family home or child-care institution a substantial distance from the home of the parents of *the child*, or in a State different from the State in which such home is located, sets forth the reasons why such placement is in the *best interests of the child*, and
>
> (ii) if *the child* has been placed in foster care outside the State in which the home of the parents of *the child* is located, requires that, periodically, but not less frequently than every 6 months, a caseworker on the staff of the State agency of the State in which the home of the parents of *the child* is located, of the State in which *the child* has been placed, or of a private agency under contract with either such State, visit *such child* in such home or institution and submit a report on such visit to the State agency of the State in which the home of the parents of *the child* is located, . . .

[66] "[R]egulations, if valid and reasonable, authoritatively construe the statute itself." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). Regulations "may provide evidence of what private rights Congress intended to create." *Rolland*, 318 F.3d at 52 (internal quotation omitted). 45 C.F.R. § 1356.21(g) provides, in relevant part (emphasis added):

> (g) . . . The case plan for *each child* must:
>
> (1) Be a written document, which is a discrete part of the case record, in a format determined by the State, which is developed jointly with the parent(s) or guardian of *the child* in foster care; and
>
> (2) Be developed within a reasonable period, to be established by the State, but in no event later than 60 days from *the child's* removal from the home . . . ;
>
> (3) Include a discussion of how the case plan is designed to achieve a safe placement for *the child* in the least restrictive (most family-like) setting

*cont.*

Although the Eleventh Circuit found in *31 Foster Children*, that two subdivisions of section 675(5) do not confer enforceable rights, two dispositive factors in the Eleventh Circuit's opinion squarely distinguish it from this case. First, the court stated that, "[b]ecause §§ 675(5)(D) and (E) are definitional in nature, they *alone* cannot and do not supply a basis for conferring rights enforceable under § 1983." *31 Foster Children*, 329 F.3d at 1271 (emphasis added). Second, the court noted that the plaintiffs there had failed to sue under § 622(b)(10)(B)(ii), a rights-creating section of AACWA that incorporates § 675(5) by reference and explicitly makes the definitional language therein binding. *31 Foster Children*, 329 F.3d at 1272 n.8. Here, in contrast, Plaintiff Children rely on definitional provisions within AACWA only in conjunction with other provisions that are privately enforceable on their own, including § 622(b)(8)(A)(ii) (as § 622(b)(10)(B)(ii) was redesignated in 2006). These same two distinctions were present in *Kenny A. v. Perdue*, 218 F.R.D. 277 (N.D. Ga. 2003), a case from within the Eleventh Circuit where *31 Foster Children* is binding authority. On the basis of these two factors, the federal court there distinguished *31 Foster Children* and went on to find that AACWA's case-plan

---

*cont.*

> available and in close proximity to the home of the parent(s) when the case plan goal is reunification and a discussion of how the placement is consistent with the best interests and special needs of *the child* . . . ;
>
> (4) Include a description of the services offered and provided to prevent removal of *the child* from the home and to reunify the family; and
>
> (5) Document the steps to finalize a placement when the case plan goal is or becomes adoption or placement in another permanent home in accordance with sections 475(1)(E) and (5)(E) of the Act [42 U.S.C. §§ 675(1)(E) & 675(5)(E)]. When the case plan goal is adoption, at a minimum, such documentation shall include *child-specific* recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems.

and case-review provisions — among others — confer enforceable individual rights on children in foster care. *See Kenny A.*, 218 F.R.D. at 290-93, 303.

Defendants quote *Carson P.* for the proposition that "§§ 671(a)(16) and 622 fail the first prong of the *Blessing* test," (Defs.' Mem. at 101 (quoting *Carson P.*, 240 F.R.D. at 542-44), notwithstanding the plain language in both provisions that makes clear that they were intended to benefit "*each child* receiving foster care," §§ 622(b)(8)(A)(ii), 671(a)(16) (emphasis added). *Carson P.*'s analysis of these provisions, quoted at great length by Defendants, relies on a misreading and misapplication of *Blessing*.

The *Carson P.* court took from *Blessing* the rule that "Federal statutes requiring operation of a program in 'substantial compliance' with federal law are not intended to benefit individuals and cannot create federal rights." *Carson P.*, 240 F.R.D. at 544. The *Carson P.* court then applied this principle to 42 U.S.C. § 1320a-2a, which provides a "substantial conformity" standard for reviews, by the Secretary of Health and Human Services (HHS), of the States' administration of their child welfare programs. *Carson P.*, 240 F.R.D. at 543–44; *see also* § 1320a-2a.[67] This was clear error, because the plaintiffs in *Carson P.*, like Plaintiff Children here, had neither sued under § 1320a-2a nor asserted a blanket right to have the State substantially conform to provisions that specify the required contents of a State plan. The *Carson P.* court's misapplication of the rule it derived from *Blessing* indicates that the *Carson P.* court misread *Blessing* as saying that if a "substantial compliance" standard or its equivalent applies to federal review of a State's performance under a State plan, then statutory provisions that specify the required

[67] Incorrectly referred to as § 1320a-2 in *Carson P.* and, therefore, in Defendant's brief. Ironically, § 1320a-2 is, in fact, the "*Suter* fix."

contents of a State plan do not give rise to individual rights. That is both a serious misreading of *Blessing* and the precise opposite of the explicit language of the "*Suter* fix."[68]

