# Exhibit 2

## Appendix

# APPENDIX

## SAM AND TONY M.

In May 1999, Sam and Tony M. were committed to DCYF's "care, custody and control." (Defs.' Exs. D-3, D-36.) DCYF made the decision to maintain the boys in the home of a family friend. (Am. Compl. at ¶ 21.) While living in this home, one of the boys was found to have suffered cigarette burns. (*Id*.) DCYF later decided to return Sam and Tony to the home of their parents, where they remained for the next year under DCYF's supervision. (Am. Compl. at ¶ 23.) During this period of DCYF supervision, DCYF received reports that Sam and Tony were being subjected to further physical abuse and neglect. (Am. Compl. at ¶ 23.) DCYF made appearances before the Family Court throughout 2001 until November when the boys' case was closed (Defs.' Ex. D-44), yet the preprinted forms submitted by Defendants as documentation of those judicial reviews do not show that DCYF made the Court aware of the children's circumstances; the review forms from 2001 are entirely devoid of information regarding the well-being of Sam and Tony (Defs.' Exs. D-7 to D-9, D-40 to D-43). DCYF took no action to protect these boys until July 2002, when Tony was sexually and physically abused by his stepfather. (Defs.' Exs. D-10, D-45; Am. Compl. at ¶ 24.) DCYF apparently did not request physical custody of the children (Defs.' Exs. D-10, D-45), and Sam and Tony were placed in temporary DCYF custody, remaining in their mother's care (Defs.' Exs. D-11, D-46, D-47). The boys' DCYF case was closed in January 2003. (Defs.' Exs. D-14, D-15, D-50.)

The next month, in February 2003, DCYF again filed a child protective petition concerning Sam and Tony. (Defs.' Exs. D-16, D-51.) Although not set forth in its

petition to the court, DCYF sought custody because Sam and his mother were involved in a car accident that occurred while she was driving while under the influence. (Defs.' Mem. at 23-24; Am. Compl. at ¶ 26.) DCYF was awarded "care, custody & control" of the boys (Defs.' Exs. D-17, D-55), and the Family Court granted the agency explicit "discretion as to placement" (Defs.' Ex. D-54). Within a matter of months, DCYF, absent any apparent Family Court determination, returned the boys their mother's care (Defs.' Mem. at 24), despite the fact that the agency had by that time received 14 reports questioning her capacity to care for them; DCYF had confirmed 8 of these reports and issued "early warnings" in response to 6 (Am. Compl. at ¶ 27).

Six months later, in May 2004, DCYF again sought and received "care, custody & control" of Sam and Tony because it found the children were being neglected by their mother, who was abusing alcohol and cocaine. (Defs.' Exs. D-18, D-56.) Since being awarded custody this last time, DCYF decided to separate and institutionalize Sam and Tony. (Am. Compl. at ¶¶ 29-31.) DCYF has moved Sam, now only 12 years old, through at least 10 placements and Tony, now 9 years old, through at least 12. (Am. Compl. at ¶ 31.) When DCYF learned that Tony was sexually molested in one of the placements it had selected, DCYF failed to report the sexual abuse for investigation and did not immediately find a more appropriate placement for Tony. (Am. Compl. at ¶ 30.) Not one of the Family Court orders submitted by Defendants specifically directed the harmful placement decisions made by DCYF for Sam and Tony, nor is there any indication that DCYF alerted the Family Court to the harms, including sexual abuse, suffered by these two boys while in Defendants' custody. (Am. Compl. at ¶¶ 30, 32-33.)

Although the Family Court directed DCYF to file a petition to terminate the parental rights of Sam and Tony's mother in February 2005 (Defs.' Exs. D-21, D-59), and again in April 2005 (Defs.' Ex. D-22), DCYF did not take action to terminate parental rights until October 2005 (Defs.' Exs. D-29, D-63; Defs.' Mem. at 25). In February 2006, the rights of Sam and Tony's father were terminated. (Defs.' Exs. D-31, D-65.) Five months later, DCYF withdrew its petition to terminate the rights of their mother. (Defs.' Mem. at 25.) Sam and Tony have been in DCYF custody since 2004 (Defs.' Exs. D-18, D-56), and are not yet free for adoption (Defs.' Mem. 25-26).

