**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SAM and TONY M., by Next Friend Gregory c. Elliot; CEASER S., by Next Friend Kathleen J. Collins; DAVID T., by Next Friend Mary Melvin; BRIANA, ALEXIS, CLARE and DEANNE H., by Next Friend Gregory C. Elliott; and DANNY and MICHAEL B., by Next Friend Gregory C. Elliott; for themselves and those similarly situated** | : | |
| **v.** | : | **C.A. 07-241L** |
| **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island; JANE HAYWARD, in her official capacity as Secretary of the Executive Office of Health & Human Services; and PATRICIA MARTINEZ, in her official capacity as Director of the Department of Children, Youth and Families** | : | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PURSUANT TO RULE 12(1) AND (6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

## I. Introduction

On October 1, 2007, Defendants Donald L. Carcieri, in his official capacity as Governor of the State of Rhode Island, Jane Hayward, in her official capacity as Secretary of the Executive Office of Health & Human Services, and Patricia Martinez, in her official capacity as Director of the Department of Children, Youth And Families (hereinafter "State" Defendants) filed a Motion to Dismiss Plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject

matter jurisdiction or, in the alternative, 12(b)(6) for failure to state a claim upon which relief may be granted. Defendants assert that Plaintiffs' Amended Complaint should be dismissed because the Court lacked of subject matter jurisdiction under the application of ***Younger*** Abstention Doctrine and/or ***Rooker-Feldman*** Abstention Doctrine, the named plaintiffs' "next friends" are inappropriate and lack standing, and (c) the claims of three (3) of the named Plaintiffs are moot. Plaintiffs' filed a Memorandum in Opposition to the Motion to Dismiss on November 2, 2007.

Defendants' Motion to Dismiss is premised on purely legal grounds. Accordingly, Defendants have refrained from identifying the factual mischaracterizations and inaccuracies in Plaintiffs' *Amended Complaint* and *Opposition Memorandum* or substantively counter the allegations of systemic deficiencies as they are not facts that this Court must consider in ruling on the Motion to Dismiss. Defendants' silence on these allegations in their motion and supporting memorandum in no way reflects a callous disregard for Rhode Island's children who have been abused or neglected.

The Defendants seek to have all counts of the Amended Complaint dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Specifically, the Defendants ask this Court to abstain from rendering a decision on all claims asserted based on the ***Younger*** Doctrine and/or ***Rooker-Feldman*** Doctrine. In the alternative, Defendants seek to dismiss, pursuant to Rule 12(b)(6), Count Four as the Adoption Assistance and Child Welfare Act does not create enforceable rights under 42 U.S.C. §1983 and all claims asserted by Briana, Alexis and Clare as they are moot.

The Defendants file this reply memorandum to clarify the ambiguities Plaintiffs' attempt to create regarding the role the Rhode Island Family Court plays in the placement

and well-being of children suspected of being abused or neglected and whether they possess enforceable rights under the Adoption Assistance and Child Welfare Act. At Exhibit 2, Plaintiffs create factual scenarios that they claim properly represent the travel of the Plaintiffs' children history. The scenarios, however, are incomplete and artfully attempt to diminish or create ambiguity with respect to the role of the Family Court. In response to any ambiguity that may have been created by Plaintiffs' Exhibit B and in order for this Court to analyze this case under the criteria set forth by ***Younger*** and its progeny, Defendants provide this Court with additional information relating to the Family Court's interaction with the Plaintiff Children. This information and supporting documentation is to provide the Court with an understanding of the type of factual information the Family Court considers when it makes decisions and renders orders with respect to issues of child well being and placement. At this juncture, this information is being offered to support Defendants' contention that this Court lacks subject matter jurisdiction over the Plaintiffs' Amended Complaint and is permissible for submission under Rule 12(b)(1). *See Defendants' Memorandum of Law in Support of Motion to Dismiss* at page 57.

In their *Opposition Memorandum*, the Plaintiffs' claim that:

(1) the "next-friends" are appropriate individuals for representing the Plaintiff children;

(2) (2) ***Younger*** abstention is inappropriate because the Amended Complaint poses no threat to comity; it does not interfere with any state enforcement actions of Family Court proceedings and there are no ongoing state court proceedings that implicate important state

interests and in which Plaintiff Children have an adequate opportunity to raise their federal claims;

(3) (3) ***Rooker-Feldman*** abstention does not apply because Plaintiff Children are not losing parties to a state court action and are not requesting the Court to review and reject any state court judgment; and;

(4) the statutes Plaintiffs rely on are intended to benefit these children and are privately enforceable.

*Plaintiffs' Opposition Memorandum* at pages 2-3. The Defendants disagree with Plaintiffs' arguments. For the reasons set forth below, and for those reasons set forth in Defendants' initial Memorandum of law, Plaintiffs' Amended Complaint should be dismissed with prejudice.

## II. Named Plaintiffs and the Rhode Island Family Court

### a. Family Court

The Plaintiffs aver that the Defendants failed to demonstrate that the Family Court has been involved in either approving and/or authorizing placements for the named plaintiffs. Such an argument ignores the explicit statutory authority of the Rhode Island Family Court and is not consistent with certified records from the Family Court files. Indeed, the DCYF is required to develop a written service plan for each child under the department's care and supervision. *See R.I. Gen. Laws §42-72-10*. The service plan must include a statement of the needs of each child as well as the "proposed treatment and placement" for each child. *R.I. Gen. Laws §42-72-10 (a).* The Department must ensure that the service plan is subject to review every six months for purposes of

determining, "…whether the service plan is in the best interests of the child and is also cost effective." *R.I. Gen. Laws §42-72-10 (a)*. Moreover, case plans that refer to a goal of "adoption" or placement in another permanent home, must include, "…documentation of the steps the department is taking to find an adoptive family or other permanent placement, to place the child in such a family or placement, and to finalize permanency." *R.I. Gen. Laws §42-72-10 (c).*

The Family Court is vested with explicit statutory authority to review the department's service plans. At each regularly scheduled Family Court review and/or permanency hearing of any child found to be neglected and/or abused, DCYF is required to present a written reunification or permanency plan to the Family Court. *See R.I. Gen. Laws §40-11-12.2.* The DCYF service plan shall include a statement as to, "…whether, and if applicable when, the child will be returned to the parent, placed for adoption, referred for legal guardianship, placed with a fit and willing relative, or (in cases whether the department can show the court compelling reasons why the foregoing placements or referrals would not be in the child's best interests) placed in another planned permanent living arrangement." *R.I. Gen. Laws §40-11-12.2(a).* As a matter of law, the Family Court is vested with the exclusive authority to pass judgment on the plan. In pertinent part, *R.I. Gen. Laws §40-11-12.2(a)* provides: "The plan may be approved and/or modified by a justice of the family court and incorporated into the orders of the court, at the discretion of the court."

In passing judgment on the department's plan, the Family Court considers what, if any, reasonable efforts shall be made with respect to the child taking into consideration the child's health and safety as a paramount concern. *R.I. Gen. Laws §40-11-12.2 (b)*. In

addition, the statute provides the parameters in which the Family Court must determine whether the Department has made reasonable efforts. The parameters require that the DCYF document what efforts have been made to preserve and reunify family. ***See R.I. Gen. Laws §40-11-12.2 (c)(i)(ii)***. Moreover, if the Family Court makes a determination that a continuation of reasonable efforts to work toward reunification are "inconsistent with the permanency plan for the child," the Court has the authority to direct that the DCYF make reasonable efforts to place the child in a timely manner in accordance with an approved permanency plan. ***R.I. Gen. Laws §40-11-12.2 (d)***. Further, in the case of a child whose case plan goal is identified as "adoption," the DCYF must submit to the Family Court a permanency plan that "…includes documentation of the steps the department is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship." ***R.I. Gen. Laws §40-11-12.2(h).***

In addition, the Family Court is also vested with the authority to conduct permanency hearings for every child who is placed within the care of the DCYF within twelve months of the child's placement. ***See R.I. Gen. Laws §40-11-12.1***. The Family Court, in determining an order of permanency must take into consideration:

(1) The appropriateness of the Department's plan for service to the child and parent;
(2) What services have been offered to strengthen and reunite the family;
(3) Where return home of the child is not likely, what efforts have been or should be made to evaluate or plan for other modes of care;
(4) Any further efforts which have been or will be made to promote the best interests of the child; and
(5) The child's health and safety shall be the paramount concern.
(See RIGL 40-11-12.1(d) (1) through (5))

At the conclusion of the hearing, the Family Court is vested with broad authority to direct that the Department proceed with implementing a permanency plan. The Family Court may direct that the Department proceed as follows:

> (1) In the case of a child whose care and custody have been transferred to the department of children, youth, and families, direct that the child be returned to and safety maintained in the home of the parent, guardian, or relative; or
>
> (2) Direct that the child's placement in foster care continue on a long-term basis or that the child be placed in an independent living facility; or
>
> (3) Direct that foster care of the child and reunification efforts be continued if the department of children, youth, and families, after a hearing, has demonstrated to the court that continuation of the child in foster care and continued reunification efforts for a determinate period is in the child's best interests. If the court does not return the child to the care and custody of the parent, guardian or relative and the court does not direct that foster care of the child and reunification efforts be continued, the department shall institute a proceeding within thirty (30) days of the permanency hearing pursuant to chapter 7 of title 15 to legally free the child for adoption; or
>
> (4) In the case of a child with an emotional, behavioral, or mental disorder or developmental or physical disability who has, pursuant solely to §§ 42-72-14 and 14-1-11.1, been placed in an out-of-home program which provides services for children with disabilities, including, but not limited to, residential treatment programs, residential counseling centers, and therapeutic foster care programs, shall determine whether the continuation of such placement is in the best interest of the child; or
>
> (5) For a child who has been placed in foster care by the department for a period of twelve (12) consecutive months, the court shall order that the department institute proceedings for adoption of the child except in the event that the court determines it is not in the best interest of the child due to one or more of the following factors:
>
> (i) There is a substantial probability that the child shall be returned to the parent within the next three (3) months; or
>
> (ii) The parent has maintained regular and consistent visitation and contact with the child, there is a relationship that is beneficial to the child, and there is a substantial probability that the child shall be returned to the parent within the next three (3) months; or

(iii) The child is in the care of a relative and the relative is not willing to adopt the child but is willing and capable of providing the child with a stable and permanent environment; or

(iv) Any other significant factor, which the court finds would not be in the best interest of the child.

(v) The department has documented in the case plan, which shall be presented to the court, a compelling reason for determining that filing a petition for termination of parental rights and a petition for adoption would not be in the best interests of the child; or

(vi) The department has not provided to the family of the child, consistent with the time period in the case plan, such services as the department deems necessary for the safe return of the child to the child's home, if reasonable efforts are required to be made.

(6) In the case of a child who has been in foster care under the temporary custody or custody of the department for fifteen (15) of the most recent twenty-two (22) months, or if the court has determined a child to be abandoned or has made a determination that the parent has engaged in conduct toward any child of a cruel and abusive nature or that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the department shall file a petition to terminate the parental rights of the child's parents, and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless:

(i) The child is being cared for by a relative;

(ii) The department has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or

(iii) The department has not provided to the family of the child, consistent with the time period in the case plan, such services as the department deems necessary for the safe return of the child to the child's home, if reasonable efforts are required to be made with respect to the child. ***R.I. Gen. Laws §40-11-12.1 (e) (1)-(5).***

In addition, the Family Court has broad statutory authority to authorize placement of children in foster care. First, pursuant to ***R.I. Gen. Laws §14-1-27***, the Family Court may

approve placement of a child with a fit and willing relative during the preliminary stages of a child abuse and neglect proceeding. Second, ***R.I. Gen. Laws §14-1-32*** vests the Family Court with authority to authorize placement of a dependent, neglected or abused child, "…in his or her own home or in the custody of a relative or other suitable person, or in the custody of the director of children, youth and families, **upon any terms the court determines**." *R.I. Gen. Laws §14-1-32(1)* (emphasis added). Finally, in cases involving children with disabilities, the Family Court possesses explicit statutory jurisdiction to review the services being provided to each child by the DCYF. ***R.I. Gen. Laws § 40-11-12.1(e)(4)*** provides:

> In the case of a child with an emotional, behavioral, or mental disorder or developmental or physical disability who has, pursuant solely to §§ 42-72-14 and 14-1-11.1, been placed in an out-of-home program which provides services for children with disabilities, including, but not limited to, residential treatment programs, residential counseling centers, and therapeutic foster care programs, shall determine whether the continuation of such placement is in the best interest of the child.

In the instant case, there is explicit documentation that the Family Court has exercised its statutory authority. In each instance, the Family Court conducted regularly scheduled Court reviews and permanency hearings as required by statute. In each instance, DCYF submitted updates to the Family Court on the placement of the children while they were in foster care. In addition, DCYF provided the Court with case plans for the Court's review. In each case, the Family Court routinely exercised its authority to approve the case plans submitted by the Department. While each placement of the named plaintiffs may not have been explicitly authorized by the Family Court, the Department certainly made the Court aware of the children's placement and both the

Court and the Child Advocate certainly had the authority to address any issues with respect to the health and safety of the children while in State care.

**b. Named Plaintiffs**

**Sam and Tony M.**

In its reply memorandum and Exhibit 2, the plaintiffs aver that DCYF failed to provide the Family Court with information relating to the circumstances and well being of Sam and Tony M. In addition, the plaintiffs assert that the Family Court was not informed and or involved in any of the placement decisions with respect to the two boys. The plaintiffs apparently base this assertion on the assumption that the Family Court was conducting case reviews and permanency hearings in a vacuum without the benefit of information provided by the parties. Contrary to the plaintiffs' claim, documentation within the Family Court records demonstrably reflects that DCYF kept the Family Court informed of case activities with respect to Sam and Tony M. throughout the course of the Family Court hearings.

By way of illustration, in March of 2001 the Family Court held a review of the child protection petitions filed on behalf of Sam and Tony M. See Def's Ex. D-7, D-40. At the review, DCYF submitted a written report to the Family Court that noted that both boys continued to reside with their mother and that the mother had obtained a restraining order against their father. (Def's Ex. No. D-68. In addition, DCYF noted that the mother had successfully completed substance abuse treatment. ***Id.*** The Family Court continued the case for further review noting that the children's mother intended to seek custody of both boys on a domestic petition. D-8, D-44. In September of 2001, DCYF reported to the Family Court that it was uncertain as to whether the mother had obtained full

domestic custody. Def's Ex. No. D-69. As a result, the Department recommended that the case be continued for a court review in three months. ***Id.*** The Family Court approved the Department's recommendation and the case was continued for further review to November 29, 2001. See Def's ex. No. D-9, D- 43. At the review in November of 2001, DCYF submitted a written report to the Family Court that stated the boys' mother had obtained sole legal custody of the boys and as a result, the Department was recommending that the DCYF petition be closed. Def's Ex. No. D-70. The Family Court accepted the DCYF recommendation and dismissed the DCYF petitions. See Def's Ex. D-44.

Between November of 2001 and July of 2002, there was no legal petition pending in the Family Court with respect to Sam and Tony M. Further, Tony and Sam M. where not placed in the care and custody of the DCYF during this time frame. Yet, in their pleadings, the plaintiffs assert that subsequent to November of 2001, DCYF did not take any action to protect the welfare of Sam and Tony M. until July of 2002. *See Plaintiffs' Opposition Memorandum, Exhibit # 2 at page 1 and Am. Complaint Para. 24.* Such a claim fails to take into consideration that the Family Court had dismissed the DCYF child protection petitions in November of 2001.

In July of 2002, the DCYF filed a second child protective petition on behalf of Sam and Tony M. (See Def's Ex. D-10 and D-45). That petition was based upon new allegations that the children's stepfather had sexually abused one of the children. The children were allowed to remain in the care of their mother and a restraining order was issued by the Family Court prohibiting the mother from having the children in the care of the stepfather. (See Def's Ex. D-11 and D- 46 and D-47). On January 2, 2003, the

Family Court closed the DCYF child protective petitions noting on the Court disposition form that all parties agree that the case could be closed and that the boys' mother had a restraining order against the boys' stepfather. (See Def's Ex. D-14, D-15, D-50).

