# EXHIBIT G

PDF created with pdfFactory trial version www.pdffactory.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SAM M., by Next Friend Gregory C. Elliott, for himself and those similarly situated, ET AL | C.A. NO. 07-241L |
| VS. | JANUARY 23, 2008 11:00 A.M. |
| DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island, ET AL | PROVIDENCE, RI |

BEFORE THE HONORABLE RONALD R. LAGUEUX,

SENIOR DISTRICT JUDGE

(Motion to Dismiss)



PDF created with pdfFactory trial version www.pdffactory.com

APPEARANCES:

FOR THE PLAINTIFFS:

JAMETTA O. ALSTON, ESQ.
Office of the Child Advocate
57 Howard Avenue
Cranston, RI 02920

JOHN WILLIAM DINEEN, ESQ.
305 South Main Street
Providence, RI 02903

SUSAN LAMBIASE, ESQ.
MARCIA ROBINSON LOWRY, ESQ.
Children's Rights
330 7th Avenue, 4th Floor
New York, NY 10001

FOR THE DEFENDANTS:

BRENDA D. BAUM, ESQ.
Attorney General's Office
150 South Main Street
Providence, RI 02903

JAMES R. LEE, ESQ.
Attorney General's Office
150 South Main Street
Providence, RI 02903

KEVIN AUCOIN, ESQ.
Department of Children, Youth and Families
101 Friendship Street
Providence, RI 02903

Court Reporter:

Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



PDF created with pdfFactory trial version www.pdffactory.com

# I N D E X


| PLAINTIFFS' WITNESS | PAGE |
|---|---|
| Mary Melvin | |
| Direct Examination by Ms. Alston | 11 |
| Cross-Examination by Mr. Lee | 25 |
| Redirect Examination by Ms. Alston | 28 |
| Kathleen Collins | |
| Direct Examination by Ms. Lambiase | 30 |
| Cross-Examination by Mr. Lee | 44 |
| Redirect Examination by Ms. Lambiase | 53 |
| Lennette Azzi-Lessing | |
| Direct Examination by Ms. Lambiase | 61 |




PDF created with pdfFactory trial version www.pdffactory.com

23 JANUARY 2008 -- 11:00 A.M.

THE COURT: Good morning, everyone. This is Civil Action 07-241L, Sam and Tony M., et al, versus Donald L. Carcieri, et al. And this is a hearing on the question of whether the next friends of the named minor Plaintiffs have standing to prosecute this action.

Will the attorneys identify themselves for the record.

MS. LAMBIASE: Susan Lambiase, Children's Rights, for Plaintiffs. Good morning, your Honor.

MS. ALSTON: Jametta Alston, counsel for the Plaintiffs, child advocate.

MR. DINEEN: John W. Dineen, local counsel for Plaintiffs.

MS. LOWRY: Marcia Lowry for Plaintiffs, your Honor.

MR. LEE: Jim Lee for Defendants.

MS. BAUM: Brenda Baum for the Defendants.

MR. AUCOIN: Kevin Aucoin for the state Defendants.

MR. MOREIRA: John Moreira for the Defendants.

THE COURT: All right. I'll hear your witnesses on the Plaintiffs' side.

MS. ALSTON: Your Honor, before we start with



PDF created with pdfFactory trial version www.pdffactory.com

the witness, I'd like to make a brief statement, if I may.

THE COURT: All right. Go ahead.

MS. ALSTON: Your Honor, this Court posed a question, which I am here and prepared to answer today through our evidentiary witnesses or our next friends, about who decided that these minor named Plaintiffs would be exposed to the rigors of federal court.

And, your Honor, to answer that question, I, the Rhode Island Child Advocate, made that decision according to my statutory mandate and my review of the failings of the Rhode Island child welfare system.

The failings are so great, your Honor, that they're in danger -- that the children are in danger and a repeated danger for the named Plaintiffs. And for example, if one problem was solved for them today, such as a bad placement that harms them, the state can just easily place that one child and would not deal with the problems that exist.

General Laws -- Rhode Island General Laws 42-73-7 states that the duties of the advocate are unambiguous, they're clear and in plain language, establishes the responsibilities that the child advocate can take all possible action, including, but not limited to, programs of public education and formal



PDF created with pdfFactory trial version www.pdffactory.com

legal action to secure and ensure the legal, civil and special rights of children subject to the provisions of the Children, Youth and Families Welfare Act.

And the statute is clear, your Honor, that the child advocate shall have this responsibility to ensure and secure the legal rights of children. And there should be no question that, as child advocate, I have a duty to protect the children who are being harmed daily by the department.

I'm not limited by the statute, by the forum or by form or technique. In this instance, I have sought federal court to address the systematic problems that exist in the department. And I know that these children's constitutional rights are being violated, and I know that I had to do something to move -- something to basically help each child and not individual cases.

The law says I must protect the children; and there's nothing in the statute, absolutely nothing that says that I must go to Family Court to vindicate the children's rights.

In executing my mandate, I've determined that that would not work, and established -- the statute establishes the independence, and it doesn't say I have to seek permission from the Family Court or any court



PDF created with pdfFactory trial version www.pdffactory.com

in order to determine which forum I need to protect children.

And, your Honor, in answering your question, or the Court's question, we cannot stop here because the next question we have to ask is, who decides that children should be exposed to physical abuse, exposed to rape, cigarette burns, constant shuffling in and out of institutions? Who approves such action? Who has made a move to try and stop it? The state? The Department of Children, Youth and Families? The officials who are named by -- named Defendants? No.

So, your Honor, as other oppressed people have sought legal remedies from the federal system, so do I. I bring this action to federal court to address the oppressive, abusive and neglectful behaviors that children are subjected to in the state of Rhode Island.

And after reviewing hundreds of files, it is clear to me that the children simply cannot get the systemic relief that is needed through Family Court. No matter how formidable the rigors of federal court may be perceived, the federal court experience will never match the neglect, the abuse and the violence and the rapes that occur and face children every single day.

The four corners of the Complaint establish



PDF created with pdfFactory trial version www.pdffactory.com

clearly the systemic issues that can only be addressed in this forum. And if, for example, your Honor, if we look at the four corners of the Complaint, a young -- one of the young Plaintiffs, David, has been in state custody for 12 years. He came in as a normal two-year-old at the time when he was placed in care. He has not lived in a home since he was four years old. No one has -- the state now says that he's too damaged to be adopted. The state did this, your Honor, and no one stopped this.

The named Plaintiff has been institutionalized for 10 years, and the state has not been able to find him a permanent home, even though he came into state custody as a normal two-year-old boy. I mean, I could have requested that he be moved from the institution from where he currently resides, but that doesn't solve his problem because there are limited options as to where he could be moved. There are no homes, no foster placements for him.

And it certainly does not talk about the state that the actor -- I'm sorry, your Honor. Excuse me. Moving David, and this is what I'm trying to say, your Honor, moving David does not cause professionals to conclude that he needs a high level of care. We need to look at what kind of relief can require the state to



PDF created with pdfFactory trial version www.pdffactory.com

develop the kind of housing, foster care, treatment programs that can prevent others like David from being damaged.

It is counter-intuitive to institutionalize children. Children need to live within families, yet the state of --

THE COURT: You're making an argument on the merits of this case, and that's not what's before me here today.

MS. ALSTON: No. I'm sorry, your Honor. What I'm trying to do is set up --

THE COURT: I'm not dealing with whether or not you properly alleged a 1983 cause of action. That will come later if I find that you and the next friends have the authority to come before this Court.

MS. ALSTON: What I'm trying to establish, your Honor, in this statement is not the merits but why we did not -- one, why the next friends are important, because those children are so isolated, because they don't have family, because they don't have --

THE COURT: This is what I will determine after hearing the evidence as to whether they're properly next friends. And I will also have to determine whether you have the authority to bring this action because that's very much an issue in this case,



PDF created with pdfFactory trial version www.pdffactory.com

although it was waved aside by Plaintiffs' counsel the other day.

I have to determine whether you have the authority to do that under state law in view of the fact that these children are under the jurisdiction of the Family Court and the Family Court has appointed someone to represent them.

