# EXHIBIT H

PDF created with pdfFactory trial version www.pdffactory.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SAM M., by Next Friend Gregory C. Elliott, for himself and those similarly situated, ET AL | C.A. NO. 07-241L |
| VS. | JANUARY 24, 2008<br>2:00 P.M. |
| DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island, ET AL | PROVIDENCE, RI |

BEFORE THE HONORABLE RONALD R. LAGUEUX,

SENIOR DISTRICT JUDGE

(Motion to Dismiss)



PDF created with pdfFactory trial version www.pdffactory.com

APPEARANCES:

FOR THE PLAINTIFFS:

JAMETTA O. ALSTON, ESQ.
Office of the Child Advocate
57 Howard Avenue
Cranston, RI 02920

JOHN WILLIAM DINEEN, ESQ.
305 South Main Street
Providence, RI 02903

SUSAN LAMBIASE, ESQ.
MARCIA LOWRY, ESQ.
Children's Rights
330 7th Avenue, 4th Floor
New York, NY 10001

FOR THE DEFENDANTS:

BRENDA D. BAUM, ESQ.
Attorney General's Office
150 South Main Street
Providence, RI 02903

JAMES R. LEE, ESQ.
Attorney General's Office
150 South Main Street
Providence, RI 02903

KEVIN AUCOIN, ESQ.
Department of Children, Youth and Families
101 Friendship Street
Providence, RI 02903

Court Reporter:

Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903



PDF created with pdfFactory trial version www.pdffactory.com

# I N D E X

**PLAINTIFFS' WITNESS** **PAGE**


Gregory C. Elliott
Direct Examination by Ms. Lambiase 4
Cross-Examination by Mr. Lee 12




PDF created with pdfFactory trial version www.pdffactory.com

24 JANUARY 2008 -- 2:00 P.M.

THE COURT: Good afternoon, everyone. We'll proceed with the next witness.

MS. LAMBIASE: Thank you, your Honor. We call Gregory Elliott.

**GREGORY C. ELLIOTT, PLAINTIFFS' WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Gregory C. Elliott, E-L-L-I-O-T-T.

MS. LAMBIASE: May I proceed, your Honor?

THE COURT: Yes.

**DIRECT EXAMINATION**

**BY MS. LAMBIASE:**

Q. Thank you. Good afternoon.

A. Good afternoon.

Q. Can you please tell us what your occupation is.

A. I'm an associate professor of sociology at Brown University.

Q. Professor Elliott, can you tell us your educational background, please.

A. Yes. I received a Bachelor of Arts in mathematics at Boston College, a Master of Arts in mathematics at University of North Carolina, a Master of Arts in sociology at the University of Wisconsin-Madison, and a Ph.D. in sociology at the University of



PDF created with pdfFactory trial version www.pdffactory.com

Wisconsin-Madison.

Q. How long have you taught at Brown University?

A. Twenty-four years.

Q. And what classes do you teach or have you taught most recently?

A. I teach classes in statistics; but more along with my substantive interest, I teach classes in social psychology, in particular classes having to do with the social development of the self and the integration of self into society.

Q. Do you have particular areas of interest in your research, particular specialties?

A. Yes, I do.

Q. Can you explain what they are.

A. Sure. My two major areas of research to date are in child maltreatment and the causes and consequences thereof. Most recently I have turned to research on a relatively new concept in social psychology, which is the notion of mattering. Mattering is the obverse notion of a significant other.

Q. Can you explain that to the rest of us.

A. Sure. If a significant other is -- who makes a difference in your life, the question of mattering is do you make a difference in anybody else's life. And the basic principle behind mattering is that those who



PDF created with pdfFactory trial version www.pdffactory.com

do not matter to the important people in their lives are in very grave straits and they are much more likely to do both antisocial and self-destructive behaviors, antisocial in order to force themselves to matter so that they will be able to get somebody's attention and self-destructive behaviors because if you don't matter to anyone, then you are -- you may feel that you are superfluous in this life and choose to end it.

Q. Do these issues that you do research on have any relation to children who are in foster care in a state system?

A. They certainly are applicable.

Q. And can you just talk about that for a moment.

A. Sure. Child maltreatment is a very serious issue. We have a long list of sequelae to child maltreatment that are all detrimental to a child, and unfortunately child maltreatment often happens while children are under the care of DCYF.

So the results of the research I and others do on child maltreatment would have direct application to the dangers that these children face.

The research on mattering is very applicable because mattering, we think, is one of the most fundamental needs of human beings; and it is very often the case that these children under the state care are



PDF created with pdfFactory trial version www.pdffactory.com

in situations where they do not really believe that they matter to individuals or to the agency that is taking care of them, at least nominally taking care of them.

