# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **SAM and TONY M., *et al.*, ,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **DONALD L. CARCIERI, in his official capacity as Governor of the State of Rhode Island, *et al.*,** <br><br> **Defendants.** | **Class Action** <br><br> **Civil Action No. 1:07-cv-00241-L-LDA** |

**DECLARATION OF LENETTE AZZI-LESSING**
**PURSUANT TO 28 U.S.C. § 1746**

I, LENETTE AZZI-LESSING, do hereby declare under penalty of perjury that the foregoing is true and correct:

1. I am an Assistant Professor at Wheelock College in the School of Social Work and Family Studies. I hold a Ph.D. in Human Development and Family Studies and a Masters degree in Social Work.

2. Prior to teaching at Wheelock College, I served as the Executive Director of Children's Friend and Service from 1994 to 2007. Children's Friend and Service is an agency that provides services to disadvantaged children and families. As Executive Director, I developed, among other things, family preservation, adoption support, and foster care programs and services for families involved with the Rhode Island Department of Children, Youth and Families (DCYF).

3. My professional career has been focused on child welfare. From 1989 to 1994, I founded and served as the Executive Director of the Rhode Island Center for Children At-Risk,

an agency which specialized in providing home-based services to vulnerable families in poor urban centers in Rhode Island. At the Rhode Island Center for Children At-Risk, I helped to create the state's first comprehensive program for substance abuse-affected families in the child welfare system.

4. Prior to those positions, I was an Assistant Professor of Social Work at Rhode Island College for four years, served as the Director of Outpatient Services at Community Counseling Center for four years, was a Program Director at Cranston Community Action Program for two years, and worked as a social worker at Charlton Memorial Hospital in Fall River, MA for one and one half years.

5. During the course of my professional career, I have served on numerous panels, boards of directors, and professional associations involving child welfare, including the following: I have served as the Co-Chair of the Child Welfare League of America's National Committee on Family Support and Family Preservation for the past five years; I have served on panels to investigate the deaths of children in foster care under two Child Advocates; I served as the Chair of the Advisory Committee of the Child Welfare Training Institute at DCYF; I initiated and chaired the Project Connect Coordinating Committee, which brings together DCYF, substance abuse treatment and other service providers to address the needs of substance abuse-affected families in the child welfare system; and I have served on task forces under the Governor, Lieutenant Governor, and Mayor on early childhood and on the placement of children for adoption and foster care.

6. I have received awards for my work in the area of child welfare, including the Commissioner's Award for Outstanding Leadership in Preventing Child Abuse and Neglect from the U.S. Department of Health and Human Services, Administration for Children, Youth and

Families in 1989 and 2001, the Congressional "Angels in Adoption" Award in 2006, and the Children's Services Champion Award from NRI Community Services in 2002.

7. In addition, I convened a group of leaders in providing child welfare services from the private sector that met with the Director of DCYF to discuss systemic issues on several occasions for approximately one and one half years.

8. In the course of carrying out my duties and responsibilities as the Executive Director of Children's Friend and Service and as the Executive Director of Rhode Island Center for Children At-Risk, I have come to know the workings of the Department of Children, Youth and Families as it pertains to children in its custody due to maltreatment.

9. In my professional experience and professional opinion, there are systemic deficiencies that interfere with the operation of the Rhode Island child welfare system.

10. DCYF has an inadequate number of suitable foster homes available for the children in its custody. This can lead to placements that are unable to meet the child's needs, because an appropriate placement is unavailable. Further, this shortage of foster homes leads DCYF to accept substandard foster homes as placements for children, and to allow unlicensed, relative homes to care for children. This may lead to maltreatment of the children living in those homes.

11. Further, DCYF does not adequately support foster families. DCYF does not have adequate staff capacity to recruit and train these foster families. Nor are there sufficient services available to support these foster families once they are caring for a child, to ensure that the placement is stable and that the child's and foster family's needs are met. The licensing department is also inadequately staffed, which leads to backlogs in securing placements for children.

12. DCYF also suffers from a lack of leadership. There is no coherent, overall vision for the department and no systems for planning and monitoring the implementation of plans for how to improve the child outcomes for which DCYF is responsible. Several plans that were created, with input from within DCYF and from the community, have never been implemented. Further, there is a failure to seek resources from the Governor or legislature to implement any plan.

13. Additionally, there is a lack of resources committed to DCYF. For example, with recent budget cuts and freezes, there are not sufficient DCYF caseworkers. This leads to fewer caseworkers being able to visit the children in their caseload and to the failure by DCYF to provide adequate services to meet the needs of the children in its custody, because caseworkers cannot assess what the child needs because they do not see the child with sufficient frequency. As another example, there is a severe shortage of services available to children in custody.

14. DCYF damages children in its custody by moving them frequently between placements. Research shows that frequent moving of children between placements causes them harm. On account of the further trauma caused by these moves, children are more likely to have mental health issues, which leads to the likelihood that they will eventually need to be placed in institutional settings.

15. Further, DCYF fails to timely achieve permanency for the children in its custody. It has been shown that long stays in foster care, without active plans for permanency, can negatively impact a child's well-being. Yet DCYF often fails to establish appropriate permanency plans for the children in its care and also often fails to implement plans. During my tenure at Children's Friend and Service, we piloted a program to move children to permanency. However, this program has only approximately 20 slots, and, despite data showing the program's

effectiveness, neither it nor any similar program has been expanded or established to serve children state-wide.

16. There is a lack of quality assurance at DCYF. As part of its contract to provide services to DCYF, Children's Friend and Service was required to submit data to DCYF, but during my tenure I never saw this data used for performance assessment. I saw the data used only once, and in that instance the data cited was incorrect and was not the data we submitted to DCYF.

17. In my professional experience, I have observed a number of Family Court hearings regarding permanency reviews and adoptions. In the course of my professional duties, I have also supervised workers in my agencies who have been involved with the Family Court reviews on behalf of individual children.

18. In my professional opinion, the Family Court does not have the capacity to remedy these systemic issues in the context of its reviews on behalf of individual children. The Family Court is set up to dispose of matters on behalf of individual children. Further, the relief available to the Family Court is limited by the resources, programs, and services offered by or funded by DCYF. The Family Court is not established to oversee the DCYF system. The Child Advocate is empowered to oversee the DCYF system and to address systemic failures.

Executed on January 23, 2008

LENETTE AZZI-LESSING