## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **SAM and TONY M.**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Class Action** |
| **DONALD L. CARCIERI, in his official** | ) | **Civil Action No. 1:07-cv-00241-L-LDA** |
| **capacity as Governor of the State of** | ) | |
| **Rhode Island**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO FED. R. CIV. 12(b)(1)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................iv

I.       INTRODUCTION ....................................................................................................1

II.      PROCEDURAL HISTORY......................................................................................3

III.     THE NAMED PLAINTIFF CHILDREN ARE REPRESENTED BY
         FULLY QUALIFIED NEXT FRIENDS ................................................................4

         A.       The Named Plaintiff Children Cannot Vindicate Their Rights
                  Without the Assistance of Next Friends ....................................................5

         B.       The Named Plaintiff Children Are Represented by Proper Next
                  Friends........................................................................................................6

                  1.       Mary Melvin Is a Qualified and Appropriate Next Friend
                           for David T..................................................................................7

                  2.       Kathleen Collins Is a Qualified and Appropriate Next
                           Friend for Caesar S. ..................................................................10

                  3.       Gregory Elliott Is a Qualified and Appropriate Next Friend
                           for Sam and Tony M., Deanna H., and Danny and Michael
                           B.................................................................................................13

                  4.       Defendants' Arguments for Disqualifying Mary Melvin,
                           Kathleen Collins and Gregory Elliott as Next Friends Are
                           Baseless and Should Be Rejected ..............................................17

         C.       Inadequacy of Next Friends Would Not Justify Dismissal.....................22

IV.      ABSTENTION UNDER *YOUNGER V. HARRIS* WOULD BE
         IMPROPER.............................................................................................................23

         A.       This Case Meets None of the Threshold Issues That Implicate
                  *Younger* Abstention ...............................................................................24

                  1.       This Lawsuit Does Not Undermine Comity ...............................25

                  2.       The Family Court Proceedings Are Not Enforcement
                           Proceedings................................................................................25

                  3.       This Lawsuit Will Not Interfere with Any Family Court
                           Proceeding..................................................................................27

a.    The Family Court's Decisions Are Not at Issue in This Lawsuit..................................................................27

b.    The Defendant Executive Actors Are Responsible for Plaintiff Children..........................................29

c.    The Family Court Merely Performs a Narrow, Proscribed Oversight Role ............................................30

d.    Plaintiff Children Seek Relief That Will Operate *Solely* Against the Executive Defendants and Not Against the Family Court..................................................32

B.    Applying the *Middlesex* Test Requires the Court to Decline *Younger* Abstention ...............................................35

1.    There Are No Ongoing Proceedings............................35

2.    There Is No Extremely Important State Interest at Stake ...........................35

3.    The Family Court Proceedings Do Not Afford Plaintiff Children an Adequate Forum to Litigate Their Claims ..............................36

V.    THE *ROOKER-FELDMAN* DOCTRINE DOES NOT APPLY.........................................39

VI.    PLAINTIFF CHILDREN ARE PROPERLY REPRESENTED BY THE CHILD ADVOCATE AND FOUR OTHER COUNSEL OF RECORD IN THIS FEDERAL SUIT...............................................40

A.    Plaintiff Children Are Represented by a Team of Attorneys and May Proceed with Their Federal Claims Before This Court Regardless of the Child Advocate's Statutory Mandate ..........................................41

B.    Rhode Island State Statutes Cannot Defeat This Federal Court's Subject Matter Jurisdiction Over Plaintiff Children's Federal Claims ...............................................42

C.    There is No State Statutory Requirement That the Child Advocate Pursue Plaintiffs' Claims Only in Family Court....................................45

VII.    CONCLUSION..................................................................47

## **TABLE OF AUTHORITIES**

### **Supreme Court Cases**

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976)...................................................................................................24

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989)...................................................................................................29

*Estelle v. Gamble*, 429 U.S. 97 (1976) ..................................................................29

*Exxon-Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005)..................................24

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) ......................................................24

*Marshall v. Marshall*, 547 U.S. 293 (2006)........................................................43, 48

*Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982)...................................................................................................35

*Moore v. Sims*, 442 U.S. 415 (1979)................................................................26, 36

*New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350 (1989)....................25

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ....................................................9, 13, 16

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ..........................................................29

### **First Circuit Cases**

*Cruz v. Melecio*, 204 F.3d 14 (1st Cir. 2000) ........................................................39

*Developmental Disabilities Advocacy Center, Inc. v. Melton*, 689 F.2d 281 (1st Cir. 1982)...................................................................................................5, 6

*Durrett v. Housing Authority of Providence*, 896 F.2d 600 (1st Cir. 1990) ...............................44

*Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17 (1st Cir. 2005)...........................................................40

*Figueroa v. Rivera*, 147 F.3d 77 (1st Cir. 1998)......................................................16

*Germany v. Vance*, 868 F.2d 9 (1st Cir. 1989) ........................................................29

*Kercado-Meléndez v. Aponte-Roque*, 829 F.2d 255 (1st Cir. 1987)................................33, 34, 36

*Malachowski v. City of Keene*, 787 F.2d 704 (1st Cir. 1986)......................................26

*Río Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005) ..25, 26, 27, 34

*Rivera-Puig v. García-Rosario*, 983 F.2d 311 (1st Cir. 1992) .....................................36

*Vélez-Díaz v. Vega-Irizarry*, 421 F.3d 71 (1st Cir. 2005)............................................29

## **Other Federal Cases**

*31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003)......................................33

*Ad Hoc Committee of Concerned Teachers v. Greenburgh #11 Union Free School Dist.*, 873 F.2d 25 (2d Cir. 1989)...............................................................7, 10

*Adelman v. Graves*, 747 F.2d 986 (5th Cir. 1984)......................................................23

*Bowen v. Rubin*, 213 F. Supp. 2d 220 (E.D.N.Y. 2001) .............................................16

*Brian A. v. Sundquist*, 149 F. Supp. 2d 941 (M.D. Tenn. 2000)................................39

*Brooklyn Institute of Arts & Sciences v. City of New York*, 64 F. Supp. 2d 184 (E.D.N.Y. 1999)......................................................................................39

*Child v. Beame*, 412 F. Supp. 593 (S.D.N.Y. 1976) ...................................................15

*Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428 (D. Nev. May 14, 2007) ................................................................................................10, 22

*Corporación Insular de Seguros v. García*, 680 F. Supp. 476 (D.P.R. 1988)..............24

*Davis v. Austin*, 492 F. Supp. 273 (N.D. Ga. 1980).....................................................16

*Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920 (E.D. Mich. Apr. 17, 2007) ........................................................................................10, 21, 22

*Essex Chemical Corp. v. Hartford Accident & Indemnity Co.*, 993 F. Supp. 241 (D.N.J. 1998)..................................................................................................42

*First National City Bank v. Gonzalez & Co. Sucr. Corp.*, 308 F. Supp. 596 (D.P.R. 1970) ...............................................................................................43

*Gardner v. Parson*, 874 F.2d 131 (3d Cir. 1989) .......................................................23

*G.L. v. Strangler*, 873 F. Supp. 252 (W.D. Mo. 1994) ..............................................33

*González v. Reno*, 86 F. Supp. 2d 1167 (S.D. Fla. 2000) ...........................................16

*Gough v. Perkowski*, 694 F.2d 1140 (9th Cir. 1982) ..................................................42

*Grand Bahama Petroleum Co., Ltd. v. Asiatic Petroleum Corp.*, 550 F.2d 1320 (2d Cir. 1977)............................................................................................................43

*Gross v. Weingarten*, 217 F.3d 208 (4th Cir. 2000) ......................................................44

*Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195 (3d Cir. 1992) ..........................................................................................................................27

*In re Zawisza*, 73 B.R. 929 (Bankr. E.D. Pa. 1987)........................................4, 18, 21, 24

*Inmates of Boys' Training School v. Affleck*, 346 F. Supp. 1354 (D.R.I. 1972)...........................33

*Jeanine B. v. Thompson*, 877 F. Supp. 1268 (E.D. Wis. 1995) ...............................15, 22

*John G. v. L'Heureux*, No. 81-0035 (D.R.I. 1981) .................................................33, 48

*Joseph A. v. Ingram*, 275 F.3d 1253 (10th Cir. 2002) ...................................................33

*Joseph A. v. New Mexico Department of Human Services*, No. 80-623 JC/DJS, slip op. (D.N.M. Jan. 16, 2003) ....................................................................................33

*Kenny A. v. Barnes*, No. 1:02-cv-1686-MHS (N.D. Ga. Oct. 18, 2002) ......................15

*Kenny A. v. Perdue*, 218 F.R.D. 277 (N.D. Ga. 2003)...........................................34, 39

*Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS (N.D. Ga. Aug. 10, 2004) .....................15

*Marisol A. v. Giuliani*, No. 95 Civ. 10533(RJW), 1998 WL 265123 (S.D.N.Y. May 22, 1998)................................................................................................7, 13, 15, 22

*McLeod v. Me. Department of Human Services*, No. 99-233-P-H, 1999 WL 33117123 (D. Me. 1999)..........................................................................26, 27, 36

*Norfleet v. Ark. Department of Human Services*, 989 F.2d 289 (8th Cir. 1993) ..........................29

*Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178 (D.R.I. 2004)..................... *passim*

*Office of the Child Advocate v. Pontarelli*, No. 82-0091 P (D.R.I. 1982) ...............................33, 48

*Olivia Y. v. Barbour*, 351 F. Supp. 2d 543 (S.D. Miss. 2004) ......................................34

*Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. (S.D. Miss. Mar. 11, 2005) ............7, 10, 13, 22

*Poitra v. Demarrias*, 502 F.2d 23 (8th Cir. 1974) ........................................................43

*Sánchez-Velasco v. Security of Department of Corrections*, 287 F.3d 1015 (11th Cir. 2002) .........................................................................................................................16

## State Cases

*Cardinale v. Cardinale*, 889 A.2d 210 (R.I. 2006)..................................................................38

*Catalina Inc. v. P. Zwetchkenbaum & Sons, Inc.*, 267 A.2d 702 (R.I. 1970)...............................45

*In re Doe*, 390 A.2d 390 (R.I. 1978)........................................................................................30

*In re R.J.P.*, 445 A.2d 286 (R.I. 1982).....................................................................................47

*Mottola v. Cirello*, 789 A.2d 421 (R.I. 2002) ..........................................................................45

*Providence & Worcester R.R. Co. v. Pine*, 729 A.2d 202 (R.I. 1999)........................................45

*Rison v. Air Filter System, Inc.*, 707 A.2d 675 (R.I. 1998)........................................................45

*Waldeck v. Piner*, 488 A.2d 1218 (R.I. 1985)..........................................................................30

## Federal Statutes, Regulations, Rules

Federal Rules of Civil Procedure 17(c) (2007)..........................................................................23

## State Statutes, Regulations, Rules

03 007 Code R.I. R. 0025 (2005)..............................................................................................29

03 007 Code R.I. R. 0030 (2006)..............................................................................................28

R.I. Gen. Laws § 11-9-5.1 (2007).............................................................................................30

R.I. Gen. Laws §§ 12-25-1 *et seq.* (2007)................................................................................46

R.I. Gen. Laws §§ 12-25-16 *et seq.* (2007)..............................................................................46

R.I. Gen. Laws § 14-1-32 (2007)..............................................................................................31

R.I. Gen. Laws § 14-1-30 (2007)..............................................................................................18

R.I. Gen. Laws § 15-7-7 (2007)...........................................................................................18, 26

R.I. Gen. Laws § 38-2-2 (2007)................................................................................................18

R.I. Gen. Laws § 40-11-6 (2007).............................................................................................30

R.I. Gen. Laws § 40-11-7 (2007).............................................................................................30

R.I. Gen. Laws § 40-11-7.1 (2007) ...................................................................................38

R.I. Gen. Laws § 40-11-12 (2007) ......................................................................18, 26, 31

R.I. Gen. Laws § 40-11-12.1 (2007) ...................................................................28, 31, 37

R.I. Gen. Laws § 40-11-12.2(a) (2007) ...................................................................28, 29

R.I. Gen. Laws § 40-11-13 (2007) ...................................................................................18

R.I. Gen. Laws § 40-11-14 (2007) ...................................................................................38

R.I. Gen. Laws § 45-24.2-7 (2007) ..................................................................................44

R.I. Gen. Laws § 42-72-2 (2007) .....................................................................................29

R.I. Gen. Laws § 42-72-4 (2007) ...............................................................................29, 30

R.I. Gen. Laws § 42-72-5 (2007) .....................................................................................30

R.I. Gen. Laws § 42-72-7 (2007) .....................................................................................18

R.I. Gen. Laws § 42-72-8 (2007) .....................................................................................18

R.I. Gen. Laws § 42-72-10 (2007) ...................................................................................29

R.I. Gen. Laws § 42-72.1-1, *et seq.* (2007) ....................................................................30

R.I. Gen. Laws § 42-73-7(6) (2007) .................................................................................45

R.I. Gen. Laws § 42-73-9.1 (2007) .............................................................................45, 46

R.I. R. Juv. P. R. 17(c) (2007) .........................................................................................29

## I.      INTRODUCTION

This lawsuit is brought by seven Named Plaintiff Children in Defendants' foster

care custody who assert that Defendants are harming them, as well as the Class they seek

to represent, in violation of their federal constitutional and statutory rights to basic safety,

protection, and care while in state custody.  Although federal courts across the country

have exercised their jurisdiction to hear similar claims brought by plaintiff children

against their state custodians, Defendants ask this Court to take the extraordinary act of

declining to exercise its jurisdiction over Plaintiffs' *federal* claims and dismiss this case

on the basis of four legally and factually flawed arguments.