The plaintiffs in *Blessing* asserted "individual rights to all mandated services delivered in substantial compliance" with the child-support enforcement provisions of Title IV-D of the Social Security Act, and sought an injunction requiring "substantial compliance" in all areas of a Title IV-D State plan. *Blessing*, 520 U.S. at 341. They did not assert any specific rights under any of the individual provisions of Title IV-D. *Id.* at 341-46. While the Court found that "the requirement that a State operate its child support program in 'substantial compliance' with Title IV-D was not intended to benefit individual children . . . and therefore it does not constitute a federal right," the Court explicitly "d[id] not foreclose the possibility that some provisions of Title IV-D give rise to individual rights" and remanded the case to the district court "to determine exactly what rights, considered in their most concrete, specific form, respondents are asserting." *Id.* at 343, 345-46.

Because Plaintiff Children do not assert any rights under § 1320a-2a and do not assert a blanket right to the administration of any programs in "substantial conformity" with any statutory provisions, regulations, or State plan requirements, the "substantial conformity" standard specified in § 1320a-2a is irrelevant to the issues before this Court.

Not only is the *Carson P.* opinion based on a misreading and misapplication of *Blessing*, its conclusion regarding private enforcement of AACWA's case-plan and case-review provisions is contrary to those of the many other federal courts, including the

[68] *See supra* note 57.

Court of Appeals for the First Circuit, that have adjudicated the issue and concluded that AACWA confers upon children in foster care privately enforceable rights to individual case plans and a case review system. *See Lynch v. Dukakis*, 719 F.2d 504, 509-12 (1st Cir. 1983) (case plan and case review system); *L.J.*, 838 F.2d at 123 (same); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, *10 (D. Nev. May 14, 2007) (same); *Kenny A.*, 218 F.R.D. at 291-92 (same); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 945-49 (M.D. Tenn. 2000) (same); *Occean v. Kearney*, 123 F. Supp. 2d 618, 625 (S.D. Fla. 2000) (case review system); *Norman v. McDonald*, 930 F. Supp. 1219, 1227 (N.D. Ill. 1996) (case plan and care review system); *Jeanine B. v. Thompson*, 877 F. Supp. 1268, 1284 (E.D. Wis. 1995) (case review system); *LaShawn A.*, 762 F. Supp. at 962-63, 989 (case plan); *B.H.*, 715 F. Supp. at 1402 (case plan and case review system); *Norman v. Johnson*, 739 F. Supp. 1182, 1204-9 (N.D. Ill. 1990) (case plan); *Del A.*, 1988 WL 19284, at *2 (case plan and case review system). This court should follow the persuasive authority of the many other federal courts in holding that the case-plan and case-review-system provisions of AACWA create privately enforceable rights for children in foster care.

**2. Plaintiff Children Have an Enforceable Right to Have a Timely Petition to Terminate Parental Rights Filed, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(ii) and 675(5)(E)**

Section 622(b)(8)(A)(ii) requires "a case review system (as defined in section 675(5) of this title) *for each child* receiving foster care under the supervision of the State." *Id.* (emphasis added).[69] Section 675(5)(E) further requires that such a "case review system" assure that "in the case of *a child* who has been in foster care under the

[69] *See supra* note 64.

responsibility of the State for 15 of the most recent 22 months . . . the State shall file a petition to terminate the parental rights of *the child's* parents . . . and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption," unless one of three specific exceptions applies. *Id.* (emphasis added).[70] The right created by these provisions is commonly known as the "15/22" right.

These provisions focus on the required steps the State must take to free for adoption individual children who have been in state custody for 15 out of 22 consecutive months. The statutory exceptions also all relate to the status of "*the child*" and required

---

[70] 42 U.S.C. § 675(5)(E) provides, in relevant part (emphasis added):

> (5) The term "case review system" means a procedure for assuring that . . . (E) in the case of *a child* who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined *a child* to be an abandoned infant . . . or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to *the child* or to another child of the parent, the State shall file a petition to terminate the parental rights of *the child's* parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless—
>
> (i) at the option of the State, *the child* is being cared for by a relative;
>
> (ii) a State agency has documented in the case plan . . . a compelling reason for determining that filing such a petition would not be in *the best interests of the child*; or
>
> (iii) the State has not provided to the family of *the child*, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of *the child* to the child's home, if reasonable efforts of the type described in section 671(a)(15)(B)(ii) of this title are required to be made with respect to *the child*; . . .

State actions "with respect to *the child*." § 675(5)(E) (emphasis added).[71] Clearly, this "is rights-creating language because it is mandatory and has a clear focus on the benefitted [sic] [children]." *Río Grande*, 397 F.3d at 74 (citing *Gonzaga*, 536 U.S. at 279, 287). The provisions also have a clearly individualized focus.