**CAESAR S.**

In March 2002, DCYF asked the Family Court to find that Caesar S., then seven months old, was being neglected by his teenaged mother. (Defs.' Ex. C-1; Am. Compl. at ¶ 37.) That April Caesar was placed under "temporary DCYF custody" (Defs.' Ex. C-2), and in September, Caesar was committed to the "care, custody & control" of DCYF (Defs.' Ex. C-7). He was to remain living with his mother as long as she stayed in her present home or moved to a DCYF-approved home. (Defs.' Exs. C-7, C-8.)

Following a further allegation of neglect and parental drug abuse, DCYF removed Caesar from his mother's care in December 2002. (Defs.' Exs. C-9, C-10.) In its request for emergency placement of Caesar, DCYF documented that it had previously investigated 57 allegations of maltreatment involving the family, 19 of which DCYF substantiated; that the mother admitted to drug use and had been noncompliant with various remedial services; that she continued to associate with known substance abusers, including her siblings, despite the requirement in her case plan that she stop such

associations; and that the mother's continued drug use and domestic violence issues placed Caesar in "immediate danger." (Defs.' Ex. C-9.)

Upon removing Caesar, then only 16 months old, from his mother, DCYF chose to place him in an emergency shelter. (Am. Compl. at ¶ 39.) Next DCYF decided to move him to a foster home for a month, and then to move him again, this time to the home of his paternal aunt, where he remained for the next year and a half, despite clear indications that the placement was unsuitable without supportive services. (Am. Compl. at ¶ 39.) Not one of these moves was directed by any of the preprinted Family Court review forms submitted by Defendants to document this time period. (*See* Defs.' Exs. C-10 to C-23.)

In September 2004, DCYF moved Caesar to the home of his great-aunt and her son, who had criminal drug record. Within nine days, DCYF decided to move Caesar because the great-aunt and her son were selling drugs from the home. (Am. Compl. at ¶ 40.) DCYF moved Caesar to a foster home, and then back to the home of his paternal aunt, despite his complaints to the agency that she beat him. (Am. Compl. at ¶¶ 41-42.) In September 2005, Caesar was found with bruises and marks on his arms; a doctor confirmed Caesar's report that he had been hit with a belt. Caesar also reported to DCYF that his penis hurt, but the agency failed to have Caesar evaluated for sexual abuse. (Am. Compl. at ¶ 43.)

Following this abuse, DCYF moved Caesar into the unlicensed home of his paternal grandmother, despite DCYF having deemed the home unsuitable for Caesar only a year before. (Am. Compl. at ¶ 44.) This unsafe and temporary placement was not ordered by, specifically ratified by, or mentioned in the Family Court records submitted

by Defendants. In fact, there is a total absence of any information in Defendants' exhibits regarding Caesar's well-being. (*See* Defs.' Exs. C-30 to C-39.)

DCYF first petitioned for the involuntary termination of Caesar's parents' rights in January 2005, on the grounds of his parents' substance abuse and abandonment. (Defs.' Ex. C-24.) Nine months later, however, DCYF requested that the petition be withdrawn. (Defs.' Ex. C-38.) During those nine months, DCYF continued to bring Caesar for visits with his parents, despite having found them unwilling or unable to care for him. (Am. Compl. at ¶ 50.) DCYF filed a new petition to terminate the rights of Caesar's mother in August 2006, based on allegations virtually identical to those in the initial petition it had filed a year and a half earlier. (Defs.' Ex. C-40.) It was not until June 2007, fully five years after DCYF took custody of and assumed responsibility for Caesar, that he was finally freed for adoption, and then only with the voluntary agreement of his parents. (Defs.' Exs. C-48, C-49.) To this day DCYF remains Caesar's guardian and the sole party to give or withhold consent to Caesar's adoption. (Defs.' Ex. C-48.)