DCYF filed a third set of child protective petitions on behalf of Sam and Tony M. in February of 2003. See Def's. Ex. D-16 and D- 51. Based upon the new petitions, the boys where removed from the custody of their mother and placed in the care and custody of the DCYF. In October of 2003, DCYF submitted a written report to the Family Court in which it noted that the children's mother had completed parenting classes as well as successfully completed substance abuse counseling. Def's. Ex. 71. In addition, DCYF reported that Sam and Tony M. had been placed in non-relative foster care since May of 2003 and that both boys had done very well in the foster home. ***Id.*** DCYF indicated to the Family Court that the boys and the mother had participated in a special program run through the Children's Museum and that weekend overnight visitation had been going very well. ***Id.*** DCYF indicated that its plan was to reunify the boys, Sam and Tony M., with their mother on October 24, 2003. ***Id.*** At the conclusion of the hearing, the Family Court committed Sam and Tony M. into the care, custody and control of the DCYF for placement until further order of the Court. See Def's Ex. No. D-17 and D-55. In addition, the trial judge noted on the back of the Family Court disposition form that the children's mother need not appear at the next court hearing if the case was to be closed. ***Id.*** In May of 2004, the DCYF filed an Emergency Motion to Change Placement on behalf of Sam and Tony M. See Def's Ex. No. D-18 and D-56. The motion was based, in part, on new allegations that the children's mother was using illegal drugs in the home. ***Id***. On May 20, 2004, the Family Court granted the DCYF Motion to Change Placement

and authorized the removal of the children from the home of the mother. (D-19 and D-57). In addition, the Family Court approved the DCYF case plan, found that the permanency plan's goal of reunification was appropriate and found that the Department had documented a compelling reason to continue efforts to work toward a case plan goal of reunification. See Def's Ex. D-20 and D-58.

In February of 2005, the Family Court ordered DCYF to file a termination of parental rights petition. Def's Ex. D-21, D-22, D-59. In October of 2005, DCYF filed termination of parental rights petitions in the Family Court on behalf of both children. Def's Ex. D-29 and D-63. In November of 2005, DCYF submitted to the Family Court case plan agreements on behalf of both children with a permanency goal of "adoption." See Def's ex. No D-72 and No. D-73. The case plans provided an outline of the services that DCYF was providing to the children for purposes of achieving the permanency plan's goal of adoption. ***Id.*** In addition, the case plans reference that DCYF would continue to allow the children to maintain contact with "appropriate family members" until the termination of parental rights petition was adjudicated. ***Id.*** At the conclusion of the Court hearing held on November 17, 2005, the trial judge continued the petitions for a pre trial hearing and noted on the Court disposition form that the maternal grandparents were to remain involved with the boys in their placements. See Def. ex's No D-30 and D-64.

In April of 2006, the Family Court convened a court review of the case. At that review, DCYF submitted a written report to the Family Court. Defs. Ex. No. D-74. In its report, DCYF updated the Family Court on significant changes in the treatment and placement of Tony and Sam M. ***Id.*** The DCYF noted that the boys had been placed in

psychiatric hospitals due to significant sexualized acting out behavior and suicidal ideation. The letter states that Tony continued to reside in Butler Hospital and that Sam had been discharged into a step down program. ***Id.*** The DCYF also noted that the maternal grandparents continued to be a "consistent presence" in the boys' lives. ***Id.*** Based upon the changes in the case, DCYF recommended that the Family Court continue the case for three months. ***Id.*** Based upon the DCYF report, the Family Court continued the case for review to July of 2006. See Def's Ex. D-32 and D-66. In addition, the trial judge noted on the court disposition forms that the Sam and Tony M. may be allowed to visit with the maternal grandparents. ***Id.***

At a permanency hearing in July of 2006, DCYF submitted a written report to the Family Court. See Def's Ex. D-75. In its report, DCYF noted that both boys had been placed in a group home placement. ***Id.*** In addition, DCYF indicated that it would continue to work with the Sam and Tony M. on a transition plan with a short-term goal to have the boys complete their residential treatment programs. ***Id.*** Further, DCYF advised the Family Court that the long-term plan was for both boys to be transitioned into placement in maternal grandparents' home and to be adopted by the grandparents. ***Id.*** At the conclusion of the hearing, the Family Court entered an order which approved of the DCYF case plan and specifically found that DCYF was making reasonable efforts toward achieving a permanency plan goal of adoption. See Def's Ex.D-26 and D-60. Thereafter, at a permanency hearing conducted in January of 2007, the Family Court once again approved of the DCYF case plan and found that DCYF was making reasonable efforts toward achieving a permanency plan goal of adoption.

See Def's Ex. D-27, and D-61.

Notwithstanding the above, the plaintiffs' suggest that the DCYF has failed to meet its responsibility to work on a plan to finalize a case plan goal of adoption of behalf of Sam and Tony M. Yet, such an allegation is in direct contradiction to the findings of the Family Court. Moreover, at no time has the Office of the Child Advocate sought to intervene on behalf of the two children to seek any change in the DCYF plan and/or any modification of the Family Court orders.

**Caesar S.**

In its reply memorandum and exhibits, the Plaintiffs argue that there is no documentation that any of Caesar's placements were directed and/or approved by the Family Court. *See Plaintiff's Memorandum in Opposition, Exhibit # 2* at pages 3-5. Moreover, the Plaintiffs state that there is a "total absence of any information in Defendants' exhibits regarding Caesar's well being." *See Plaintiff's Opposition Memorandum, Exhibit # 2* at pages 4-5. Such an assertion is premised upon an assertion that the Family Court orders and Court disposition forms are completed in a vacuum and without any information or input provided by the parties.

Contrary to the plaintiffs' assertion, DCYF regularly provided the Family Court with written reports relating to the welfare of Caesar during the numerous reviews and permanency hearings held within the Family Court. By way of illustration, at a permanency hearing conducted by the Family Court in April of 2004, DCYF submitted a written report to the Family Court in which the Department informed the Court that Caesar was being "…successfully maintained in relative foster care and has biweekly visits with his parents." Def's Ex. C-50. In addition, the report, summarized the services that DCYF had offered to his mother and her reluctance to engage in treatment. ***Id***. At

the conclusion of the hearing, the Family Court approved of the Department's case plan goal and the trial judge noted that Caesar would continue to reside in relative foster care. See Defs' Ex. C-13.

Another permanency hearing was held by the Family Court in May of 2004. At that hearing, DCYF submitted a report to the Family Court that noted that Caesar remained in relative foster care and was, "…doing very well." Def's Ex. C-51. In addition, the DCYF advised the Family Court of the services that DCYF was recommending for both parents. DCYF ultimately recommended that the Family Court schedule a review of the case in three months for purposes of obtaining the results of a neurological examination of the mother. ***Id.*** In addition to a written report, DCYF submitted a copy of the case plan agreement to the Family Court. Def's Ex. No. C-52. The case plan identified the permanency goal as "reunification with parent or principal caretaker" and included on outline of the services that the parents would be required to obtain as a condition of achieving the goal of reunification. ***Id.*** At the conclusion of the permanency hearing of May 10, 2004, the Family Court entered an order approving DCYF's case plan. Defs. Ex. C-22 and C-23. In addition, the Court concluded that the case plan's goal of reunification was appropriate and that DCYF had made reasonable efforts to facilitate reunification of Caesar with his parents. ***Id.*** Additionally, the Family Court found that DCYF had documented a compelling reason to continue efforts to work toward a case plan goal of reunification. ***Id.*** Finally, it ordered that DCYF was required to continue to make efforts to reunify Caesar with his mother until August of 2004. ***Id.***

On November 14, 2005, the Family Court convened a permanency hearing. At the hearing, DCYF submitted a written report to the Family Court that stated that Caesar was

residing in the home of his paternal grandmother. Def's Ex. C-53. In addition, DCYF recommended to the Family Court that Caesar continue to reside in paternal grandmother's home and that the Family Court approve the DCYF case plan and the permanency goal of adoption. ***Id.*** Further, DCYF asked that the Court schedule Caesar's case for further review in six months with the hopes of finalizing a goal of adoption. ***Id.*** In addition to the written report, the DCYF submitted to the Family Court a service plan that identified the permanency goal for Caesar as "adoption." See Def's Ex. C-54. The permanency plan also identified an array of services intended to ensure Caesar's well being in the relative foster care as well as to facilitate identifying a plan of action to achieve the case plan goal of adoption. ***Id.*** As noted previously, at the conclusion of the permanency hearing in November of 2005, the Family Court approved the Department's case plan as well as the goal of an adoption. See Def's Ex. C-39.

In November of 2006, the Family Court conducted a permanency hearing on behalf of the child, Caesar. At the permanency hearing, DCYF presented the Family Court with a copy of its service plan. See Def's Ex. C-55. In the service plan, DCYF outlined the services that were necessary to maintain the well being of Caesar as well as identifying support services within the community to help the prospective pre adoptive family cope with Caesar's special needs. ***Id.*** At the conclusion of the permanency hearing, the Family Court approved the Department's case plan as well as the permanency goal of adoption. Def's ex. C-44. In addition, the family Court made a finding that DCYF had made reasonable efforts to finalize a permanency goal of adoption or guardianship. ***Id.***

The plaintiffs suggest that Caesar is presently residing in an, "unsafe and temporary placement." *See Plaintiffs' Opposition Memorandum*, Exhibit # 2 at page 4. Yet, the Office of the Child Advocate has not attempted to intervene in the Family Court proceedings relating to Caesar's case and seek a change in Caesar's placement. Rather, the Family Court has approved the Department's service plan – which includes a plan to provide services to maintain Caesar in the home of his paternal grandmother. Once again, the plaintiffs are second guessing the Family Court's decision to approve the Department's service plan (and asking this Court to second guess it) and is seeking that this Court assume jurisdiction over case management issues that are clearly within the statutory authority of the Family Court.

**<u>David T.</u>**

The plaintiffs acknowledge that the Family Court authorized placement of David T. with a relative in an out of state placement in February of 1999. Def's Ex. E-19. The plaintiffs' further acknowledge that in December of 2000 the Family Court found that the placement of David T. in an out of state program was necessary. Def's Ex. E-58. Notwithstanding the above, the plaintiffs' suggest that subsequent to the entry of the Court order to approve out of state placement, DCYF failed to apprise the Family Court of changes in David T's placement. *See Plaintiffs' Opposition Memorandum*, Exhibit # 2, at page 7. This claim is based upon an assumption that the Family Court conducts its hearings in a vacuum and is simply not accurate.

Beginning in October of 2000, the Family Court has scrupulously monitored DCYF's efforts to find an appropriate placement for David T. Def. Ex. E-21- E-77. At

each Court hearing, DCYF kept the Family Court apprised of the status of David T's placement and the challenges that David T. was presenting his caretakers by his aggressive behaviors. By way of illustration, at the court hearing in January of 2001, DCYF submitted a report to the Family Court that noted that David T. was placed in a group home in Fall River, Massachusetts in December of 2000. See Def's Ex. E-78. DCYF advised the Court that this group home was "well equipped" to address David T's sexualized behavior and that the group home would work closely with DCYF toward achieving the permanency plan goal of adoption. ***Id.*** DCYF also reported that David had previously been placed in a residential program in Rhode Island and that he had been discharged from that program due to his increasing aggressive behavior. ***Id.*** At the conclusion of the Family Court hearing, the trial judge continued the case for further review to April of 2001. See Defs. Ex. E-23.

Similarly, at a permanency hearing convened by the Family Court in October of 2002, DCYF reported to the Family Court that David continued to exhibit "aggressive behaviors" in the group home placement. Def. Ex. E-79. The DCYF report stated that David had exhibited poor boundaries that included "impulse touching of his peers and staff." ***Id.*** The DCYF report stated that David had exposed himself to the other children and that he had engaged in, "…sexualized behavior with another child several times over the past several months." ***Id.*** DCYF apprised the Family Court that, based upon David's aggressive behavior, the group home had asked DCYF to identify an alternative placement for Daniel. *Id.* In addition, DCYF also submitted a copy of its case plan agreement to the Family Court. See Def's Exhibit # E-80. As part of the case plan, DCYF summarized a service plan intended to address David T.'s special needs as well as

documenting the Department's efforts toward identifying an adoption resource for David T. ***Id.*** At the conclusion of the permanency hearing, the Family Court entered an Order which stated that the DCYF case plan was approved and found that DCYF was making reasonable efforts to finalize a permanency plan goal of adoption, guardianship or another planned alternative living arrangement." Def Ex. E-29, E-30, E-31.

At a Family Court review hearing in January of 2003, DCYF reported to the Family Court that David T. had been accepted into an intensive residential treatment facility in Hancock, Massachusetts. Def. Ex. E-81. At the conclusion of the hearing, the Family Court trial judge noted on the Court disposition form that DCYF was granted with discretion to place the child and continued the case for further review to July 28, 2003. See Def's Ex. E-32. In October of 2003, the Family Court conducted a permanency hearing. At the permanency hearing, DCYF provided the Family Court with a status report on David's placement. In the report, DCYF advised the Family Court that David was transferred to a new location in Lenox Massachusetts and that David was experiencing "moderate difficulty" adjusting to the new placement. Def. Ex. E-82. DCYF recommended to the Family Court that David T. continue in placement and that the case be continued for six months. ***Id.*** In addition, DCYF provided the Family Court with a copy of the case plan agreement. ***See*** Def. Ex. E-83. The case plan agreement summarized a service plan intended to address David T.'s special needs. ***Id.*** At the conclusion of the hearing, the Family Court noted on the court disposition form that the DCYF case plan was approved and continued the case for further review to April of 2004. See Def. ex. E-34.

In November of 2004, the Family Court conducted a permanency hearing on behalf of David. At the hearing, DCYF reported that David T continued in the residential treatment program in Lenox Massachusetts. Def. Ex. E-84. The DCYF report references the treatment plan for David and suggested that David's needs might be better met by a transfer into a more intensive residential program operated by the same residential provider. ***Id.*** Based upon these facts, DCYF recommended that the Family Court approve the plan and that the case be continued for six months. In addition to the report, DCYF presented to the Family Court a case plan agreement. See Def. Ex. E-85. The case plan agreement outlined the services that DCYF was providing on behalf of the child, David T. ***Id.*** At the conclusion of the hearing, the Family Court approved DCYF's case plan. Def's Ex. E-36, E-37. In addition, the trial judge Court noted on the Court disposition form that David was experiencing "severe problems" in residential treatment. Def's Ex. E-36. The Court additionally found that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative was not an appropriate permanency plan goal for David. Def's Ex. E-37. As such, the Court found that the goal of another planned living arrangement was the most appropriate permanency plan goal for David. ***Id.*** Lastly, it held that DCYF had not made reasonable efforts to finalize the permanency plan goal of another planned alternative living arrangement. (***Id.)***

In November of 2005, the Family Court conducted another permanency hearing on David's case. Once again, DCYF provided the Family Court with a report on the status of David T's placement. See Def Ex. No E-86. In the report, DCYF notified the Family Court that David had been transferred to a more intensive residential treatment program in Pittsfield Massachusetts. ***Id.*** In addition, DCYF reported that David was not

making progress toward the goal of transitioning to a least restrictive placement and that DCYF was reviewing David's placement for purposes of determining a more appropriate type of setting. ***Id.*** DCYF recommended that the Family Court approve the case plan goal of "long term living arrangement with other" and that the Family Court grant DCYF with discretion with respect to placement. ***Id.*** At the conclusion of the hearing, the Family Court entered an order in which it approved of the DCYF case plan and the goal of "long term living arrangement with other." Def. Ex. No. E-38 and E-39. In addition, the Family Court made a finding that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative was not an appropriate permanency plan goal for David and that DCYF had made reasonable efforts to finalize a permanency plan goal of another planned alternative living arrangement. ***Id.*** The Family Court also directed that DCYF continue to make placement referrals on behalf of David T. through the DCYF Care Management Team and the case was continued to January 9, 2006 for review. ***Id.*** On February 6, 2006, the Family Court noted on the Court disposition form that DCYF was awaiting approval from Massachusetts to place the child, David T. at Merrimack Center. (Def. Ex. E-41.)