And I have to do some statutory construction. And depending on what the statutory construction is, there may be a constitutional issue, a state constitutional issue involving separation of powers, if the legislature gives this power to you without regard to seeking approval of the Family Court that has jurisdiction over this case, each case.

MS. ALSTON: They have jurisdiction over each case, your Honor --

THE COURT: I'm just telling you what the issue is, and that's what I'm going to decide. I don't want to hear arguments now on the merits of this case and your theories of possible recovery under 1983. So let's get on with the hearing.

MS. ALSTON: All right. Then the last thing I would say, your Honor, is that two of our next friends have had good relationships with the children that they are representing, and this Court we hope will accept



PDF created with pdfFactory trial version www.pdffactory.com

them.

The first witness we'll call is Mary Melvin.

**MARY MELVIN, PLAINTIFFS' WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Mary Melvin, M-E-L-V-I-N.

**DIRECT EXAMINATION**

**BY MS. ALSTON:**

Q. Ms. Melvin --

THE COURT: Please, get close to the microphone so we can hear you. Speak right into that microphone.

Q. Ms. Melvin, can you please tell us what your occupation is.

A. Well, at this time I am retired.

Q. And do you reside in Rhode Island?

A. Yes, I do.

Q. And what was your occupation prior to you retiring?

A. Well, I worked for St. Joseph -- worked at St. Joseph Hospital, I worked for the nursing homes, Banister House Nursing Care, I worked for Industrial National Bank and also a foster mother for 20 years.

Q. And are you currently a foster parent?

A. I'm not a foster parent at this time.

Q. Now, as a foster parent for 20 years, what, if



PDF created with pdfFactory trial version www.pdffactory.com

any, special recognition did you receive for being a foster parent?

A. In 1992, I was awarded Foster Mother of the Year. In '97, I was awarded Foster Mother of the Year.

Q. Do you recall what year you stopped being a foster parent?

A. It was approximately -- well, I was 65 at the time. I'm 74 now.

Q. And why did you stop being a foster parent?

A. Well, I stopped being a foster parent because my mother was living with me and she became ill with cancer, and I was in the process of retiring, and it was a little too much to take care of an 85-year-old mother and care for a small child.

Q. Do you know a boy that we're referring here today as David?

A. Yes, I do.

Q. And how do you know David?

A. I know David because he came to me as a foster child when he was 18 months old.

Q. And how long did he live with you?

A. David stayed with me until he turned five.

Q. And what was he like as a little boy?

A. As a little boy, he was a very active little boy. He had a few problems interacting with children, and he



PDF created with pdfFactory trial version www.pdffactory.com

had a short attention span; but as he got older, I saw a big change in David. He was able to play with children a little better. He would sit and watch cartoons with the other children. And by the time he turned, I would say, four years old, he was very loving, friendly. He was able to interact with other children. David was a totally different little boy.

Q. And what did he call you?

A. He called me mom.

Q. And how did you feel about him?

A. I was very attached to David because he was one of the younger children that came into my home. Most of the children, they were at least three, four, five years old. David was only 18 months, and we grew very close together. He became very attached to me and I to him.

Q. And would you have adopted him if you could?

A. Yes, I would have.

Q. And what -- do you keep any pictures of him?

A. I beg your pardon?

Q. Do you still keep pictures of him, of David?

A. Do I keep?

Q. Pictures.

A. Oh, yes. Yes. I have a picture album of David and a lot of the other children that was in my care



PDF created with pdfFactory trial version www.pdffactory.com

that I reflect back on and wonder how they're doing, you know, are they with their parents or are they married or been adopted. I have a lot of memories of those children.

Q. And do you recall when David left your home?

A. Yes, I do.

Q. And what was the reason?

A. When David left my home, it was in the -- he was in the process of being adopted by a family member.

Q. And do you recall what happened after that, after he left to be adopted by a family member?

A. I don't recall what happened because about eight months later after he left me, I contacted one of the social workers and I asked her how was he doing and how did the adoption go. And she said to me that the adoption did not take place, that he was back in the shelter.

Q. After he left your home and when you found out he was in a shelter, did you ever see him again?

A. Yes, I did. The bond that we had, that the two of us had, the social worker allowed me to go to the home, the shelter, and pick David up. And I would keep him for the day, and we would go out and eat or probably just go to the store, and I'd get him a little toy or something. We would spend the day together, and I did



PDF created with pdfFactory trial version www.pdffactory.com

this until he was moved again.
Q. And do you know where he was moved?
A. The last place that I heard that he was transferred to, I think it was a shelter in Woonsocket.
Q. In addition to bringing him home for a day for a visit, did you see him or where else would you take him?
A. Well, on occasions I would take him to church with me, but it depends on the social worker. I would always have to get permission, and they would let me pick him up and do things with him.
Q. What, if any, time -- did you ever take him to doctors' appointments or other types of official visits?
A. Oh, yes. I have taken him to doctors' appointments, and I've taken him to -- at one point he was going to counselling, and I would take him to counselling.
Q. To the best of your knowledge, what, if any, medications was David on?
A. Well, to the best of my knowledge, at one point he was on medication, but it was for a very short period, I would say a couple of months, and it was stopped.
Q. And when he was living with you between the ages of 18 months to approximately four or five years old,



PDF created with pdfFactory trial version www.pdffactory.com

was he in day care or preschool at that time?
A. Yes, he did. He went to John Hope Day Care for a period of time.
Q. And how did he do there?
A. Well, he did fairly well, but they said that he was really pretty hyper; but he did do pretty well there.
Q. And how was he with you at home?
A. He was very -- he was very good with me as long as I was in the house. He would get upset, however, if I would leave for a short period of time and -- to go to the store or something like that. He really didn't want me out of his sight; but other than that, he was a good little boy.
Q. As a four-year-old boy, was there anything that you know that would have prevented him from being adopted?
A. No.
Q. To the best of your knowledge, do you know if David's parents' rights have been terminated while he was with you?
A. Yes.
Q. Do you know how old he is now?
A. Well, he's about 14 years old now because I have a grandson that's the same age as David, only a few



PDF created with pdfFactory trial version www.pdffactory.com

months different, and that's how I know how old he would be now.

Q. Have you seen him recently?

A. No. It's been quite a while since I've seen him.

Q. How did it happen that you lost touch with him?

A. Well, the different places that I would call, the last place that I called, they didn't give me any information on him.

Q. At some point last year, were you contacted by someone in the child advocate's office?

A. Yes, I was.

Q. And do you recall approximately what time it was, what month it was?

A. I don't remember exactly what month.

Q. Do you know who contacted you specifically?

A. Yes.

Q. And who was that?

A. Shelia High King.

Q. And without telling us what you talked about, what did you learn about David?

A. Well, I learned that --

MR. LEE: Your Honor, I object.

THE COURT: Sustained. That's all hearsay.

Q. Do you know -- is David still, to the best of your knowledge, still in the foster care system?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes.
Q. Okay. And how did you react when you learned that he was still in care?
A. Well, when I was told that he was still in foster care, I was really surprised. I was shocked. I was upset that a child that I had at 18 months old and now 14 was still in foster care. I was really surprised.
Q. And what did you learn, if anything, about the actions the office of the child advocate was taking on behalf of David?
A. What did I think of it?
Q. What did you learn? What did you know?
A. Oh, I was told that --
MR. LEE: I object.
THE COURT: Overruled. I'll allow that as what she was told to dictate what her actions were, predicate to her action.
Q. Please answer.
A. I was told that there was going to be a lawsuit brought about on behalf of the children.
Q. And what was your understanding about the reason for the lawsuit?
A. Well, my understanding was that it was to -- I was told it wasn't about money or anything like that. It was about making things better for the children, like



PDF created with pdfFactory trial version www.pdffactory.com

David.
Q. And did you learn of the term next friend?
A. Yes, I did.
Q. And what is your understanding about what this term means?
A. My understanding is that a next friend would be someone that cares about the well-being of the child, that want to be a part of whatever is needed for this child that he may be a productive human being when he become of age, just loving him and letting him know that you care and to fill in wherever is needed.
Q. And were you asked would you be willing to be David's next friend?
A. Yes, I was.
Q. And what did you do when you were asked that question?
A. I told them that I didn't mind being a next friend for David because David was a child that was a part of my family and anything that I could do to be supportive to him and to help things be better for him, I was willing to be a part of that.
Q. And are you trying to accomplish anything specific with being a next friend for David?
A. Well, yes. I'm hoping that being a next friend for David would help make things better for him, that



PDF created with pdfFactory trial version www.pdffactory.com

we could continue to create a bond. I want David to know that anything I can do to help him or to be there for him, I'm a willing participant.