Q. Do you know of children we are referring to in this courtroom as Sam and Tony, Danny and Michael and Deanna?

A. I know of them. I don't know them personally.

Q. How do you know of them?

A. I know of them because I was asked to be a next friend on their behalf in the class action suit that's being pursued by your organization.

Q. Who were you contacted by first?

A. I was contacted first by Professor Richard Gelles who has done such work and is a good friend of mine and had done such work when he was in Rhode Island at the University of Rhode Island. Now he's at the University of Pennsylvania as dean of the school of social work, and he said that he had recommended --

Q. Don't talk about what other people said to you. It's just a basic rule in the courtroom.

A. He had recommended me to your organization.

Q. Did there come a point where you heard from somebody from the child advocate's office?

A. Yes.



PDF created with pdfFactory trial version www.pdffactory.com

Q. And approximately when was that?
A. Oh, June of 2007.
Q. Okay. And who from that office contacted you, if you can recall?
A. I believe her name was King.
Q. Shelia King?
A. Yes.
Q. And without telling us the content of the conversation you had with Ms. King, did you talk about the possibility of being involved in a lawsuit involving the children that we've discussed?
A. Yes.
Q. And in the course of that conversation, did you consider whether you would be willing to be a next friend for these children?
A. I told them that I would give it some consideration and respond after I had done so.
Q. And did you gain an understanding at some point either before or after that about what a next friend's role would be?
A. Yes.
Q. And what is your understanding of a next friend's role?
A. My understanding of a next friend's role is that it is someone who is of legal competence who acts on



PDF created with pdfFactory trial version www.pdffactory.com

behalf of minors who have no legal competence in the court.
Q. Did there come a point where you agreed to be a next friend in this case?
A. Yes.
Q. And you agreed to be a next friend for Sam and Tony, Danny and Michael, Deanna?
A. Yes.
Q. And why did you agree?
A. I agreed for two reasons. First of all, I saw a dire need as reflected in the Complaint that was being filed, and I also agreed because I thought I had some information based on my research and expertise that would be of help to the Court in making a decision regarding these issues.
Q. And regarding the issues in the context of this lawsuit?
A. Uh-huh. Yes.
Q. I'm sorry. You have to say yes or no.
A. Yes. Sorry.
Q. That's okay. Do you think it's in these children's best interests to participate in this lawsuit?
A. Absolutely.
Q. Why?



PDF created with pdfFactory trial version www.pdffactory.com

A. Because I think these children, as I have learned from the documents that I have been given, are in dire circumstances, circumstances that are detrimental to their mental and physical health, and someone needs to step in to see to it that they are relieved of these distresses.

Q. Do you think it would be invasive for them in a way that should preclude them from participating? Let me rephrase that. Do you think their participation in this federal lawsuit would be invasive in a way that you would think they should not be involved in?

MR. LEE: Your Honor, I object.

THE COURT: Sustained.

Q. In the course of your duties as a next friend, did you make a decision about whether or not you thought these children should be next friends -- should be named Plaintiffs?

A. Yes.

Q. And in the course of your responsibilities that you took on as a next friend, did you consider whether it -- did you consider the implications of that for them?

A. Yes, I did.

Q. And can you talk about that and talk about why you then decided, yes, to do it.



PDF created with pdfFactory trial version www.pdffactory.com

MR. LEE: Objection.

THE COURT: Overruled. I'll allow it.

A. Based on my knowledge and expertise and on what I read in the documents that were filed, I came to the conclusion that while there might be some discomfort involved, the amount of stress or discomfort that would be involved in their participation is so much less than the circumstances that they are under now that I think it would be important for them to take part in this case.

Q. Do you think that you can represent them despite the fact that right now you have not met them?

A. Yes.

Q. Can you say why.

A. Because I know enough about the circumstances that they face, and I know enough thanks to my and others' research about the consequences of the circumstances that they face, and I know that those consequences are quite dire.

MS. LAMBIASE: Thank you. I have no further questions, your Honor.

THE COURT: You may cross-examine.

MR. LEE: Thank you, your Honor.



PDF created with pdfFactory trial version www.pdffactory.com

**CROSS-EXAMINATION**

**BY MR. LEE:**

Q. Good afternoon, Professor Elliott.
A. Good afternoon.
Q. Do you know the real names of Briana, Alexis, Clare or Deanna?
A. No, I do not.
Q. Do you know the real names of Sam or Tony?
A. No, I do not.
Q. Do you know the real names of Danny or Michael?
A. No, I do not.
Q. Is it safe to assume you've never met them?
A. That's correct.
Q. Have you ever met any of their natural relatives?
A. No.
Q. Have you ever met or communicated with anyone who has legal responsibility over them, such as a CASA attorney or someone appointed by the Family Court?
A. No, I have not.
Q. Have you, for any of these children, ever reviewed their medical records?
A. Formal medical records?
Q. Yes.
A. No, I have not.
Q. Have you ever reviewed the Family Court files on