First, Defendants levy a variety of complaints about the Next Friends.  But

Defendants fail to tie those complaints to the applicable legal standard for Next Friends,

making Defendants' complaints legally irrelevant.  The Next Friends have presented

clear, uncontroverted evidence that they meet the standard; they are truly dedicated to the

best interests of the Named Plaintiffs on whose behalf they appear and are thus suitable.

Even if these Next Friends were inappropriate, the proper remedy under Rule 17(c)

would be for the Court to replace them with alternative representatives rather than, as

Defendants request, dismiss the case.

Second, Defendants contend that the adjudication of Plaintiff Children's federal

claims in this Court would somehow interfere with Rhode Island Family Court

proceedings.  However, because the relief Plaintiffs seek is solely directed at Defendants,

the executive branch officials who run Rhode Island's foster care system and who are

duty bound to protect all children in foster care custody, the interference that Defendants

seek to create is illusory.  The relief Plaintiff Children seek from the systemic

deficiencies plaguing the Department of Children, Youth and Families (DCYF) is not

available in annual Family Court review hearings and, if granted in this case, would not interfere with the Family Court's limited appraisal of DCYF actions in individual cases. Defendants have exclusive responsibility for ensuring the safety of foster children, and only reforms undertaken by Defendants can remedy the overwhelming failures that continue to endanger Rhode Island's foster children. *Younger* abstention is therefore unwarranted.

Third, Defendants suggest that Plaintiffs are seeking to overturn individual Family Court judgments, and ask the Court to invoke *Rooker-Feldman*. The premise of Defendants' position is wrong; Plaintiffs are challenging Defendants' administration of DCYF, and are not seeking to overturn individual Family Court judgments. Thus, the *Rooker-Feldman* doctrine does not apply.

Last, Defendants argue that the Child Advocate lacks the authority to bring this case in federal court and that, therefore, this case should be dismissed. This argument is utterly meritless and in any event is no basis for dismissal. The Child Advocate's role in this case is not as a party, but as one of five attorneys of record for Plaintiff Children. Regardless of the Child Advocate's participation as co-counsel, and even if she were to exit the case forthwith, Plaintiff Children's pending federal case is properly before this Court, as they are and would remain represented by four other attorneys of record. There is thus no need to reach this issue. Even if there were, in participating as co-counsel in this case, the Child Advocate is completely within her explicit statutory authority and mandate, which permits her to act as co-counsel and raise Plaintiffs' claims in her choice of forum. There is no statutory requirement that the Child Advocate only bring claims in Family Court, but even if there were, that would not in any way defeat this Court's

subject matter jurisdiction over Plaintiff Children's federal claims, as this Court's jurisdiction is defined solely by federal, not state, law and this case is based purely on federal law.

Because Defendants have not set forth any valid justification for this Court to refrain from its judicial obligation to hear Plaintiff Children's federal claims, Defendants' Motion to Dismiss should be denied in its entirety.

## II.   PROCEDURAL HISTORY

Plaintiffs filed this suit in June 2007 and amended their complaint in September of that year. In October 2007, Defendants filed a Motion to Dismiss, and in January 2008, after the matter was fully briefed by the parties, the Court heard oral argument. At oral argument, the Court ordered an evidentiary hearing on the issue of whether the Next Friends who have brought the case on behalf of the minor Named Plaintiffs are appropriate. In anticipation of that hearing, Plaintiffs filed a supplemental brief further addressing the suitability of the three Next Friends. At the evidentiary hearing, held on January 23 and 24, 2008, the three Next Friends, Mary Melvin, Kathleen Collins, and Gregory Elliott, testified.[1] Defendants called no witnesses.

At the conclusion of the proceeding, the Court ordered further briefing on four issues: the Next Friends' suitability to bring this action, the applicability of the *Younger* and *Rooker-Feldman* doctrines, and the authority of the Child Advocate to bring this case in federal court, the last of which Defendants had not themselves raised. Plaintiffs submit

---

[1]During the hearing, Defendants questioned the propriety of the Next Friends' pursuing Plaintiffs' claims in federal court rather than in each child's individual Family Court annual review. In response, Plaintiffs sought to introduce testimony of two additional witnesses regarding the inadequacy of such Family Court reviews as a forum to redress the injuries suffered by the Named Plaintiffs. The Court denied Plaintiffs' offer of proof.

this supplemental briefing in response to Defendants' supplemental briefing on these specific issues.

### III.  THE NAMED PLAINTIFF CHILDREN ARE REPRESENTED BY FULLY QUALIFIED NEXT FRIENDS

Defendants argue that none of the Next Friends are suitable representatives of the Named Plaintiff Children and that, as a consequence, this case should be dismissed.  They are incorrect on both counts.  All three Next Friends meet the applicable legal standards and, even if they did not, dismissal would be the wrong remedy under Rule 17(c) because it would unjustly deny the Named Plaintiff Children their right to be heard in this Court.[2]

Defendants do not suggest that the Next Friends are motivated by anything other than the best interests of the children on whose behalf they appear.  The crux of Defendants' argument is that the Next Friends cannot be truly dedicated to the best interests of the Named Plaintiffs simply because they did not take certain specific actions on behalf of the Named Plaintiff Children before filing this suit.[3]  Yet none of the those supposed omissions were prerequisites to filing this suit and none have any bearing on the Next Friends' qualifications to represent the minor Named Plaintiffs.  Defendants' arguments are groundless and in any event are not a basis for dismissal.

---

[2] In the interest of economy, Plaintiffs do not repeat here all of the legal and factual discussions concerning adequacy of Next Friends contained in their last two briefs but instead incorporate those discussions by reference.  (*See* Pls.' Mem. of Law in Objection to Defs.' Mot. to Dismiss ("Pls.' Resp.") at 10–20; Pls.' Mem. of Law Submitted in Conjunction with Evidentiary Hr'g Regarding Adequacy of Pls.' Next Friends ("Pls.' Hr'g Mem.") at 4–13.)

[3] Defendants' arguments are made with the goal of dismissal, not with Plaintiff Children's best interests at heart, and should not be taken as expressions of concern that the Next Friends are not acting in the best interests of the minors they represent.  *In re Zawisza*, 73 B.R. 929, 936 (Bankr. E.D. Pa. 1987) ("[W]e are reluctant to heed the claims of an adverse party that the standing of one purporting to act on behalf of an incompetent is lacking").

**A.      The Named Plaintiff Children Cannot Vindicate Their Rights Without the Assistance of Next Friends**

As minors, the Named Plaintiff Children lack legal capacity to bring this action on their own.  They must rely instead on capable adults to protect their interests and make decisions on their behalf.  The Named Plaintiff Children have neither natural nor duly appointed guardians who can represent them in this matter.  Their natural guardians—their parents—have clear conflicts of interest, having already lost custody of the Named Plaintiff Children, in most cases permanently, after abusing or neglecting them.  (*See generally* Am. Compl. at 10–34.)  A conflict of interest also precludes their duly appointed guardian, the Department of Children, Youth and Families (DCYF), from representing the Named Plaintiff Children, since its Director is a Defendant in this case.[4] *See Dev. Disabilities Advocacy Ctr., Inc. v. Melton*, 689 F.2d 281, 285 (1st Cir. 1982) (recognizing that proceeding by next friend is proper "when it appears that the minor's general representative has interests which may conflict with those of the person he is supposed to represent") (internal quotation omitted).  Accordingly, Plaintiff Children need the assistance of next friends in order to vindicate their rights in federal court.[5]

---

[4] The guardians ad litem and court-appointed special advocates who represent the Named Plaintiffs in their Family Court proceedings are not *general* guardians for purposes of Rule 17(c)(1).  (*See* Pls.' Hr'g Mem. at 5–6.)  Thus, their representation in Family Court does not obviate their need for next friends to proceed in federal court.

[5] This case is quite different from *Developmental Disabilities*, the single case in which the First Circuit has decided whether a putative next friend should be permitted to litigate on behalf of an incompetent person pursuant to Rule 17(c).  The putative next friend there sought to sue on behalf of mentally retarded residents of a state institution.  One of the plaintiffs was a minor whose natural guardian, his mother, opposed the next friend's actions; a second was an adult whose duly appointed guardian, her brother, also disapproved of the suit.  *Dev. Disabilities Advocacy Ctr.*, 689 F.2d at 285–86.  The First Circuit found no abuse of discretion in the district court's decision not to permit the putative next friend to proceed, given that these plaintiffs were otherwise competently represented by their guardians and that there was no evidence of any conflict between the

*cont.*

**B.     The Named Plaintiff Children Are Represented by Proper Next Friends**

Before filing this case, Plaintiffs' counsel made diligent efforts to find adults with personal connections to the Named Plaintiffs, who would be willing and capable of undertaking the responsibilities that serving as next friends entails and who were not barred from doing so by any conflict of interest.  (*See* Alston Decl. (Oct. 19, 2007) at ¶¶ 7–8 (attached as Ex. 1 to Pls.' Resp.).)

> These efforts revealed that each of the Named Plaintiff children lacked a network of stable adults [who were] willing and able to represent them in a federal lawsuit.  The persons most closely connected to the children, including foster parents, guardians *ad litem*, or relatives, either posed a potential conflict or expressed concern regarding possible retaliation from the Department [of Children, Youth and Families] or other state entities and declined to become involved.

(Alston Decl. (Oct. 19, 2007) at ¶ 8.)  Despite these obstacles, counsel ultimately found qualified adults with personal connections to David T. and Caesar S. who agreed to serve as their next friends.  While counsel were unable to find a single adult who had an existing personal relationship with Danny and Michael B., Sam and Tony M., or Deanna H. and her sisters, and who was also willing and able to stand up publicly for those children, counsel nevertheless located a fully qualified, committed next friend to represent those Named Plaintiff Children.[6]

---

*cont.*
plaintiffs and their representatives.  *Dev. Disabilities Advocacy Ctr.*, 689 F.2d at 286. Here, the conflicts of interest that preclude representation of the Named Plaintiff Children by their parents or DCYF squarely distinguish this case from *Developmental Disabilities*.
[6] Deanna H.'s sisters were adopted after the Complaint was filed and are no longer Named Plaintiffs in this case.

As established by their testimony, all three Next Friends are committed to pursuing the best interests of the Named Plaintiff Children they represent and seeking justice on their behalf.  The law requires nothing more.[7]

**1.      Mary Melvin Is a Qualified and Appropriate Next Friend for David T.**

Mary Melvin, the Next Friend for David T., demonstrated in her testimony on January 23, 2008, that she is truly dedicated to David's best interests and that she has no other motive for bringing this suit on his behalf.  Ms. Melvin, David's former DCYF foster parent, showed beyond a shadow of a doubt that she loves David and cares deeply for him.  David was only a toddler when he went to live with Ms. Melvin, and he remained in her care until around the age of five.  (Melvin Test. at 12.)  During that time, "we grew very close together.  He became very attached to me and I to him."  (Melvin Test. at 13.)  David called Ms. Melvin "Mom" and "really didn't want me out of his sight," Ms. Melvin testified.  (Melvin Test. at 13, 16.)  Ms. Melvin testified that, had she been able to do so, she would have adopted David, demonstrating her willingness and

---

[7] In previous filings, Plaintiffs fully briefed the legal standards for qualification to serve as a next friend pursuant to Rule 17(c)(2).  (*See* Pls.' Resp. at 14–17; Pls.' Hr'g Mem. at 7–10.)  Those analyses of applicable law are not repeated here.  In brief, courts assessing the adequacy of a next friend to represent a child in state custody have looked to "the good faith of those claiming to speak for the infant" and whether "the 'next friend' is motivated by a sincere desire to seek justice on the infant's behalf."  *Ad Hoc Comm. of Concerned Teachers v. Greenburgh #11 Union Free Sch. Dist.*, 873 F.2d 25, 30–31 (2d Cir. 1989); *accord Marisol A. v. Giuliani*, No. 95 Civ. 10533(RJW), 1998 WL 265123, at *9 (S.D.N.Y. May 22, 1998) (quoting *Ad Hoc Comm. of Concerned Teachers*); *Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op. at 10 (S.D. Miss. Mar. 11, 2005) (order granting class certification) (finding next friends to plaintiff foster children adequate because each was "generally knowledgeable about the nature and purpose of this litigation, and has a good faith interest in the named plaintiffs' welfare and in the prosecution of this litigation") (attached to Pls.' Resp. as Ex. 3).

desire to make the most essential commitment to a child's best interests that an unrelated adult can make.  (Melvin Test. at 13.)