Additional evidence that Congress intended to provide for private enforcement of the 15/22 right lies in the "Transition Rules" contained in the Adoption and Safe Families Act of 1997, the legislation that created the 15/22 right. *See* Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, § 103(c), 111 Stat. 2115, 2119 (1997) (codified at 42 U.S.C. § 675 note). The Transition Rules reiterate that the States have an affirmative duty to implement the 15/22 provisions because they explicitly vest the 15/22 right in *all children in foster care*. They provide a timetable for implementing the 15/22 mandate with respect to *all* children in foster care, be they "new foster children"[72] or "current

[71] Like the plaintiffs in *Jeanine B. v. McCallum*, No. 93-C-0547, 2001 WL 748062 (E.D. Wis. June 19, 2001), Plaintiff Children here do not ask this Court to "go behind" State Defendants' determinations in any individual child's case that one of the exceptions defined in §§ 675(5)(E)(i)–(iii) applies in that case. *See Jeanine B.*, 2001 WL 748062 at *4. Plaintiff Children only seek to enforce their right to have a petition to terminate parental rights *timely filed* or to have one of the available statutory exceptions *documented*.

[72] Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, § 103(c)(1), 111 Stat. 2115, 2119 (1997) (codified at 42 U.S.C. § 675 note), provides, in relevant part (emphasis added):

> **(1) New foster children.**—In the case of *a child* who enters foster care . . . under the responsibility of a State after the date of the enactment of this Act [Nov. 19, 1997]—
>
> **(A)** if the State comes into compliance with the amendments made by subsection (a) of this section [amending § 675(5)(C)–(E)] before *the child* has been in such foster care for 15 of the most recent 22 months, the State *shall comply* with . . . [§ 675(5)(E)] with respect to *the child* when *the child* has been in such foster care for 15 of the most recent 22 months; and
>
> **(B)** if the State comes into such compliance after *the child* has been in such foster care for 15 of the most recent 22 months, the State *shall comply* with

*cont.*

foster children."[73] They also explicitly provide that, although the 15/22 right was added to a definitional section of AACWA, § 675(5), it was meant to be enforceable as a State plan requirement under § 671(a).[74]

Because the Transition Rules require 100-percent compliance, they are distinct from the statute that the Supreme Court held did not give rise to private rights in *Blessing* because it required only "substantial compliance," defined as 75-percent compliance. *See Blessing*, 520 U.S. at 343-44. That statute did not give rise to private rights because, even when a State achieves substantial compliance, "any individual plaintiff might still be among the . . . 25 percent of persons whose needs ultimately go unmet." *Id.* at 344. Here, in contrast, Congress made clear that it intended no children to have their "needs ultimately go unmet," giving each child a personal stake in State compliance with the 15/22 provisions and giving rise to a private right for each child to hold the State to the requirements that Congress imposed.

---

*cont.*

> . . . [§ 675(5)(E)] with respect to *the child* not later than 3 months after the end of the first regular session of the State legislature that begins after such date of enactment.

[73] § 103(c)(2)(C), 111 Stat. at 2119, provides, in relevant part (emphasis added):

> **(2) Current foster children.—**In the case of children in foster care under the responsibility of the State on the date of the enactment of this Act [Nov. 19, 1997], the State *shall* . . . (C) not later than 18 months after the end of . . . [the] first regular session [of the State legislature that begins after the date of enactment], *comply* with . . . [§ 675(5)(E)] with respect to *all of such children*.

[74] § 103(c)(4), 111 Stat. at 2119, provides, in relevant part (emphasis added):

> **(4) Requirements treated as state plan requirements.—**. . . [T]he requirements of this subsection *shall* be treated as State plan requirements imposed by section 471(a) [42 U.S.C. § 671(a)] . . . .

Defendants do not contest that the terms of these provisions unambiguously impose a binding obligation on the State. *See, e.g.*, § 675(5)(E) ("the State *shall* file a petition" (emphasis added)). Furthermore, the degree of detail and precision in the statute, as well as in the corresponding federal regulations, puts to rest Defendants' concern about vagueness or ambiguity. Section 675(5)(E) and the regulations at 45 C.F.R. § 1356.21(i)[75] specify exactly how to determine when a petition to terminate

---

[75] 45 C.F.R. § 1356.21(i) provides, in relevant part (emphasis added):

> Application of the requirements for filing a petition to terminate parental rights at section 475(5)(E) of the Social Security Act [42 U.S.C. § 675(5)(E)].
>
> (1) Subject to the exceptions in paragraph (i)(2) of this section, the State *must* file a petition (or, if such a petition has been filed by another party, seek to be joined as a party to the petition) to terminate the parental rights of a parent(s):
>
> (i) Whose *child* has been in foster care under the responsibility of the State for 15 of the most recent 22 months. The petition *must* be filed by the end of *the child's* fifteenth month in foster care. . . .
>
> (ii) Whose *child* has been determined by a court of competent jurisdiction to be an abandoned infant . . . . The petition to terminate parental rights *must* be filed within 60 days of the judicial determination that *the child* is an abandoned infant; or,
>
> (iii) Who has been convicted of one of the felonies listed at paragraph (b)(3)(ii) of this section. Under such circumstances, the petition to terminate parental rights *must* be filed within 60 days of a judicial determination that reasonable efforts to reunify *the child* and parent are not required.
>
> (2) The State may elect not to file or join a petition to terminate the parental rights of a parent per paragraph (i)(1) of this section if:
>
> (i) At the option of the State, *the child* is being cared for by a relative;
>
> (ii) The State agency has documented in the case plan . . . a compelling reason for determining that filing such a petition would not be in the *best interests of the individual child*. Compelling reasons for not filing a petition to terminate parental rights include, but are not limited to:
>
> (A) Adoption is not the appropriate permanency goal for *the child*; or,

*cont.*

parental rights must be filed on behalf of a child, making judicial enforcement not only possible but straightforward. Other federal courts have held that the right to have a petition to terminate parental rights filed or to have an available statutory exception documented within the statutorily-defined time frames is privately enforceable by children in foster care. *See, e.g.*, *Kenny A.*, 218 F.R.D. at 292; *Jeanine B. v. McCallum*, No. 93-C-0547, 2001 WL 748062, *3-5 (E.D. Wis. June 19, 2001).