**DAVID T.**

In early 1996, DCYF petitioned the Family Court for the removal of David T. from his mother's care (Defs.' Ex. E-1) due to her "history of physically and sexually abusing her children . . . threaten(ing) to kill one of them," having six children in the care and custody of the states of Michigan and Massachusetts, and abuse of drugs (Defs.' Ex. E-2). DCYF's petition was granted, and David was placed in DCYF's temporary custody. (Defs.' Exs. E-2 to E-3.) In October 1996, David was "(c)ommitted to the care, custody and control of the Director of DCYF." (Defs.' Ex. E-10.)

DCYF initially placed David in the foster home of Mary Melvin. (Am. Compl. at ¶¶ 58, 69.) After David had spent two years in that home (Am. Compl. at ¶ 58), DCYF successfully petitioned to terminate the parental rights of his parents, naming DCYF as David's sole guardian (Defs.' Exs. E-46, E-48, E-49). Because his foster mother could not continue to care for him, DCYF placed David in a series of temporary emergency shelters until early 1999 (Am. Compl. at ¶¶ 58-59), when DCYF requested and received the Family Court's approval for David's out-of-state placement with an aunt (Defs.' Ex. E-19).

Defendants state that David was subsequently placed in a residential treatment program and later at Butler Hospital, but none of the Family Court documents submitted by the Defendants indicate that either placement was ordered by the Family Court. (Defs.' Mem. at 27.) In 2000, Butler Hospital requested that DCYF secure a more appropriate placement for David. (Defs.' Ex. E-53.) After several months of inaction, David's Family Court guardian ad litem alerted the court to the hospital's request and DCYF's failure to secure such placement. (*Id*.) The Family Court then ordered DCYF to submit a residential review and respond to "delay for referrals and status." (Defs.' Ex. E-54.) In October 2000, two months later, the Family Court indicated that it was still waiting for DCYF's residential review. (Defs.' Ex. E-57.) In December 2000, while David remained at Butler Hospital, the Family Court found that he was showing signs of institutionalization and needed to be moved as soon as possible. (Defs.' Ex. E-58.) In light of the lack of appropriate available DCYF residential placements, the Family Court noted that "out-of-state placement [was] necessary." (*Id*.) Defendants acknowledge that DCYF accordingly arranged for David's placement in an out-of-state residential program

in Fall River, Massachusetts. (Defs.' Mem. at 27.) David was sexually abused by his roommate while in this placement. (Am. Compl. at ¶ 62.)

In 2003, DCYF transferred David to another residential treatment program in Massachusetts (Defs.' Mem. at 28), where he required one-on-one supervision (Am. Compl. at ¶ 62). The only Family Court document Defendants provide regarding David's placement at this time confirms that DCYF had placement discretion. (Defs.' Ex. E-32.)

Noting that David was having "severe problems" in residential treatment while under DCYF guardianship (Defs.' Mem. at 28), the Family Court approved DCYF's case plan for an "alternative living arrangement" in 2004 and found that the agency had not made reasonable efforts to achieve that goal (Defs. Exs. E-36, E-69, E-70). By November 2004, DCYF had already had the "exclusive right to place [David] for adoption" for six years, and for six years DCYF had shuffled him among multiple residential treatment programs only to ultimately abandon the goal of adoption for David. (Defs.' Exs. E-37, E-70; Am. Compl. at ¶¶ 59-63.)

In 2006, at another DCYF-chosen out-of-state residential treatment facility, Merrimack Center, David was not enrolled in an educational program. (Defs.' Ex. E-75; Defs.' Mem. at 29.) He also engaged in self-mutilation. (Am. Compl. at ¶ 64.) DCYF moved David yet again on May 9, 2007, this time to Swansea Woods. (Defs.' Mem. at 30.) There is no indication in any court document provided by Defendants that the Family Court ordered or was apprised of the fact that David was moved. (Defs.' Exs. E-44, E-45, E-76, E-77.)