Thereafter, a permanency hearing was held in the Family Court on November 27, 2006. At the permanency hearing, DCYF reported that David T. had been placed at Merrimack Center on March 14, 2006. See Def. Ex. E-87. Once again, the DCYF report referred to David's aggressive behavior as well as the services that he was receiving in the residential treatment program. ***Id.*** In addition, DCYF notified the Court that David T. had not been allowed to enroll in the educational program at Merimack due to a funding issue between Massachusetts Department of Education and Rhode Island. ***Id.***

DCYF reported that David T. had been receiving tutorial services and that efforts were being made to initiate placement referrals for David T. to two residential treatment programs in Swansea Massachusetts. ***Id.*** In addition to the report, DCYF provided the Family Court with a copy of a case plan. See Def. Ex. E-88. As part of the case plan, DCYF summarized a service plan intended to address David T.'s special needs. ***Id.***

At the conclusion of the hearing, the Family Court issued an Order approving DCYF's case plan. See Def. ex. E-42, E-43, E-75. In addition, the Family Court found that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative was not an appropriate permanency plan goal for David and the Court held that the goal of another planned living arrangement was the most appropriate permanency plan goal for David. ***Id.*** The Family Court also found that DCYF had made reasonable efforts to finalize the permanency goal of another planned alternative living arrangement. ***Id.*** The trial judge noted on the Court disposition form that David continued to be placed at Merrimack Center and that he was not enrolled in an educational component. Defs. Ex. E-75. The trial judge further noted that DCYF was pursing placement for David T at Swansea Woods or Meadow Ridge; two residential treatment programs located within Massachusetts. ***Id.***

In June of 2007 DCYF reported to the Family Court that David T. had been placed in a residential treatment program in Swansea, Massachusetts on May 9, 2007. See Def's Ex. E-89. The DCYF report summarizes David T's placement history since February of 1999 and provides the Family Court with an update on the treatment plans for David T. ***Id.*** Based upon the DCYF report, the Family Court continued the case for a

case review and permanency hearing of David's case to November 26, 2007. Def's. Ex. No. E-77.

Clearly, the issues relating to the provision of services to David T. presented a significant challenge to both DCYF and the Family Court. David T.'s case was subject to frequent and on-going review by the Family Court. Once again, had the Office of the Child Advocate concluded that either DCYF or the Family Court were not adequately protecting the rights and interests of David T., she could have sought to intervene in the Family Court proceedings. Rather, the plaintiffs seek to challenge the actions taken by DCYF with respect to the quality and delivery of services provided to David T. in the context of the instant dispute. Such issues are clearly and inextricably intertwined with the existing Family Court action.

**Deanna H.**

The Family Court began to exercise jurisdiction over Deanne H. on or about October 13, 2006 based upon the filing of a child protective petition by DCYF. Def's. Ex. A-157. At that time the child, Deanna was only one day old! In January of 2007, the DCYF filed a termination of parental rights petition on behalf of the child, Deanna H. Def's A-173. The termination of parental right petition was ultimately withdrawn by DCYF with the approval of the Family Court on February 6, 2007. Def's A-175. The trial judge noted on the back of the Family Court disposition form, that the child was born on October 12, 2006. ***Id.*** In August of 2007, the Family Court entered an order in which it committed Deanna to the care, custody and control of the Director of the DCYF. See Def's A-172 (A). In addition, the Family Court continued the case for a permanency hearing in October 17, 2007. ***Id.***

Notwithstanding the above, the plaintiff's aver that DCYF's actions in this case are violative of Deanna's due process rights. In support of this argument, the plaintiffs allege that DCYF violated the rights of Deanna by not moving forward on a termination of parental rights petition. This argument ignores the fact that disposition of Deanna's case was approved by a justice of the Rhode Island Family Court. It should be noted that the trial judge who approved of the disposition in Deanna's case was the same trial judge who granted the DCYF termination of parental rights petition on the three siblings. (See Def's A–175 and A-176. Such an argument is tantamount to second guessing the judgment entered by the Family Court. Certainly, if the Rhode Island Office of the Child Advocate had a concern about the disposition of Deanna's case, she could have intervened on Deanna's behalf in the Family Court proceedings.

Contrary to the plaintiffs' assertions, the rights of Deanna have been fully protected. At a permanency hearing held in the Family Court on October 17, 2007, DCYF provided the Family Court with a written report. (Defs. Exhibit # A-177). In its report, DCYF advised the Family Court that the child, Deanna, continues to reside in a kinship home wherein the child is "thriving and developing." ***Id.*** DCYF also reported that the kinship caretakers where interested in adopting the child, Deanna. DCYF further advised the Family Court that the child's mother had not followed through on visitation with Deanna and that the Department was in the process of filing a termination of parental rights petition. ***Id.*** At the conclusion of the permanency hearing, the Family Court authorized DCYF to file a termination of parental rights petition as to the child, Deanna H. See Def's Ex. A-178. On November 1, 2007, DCYF filed a termination of parental rights petition was filed in the Family Court. See Def's Ex. A-179 and Ex. A-

180. The termination of parental rights petition is presently pending before the Family Court.

**Danny and Michael B.**

In the case of Danny and Michael B., the Family Court asserted jurisdiction over the case based upon the filing of child abuse and neglect petitions in March of 2005. Defs. Ex. B-1 and B-2. Thereafter, the Family Court reviewed the child welfare petitions on a regular basis between April of 2005 and September of 2007. See Def's Ex. B-3 through B-26. The Plaintiffs, though, argue that there is no documentation within the orders and disposition sheets indicating that the Family Court directed that DCYF make any of the placement decisions in this case. The Defendants acknowledge that in the case of Danny and Michael B., the Family Court did not, nor was it asked, to issue Orders directing that DCYF place the boys in any particular placement. However, as illustrated in the cases cited above, the issue of placement is well within the Family Court's statutory authority. Indeed, at each court review and/or permanency hearing any party could raise an issue with respect to the placement of the children. Further, at each review, the Court would certainly be provided information from the parties with respect to the well being of the children. This was certainly the case as it relates to Danny and Michael B's case.

By way of illustration, the Family Court held the first permanency hearing on Danny and Michael's case in March of 2006. At the permanency hearing, DCYF submitted a case plan agreement to the Family Court for its review and consideration. Def's Ex. B-27. The DCYF case plan identified case objectives that the parents were required to meet to ensure for the safety and well being of the children. ***Id***. In addition,

the case plan identified the permanency plan goal as reunification. ***Id.*** At the conclusion of the permanency hearing, the Family Court entered an Order which stated that DCYF's permanency plan's goal of reunification was appropriate and that DCYF had made reasonable efforts to work toward reunification with the parents. See Defs. Ex. No. B-9, B-10. In addition, the Family Court concluded that DCYF had documented a compelling reason to continue efforts to work toward reunification and that DCYF was required to continue to make such reasonable efforts to achieve the goal of reunification by September of 2006. ***Id.***

The child protection petitions were reviewed by the Family Court on May 10 2006. At the review, DCYF submitted a written report to the Family Court. In the report, DCYF reported that both children were exepre3icneing "behavioral problems and developmental issues." See Defs. Ex. No. B-28. The DCYF report referenced the services that the two boys were receiving through the Head Start program and the Providence Center. ***Id.*** In addition, the DCYF advised the Family Court that the parents had failed to cooperate with services that had been offered to effectuate the case plan goal of reunification. ***Id.*** The DCYF further advised the Family Court of its intention to file a termination of parental rights petition of behalf of Danny and Michael based upon the fact that the children have been in DCYF for a period in excess of one year and the parents had not complied with services. ***Id.*** At the conclusion of the Court review, the trial judge continued the case for further review to July of 2006 and noted on the court disposition from that DCYF was to file a termination of parental rights petition. See Defs. Ex. B-11 and B-12.

On June 14, 2006, DCYF filed termination of parental rights petitions on behalf of Danny and Michael B. See Defs. Ex. No. B-13 and B-14. On November 8, 2006, the Family Court granted the Department's termination of parental rights petition. As a result, Danny and Michael were placed in the legal guardianship of DCYF and the Family Court ordered that DCYF is the sole party to give or withhold consent to the adoption of these children. See Defs. Ex. No. B-19 and B-20.

In March of 2007, the Family Court convened a permanency hearing. At the hearing, DCYF submitted a written report to the Family Court. See Defs. Ex. No. B-29. In its report, DCYF noted that the child Danny had been placed in a group home in September of 2006 due to "increased sexualized behavior" at his school. ***Id.*** The report also stated that Danny was receiving individual therapy and that he was reportedly doing "extremely well" in his current placement. ***Id.*** Further, DCYF reported that the child Michael remained in the relative foster home and that he was receiving clinical outreach services. ***Id.*** DCYF also reported that a sexual abuse evaluation had been conducted on Michael and the therapist was unable to determine if Michael had been a victim of sexual abuse due to his unwillingness to participate in the evaluation sessions. Finally, DCYF reported that both boys had been registered with Adoption Rhode Island and that "all parties" were involved in actively seeking a permanent home for both boys. ***Id.*** At the conclusion of the hearing, the Family Court approved the Department's case plans for both boys and the trial judge wrote "federal findings" on the back of the Family Court disposition sheet. See Def's Ex. B-22, B-23. DCYF submits that the term "federal findings" relates to requirements referenced in RIGL 40-11-12.1 and 40-11-12.2 with

respect to the obligation of the Family Court to pass of the efforts being made by DCYF to achieve permanency for the children.

Notwithstanding the above, the plaintiffs once again seem to be second-guessing the findings of the Family Court with respect to its approval of the Department's permanency plan. In their memorandum and accompanying exhibits recently filed by the plaintiffs in the instant case, the plaintiffs refer to the current placement of Michael and Danny as follows: "Since then, DCYF has left Danny in an institution and left Michael in the home of his elderly great-grandmother, neither of which can provide the children with permanency." *See Plaintiffs' Opposition Memorandum*, Exhibit # 2 at pages 9 -10 (citing paragraph 94 of the amended complaint)). Notwithstanding the criticality of the plaintiffs' broad assertions, it is important to note that at no time has the Office of the Child Advocate sought to intervene in the Family Court proceeding on behalf of Michael and/or Danny. The Defendants suggest that the Plaintiffs' broad assertions are not based in fact and that, at the present time, the Family Court has approved of the permanency plan that the DCYF has developed on behalf of Danny and Michael.

## III. Argument

### A. Younger Abstention

Contrary to the Plaintiffs' assertions, application of the ***Younger*** Doctrine and this Court's abstention from addressing the claims of this Amended Complaint is appropriate under the case law of this District Court, the First Circuit and the United States Supreme Court. Abstention is appropriate because the pending State Family Court proceedings are of a nature contemplated by ***Younger***, the relief requested by Plaintiffs in their Amended Complaint would interfere with the Rhode Island Family Court proceedings, the

Plaintiffs' cases and pending Family Court actions involve important state interests and the Family Court provides Plaintiffs with adequate opportunities to raise their constitutional claims.

**i. Comity**

Plaintiffs' argument that abstention under ***Younger*** is not necessary as traditional notions of comity are not offended because the State of Rhode Island accepts funding under Title IV-E for its child welfare system is without merit. Plaintiffs' assert that their "Amended Complaint invades no preserved field of unfettered state sovereignty, but instead seeks prospective injunctive relief strictly over those state agency officials responsible for operating Rhode Island's child welfare system in compliance with federal mandates." ***Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss*** at p. 22. Plaintiffs direct this Court to the First Circuit's decision of *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005) and *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *5 n.5 (E.D. Mich. Apr. 17, 2007).

The Defendants disagree with Plaintiffs' characterization that this lawsuit and any prospective injunctive relief granted will only affect state agency officials administering the child welfare system. Plaintiffs allege in the Amended Complaint that their constitutional rights have been violated due to inappropriate placements, lack of services, prolonged attempts at reunification, failure to timely file to terminate parental rights, etc. and that this Court should issue prospective injunctive relief. However, in order to make such a ruling and find that Plaintiff Children have been harmed by inappropriate placements or have languished in foster care due to prolonged reunification efforts or failure to terminate parental rights, would require this Court to review, reverse and dictate

to the Rhode Island Family Court how it should rule on the specific cases of abused or neglected children under its original jurisdiction. Asking this Federal Court to oversee and manage the justices of the Rhode Island Family Court and their rulings or orders on specific cases, treads on the comity that ***Younger*** was so very concerned about. Contrary to Plaintiffs' claims, this case does implicate issues of comity between the State and Federal Government.

Moreover, the First Circuit did not decline to abstain under ***Younger*** in ***Rio Grande*** because comity would not be impacted as Puerto Rico participated in the federal-state funded Medicaid Program. Rather, the First Circuit declined to abstain only after finding that the facts of ***Rio Grande*** did not satisfy the requirements of ***Younger*** or the ***Middlesex*** test. The Plaintiffs also refer this Court to United States District Court for the Eastern District of Michigan's decision in ***Dwayne B. v. Granholm***, No. 06-13548, 2007 WL 1140920, at *5, n.5 (E.D. Mich. Apr 17, 2007) in support of its argument that there are no comity or federalism concerns presented by the lawsuit because a state voluntarily agreed to federal oversight of its foster care system in exchange for federal funding. In making such a broad, sweeping statement, the ***Dwayne B***. Court merely referred to Plaintiffs' Motion rather than citing any specific case law in support. Despite this statement, the ***Dwayne B***. Court still analyzed the facts of that case under the ***Middlesex*** criteria to see whether ***Younger*** abstention was appropriate.

The Plaintiffs' claims that comity is not a concern implicated by this lawsuit is without merit.

**ii. Alleged "Threshold" Considerations Under *Rio Grande***

In their *Opposition Memorandum*, Plaintiffs erroneously claim that the Defendants have not satisfied some "threshold" established by the First Circuit in *Rio Grande* and, therefore, *Younger* abstention should not be applied. Specifically, Plaintiffs claim that their Amended Complaint: (1) is not an enforcement action[1] and (2) the relief sought will not interfere with any Family Court proceedings. Plaintiffs claim that their Amended Complaint exclusively seeks relief from state executive action and does not implicate the Rhode Island Family Court. Defendants disagree.

As addressed extensively in the Defendants' *Memorandum in Support of their Motion to Dismiss* and further supported by the Family Court exhibits, the relief sought by Plaintiffs does interfere with past, present and future Family Court proceedings and orders concerning Plaintiff Children and their proposed class members. The "wrongs" and "harms" that Plaintiffs allege in the Amended Complaint and their request for prospective relief do and will interfere with pending Rhode Island Family Court cases. Specific examples of this conflict are set forth at pages 45-47. This lawsuit is precisely the type envisioned by *Younger* and its progeny. Thus, even under some "threshold" that Plaintiffs assert is set forth by the First Circuit in *Rio Grande*, abstention is appropriate.

Additionally, both the United State Supreme Court and the First Circuit have likened state court actions surrounding allegations of abuse and neglect to "enforcement proceedings." Although the Family Court has entered orders adjudging Plaintiff Children

---

[1] Plaintiffs make a bold assertion that the First Circuit has only applied *Younger* abstention to "claims that would review or enjoin clear-cut enforcement proceedings" and, therefore, it is not appropriate in the instant lawsuit. *Plaintiffs' Opposition Memorandum* at page 28. However, the list of First Circuit abstention cases cited by Plaintiffs at footnote 35 at Page 28 is not all-inclusive.

as abused or neglected, the Family Court is required by statute to continue to exercise jurisdiction over these cases and to conduct on going court reviews and permanency hearings in each case. *(See R.I.G.L 40-11-12.1, 40-11-12.2 and Rhode Island Family Court Rules of Juvenile Proceedings Rule 17)*. Moreover, many children in the class Plaintiffs seek to certify are the current subjects of petitions alleging abuse or neglect. The First Circuit has determined that ***Younger*** applied to a child welfare case where a finding of abuse or neglect has been entered and termination of parental rights is to follow. Based on the holdings of the United States Supreme Court and the First Circuit, the pending Family Court cases may be characterized as "enforcement" type proceedings under *Younger*.

The United States Supreme Court in ***Moore v. Sims***, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) applied ***Younger*** abstention in the context of a state court child abuse case. The ***Moore*** Court explained that:

> The *Younger* doctrine, which counsels federal-court abstention when there is a pending state proceeding, reflects a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff. *Samuels v. Mackell*, 401 U.S. 592, 95 S.Ct. 1200, 43 L Ed.ed 688 (1971). That policy was first articulated with reference to state criminal proceedings, but as we recognized in *Huffman v. Pursue, Ltd*., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the basic concern – *that threat to our federal system posed by displacement of state courts by those of the National Government – is also fully applicable to civil proceedings in which important state interests are involved*. As was the case in *Huffman*, *the State here was a party to the state proceedings, and the temporary removal of a child in a child-abuse context is, like the public nuisance statute involved in Huffman, "in aid of and closely related to criminal statutes*." Id. at 604, 95 S.Ct., at 1208. The existence of these conditions, or the presence of such other vital concerns as the enforcement of contempt proceedings, *Juidice v. Vail*, 430 U.S. 327. 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), or the vindication of "important state policies such as safeguarding the integrity of [public assistance] programs," *Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977), determines the

> applicability of ***Younger-Huffman*** principles as a bar to the institution of a later federal action.