Q. And are you prepared to help make decisions for David in this matter?

A. Yes.

Q. And what if he doesn't want to be in this case, what would you do?

A. I'm sorry, I didn't --

Q. What if he doesn't want to be in -- a part of this case, what would you do?

A. Well, I would still be there for him. I would still care for him and love him. That's about it.

Q. And what if he didn't understand what this case was about, what would you do?

A. I would try to help him to understand what we're trying to do for him, trying to make things better.

Q. Now, do you understand that in coming to federal court there are different procedures and processes, the rigors of federal court? Why would you decide to do this matter? Why did you decide to do this for David as his next friend?

A. Because I care about David. I'm a mother myself, and I know what it means to love children and to care for them, and I hope that -- I hope that things will be



PDF created with pdfFactory trial version www.pdffactory.com

better for David and for all children.

Q. Do you understand that it means as a next friend that you will be part of settlement discussions and making decisions on David's behalf?

A. Yes.

MS. ALSTON: No further questions at this time, your Honor.

THE COURT: All right. Cross-examination.

MR. LEE: Your Honor, at the last hearing, you indicated that if we would cross-examine, you'd give us time to do that. We also just got a memorandum last night at 4:30.

I was going to ask that if we could have permission to depose the witnesses possibly next week if they're available, and then we'd submit a memo with the depositions or the relevant portions of them whenever the Court thought it was appropriate, the following week we could do that; that you indicated you'd give us an opportunity to prepare for cross-examination when you set this hearing.

THE COURT: I didn't have in mind delaying it for a week or more. You've heard her testimony. You can cross-examine right now. We'll deal with any other issues later.



PDF created with pdfFactory trial version www.pdffactory.com

## CROSS-EXAMINATION

**BY MR. LEE:**

Q. Ms. Melvin, am I correct that you were the foster mother for David from 1996 to 1998?

A. 1996 to 1998?

Q. Yes, ma'am.

A. I was a foster mother for David for a longer period of time than that, for more than two years.

Q. Have you seen the Complaint that was filed on your behalf in this action?

A. Yes, I did.

Q. And are you aware that that Complaint says you were the foster mother from 1996 to 1998?

A. Well, I was a foster mother for David from the age of 18 months to the age of five.

Q. And is it true that the last time you saw David was in 1998?

A. Approximately so, yes.

Q. And you've had no contact with David for approximately 10 years, then; is that true?

A. Correct.

Q. And you've had no access to any of David's DCYF records during that 10-year period?

A. No.

Q. You've had no access to the Family Court records



PDF created with pdfFactory trial version www.pdffactory.com

during that period?

A. No.

Q. You've had no access to David's medical or educational records during that period?

A. No.

Q. Is it also true that you've had no contact with any of David's natural relatives during that period?

A. No.

Q. And you've had no contact with any DCYF personnel related to David during that 10-year period, have you?

A. Well, I had contact with different social workers to ask questions about how he was doing.

Q. During the two years or whatever period it was that you were David's foster mother, did you have frequent contact with DCYF?

A. Yes.

Q. And did you ever go to the Family Court during that period?

A. I have went to -- I have gone to Family Court, but I didn't participate. I would take the child there to court sessions, to meet with the mother and whatever, but I was in a different room. I didn't go in and have direct contact.

Q. So during the period that you were David's foster mother, you never raised any complaints with the Family



PDF created with pdfFactory trial version www.pdffactory.com

Court related to David, did you?
A. No.
Q. And during the 10-year period when you stopped being his foster mother, you never raised any complaints with the Family Court related to David, did you?
A. No.
Q. Isn't it true that you have no complaint the way the Family Court treated David?
MS. ALSTON: Objection, your Honor.
THE COURT: Overruled. Based on her knowledge.
A. Well, I can't say at this point that I don't have any because the information that was given to me concerning David, I was very concerned about that.
Q. Maybe I can rephrase it. Based on your own personal knowledge of what you know about David, is it true that you have no complaint as to the way the Family Court has handled his case?
A. No, I have no complaint in that perspective.
Q. You were asked the question something to the effect of -- it was something to the effect of you choosing to bring this action to the federal court. Did you ever make a choice which court this case was filed in?
MS. ALSTON: Objection. I don't believe the



PDF created with pdfFactory trial version www.pdffactory.com

witness has stated that.
A. No. That was up to the lawyer.
THE COURT: Wait a minute, please. I'll sustain the objection to the form of the question.
Q. You didn't make a decision which court this action was brought in, did you?
A. No.
Q. In fact, you were told by someone that it was going to be filed here?
A. Yes.
Q. Did you express to that person any reluctance to going to the Family Court for David?
A. I didn't have any reluctance to going to court for David because I was concerned about David.
Q. And are you aware that David has a CASA attorney appointed for him?
A. I'm sorry, I didn't understand. I didn't hear you.
Q. Do you know what a CASA, C-A-S-A, attorney is?
A. Yes.
Q. Are you aware that David has a CASA attorney appointed for him?
A. No.
Q. So you've never raised any concerns about David with the CASA attorney, have you?



PDF created with pdfFactory trial version www.pdffactory.com

A. No.
Q. Do you know where David's physically located right now?
A. Do I know where he's located?
Q. Yes, ma'am.
A. No, I don't.
Q. Do you know what documents the Court reviewed for David over the last year?
A. No.
Q. You have no criticisms of any decisions the Family Court's made for David over the last year, then; is that accurate?
A. Yes.
Q. Do you understand what the effect of a federal court order could be on David's treatment or supervision by the Family Court?
A. I don't quite understand what you're saying.
Q. I understand. I just wondered if you're aware of what the legal consequences or legal significance could be if a federal court makes an order related to David, you know, how that would interact with the Family Court making an order related to David.
A. No, I don't.
MS. ALSTON: Objection, your Honor. Calls for a legal --



PDF created with pdfFactory trial version www.pdffactory.com

THE COURT: Sustained. You're asking her for a legal conclusion.

A. That would be up to the lawyers.

THE COURT: Don't answer, please. When I say objection sustained, that means you don't have to answer.

THE WITNESS: Okay.

THE COURT: If I say objection overruled, then you do have to answer.

THE WITNESS: Okay.

THE COURT: All right?

THE WITNESS: All right.

MR. LEE: Your Honor, I'd just like to offer that I didn't want the legal conclusion. She was asked about what she would explain to David. I just wanted to establish that she wouldn't be able to explain that to David. So I'm just asking her understanding.

THE COURT: I'll sustain the objection. You're asking her for legal matters, about legal matters.

Q. Are you aware where David's going to school right now or if he's going to school?

A. I don't know.

Q. Do you have any idea whether or not this action could affect David's schooling?

A. No, I don't.



PDF created with pdfFactory trial version www.pdffactory.com

Q. Do you have any idea whether or not this action could affect David's placement?

A. Well, I don't see how this action can affect his placement. I see it as helping in some way.

Q. Are you aware that the Family Court could also help David in some way?

A. Yes.

MR. LEE: I don't have anything else, your Honor.

THE COURT: All right. Anything else?

MS. ALSTON: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MS. ALSTON:**

Q. Ms. Melvin, I have a question for you. When David was in your care, when -- can you please tell us any time that you saw a CASA attorney. When did you ever speak with a CASA attorney?

A. I didn't.

Q. And you are aware of the Complaint in this matter, aren't you?

A. Yes.

Q. And a copy was provided for you to read the section regarding David, yes?

A. Yes.

Q. Based on what you read regarding David, what, if



PDF created with pdfFactory trial version www.pdffactory.com

anything, do you feel that -- do you feel that -- based on what you read, can you please explain or describe how do you think his treatment benefited him, or do you think that the treatment that he received benefited him?