PDF created with pdfFactory trial version www.pdffactory.com

these children?
A. No, I have not.
Q. Have you ever reviewed their DCYF records?
A. No, I have not.
Q. Have you ever reviewed any of their educational records?
A. Formal educational records?
Q. Correct.
A. No, I have not.
Q. Do you know the names of the Family Court judges who are overseeing their cases?
A. No, I do not.
Q. Do you have any idea what material those judges reviewed in issuing orders in their cases?
A. No, I do not.
Q. You indicated that you reviewed some documents. Is that the Complaint on file in this action?
A. That's correct.
Q. So during your direct when you said that you made certain decisions based on documents, you mean that Amended Complaint?
A. That's correct.
Q. And are you aware that that Complaint was prepared by the Plaintiffs' attorneys?
A. Yes.



PDF created with pdfFactory trial version www.pdffactory.com

Q. Are you aware -- strike that. If I can again refer to Briana, Alexis, Clare and Deanna, are you aware which of those children have been adopted?

A. The first three, I believe.

Q. And are you aware where the fourth child resides currently?

A. I don't know the name of the person.

Q. Do you know whether or not that fourth child is in a pre-adoptive home?

A. Not offhand, no.

Q. The records that I described, DCYF records, medical, educational records, those things, is that the type of thing you would normally rely on in doing your research at Brown?

A. The research I do at Brown is not clinical research. It is research on large-scale interviews and surveys, which can be quite graphic and quite stark, but it's not clinical research. So this is not the kind of evidence that I would do -- use for my research, no. It is, however, sufficient to set off alarm bells.

Q. You mean the Complaint that was written by the Plaintiffs' attorneys?

A. Yes. Right.

Q. Have you seen the Answer to that Complaint?



PDF created with pdfFactory trial version www.pdffactory.com

A. Yes. I've also seen the Amended Complaint.

MR. LEE: Could I just have one second, your Honor.

(Pause)

MR. LEE: I have no more questions, your Honor.

THE COURT: Anything else?

MS. LAMBIASE: No, your Honor. Thank you.

THE COURT: Thank you, Professor. You may step down. Anything else?

MS. LAMBIASE: No, your Honor.

MR. LEE: Nothing, your Honor.

THE COURT: All right. Then this hearing is concluded, this evidentiary hearing. I'll give both sides an opportunity to make a filing analyzing this evidence that I've taken and any other issue relating to what I call the 12(b)(1) issues in this case.

I'm not going to deal with any 12(b)(6) issues at the present time. If this case does move on, then I think we'll have to get into the question of whether the 1983 cause of action has been properly stated in this case, and I would expect the parties to file memos on that.

But right now we'll restrict ourselves to the issues raised, the standing of the next friends, the authority of the child advocate to bring this suit,



PDF created with pdfFactory trial version www.pdffactory.com

*Younger* abstention and the *Rooker-Feldman* doctrine. Those I see as the issues at the moment.

What's your pleasure from the state's point of view or Defendants' point of view in this case? How much time do you want to file additional memoranda?

MR. LEE: Your Honor, I would just indicate the Plaintiffs have the burden. I think we'd ask for a couple of weeks after whenever they file theirs we'd want to respond.

MS. LAMBIASE: Your Honor, we can have anything ready to the Court whenever the Court is -- whenever the Court would like to hear it.

As to the issue that the Court has invited conversation about in terms of the authority of the child advocate to bring this suit, however, I would think, your Honor, that that would be the Defendants' burden since that was actually not in their motion to dismiss. It's their burden in a motion to dismiss to bring those matters to the Court's attention first.

So I would ask, actually, your Honor, to have the opportunity to respond as we did in the original motion papers.

THE COURT: Well, this is being heard on the Defendants' motion to dismiss, so I think it's your burden to proceed first and file memoranda opposing



PDF created with pdfFactory trial version www.pdffactory.com

Plaintiffs' position on these various issues.

MR. LEE: Could we have three weeks, your Honor?

THE COURT: All right. Let's look at the calendar. February 15th, a Friday. I like to have these things filed on a Friday, give everyone a full week. So Defendants will file their memo by February 15, 2008. And Plaintiffs' response?

MS. LAMBIASE: Two weeks, your Honor.

THE COURT: Two weeks after that?

MS. LAMBIASE: Yes.

THE COURT: All right. That will be the 29th. It's leap year. All right. So I will await those memoranda, and I will take under advisement what I call the 12(b)(1) issues in this case, and I will write an opinion. All right. We'll take a recess.

(Adjourned)



PDF created with pdfFactory trial version www.pdffactory.com

CERTIFICATION

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Karen M. Wischnowsky

Karen M. Wischnowsky, RPR-RMR-CRR

January 29, 2008

Date



PDF created with pdfFactory trial version www.pdffactory.com