David left Ms. Melvin's foster home because one of his family members had agreed to adopt him.  (Melvin Test. at 14.)  Ms. Melvin later learned that the adoption had not taken place and that David was "back in the shelter" and still in DCYF foster care. (Melvin Test. at 14.)  Thereafter, even though Ms. Melvin was no longer caring for David in her home, she remained involved in his life and continued to do things to take care of him.

> The bond that we had, that the two of us had, the social worker allowed me to go to the home, the shelter, and pick David up.  And I would keep him for the day, and we would go out and eat or probably just go to the store, and I'd get him a little toy or something.  We would spend the day together, and I did this until he was moved again. . . . [O]n occasions I would take him to church with me, but it depends on the social worker.  I would always have to get permission, and they would let me pick him up and do things with him.

(Melvin Test. at 14–15.)  Ms. Melvin continued to take David to doctors' appointments and counselling sessions after he left her home.  (Melvin Test. at 15.)  Unfortunately, Defendants kept moving David from one institutional placement to another and eventually, "the last place that I called, they didn't give me any information on him," Ms. Melvin testified.  (Melvin Test. at 17.)

Ms. Melvin stated that she was contacted by the Office of the Child Advocate in 2007 and told that a lawsuit was being planned on behalf of David and other children in DCYF custody.  (Melvin Test. at 17–19.)  She described herself as feeling "really surprised," "shocked," and "upset" to learn that David was still in foster care after 12 years.  (Melvin Test. at 18.)  Ms. Melvin testified that she agreed to be David's Next Friend in the lawsuit.  (Melvin Test. at 19.)

> I told them that I didn't mind being a next friend for David because David was a child that was a part of my family and anything that I could do to be supportive to him and help things be better for him, I was willing to be a part of that. . . . I'm hoping that being a next friend for David would help make things better for him, that we could continue to create a bond. I want David to know that anything I can do to help him or to be there for him, I'm a willing participant.

(Melvin Test. at 19–20.)

Ms. Melvin also stated that she is prepared to make decisions for David in this matter (Melvin Test. at 20–21), but she also expressed a holistic perspective on the role of a "next friend," one that is not limited simply to being a representative in litigation:

> My understanding is that a next friend would be someone that cares about the well-being of the child, that want to be a part of whatever is needed for this child that he may be a productive human being when he become of age, just loving him and letting him know that you care and to fill in wherever is needed.

(Melvin Test. at 19.)

The unmistakable import of Ms. Melvin's testimony was that she loves and cares for David, that she wants to help him, and that her sole motive in bringing this case on his behalf is to "make things better for him." (Melvin Test. at 19.) Nothing in her testimony remotely suggests that she has any agenda in pursuing this action other than to help David and to advance his best interests. Moreover, although not legally required, it is clear from her testimony that she has had a significant relationship with David and would have been more involved in his life in recent years had DCYF permitted David to maintain his connections with the woman he called "Mom" while the agency cycled David through a dozen institutional placements over the last decade. Defendants offered no witnesses to impeach or counter Ms. Melvin's testimony.

In short, Mary Melvin is "truly dedicated to the best interests of the person on whose behalf [s]he seeks to litigate." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990).

She demonstrated "a sincere desire to seek justice on . . . [David's] behalf." *Ad Hoc Comm. of Concerned Teachers*, 873 F.2d at 30–31.  This Court should conclude that she is an appropriate, fully qualified next friend for David, and it should permit her to proceed on his behalf.  *See, e.g.*, *Dwayne B. v. Granholm*, No. 06-13548, 2007 WL 1140920, at *3 (E.D. Mich. Apr. 17, 2007) (finding former foster mother of named plaintiff's sibling suitable as next friend); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *6 (D. Nev. May 14, 2007) (finding former foster parent adequate as next friend); *Olivia Y. v. Barbour*, No. 3:04CV251LN, slip op., at 9–10 (S.D. Miss. Mar. 11, 2005) (finding one former foster parent and friend of another former foster parent suitable as next friends) (attached to Pls.' Resp. as Ex. 3).

### 2. Kathleen Collins Is a Qualified and Appropriate Next Friend for Caesar S.

Kathleen Collins, the Next Friend for Caesar S., demonstrated through her testimony that she is truly dedicated to Caesar's best interests.  Ms. Collins was Caesar's school psychologist throughout the 2006–2007 academic year.  (Collins Test. at 33, 37.) She initially got to know Caesar when she evaluated him for a special education referral. (Collins Test. at 34.)  Ms. Collins also observed Caesar in the classroom, sat in on an individualized educational plan meeting for him, "was involved with Caesar in his classroom setting and occasionally outside of his classroom setting," and monitored his therapeutic progress over the course of the year.  (Collins Test. at 34, 37–38.)

Ms. Collins devoted time to forming a relationship with Caesar.  (Collins Test. at 34.)  She worked with him one-on-one on numerous occasions and saw him at least three or four times every week.  (Collins Test. at 34–37.)  During the course of the school year, Ms. Collins got to know Caesar well, as her vivid descriptions of him reveal.

Caesar is a very active child, doesn't necessarily trust adult relationships very well.  So he's a very busy little guy, questions directions, questions redirection, questions rules, but also can be incredibly playful and smiling and cheerful.   And his moods change back and forth very rapidly depending on what he wants to do what you're trying to encourage him to do.

He thrived really well on praise.  So if he came to see me individually, he absolutely adored the idea that somebody would spend time with him individually, would encourage him to draw and talk and share his feelings.

(Collins Test. at 35.)

Sometimes he would be walking very proudly at the head of his line, and then he would be thrilled to get praise when he was doing the right thing.

(Collins Test. at 36.)  When asked whether she and Caesar established a relationship, Ms. Collins's answer was unequivocal: "Absolutely."  (Collins Test. at 38.)  Asked whether they established a bond, she answered, "I would say so, yes."  (Collins Test. at 38.)

Ms. Collins last saw Caesar in late May or June 2007, when the school year ended.  (Collins Test. at 38.)  Although she would no be longer working at Caesar's school for the 2007–2008 academic year, she "went to check on him at the beginning of this school year."  (Collins Test. at 39.)  She discovered, however, that Caesar "was gone, that he moved out of the district."  (Collins Test. at 39.)  Since then, Ms. Collins testified, she has tried, unsuccessfully, to find some information on Caesar, "to at least know where he is because I had a lot of concerns about him, his being so young and seemingly out on – out on his own, in a sense, in the world."  (Collins Test. at 39.)

Ms. Collins testified that she was contacted by the Office of the Child Advocate "around the end of the school year last year," while she was still Caesar's school psychologist.  (Collins Test. at 39–40.)  She thought the suit "was a timely action to be taken" and "an important endeavor" because she had "been very concerned about Caesar's history in particular:"

> What concerns me about Caesar is he's very young.  He's only six, he would be six now, he was five when I knew him, but that he still had no permanent home; and it just seemed that there was nobody that was able to care for him, and that just seemed really tragic to me that here was this totally adorable little boy, albeit with some behavior problems, but who absolutely deserved and needed permanent care and wasn't getting that. So that was a major concern for me.

(Collins Test. at 41.)

After careful consideration, Ms. Collins agreed to serve as Caesar's Next Friend and to litigate this case on his behalf.  (*See* Collins Test. at 42–43.)  As she explained,

> I believe this is an absolutely important case. . . . [T]his child deserves justice, and many, many other children deserve that justice.  And there didn't appear to be anybody else that was really willing to do this for this child.  There didn't appear to be anyone else who was available, so I chose to make myself available.

(Collins Test. at 43.)

Ms. Collins expressed a clear understanding of the responsibilities involved in serving as Caesar's Next Friend: "I'm here to represent the interests of that particular child in getting justice from the system, to assist him and support him in seeking some sort of support and justice."  (Collins Test. at 42.)  She testified that she is "[a]bsolutely" prepared to represent Caesar in this case until the lawsuit is over and to be "available and present for whatever needs to be done in order to see the case through, in order to support the child's rights through this case."  (Collins Test. at 44.)

Ms. Collins's testimony clearly establishes her true dedication to Caesar's best interests.  She demonstrated that she understands and is committed to fulfilling the responsibilities that serving as his Next Friend entails and that she did not accept this role lightly, but rather with full knowledge of the responsibilities she would have. Furthermore, while not required for acting as his Next Friend, she has developed a significant relationship with Caesar.  She plainly cares for him and is concerned about his

well-being.   In the course of her work with Caesar, Ms. Collins identified his specific needs and demonstrated a willingness to work to meet those needs.  Her manifest abilities to discern Caesar's needs and to find ways of meeting those needs, critical skills of her profession, make her particularly well-suited to the role of next friend.  She has no conflict of interest and nothing in her testimony even hinted at any ulterior motive for bringing this suit on Caesar's behalf.  Defendants offered no witnesses to impeach or counter Ms. Collins's testimony.

Because the evidence overwhelmingly demonstrates that Ms. Collins is "truly dedicated to the best interests of the person on whose behalf [s]he seeks to litigate," *Whitmore*, 495 U.S. at 163, and because she "has a good faith interest in . . . [Caesar's] welfare and in the prosecution of this litigation," *Olivia Y.*, No. 3:04CV251LN, slip op., at 10, this Court should find that she is a fully qualified and appropriate Next Friend for Caesar, and it should permit her to proceed on his behalf.  *See, e.g.*, *id*. at 9–10 (finding friend of foster parent who had previously cared for named plaintiff suitable as next friend); *Marisol A*., 1998 WL 265123, at *9 n.14 (finding staff attorney who worked at teenage homeless shelter suitable as next friend).

### 3.   Gregory Elliott Is a Qualified and Appropriate Next Friend for Sam and Tony M., Deanna H., and Danny and Michael B.

In his testimony on January 24, 2008, Professor Gregory C. Elliott demonstrated that he is truly dedicated to the best interests of the five Named Plaintiffs on whose behalf he seeks to litigate.  Dr. Elliott, an associate professor of Sociology at Brown University, testified that his "two major areas of research to date are in child maltreatment and the causes and consequences thereof."  (Elliott Test. at 5.)  He described his most recent research, which concerns the concept of "mattering," and the disastrous consequences of

being made to feel that one does not matter, as "very applicable" to the lives of the Named Plaintiffs he represents because "it is very often the case that these children . . . [in] state care are in situations where they do not really believe that they matter to individuals or to the agency that is taking care of them [i.e., DCYF], at least nominally taking care of them."  (Elliott Test. at 6–7.)

Dr. Elliott does not know Sam and Tony M., Deanna H., or Danny and Michael B. personally.  (Elliott Test. at 7.)  Nevertheless, after reviewing the Complaint that Plaintiffs' counsel planned to file, he agreed to bring this suit on those Named Plaintiff Children's behalf because he "saw a dire need as reflected in the Complaint."  (Elliott Test. at 9.)  "I think these children, as I have learned from the documents that I have been given, are in dire circumstances, circumstances that are detrimental to their mental and physical health, and someone needs to step in to see to it that they are relieved of these distresses."  (Elliott Test. at 10.)

Dr. Elliott considered the implications for the Named Plaintiff Children of being involved in federal litigation and described weighing the possibility that the children's participation might involve some stress against the difficulties that the children already face in DCYF custody:

> Based on my knowledge and expertise and on what I read in the documents that were filed, I came to the conclusion that while there might be some discomfort involved, the amount of stress or discomfort that would be involved in their participation is so much less than the circumstances that they are under now that I think it would be important for them to take part in this case.

(Elliott Test. at 11.)

Asked why he thought he could represent Sam, Tony, Deanna, Danny, and Michael despite not having yet met them, Dr. Elliott explained: "I know enough about the

circumstances that they face, and I know enough thanks to my and others' research about the consequences of the circumstances that they face, and I know that those consequences are quite dire."  (Elliott. Test at 11.)