**3. Plaintiff Children Have an Enforceable Right to Have Their Health and Educational Records Reviewed, Updated and Supplied to the Foster Care Providers with Whom They Are Placed at the Time of Placement, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(ii), 671(a)(16), 675(1)(C) and 675(5)(D)**

The record-keeping requirements of §§ 675(1)(C) and 675(5)(D) are suffused with "individually focused terminology" and have "'an *unmistakable focus* on the benefited class'" of children in foster care. *Gonzaga*, 536 U.S. at 287 (quoting *Cannon*, 441 U.S. at 691). Section 675(1)(C) provides that each child's case plan must include numerous specific records, each defined by reference to the individual child: "the names

---

*cont.*

(B) No grounds to file a petition to terminate parental rights exist; or,

(C) *The child* is an unaccompanied refugee minor . . . ; or

(D) There are international legal obligations or compelling foreign policy reasons that would preclude terminating parental rights; or

(iii) The State agency has not provided to the family, consistent with the time period in the case plan, services that the State deems necessary for the safe return of *the child* to the home, when reasonable efforts to reunify the family are required.

(3) When the State files or joins a petition to terminate parental rights in accordance with paragraph (i)(1) of this section, it *must* concurrently begin to identify, recruit, process, and approve a qualified adoptive family for *the child*.

and addresses of *the child's* health and educational providers; . . . *the child's* grade level performance; . . . *the child's* known medical problems; . . . [and] any other relevant health and educational information concerning *the child*." § 675(1)(C)(i), (ii), (vi), (viii) (emphasis added).[76] Section 675(5)(D) likewise requires that each child have a case review system that assures that "*a child's* health and education record . . . is reviewed and updated," and that a copy be provided to the child's foster care provider "at the time of each placement of *the child* in foster care" and "to *the child*" if the child is still in foster care when he or she reaches adulthood. *Id*. (emphasis added).[77]

These record-keeping provisions, like the case-plan and case-review provisions of which they are a part, are devoid of any vagueness or ambiguity, specifying precisely which records must be included in each child's case plan and when they must be provided to the child's foster caregiver. In conjunction with the rights-creating, mandatory language of §§ 622(b)(8)(A)(ii) and 671(a)(16),[78] these provisions are privately enforceable under *Gonzaga*. *See, e.g.*, *Clark K.*, 2007 WL 1435428, at *12 (case plans and case review system, including health and education records); *Kenny A.*, 218 F.R.D. at 292 (same); *Brian A.*, 149 F. Supp. 2d at 945–49 (case plans and case review system);

---

[76] *See supra* note 63.

[77] 42 U.S.C. § 675(5)(D) provides, in relevant part (emphasis added):

> (5) The term "case review system" means a procedure for assuring that . . . (D) *a child's* health and education record (as described in . . . [§ 675](1)(A)) is reviewed and updated, and a copy of the record is supplied to the foster parent or foster care provider with whom *the child* is placed, at the time of each placement of *the child* in foster care, and is supplied to *the child* at no cost at the time *the child* leaves foster care if *the child* is leaving foster care by reason of having attained the age of majority under State law; . . .

[78] *See supra* notes 64 & 62.

*Occean*, 123 F. Supp. 2d at 625 (same); *Norman*, 930 F. Supp. at 1227 (same); *Jeanine B.*, 877 F. Supp. at 1284 (same); *LaShawn A.*, 762 F. Supp. at 962–63, 989 (health and educational records in case plan).

#### 4. Plaintiff Children Have an Enforceable Right to Services to Protect Their Safety and Health, Pursuant to 42 U.S.C. §§ 622(b)(15), 671(a)(22) and 675(1)(B)

Section 622(b)(15) requires States to "actively consult[] with and involve[] physicians or other appropriate medical professionals in . . . assessing the health and well-being of *children in foster care* . . . and . . . [in] determining appropriate medical treatment *for the children*." *Id.* (emphasis added).[79] Section 671(a)(22) mandates that "the State *shall* develop and implement standards to ensure that *children in foster care placements* . . . are provided quality services that protect *the safety and health of the children*." *Id.* (emphasis added).[80] Likewise, the State is required to develop, for each child in foster care, a case plan "for assuring that *the child receives* safe and proper care and that *services are provided to the . . . child* . . . in order to . . . address *the needs of the*

[79] 42 U.S.C. §§ 622(b)(15) provides, in relevant part (emphasis added):

> (b) . . . Each plan for child welfare services under this subpart shall . . . (15) describe how the State actively consults with and involves physicians or other appropriate medical professionals in . . . (A) assessing the health and well-being of *children in foster care* under the responsibility of the State; and (B) determining appropriate medical treatment *for the children*; . . .