**DEANNA H.**

When Deanna H. was one day old, DCYF requested (Defs.' Ex. A-157) and was granted temporary custody of her by the Family Court because of her parents' extensive histories with DCYF, including their noncompliance with treatment plans and the termination of their parental rights to several other children (Defs.' Ex. A-158). In January 2007, DCYF filed a petition to terminate the rights of Deanna's parents. (Defs.' Ex. A-173.) Defendants state that the Family Court dismissed DCYF's petition. (Defs.' Mem. at 14.) The Family Court documents state that the petition was "*withdrawn* . . . *by DCYF*" (Defs.' Ex. A-175 (emphasis added)) and that Deanna was "committed to the care, custody and control of" DCYF (Defs.' Ex. A-176). Now one year old, Deanna still lives in the same foster home where DCYF placed her at birth. (Am. Compl. at ¶¶ 78, 80.) Notwithstanding her parents' long history with DCYF, which includes the termination of her mother's rights to eight other children (Am. Compl. at ¶ 71; *see* Defs.' Mem. at 15) and her father's "chronic substance abuse problem," his noncompliance with the case plan, and his expressed lack of interest in "reunification and or visitation" (Defs.' Ex. A-176), DCYF apparently maintains reunification as Deanna's permanency goal (Am. Compl. at ¶¶ 78-80).

**DANNY AND MICHAEL B.**

In April 2005, after DCYF filed petitions alleging that Danny and Michael B. were being neglected (Defs.' Exs. B-1, B-2), the Family Court placed the brothers in DCYF's temporary custody and directed the children to "be placed by the Department of Children, Youth, and Families" (Defs.' Ex. B-3). DCYF placed Danny and Michael in the unlicensed home of their maternal great-grandmother, despite concerns about her

health. (Am. Compl. at ¶ 86.) Less than a week later, DCYF separated Danny and Michael, moving them to different foster homes, one of which had a significant history of abuse complaints against it. (Am. Compl. at ¶¶ 86-87.) DCYF then decided to return Michael to his great-grandmother's home but left Danny in the inappropriate foster home. (Am. Compl. at ¶ 88.) None of the Family Court documents submitted by Defendants directs or mentions these DCYF placement decisions.

In September 2005, Danny and Michael's mother admitted to neglect of her sons (Defs.' Ex. B-5) and DCYF continued its responsibility for the boys' care, custody, and control (Defs.' Ex. B-6). In June 2006, due to their mother's noncompliance with her case plan, DCYF filed petitions to terminate her parental rights. (Defs.' Exs. B-13, B-14.)

In July 2006, Danny was sexually assaulted in the foster home that had a history of abuse complaints. (Defs.' Mem. at 16; Am. Compl. at ¶ 91.) Defendants acknowledge that DCYF removed Danny from the foster home as a result of this abuse. (Defs.' Mem. at 16.) DCYF chose to place Danny in a temporary foster home, then returned him to his great-grandmother's home with Michael, but then decided to remove him a short time later because of the brothers' behaviors. (Defs.' Mem. at 16-17; Am. Compl. at ¶ 92.) DCYF placed Danny in a group home, where he remains to this day. (Am. Compl. at ¶ 92.) The Family Court documents provided by Defendants for Danny and Michael do not indicate that any of these placement decisions were directed by the Family Court.

In November 2006, DCYF sought and obtained sole guardianship of Danny and Michael, with the exclusive right to give or withhold consent to adoption. (Defs.' Exs. B-19, B-20.) Since then, DCYF has left Danny in an institution and left Michael in the

home of his elderly great-grandmother, neither of which can provide the children with permanency (Am. Compl. at ¶ 94), while the Family Court has periodically approved case plans that call for adoption for both Danny and Michael (Defs. Exs. B-21 to B-24). Defendants' assertion that the Family Court has ruled that DCYF "had made reasonable efforts to achieve this permanency plan" of adoption (Defs.' Mem. at 17) is not supported by the cited orders (Defs.' Exs. B-22, B-23).