442 U.S. 415, 423, 99 S.Ct. 2371, 2377. Emphasis Added.

Although there are some factual distinctions in so much as the federal lawsuits were brought by the parents, the First Circuit has had the brief opportunity to address ***Younger*** in the aspect of a child abuse case. In ***McLeod v. Maine Department of Human Services***, 1999 WL 33117123 (D.Me. Nov. 2, 1999)(not reported in F.Supp.2d), the United States District Court for the District of Maine, abstained under ***Younger*** and dismissed a complaint involving child welfare. As background to its decision, the District Court related:

> McLeod alleges that her three minor children were removed from her custody and placed in the custody of DHS in August 1997. Complaint (Docket No.2) at [1]. DHS purportedly failed to provide certain services mandated by state law, among them an effort to reunite McLeod and her children. ***Id***. At some unspecified date DHS sought a "cease reunification" order, which was granted by the Main District Court. ***Id***. at [2]. The Law Court affirmed this judgment. ***Id***. DHS contends, and McLeod acknowledges, that she is in the midst of an ongoing state-court child protection proceeding in which the next step in the continuum is termination of parental rights. Defendant's Motion at 1-2; Plaintiff's Objection to Defendant's Motion to Dismiss ("Opposition") (Docket No. 4) at [2]("In this case, the pending action in state courts is to terminate Ms. McLeod's parental rights of her three children."). On the bases of the alleged violations of her rights pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA"), and the due process clause of the Fourteenth Amendment to the United State Constitution, McLeod asks this court to issue an injunction compelling DHS to provide reunification services and to award damages (including punitive damages), costs and fees. *See generally Complaint.*

1999 WL 33117123 at page 1. In making its determination whether to abstain based on ***Younger***, the District Court explained:

> McLeod concedes that she is in the midst of ongoing state child-custody proceedings. She does not argue that those proceedings antedate the filing

> of the instant complaint. *See generally* Opposition.
>
> The question of child custody implicates an important, if not paramount, state interest. ***See, e.g.***, ***Moore v. Sims***, 442 U.S. 415, 423 (1979) (recognizing applicability of ***Younger*** doctrine to cases concerning state proceedings for temporary removal of child in child-abuse context); ***Malachowski v. City of Keene***, 787 F.2d 704, 708 (1st Cir.1986) (noting that Supreme Court had expanded applicability of ***Younger*** doctrine to many categories of civil proceedings, including state child-custody actions).
>
> Finally, Maine courts afford an opportunity to challenge a state-initiated child-welfare or child-custody proceeding on federal statutory or constitutional grounds. ***See, e.g.***, ***In re Christmas C.***, 721 A.2d 629, 631-32 (Me.1998) (adjudicating challenge to cease-reunification order on federal constitutional due-process grounds); ***In re Angel B.***, 659 A.2d 277, 279 (Me.1995) (adjudicating challenge to termination of parental rights on ADA grounds). ***See also*** ***Moore***, 442 U.S. at 425 ("The pertinent issue is whether appellees' constitutional claims could have been raised in the pending state proceedings.").
>
> * * *
>
> In sum, McLeod falls short of demonstrating a compelling reason for this court to consider intruding into pending state child-custody proceedings through the granting of either the injunctive or monetary relief she seeks. ***See, e.g.***, ***Bettencourt v. Board of Registration in Med.***, 904 F.2d 772, 777 (1st Cir.1990) (noting that injunction could immobilize and money damages embarrass pending state proceedings to revoke plaintiff's license to practice medicine).

***Id***. at pp.1-2. Footnote omitted. Plaintiff McLeod appealed the District Court's decision to the First Circuit, which in an unpublished opinion ruled that:

> After a thorough review of the parties submissions and of the record, we affirm. In order to establish that an exception to abstention under ***Younger v. Harris***, 401 U.S. 37 (1971), would be appropriate, appellant must show that the "extraordinary circumstances" in question "render the state court incapable of fairly and fully adjudicating the federal issues before it."***Id.*** (***quoting Kugler v. Helfant***, 421 U.S. 117, 124-25, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975)). This is a "narrow exception" to the *Younger* abstention doctrine. ***See*** ***Huffman v. Pursue, Ltd.***, 420 U.S. 592, 611, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); ***see also*** ***United Books, Inc. v. Conte***, 739 F.2d 30, 34 (1st Cir.1984). The irreparable injury that is threatened

> must be one " 'other than that incidental to every [ ] proceeding brought lawfully and in good faith.'" *Younger*, 401 U.S. at 47 (quoting ***Douglas v. City of Jeannette***, 319 U.S. 157, 164 (1943)).
>
> Appellant has not alleged facts showing that the state court is somehow incapable of adjudicating this matter including the federal issues, nor has she alleged an injury that is different "than that incidental to every [child protection] proceeding brought lawfully and in good faith.' " *Id.* Appellant's argument that her federal action would not interfere with the state action is unsupported by detailed argument and is inherently unpersuasive; the conduct of parts of the same controversy in federal court, after a state proceeding has begun, *is* an interference with the state proceeding. Further, it appears that if the federal court were to grant the relief she requests, its judgment would conflict with the previous order of the state court to "cease reunification." Abstention is most appropriate in such circumstances.
>
> Thus, the lower court correctly abstained from this matter. *See* ***Moore v. Sims***, 442 U.S. 415, 434-35, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (since state courts traditionally have addressed important matters of family relations, allegation that those relations are threatened by ongoing state proceedings is insufficient, standing alone, to justify exception to abstention doctrine).

*McLeod v. Maine Department of Human Services*, 229 F.3d 1133, 2000 WL 869512 (1st Cir. 2000).

Additionally, in ***Malachowski v. City of Keene***, 787 F.2d 704(1st Cir. 1986), the First Circuit applied ***Younger*** and abstained from entertaining parents' alleged violations of constitutional rights that occurred during the context of a state court juvenile delinquency proceedings. In that case, the Malachowski's daughter Amy was placed in foster care "pursuant to a consent order entered as a result of a petition alleging abuse and/or neglect filed in Keene District Court by the New Hampshire Division of Welfare." 787 F.2d at 706. Four months later, Amy was returned to her parents' custody. *Id*. Four months later Amy's mother reported to the local police that Amy had run away. *Id*. Amy was located by her parents and brought home, however during his investigation a police

officer observed Amy strike her father. *Id*. Amy was taken into custody and subsequently arraigned on a juvenile delinquency petition. *Id*. Several hearings were held and at the "dispositional hearing" the Keene District Court ordered that Amy remain in the custody of a foster care – the Youth Services, Inc.; family counseling and scheduled a court review two months later. *Id*. Neither Amy, through her court appointed attorney, or her parents appealed. Subsequently, Amy's parents filed a §1983 action in federal court seeking redress for alleged violations of their own constitutional rights. *Id*. Although there are some factual distinctions to the present case, the First Circuit's reasoning for abstaining under *Younger* is helpful. The First Circuit held that:

> There is no question that *Younger* principles apply to the instant action. The Supreme Court has expanded the applicability of *Younger* to many categories of civil proceedings, including a state child custody action. *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). Whether the Keene District Court juvenile delinquency proceedings are characterized as quasi-criminal or as child custody proceedings, therefore, the propriety of federal interference with them must be judged by *Younger* standards. Insofar as appellants seek an order returning Amy to their custody, "the fact that 'family law' is at issue here makes 'abstention' particularly appropriate." *Friends of Children, Inc.*, *supra*, 766 F.2d at 37.
>
> Applying those standards, we find that the district court's abstention from asserting jurisdiction over appellants' injunctive claims was fully justified. Appellants filed the instant complaint in federal court on November 1, 1984, before the end of the 30-day period specified in N.H.R.S.A. 169-B:29 during which Amy, or perhaps appellants on Amy's behalf, could have appealed the October 11 dispositional order to the New Hampshire Superior Court. Even if appellants could not bring a direct appeal on their own behalf under that statute, they had open to them the option, with no express time limitation, of seeking a writ of certiorari from the New Hampshire Supreme Court to review the Keene District Court proceedings. N.H.R.S.A. 490:4. *See In re John M. and David C.*, 122 N.H. 1120, 1130, 454 A.2d 887 (1982). Under these circumstances, *see Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607-11, 95 S.Ct. 1200, 1209-11, 43 L.Ed.2d 482 (1975), *Younger* policies counsel abstention.
>
> Furthermore, although N.H.R.S.A. 169-B:29 fixed the state district court's dispositional order as the only proper occasion for the minor's appeal as of

> right to the superior court for a de novo hearing-reflecting a legislative policy judgment that a right to de novo review at any other point in juvenile delinquency proceedings is unnecessary, ***see*** ***In re Cindy G.***, 124 N.H. 51, 58, 466 A.2d 943 (1983)-the district court juvenile delinquency proceedings were not finally concluded at that time. Instead, the district court retains jurisdiction and must review its disposition at least once annually. N.H.R.S.A. 169-B:31; ***In re Cindy G.***, ***supra***, 124 N.H. at 57-58, 466 A.2d 943. In the instant case the record reveals that the Keene District Court has reviewed Amy's disposition on at least two occasions following its initial dispositional order, on December 27, 1984, and on February 13, 1985. Appellants' filings herein indicate that appellants have presented further requests for a return of Amy's custody, or for other relief, to the Keene District Court on numerous occasions. At the time the district court dismissed appellants' injunctive claims, therefore, the Keene District Court still remained available as a local forum where appellants could press objections to Amy's custody.

***Id***. at 708-709.

Plaintiffs failed to acknowledge the First Circuit's application of Younger in ***McLeod*** and ***Malachowski***. The First Circuit's reasoning and abstention clearly contradicts Plaintiffs' claims that this case is not the type of proceeding that the First Circuit would apply ***Younger*** abstention. The Defendants have clearly satisfied any "threshold" issue that the Plaintiffs claim is prescribed in ***Rio Grande***. Younger abstention is appropriate in this case.

**iii. *NOPSI* and *Rio Grande***

Plaintiffs erroneously claim that the First Circuit's decision in ***Rio Grande*** and the United States Supreme Court's decision in ***New Orleans Public Service, Inc. v. Council of the City of New Orleans***, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) preclude the application of ***Younger*** to their Amended Complaint. Their basis for such an assertion is that ***Younger*** "does not apply to this action, which exclusively seeks relief from state executive action." *Opposition Memorandum* at Page 24. The Defendants

disagree. ***Rio Grande*** and ***NOPSI*** are factually distinguishable from this case and are not controlling.

In ***NOPSI***, a utility company requested permission from the New Orleans City Council ("Council"), the local government agency responsible with ratemaking authority, to institute a rate increase. 491 U.S. at 355, 109 S.Ct. 2511. The Council denied NOPSI's request. ***Id***. NOPSI filed an action for injunctive and declaratory relief in the Federal District Court. ***Id***. The District Court dismissed NOPSI's lawsuit under the *Johnson Act* and indicated it would also abstain under ***Burford*** Doctrine. On appeal, the Fifth Circuit initially reversed the District Court's decision on both grounds; however, on its own motion, it vacated this decision and held that abstention was appropriate under both ***Burford*** and ***Younger***. 491 U.S. at 355-56, 109 S.Ct. 2511. NOPSI filed two subsequent suits in the federal district court in response to two subsequent decisions by the Council. 491 U.S. at 356, 109 S.Ct. 2512. Anticipating that the District Court might again abstain, NOPSI filed a petition for review of the Council's order in the Civil District Court for the Parish of Orleans, Louisiana. 491 U.S. at 357, 109 S.Ct. 2512. As NOPSI predicted, the District Court abstained. ***Id***.

The United States Supreme Court ruled that ***Younger*** abstention was not appropriate. It explained that "[w]hile we have expanded ***Younger*** beyond criminal proceedings, and even beyond proceedings in courts, we have never extended it to proceedings that are not 'judicial in nature.'" 491 U.S. at 369-70, 109 S.Ct. 2519. The Court "has never been suggested that ***Younger*** requires abstention in deference to a state judicial proceedings reviewing legislative or executive action." 491 U.S. at 368, 109 S.Ct. 2518. The Supreme Court held that NOPSI's challenge was to a completely legislative

action and did not represent an "interference with ongoing judicial proceedings against which Younger was directed." 491 U.S. at 372, 109 S.Ct. 2520.

The other case relied upon by Plaintiffs in their opposition to ***Younger*** abstention is the First Circuit's decision in ***Rio Grande***. In ***Rio Grande***, Plaintiffs, federally qualified health centers brought suit against Puerto Rico's Secretary of Health under 42 USC §1983 seeking an injunction ordering that wraparound payment monies be paid in a timely manner. 397 F.3d 56, 60. Prior to filing their federal lawsuit, the health centers sued the Secretary in state court seeking damages for past overdue payments and other relief. ***Id***.

The First Circuit held that the ongoing state proceeding involved in ***Rio Grande*** was not the proper type of proceeding to require adherence to ***Younger*** principles." ***Id***. at 69. The First Circuit acknowledged that ***Younger*** occurred within the context of a criminal state proceeding and, it subsequently has been extended to "some quasi-criminal (or at least 'coercive') state civil proceedings - and even administrative proceedings - brought by the state as enforcement actions against an individual." As an example of such proceedings, the First Circuit cited the United States Supreme Court's decision in ***Moore v. Sims***, 442 U.S. 415, 423, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) where "***Younger*** abstention [was] appropriate in context of state child removal proceedings due to allegations of child abuse." ***Id***. ***Younger*** has also been extended to those "situations uniquely in furtherance of the fundamental workings of a state's judicial system." ***Id***. The First Circuit stated that it was "unclear exactly how far this second rationale extends, although it is related to the coercion/enforcement rationale." ***Id***.

The ***Rio Grande*** Court found that neither situation was present in that case and, thus declined to abstain under ***Younger***. ***Id***. at 70. The First Circuit found that the state court action for payment of wraparound benefits by Puerto Rico's Secretary of Health was more appropriately characterized as "judicial review of executive action," similar to *New Orleans Public Serv., Inc. (NOPSI) v. Council of City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). A second reason why the First Circuit found ***Younger*** abstention inappropriate was because the federal court suit and an injunction would not stop "the state court from proceeding independently against the state Medicaid agency as well, nor is it inconsistent with any of the Commonwealth court orders." ***Id***. at 71.

Plaintiffs' erroneously claim that the instant lawsuit is similar to ***NOPSI*** and ***Rio Grande*** and that it is only aimed at and relief would only affect the executive branch of state government. In order to make a finding that Plaintiff Children's constitutional rights have been violated, the Plaintiffs are not merely asking this Court to review and find error with decisions made by the executive on child welfare issues. The Rhode Island Family Court has issued orders addressing placement and services (areas where Plaintiffs alleged they have been harmed) as to Plaintiff Children and will continue to do so in the future. By its very essence, the Plaintiffs lawsuit implicates and challenges Family Court orders. Any remedy that this Court may fashion to rectify placement and service issues will directly and/or indirectly interfere with pending Family Court proceedings. Accordingly, NOPSI and Rio Grande are not dispositive of whether Younger applies in the instant case.

**iv. Interference Would Extend to Family Court Proceedings**

Plaintiffs argue to this Court that *Younger* abstention is not appropriate because this lawsuit only asks this Court to "review executive actions, not to review any Family Court proceeding" and that they do not ask this Court to overturn any Family Court decisions, but instead challenge the decisions made by the executive agency regarding the children's treatment, placement, and services while in the state's custody – decisions made outside the context of the state court proceedings, either the enforcement actions or the periodic reviews." *Plaintiffs' Opposition Memorandum* at pages 26-27. Despite Plaintiffs' desire to segregate the executive and judiciary's actions so that this lawsuit may proceed, the Rhode Island Family Court's active role in the placement and case plans of the named Plaintiffs cannot be denied. DCYF's actions cannot be viewed in a vacuum as they are the subject of and reviewed by the Rhode Island Family Court.