MR. LEE: Your Honor, I object.

THE COURT: Sustained. She has no knowledge of what's happened to him.

Q. Based on what you read -- strike that. You did have an opportunity to review the Complaint?

A. Yes.

Q. Given that -- based on the fact if we assert that the Complaint -- the facts are true in that Complaint, what were your -- what were your feelings or what did you believe happened to David based on what you read?

MR. LEE: Objection.

THE COURT: Sustained. That's not only an improper question, it's a compound question as well.

Q. Based on what you saw in the Complaint, how did you react to reviewing what happened to David?

MR. LEE: Objection.

THE COURT: Sustained.

MS. ALSTON: No further questions, then, your Honor.

MR. LEE: Nothing, your Honor.



PDF created with pdfFactory trial version www.pdffactory.com

THE COURT: All right. Thank you, Ms. Melvin. You may step down.

MS. LAMBIASE: Are you ready for the next witness, your Honor?

THE COURT: I'm sorry?

MS. LAMBIASE: Are you ready for the next witness?

THE COURT: Yes.

MS. LAMBIASE: We call Kathleen Collins to the stand.

THE COURT: All right.

**KATHLEEN COLLINS, PLAINTIFFS' WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: My name is Kathleen Collins, C-O-L-L-I-N-S.

MS. LAMBIASE: May I inquire of the witness, your Honor?

THE COURT: Yes.

**DIRECT EXAMINATION**

**BY MS. LAMBIASE:**

Q. Good morning, Ms. Collins.

A. Good morning.

Q. Can you please state your occupation for the Court.



PDF created with pdfFactory trial version www.pdffactory.com

A. I'm a school psychologist.
Q. And can you give us a little about your educational background.
A. I have a master's degree in school psychology specifically with some additional course work.
Q. And where are you currently employed?
A. I'm currently employed by the Providence School Department.
Q. Where are you currently working?
A. I am currently working at two schools, Robert L. Bailey and Webster Avenue School.
Q. And what are your job responsibilities as a school psychologist?
A. They're ever-increasing. I am primarily responsible for evaluation of children who may or may not need special education services, also for helping to manage behaviors and assisting teachers in managing behaviors, providing other additional support that I may be called upon to -- through the principal or other people, evaluating for learning disabilities, sometimes mental health support or counselling, teaching social skills groups and a number of different responsibilities, both academic and social, social learning.
Q. And what age range of children do you deal with?



PDF created with pdfFactory trial version www.pdffactory.com

A. My certification is for kindergarten through high school. I'm currently working with elementary students, so generally preschool or kindergarten through fifth or sixth grade.

Q. And, Ms. Collins, during the course of your professional life, have you been involved in any way with children who are involved with Rhode Island's child welfare or foster care system?

A. Yes, I have.

Q. And it's known as DCYF to you?

A. In this state, yes.

Q. And in what capacity have you been involved with children who were involved with DCYF?

A. A number of children who come into our system are involved in DCYF for one reason or another. I have worked with them as a counselor. I have been an evaluator for some of those children. I have done case coordination for educational purposes in collaboration with social workers or educational advocates, parents, foster parents, the children themselves, the teachers.

Q. And some of the children who you see at your school during the course of your time as a school psychologist can be children in foster care?

A. Absolutely, yes.

Q. And what school did you work at immediately prior



PDF created with pdfFactory trial version www.pdffactory.com

to your current position?
A. Last year I was involved at Charlotte Woods/Sergeant Cornell Young. Those are two schools in one building. They essentially function as one school at this point.
Q. And do you know a boy that we're referring to here as Caesar?
A. I do.
Q. And how do you know Caesar?
A. Caesar was a student of mine, came to my attention at the very beginning of the school year that I was there.
Q. Can you state month and year?
A. It would have been September. I believe it was '05, but I may be incorrect.
Q. Was it one year?
A. It would have been -- yeah. Maybe it was '06-07. I'm sorry, I'm having trouble with the dates at the moment.
Q. Okay. Let's just back up and take a breath. We're currently in the '07-08 school year?
A. Yes, so it would have been '06-07.
Q. Thank you. And what kind of -- and so you knew him at that school?
A. I did.



PDF created with pdfFactory trial version www.pdffactory.com

Q. At Charlotte Woods?
A. Yes.
Q. And so did you provide services to Caesar?
A. I did.
Q. And can you tell us a little bit about that.
A. Initially I was assisting in evaluating him for completion of a special education referral that had begun before he came to us. So I was involved in doing some behavioral observations in his kindergarten classroom.
And then when that process was completed, I sat in on an individualized educational plan meeting, which is a meeting of the caretakers and the school personnel that will assist in serving that child in a special education capacity.
And then following that I was involved with Caesar in his classroom setting and occasionally outside of his classroom setting teaching social skills and just generally trying to form relationships with him and some other children who were in similar circumstances.
Q. And you talked about work in the classroom setting as well as work outside of the classroom setting?
A. Correct.
Q. Did you ever work with Caesar one on one?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes.
Q. And can you talk a little bit about that.
A. Yeah. Caesar is a very active child, doesn't necessarily trust adult relationships very well. So he's a very busy little guy, questions directions, questions redirection, questions rules, but also can be incredibly playful and smiling and cheerful. And his moods change back and forth very rapidly depending on how much he wants to do what you're trying to encourage him to do.
He thrived really well on praise. So if he came to see me individually, he absolutely adored the idea that somebody would spend time with him individually, would encourage him to draw and talk and share his feelings.
Q. And how often would you do that, would you say, in the course of that year?
A. I probably worked with him individually maybe a dozen times and in class several more than that.
Q. Several more than a dozen in class?
A. Yeah. Yeah.
Q. And are there times -- aside from the one-on-one work that you just talked about and the in-class work, were there other times when you and he crossed paths and interacted with each other in the school?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes.
Q. And can you talk about that a little.
A. Yeah. During the times that I was observing him when he was in kindergarten and he hadn't formally been brought into special education services, I spent a lot of time watching his antics, as they could be called.
He is a very busy little guy, as I said, so he's very difficult to manage in a classroom of 26 children. He spent a lot of time swinging from inappropriate objects, like the television support stand in the corner of the room, we had to kind of coax him down from there, climbing on top of furniture, hiding in the bathrooms and needing to be coaxed back out so he could be redirected into more productive activity.
Sometimes he would be walking very proudly at the head of his line, and then he would be thrilled to get praise when he was doing the right thing; but we crossed paths in a number of situations and settings, and you try to deliver appropriate praise when you see them doing the best things.
So there were lots of opportunities. I spent a lot of time bumping into Caesar, both intentionally and unintentionally.
Q. And how frequently would you say you saw him during the course of a normal -- if you can talk about



PDF created with pdfFactory trial version www.pdffactory.com

a normal school week.

A. I would say probably at least three or four times just because my office was right in an area where we would always be passing each other for one reason or another.

Q. Three or four times a week, is that what you mean?

A. Yeah.

Q. And did Caesar have any learning disabilities?

A. Not to my knowledge, no. No, he was a very bright little boy.

Q. And what grade was he in?

A. He was in kindergarten at that time.

Q. And during the year that you -- were you his psychologist, his school psychologist?

A. I was the school psychologist in charge of his case, yes.

Q. And did he make therapeutic progress during that year?

A. He did make some therapeutic progress.

Q. Can you talk about that.

A. Yes. His behaviors resolved somewhat, I would certainly not say entirely, but he certainly became more safe. He certainly began to learn the limits where safety was when he was put into a special education program specifically to address his



PDF created with pdfFactory trial version www.pdffactory.com

difficulties. And he was able to learn that praise -- that praise was a good -- you know, doing the right thing was a good way to get praise and attention and doing the wrong thing didn't earn him as much, but he certainly fluctuated quite a bit over the course of that year.

By the end of the year, he had improved statistically it looked like about 50 percent, basically. Having reviewed his records not very long ago, there was -- he made somewhat of an improvement.