Federal courts have permitted next friends like Dr. Elliott to proceed on behalf of plaintiff children with whom they have no prior relationship, where the putative next friends have shown themselves to be committed to the children's best interests.  *See, e.g., Marisol A.*, 1998 WL 265123, at *8–9 (denying motion to dismiss next friends of plaintiff children in foster care where "the Court is satisfied that they understand their role as next friends, and that they are motivated only by a sincere desire to seek justice for the named plaintiffs," even though "many of the next friends conceded either that they had not met or had had very limited contact with the plaintiffs they represent"); *Jeanine B. v. Thompson*, 877 F. Supp. 1268, 1287–88 (E.D. Wis. 1995) (finding prominent community members with demonstrated interest in children's issues adequate as next friends for children in foster care); *Child v. Beame*, 412 F. Supp. 593, 599 (S.D.N.Y. 1976) (permitting next friend, who did not know plaintiff children before agreeing to serve as their next friend, to litigate on their behalf because he had "manifested an interest in their welfare").[8]  While a prior relationship between a next friend and a named plaintiff "may

---

[8] *See also Kenny A. v. Perdue*, No. 1:02-cv-1686-MHS (N.D. Ga. Aug. 10, 2004) (order for substitution of next friend) (approving juvenile public defender, originally the next friend of two named plaintiffs, as next friend for a third, where she had demonstrated her commitment to protecting the best interests of minor children in state foster care custody) (motion and order attached as Ex. 1); *Kenny A. v. Barnes*, No. 1:02-cv-1686-MHS (N.D. Ga. Oct. 18, 2002) (order for substitution of next friend) (approving attorney whose bar admission was pending, who worked in juvenile justice and, before that, as a child advocate in deprivation and abuse cases, as next friend for plaintiff child, where she was familiar with child's circumstances and was dedicated to child's best interests) (motion and docket entry attached as Ex. 2).  In *Charlie H. v. Whitman*, No. 99-3678-GEB,

*cont.*

be one means by which the would-be next friend can show true dedication to the best interests of the person on whose behalf he seeks to litigate," it is not required. *Sánchez-Velasco v. Sec'y of Dep't of Corr.*, 287 F.3d 1015, 1026 (11th Cir. 2002); *accord González v. Reno*, 86 F. Supp. 2d 1167, 1185 (S.D. Fla. 2000) (requiring putative next friend to show "some relationship *or other evidence* that demonstrates the next friend is truly dedicated to the interests of the real party in interest") (emphasis added), *aff'd* 212 F.3d 1338 (11th Cir. 2000); *see also Bowen v. Rubin*, 213 F. Supp. 2d 220, 227 (E.D.N.Y. 2001) ("a long-term relationship between a proposed next friend and the individual in need of representation is not required").[9]

Dr. Elliott demonstrated through his testimony that, notwithstanding his not yet having met the five Named Plaintiffs on whose behalf he appears, he is truly dedicated to their best interests and entirely capable of handling the responsibilities that the role of

---

*cont.*

(D.N.J.), one of the next friends was a schoolteacher who had no prior relationship with the children she represented. (Posluszny Dep. Tr. at 8–12, 21–23.) Another next friend, an attorney and registered nurse who had at one time worked as a public advocate in matters such as abuse and neglect cases, also had no prior relationship with the child she represented. (Maraziti Dep. Tr. at 8–10, 12.) Two other next friends, one a family law attorney, the other a minister, also had no prior relationship with children they represented. (Dargay Dep. Tr. at 6–7, 17, 36–37, 57–59; Bouton Dep. Tr. at 9, 14) (Transcript excerpts attached as Ex. 3.)

[9] Because Plaintiffs have analyzed this question in previous briefs, that analysis is not repeated here. (*See* Pls.' Resp. at 16–17; Pls.' Hr'g Mem. at 8–10.) In brief, the notion that a next friend should have a "significant relationship" with the person she represents is based on dictum in *Whitmore*, where the Supreme Court commented that a decision from the United States District Court for the Northern District of Georgia "further suggested that a 'next friend' must have some significant relationship with the real party in interest," but made no further mention of it and did not factor it into its analysis. 495 U.S. at 163–64 (citing *Davis v. Austin*, 492 F. Supp. 273, 275–76 (N.D. Ga. 1980)). In the one decision in which the First Circuit has applied the *Whitmore* criteria, it did not mention the "significant relationship" dictum. *See Figueroa v. Rivera*, 147 F.3d 77, 82 (1st Cir. 1998). Significantly, *Whitmore*, *Davis*, and *Figueroa* were all federal habeas corpus cases where the real parties in interest were prisoners, not children.

Next Friend entails.  While he does not yet know the five children he has agreed to stand up for, his professional expertise makes him particularly well-qualified to understand and have insight into their individual needs in this case.  It is uncontroverted that Dr. Elliott has no conflicting motivation or commitments that would in any way compromise his ability to represent Sam, Tony, Deanna, Danny, and Michael in this action and that his only motive is a good-faith dedication to their best interests.  Defendants offered no witnesses to impeach or counter Dr. Elliott's testimony.  Because Dr. Elliott has demonstrated the necessary commitment to pursue their best interests in this litigation, this Court should find him to be a suitable Next Friend for Sam and Tony, Deanna, and Danny and Michael and permit him to litigate this case on their behalf.

### 4. Defendants' Arguments for Disqualifying Mary Melvin, Kathleen Collins, and Gregory Elliot as Next Friends Are Baseless and Should Be Rejected

Faced with abundant evidence of the Next Friends' true dedication to the Named Plaintiff Children they represent and sincere desire to seek justice on their behalf, Defendants resort to arguments that have no basis in law and no bearing on the Next Friends' suitability, inventing out of whole cloth a series of requirements that the Next Friends have supposedly failed to meet.  Not only do these contrived requirements lack any legal basis, their application would effectively preclude most foster children from ever being able to seek relief in the federal courts, defeating the purpose of Rule 17(c).

Defendants appear to argue that the Next Friends do not have enough knowledge about or contact with the Named Plaintiff Children to be truly dedicated to their best interests, declaring that the Next Friends have "a total lack of knowledge of the children's current lives," (Defs.' Mem. at 8–10).  This assertion misrepresents the Next Friends' testimony and unreasonably faults them for not remaining fully abreast of any changes in

the Named Plaintiff Children's placements and services since the Complaint was filed, when even counsel have received no discovery in this case as of yet.  The Next Friends reviewed all of the factual allegations in the Complaint before it was filed and reasonably relied on the information provided by their attorneys.

Defendants' position partly rests on the irrelevant fact that the Next Friends have not reviewed certain documents such as Family Court orders, DCYF case plans, medical records, and educational records (*see, e.g.,* Defs.' Mem. at 2–4), though Defendants fail to mention those documents are confidential and under the control of Defendants, and that there has been no discovery in this case.   *See* R.I. Gen. Laws §§ 15-7-7(f), 38-2-2(4)(i)(C), 40-11-13, 42-72-7, 42-72-8 (2007).   Similarly, Family Court proceedings are closed.   R.I. Gen. Laws § 14-1-30 (2007).   As to contact with the Named Plaintiffs, DCYF controls access to the children in its custody.   R.I. Gen. Laws § 40-11-12(b) (2007).   Defendants can cite no authority (as there is none) for the proposition that a putative next friend must review any particular documents (let alone confidential documents that are not easily available before discovery) in order to bring litigation on behalf of an infant.   Nor is there any requirement that a putative next friend have contact with a child to whom she has no access before filing suit on the child's behalf against the child's very custodians.   *Cf. In re Zawisza*, 73 B.R. at 936 (noting "absurdity" of arguing that next friend should have communicated with incompetent before taking legal action, where defendant admitted fact of incompetence).   Likewise, there is no legal authority for Defendants' novel position that a putative next friend must undertake an independent verification of the facts alleged in a complaint that has been drafted by counsel, and must have personal knowledge of those facts.  (Defs.' Mem. at 2–4, 7, 10.)

Defendants also fault the Next Friends for not "voic[ing] their concerns to the individual child's CASA or guardian ad litem or before the Rhode Island Family Court." (*Id*. at 10.)  Again, this argument has no basis in law, as Family Court proceedings are closed and a putative next friend is not required to exhaust other avenues on behalf of a child before bringing the child's federal constitutional and statutory claims in federal court.

Defendants complain that the Next Friends cannot show support for this lawsuit from the natural relatives, foster parents, and CASAs or GALs of the Named Plaintiff Children.  (*See id*. at 2, 3, 5, 8, 10.)  Like Defendants' other arguments, this assertion has no bearing on whether the Next Friends are suitable.  Even worse, it suggests that a federal court should not hear the constitutional and statutory claims of a child who has been harmed while in state custody unless the child's representative can show broad-based support for the litigation on the part of various individuals who may have opinions about the case but are not parties to it.[10]  To impose such a restriction would make it essentially impossible for children in foster care to ever have claims against their state custodians heard by a federal court.

As to whether the Plaintiff Children themselves support this litigation, the Next Friends have not yet been able to discuss the matter with them because they have not yet

---

[10] The degree of involvement of these individuals in Plaintiff Children's lives varies widely and cannot be taken for granted.  Even GALs and CASAs often have little or no contact with the children whom they are assigned to represent in Family Court, given that they carry average caseloads of 400 children each.  *See* RI Family Court - Overview, http://www.courts.state.ri.us/family/overview.htm#departments (last visited Feb. 28, 2008).  As recently as June 2007, when the Complaint was filed, at least one of the Named Plaintiffs had never met the GAL who had represented him for years.  (Alston Decl. (Oct. 19, 2007) at ¶ 8.)

had access to the children, who are in Defendants' custody.  Given the Next Friends' testimony that they are committed to the best interests of the children on whose behalf they appear, they are undoubtedly concerned with those children's wishes and can be expected to take those wishes into account in the due exercise of their responsibilities as next friends, once Defendants grant them access to the children.  At the same time, it must be remembered that the seven Named Plaintiffs are *children*.  Five of them are under the age of ten, the youngest only sixteen months old.  To ask whether six-year-old Caesar or nine-year-old Tony "supports" this litigation ignores both the legal and practical realities of their minority.  Even the eldest of the Named Plaintiffs, David, is only fourteen, and Ms. Melvin's testimony surely puts to rest any concerns that she would act in disregard of his wishes.

Defendants' speculations about some theoretical "detrimental effect" on the Named Plaintiff Children from being "subjected" to federal litigation are at once presumptuous, disingenuous, and irrelevant.  (*See* Defs.' Mem. at 2, 4–5.)  First, the suggestion that litigation before this Court would have some hypothetical "detrimental effect" on the Named Plaintiff Children that would be prevented by litigating their claims in individual proceedings in Family Court—Defendants' preferred forum—or elsewhere is entirely unfounded.[11]  Second, it cannot be presumed that children whose civil rights have been violated would suffer a "detrimental effect" by participating in a proceeding at which those rights are vindicated.  Even in the unlikely event that Defendants were to compel a child to testify, the Court and counsel would certainly take steps to minimize any possible trauma from the experience.  Should a child wish to be heard, of course,

---

[11] *See infra.* at note 49.

there would be no reason to assume that the experience of telling his or her story, of having a voice, would be a detrimental one; indeed, the effect could be quite the opposite. Finally, if the decision to seek redress of the harms suffered by the Named Plaintiff Children by filing this suit has any relevance to the question of the Next Friends' suitability, it demonstrates that they are dedicated to the children's best interests. *In re Zawisza*, 73 B.R. at 936 (presuming that next friend had incompetent's best interest at heart, given nature of proceeding and relief sought).

Lastly, Defendants' claim that the Next Friends are inadequate because they lack "significant relationships" with the children they represent is unpersuasive and ignores the tragic reality of the Named Plaintiffs' lives in DCYF custody. (*See* Defs.' Mem. at 9–10.)  First, it is factually inaccurate with respect to Ms. Melvin and Ms. Collins; both have significant relationships with the children on whose behalf they appear.  Second, a significant relationship is not legally required under Rule 17(c).[12]  Third, one of the very harms that Plaintiff Children have suffered is the disruption and destruction of relationships with adults.  Defendants' moving children from one placement to another, particularly among institutional placements, denies the children the opportunity to develop and maintain meaningful relationships.  David's separation from Ms. Melvin and his subsequent decade-long deterioration in a series of institutional placements is but one example of this widespread harm.  *See, e.g., Dwayne B.*, No. 06-13548, 2007 WL 1140920, at *3 ("Because the named Plaintiffs, like other foster children, have been removed from home and have had their preexisting ties to family and friends effectively

---

[12] For a full analysis of this question, see Pls.' Resp. at 16–17; Pls.' Hr'g Mem. at 8–10; *see also supra* at note 9.

severed, they have few, if any, significant relationships with adults who are suitable and willing to act as 'next friends.'").

Foster children have appeared in federal court to vindicate their rights through similar next friends in a legion of cases.  *See, e.g*., *id* at *3 (finding former foster mother of named plaintiff's sibling suitable as next friend); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *6 (D. Nev. May 14, 2007) (finding former foster parent adequate next friend); *Olivia Y.*, No. 3:04CV251LN, slip op., at 9–10 (finding one former foster parent and friend of another former foster parent suitable) (attached to Pls.' Resp. as Ex. 3); *Jeanine B.*, 877 F. Supp. at 1287–88 (finding prominent community members with demonstrated interest in children's issues adequate as next friends for foster children); *Marisol A.*, 1998 WL 265123, at *8–9 (finding next friends, most of whom were professionals in child welfare, appropriate notwithstanding that "many . . . had not met or had had very limited contact with the plaintiffs they represent").  To bar the Named Plaintiffs from vindicating their federal statutory and constitutional rights simply because they have not had the opportunity to develop close relationships with adults who can represent them in federal court would be to penalize them for being caught in a dysfunctional child welfare system that has harmed them and would deny them the opportunity to seek redress for those very harms in this forum.