[80] 42 U.S.C. § 671(a)(22) provides, in relevant part (emphasis added):

> (a) . . . In order for a State to be eligible for payments under this part, it *shall* have a plan . . . which . . . (22) provides that . . . the State *shall* develop and implement standards to ensure that *children in foster care placements* in public or private agencies are provided quality services that protect *the safety and health of the children*; . . .

*child* while in foster care." § 675(1)(B) (emphasis added).[81] Like the case-plan provisions of which they are a part, these statutory sections leave no doubt as to "'the class for whose *especial* benefit the statute was enacted,'" *Rolland v. Romney*, 318 F.3d 42, 52 (1st Cir. 2003) (quoting *Cannon*, 441 U.S. at 688 n.9), and have an individualized focus.[82] They require individualized care and services to "address *the needs of the child* while in foster care." § 675(1)(B) (emphasis added). The related regulations also make clear the mandatory focus on the proper care of children in foster care. *See* 45 C.F.R. § 1357.10(c)(5).[83]

Because these health and safety provisions contain rights-creating language and do not "speak only in terms of institutional policy and practice," they create individual rights for children in foster care and are enforceable. *Gonzaga*, 536 U.S. at 288. Defendants do not dispute that these provisions impose binding obligations. Contrary to

---

[81] 42 U.S.C. § 675(1)(B) provides, in relevant part (emphasis added):

> (1) The term "case plan" means a written document which includes at least . . . (B) A plan for assuring that *the child* receives safe and proper care and that services are provided to *the* . . . *child* . . . in order to . . . facilitate return of *the child* to his own safe home or the permanent placement of *the child*, and address *the needs of the child* while in foster care, including a discussion of the appropriateness of the services that have been provided to *the child* under the plan.

[82] Without specifically addressing services to protect children's safety and health, a subset of the case-plan requirements, other courts have held that the case-plan provisions of AACWA as a whole are privately enforceable. *See Lynch v. Dukakis*, 719 F.2d 504, 507, 509–12 (1st Cir. 1983) (§ 675(1)); *Clark K.*, 2007 WL 1435428, at *10 (§ 675(1)); *LaShawn A.*, 762 F. Supp. at 962–63, 988–89 (§ 675(1)).

[83] 45 C.F.R. § 1357.10(c)(5) provides, in relevant part (emphasis added):

> (c) . . . Child welfare services means public social services directed to accomplish . . . (5) Assuring adequate care of *children* away from their homes, in cases where *the child* cannot be returned home or cannot be placed for adoption; . . .

Defendants' assertion (*see* Defs. Mem. at 100, 104–5), however, these provisions are not too vague and amorphous to be enforced. *See Kenny A.*, 218 F.R.D. at 291-92 (concluding that Congress intended to confer on children in foster care right to quality foster care services that protect their health and safety and finding that this right is privately enforceable).

**5. Plaintiff Children Have an Enforceable Right to Planning and Services to Facilitate Their Safe Return Home or Permanent Placement, Pursuant to 42 U.S.C. §§ 622(b)(8)(A)(iii), 629a(a)(1)(A), 629a(a)(7), 629a(a)(8), 675(1)(B) and 675(1)(E)**

Section 622(b)(8)(A)(iii) requires the State to operate:

> a service program designed *to help children* . . . where safe and appropriate, return to families from which they have been removed; or . . . be placed for adoption, with a legal guardian, or, if adoption or legal guardianship is determined not to be appropriate *for a child*, in some other planned, permanent living arrangement.

*Id.* (emphasis added); *see also* § 629a(a)(1)(A) ("services *for children* . . . designed *to help children* . . . where safe and appropriate, return to families from which they have been removed; or . . . be placed for adoption, with a legal guardian, or, if adoption or legal guardianship is determined not to be safe and appropriate *for a child*, in some other planned, permanent living arrangement") (emphasis added). Thus, in "individually focused terminology," *Gonzaga*, 536 U.S. at 287, the statute clearly identifies "children" who "have been removed" from their families as the intended beneficiaries of mandatory reunification and permanency services. § 622(b)(8)(A)(iii); *see also* § 629a(a)(7)(A) ("services . . . are provided to *a child* that [sic] is removed from *the child's* home") (emphasis added);[84] § 629a(a)(8) ("services . . . [to facilitate adoption] when adoptions

[84] 42 U.S.C. § 629a(a)(7)(A) provides, in relevant part (emphasis added):

*cont.*

promote the best interests of *children*") (emphasis added);[85] 45 C.F.R. § 1357.10(c)(4) ("Child welfare services means public social services directed to accomplish . . . [r]estoring to their families *children* who have been removed and may be safely returned, by the provision of services to *the child* and the family").

The AACWA case plan provisions likewise require "that services are provided to *the* . . . *child* . . . in order to . . . facilitate return of *the child* to his own safe home or the permanent placement of *the child*." § 675(1)(B) (emphasis added);[86] *see also* § 675(1)(E) ("[case plan for] *a child* with respect to whom the permanency plan is adoption or placement in another permanent home" must include documentation of "*child specific* recruitment efforts" to facilitate placement) (emphasis added).[87] These provisions confer "*individual* entitlement[s]." *Gonzaga*, 536 U.S. at 287.

---

*cont.*

> (7)(A) . . . The term "time-limited family reunification services" means the services and activities . . . that are provided to *a child* that is removed from *the child's* home and placed in a foster family home or a child care institution . . . in order to facilitate the reunification of *the child* safely and appropriately within a timely fashion, but only during the 15-month period that begins on the date that *the child* . . . is considered to have entered foster care.