The statutory mandate given to the Family Court and the Family Court's application of its authority to the individual abused or neglected child that come before it contradict Plaintiffs' arguments. Upon the filing of an ex parte petition, the Rhode Island Family Court is statutorily authorized to ""immediately take any action *it deems necessary or appropriate* for the protection of the child, or children, suspected of being abused or neglected, including the removal of the child, or children, from the custody of the parent or parents, or other person suspected of the abuse of neglect." R*.I. Gen. Laws §40-11-7.1(a)*. At the initial hearing, the Family Court is authorized to "*make any interim orders in its discretion* respecting the rights of the child." *R.I. Gen. Laws §40-11-7.1(b)*. If the Family Court determines that the child has been abused, it enters a formal decree in which it sets forth its determination whether the child can safely be returned to

their home, award the care, custody, and control of the child to the department ***upon such terms as the court shall determine***, or place the custody of the child in the department ***until such time as it finds*** that the child may be returned to the parents or other person previously having custody or care of the child under circumstances consistent with the child's safety. *R.I. Gen. Laws §40-11-12*. If the Court does not return the child to his/her parents' custody, "the court shall direct … [DCYF] to submit within thirty (30) days a written plan for care and treatment… .The ***court shall thereupon approve or modify such plan, or shall remand the plan to …[DCYF] for further development or resubmission***." *Rhode Island Family Court Rules of Juvenile Proceedings Rule 17*. Upon approval of this individualized plan, ***the Court shall direct DCYF to "review such plan*** and report thereon to the court not later than six (6) months thereafter." ***Id.***

The service plan that is submitted to the Family Court for its review and consideration must include a statement of the needs of each child as well as the "proposed treatment and placement" for each child. *R.I. Gen. Laws §42-72-10(a)*. The Department must ensure that the service plan is subject to review every six months for purposes of determining, "…whether the service plan is in the best interests of the child and is also cost effective." *R.I. Gen. Laws §42-72-10 (a)*. Moreover, plans that refer to a goal of "adoption "or placement in another permanent home, must include, "…documentation of the steps the department is taking to find an adoptive family or other permanent placement, to place the child in such a family or placement, and to finalize permanency." *R.I. Gen. Laws §42-72-10 (c)*.

At each regularly scheduled review and/or permanency hearing of any child found to be neglected and/or abused, DCYF is required to present a written reunification or

permanency plan to the Family Court. *R.I. Gen. Laws §40-11-12.2*. The DCYF service plan shall include a statement as to, "…whether, and if applicable when, the child will be returned to the parent, placed for adoption, referred for legal guardianship, placed with a fit and willing relative, or (in cases whether the department can show the court compelling reasons why the foregoing placements or referrals would not be in the child's best interests) placed in another planned permanent living arrangement." *R.I. Gen. Laws §40-11-12.2 (a)*. As a matter of law, the Family Court is vested with the exclusive authority to pass judgment on the plan. R.I. Gen. Laws §40-11-12.2 (a) requires that "the plan may be approved and/or modified by a justice of the family court and incorporated into the orders of the court, at the discretion of the court." Accordingly, if the Family Court accepts the plan, the Court is determining that the child's placement, services and reunification or permanency plan is appropriate and in the best interest of the child. If the Court orders the plan to be modified it is finding that some aspect of placement, services or permanency is not appropriate or is deficient and compels DCYF to alter the services or placement until accepted by the Court. By the plain face of the statute, the Family Court is reviewing decisions that DCYF may make as to the placement and services to an abused or neglected child in its custody and either accepting those arrangements as being in the best interest of the child or requiring DCYF to make alternative placements or services that are then subject to approval by the Court. Therefore, although the Plaintiffs identify court orders where the wording indicates that a child is placed in the custody of DCYF with discretion to placement, ultimately the Family Court exercises its authority to review the child protective petitions and has the authority to accept, modify or reject the

DCYF plan for services; including the Department's recommendations relating to placement and permanency planning.

The Plaintiffs' lawsuit asks this Court to find that DCYF placed the Plaintiff children in unstable and inappropriate placements, failed to establish a permanency plan, failed to timely terminate parental rights, unnecessarily placed them in institutions, etc. The Plaintiffs contend that they are not asking this Court to "review any Family Court proceeding" as the Rhode Island Family Court lacks authority regarding such issues as placement. The facts of the Plaintiff Children's cases contradict these statements:

* Exhibit A-16 & 17 – The Family Court approved DCYF's case plan for Brianna H. and approved a goal of reunification with her parents. The Family Court ordered that Brianna's father may supervise the visits with her mother.

* Exhibit A-23. The Family Court ordered that Brianna is ordered into the temporary custody of DCYF and expressly ordered placement with a specifically named relative. The Family Court further ordered no unsupervised visits.

* Exhibit A-28. The Family Court entered an order that Brianna, Clare and Alexis are "committed to the care custody and control of DCYF" and ordered placement of the three children with a specifically named relative and her spouse. The Court also entered a specific order regarding the time of visitation.

* Exhibits D- 26 and D-60 – In July of 2006, the Family Court entered an order in the case of Sam and Tony M. which approved of the DCYF case plan and specifically found that DCYF was making reasonable efforts toward achieving a permanency plan goal of adoption.

* Exhibits D-27 and D-61- In January of 2007, the Family Court once again approved of the DCYF case plan as it relates to Sam and Tony M. and found that DCYF was making reasonable efforts toward achieving a permanency plan goal of adoption.

* Exhibit C -13 In April 14, 2003, the Family Court convened a permanency hearing on behalf of the child Caesar S. At the conclusion of the hearing, the Family Court approved of the Department's case plan goal and the trial judge noted that Caesar would continue to reside in relative foster care.

* Exhibit C-22 and C-23: At the conclusion of a permanency hearing conducted on May 10, 2004 relating to the child, Caesar S., the Family Court entered an order approving DCYF's case plan. In addition, the Court concluded that the case plan's goal of reunification was appropriate and that DCYF had made reasonable efforts to facilitate reunification of Caesar with his parents. Additionally, the Family Court found that DCYF had documented a compelling reason to continue efforts to work toward a case plan goal of reunification. Finally, it ordered that DCYF was required to continue to make efforts to reunify Caesar with his mother until August of 2004.

* Exhibit C-44 In November of 2006, at the conclusion of a permanency hearing, the Family Court approved the Department's case plan as well as the permanency goal of adoption for the child, Caesar S. In addition, the Family Court made a finding that DCYF had made reasonable efforts to finalize a permanency goal of adoption or guardianship.

* Exhibit E-19 In the case of David T., the Family Court specifically authorized placement of David T. with a relative who resided out of state in February of 1999.

* Exhibit E-58 In December of 2000, the Family Court found that placement of David T. in an out of state program was necessary.

* Exhibits E-38 and E-39- In November of 2005, the Family Court conducted a permanency hearing on behalf of the child, David T. At the conclusion of the hearing, the Family Court entered an order in which it approved of the DCYF case plan and the goal of "long term living arrangement with other." In addition, the Family Court made a finding that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative was not an appropriate permanency plan goal for David and that DCYF had made reasonable efforts to finalize a permanency plan goal of another planned alternative living arrangement. The Family Court also directed that DCYF continue to make placement referrals on behalf of David T. through the DCYF Care Management Team and the case was continued to January 9, 2006 for review.

* Exhibit E-41- On February 6, 2006, held a review of the child protective petition relating to the child, David T. At the conclusion of the review, the Family Court noted on the Court disposition form that DCYF was awaiting approval from Massachusetts to place the child, David T. at Merrimack Center.

* Exhibit E-42, E-43, and E-75 – In November of 2006, the Family Court held a permanency hearing on David T's case. At the conclusion of the hearing, the Family Court issued an Order app roving DCYF's case plan. In addition, the Family Court found that DCYF had documented a reason why return home, adoption, guardianship or placement with a relative was not an appropriate permanency plan goal for David and the Court held that the goal of another planned living arrangement was the most appropriate permanency plan goal for David. The Family Court also found that

DCYF had made reasonable efforts to finalize the permanency goal of another planned alternative living arrangement. The trial judge noted on the Court disposition form that David continued to be placed at Merrimack Center and that he was not enrolled in an educational component. The trial judge further noted that DCYF was pursing placement for David T at Swansea Woods or Meadow Ridge; two residential treatment programs located within Massachusetts.

It is clear from the Family Court orders pertaining to the Plaintiff Children that the Rhode Island Family Court did evaluate and approve of DCYF's placements, services, etc. specifically or by expressly accepting the case plans. Moreover, in some instances the Family Court ordered that the children be placed with a specifically named individual or at an institution. Since Plaintiffs' Amended Complaint alleges that DCYF violated their constitutional rights by these very actions and seeks prospective relief on these same issues, any remedy would necessarily interfere with the Rhode Island Family Court and its ongoing proceedings.

When determining what constitutes "interference" under ***Younger***, the Court must look to determine whether the relief sought would either directly or indirectly interfere in a state court proceeding. The United States Supreme Court elaborated on "direct" and "indirect" interference in ***O'Shea v. Littleton***, 414 U.S. 488, 94 S.Ct., 669, 38 L.Ed.2d 674 (1974). In ***O'Shea***, the respondents alleged "that [a state prosecutor and his investigator, the police commissioner, a magistrate and judge of court] have intentionally engaged in, and are continuing to engage in, various patterns and practices of conduct in the administration of the criminal justice system in Alexander County that deprive" them of their constitutional rights. 414 U.S. at 489, 94 S.Ct. 673. The respondents sought an

injunction aimed at preventing these practices. In finding that the federal court should have abstained under ***Younger***, the United States Supreme Court explained:

> *A federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable*. In concluding that injunctive relief would be available in this case because it would not interfere with prosecutions to be commenced under challenged statutes, the Court of Appeals misconceived the underlying basis for withholding federal equitable relief when the normal course of criminal proceedings in the state courts would otherwise be disrupted. The objection is to unwarranted anticipatory interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts; the object is to sustain ' (t)he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' *An injunction of the type contemplated by respondents and the Court of Appeals would disrupt the normal course of proceedings in the state courts* via resort to the federal suit for determination of the claim ab initio, just as would the request for injunctive relief from an ongoing state prosecution against the federal plaintiff which was found to be unwarranted in *Younger*. *Moreover, it would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class.* The Court of Appeals disclaimed any intention of requiring the District Court to sit in constant day-to-day supervision of these judicial officers, but the 'periodic reporting' system it thought might be warranted would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity

414 U.S. at 500-501, 94 S.Ct. 678-979 (citations and footnotes omitted). Emphasis Added.

Thus, applying the reasoning in *O'Shea* to this lawsuit, any remedy addressing Plaintiffs' complaints would require that this Court continuously supervise and oversee the Family Court's decisions on placement and services to Rhode Island children who are suspected of being neglected or abused. The Defendants submit that such action would constitute an interference that *Younger* seeks to avoid.

**v. Cases from Other Jurisdictions**

Plaintiffs identify similar lawsuits that have been brought across the country alleging systemic deficiencies in state child welfare system. Many of the plaintiffs in these other lawsuits have argued that ***Younger*** abstention was not appropriate because the lawsuit and requested remedy were directed at the executive branch of state government. Ultimately, there is a split of authority on the issue. *See* *Foreman v. Heinman*, 240 F.R.D. 456 (D.Neb. 2007)(District Court found that "[f]ederal court injunctive orders against HHS would undermine and interfere with the Nebraska juvenile court's ability to exercise the full extent of its authority over juvenile court proceedings); *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) (Eleventh Circuit affirmed the District Court's application of ***Younger*** abstention and that court must look beyond who the order is directed at in name and view the practical affect); *cf* *Kenny A. v. Perdue*, 218 F.R.D. 277 ((N.D.Ga.2003)(Court found that requested relief was aimed at executive branch and would not impact pending juvenile proceedings. The Court stated, however, that it was important to note that "once the juvenile court grants legal custody of a child to DFCS, the Court is powerless to order DFCS to give physical custody of the child to a particular foster parent or otherwise restrict the actual placement of the child."); *Dwayne B. Granholm*, 207 WL 1140920 (E.D.Mich.2007)(District Court found that *Younger* did not apply as relief was not directed at the juvenile courts); *Brian A. v. Sundquist*, 149 F.Supp.2d 941(M.D.Tn.2000)(District Court determined, in a brief analysis, that the lawsuit would not interfere with state juvenile court cases).

In ruling on ***Younger*** in this lawsuit, this Court must look to the specific facts of this case, review the Rhode Island Family Court's role, as set forth in statute and practice

(see Defendants' exhibits) – and determine whether the relief sought by the Plaintiffs will interfere with pending Family Court cases. By crafting a vague request for relief, the Plaintiffs have made this task challenging. However, the Plaintiffs should not be permitted to avoid an appropriate application of ***Younger*** abstention in this case because of its vague request for relief.

The Nebraska District Court in ***Foreman*** applied ***Younger*** despite the vaguely worded relief in Plaintiffs' Amended Complaint. In order to perform this analysis, the ***Foreman*** Court attempted to describe what relief would look like in concrete terms. Once having done that and reviewing the Nebraska state juvenile court system, it was evident that any relief would impact the state judicial system. Taking a page from the ***Foreman*** decision, the Defendants, in their ***Memorandum of Law in Support of their Motion to Dismiss***, attempted to similarly set forth what relief may look like in concrete terms, how its impact could not be limited to the executive branch and how that would ultimately interfere with proceedings before the Rhode Island Family Court.

The ***Foreman*** Court rejected the argument asserted here that abstention under ***Younger*** was not appropriate because the lawsuit and requested remedy was directed at the executive branch. In rejecting this argument, the ***Foreman*** Court reasoned:

> Citing *Kenny A.,* the plaintiffs argue that their litigation is directed at the HHS department, not the courts, and any federal order would assist rather than interfere with the juvenile court by imposing higher standards on HHS. The Georgia juvenile court system at issue in *Kenny A.* distinguishes that case from this lawsuit. As noted by *Kenny A.,* " under Georgia law, once the juvenile court grants legal custody of a child to DFCS, the court is powerless to order DFCS to give physical custody of the child to any particular foster parent or otherwise restrict the actual placement of the child." *Kenny A.,* 218 F.R.D. at 286 n. 6. In *Kenny A.,* the juvenile court's authority over the state social service department was very limited, and the federal court could arguably assist that juvenile court by issuing orders against the state agency, orders that the juvenile court itself was powerless

> to enter. Such is not the case in Nebraska.
>
> Article V, § 27 of the Nebraska Constitution authorized the Nebraska legislature to " establish courts to be known as juvenile courts, with such jurisdiction and powers as the Legislature may provide." Ne. Const. Art. V, § 27. Consistent with this authority, the legislature enacted Neb.Rev.Stat. § 43-285 which states:
> When the court awards a juvenile to the care of the Department of Health and Human Services, an association, or an individual in accordance with the Nebraska Juvenile Code, the juvenile shall, unless otherwise ordered, become a ward and be subject to the guardianship of the department, association, or individual to whose care he or she is committed. Any such association and the department shall have authority, ***by and with the assent of the court,*** to determine the care, placement, medical services, psychiatric services, training, and expenditures on behalf of each juvenile committed to it.
>
> Neb.Rev.Stat. § 43-285(1)(LEXIS 2005)(emphasis added). Accordingly, " [e]ven though any remedial order would run against the Department, state law makes it a duty of state courts to decide whether to approve a case plan, and to monitor the plan to ensure it is followed." *31 Foster Children*, 329 F.3d at 1279. Exercising federal court oversight over HHS' conduct on behalf of a child would serve to duplicate the authority already afforded to the Nebraska juvenile court by the Nebraska legislature. Federal court injunctive orders against HHS would undermine and interfere with the Nebraska juvenile court's ability to exercise the full extent of its authority over juvenile court proceedings.

240 F.R.D. 529-530.

The Eleventh Circuit rejected a similar argument that the lawsuit and remedies were directed at the state child welfare agency in *31 Foster Children*. In so doing, the Eleventh Circuit explained that:

> The plaintiffs argue that the requested relief would not interfere because it is directed solely at the Department of Children and Families and not the state courts. We previously rejected essentially that same argument in ***Luckey V,*** and we reject it again here. In that case, the plaintiffs sued the Governor of Georgia and all state court judges who presided over prosecutions of indigent defendants. 976 F.2d 673, 678. The plaintiffs contended that the relief they requested against the Governor of Georgia would not interfere with state court proceedings because the onus to comply would be on the state executive and not the judiciary. ***Id.*** We observed that " a case cannot be decided in a vacuum, and the potential

> enforcement difficulties of any order reforming such an integral aspect of a state criminal justice process as the indigent defense system would be significant." ***Id.*** at 679. This case raises the same concerns that ***Luckey V*** did, and the federal court relief the plaintiffs seek would interfere with the ongoing state dependency hearings, even if it were directed against the Department and state officers, instead of state courts and judges.