Q. And did you -- would you say that you and he, in your opinion, established a relationship?

A. Absolutely.

Q. Did you establish a bond?

A. I would say so, yes.

Q. And as far as you know, was he in DCYF custody during that year that you were his school psychologist?

A. Yes.

Q. Do you know who he was living with at the time?

A. I believe he was living with his grandmother.

Q. And when's the last time that you saw him?

A. At the end of the previous -- that school year.

Q. So --

A. Probably about June, the end of May or June.

Q. End of May, June of '07?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes.
Q. Okay. And how did it come about that that was the last time you saw him?
A. Well, that was the end of our school year, so I normally would not have seen him during the summer. When I went to check on him at the beginning of this school year, even though I had changed schools so our relationship would have changed anyway, but I did go to update the psychologist who had taken my position, and I found out that he was gone, that he moved out of the district.
Q. Have you tried to see Caesar since he moved schools?
A. I have tried to find out a little bit of information to at least know where he is because I had a lot of concerns about him, his being so young and seemingly out on -- out on his own, in a sense, in the world. I haven't really known how to go about getting in touch with him at this point.
Q. Did there come a point in time, Ms. Collins, when you were contacted by someone in the child advocate's office?
A. Yes, there was.
Q. Can you tell us approximately when that was.
A. It was the end of May, beginning of June, right



PDF created with pdfFactory trial version www.pdffactory.com

around the end of the school year last year.

Q. So Caesar was still a child that was on your case as a school psychologist?

A. Yes.

Q. And who contacted you specifically, if you can recall?

A. I believe it was Shelia High King.

Q. And without telling us the content of the conversation you had with Ms. King, did you learn about possible actions that were being considered by the child advocate on behalf of Caesar and others?

A. Yes, I did.

Q. And did you have a discussion with Ms. King about those actions?

A. I had a brief discussion with Ms. King and then arranged a meeting with the child advocate.

Q. And did you have that meeting with the child advocate?

A. I did.

Q. And that's Ms. Alston?

A. Yes.

Q. And did you discuss the possibility that there might be a lawsuit filed in this case for Caesar and others?

A. Yes.



PDF created with pdfFactory trial version www.pdffactory.com

Q. And how did you react or what were your thoughts about that possibility when you had that discussion?
A. I thought it was a timely action to be taken. I thought that it was an important endeavor.
Q. Why is that?
A. I have been very concerned about Caesar's history in particular but a number of children that have come through that particular system with issues that are just concerning.
Q. And what particular issues as to Caesar concerned you?
A. What concerns me about Caesar is he's very young. He's only six, he would be six now, he was five when I knew him, but that he still had no permanent home; and it just seemed that there was nobody that was able to care for him, and that just seemed really tragic to me that here was this totally adorable little boy, albeit with some behavior problems, but who absolutely deserved and needed permanent care and wasn't getting that. So that was a major concern for me.
Q. And were you -- did you discuss with Ms. Alston the concept of next friend?
A. I did.
Q. And had you heard that concept before, that legal term?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yeah, sort of in a vague way. Yeah.
Q. And after your conversations with Ms. Alston, did you have an understanding of what a next friend might be in the course of a proceeding like this?
A. Yes.
Q. And what was your understanding?
A. My understanding is that I'm here to represent the interests of that particular child in getting justice from the system, to assist him and support him in seeking some sort of support and justice.
Q. And is it your understanding that this case is against the officials at the Department of Children, Youth and Families?
A. Yes.
Q. And this case is not against the Family Court in any way?
A. No.
Q. And did you agree, based on your discussions and understanding, to be a next friend for Caesar?
A. Yes, I did.
Q. Did you do that right away?
A. No. I actually went home and discussed it with my husband and kind of researched the idea of next friend a little bit to get a more solid understanding and spent some time just kind of sitting with it for a day



PDF created with pdfFactory trial version www.pdffactory.com

or so, and then I agreed to do the job.

Q. And what ultimately caused you to agree?

A. I believe this is an absolutely important case. It's a -- this child deserves justice, and many, many other children deserve that justice. And there didn't appear to be anybody else that was really willing to do this for this child. There didn't appear to be anyone else who was available, so I chose to make myself available.

Q. And do you think it is in Caesar's best interests to be part of this lawsuit?

A. Absolutely.

Q. Do you think it would be invasive for him personally so that he shouldn't be part of this lawsuit?

A. I don't see why that should be a problem. No, I don't think it would be invasive personally.

Q. What about subjecting him to the -- perhaps having a deposition taken or taking the stand here like you are today?

A. I just -- it's certainly not in my purview to make that decision whether he would appear in court or not. It would be a discussion I would have with the attorneys, but I don't think -- in considering the things that have happened to this child over the course



PDF created with pdfFactory trial version www.pdffactory.com

of his life, this might be the best thing that ever happened to him.

Q. And are you prepared to represent him in this lawsuit until the lawsuit is over?

A. Absolutely.

Q. And what does that mean for you?

A. For me that means being available and present for whatever needs to be done in order to see the case through, in order to support the child's rights through this case.

Q. And would you be willing to make decisions on his behalf regarding this lawsuit?

A. Absolutely.

Q. And outcomes that have to be made with lawyers and their clients in this lawsuit?

A. Yes.

MS. LAMBIASE: Thank you. I don't have any further questions for you.

THE WITNESS: Thank you.

THE COURT: You may cross-examine.

**CROSS-EXAMINATION**

**BY MR. LEE:**

Q. Ms. Collins, when you were the school psychologist for Caesar, how many other children were under your jurisdiction?



PDF created with pdfFactory trial version www.pdffactory.com

A. I would say under my direct -- well, would you explain jurisdiction for me.
Q. Well, as a school psychologist, do you supervise other children or treat other children, or what's the appropriate word?
A. I would say that I have a caseload of children for whom I do services.
Q. And what was your caseload for children during the one year that you had Caesar in your load?
A. My caseload for counselling was about 30 to 36 children.
Q. And in addition to that caseload, would you have responsibility for the other children in the school, also?
A. Some responsibility.
Q. And how many other children were in the school that you would have some responsibility for?
A. Oh, approximately 700, 750.
Q. And you had responsibility for all of those children to at least some extent on a daily basis; true?
A. No, not necessarily.
Q. You had some responsibility for all the children on some periodic basis; is that accurate?
A. That's not exactly correct either.



PDF created with pdfFactory trial version www.pdffactory.com

Q. Well, I think you indicated that you had some responsibility for approximately 700 children. What does that mean?
A. That means that in the event that a situation arises whereby those children might be referred to special education, I might be called in to assist in that case.
Q. And it's true that you met Caesar for the first time in September of 2006?
A. That's correct.
Q. And you had no interaction with Caesar prior to that date?
A. That's correct.
Q. And you had no involvement with Caesar's DCYF records prior to that date, did you?
A. That would be correct.
Q. And no involvement with Caesar's medical records prior to that date, did you?
A. No, that would be correct.
Q. Are you aware of who Caesar's guardian ad litem is?
A. I am not.
Q. During the year he was in your caseload, were you aware who his guardian ad litem was at that time?
A. You'll have to explain the term guardian ad litem.



PDF created with pdfFactory trial version www.pdffactory.com

Maybe I know and I don't know the term well.
Q. Are you aware of any representative appointed by the Family Court for Caesar during the period he was in your caseload?
A. I don't think so, no.
Q. Did you have any interaction with the Family Court during the year that Caesar was in your caseload?
A. Not direct, no. Probably not indirect either.
Q. So you never tried to bring a complaint to that court about Caesar?
A. I don't believe so, no.
Q. Did you have any involvement with DCYF personnel related to Caesar during the one year he was in your caseload?
A. Yes, I did.
Q. And who was that?
A. That would have been Jovina Vales, I believe was the caseworker that was involved with him.
Q. And how many times during that year did you see Jovina Vales?
A. I can only give you an estimate.
Q. What's that estimate?
A. Maybe five times.
Q. Did you voice complaints to Jovina Vales during any of those times related to Caesar?