This Court should find that Ms. Melvin, Ms. Collins, and Dr. Elliott are all qualified, suitable Next Friends, and it should permit them to prosecute this case on behalf of the Named Plaintiffs.

### C.      Inadequacy of Next Friends Would Not Justify Dismissal

Rule 17(c) provides a mechanism for aggrieved people who themselves lack legal capacity to have their cases heard by a federal court.  Defendants would have this Court

disqualify the Next Friends and then dismiss this case altogether rather than appoint other representatives for the Named Plaintiffs.  (Defs.' Mem. at 11.)  In taking this position, Defendants pervert the Rule's purpose by attempting to use it as a basis for shutting the doors of federal court to children with justiciable federal claims.  *See Gardner v. Parson*, 874 F.2d 131, 140 (3d Cir. 1989) ("The purpose of Rule 17(c) is to further the child's interest in prosecuting or defending a lawsuit. . . .  [It] was not intended to be a vehicle for dismissing claims.").

Ms. Melvin, Ms. Collins, and Dr. Elliott are all fully qualified next friends for the Named Plaintiff Children on whose behalf they appear.  Should this Court conclude otherwise, however, the proper remedy would be to grant Plaintiffs leave to provide substitute next friends, or to appoint individuals whom the Court finds more suitable to serve as next friends, so as to ensure that the Named Plaintiff Children are not denied access to federal court and prevented from obtaining justice.  *See* Fed. R. Civ. P. 17(c)(2) ("The court *must* appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.") (emphasis added); *see Gardner*, 874 F.2d at 140 ("[w]e have found no case . . . holding that a court may decline to appoint a guardian with the result of allowing the child's interests to go *un*protected"); *Adelman v. Graves*, 747 F.2d 986, 989 (5th Cir. 1984) (finding reversible error where lower court failed to appoint next friend under Rule 17(c) for minor or to otherwise ensure that infant's right to vindicate his statutory and constitutional claims was protected).

## IV.    ABSTENTION UNDER *YOUNGER v. HARRIS* WOULD BE IMPROPER

Defendants would have this Court rule that children in foster care can never challenge Defendants' actions as unconstitutional in any forum other than the Family

Court.  This would effectively deny Plaintiff Children *any* forum for their federal claims, which, as explained below, cannot be prosecuted in Family Court.  However, Defendants misconstrue the law; concurrent federal court litigation while there is limited state court activity involving the same plaintiff is completely permissible under our judicial system.[13]  Abstention by a federal court is "an extraordinary and narrow exception" to this general principle and to the rule that a federal court must exercise the jurisdiction it has been constitutionally granted.[14]

*Younger* abstention applies only where the prosecution of a lawsuit in federal court threatens comity between state and federal governments.[15]  Further, abstention is disfavored in civil rights lawsuits, particularly, as here, in the context of a section 1983 action.[16]  As this civil rights lawsuit does not implicate considerations of federal-state comity and as no other grounds exist to invoke *Younger* abstention, this Court should retain its lawful jurisdiction over this action.[17]

### A.    This Case Meets None of the Threshold Issues That Implicate *Younger* Abstention

In order for a federal court to abstain from hearing a case pursuant to the *Younger* doctrine, the case must satisfy each of three threshold criteria: (1) hearing the lawsuit

---

[13] Even were there a parallel ongoing state court case, there could still be concurrent federal litigation.  *Exxon-Mobil Corp. v. Saudi Basic Indust. Corp.*, 544 U.S. 280, 292 (2005) ("This Court has repeatedly held that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'") (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).
[14] *See Office of the Child Advocate v. Lindgren*, 296 F. Supp. 2d 178, 189 (D.R.I. 2004) (quoting *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959).
[15] *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601–602 (1975).
[16] *Corporación Insular de Seguros v. García*, 680 F. Supp. 476, 479 (D.P.R. 1988); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 815 n.21 (1976) ("Indeed, the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention.").
[17] (*See also* Pls.' Resp. at 20–43, incorporated herein as if fully set forth.)

would undermine federal-state comity, *see New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 364 (1989); (2) the underlying state court proceeding is an enforcement proceeding, *Río Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 69–70 (1st Cir. 2005); and (3) the federal lawsuit would interfere with the state court proceedings, *id* at 70.  The failure of any one of these conditions bars the application of *Younger*.  *See id* at 69–70.  If the three threshold conditions are satisfied, only then can the Court turn to the *Middlesex* Test.  *See infra*, note. 29.

### 1.    This Lawsuit Does Not Undermine Comity

As Plaintiff Children have set forth in their Opposition to the Motion to Dismiss, the driving force behind *Younger* abstention—the notion of comity—is not implicated in the instant lawsuit because the Rhode Island child welfare system is a joint federal-state program.  (Pls.' Resp. at 22–24.).  This defect in Defendants' argument is fatal to their motion to dismiss under the doctrine of *Younger* abstention.

### 2.    The Family Court Proceedings Are Not Enforcement Proceedings

Even if principles of comity were implicated by Plaintiff Children's suit, Defendants have failed to point to any concurrent, underlying enforcement proceedings involving Plaintiff Children's claims, which is a prerequisite to the application of *Younger*.  (*See* Pls.' Resp. at 24–29.)  Defendants allege that "the United States Supreme Court and the First Circuit have likened state court actions surrounding allegations of abuse and neglect to 'enforcement proceedings.'"  (Defs.' Mem. at 20.)  Plaintiff Children do not dispute that the *initial proceedings* by which the Family Court adjudicated them abused or neglected, removed them from their parents or guardians, and

placed them into DCYF custody were enforcement proceedings.[18]  Such initial abuse and

neglect adjudications are typical enforcement proceedings in that they are coercive state

civil proceedings brought by the state to enforce state law against an individual, i.e., the

children's parent or guardian.  *See Río Grande*, 397 F.3d at 69 (defining an enforcement

action for *Younger* purposes).  Likewise, while Plaintiff Children do not dispute that the

proceedings by which some of their parents' parental rights were involuntarily terminated

were coercive enforcement proceedings, these proceedings were against their parents, not

Plaintiff Children.[19]  However, there are currently no pending enforcement proceedings

involving Plaintiff Children, and Plaintiff Children do not challenge any prior custody

determination placing them in DCYF custody any terminating parental rights.  Therefore,

the cases cited by Defendants—which all apply *Younger* abstention analysis in the

context of child custody enforcement proceedings—are inapposite.[20]

---

[18] *See* R.I. Gen. Laws § 40-11-12; *see also Moore v. Sims*, 442 U.S. 415, 423 (1979) (equating child custody proceedings with criminal proceedings and enforcement proceedings for purposes of *Younger* abstention).

[19] *See* R.I. Gen. Laws § 15-7-7.  *See also McLeod v. Me. Dep't of Human Servs.*, No. 99-233-P-H, 1999 WL 33117123, *1–3 (D. Me. 1999), (abstaining from considering parent's challenge to "cease reunification" order) *aff'd* 229 F.3d 1133 (1st Cir. 2000) (Table).

[20] In *Moore v. Sims* the federal plaintiffs challenged their children's removal into state custody and sought to enjoin a state court abuse-and-neglect enforcement proceeding. 442 U.S. 415, 418–419 (1979).  The First Circuit in *Río Grande* clarified that the child removal proceeding in *Moore* was a civil enforcement action and thus that the application of *Younger* was appropriate.  397 F.3d at 69.  In *Malachowski v. City of Keene*, 787 F.2d 704 (1st Cir. 1986),—a case which Defendants acknowledge as having "factual distinctions" from the case at bar—the parents of a child who had been committed to state custody sought an order returning their daughter to their custody.  *Id.* at 708.  Consistent with *Moore*, the First Circuit held that *Younger* applied to this type of civil custody proceeding.  *Id.*  Finally, in *McLeod*, 1999 WL 331171123, a *parent* who was in the midst of an ongoing child custody proceeding "in which the next step in the continuum is termination of parental rights" brought a federal lawsuit to enjoin the state court custody proceeding.  *Id.* at *1.  Again, *Younger* abstention applied to bar that proceeding challenging a state court custody determination.  *Id.* at *1–3.  In contrast, in the case at

*cont.*

The only remaining state court proceedings that currently involve Plaintiff Children in any way are their annual Family Court reviews, which are clearly not enforcement proceedings.  At those reviews, the Family Court simply reviews plans that DCYF staff have developed on behalf of each individual Plaintiff Child, which outline the child's permanency goals and services to be provided.  As a Family Court review is simply judicial review of DCYF executive action, and not an enforcement action, it cannot provide the basis for *Younger* abstention.  *See Río Grande*, 397 F.3d at 69–70 (*Younger* only implicated where there is ongoing state court enforcement proceeding); *Child Advocate v. Lindgren*, 296 F. Supp. 2d at 192 (noting that, in the context of a consent decree, federal court review of DCYF action would not implicate *Younger*).

### 3.      This Lawsuit Will Not Interfere with Any Family Court Proceeding

Even if comity were at issue *and* this federal lawsuit implicated a state enforcement proceeding—of which neither condition is satisfied here—abstention would still be unwarranted because Defendants have made no showing that this federal lawsuit will interfere with any state court proceedings involving the individual Plaintiff Children. "[W]here federal proceedings parallel but do not interfere with the state proceedings, the principles of comity underlying *Younger* abstention are not implicated." *Gwynedd Props., Inc. v. Lower Gwynedd Township*, 970 F.2d 1195, 1201 (3d Cir. 1992); *accord Río Grande*, 397 F.3d at 70.  Accordingly, this Court cannot abstain.[21]

---

*cont.*
bar the parents are not parties and the Plaintiff Children do not challenge any custody proceedings.
[21] (*See also* Pls.' Resp. at 29–34.)

### a. The Family Court's Decisions Are Not at Issue in This Lawsuit

Defendants' abstention argument largely turns on the premise that, by allowing this lawsuit to proceed, this Court will somehow be required to rule on prior Rhode Island Family Court orders regarding individual Plaintiff Children and will therefore "interfere" with those proceedings. (Defs.' Reply Mem. in Support of Mot. to Dismiss ("Defs.' Reply") at 30–31, 41.) But Defendants have provided no support for this baseless assertion. In the Amended Complaint, Plaintiff Children do not challenge any Family Court order. Instead, Plaintiff Children seek only *prospective* injunctive relief against Defendants, *the executive actors*, for which no analysis of prior Family Court decisions is required.

Much of Defendants' interference argument relies on the Family Court's purported ratification of the services and placements provided by DCYF and each service and permanency plan. (*Id.*) But Defendants mischaracterize the Family Court's role. Under Rhode Island statute, the Family Court is required to review annually each Plaintiff Child's permanency plan as developed by DCYF, and the only order the Family Court enters at that annual review is an order of permanency. (R.I. Gen. Laws §§ 40-11-12.1(e), 40-11-12.2(a); Alston Decl., Ex. 5 at ¶¶ 7–8.) During this annual review, the Family Court does *not* approve or reject each specific placement to which DCYF may have moved the child. (Alston Decl., Ex. 5 at ¶ 8.; *See also* Ex. D-58 to Defs.' Mot. to Dismiss[22]) Additionally, the statutes Defendants cite refer *only* to the Family Court's

---

[22] Defendants allege that this lawsuit would "abolish the Rhode Island Family Court's ability to place a child or order" his or her treatment. (Defs.' Reply at 53.) But in fact, the Family Court does not have the authority to place a child or to order specific treatment. Defendants' concern is illusory.

review of permanency plans, not any service plans.  There appears to be no requirement

that the Family Court review any service plan, other than the original, and all objections

to a child's service plan are heard in administrative proceedings, not in any Family Court

proceeding.  03 007 R.I. R. 0030(G)(2)(d).[23]

> **b.    The Defendant Executive Actors Are Responsible for Plaintiff Children**

As a matter of law, Defendants, not the Family Court, bear the ultimate

responsibility for Plaintiff Children's safety, well-being, and permanency.[24]  Pursuant to

this responsibility, Defendants must, *inter alia*, (1) provide the children in state custody

with individualized service plans and written "reunification and/or permanency plans," as

well as the necessary services to implement those plans;[25] (2) select and place each

---

[23] As Defendants correctly note, each Plaintiff Child's service plan is reviewed every six months.  R.I. Gen. Laws § 42-72-10.  However, Defendants fail to point out that the Family Court does not conduct these reviews and is in no way involved with them.  In fact, these reviews are conducted by an Administrative Review Officer, who is an employee of DCYF.  03 007 Code R.I. R. 0030.  Far from being an impartial, independent review of DCYF's compliance with its obligations to each Plaintiff Child, these reviews are in fact internal audits by the self-same agency.  While the Family Court directs DCYF to submit an *initial* service plan "for care and treatment" within 30 days of the child's placement into DCYF custody and is required to approve, modify, or remand that initial service plan, R.I. R. Juv. P. R. 17(c); 03 700 Code R.I. R. 0025(D)(5), there is no indication that any subsequent treatment plans are ever formally reviewed by the Family Court, R.I. R. Juv. P. R. 17(d) (requiring DCYF to review children's service plans every six months and to report to the court, without requiring court ratification).