[85] 42 U.S.C. § 629a(a)(8) provides, in relevant part (emphasis added):

> The term 'adoption promotion and support services' means services and activities designed to encourage more adoptions out of the foster care system, when adoptions promote the best interests of *children*, including such activities as pre- and post-adoptive services and activities designed to expedite the adoption process and support adoptive families.

[86] *See supra* note 63.

[87] 42 U.S.C. § 675(1)(E) provides, in relevant part (emphasis added):

> (1) The term "case plan" means a written document which includes . . . (E) In the case of *a child* with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement *for*

*cont.*

Defendants argue that there is no private right of action under §§ 629a(a)(7) or 629a(a)(8) because these sections "are definitional provisions and, as such, '*alone* cannot and do not supply a basis for conferring rights enforceable under § 1983.'" (Defs.' Mem. at 106 (quoting *31 Foster Children*, 329 F.3d at 1271) (emphasis added).) To the contrary, however, such definitional sections in AACWA work together with sections like 622(b)(8)(A)(iii) to provide the requisite specificity to the conferred rights that allows for judicial enforcement. Thus, for example, far from being vague and amorphous, § 629a(a)(7) enumerates precisely which "services and activities . . . are [to be] provided *to a child* . . . in order to facilitate the reunification of *the child* safely and appropriately within a timely fashion." (emphasis added). Similarly, § 675(1)(E) spells out exactly what child-specific documentation must be included in the case plan of a child whose permanency goal is other than reunification. These provisions grant children in foster care enforceable federal rights to services in order to facilitate their return to their family homes, their placement for adoption, or their placement in some other planned, permanent living arrangement. *See Kenny A.*, 218 F.R.D. at 291–92.

---

*cont.*

> *the child*, to place *the child* with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include *child specific* recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems to facilitate orderly and timely in-State and interstate placements.

### 6. Plaintiff Children Have an Enforceable Right to Foster Care Maintenance Payments Made on Their Behalf That Cover the Cost of Food, Clothing, Shelter, Daily Supervision, School Supplies, Reasonable Travel to Family Visitation and Other Expenses, Pursuant to 42 U.S.C. §§ 671(a)(1), 671(a)(11), 672 and 675(4)(A)

Section 672(a)(1) provides that "[e]ach State . . . shall make foster care maintenance payments *on behalf of each child* who has been removed from the home of a relative . . . into foster care." *Id.* (emphasis added);[88] *see also* § 671(a)(1) (requiring State plan to provide for foster care maintenance payments);[89] § 671(a)(11) (requiring State plan to provide for periodic review of foster care maintenance payment amounts);[90] 45

---

[88] 42 U.S.C. § 672 provides, in relevant part (emphasis added):

> (a) . . . (1) . . . Each State with a plan approved under this part *shall* make foster care maintenance payments *on behalf of each child* who has been removed from the home of a relative . . . into foster care . . .
>
> (b) . . . Foster care maintenance payments may be made under this part only *on behalf of a child* described in subsection (a) of this section who is . . . in the foster family home of an individual, whether the payments therefor are made to such individual or to a public or private child-placement or child-care agency, or . . . in a child-care institution, whether the payments therefor are made to such institution or to a public or private child-placement or child-care agency, which payments shall be limited so as to include in such payments only those items which are included in the term "foster care maintenance payments" (as defined in section 675(4) of this title). . . .

[89] 42 U.S.C. § 671(a)(1) provides, in relevant part (emphasis added):

> (a) . . . In order for a State to be eligible for payments under this part, it *shall* have a plan . . . which— (1) provides for foster care maintenance payments in accordance with section 672 . . . .

[90] 42 U.S.C. § 671(a)(11) provides, in relevant part (emphasis added):

> (a) . . . In order for a State to be eligible for payments under this part, it *shall* have a plan . . . which . . . (11) provides for periodic review of the . . . amounts paid as foster care maintenance payments . . . to assure their continuing appropriateness; . . .

C.F.R. § 1356.21(m)(1) (same).[91] AACWA and its implementing regulations also specify exactly what the foster care maintenance payments on behalf of each child must cover: "the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, *a child's* personal incidentals, liability insurance *with respect to a child*, and reasonable travel to *the child's* home for visitation." § 675(4)(A);[92] *see also* 45 C.F.R. § 1355.20(a).[93] This language is rights-creating, as it has an "*unmistakable* focus" on the

---

[91] 45 C.F.R. § 1356.21(m)(1) provides, in relevant part (emphasis added):

> (m) . . . In meeting the requirements of section 471(a)(11) of the Act [42 U.S.C. § 671(a)(11)], the State *must* review at reasonable, specific, time-limited periods to be established by the State: (1) The amount of the payments made for foster care maintenance and adoption assistance to assure their continued appropriateness; . . .