329 F.3d at 1279, fn. 11. The Defendants submit that the reasoning by the federal courts in ***Foreman*** and ***31 Foster Children*** is persuasive and applicable here. Given the significant role the Rhode Island Court plays in the placement, treatment and services of abused or neglected children in state custody any remedy that this Court may fashion would not only be directed against the named Defendants but also against the Rhode Island Family Court. Indeed, any such order would abolish the Rhode Island Family Court's ability to place a child or order treatment for a child contrary to this Court's order. That is truly an astonishing request in that the Child Advocate has never asserted in Family Court any disagreement with any action by DCYF or any ruling of said Court for any of these children. Moreover, the Child Advocate, when invited by DCYF to participate in a pending hearing for a named plaintiff after filing this case, wrote that "the Office of the Child Advocate recognizes the Family Court's authority to make decisions in individual cases and we will not interfere with the Court's decision-making process." See Exhibit F.

Plaintiffs urge this Court to reject the sound reasoning of the Eleventh Circuit in ***31 Foster Children***, the United States District Court for Nebraska in ***Foreman***[2] and the Tenth Circuit in ***J.B. ex rel. Hart v. Valdez***, 186 F.3d 1280 (10th Cir. 1999) claiming that they are "nonbinding," "wrongly decided" and "have never been certified as class

[2] If the District Court's decision in ***Foreman*** was so glaringly wrong and deficient as Plaintiffs' counsel asserts, it is surprising that the plaintiffs' counsels, which included Children's Rights, did not appeal to the Eighth Circuit Court of Appeals.

actions." *Plaintiffs' Opposition Memorandum* at pages 31-33. The issue of whether to certify a class in this case is an issue that has not been decided by this Court and should not be a consideration in whether ***Younger*** compels abstention. Moreover, it is evident from their decisions, that the fact that these federal courts declined to certify a class was not a factor in ruling whether ***Younger*** abstention was appropriate. Each of these decisions provides an extensive analysis of the states' respective child welfare system, their juvenile/family court's role and a detailed discussion of ***Younger*** as it applies to the facts.

Admittedly, there are federal court decisions that agree with many of Plaintiffs' positions; however, to use Plaintiffs' words, these decisions are not binding on this Court. Yet, each case must be considered based upon the unique facts and circumstances that are presented. In the instant case, as demonstrated above, the Rhode Island Family Court routinely exercises its broad statutory authority in its exercise of jurisdiction in cases invoking abused and/or neglected children.

**vi. *Middlesex* Test**

Plaintiffs' claim that ***Younger*** abstention is not warranted because the three part test set forth in ***Middlesex County Ethics Comm. V. Garden State Bar Ass'n***., 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) has not been met is without merit. It is undisputed that when determining whether ***Younger*** is appropriate this Court must consider whether (1) there is an ongoing state judicial proceeding, (2) that implicates an important state interest, and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge. ***Middlesex***, 457 U.S. at 432, 102

S.Ct. at 2521. Performing this analysis to the specific facts of this case compels abstention.

**a. Interference with State Court Proceeding**

Plaintiffs claim that there are no ongoing Family Court proceedings for the seven Plaintiff Children. Citing ***Office of Child Advocate v. Lindgren***, 296 F.Supp.2d 178 (D.R.I. 2004), Plaintiffs assert that the Family Court proceedings are merely isolated points at which the Family Court "re-enters the proceeding after awarding custody of the Child to DCYF." ***Plaintiffs' Opposition Memorandum*** at Page 35. Defendants' vehemently disagree with this characterization – as is evidenced by the contact between the Family Court and the named Plaintiffs. In ***Lindgren***, the District Court was confronted with vastly different facts than the present case. The District Court considered ***Younger*** in the context of a twelve year old consent decree, the motion to adjudge in contempt was not brought in the name of any specific child and the three children named in the Plaintiffs' Complaint were in their thirties at the time the motion was heard. 296 F.Supp.2d at 191. The District Court also qualified its holding as to the existence of "ongoing family court proceedings" to the specific facts presented to it. In so doing, the District Court explained:

> Defendant has not made a showing that there is a pending state proceeding regarding any child involved in this case. That is obviously because Plaintiff has not brought the motion to adjudge in contempt on behalf of any specific child in DCYF custody. Although the question of abstention may recur when the Court hears that motion on its merits, it is not an issue now. One thing is clear. Although the Family Court retains jurisdiction over children in state custody, that Court has no present jurisdiction over any of the three children referred to in Plaintiff's Complaint because those children are presently in their thirties. All that this Court can say now in view of the present posture of this case, is that enforcing the SACD will not interfere with any known Family Court proceeding or decision. Since there is no known ongoing state proceeding regarding any child involved

> in the case at present, there is no basis for this Court to abstain under *Younger v. Harris* at this time.

***Id***. The ***Lindgren*** Court acknowledged the decisions in ***Joseph A v. Ingram,*** 275 F.3d 1253 (10th Cir.2002) and ***31 Foster Children v. Bush***[3], 329 F.3d 1255 (11th Cir.2003) *cert denied sub nom,* ***Reggie v. Bush,*** 540 U.S. 984, 124 S.Ct. 483, 157 L.Ed.2d 376 (2003) and their findings that federal court action would interfere with ongoing state proceedings; however it found the posture of its case, enforcing the consent decree, distinguishable. ***Id***. at 191-192.

Unlike ***Lindgren***, the specific facts relating to the named Plaintiff Children demonstrate that the Family Court hearings are "ongoing" and not merely isolated points of re-entry. Most recently, Deanna's case was assigned for review and permanency hearing by the Family Court to October 17, 2007. (See Exhibit A-171, A-172 and A-172(a)); Danny and Michael's case was reviewed by the Family Court on September 12 of 2007. (See Exhibits B-25 and B-26) and the Family Court has scheduled a permanency hearing in March 2008. Caesar's case was reviewed by the Family Court on the Department's petition on August 31, 2007 and is scheduled for a permanency hearing on November 5, 2007; Sam and Tony's permanency hearing is schedule for January 10, 2008. (See Exhibits D-27, D-28, D-61 and D-62). And the Family Court continued the case for a case review and permanency hearing of David's case on November 26, 2007. (See Exhibits E-45 and E-77).

---

[3] It is interesting to note, that the plaintiffs in ***31 Foster Children***, who were also represented by Children's Rights, agreed that "continuing state dependency proceedings involving each of the plaintiffs are ongoing state proceedings for the purpose of ***Middlesex*** analysis." 329 F.3d at 1275. Florida's juvenile court review is similar to Rhode Island in many respects.

Defendants submit that the first prong of the ***Middlesex*** test has been met.

**b. Implicates An Important State Interest**

Surprisingly and contrary to the established case law, Plaintiffs contend that the second prong of the ***Middlesex*** test has not been met; specifically that the suit implicates an important state interest. In its *Opposition Memorandum (at pages 37-28)*, Plaintiffs impose some new requirement that in order for ***Younger*** to apply it must not only implicate an "important state interest" but an "***exclusive*** area of important state interest." Emphasis added. There is no legal authority to support Plaintiffs' position or interpretation.

Contrary to Plaintiffs' position, this Court, the First Circuit and other federal courts acknowledge that a state's child welfare system is an area of important state interest for purposes of ***Younger*** and the ***Middlesex*** test. ***See Moore v. Sims***, 442 U.S. 415, 434, 99 S.Ct. 2371, 2382, 60 L.Ed2d 994 (1979)("Family relations are a traditional area of state concern. This was recognized by the District Court when it noted the 'compelling state interest in quickly and effectively removing the victims of child abuse from their parents.'") ***Office of Child Advocate v. Lindgren***, 296 F.Supp.2d 178, 193 (D.R.I. 2004)("This Court acknowledges the important and sensitive nature of Rhode Island's child welfare program and the Family Court's role regarding children in state care."); ***McLeod v. State of Maine Department of Human Services***, 1999 WL 33117123 (D.Me. 1999), affirmed ***McLeod v. Maine Department of Human Services***, 229 F.3d 1133, 2000 WL 869512 (1st Cir. 2000)(The District Court held that the "question of child custody implicates an important, if not paramount state interest."); ***Foreman v. Heinman***, 240 F.R.D. 456, 524(D.Neb. 2007)("The state has a compelling interest in quickly and

effectively removing the victims of child abuse and neglect from their parents and placing them in safe and suitable homes. State conduct performed and proceedings instituted to protect children from abuse implicate sufficiently important state interests to justify ***Younger*** abstention."). Even cases repeatedly cited by Plaintiffs' in support of their position acknowledge that a child welfare system is an important state interest for the purposes of ***Younger***. See ***Dwayne B. v. Granholm***, 2007 WL 1140920, *5 (E.D.Mich.2007)("It is not disputed that Michigan has a strong interest in the welfare f children in its foster care system"); ***Kenny A. v. Perdue***, 218 F.R.D. 277, 285 (N.D.Ga. 2003)("Nor is there any dispute that these proceedings implicate important state interests in the care, disposition and welfare of deprived children.").

Plaintiffs' claim that the second ***Middlesex*** prong has not been satisfied clearly must fail.

**c. Provides an Adequate Opportunity to Advance Constitutional Challenge.**

The Plaintiffs claim that the third ***Middlesex*** prong has not been met because "Family Court is not a forum in which Plaintiff Children can adjudicate or remedy the systemic constitutional violations that are harming them, and thus abstention is improper." ***Plaintiffs' Opposition Memorandum*** at Page 38. The Plaintiffs further claim that Family Court is "an inadequate forum because the Rhode Island Family Court has no direct authority to hear class action lawsuits." ***Plaintiffs' Opposition Memorandum*** at Page 38. Defendants disagree that the third ***Middlesex*** prong has not been satisfied. Defendants submit that the Plaintiffs cannot sustain their burden and demonstrate that that the Family Court does not provide them with the opportunity to advance their constitutional claims by unsupported conclusory allegations.

Plaintiffs claim that the Family Court cannot adjudicate or remedy systemic constitutional violations that are harming them. This is a remarkable and unsupported claim since plaintiffs' counsel have never approached the Family Court with any evidence that the Plaintiffs were in unsafe and inappropriate placements, were not receiving appropriate services or treatment despite the statutory authority and responsibilities of at least one counsel. Had such claims been brought before the Family Court during the numerous hearings and case reviews, the Family Court would have had an opportunity to address them. Plaintiffs ask this Court to take judicial notice of the number of children that court appointed attorneys represent before the Family Court, *See Plaintiffs' Opposition Memorandum* at page 40, fn 44 and then make the unsupported inference because of this they do not have an opportunity to raise their federal claims in Family Court.[4] Despite Plaintiffs' sweeping allegations of overburdened legal representation, court appointed counsel for children have raised issues of constitutional dimensions that affect the children and addressed by the Family Court. *See Defendants' Memorandum in Support of their Motion to Dismiss* at pages 66 and 67. Moreover, since the Child Advocate has *never* intervened or even appeared for any of the named plaintiffs in any Family Court proceeding, she cannot even allege that the Family Court would not entertain them.

As explained in depth in the *Memorandum in Support of the Motion to Dismiss* and in this pleading, the Rhode Island Family Court has the authority and opportunity to

[4] In ***Kenny A v. Purdue***, 218 F.R.D. at 287, the U.S. District Court for Northern District of Georgia held that plaintiffs' very status as children combines with their lack of adequate adult representation due to an overburdened caseload created an insurmountable procedural obstacle that preclude them from asserting their constitutional claims in state juvenile court.

address the harms alleged by Plaintiff Children. The Family Court not only can address placement of children – and as seen in the case of Brianna, Clare and Alexis – it has final say over such placement and it has even directed a specific person with whom to place the children. The Family Court reviews each child's case plans, which detail the proposed treatment and placement for each child, addresses a permanency plan and requires documentation of the steps DCYF is taking with respect to permanent placement. *R.I. Gen. Laws §42-72-10*. If the Family Court disagrees, it has final say and can require that the case plan be modified. *R.I. Gen. Laws §40-11-12.2*. The Family Court has the authority and the procedural safeguards to address the harms Plaintiffs allege. Plaintiffs, however, never availed themselves of this resource for protection. This Court should not permit Plaintiffs' blanket assertions that the Family Court cannot address alleged systemic deficiencies in an effort to avoid abstention under ***Younger***.[5]

The Eleventh Circuit in *31 Foster Children* addressed a similar argument offered by plaintiff children in an attempt to thwart abstention. The Eleventh Circuit rejected the argument, finding that the Florida state court "can remedy in a dependency proceeding the harms that a child in the defendants' custody and in that court's jurisdiction might suffer." 329 F.3d at 1279. The Eleventh Circuit found that the state court could address harms the plaintiffs had suffered by ordering that siblings be placed together in foster care, that a child be placed in a therapeutic setting and that if the state child welfare agency was not complying with the case plan it could be held in contempt. 329 F.3d at 1279-1280. The Eleventh Circuit further found that:

---

[5] Other Federal Courts have accepted allegations that their respective state court was in insufficient venue to address systemic deficiencies and, thus, *Younger* did not apply. *See Dwayne B. v. Granholm*, 2007 WL 1140920 (E.D.Mich 2007); *LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993); *Kenny A. v. Perdue*, 218 F.R.D. 277 ((N.D.Ga.2003).

> …each of these plaintiffs is represented by counsel. There are no procedural constraints preventing them from presenting the claims in this case to the state courts in their dependency review hearings. They have not provided unambiguous authority establishing that the procedures available in state court dependency proceedings do not provide an adequate opportunity for them to raise their constitutional claims. At dependency review proceedings for each plaintiff in this case, the state court will consider whether the parties have complied with the child's case plan, the appropriateness of that child's current facility placement, educational placement, and any special needs the child has. Fla. Stat. §§ 39.701(7)(d), (g). If the Department is not complying with the case plan for the child, the court can hold it in contempt. ***Id.*** §§ 39.701(8)(c), (g). If the plaintiff claims that he is in an unsafe and inappropriate placement, as we have already noted, the court can order the Department to comply with the case plan by putting him in a safe and appropriate place. ***Id.*** §§ 39.601(3)(e); 39.701(8)(c). If the plaintiff claims that he has been in foster care longer than reasonably necessary, the court can require the Department to document the steps that it is taking toward permanent placement. ***Id.*** § 39.701(f). If the plaintiff has not been placed with his siblings, the court can order them be placed together or it can require visitation between them. ***See Div. of Family Servs. v. S.R.,*** 328 So.2d 270, 271 (Fla. 1st DCA 1976).
>
> The availability of these forms of relief and the existence of the state courts' protective order and contempt powers mean that the plaintiffs have not carried their burden of establishing that the ongoing state court proceedings do not provide an adequate opportunity to raise and vindicate each plaintiff child's individual claims. Therefore, the third and final ***Middlesex*** factor is satisfied. The district court did not abuse its discretion in abstaining under the ***Younger*** doctrine.

329 F.3d at 1282. Footnote omitted. In its decision, the Eleventh Circuit acknowledged that the D.C. Circuit rejected ***Younger*** abstention in similar case, ***LaShawn A. ex rel. Moore v. Kelly,*** 990 F.2d 1319, 1323-24 (D.C.Cir.1993), but found that case to be distinguishable. ***Id***. fn 12.

The United States District Court for the District of Nebraska addressed the same argument in opposition to the third ***Middlesex*** prong and found them lacking. 240 F.R.D. at 531-532. The ***Foreman*** Court found that:

> The Nebraska juvenile court can exercise substantial control over HHS for the protection of a child, can issue rulings governing HHS' conduct on behalf of that child, and can modify or reject HHS's recommendations regarding a child's care and placement while in HHS custody. The plaintiffs each have a court-appointed guardian ad litem to assist in the juvenile court proceedings-an attorney and officer of the court statutorily obligated to act for the plaintiff and protect his or her interests.

240 F.R.D. at 532. Footnote Omitted. The ***Foreman*** Court further found that the issues could have been raised before the juvenile court and, as such, the third ***Middlesex*** prong had been satisfied and abstention appropriate.

In line with the reasoning in ***31 Foster Children*** and ***Foreman***, the Plaintiffs' claim that the Rhode Island Family Court is an inappropriate forum to address its constitutional claims must fail. Plaintiffs cannot sustain their burden of proof and demonstrate an absence of evidence to support the third prong of the ***Middlesex*** test.