PDF created with pdfFactory trial version www.pdffactory.com

A. Complaints in what sense?
Q. Any complaints.
A. I made suggestions as to what his needs might be.
Q. And that was it; correct?
A. Yes.
Q. Did you have any contact with the child advocate during the year that Caesar was in your caseload other than when they contacted you?
A. Not with regard to Caesar.
Q. You are familiar with the Office of Child Advocate, aren't you?
A. Yes.
Q. And you were familiar with it prior to them calling you; correct?
A. Yes.
Q. And you knew as a school psychologist that that was an organization available as a resource to you if you saw an issue with a child in DCYF custody, didn't you?
A. Yes.
Q. Have you ever contacted the Family Court regarding a complaint about a child?
A. I have not initiated such contact.
Q. Are you familiar with something called the CANTS hotline?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes.
Q. And it's true that that's a hotline that allows you to report allegations of abuse or neglect of a child; is that true?
A. Yes.
Q. Have you utilized that hotline before?
A. Yes.
Q. Did you ever utilize it for Caesar?
A. No.
Q. Is it also true the last time you saw Caesar was approximately June of 2007?
A. That would be correct.
Q. And you've never seen any of Caesar's DCYF records subsequent to that period, have you?
A. No.
Q. Never seen any of his medical records subsequent to that period?
A. No.
Q. Never seen any of his educational records subsequent to that period?
A. No.
Q. No communication with the Family Court whatsoever related to Caesar subsequent to that period; correct?
A. No, that's correct.
Q. In fact, you have no personal knowledge of how



PDF created with pdfFactory trial version www.pdffactory.com

Caesar is doing in his current placement, do you?
A. I have no personal knowledge. That's correct.
Q. You have no personal knowledge of Caesar's current medical treatment plan, do you?
A. That's correct.
Q. And you have no personal knowledge of Caesar's current educational plan, do you?
A. That's correct.
Q. Has the Family Court ever been unresponsive to your concerns related to Caesar?
A. No.
Q. Do you have any reason to believe they would be unresponsive to a concern now if you had one?
A. I have no reason to believe that, no.
Q. And, in fact, based on your complete lack of knowledge about Caesar post June of 2007, you have no concerns about him, do you?
A. I do have concerns about him.
Q. And that's based on the one year that he was in your case plan?
A. That's correct.
Q. And during that year, am I right that you said there was about a 50 percent improvement in his conduct just in that one year?
A. Yup. Within the school setting, yes.



PDF created with pdfFactory trial version www.pdffactory.com

Q. Is that an unusual improvement?
A. No, actually it's not unusual. I thought it should have been better.
Q. Have you seen improvements less than 50 percent?
A. Some, yeah.
Q. And you've seen some better?
A. I've seen many better.
Q. And, again, during that one year, you personally supervised Caesar, saw the improvement, yet made no formal complaints to DCYF, the Family Court, the child advocate or the CANTS hotline; correct?
A. I expressed concerns to the DCYF worker about his needs.
Q. And you thought that she was an appropriate person to address those with; correct?
A. Yes.
Q. And I assume -- strike that. Have you dealt with Jovina Vales on other DCYF cases?
A. Yes.
Q. So you had personal knowledge or relationship with her prior to having Caesar on your caseload; is that true?
A. I'm not sure about that because she had more than one case in that year and I don't remember when I became aware who was in charge of which child. So



PDF created with pdfFactory trial version www.pdffactory.com

Caesar may have been first, but I can't be certain.
Q. Now, you've indicated that you've come to this Court because you want some things for Caesar and other children in DCYF; is that true?
A. That's true.
Q. The things that you want specifically for Caesar, have you ever addressed them with the Family Court?
A. No.
Q. So you have no idea if they would be responsive to whatever it is you want for Caesar, do you?
A. I don't know.
Q. Are you aware that Caesar is currently in DCYF care and custody on a dependency petition, not an abuse and neglect petition?
A. I'm not aware of that detail.
Q. Are you aware why he's in DCYF care and custody at all?
A. I was not privy to those records.
Q. So even during the year he was in your caseload, you were not privy to DCYF's internal records related to Caesar?
A. Only the details out of discussions with Jovina and whatever might have been released to the School Department.
Q. Were you privy during the year he was in your



PDF created with pdfFactory trial version www.pdffactory.com

caseload to the Family Court records related to Caesar?
A. No.
Q. So you have no idea what the Family Court did or did not approve for Caesar during that one-year period; true?
A. That's correct.
Q. And you have no idea what the Family Court reviewed in making its decisions during the one year that Caesar was in your caseload; also true?
A. That's correct.
MR. LEE: Nothing else, your Honor.
THE COURT: Anything else?
MS. LAMBIASE: Yes. Thank you, your Honor.

**REDIRECT EXAMINATION**

**BY MS. LAMBIASE:**
Q. Ms. Collins, you stated that you spoke to Caesar's DCYF caseworker on a number of occasions; is that right?
A. Yes.
Q. What were the purpose of -- what were the purposes of those conversations?
A. Largely planning for special education, to express concerns for his needs and what DCYF's role might be in addressing some of those needs that the school could not address.



PDF created with pdfFactory trial version www.pdffactory.com

Q. And what were some of those needs that you specifically spoke to with DCYF's worker about Caesar?

A. I specifically requested that they seek counselling, a private or at least a community-based counselling service for him, some therapy to deal with some of his attachment issues and difficulties with his behaviors.

Q. And as far as you know, were those suggestions taken up?

A. I received an assent from the worker that she would seek those services, and I believe that she did make an attempt to garner those services.

Q. Were you ever made aware that he was actually receiving those services?

A. I don't -- I'm trying to remember whether someone specifically said yes, he's being seen in a particular venue. I don't remember.

Q. And in the course of your experience as a school psychologist who deals with children who are DCYF-involved, have there been occasions, as far as you personally know, where there have been requests that you have made for services for children and the services weren't available by DCYF?

MR. LEE: Your Honor, objection.

THE COURT: Sustained.



PDF created with pdfFactory trial version www.pdffactory.com

Q. When you were asked about whether you know about what's happening to Caesar currently -- well, let me just say, you were asked about that, were you not?
A. I was asked.
Q. And regarding any current issues or any future issues that would come up for Caesar, as his next friend, would you consider it your responsibility to educate yourself about his issues?
A. Absolutely.
Q. Would you educate yourself about his issues before you made any decisions on his behalf?
A. Oh, yes. Absolutely.
MS. LAMBIASE: Thank you. Nothing further, Judge.
MR. LEE: Nothing, your Honor.
THE COURT: Thank you, Ms. Collins. You may step down.
THE WITNESS: Thank you.
MS. LAMBIASE: Your Honor, we have one other next friend to testify, but he was not going to be available this afternoon, so I sought the Court's permission to have him come tomorrow morning. I do have -- and I thank the Court for that graciousness. He has his very first seminar with a new class at Brown this afternoon.



PDF created with pdfFactory trial version www.pdffactory.com

We do have two other witnesses that we'd like to present this afternoon, your Honor.

THE COURT: All right. We can do that. Tomorrow, something has come up for me tomorrow morning. So we'll resume tomorrow at 2:00 in the afternoon.

MS. LAMBIASE: Very good, your Honor.

MR. LEE: Your Honor, could I just be heard briefly on this?

THE COURT: Yes.

MR. LEE: Thank you. We contacted the Plaintiffs' counsel prior to this hearing. Specifically, Mr. Dineen contacted us. We were told that they were going to have the two witnesses who currently testified and would ask to do Professor Elliott tomorrow.

We've had no notice for any other witnesses. As I stand here right now, I don't even know the names of these people. If they are allowed to put these people on, we really should be given an opportunity to do some discovery, at least a deposition with these people.

I don't know who they are. We were not told they were coming in. They've never mentioned before right now in court they were going to put other people on. I understood from the Court's instructions at our



PDF created with pdfFactory trial version www.pdffactory.com

last hearing it was supposed to be the next friends to tell the Court why they're the appropriate next friends.

THE COURT: Who are these new witnesses?

MS. IAMBIASE: Your Honor, it was my understanding from the Court's request and order to have us have next friends here today that the Court also actually invited us at the end of the day last Wednesday to bring whatever other witnesses we deemed appropriate concerning the issues that the Court has raised.

One of the questions the Court has asked, as I understand it, was whether in the context of what some have called next friend standing or prudential standing the next friend's decision to bring this case is in the best interest of the named Plaintiff.

So we have two witnesses to offer to the Court who can testify as to some of the systemic issues in DCYF and also how those systemic issues cannot be addressed in the Family Court, your Honor.