[24] *See* R.I. Gen. Laws § 42-72-2; *see generally DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989); *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Vélez-Díaz v. Vega-Irizarry*, 421 F.3d 71, 79–80 (1st Cir. 2005); *Germany v. Vance*, 868 F.2d 9, 23 (1st Cir. 1989); *Norfleet v. Ark. Dep't of Human Servs.,* 989 F.2d 289, 293 (8th Cir.1993).

[25] R.I. Gen. Laws § 42-72-10 (service plan), § 40-11-12.2(a) (requiring "written reunification and/or permanency plan"), § 42-72-4(b)(14) (requiring treatment, rehabilitation, and care); 03 007 Code R.I. R. 0025 (service plan).

Plaintiff Child in a specific foster home, group home, or institution;[26] (3) choose when,

why, and how frequently to move a child from one placement to another; (4) hire

caseworkers, develop a training curriculum, and ensure that caseworkers have

manageable caseloads and resources;[27] (5) recruit foster parents and train and license

them to ensure that their homes are safe for the children placed there;[28] (6) develop a full

array of placements appropriate to the children's individualized needs;[29] and (7)

investigate and act on allegations that a child in their custody has been abused or

neglected.[30]  All of these functions are Defendants' alone.

### c.   The Family Court Performs a Narrow, Proscribed Oversight Role

Adjudication of Plaintiff Children's claims by this Court would not impinge on

the role of the Family Court.  While charging Defendants with responsibilities to the

children in its care and custody, Rhode Island law also limits the oversight role of the

Family Court.  As noted by the Rhode Island Supreme Court, "the Family Court, as a

court of statutory origin, has no more powers than those expressly conferred upon it by

the Legislature."  *Waldeck v. Piner*, 488 A.2d 1218, 1220 (R.I. 1985).  As such, the

Family Court "cannot take action unless specific jurisdictional authority to act can be

found in the Family Court Act."  *Id.* (citing *Britt v. Britt*, 383 A.2d 592, 594 (1978)).  In

most instances, the authority of the Rhode Island Family Court is limited to choosing

---

[26] Regardless of what individual judges may do in practice (Defs.' Mem. at 22–23), the law is clear that DCYF is responsible for selecting Plaintiff Children's placements. *See In re Doe*, 390 A.2d 390, 396 (R.I. 1978) ("[T]he [family] court does not have the authority specifically to select a given facility").

[27] R.I. Gen. Laws § 42-72-5(b)(10).

[28] R.I. Gen. Laws §§ 42-72-5, 42-72.1-1

[29] R.I. Gen. Laws §§ 42-72-5(b)(3), 42-72-4(b)(14), 42-72-4(b)(17)

[30] R.I. Gen. Laws §§ 11-9-5.1, 40-11-6, 40-11-7.

between a few statutorily delineated options, based upon information supplied by

Defendants. [31]

Moreover, the Family Court can only order relief within the child welfare system

as maintained and operated by Defendants.  For example, when Named Plaintiff David's

behavior was regressing because of his inordinate length of stay in an institution, and

institution personnel warned that David needed to be moved before his behavior further

deteriorated,[32] the Family Court could not order that David be placed in a more

appropriate facility because DCYF had failed to develop an adequate array of group

homes and so none existed which could meet David's needs.  This is a problem created

exclusively by DCYF that the Family Court, in the context of David's individual

permanency review, could not remedy.  Nor could the Family Court order DCYF to hire

more caseworkers, impose caseload limits, or change its licensing standards in order to

assure the safety of each foster home after Named Plaintiff Danny was abused in an

---

[31] For example, if the court finds that a child is abused or neglected, the court shall by decree do one of the following with respect to the child's custody: place the child under DCYF supervision in his or her own home; award DCYF the "care, custody, and control of the child"; or appoint a guardian for the child.  R.I. Gen. Laws § 40-11-12; *see also* § 14-1-32 (the court may place the child in the custody of a relative or other suitable person; place the child in the custody of DCYF; order the parent(s) to undertake a counseling program; or place the petition on file).  Similarly, at the annual permanency hearings for each Plaintiff Child, the Family Court is required to order one of the following goals: reunification; continuation of long-term foster care; placement in an independent living facility; continuation of current foster care placement along with reunification efforts; or order DCYF to institute adoption proceedings.  R.I. Gen. Laws § 40-11-12.1(e).  (*See also* Exs. D-57, D-58 to Defs.' Mot. to Dismiss (orders approving permanency plan).)  The statute further dictates the factors the court must consider in making its order regarding a permanency goal.  R.I. Gen. Laws § 40-11-12.1(d) (listing factors to consider: appropriateness of service plan; reunification services that have already been offered; efforts to plan for permanency where reunification unlikely; other efforts; and the child's health and safety).
[32] (Am. Compl. ¶ 61.)

unsafe foster home.[33]  The Family Court, operating within its limited statutory mandate and with only limited information, is not ultimately responsible for Plaintiff Children. The quality of the Family Court's options and the meaningfulness of the Family Court's choice therefore depend almost exclusively on Defendants' administration of the child-welfare program, i.e., the conduct that forms the basis for this lawsuit.

Ultimately, the Family Court has a very limited oversight role over but a few of the many decisions made by DCYF on behalf of each individual Plaintiff Child.  The majority of the actions taken by DCYF are never reviewed by the Family Court at all, let alone ratified or pre-approved by it.  Despite Defendants' contentions to the contrary, it is evident that, as to the circumstances described in Plaintiffs' Amended Complaint, DCYF is the entity acting or failing to act on behalf of each child, not the Family Court.  As much as Defendants seek to implead the Family Court into this action, they cannot shirk their custodial duties by falsely laying responsibility for Plaintiff Children's care and well-being on the Family Court.

          **d.**       **Plaintiff Children Seek Relief That Will Operate *Solely* Against the Executive Defendants and Not Against the Family Court**

Federal courts have routinely ordered system-wide relief against executive actors to reform child welfare agencies in actions brought by similarly situated plaintiff children.  Several courts have successfully entered orders—in exactly the same types of cases—that caused absolutely no interference with Family Court decisions.[34]  Further,

---

[33] (*See* Am. Compl. ¶ 91.)

[34] For example, in a similar case concerning a class of children in foster care with open family court reviews, the Tenth Circuit preliminarily found that provisions of a child welfare consent decree governing training of social workers, the development of a computerized management information system, and qualifications of social workers did

*cont.*

there are numerous examples in this Court where children in the custody of DCYF have challenged aspects of their treatment while in custody.[35] The plaintiff children in each of those cases were subject to the same type of Family Court review proceedings that form the basis for Defendants' abstention argument here.  As the relief sought in this case is directed solely at the executive agency Defendants, and not against the Family Court, abstention here would be inappropriate.[36]

Defendants repeatedly turn to *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) to support their abstention argument.  However, unlike the instant lawsuit, the plaintiffs in *31 Foster Children* sought to "have the district court appoint a panel and give it authority to implement a system wide plan to revamp and reform dependency

---

*cont.*
not interfere with family court proceedings or implicate *Younger*.  *Joseph A. v. Ingram*, 275 F.3d 1253, 1272 (10th Cir. 2002).  On remand, the district court found that those provisions and all consent decree provisions concerning case planning and review and adoption processes did not interfere with family court decisions or trigger *Younger*. *Joseph A. v. N.M. Dep't of Human Servs.*, No. 80-623 JC/DJS, slip op. at 7–23 (D.N.M. Jan. 16, 2003) (attached to Pls.' Resp. as Ex. 6).  Similar consent decrees around the country have been approved by federal courts.  *See, e.g., G.L. v. Stangler*, 873 F. Supp. 252 (W.D. Mo. 1994).  In addition, in the context of enforcing a consent decree against executive actors, this Court has previously noted that its "[federal court] review [of] the actions of DCYF, an agency of the state executive branch" does not implicate *Younger* concerns.  *Child Advocate v. Lindgren*, 296 F. Supp. 2d at 192.

[35] *See, e.g., Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354 (D.R.I. 1972) (challenging conditions of confinement); *Child Advocate v. Lindgren*, 296 F. Supp. 2d 178 (D.R.I. 2004) (challenging, *inter alia*, placement practices for children in the child welfare system); *Office of the Child Advocate v. Pontarelli*, No. 82-0091 P (D.R.I. 1982) (complaint attached as Ex. 6) (challenging DCYF's and the Department of Elementary and Secondary Education's failure to provide educational surrogates to children in the foster care system); *John G. v. L'Heureux*, No. 81-0035 (D.R.I. 1981) (complaint attached as Ex. 7) (challenging failure to provide appropriate education by excluding children from public school).

[36] *See Kercado-Meléndez v. Aponte-Roque*, 829 F.2d 255, 261 (1st Cir. 1987) (declining to abstain where "the federal plaintiff claimed actual injury arising from action undertaken and completed by state actors").

*proceedings* in Florida, as well as the appointment of a permanent children's advocate to oversee that plan." *Id.* at 1279 (emphasis added). The Eleventh Circuit therefore found that the relief sought in that case would by its very nature "transfer[] responsibility for state child dependency proceedings from state to federal court and create[] a problematic 'federal court oversight of state court operations.'" *Child Advocate v. Lindgren*, 296 F. Supp. 2d at 191–92 (quoting *31 Foster Children*, 329 F.3d at 1279). In contrast, Plaintiff Children seek no relief that would require this Court —either directly or indirectly—to oversee, review, or reform any Family Court proceedings. What is more, the mere *possibility* that some of the relief sought by Plaintiff Children would interfere with Family Court proceedings is an insufficient basis for abstention and is premature.[37]

In sum, Defendants have made no showing that this federal lawsuit will interfere with any pending state court proceeding. Nor have they shown that this federal lawsuit will undermine notions of comity, nor that any relevant enforcement proceedings against these children exist concerning these children. As none of these threshold criteria are met, this Court cannot abstain pursuant to *Younger* from hearing the instant lawsuit, and no further analysis is necessary.[38]

---

[37] *See Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 570 (S.D. Miss. 2004) (declining to abstain where "it [wa]s not apparent that *all* the relief plaintiffs might request necessarily would interfere with ongoing youth court proceedings"); *Kenny A. v. Perdue*, 218 F.R.D. 277, 286 n.5 (N.D. Ga. 2003) (court within the Eleventh Circuit noting that although "precise relief sought by plaintiffs remains somewhat unclear," nonetheless "specific relief can be crafted that will not interfere with state court proceedings").

[38] Under First Circuit precedent, a court may not abstain under *Younger* if the threshold criteria are not met, and may not even engage in the *Middlesex* analysis. Defendants incorrectly contend that the *Río Grande* court went through the *Middlesex* analysis, (Defs.' Reply at 31), but in fact, the First Circuit did not discuss any of the *Middlesex* prongs before determining that it would not abstain pursuant to *Younger*.

**B.     Applying the *Middlesex* Test Requires the Court to Decline *Younger* Abstention**

Even if this case did meet each of the three threshold criteria discussed above, this case would still not be appropriate for federal abstention because it does not meet the *Middlesex*.  Under the *Middlesex*, abstention is appropriate where the injunctive relief sought interferes with (1) ongoing state court proceedings that (2) implicate an important state interest and (3) in which there is an adequate opportunity for the federal plaintiffs to raise their federal claims.  *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).  As with the threshold considerations above, all three prongs must be met to warrant abstention.  Here, none of these prongs are met, and thus abstention is not warranted.  (*See also* Pls.' Resp. at 35–43.)

**1.     There Are No Ongoing Proceedings**

As explained more fully in Plaintiff Children's Response to Defendants' Motion to Dismiss, the Family Court review on behalf of each Plaintiff Child is not an "ongoing proceeding" within the meaning of *Younger*.  (*See* Pls.' Resp. at 35–36.)

**2.     There Is No Extremely Important State Interest at Stake**

Both the federal and Rhode Island governments have an interest in the administration of Rhode Island's child welfare system and in protecting the foster children within that system whose care is funded to a large degree by federal funds and subject to federal statutory standards.  Plaintiff Children do not deny the existence of any state interest in this lawsuit.  However, abstention is only appropriate where there is an "extremely important" state interest.  *Middlesex*, 457 U.S. at 434.  Rhode Island's admittedly important interest in the outcome of this action is however insufficient to meet the second prong of *Middlesex*.  (*See supra* at 25; *see also* Pls.' Resp. at 22–24, 37–38.)