[92] 42 U.S.C. § 675(4)(A) provides, in relevant part (emphasis added):

> (4)(A) The term "foster care maintenance payments" means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, *a child's* personal incidentals, liability insurance *with respect to a child*, and reasonable travel to *the child's* home for visitation. In the case of institutional care, such term *shall* include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

[93] 45 C.F.R. § 1355.20(a) provides, in relevant part (emphasis added):

> (a) . . . Foster care maintenance payments are payments made *on behalf of a child* eligible for title IV-E foster care to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, *a child's* personal incidentals, liability insurance *with respect to a child*, and reasonable travel for *a child's* visitation with family, or other caretakers. Local travel associated with providing the items listed above is also an allowable expense. In the case of child care institutions, such term *must* include the reasonable costs of administration and operation of such institutions as are necessarily required to provide the items described in the preceding sentences. "Daily supervision" for which foster care maintenance payments may be made includes:
>
> (1) Foster family care—licensed child care, when work responsibilities preclude foster parents from being at home when *the child* for whom they

*cont.*

child as an individual whose care has an ascertainable economic cost, and it confers an "*individual* entitlement" to financial support to cover those costs on behalf of each child. *Gonzaga*, 536 U.S. at 284 (quoting *Cannon*, 441 U.S. at 691); *Gonzaga*, 536 U.S. at 287 (quoting *Blessing*, 520 U.S. at 343).

The fact that these maintenance payments "on behalf of each child" are to be made to the child's caregiver in no way detracts from the child's status as the beneficiary. AACWA clearly specifies that the payments are to be spent on *the child's* food, clothing, shelter and other essentials. The payments are made "on behalf of each child" because the subject children lack the legal capacity to receive the payments themselves. The *only* purpose of AACWA's maintenance-payment provisions is to provide for and benefit children in foster care.

Nor are AACWA's maintenance-payment provisions too vague or amorphous to be enforced by a federal judge, as argued by Defendants. In *Wilder*, the Supreme Court rejected that argument regarding a similar provision of the Medicaid Act that required States to adopt reasonable and adequate reimbursement rates for health care providers. *See* 496 U.S. at 519–20. Like the AACWA provision in question here, the Medicaid Act

---

*cont.*

> have care and responsibility in foster care is not in school, licensed child care when the foster parent is required to participate, without *the child*, in activities associated with parenting *a child* in foster care that are beyond the scope of ordinary parental duties, such as attendance at administrative or judicial reviews, case conferences, or foster parent training. Payments to cover these costs may be: included in the basic foster care maintenance payment; a separate payment to the foster parent, or a separate payment to the child care provider; and
>
> (2) Child care institutions—routine day-to-day direction and arrangements to ensure the well-being and safety of *the child*.

provision identified factors that the States must consider in setting its reimbursement rates. *Id*. at 519. The Supreme Court's reasoning in *Wilder* is directly applicable here:

> While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

*Id*. at 519–20 (footnote omitted). Moreover, the maintenance-payment provisions of AACWA provide considerably more guidance than the Medicaid Act provision at issue in *Wilder*. They are thus "defined with sufficient particularity to enable a court to assess the sufficiency of the rates paid by the state." *Kenny A.*, 218 F.R.D. at 303 (finding that children in foster care have privately enforceable federal right under AACWA to maintenance payments made on their behalf); *cf. ASW v. Oregon*, 424 F.3d 970, 978 (9th Cir. 2005) (concluding that AACWA's provisions requiring adoption assistance payments create federal rights enforceable through § 1983); *Cal. Alliance of Child & Family Servs. v. Allenby*, 459 F. Supp. 2d 919, 925 (N.D. Cal. 2006) (concluding that AACWA's maintenance payment provisions confer enforceable individual right on foster-care providers); *Mo. Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1040–42 (W.D. Mo. 2003) (concluding that AACWA's maintenance payment provisions are privately enforceable by institutional foster-care providers, though "the ultimate beneficiaries of the [AA]CWA are the foster children").

### 7. Plaintiff Children Have an Enforceable Right to Placements That Conform to Reasonable Professional Standards, Pursuant to 42 U.S.C. §§ 671(a)(10) and 671(a)(11)

Defendants do not contest that the AACWA provisions requiring the application of reasonable professional licensing standards to family foster homes and institutions are intended to benefit children like Plaintiff Children and are mandatory. Section 671(a)(10) requires that "any foster family home or child care institution receiving funds" under AACWA for the care of children in foster care be subject to State licensing standards "which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes."[94] Those licensing standards must be subject to "periodic review . . . to assure their continuing appropriateness." § 671(a)(11);[95] *see also* 45 C.F.R. § 1356.21(m)(2).[96]

---

[94] 42 U.S.C. § 671(a)(10) provides, in relevant part (emphasis added):

> (a) . . . In order for a State to be eligible for payments under this part, it *shall* have a plan . . . which . . . (10) provides for the establishment or designation of a State authority or authorities which *shall* be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established *shall* be applied by the State to any foster family home or child care institution receiving funds under this part [§§ 670 *et seq.*] or part B [§§ 621 *et seq*.] . . . ;

[95] 42 U.S.C. § 671(a) provides, in relevant part (emphasis added):

> (a) . . . In order for a State to be eligible for payments under this part, it *shall* have a plan . . . which . . . (11) provides for periodic review of the standards referred to in the preceding paragraph and amounts paid as foster care maintenance payments and adoption assistance to assure their continuing appropriateness; . . .