Plaintiffs' further attempt to avoid ***Younger*** abstention with yet another sweeping allegation – that the Family Court is not an appropriate forum to entertain a class action lawsuit. Plaintiffs' argument is premature and presupposes that this Court will certify a class. Moreover, the ***Foreman*** Court rejected a similar argument that the Nebraska state juvenile court was an inappropriate forum to address a class action in an attempt to thwart the application of ***Younger***. ***Id***. at 531. The ***Foreman*** Court denied the motion to certify a class, however, it went on to state that "as the court held in ***Joseph A. ex rel. Corrine Wolfe v. Ingram,*** 275 F.3d 1253, 1274 (10th Cir.2002), there is no persuasive authority holding "that a party is entitled to avoid the effects of the ***Younger*** abstention doctrine in cases where relief is available to individual litigants in ongoing state proceedings but not to represented parties in a class action." ***Joseph A.,*** 275 F.3d at 1274.´" ***Id***. ***Foreman*** acknowledged that the federal courts in ***Kenny A.,*** 218 F.R.D. at 287. ***Brian A. ex rel.***

*Brooks v. Sundquist,* 149 F.Supp.2d 941, 957 (M.D.Tenn.2000) were in disagreement with its ruling but found them distinguishable. *Id*. at fn 46.

Contrary to Plaintiffs' assertions, the third prong of the *Middlesex* factor has been satisfied in this case. The Rhode Island Family Court provides the Plaintiffs an adequate opportunity to advance their constitutional claims. The fact that Plaintiffs never raised the alleged harms or constitutional claims in the numerous hearings convened before the Family Court or that the Child Advocate, who never sought to intervene in any of these cases, has proclaimed that it would be "inefficient and ineffectual to raise these claims in myriad Family Court proceedings", *see Plaintiffs' Exhibit 1 at ¶¶5-6*, is insufficient to avoid *Younger* abstention.

The prerequisite elements for *Younger* abstention are present in this case. The pending Family Court proceedings are the type envisioned by *Younger* and its progeny. The *Middlesex* test has been satisfied. Plaintiffs sweeping assertions and assumptions of class certification are an insufficient basis to deny the application of *Younger*. The Defendants pray that this Court apply *Younger*, abstain from the constitutional claims set forth in this lawsuit and grant their Motion to Dismiss the Amended Complaint.

### B. ***Rooker-Feldman*** **Abstention**

Plaintiffs claim that *Rooker-Feldman* does not apply because they were not a losing party to a state court action, that they did not litigate their constitutional claims before the Rhode Island Family Court and that "the relief they seek would in no way reverse or call into doubt any previous state court judgments." *Plaintiffs' Opposition Memorandum* at p. 44. Defendants disagree.

*Rooker-Feldman* doctrine applies in the "limited circumstances where 'the losing

party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment."' ***Federaciòn de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*** , 410 F.3d 17, 23-24 (1st Cir. 2005). Although the Plaintiff children may not fit neatly in the traditional titles of parties as they exist in typical civil cases, they were nonetheless a participant in the Family Court proceedings. Plaintiff children have been represented by legal counsels who have protected their best interest during the Family Court proceedings. As any party, the Plaintiff Children through legal counsel had the opportunity to address the Family Court and advocate for a decision in their best interest. In their Amended Complaint, Plaintiff Children allege that they were harmed by such action as inappropriate placements *that were the subject of review and approval by the Family Court.* To the extent that the Plaintiffs' claim that they suffered a constitutional violation because of these inappropriate, judicially supervised placements, it is not unreasonable to characterize Plaintiff Children in such circumstances as "losing parties" for purposes of the ***Rooker- Feldman*** Doctrine. The underlying reason for abstaining under ***Rooker-Feldman*** should not be disregarded out of hand because standard civil litigation titles do not translate to Family Court proceedings.

The Plaintiffs claim that they do not seek to reverse any Family Court Orders; Defendants disagree. The examples set forth of pages 44-47 demonstrate that the Family Court, either directly or through approval of the case plan, approved of the placement and services to Plaintiff Children that they assert in this Amended Complaint have caused them harm and violated their constitutional rights.

These examples demonstrate that Plaintiffs complain that they suffered an injury caused by a Family Court order or judgment and the state-court judgment and are seeking this Court to review and rejection of the judgment as a basis for injunctive relief. The Defendants submit that ***Rooker-Feldman*** Doctrine applies to this case and this Court should abstain.

C. **Plaintiffs' Proposed "Next-Friends"**

The Plaintiffs erroneously claim that they are not bound by the requirements of ***Whitmore v. Arkansas***, 495 U.S. 149, 163, 110 S.Ct. 1717, 1727, 109 L.Ed.2d 135 (1990) in order to be found appropriate "next friends" under Rule 17(c) of the Federal Rules of Civil Procedure. Plaintiffs have a burden to demonstrate that they fulfill the requirements under Rule 17(c) and they have failed to sustain that burden.

***Whitmore*** requires that the next friend must provide the Court with an adequate explanation- such as inaccessibility, mental incompetence, or other disability – why the real party in interest cannot appear on his own behalf to prosecute the action, that they are truly dedicated to the best interests of the person on whose behalf he seeks to litigate and that they have some significant relationship with the real party in interest. It is the second and third prong that Plaintiffs have failed to demonstrate to the Court.

Despite it being Plaintiffs' burden to produce evidence to the Court to satisfy the requirements under ***Whitmore***, they claim that the "Defendants have provided no basis for questioning that each of these adults is committed to and has a good-faith interest in the Named Plaintiff Children's welfare, and there is no suggested or real conflict or personal agenda that threatens to subvert proper representation." *Plaintiffs' Opposition Memorandum* at Page 17. The burden is not on the defendants. The Defendants merely

identified that next-friend Professor Gregory Elliott has had no relationship with the children for whom he proposes to act. Plaintiffs claim that Kathleen Collins works at the school Caesar attends, but there is no representation what interaction she has with Caesar or that she is truly dedicated on his behalf to pursue this litigation. Plaintiffs claim that Mary Melvin was David T.'s foster parent for two years, but there is no representation of what type of contact she has had that demonstrates to this Court that she is an appropriate "next-friend."

The Child Advocate supplied an affidavit to this Court in support of the appointment of these three individuals as "next friends". However, there is no specific evidence that would demonstrate to this Court that the three individuals are truly dedicated to the best interests of the named child on whose behalf he/she seeks to litigate and that they have some significant relationship with the child. The Child Advocate makes a broad sweeping statement to this Court that "I conclude that each of the next friends selected in this case is sincerely motivated to pursue the best interests of the children for whom they appear in this lawsuit." Declaration of Jametta O. Alston, ¶9. The Defendants submit that this broad sweeping statement is not by itself sufficient to satisfy all three parts of ***Whitmore*** and, therefore Plaintiffs' have failed to sustain their burden of proof under Rule 17(c) and the supporting case law. This suit should be dismissed.

D. **The AACWA**

Contrary to Plainitffs' contentions, the provisions of the Adoption Assistance and Child Welfare Act of 1980 (AACWA), as amended, do not vest them with private enforceable rights under the analysis set forth in ***Rio Grande*** or ***Gonzaga***. Plaintiffs

mischaracterize "benefits" and "interests" as a "private right" under the AACWA in order to pursue their claims under 42 U.S.C. §1983. Additionally, Plaintiffs' fail to identify the specific Plaintiff children's cases where there is a documentation of case plans or case review systems under the AACWA; otherwise a legal analysis of these provisions is merely an exercise in legal theory that Plaintiffs seek this Court to engage in.

**ii. *Suter* , Post-*Suter* and Congress's Intent**

Plaintiffs erroneously contend that Congress has clearly signaled that it intended "State Plan" provisions of the Social Security Act to be privately enforceable in an effort to pursue the claims they assert under the AACWA. In an effort to demonstrate "Congressional intent," Plaintiffs refer this Court to the circumstances surrounding the United State Supreme Court's decision in ***Suter v. Artist M.***, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Defendants submit that the amendments and records that Plaintiffs' refer this Court to do not demonstrate with a clear voice that Congress intended the provisions of the AACWA to create private individual rights that are enforceable under 42 U.S.C. §1983.

In ***Suter***, the United States Supreme Court ruled that §671(a)(15)[6] of the AACWA did not confer enforceable rights to be pursued under 42 U.S.C. §1983. 503 U.S.347,

---

[6] As relevant here, §671(a)(15) provides:
" (a) Requisite features of State plan
" In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which-

" (3) provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them;

" (15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return

363, 1123 S.Ct. 1360, 1370. In so reaching, the ***Suter*** Court analyzed §671(a)(15) under ***Blessing*** to determine whether "Congress in enacting the Adoption Act unambiguously confered upon the child beneficiaries of the Act a right to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." ***Suter***, 503 U.S. at 357, 112 S.Ct. 1360." The ***Suter*** Court found that § 671(a)(15) did not unambiguously confer an enforceable right on individual children within the child welfare system because only "a rather generalized duty" was imposed upon the state "to be enforced not by private individuals, but by the Secretary" in the manner set forth in the AACWA. ***Id.*** at 363, 112 S.Ct. 1360.

As Plaintiffs correctly note, Congress amended the Social Security Act in 1994; specifically mentioning the ***Suter*** decision. This amendment, commonly referred to as the "***Suter***-fix," did not overrule the Supreme Court's decision, but rather "only forecloses the refusal to find a federal right enforceable under § 1983 because the statutory provision may be included in a section requiring a State plan or specifying the required contents of such a plan." ***Charlie H. v. Whitman***, 83 F.Supp2d 476, 484 (D.N.J.2000).

Plaintiffs erroneously contend that the legislative history of the "***Suter*** fix" "makes it clear that Congress intended the provisions of AACWA (other than §671(1a)(15)) and other "State plan" programs to be privately enforceable, and that the purpose of the "***Suter*** fix" was to confirm the intent" that individuals should have the right nor to be denied any service or benefit under the AACWA. Plaintiffs provide a

---

to his home...."

limited quote from The Revenue Act of 1992, Report of the Committee on Ways and Means House of Representatives, House Report No. 102-631 (June 30, 1992) in support of this proposition. *Plaintiffs' Opposition Memorandum* at Page 50. However, if Congress intended all provisions of the AACWA to be privately enforceable, its amendment would have expressly stated such. Moreover, Plaintiffs fail to acknowledge that in House Report 102-631 (at 366) Congress also stated that:

> This provision is therefore intended to restore to an aggrieved party the right to enforce, as it existed prior to the ***Suter v. Artist M***. decision, the Federal mandates of the State plan titles of the Social Security Act in the Federal courts. *This provision is not intended to expand upon enforceable rights created under the State plan titles of the Social Security Act. Nor is this provision intended to define, clarify, or establish standards for determining whether States have made "reasonable efforts" to prevent the need for foster care placement or to reunify children with their families after placement* as required by the Adoption Assistance and Child Welfare Act (Title IV-E of the Social Security Act).

Emphasis Added. The end result is that courts are left to conduct an analysis in line with the standards set forth in ***Gonzaga University v. Doe***, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) and ***Blessing v. Freestone***, 520 U.S. 329, 329, 117 S.Ct. 1353, 1354, 137 L.Ed.2d 569 (1997). Congress granted Plaintiffs no greater rights after the "***Suter*** fix" amendment; any intimations by Plaintiffs to the contrary are wrong.

**iii. Gonzaga and Rio Grande Analysis**

Contrary to Plaintiffs' contentions, Defendants provided this Court with the standards set forth by the Supreme Court in ***Gonzaga*** and ***Blessing***. *See Defendants' Memorandum of Law in Support of Motion to Dismiss* at pp. 89-106. Plaintiffs' erroneously claim Defendants' analysis was incorrect.

*Gonzaga* did not reject or disregard the *Blessing* analysis. Rather, *Gonzaga* clarified ambiguity that lower federal courts caused by being overly liberal in their determinations of the type of language that created private rights. The *Gonzaga* Court explained that "some courts .. interpret[ed] *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." *Gonzaga*, 536 U.S. 273, 283, 122 S.Ct. 2268, 2275. The *Gonzaga* Court unequivocally stated: "[w]e now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under *§ 1983. Section 1983* provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id*. If anything, *Gonzaga* imposes a more stringent analysis to determine the existence of rights than does *Blessing*.

The First Circuit has not rejected or disregarded *Blessing* in its *Rio Grande* decision. It characterized *Gonzaga* as "tighten[ing] up the *Blessing* requirements. It did not precisely follow the *Blessing* test but rather relied on several different factors in determining whether a right existed: whether the provision contains "rights-creating language," whether the provision had an aggregate as opposed to an individualized focus, and the other sorts of enforcement provisions that Congress has provided for." *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56, 73 (1st Cir. 2005). In *Rio Grande*, the First Circuit applied "the more recent analysis used in *Gonzaga* rather than

the ***Blessing*** test …but it is evident from … [it's] analysis that the three factors in the ***Blessing*** test are all met." ***Id***. Prior to ***Rio Grande***, the First Circuit twice addressed whether specific provisions of the Medicaid Act granted enforceable rights; once finding in the negative, once in the affirmative. *See* *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50 (1st Cir. 2004); ***Bryson v. Shumay***, 308 F.3d 79 (1st Cir. 2002)(The First Circuit used the ***Blessing*** test to conduct its analysis.).

The sections of the AACWA that Plaintiffs seek to enforce do not create personal rights, as defined (by enforceable) under ***Gonzaga*** and ***Blessing***, is enforceable under 42 U.S.C. §1983. Plaintiffs essentially argue that Congressional intent to provide enforceable rights can be shown in the AACWA sections they rely on can be inferred from the mere conclusion the word "child" or "children." Plaintiffs italicize the words "child" and "children" in the portions of the section texts they recite. The mere reference to the words "child" or "children" do not by themselves demonstrate an "individualized focus" under ***Gonzaga*** or Congress's intent to create a federally enforceable right. In fact, §671(a)(15) contains the word "child" in several places and the ***Suter*** Court nonetheless found that the provision did not create enforceable rights. As the ***Gonzaga*** Court held, "it is *rights*, not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section." ***Gonzaga***, 536 U.S. 273, 283, 122 S.Ct. 2268, 2275. Plaintiffs fail to make this all-important distinction. They simply fail to focus on the phrasing of the sections – a fatal flaw in their analysis[7].

[7] In ***31 Foster Children***, the Eleventh Circuit stated that what it took from the Supreme Court's decision in ***Gonzaga*** was "… to look at the text and structure of a statute in order to determine if it unambiguously provides enforceable rights. If the text and structure " provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." ***Id***. at 286, 122 S.Ct. at 2277. If they provide some indication

Defendants submit that, in line with the First Circuit's applications of ***Gonzaga*** and ***Blessing***, the Plaintiffs have failed to demonstrate that Congress spoke with a "clear voice" and manifested an "unambiguous" intent to confer private enforceable rights in the Sections of the AACWA that it seeks to enforce in Count Four of the Amended Complaint.

**iv. Specific Provisions of the AACWA**

Plaintiffs erroneously contend that "Congress clearly intended to confer children in foster care a right to timely written case plans that contain specific mandated elements and to a case review system to ensure the implementation of those plans." *Plaintiffs' Opposition Memorandum* at p56. Plaintiffs' set forth in their *Opposition Memorandum* what they assert are "relevant" portions of the sections for this Courts' review, however, in order to properly analyze the provisions under ***Gonzaga*** and ***Blessing***, the full text is necessary.

Section 671(a)(16) provides that "in order for the State to be eligible for payments under this part, it shall have a plan approved by the Secretary" which "provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title

---

that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite " clear voice." Ambiguity precludes enforceable rights. ***Id***. at 280, 122 S.Ct. at 2273. The first ***Blessing*** requirement, which is what ***Gonzaga*** addressed, is that Congress must have intended that the provision in question benefit the plaintiff. Factors to consider in determining if it did include whether the statute: (1) contains " rights-creating" language that is individually focused; (2) addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus; and (3) lacks an enforcement mechanism through which an aggrieved individual can obtain review.

with respect to each such child." Section 675 is a definitional section that includes the definitions of "case plan" (§675(1)) and "case review system" (§675A).