THE COURT: That's beyond the scope of this hearing. Systemic issues in the Family Court are not involved with this case. They're irrelevant right now.

MS. IAMBIASE: Your Honor, to the extent that the Court in making its ruling and making its



PDF created with pdfFactory trial version www.pdffactory.com

determination about the next friend issue, it's my understanding from the conversations that we had and the dialogue that happened last week that there were some concerns the Court had concerning whether or not the issues that we brought to this Court's attention could be addressed in Family Court and that somehow related in the Court's mind to standing.

I agree with the Court that there is a separate *Younger* abstention issue that the Court needs to grapple with, as well as the next friend issue as to whether under Rule 17(c) they're the adequate next friends; but to the extent that there's any prudential standing concern that the Court might have on behalf of the next friends, we thought it would be prudent to offer to the Court those conversations with these witnesses.

If the Court would not permit us to call those witnesses, I would ask, at the very least, your Honor, to make our record that we would be allowed to submit declarations on their behalf.

THE COURT: We're only dealing with these now seven minors.

MS. LAMBIASE: Yes. Understood, your Honor.

THE COURT: And the question of whether or not the best friends have standing.



PDF created with pdfFactory trial version www.pdffactory.com

MS. LAMBIASE: Yes, I understand that, your Honor.

THE COURT: And you're going way beyond that. It's really not of great significance to me. We're not dealing with systemic issues in DCYF. We're dealing with whether these particular youngsters have been somehow mistreated --

MS. LAMBIASE: Well, yes, your Honor.

THE COURT: -- by DCYF and through the Family Court process.

MS. LAMBIASE: Well, your Honor, no, actually. In Plaintiffs' view --

THE COURT: You don't view it properly. You're restricting it. The Family Court has jurisdiction over these children.

MS. LAMBIASE: Your Honor, if I could --

THE COURT: And you want to keep ignoring that, but the Family Court does have jurisdiction over these children and their cases.

MS. LAMBIASE: Your Honor, I don't ignore that in any way. The Family Court has its role, absolutely, positively, and we absolutely succumb to that role.

It, however, is not the place where a named Plaintiff, in our view, can bring a constitutional violation that needs to be remedied on behalf of those



PDF created with pdfFactory trial version www.pdffactory.com

children.

So in their individual review, that's the -- I mean, that's back to the *Younger* abstention questions that we were talking about. If the Court is to separate those issues, the *Younger* abstention, from the next friends capacity under Rule 17(c), then we don't have any other witnesses to offer.

If the Court is going to somehow combine those issues, then we would please request to put these witnesses on the stand or at the very least we have declarations signed by them and I will offer them to the Court and file them today.

THE COURT: All right. Well, I don't know what they're going to testify to in detail, so I'll have to hear them first. After I hear them, then I'll decide whether we have to recess and give the defense an opportunity to depose them.

MS. LAMBIASE: Thank you, your Honor.

THE COURT: We'll resume at 2:00 this afternoon.

MR. LEE: Your Honor, could I ask that we have -- at least have the names of these two witnesses.

MS. LAMBIASE: Sure, Lennette Azzi-Lessing and Patricia Corbett.

THE COURT: We'll resume at two this afternoon.

(Recess)



PDF created with pdfFactory trial version www.pdffactory.com

THE COURT: Good afternoon, everyone. All right. You may present your next witness.

MS. LAMBIASE: Thank you, your Honor. We call Lennette Azzi-Lessing.

THE COURT: What's the name, please?

MS. LAMBIASE: Lennette, L-E-N-N-E-T-T-E, Azzi, A-Z-Z-I hyphen L-E-S-S-I-N-G.

**LENNETTE AZZI-LESSING, PLAINTIFFS' WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: My name is Lennette Azzi-Lessing. The last name is A-Z-Z-I hyphen L-E-S-S-I-N-G.

MS. LAMBIASE: May I inquire, your Honor?

THE COURT: Yes.

MS. LAMBIASE: Thank you.

**DIRECT EXAMINATION**

**BY MS. LAMBIASE:**

Q. Ms. Azzi-Lessing, good afternoon.

A. Good afternoon.

Q. For whom do you work currently?

A. I'm currently employed by Wheelock College.

Q. And where is that?

A. Boston.

Q. And in what capacity?

A. Assistant professor of social work in the graduate



PDF created with pdfFactory trial version www.pdffactory.com

program.

Q. What do you teach there?

A. I teach social work administration, social work with communities and organizations and group, research and advanced social work practice with children and their families.

Q. And what is your educational background, ma'am?

A. I have a bachelor's degree in public service, a master's degree in social work and a doctorate in human development and family studies.

Q. And for how long have you worked at Wheelock College?

A. Just one year.

Q. And where do you live?

A. Bristol, Rhode Island.

Q. And for how long have you been a Rhode Island resident?

A. About 27 years.

Q. And prior to your teaching position, by whom were you employed?

A. Children's Friend in Providence.

Q. And is it Children's Friend and Service?

A. That's the legal name. The agency goes by Children's Friend.

Q. Thank you. And what was your position there?



PDF created with pdfFactory trial version www.pdffactory.com

A. I was executive director for the past 12 years.
Q. And what does that organization do?
A. Children's Friend provides a range of services, mainly to disadvantaged children and their families, throughout the State of Rhode Island but mostly concentrated in the urban, low-income areas.
The agency provides child care and home-based services to families with young children; early intervention services to infants and toddlers with disabilities and their families; and a whole range of child protective services or child welfare-oriented services, such as a program that provides home-based services to families who are open to DCYF because of parental addiction, services to keep families out of the DCYF system, a foster care program where DCYF children are involved in being cared for by the foster homes that the agency operates, and programs to help children obtain permanency.
Q. Children in DCYF custody?
A. Yes. Uh-huh.
Q. What were your responsibilities and duties as executive director at Children's Friend?
A. A whole range of administrative duties, working with the board of directors, communications, publicizing the agency's work, ensuring that the agency



PDF created with pdfFactory trial version www.pdffactory.com

complied with all legal standards, making sure that the agency was delivering services according to best practice, making sure that there was evaluation and accountability for the service, fiscal oversight, relationship with the community, with other organizations and so forth.

Q. Did you also foster relationships with those in DCYF?

A. Yes. We felt that it was part of our mission, actually it's in our mission statement, to improve the entire service system that serves children and their families. So, you know, certainly part of my responsibility and the responsibility of our staff was to partner with DCYF and other organizations that cared for children and to try to make the system as strong as it could be.

Q. Okay. And in the course of your responsibilities as executive director, did you also review DCYF data on a regular basis?

A. Yes.

Q. Does DCYF -- I'm sorry, does Children's Friend have caseworkers that work with children in foster care?

A. Yes.

Q. And please talk about that specifically a little.



PDF created with pdfFactory trial version www.pdffactory.com

A. Well, our staff worked with -- and I use past tense only because I'm not there anymore, but obviously these programs continue; but our staff worked with DCYF staff in a couple of different regards in foster care.

One was that our agency recruited, trained and supports foster families for DCYF. So they would be involved with making sure that the children were well cared for, making sure that the foster parents were supported, and some of our other programs, like Project Connect, where the staff works with substance abuse-affected families.

The staff would work with DCYF workers, partner with them; and if the children had to be removed and were in foster care, then the staff would continue to follow those cases and work alongside of DCYF.

We also have -- they have a program called the Partners in Permanency program, which helped children who have been in the foster care system for a long period of time to obtain permanency by working with the DCYF worker, the foster family, the biological parents and any other potential guardians or caregivers in the child's life.

Q. And those programs that you talk about specific to foster care, are there caseworkers at Children's Friend that see those children?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes.
Q. And how many employees does Children's Friend have?
A. About 130, 140.
Q. And how many clinical staff?
A. Working directly with children and their families, probably 35 to 40.
Q. And can you briefly say -- tell the Court what position you had prior to Children's Friend.
A. Before being executive director of Children's Friend, I was executive director of an organization that I had founded which was known as the Rhode Island Center for Children at Risk. And I ran this organization for four years before it merged into Children's Friend and I became executive director of the united organization.
Q. And what did that organization do different -- what was the mission of that organization?
A. I founded that organization to address the need in Rhode Island for comprehensive, high-quality services for young children who were disadvantaged, to get involved with these children and their families very early in life and to stop the progression of these families either with the child having to enter the special ed system or the family entering a system like



PDF created with pdfFactory trial version www.pdffactory.com

DCYF.