Additional caselaw also demonstrates that the state interest at issue here does not satisfy the *Middlesex* standard. The First Circuit has found a state's interest to be "severely diminished" for purposes of *Younger* abstention where a federal plaintiff's injury arose, as here, "from action undertaken and completed by state actors" and where the plaintiff was "not seeking to mount a broad, constitutional attack on the legitimacy of the state proceedings or their underlying statutory predicate." *Kercado-Meléndez*, 829 F.2d at 261. Further, the First Circuit has also registered its "doubt" that a case could implicate "the type of important state interest contemplated in *Middlesex*" where the state court proceeding "is not a criminal or civil enforcement case, and it is not 'uniquely in the furtherance of the state courts' ability to perform their judicial functions.'" *Rivera-Puig v. García-Rosario*, 983 F.2d 311, 319 n.13 (1st Cir. 1992) (quoting *NOPSI*, 491 U.S. at 368). Finally, state family law is simply not at issue in the instant lawsuit, which raises only federal constitutional and statutory causes of action.[39] Since none of the factors that would indicate a heightened state interest are present here, the state interest in the subject matter of this lawsuit does not satisfy the second *Middlesex* prong.

### 3. The Family Court Proceedings Do Not Afford Plaintiff Children an Adequate Forum to Litigate Their Claims

The individual Family Court reviews of each Plaintiff Child's permanency plan do not afford Plaintiff Children an adequate forum in which to litigate their claims alleging system-wide failings and seeking system-wide relief.[40] As previously

---

[39] *Cf. Moore*, 442 U.S. at 434 (abstaining where "family relations[,] a traditional area of state concern" were at issue); *McLeod*, 1999 WL 33117123 (D. Me. 1999) (abstaining from considering child custody challenge and noting that "[t]he question of child custody implicates an important, if not paramount, state interest").

[40] To the extent that the Court must engage in a factual inquiry in order to resolve the issues surrounding *Younger* abstention, Plaintiff Children submit Declarations from

*cont.*

established, the Family Court is not equipped to order the types of remedies required to

ameliorate the systemic problems that violate Plaintiff Children's constitutional right to

be free from harm while in state custody, such as high caseworker caseloads, poor

caseworker training and supervision, and inadequate resources such as foster homes and

mental health services.  As noted above, the Family Court has only a narrow oversight

role in the context of its permanency reviews and is limited in the relief it can provide to

specific, statutorily enumerated orders.  *Supra* section IV(A)(3)(c)*; see also* R.I. Gen.

Laws §§ 40-11-12.1.  None of the orders the Family Court is empowered to enter, as

dictated by Rhode Island statute, enable the Family Court to order any sort of the relief

required to address the constitutional violations and the causes alleged here.[41]  For

example, there would simply be no way in the context of an individual permanency

review for the Family Court to impose caseload limits on DCYF caseworkers, order

DCYF to hire more caseworkers, or order DCYF to develop a broader range of

appropriate foster placements.

     Additionally, in the context of the Family Court reviews that Defendants contend

are the appropriate forum for Plaintiff Children's claims, the limited evidence presented

to the Family Court during these proceedings is largely under the exclusive control of

---

*cont.*
Lenette Azzi-Lessing, Patricia Corbett, and Jametta Alston (attached as Exs. 8, 4, and 5,
respectively).  Should the Court require further findings to resolve any factual questions,
Plaintiff Children would request discovery on the adequacy of the individual Family
Court proceedings to address the issues raised in this lawsuit.

[41] In the opinion of a declarant who is intimately familiar with the Family Court's
reviews, "the Family Court individual reviews do not afford the Family Court an
opportunity to address systemic failings, and the Family Court is not equipped to remedy
the serious systemic weaknesses that . . . exist in the Rhode Island child welfare system."
(Corbett Decl., Ex. 4 at ¶ 16, 17; *see also* Azzi-Lessing Decl., Ex. 8 at ¶ 18; Alston Decl.,
Ex. 5 at ¶¶ 11–12.)

DCYF.  Also, caseworkers from provider agencies often are precluded from offering any testimony at these reviews, despite the fact that they generally have the most day-to-day contact with Plaintiff Children.  (Corbett Decl., Ex. 4 at ¶ 11.)

Furthermore, Family Court reviews are fairly cursory, ranging in length from 5 to 20 minutes each.  (Corbett Decl., Ex. 4 at ¶ 10; Alston Decl. Ex. 5 at ¶ 7.)  In fact, the Rhode Island Supreme Court has expressed "real concern about the caseloads facing the justices of the Family Court."  *Cardinale v. Cardinale*, 889 A.2d 210, 215 n.6 (R.I. 2006).  (*See also* Alston Decl., Ex. 5 at ¶ 9 (noting typical dockets of 60 cases per justice).)  In addition, the attorneys who represent Plaintiff Children during these reviews each carry an average caseload of 400 children.[42]  Moreover, "children in foster care custody frequently do not meet their guardians *ad litem* (GAL) or CASA attorneys." (Corbett Decl., Ex. 4 at ¶ 8.)  The children may only meet their legal representatives at their Family Court hearings, in the event that the children are brought by DCYF to attend at all.  (*Id.*)  At least one of the Named Plaintiffs had, at the time of filing, never met his guardian *ad litem*, who had represented him for years.  (Alston Decl. (Oct. 19, 2007) at ¶ 8.)[43]  Additionally, it appears that even whether to appoint an attorney to represent child is "all in the court's discretion."  *See* R.I. Gen. Laws § 40-11-14; *but cf.* R.I. Gen. Laws § 40-11-7.1(b)(3).  Lastly, the Family Court cannot hear class action lawsuits.[44]  In order to

---

[42] R.I. Family Court - Overview, http://www.courts.state.ri.us/family/overview.htm.
[43] It is ironic that Defendants challenge the adequacy of Next Friends based upon their limited interaction with Plaintiff Children while in the same brief calling for the extraordinary measure of *Younger* abstention in favor of state Family Court proceedings in which the children have little to no contact with their guardians *ad litem* and CASA attorneys.
[44] (*See* Pls.' Resp. at 40 n.45.)  This would preclude the Family Court from hearing the class claims of this putative class action.  *See also Kenny A.*, 218 F.R.D. at 287 (finding

*cont.*

abstain pursuant to *Younger*, this Court must find that the Family Court can and should deal with the matters Plaintiff Children have alleged in this lawsuit as part of each of the 3,000 Plaintiff Children's existing individual Family Court reviews.  However, it is clear that the Family Court reviews are not a forum in which Plaintiff Children's claims of constitutional violations can be heard, addressed, or remedied, and the prospect of raising 3,000 individual claims of constitutional violations in the Family Court is simply untenable.  These Family Court reviews do not satisfy the third prong of *Middlesex*.

In conclusion, Plaintiff Children have no state court forum in which they have ongoing proceedings and in which they can raise their federal claims, and they are not required to initiate a new state court proceeding in order to raise their federal claims.[45] Further, the "presence of a federal issue" in Plaintiff Children's case is a "major consideration weighing against [abstention]."[46]  The doctrine of *Younger* abstention does not require this Court to decline its jurisdiction over this matter.  In fact, application of *Younger* analysis here should compel this Court to retain its jurisdiction in this case.

## V.     THE *ROOKER-FELDMAN* DOCTRINE DOES NOT APPLY

As Defendants concede, "the *Rooker-Feldman* doctrine . . . applies only in the 'limited circumstances' where 'the losing party in state court filed suit in federal court

---

*cont.*
juvenile court proceedings inadequate where court could not order class-based relief); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) (same).
[45] *See Brooklyn Inst. of Arts & Sciences v. City of New York*, 64 F. Supp. 2d 184, 195 (E.D.N.Y. 1999) ("The mere fact that a state court of general jurisdiction can entertain any claim between two parties properly before it is too insubstantial a basis for compelling a party which wishes to bring federal constitutional claims in federal court to present those claims to a state court instead.  There is little difference between what the defendants seek here and compelling a plaintiff to bring a federal civil rights claim in state court in the first instance simply because a state forum is always available to hear it.").
[46] *Cruz v. Melecio*, 204 F.3d 14, 25 (1st Cir. 2000).

after the state proceedings ended, complaining of an injury caused by the state-court

judgment and seeking review and rejection of that judgment.'" *Federación de Maestros*

*de P.R. v. Junta de Relaciones del Trabajo de P.R.*, 410 F.3d 17, 23–24 (1st Cir. 2005).

However, Defendants fail to acknowledge that, even if Plaintiff Children were considered

"state court losers" in the context of any decisions made by the Family Court, no state

court judgments exist from which Plaintiff Children appeal.  Any decisions that the

Family Court made in the context of the children's individual permanency reviews do not

rise to the level of a judgment, nor do Plaintiff Children challenge any of those Family

Court decisions.  Rather, Plaintiff Children challenge the failure of the executive actors to

comply with their constitutionally and statutorily mandated obligations to Plaintiff

Children.  These federal constitutional and statutory claims that Plaintiff Children raise in

this federal lawsuit have never been raised or adjudicated in any state court proceeding.

Accordingly, *Rooker-Feldman* has no application here.[47]

## VI.   PLAINTIFF CHILDREN ARE PROPERLY REPRESENTED BY THE CHILD ADVOCATE AND FOUR OTHER COUNSEL OF RECORD IN THIS FEDERAL SUIT

In a further attempt to deprive Plaintiff Children of access to this Court to

adjudicate their federal claims, Defendants assert that those claims must be dismissed

because the Child Advocate is somehow prohibited from pursing litigation except in the

Rhode Island Family Court.  Defendants' argument has no bearing on Defendants'

Motion to Dismiss and fails for three reasons.  First, the Child Advocate is co-counsel in

this action, not a party.  Any alleged incapacity on the part of the Child Advocate to

---

[47] Defendants further fail to recognize that this federal lawsuit simply cannot violate *both* the doctrines of *Younger* and *Rooker-Feldman*.  Either there is an ongoing state court proceeding, which might trigger a *Younger* analysis, or the state court proceeding has terminated in a judgment, which might trigger a *Rooker-Feldman* analysis.

represent the Named Plaintiffs in this forum would not extinguish the children's rights in

this case as they are properly represented by four other counsel of record.  Second,

regardless of whether Rhode Island law would require the Child Advocate to bring suit in

Family Court, no such law can deprive Plaintiff Children of their right of access to the

*federal* court to press their *federal* claims; a federal court's jurisdiction is defined solely

by federal law.  Third, even if this Court were to reach the issue by analyzing the state

statutes in question—which it need not do—those statutes address the executive,

administrative function of the Office of the Child Advocate and in no way limit the Child

Advocate's choice of forum in which to prosecute Plaintiff Children's federal claims.

> **A.     Plaintiff Children Are Represented by a Team of Attorneys and May Proceed with Their Federal Claims Before This Court Regardless of the Child Advocate's Statutory Mandate**

Defendants' argument, that Plaintiff Children's section 1983 claims should be

dismissed because the Child Advocate allegedly does not have the statutory authority to

bring suit in federal court, rests on the mistaken premise that Plaintiff Children's claims

fail absent the Child Advocate's participation.  Aside from distorting Rhode Island

statutes, this argument ignores the plain fact that the Child Advocate is co-counsel and

that Plaintiff Children are also represented by a team of experienced and competent

attorneys, consisting of John Dineen, a Rhode Island civil rights practitioner, who, like

Ms. Alston, is local counsel; Vernon Winters, a partner with the international firm of

Weil, Gotshal & Manges LLP; and Marcia Lowry and Susan Lambiase, Director and

Associate Director, respectively, of Children's Rights, a child advocacy organization.[48]

---

[48] The qualifications of the attorneys representing Plaintiff Children in this suit are more fully set forth in Plaintiffs' Motion for Class Certification, filed on June 28, 2007.  Mr. Winters, Ms. Lowry, and Ms. Lambiase all appear in this case *pro hac vice*.

There has been no suggestion, nor is there any ground upon which to find, that these other co-counsel cannot prosecute Plaintiff Children's claims.  Therefore, assuming *arguendo* that the Child Advocate were not counsel, Plaintiff Children would nonetheless be properly before this Court through the remaining team of four attorneys who appear on their behalf.[49]

Defendants' argument for dismissal on this ground also fails because the disqualification of a litigant's attorney does not defeat the litigant's claim.  *See Gough v. Perkowski*, 694 F.2d 1140, 1142 (9th Cir. 1982) ("After disqualification, counsel may not proceed with the case.  The litigation continues on with new counsel. . . . The issue whether counsel should be disqualified is completely separate from the merits of the suit.").  Even if the Child Advocate were deemed to be acting outside of her statutory mandate, any potential remedy—including the Child Advocate's removal as co-counsel—would not alter the legal viability of Plaintiffs' claims.  In any event Plaintiffs' claims would stand.

**B.      Rhode Island State Statutes Cannot Defeat This Federal Court's Subject Matter Jurisdiction Over Plaintiff Children's Federal Claims**

While a plain reading of the statutes defining the authority of the Office of the Child Advocate readily defeats Defendants' contention that the Child Advocate is prohibited from bringing suit in federal court, this Court need not even reach that issue of state law. It is well established that "[f]ederal Courts are not bound by a statute requiring suit to be brought in a particular state court."  *First Nat'l City Bank v. Gonzalez & Co.*

---

[49] It would be reversible error to disqualify Plaintiffs' entire legal team based upon the alleged incapacity of a single member of the team.  *See Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241, 246–52 (D.N.J. 1998) (collecting cases across multiple federal jurisdictions holding that existence of co-counsel relationship alone does not warrant across-the-board disqualification).