[96] 45 C.F.R. § 1356.21(m)(2) provides, in relevant part (emphasis added):

*cont.*

Contrary to Defendants' argument, the rights conferred by §§ 671(a)(10) and 671(a)(11) are neither vague nor amorphous and their enforcement is comfortably within this Court's competence, as numerous federal courts have concluded. *See, e.g., Kenny A.*, 218 F.R.D. at 290–92 (§ 671(a)(10)); *Brian A.*, 149 F. Supp. 2d at 945–49 (same); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 683 (S.D.N.Y. 1996) (same), *aff'd*, 126 F.3d 372 (2d Cir. 1997); *Jeanine B.*, 877 F. Supp. at 1284 (§§ 671(a)(10)–(11)); *LaShawn A.*, 762 F. Supp. at 962, 988–89 (§ 671(a)(10)). The "recommended standards of national organizations concerned with standards for such institutions or homes" to which these provisions refer are readily ascertainable objective standards that are routinely promulgated by national organizations such as the Child Welfare League of America. Plaintiff Children will present expert testimony that the "national standards" referred to in the statute have a well-recognized meaning and that the standards set or applied by Defendants are not "reasonably in accord" with those national standards. Nor does the requirement of a judicial inquiry into reasonableness present an obstacle to judicial enforcement. *See, e.g., Wilder*, 496 U.S. at 519–20 ("Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary."); *Bryson v. Shumway*, 308 F.3d 79, 89 (1st Cir. 2002) ("A statute is not impermissibly vague simply because it requires judicial inquiry into 'reasonableness.' . . .

---

*cont.*

> (m) . . . In meeting the requirements of section 471(a)(11) of the Act [42 U.S.C. § 671(a)(11)], the State *must* review at reasonable, specific, time-limited periods to be established by the State: . . . (2) The licensing or approval standards for child care institutions and foster family homes.

Common law courts have reviewed actions for reasonableness since time immemorial.") (internal quotation omitted).

### D. Plaintiff Children's Federal Statutory Claims Should Not Be Dismissed

Defendants' arguments for dismissing Plaintiff Children's federal statutory claims are based on a uniform misreading of AACWA through the narrow and distorting lens of a single district court opinion from a foreign jurisdiction. It ignores the jurisprudence of the First Circuit and is consistent only in its lack of persuasiveness. Because, as demonstrated above, all of the provisions of AACWA on which Plaintiff Children rely are privately enforceable, this Court should deny Defendants' motion to dismiss Plaintiff Children's statutory claims in its entirety.

## CONCLUSION

Defendants do not dispute that Rhode Island's child welfare system, which they are responsible for administering, harms the abused and neglected children it is mandated to protect. Instead, Defendants claim that they are legally unaccountable to Plaintiff Children who suffer as a direct result of Defendants' actions and inactions.

Defendants' attempt to avoid responsibility for failing to meet their legal obligations to Plaintiff Children and Defendants' request that this Court decline to exercise its jurisdiction to hear Plaintiff Children's claims are based upon misstatements of the proper legal standards and ignore relevant Supreme Court, First Circuit and other federal district court authority. Plaintiff Children are properly before this Court to vindicate their well-established federal statutory, common law and constitutional rights. For all of the foregoing reasons, Plaintiff Children respectfully request that this Court deny Defendants' Motion to Dismiss in its entirety.

Dated: November 2, 2007

Respectfully submitted,

/s/ Susan Lambiase
MARCIA ROBINSON LOWRY (Bar No. 1187053 (N.Y.); admitted *pro hac vice*)
SUSAN LAMBIASE (Bar No. 2099489 (N.Y.); admitted *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, NY 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
Email: mlowry@childrensrights.org

/s/ Jametta O. Alston
JAMETTA O. ALSTON (Bar No. 3909)
CHILD ADVOCATE OF
THE STATE OF RHODE ISLAND
John O. Pastore Center
57 Howard Avenue, Fourth Floor
Cranston, RI 02920
Phone: (401) 222-1690
Facsimile: (401) 222-6652
Email: jalston@doa.state.ri.us

JOHN W. DINEEN (Bar No. 2346)
305 South Main Street
Providence, RI 02903
Phone: (401) 223-2397
Facsimile: (401) 223-2399
Email: jwdineen1@yahoo.com

VERNON M. WINTERS (Bar No. 130128 (Cal.); admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA
Phone: (650) 802-3005
Facsimile: (650) 802-3100
Email: vernon.winters@weil.com

***Plaintiffs request oral argument in the amount of 20 minutes***

**CERTIFICATION**

I hereby certify that on November 2, 2007, I electronically mailed the foregoing document to the attorneys of record listed below:

Brenda D. Baum, Esq.
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel: (401) 274-4400 x 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

James R. Lee, Esq.
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel: (401) 274-4400 x 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

Kevin Aucoin, Esq.
Executive Counsel
R.I. Department of Children, Youth & Families
101 Friendship Street
Providence, RI 02903-3716
Tel: (401) 528-3579
Fax: (401) 525-3566
kevin.aucoin@dcyf.ri.gov

Jane Morgan, Esq.
Assistant Director of Legal Services
R.I. Department of Elderly Affairs
Benjamin Rush Building
35 Howard Avenue
Cranston, RI 02920
Tel: (401) 462-0524
Fax: (401 462-0503
jmorgan@dea.state.ri.us

/s/ Susan Lambiase
SUSAN LAMBIASE (Bar No. 2099489 (NY); admitted *pro hac vice*)
330 7th Avenue, 4th Floor
New York, NY 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
Email: slambiase@childrensrights.org