In support of their position that these sections create enforceable private rights, Plaintiffs highlight every place where the term "child" is cited to demonstrate that they are intended beneficiaries. As previously stated, the mere mention of the word "child" is not sufficient to demonstrate that a private enforceable right exists. The ***Gonzaga*** Court explained:

> A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context. Compare *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107-108, n. 4, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (" [A] claim based on a statutory violation is enforceable under § 1983 only when the statute creates ' rights, privileges, or immunities' in the particular plaintiff " ), with *Cannon, supra*, at 690, n. 13, 99 S.Ct. 1946 (statute is enforceable under implied right only where Congress " explicitly conferred a right directly on a class of persons that included the plaintiff in the case" ). Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries. Compare *Wright*, 479 U.S., at 423, 107 S.Ct. 766 (statute must be " intended to rise to the level of an enforceable right" ), with *Alexander v. Sandoval, supra*, at 289, 121 S.Ct. 1511 (statute must evince " congressional intent to create new rights" ); and *California v. Sierra Club, supra*, at 294, 101 S.Ct. 1775 (" The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries" (citing *Cannon, supra*, at 690-693, n. 13, 99 S.Ct. 1946)). ***Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.***

536 U.S. at 285-286, 122 S.Ct. at 2276-2277. Emphasis Added. According to ***Gonzaga***, the mere mention of the word "child" does not by itself reflect that Congress intended to grant them individual enforceable rights under §1983.

In the ***Memorandum in Support of their Motion to Dismiss*** at pp. 92-93, the Defendants directed this Court to the Eleventh Circuit's decision in ***31 Foster Children***, *329 F.3d 1255 (11th Cir. 2003)* that held that sections of §675 did not "have the kind of focused-on-the-individual, rights creating language required by ***Gonzaga***" that would create a private right nor did the AACWA contain a mechanism by which aggrieved individuals could enforce its provisions. 329 F.3d at 1272. In response to Defendants' Motion to Dismiss, Plaintiffs claim that the Eleventh Circuit's ruling is distinguishable from this case. ***See Plaintiffs' Opposition Memorandum*** at p.60. Plaintiffs argue that in ***31 Foster Children***, the Eleventh Circuit found that "[b]ecause §675(5)(D) and (E) are definitional in nature, they alone cannot and do not supply a basis for conferring rights enforceable under §1983" and the Florida plaintiffs failed to sue under §6229B)(10)(B)(ii), a rights creating section of AACWA that incorporates §675(5) by reference. 329 F.3d at 1271-1272. Plaintiffs contend these issues do not exist in this lawsuit because they "rely on definitional provisions with AACWA only in conjunction with other provisions that are privately enforceable on their own, including §622(b)(8)(A)(ii) (as §622(b)(10(B)(ii) was redesignated in 2006) ***Plaintiffs' Opposition Memorandum*** at p.60. In support of its proposition, Plaintiffs cite *Kenny A. v. Perdue*, 218 F.R.D. 277(N.D.Ga 2003).

Plaintiffs' fail, however, to acknowledge the body of case law that has held that §622(b)(8)(A)(ii) (as §622(b)(10(B)(ii) was redesignated in 2006) does not create a private right of action. See ***Olivia Y. v. Barbour***, 351 F.Supp.2d 543 (S.D.Miss. 2004); ***Charlie H. v. Whitman***, 83 F.Supp.2d 476, 485-489 (D.N.J. 2000); ***Eric L. v. Bird***, 848

F.Supp. 303, 312 (D.N.H.1994); *Baby Neal v. Casey*, 821 F.Supp. 320, 328 (E.D.Pa.1993).

The decision of the United States District Court for the District of New Jersey in *Charlie H. v. Whitman*, 83 F.Supp.2d 476, 485-489 (D.N.J. 2000), that directly contradicts the holding in *Kenny A*, is particularly instructive on this issue. In *Charlie H.* The District Court for New Jersey held that §§ 671(a)(16), 622(b)(10)(B)(ii), 671(a)(16) and 675(1) and (5) did not create enforceable rights to a written case plan or case review system under §1983. Specifically, the *Charlie H.* Court reasoned:

> *42 U.S.C. § 622(b)(10)(B)(ii)* provides, in relevant part, that "[e]ach plan for child welfare services under [*42 U.S.C. § 622(a)*] shall-provide assurances that the State-is operating, to the satisfaction of the Secretary-a case review system (as defined in ***section 675(5)*** of this title) for each child receiving foster care under the supervision of the State." ***42 U.S.C. § 671(a)(16)*** provides, in relevant part, that "[i]n order for a State to be eligible for payments under [*42 U.S.C. § 670*], it shall have a plan approved by the Secretary which-provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child." Finally, ***42 U.S.C. § 675(1) and (5)*** define, in detail, "case plan" as used in ***42 U.S.C. § 671(a)(16)*** and "case review system" as used in ***42 U.S.C. § 622(b)(10)(B)(ii)***.
>
> * * *
>
> Initially, as noted above and as will be repeated herein, this Court does not sit to oversee New Jersey's child welfare system to determine whether the implementation of case plans is "appropriate" or "successful." *See* ***Blessing***, 520 U.S. at 341 and 345, 117 S.Ct. 1353. This is especially true where "[w]hether a child has a plan satisfying [each] provision is as individual as each child" and "there is no way to measure the normal or average needs of a child in foster care." *Del A. v. Roemer*, 777 F.Supp. 1297, 1309 (E.D.La.1991). Moreover, regardless of the detailed nature of the definitions of "case plan" and "case review system," the statutory provisions relied upon by Plaintiffs in support of their alleged right "to timely written case plans that contain mandate elements and to the implementation and review of these plans" are not so unambiguous so as

to confer upon Plaintiffs a right enforceable under § 1983. ***See*** ***Eric L. v. Bird***, 848 F.Supp. 303, 312 (D.N.H.1994) (holding that "plaintiff enjoy no enforceable rights" to "compel New Hampshire's full implementation of the programs" under 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), because the provision "places no direct obligation on the state"); *Baby Neal v. Casey*, 821 F.Supp. 320, 328 (E.D.Pa.1993) (holding that the language of § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), "examined in the context of the entire Adoption Act" does not "unambiguously confer an enforceable right on behalf of its beneficiaries under 42 U.S.C. § 1983"); *Del A. v. Roemer*, 777 F.Supp. 1297, 1308-09 (E.D.La.1991) (holding 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), and 42 U.S.C. § 671(a)(16)"so vague and amorphous as to evade judicial enforcement" of plaintiffs' claim for "case plans that address specific issues in their placements and care" because "[t]here is no objective benchmark" against which compliance with these provisions can be measured).

Finally, as discussed below in connection with Plaintiffs' MPA claim, both parties have failed to note the important point, which hinders Plaintiffs' claim under 42 U.S.C. § 671(a)(16) with respect to case plans, that Congress specifically examined the numerous State plan elements required under 42 U.S.C. § 671 and determined that only *one* such required element confers a private right enforceable pursuant to § 1983. Specifically, in 1996, Congress amended 42 U.S.C. § 674 by adding subsection (d) which ***explicitly*** provides that "[a]ny individual who is aggrieved by a violation of *Section 671(a)(18) of this title* by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court." 42 U.S.C. § 674(d)(3)(A) (emphasis added). That Congress recently chose to amend 42 U.S.C. § 674 to include a private right of action under § 1983 for a state or other entity's failure to comply with 42 U.S.C. § 671(a)(18), but did not include the other various elements enumerated in 42 U.S.C. § 671(a) and relied upon by Plaintiffs, ***is strong evidence*** that Congress ***did not intend these other various State plan elements in 42 U.S.C. § 671(a)*** to confer rights enforceable pursuant to § 1983. *See Wright v. Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)(noting that a court may look to "other specific evidence from the statute itself" to determine whether §1983 provides a remedial cause of action). Therefore, for this and the other reasons set forth herein, Plaintiffs § 1983 claim to "an enforceable written case plan and a case review system" under 42 U.S.C. § 622(b)(10)(B)(ii), 42 U.S.C. § 671(a)(16), and 42 U.S.C. § 675(1) and (5) and an "enforceable right to implementation of case plan services" is dismissed.

83 F.Supp. at 486-489. The *Charlie H*. Court ultimately ruled the plaintiff children failed

to demonstrate that the following sections of the AACWA created private enforceable rights: §622(b)(10)(B), 671(a)(10), 671(a)(16), 675(1)(E), and 675(5). The ***Charlie H.*** Court's decision is sound in its reasoning and result.

Additionally, similarly situated plaintiffs in the case of ***Olivia Y. v. Barbour***, 351 F.Supp.2d 543, 562 (S.D.Miss. 2004)[8] made the same argument that the Eleventh Circuit's decision in ***31 Foster Children*** was distingushable. The United States District Court for the Southern District of Mississippi rejected Plaintiffs' attempt to distinguish ***31 Foster Children*** and ruled that the plaintiff children did not have enforceable rights under §675(A), (C), (D) or (E), alone or in conjunction with either §671(a)(16) or §622(b)(10)(B)(ii) (this section was redesignated to §622(b)(8)(A)(ii) in 2006). 351 F.Supp.2d at 562-565. The ***Olivia Y.*** Court acknowledged that other courts have reached different results on these issues but explained that:

> Although this court recognizes that there are cases-indeed numerous cases-that have interpreted the provisions under consideration in the case at bar to create rights on the part of children that are enforceable under § 1983, this court, having reviewed the cases on the issues presented, finds that the analysis and conclusions of the courts that have come to the contrary conclusion to be more persuasive, and consistent with the Supreme Court's directive that nothing short of " an unambiguously conferred right" will support a cause of action under § 1983. *See* *Gonzaga* 536 U.S. at 282-83, 122 S.Ct. at 2275.

351 F.Supp.2d at 564-565.

Plaintiffs cite several cases in support of their position that they have individual rights to a case plan and review system that are enforceable under sec. 1983. ***See Plaintiffs' Opposition Memorandum*** at page 63. All except one, *Lynch v. Dukakis*, 719

[8] It is not surprising that this identical argument has been raised as plaintiffs in both ***Olivia Y.*** and this case were/are represented by Attorneys Lowery and Lambiase of Children's Rights Organization.

F.2d 504 (1st Cir. 1983), are from various district courts.

The ***Lynch*** Court ruled that AACWA case plan provision created an enforceable right, however, the primary reason for reaching this decision was driven by the First Circuit's reasoning that there was an otherwise lack of remedy available to an individual. 719 F.2d at 509-512. Given the body of case law on the precise issue and amendments to the AACWA that have occurred since the First Circuit rendered its decision in ***Lynch*** in 1983 precedential value must be greatly questioned. Since ***Lynch*** was issued, the United States Supreme Court has issued ***Blessing v. Freestone***, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 855 (1997), ***Wilder v. Virginia Hospital Ass'n.***, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), ***Suter*** (although limited given the amendment to the AACWA), ***Gonzaga***, Congress's amendment to 42 U.S.C. § 674 – to name a few. Moreover, courts have held that it is only after finding that the statutory language clearly manifests an intent to create and enforceable right does one turn to whether a remedy exists. The questionable value of the ***Lynch*** decision may be evidence by the District Court of New Hampshire's decision in ***Eric L. v. Bird***, 848 F.Supp. 303, 312 (D.N.H. 1994), which held that the "plaintiff enjoy no enforceable rights" to "compel New Hampshire's full implementation of the programs" under 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), because the provision "places no direct obligation on the state".

Plaintiffs erroneously contend that 42 U.S.C. §§ 622(b)(8)(A)(ii) and 675(5)(D) and (E) grant them private enforceable rights. *Plaintiffs' Opposition Memorandum* at pages 63-68. In an attempt to bolster their argument but having the actual effect of creating confusion, Plaintiffs' refer to §675(5)(D) as a "15/22 right." Plaintiffs

terminology does not create a right were none exists. Plaintiffs' arguments regarding "15/22 right," "substantial conformity" and "Transitional Rules" are not dispositive of whether a right is created. Additionally, Plaintiffs' claim that "the degree of detail and precision in the statute, as well as corresponding federal regulations, puts to rest Defendants' concern about vagueness or ambiguity." *Plaintiffs' Opposition Memorandum* at page 67. Defendants' disagree.

In their *Opposition Memorandum*, rather than provide the complete text of the provisions, Plaintiffs' provide what they believe are "relevant" portions. Defendants again submit that a review of the full text of the statute is necessary in order to conduct a proper analysis under *Gonzaga* and *Blessing*.

Section 675(5)(E) is contained in the definitional section of the AACWA and is not enforceable alone or in conjunction with either §671(a)(16) or §622(b)(10)(B)(ii) (this section was redesignated to §622(b)(8)(A)(ii) in 2006). *Olivia Y.*, 351 F.Supp.2d at 562-565. Contrary to Plaintiffs' claim,

> *§§ 675(5)(D) and (E)" do not have the kind of focused-on-the-individual, rights-creating language required by Gonzaga " and instead, " has an aggregate or system wide focus."* *Id.* at 1272. In so concluding, the court acknowledged that " the text of the provisions speaks to ' a child's health and education record' provided at ' each placement of the child' and to termination of the parental rights of ' the child's parents,'" but it recognized that " the case review system as a whole is defined as ' a procedure for assuring' that the desired steps are taken." *Id.* (citing 42 U.S.C. § 675(5)). In other words, " [t]he references to individual children and their placements are made in the context of describing what the procedure is supposed to ensure," and such provisions, the court opined, " ' cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983' ." *Id.* (quoting *Gonzaga* 536 U.S. at 289, 122 S.Ct. at 2278).

*Olivia Y.*, 351 F.Supp2d at 561-562 (*quoting 31 Foster Children* 329 F3d at 1272).

Applying the legal analysis set forth in ***Gonzaga***, ***31 Foster Children***, ***Olivia Y***. and ***Charlie H***., Plaintiffs claim that the sections it is proceeding under in Count IV create privately enforceable rights must fail. Sections 675 and 629a are definitional sections that cannot by their very nature demonstrate an individualized focus or clear Congressional intent to create privately enforceable rights. Plaintiffs seek to enforce these sections through 42 U.S.C. §622(b)(8)(A)(ii) (as §622(b)(10)(B)(ii) was redesignated in 2006). However, §622(b)(8)(A)(ii) itself does not "unambiguously confer an enforceable right on behalf of its beneficiaries." Thus, Plaintiffs' claims brought under §622(b)(8)(A)(ii), §§ 675 and 629a must fail. Additionally, Plaintiffs' claims brought under §§ 622 and 672, which detail the type of information that must be included in a state plan, do not vest Plaintiffs with privately enforceable rights. The plain language does not manifest a clear intent by Congress to create individual rights. Moreover Congress's amendment of 42 U.S.C. § 674 to include a private right of action under §1983 for a state or other entity's failure to comply with 42 U.S.C. § 671(a)(18), but did not include the other various elements enumerated in 42 U.S.C. § 671(a) and ***is strong evidence*** that Congress ***did not intend these other various State plan elements in 42 U.S.C. § 671(a)*** to confer rights enforceable pursuant to § 1983." ***Charlie H.***, 83 F.Supp. at 489. Lastly, § 672 may confer an indirect benefit to Plaintiffs; however, the language does not manifest an unambiguous intent that Congress intended to create a private enforceable right for Plaintiff Children. Thus, contrary to Plaintiffs' assertions, §672 does not satisfy the standard set forth in ***Gonzaga***.

## IV. CONCLUSION

For the foregoing reasons as well as those set forth in Defendants' Motion to Dismiss and supporting Memorandum of Law, the Defendants pray that this Court grant their motion and dismiss Plaintiffs' Amended Complaint with prejudice.

Respectfully submitted
DEFENDANTS
By their Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ James R. Lee

JAMES R. LEE (4305)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

/s/ Brenda D. Baum

BRENDA D. BAUM (5184)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

On Behalf of PATRICIA MARTINEZ,
in her Official Capacity as Director of the
Department of Children, Youth and Families

/s/ Kevin Aucoin

KEVIN AUCOIN (3019)
Executive Counsel
R.I. Department of Children, Youth & Families
101 Friendship Street
Providence, RI 02903
Tel: (401) 528-3579
Fax: (401) 525-3566
Kevin.Aucoin@dcyf.ri.gov

**CERTIFICATION**

I hereby certify that I have electronically mailed the foregoing document on this 30th day of November 2007 to the attorney(s) of record listed below:

**John William Dineen, Esq.**
jwdineen1@yahoo.com

**Jametta O. Alston, Esq.**
jalston@gw.doa.state.ri.us

**Susan Lambiase**
slambiase@childrensrights.org

**Vernon Winters**
vern.winters@weil.com

**Marcia Robinson Lowry**
mlowry@childrensrights.org

**/s/ Brenda D. Baum**