Q. In your professional life, can you just walk us through back maybe a couple more positions prior to that.

A. Prior to that and actually simultaneous to some of my work in founding the agency, I was on the faculty of Rhode Island College School of Social Work for four years teaching in the graduate program, taught courses similar to those that I teach currently at Wheelock College.

Prior to that, I was director of outpatient services and children's services at Community Counselling Center in Pawtucket, Rhode Island. And prior to that, I established child welfare programs at Cranston Community Action program in Cranston.

Q. And were you ever a direct-care social worker?

A. Yes. I did provide direct services at Cranston Community Action agency. I also provided direct services at Community Counselling Center and did very limited direct services at Rhode Island Center for Children at Risk.

Q. And are you currently on or during your -- the course of your time in Rhode Island, have you been on any committees or boards?

A. Yes, I have been on several committees and boards.



PDF created with pdfFactory trial version www.pdffactory.com

Q. Can you tell us a little bit about those.

A. I'm currently the co-chair of the Child Welfare League of America's national committee on family support and family preservation. I also chair about a year-old group in Rhode Island which is known as the Rhode Island Early Childhood Investment Council, which is a group of business and philanthropy leaders and includes actually the director of DCYF, again, focusing on efforts to deliver more services to younger vulnerable children.

I've been on the governor's commission to assess the placement of children for foster care and adoption at DCYF. I've been on numerous commissions at DCYF, including three or four commissions called by the previous two child advocates to investigate the deaths of children in DCYF care.

Q. Have you received any awards and honors in your work?

A. Yes. I received the outstanding -- I received two commissioner's awards from the United States Department of Health and Human Services Administration for Children, Youth and Families. I received this award twice, I think once in '89 and once in 2001. It was for outstanding service in preventing childhood abuse and neglect.



PDF created with pdfFactory trial version www.pdffactory.com

I also received an Angels in Adoption award about a year and a half ago. This is a congressional award for which I was nominated by Senator Reed.
Q. And do you know who nominated you for the other two awards you spoke of?
A. The leadership of DCYF.
Q. During your professional time in Rhode Island, in particular in carrying out your duties and responsibilities as executive director of Children's Friend and during the time you were the executive director there, did you come to know the workings of the Department of Children, Youth and Families as it pertains to children in its custody due to maltreatment?
A. Yes.
Q. And can you -- how did that come about, and can you talk about the different areas that you came to know?
A. Really through a whole variety of mechanisms, again, from the various councils and boards that I've been on. I've been on numerous task forces that have looked at the department's work and have made recommendations for strengthening and improving that work, really my entire time in Rhode Island really over the past 25 years.



PDF created with pdfFactory trial version www.pdffactory.com

Also, at Children's Friend, a number of the programs that we established were programs that work very collaboratively with DCYF, which meant that our staff shared cases with the department. And so, you know, as I supervised managers of these programs, first staff and then managers of these programs, you know, I had a lot of awareness of cases and situations and so forth in terms of the department.

I've also regularly attended the department's budget hearings and other kinds of public forums to learn about services and what was going on at the department, what the results were and those kinds of things as well.

Q. And in the course of your work, did you ever have occasion to meet with the director of DCYF regarding systemic issues?

A. Yes.

Q. And how did that come about?

A. I've met with the prior director over his tenure numerous times; and, again, that ranged from everything from individual meetings, you know, to express concern, to propose reforms for the department, to advocate, you know, for changes in terms of some of the department's practices and funding priorities, but again also on task forces that he appointed me to.



PDF created with pdfFactory trial version www.pdffactory.com

I have known the current director of DCYF for a very long time because she comes from the community, similar communities that I've worked in; but I have also met with her on several occasions since she's been director, a few times individually, to talk about concerns and to propose recommendations for improving the department's functioning.

I also had pulled together at her request a group of private service providers, leaders in delivering child welfare services in the community, to meet with the director when I was at Children's Friend, to meet with the current director on a regular basis to provide her with feedback in terms of how the department was functioning in the community and, again, to support reforms that are needed in the department.

Q. Thank you. And in your experience and regarding your perceptions during your time as executive director at Children's Friend and as a clinician and social worker in Rhode Island, have you developed -- have you become aware of any shortcomings or issues systemically with the functioning of DCYF?

MR. LEE: Objection.

THE COURT: Sustained. It's beyond the scope of this hearing.

MS. LAMBIASE: Your Honor, may I be heard on



PDF created with pdfFactory trial version www.pdffactory.com

that?

THE COURT: No. I've made my ruling.

MS. LAMBIASE: Thank you, your Honor.

THE COURT: It's beyond the scope of this hearing. We're not trying the case on the merits right now. We haven't even got to the stage where it's a class action.

The only issues before me relate to whether or not these named minor Plaintiffs are properly before this Court.

MS. LAMBIASE: Yes, your Honor. And if I may, the Defendants have said on cross-examination over and over again with the witnesses this morning, they kept asking whether those witnesses approached the Family Court, if they did anything in the Family Court, were they aware they could go to the Family Court, could the Family Court resolve their issues.

And what I'm here to offer the Court is testimony about how there are issues that are systemic as to the particular individual named Plaintiffs that cannot be addressed in the Family Court. So I'd offer this witness to talk about those systemic issues.

THE COURT: Those are questions of law that the Court will determine. They're not matters of expert testimony from this witness.



PDF created with pdfFactory trial version www.pdffactory.com

MS. LAMBIASE: Well, I'm actually offering the witness, your Honor, as a lay witness to offer her perceptions about the systemic issues in DCYF and her perceptions about whether those issues can be addressed in individual Family Court reviews.

THE COURT: It's irrelevant --

MS. LAMBIASE: Well --

THE COURT: -- to this hearing.

MS. LAMBIASE: Your Honor, respectfully, if it's irrelevant, then I have no further questions for this witness.

THE COURT: All right. Do you have any questions, Mr. Lee?

MR. LEE: No, your Honor.

MS. LAMBIASE: Your Honor, I would offer up another witness that would testify, Patricia Corbett, who would testify as to her experience in the Family Court as a caseworker for a private agency and as somebody who supervises caseworkers who have to prepare to attend court and submit letters to the court and testify as to the limitations of those hearings. That's the offer of proof as to that witness.

MR. LEE: I'd make the same objection to that witness, your Honor.

THE COURT: Sustained. It's irrelevant to this



PDF created with pdfFactory trial version www.pdffactory.com

hearing. We're not dealing with the merits of this case right now. We're dealing with a very limited issue.

MS. LAMBIASE: Then I would ask your Honor, respectfully, if the Defendants are going to take the position that Family Court has the capacity and ability to deal with the issues that are presently before the Court, that we would, before the Court issue its ruling, have an opportunity to be heard on that matter.

If that's not the issue before the Court, then we have no further witnesses today; and we have Mr. Elliott, another next friend, tomorrow at two.

THE COURT: I'll deal with the issues that are before me --

MS. LAMBIASE: Thank you, your Honor.

THE COURT: -- at the appropriate time. You filed an ample amount of material already; but after this hearing is concluded, I'll give you both an opportunity to file some additional materials if you wish.

MS. LAMBIASE: Thank you, your Honor.

THE COURT: Mr. Lee, do you intend to present any witnesses?

MR. LEE: No, your Honor.

THE COURT: So the only remaining witness is



PDF created with pdfFactory trial version www.pdffactory.com

Professor Elliott?

MR. LEE: As far as I know, your Honor.

MS. LAMBIASE: Yes, your Honor.

THE COURT: Then we'll resume tomorrow afternoon at 2:00 to hear his testimony.

(Adjourned)



PDF created with pdfFactory trial version www.pdffactory.com

CERTIFICATION

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Karen M. Wischnowsky
Karen M. Wischnowsky, RPR-RMR-CRR

January 29, 2008
Date



PDF created with pdfFactory trial version www.pdffactory.com