*Sucr. Corp.*, 308 F. Supp. 596 (D.P.R. 1970).  This Court's subject matter jurisdiction is

defined solely by federal law and cannot be expanded or diminished by state statute.  *See*

*Grand Bahama Petroleum Co., Ltd. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1325 (2d

Cir. 1977) ("In determining its own jurisdiction, a District Court of the United States

must look to the sources of its power and not to acts of states which have no power to

enlarge or to contract the federal jurisdiction." (quoting *Markham v. City of Newport*

*News*, 292 F.2d 711, 713 (4th Cir. 1961))); *Poitra v. Demarrias*, 502 F.2d 23, 26 (8th Cir.

1974) (recognizing that state law cannot enlarge or restrict the jurisdiction of federal

courts).

The requirements of federal court jurisdiction are clearly met as Plaintiff Children

assert that Defendants' actions in administering Rhode Island's child welfare system

violate their federal statutory and constitutional rights.  (Am. Compl. at ¶¶ 219–38.)

Whether state law would have required that those claims be brought in Family Court

rather than some other state court is simply irrelevant to this case, because Plaintiff

Children chose not to bring their lawsuit in state court.  *See Marshall v. Marshall,* 547

U.S. 293, 314 (2006) (state legislation granting state court exclusive jurisdiction may not

divest a federal court of jurisdiction).[50]

Defendants assert that this lawsuit "is an attempt to make an end run around the

Family Court" which poses a separation of powers "quandary" by "usurping" the judicial

---

[50] As to the concern regarding the potential rigors that federal litigation may pose to the
Named Plaintiffs, Defendants offer no explanation as to why a suit in federal court would
be any more difficult for the Named Plaintiffs than if their claims were brought *seriatim*
in state Family Court proceedings.  In fact, the Child Advocate's choice to bring a class
action, as opposed to hundreds if not thousands of individual suits, decreases these
children's exposure to the challenges posed by litigation.

branch's authority to adjudicate issues concerning Plaintiff Children who fall within the Family Court's exclusive jurisdiction. (Defs.' Mem. at 17.) Yet every time a federal court asserts jurisdiction over a claim it may be said to "usurp" the authority of some state court to adjudicate that same claim. Defendants never formulate a coherent separation of powers argument; their concern is comity.[51] There is simply no overreaching by one arm of state government into the exclusive domain of another that would give rise to a separation of powers concern.[52] Indeed, the only separation of powers issue that could be said to exist in this case concerns Defendants' suggestion that the Family Court has the authority to determine whether and where the Child Advocate may bring suit, when the Rhode Island General Assembly has explicitly delegated such authority solely to the executive branch Office of the Child Advocate.[53]

---

[51] Any tension created by the fact that in exercising its jurisdiction, a federal court necessarily deprives a state court of its jurisdiction to hear a case, must properly be understood not as a separation of powers issue, but one of comity and federalism, which the Supreme Court has fashioned the doctrine of abstention to address. *See Gross v. Weingarten*, 217 F.3d 208, 220, 222 (4th Cir. 2000) (recognizing that doctrine of abstention is "the safety valve" developed to address comity concerns that arise when federal court assumes jurisdiction in a suit over which a state court has exclusive jurisdiction). *See also supra* Section IV.

[52] For example, while Rhode Island statute requires that complaints of housing code infractions in Providence be brought in a specific housing court, *see* R.I. Gen Laws § 45-24.2-7, the First Circuit has made clear that allegations that such infractions give rise to a constitutional violation "indisputably fall[] within the [federal] court's subject matter jurisdiction." *Durrett v. Hous. Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990). The choice to challenge unlawful conditions of foster care through the more expeditious and less onerous vehicle of a single class action, rather than through innumerable individual Family Court hearings, is no different from the decision to challenge unlawful conditions in a housing project though a class action, rather than through multiple individual housing code violation complaints.

[53] *See, e.g., Mottola v. Cirello*, 789 A.2d 421, 425 (R.I. 2002) ("[I]t is not the province of this Court, or the Superior Court, to dictate how the Attorney General elects to carry out the statutory functions of his office"), *cf. Catalina Inc. v. P. Zwetchkenbaum & Sons, Inc.*, 267 A.2d 702, 705 (R.I. 1970) (holding that legislature has power to vest private

*cont.*

**C.    There Is No State Statutory Requirement That the Child Advocate Pursue Plaintiffs' Claims Only in Family Court**

Even if a state law limiting the forum in which a state court action could be brought were relevant to the justiciability of Plaintiff Children's claims in this federal court, which it is not, Rhode Island statutes regarding the authority of the Child Advocate contain none of the jurisdictional limits that Defendants assert.  It is a "long-established tenet of statutory construction that 'when the language of a statute is unambiguous and expresses a clear and sensible meaning, no room for statutory construction or extension exists.'"  *Rison v. Air Filter Sys., Inc.,* 707 A.2d 675, 681 (R.I. 1998) (quoting *In re Sabetta*, 661 A.2d 80, 83 (R.I. 1995)).  This Court must "give the words of the statute their plain and obvious meaning."  *Rison*, 707 A.2d at 681; *see also Providence & Worcester R.R. Co. v. Pine*, 729 A.2d 202, 208 (R.I. 1999).

Pursuant to R.I. Gen. Law § 42-73-7(6), the Child Advocate is mandated to "[t]ake all possible action including . . . formal legal action to secure and ensure the legal, civil, and special rights of children subject to the provisions of § 42-73-9.1 and chapter 72 of this title."  The plain reading of this provision, along with § 42-73-9.1 and all of Chapter 72, reveals no limitation on the jurisdiction in which the Child Advocate may carry out her mandate to pursue the legal claims of children in foster care.

Defendants point to 42-73-9.1(a), which provides:

> *In addition to the powers set forth in § 42-73-9*, the child advocate, or his or her designee, shall have the power to commence in the superior court a civil action against the state pursuant to the provisions of chapter 25 of title 12 on behalf of any child the custody of whom has been assigned to

---

*cont.*

persons with power to bring actions to enjoin violations of state statute and that it is not within province of court to question that authority).

> any institution or agency under the control of the department of children,
> youth, and families or other private agency or provided in § 14-1-34.

(emphasis added).  However, this provision simply broadens the Child Advocate's

authority by including the *additional* power to bring a claim regarding criminal

injuries suffered by children under the Rhode Island Criminal Injuries

Compensation Act, R.I. Gen. Laws §§12-25-1 *et seq*.  As originally enacted, that

statute specifically required that claims brought under its provisions be asserted in

the Superior Court.[54]  This section provides the Child Advocate with another

cause of action in her representation of children in DCYF custody, but does

nothing to limit the authority of the Child Advocate to undertake her mandate of

pursuing the civil rights of foster children in the forum she deems most

appropriate. [55]  While Chapter 72 of Title 42 of Rhode Island's General Laws

discusses the role of the Family Court, nothing in that chapter dictates or even

suggests that the Child Advocate may prosecute federal claims on behalf of

children only in Family Court proceedings.[56]

---

[54] The Criminal Injuries Act has been superseded by the Criminal Injuries Compensation Act of 1996 which established the Rhode Island Office of the General Treasurer, rather than the Superior Court, as the entity responsible for awarding compensation for criminal injuries.  *See* R.I. Gen Laws §§ 12-25-16 *et seq.*

[55] Defendants challenge the Child Advocate's determination not to intervene in the proceeding in Family Court on behalf of former Named Plaintiffs Briana, Alexis, and Clare.  (Defs.' Reply at 53.)  However, at the time Defendants invited the Child Advocate to participate in those reviews, as Defendants are aware, the Child Advocate had already determined that the individual Family Court reviews are an inappropriate and inadequate forum to remedy DCYF failures, and had already brought this suit in federal court.

[56] *In re R.J.P.*, 445 A.2d 286 (R.I. 1982), cited by Defendants, is similarly unhelpful.  The court in there held that the Child Advocate's authority included filing a petition with the Family Court alleging  that a child is abused or neglected, despite the absence of any specific language granting such authority in either the statute establishing the Child Advocate's Office or in any other Rhode Island statute.  *Id.* at 288.  This has no bearing

*cont.*

Further, there is no basis for Defendants' suggestion that the Child Advocate must advise the Family Court or seek Family Court approval before pursuing Plaintiff Children's federal claims in federal court.  (*See* Defs.' Mem. at 11–12.)  In exercising her statutory authority, the Child Advocate is wholly independent of any other entity, including DCYF and the Family Court.  R.I. Gen. Laws § 42-73-5; s*ee also In re R.J.P.*, 445 A.2d 286, 287 (R.I. 1982) ("[T]he Legislature has specifically stated that the Child Advocate in performing his duties, one of which is the bringing of formal legal action on behalf of children, must act independent of DC[Y]F.").  To require the Child Advocate to seek permission of the Family Court would be inappropriate and would sacrifice the independence given to her by the Rhode Island Legislature.

It is clear that the legislature did not intend to bar the Child Advocate from bringing federal actions, and this Court should decline Defendants' invitation to rewrite Rhode Island law to reach a contrary conclusion.  Such a bar would run counter to not only the intent of the legislature, but also to the past two and half decades of judicial precedent in which the Child Advocate has successfully brought federal actions against state entities, including DCYF, on behalf of Rhode Island children in foster care.  *See, e.g., Child Advocate v. Lindgren*, 296 F. Supp. 2d 178 (federal class action brought by Child Advocate on behalf of children in DCYF custody); *Child Advocate v. Pontarelli*, No. 82-0091 P; *John G.*, No. 81-0035 (D.R.I. 1981).

It is unsurprising that Defendants would prefer for the Child Advocate to challenge Defendants' unlawful conduct on an inefficient, piecemeal basis in each child's

*cont.*
on the Child Advocate's authority to take actions other than filing abuse or neglect petitions, which are exclusively filed in Family Court.

individual Family Court proceedings, where the Family Court lacks the authority to order effective system-wide remedial relief.  Yet there is no legal basis to preclude the Child Advocate from proceeding on behalf of the Plaintiff Children in this federal forum.

## VII.   CONCLUSION

The Supreme Court has famously cautioned that "'[i]t is most true that this Court will not take jurisdiction if it should not:  but it is equally true, that it must take jurisdiction, if it should. . . . We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'"  *Marshall*, 547 U.S. at 298–99 (quoting *Cohens v. Virginia*, 19 U.S. 264 (1821)).  Plaintiff Children properly appear before this Court to vindicate their well-established federal right to protection and services from the governmental agency that has assumed complete control and custody over their young lives.  This Court should reject Defendants' unjustified attempt to bar the doors of the federal courthouse to Plaintiff Children and should deny Defendants' motion in all respects.

Dated:  February 29, 2008

Respectfully submitted,


/s/ Susan Lambiase

MARCIA ROBINSON LOWRY (Bar No. 1187053 (N.Y.);
admitted *pro hac vice*)
SUSAN LAMBIASE (Bar No. 2099489 (N.Y.); admitted
*pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, NY 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
Email: mlowry@childrensrights.org,
slambiase@childrensrights.org


/s/ Jametta O. Alston

JAMETTA O. ALSTON (Bar No. 3909)
CHILD ADVOCATE OF
THE STATE OF RHODE ISLAND
John O. Pastore Center
57 Howard Avenue, Fourth Floor
Cranston, RI 02920
Phone: (401) 222-1690
Facsimile: (401) 222-6652
Email: jalston@doa.state.ri.us


JOHN W. DINEEN (Bar No. 2346)
305 South Main Street
Providence, RI 02903
Phone: (401) 223-2397
Facsimile: (401) 223-2399
Email: jwdineen1@yahoo.com


VERNON M. WINTERS (Bar No. 130128 (Cal.); admitted
*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA
Phone: (650) 802-3005
Facsimile: (650) 802-3100
Email: vernon.winters@weil.com

49

## <u>CERTIFICATION</u>

I hereby certify that on February 29, 2008, I electronically mailed the foregoing document to the attorneys of record listed below:

Brenda D. Baum, Esq.
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel: (401) 274-4400 x 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov

James R. Lee, Esq.
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903-2907
Tel: (401) 274-4400 x 2314
Fax: (401) 222-2995
jlee@riag.ri.gov

Kevin Aucoin, Esq.
Executive Counsel
R.I. Department of Children, Youth & Families
101 Friendship Street
Providence, RI 02903-3716
Tel: (401) 528-3579
Fax: (401) 525-3566
Kevin.Aucoin@dcyf.ri.gov

Jane Morgan, Esq.
Assistant Director of Legal Services
R.I. Department of Elderly Affairs
Benjamin Rush Building
35 Howard Avenue
Cranston, RI 02920
Tel: (401) 462-0524
Fax: (401) 462-0503
jmorgan@dea.state.ri.us

/s/ Susan Lambiase
SUSAN LAMBIASE (Bar No. 2099489 (N.Y.); admitted *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, NY 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
Email: slambiase@childrensrights.org