# EXHIBIT 3

RECEIVED
CHILDREN'S RIGHTS, INC.
00 NOV 14 AM 10:57

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

CHARLIE and NADINE H., :
et al. :
:
V. :
:
WHITMAN, et al. : NO. 99-3678(GEB)

COPY

FILE COPY

- - -

OCTOBER 26, 2000

- - -

Oral deposition of CHRISTINE DABNEY POSLUSZNY, held in the offices of the Department of Public Law & Safety, 124 Halsey Street, Newark, NJ 08102, commencing at 4:30 p.m., on the above date, before Kimberly S. Gordon, a Professional Shorthand Reporter and a Commissioner of the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

daughter is 19.
Q. You're a schoolteacher?
A. I'm a teacher, yes.
Q. For how long have you been working at your present school?
A. 16 years. This is my 16th year.
Q. What do you teach?
A. Second grade at this point.
Q. How long have you been teaching second grade?
A. This is the third year I've taught second grade. Before that, I taught pre-K and kindergarten for 13 years and one year as a nursery teacher. It doesn't add up, does it?
Q. That's okay. There will be no math tests today.
A. Good.
Q. Are you involved in any activities or organizations that relate to providing services for children other than your role as a teacher?
A. Other than teaching?

Q. Yes.
A. No. I belong to a couple of teacher-oriented organizations but nothing other than, nothing that has anything to do with children.
Q. What type of organizations?
A. National Council of Teachers of Mathematics and National Association for the Education of Young Children. I belong to both of those.
Q. Have you ever been involved in a lawsuit before?
A. No, thank goodness.
Q. Have you ever served as a Next Friend in any other lawsuit other than this one before?
A. No. I was previous Next Friend for the M family before their case was dismissed. But before that, no.
Q. Do you know why the M family's case was dismissed?
A. It was because the children were not presently at the time in the custody of DYFS, and the judge dismissed

all cases in which the children were not actually in DYFS custody.

Q. These children are Ricky, Daniel and Thomas?

A. Yes, and they were in the custody of their mother.

Q. When did you stop serving as their Next Friend?

A. I was notified by the attorneys as soon as the decision was made that I was no longer needed in that capacity, but there was a pending appeal and they would notify me if anything was going to happen.

Q. When you received that call, did you believe that you would have any role presently in the lawsuit other than the possibility of an appeal?

A. At that time, no.

Q. Who do you represent currently?

A. Dennis M. and Denise R. I sometimes get the initials mixed up, brother and sister.

Q. Did you know Dennis and Denise before the lawsuit was filed?
A. No, I did not.
Q. Did you know Ricky, Daniel or Thomas before the lawsuit was filed?
A. No, I didn't.
Q. Had you met Ricky, Daniel and Thomas?
A. Yes, I did.
Actually, I do believe I met them before the lawsuit was filed. The suit was filed in August of '99. I believe I met them before that, so yes, I did.
Q. Do you remember how long before?
A. Month, I believe it was July that I met them.
Q. Did you only meet them that one time or did you meet them on other occasions?
A. That was the only time I met with them.
Q. Did you meet any of their

family members?

A. I met their mother.

Q. Did you have any phone conversations with those children?

A. No, I didn't.

Q. Did you exchange any letters with them?

A. No.

Q. When was the first time you recall hearing about this litigation?

A. Must have been about a month -- I believe it was in June of '99.

Q. How did you hear about it?

A. One of the attorneys for the plaintiffs approached me at that time.

Q. Do you know why you were approached?

A. Well, she explained to me --

MR. THOMPSON: I'm going to instruct the witness just to refrain from discussing attorney/client privileged conversations. You may answer.

BY MS. KOTZKER:

A. I don't recall.
Q. Have you read the complaint since then?
A. I have reviewed it. I haven't, you know, read it word-for-word since then. I've gone over it, yes.
Q. Do you recall which portions you reviewed?
A. I went over the sections that were more, that were pertaining more to the children which I am now, you know, now representing.
Q. Dennis and Denise?
A. Yes.
Q. When did you do that?
A. Oh, several times over the last few weeks.
Q. When were you approached about becoming a Next Friend for Dennis and Denise?
A. When was that? I went to see them on the 14th, so it was -- it must have been right after their Next Friend, you know, whenever their Next

Friend became unavailable. It was shortly after that. I really don't recall exactly when.

Q. Couple of weeks?

A. Before I went to see them? That's probably about right, yes.

Q. Who approached you to be their Next Friend?

A. I'm trying to recall whether it was Eric or Carmela. I think it was Ms. Cannistraci again.

Q. Was that through a phone call or an in-person meeting?

A. That was through a phone call.

Q. Did you agree during that phone call to be their Next Friend?

A. Yes, I believe I did. I certainly said I was open to it. I wanted to hear more, and I think I did agree.

Q. Did you receive any additional information about Dennis and Denise as you requested?

A. Yes, I did.
Q. When did you receive such information?
A. I received -- when did I receive? I received the amended complaint very shortly after. You know, it was probably the next day. I think I got it in overnight mail, yes, directly thereafter.
Q. Did you receive any other information?
A. I received the interrogatories.
Q. Did you ask to receive any additional information?
A. No.
Q. Did you receive any additional information?
A. Well, we went down to visit them, and I certainly received information during the visit and in discussions with attorneys.
Q. I meant written, any further written information?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

COPY

- - -

CHARLIE and NADINE H, et al. : CIVIL ACTION

V.

CHRISTINE TODD WHITMAN, et al. : NO. 99-3678 (GEB)

- - -

October 12, 2000

- - -

Oral deposition of ROSANNE MARAZITI, held in the Law Offices of Lowenstein Sandler, P.C., 65 Livingston Avenue, Roseland, New Jersey 07068, commencing at 9:15 a.m., on the above date, before Jeffry Desnick, a Professional Reporter and a Notary Public of the State of New Jersey

- - -

ESQUIRE DEPOSITION SERVICES

1880 John F. Kennedy Boulevard

15th Floor

Philadelphia, Pennsylvania 19103

(215) 988-9191

number of answers. If at any time you don't understand a question, please feel free to stop me and ask to repeat the question or ask it in a different way.
If at any time you need to take a short break, just let me know and I will be able to accommodate you.
A. Okay.
Q. Please state you current address?
A. 50 Inwood, I-N-W-O-O-D, Road Chatham, C-H-A-T-H-A-M, New Jersey 07928.
Q. Where is your current place of employment?
A. Saint Barnabas Medical Center, Old Short Hills Road, Livingston, New Jersey.
Q. How long have you been working there?
A. 1992.
Q. Are you currently providing legal services?
A. I do.
Q. Where do you do that?

A. The firm is Rosanne Maraziti, Attorney At Law, solo practitioner. I work out of my home, 50 Inwood Road, Chatham, New Jersey.

Q. What types of cases do you handle?

A. I have a general practice. It is mostly small matters, because I work full-time as an operating room nurse at Saint Barnabas. I can't tell my boss I won't be there two weeks because of a trial.

So it's real estate matters, closings, municipal court work, wills, probate, disputes between neighbors, things like that.

Q. Do you handle any matters related to services for children?

A. I did from 1986 to 1990, but I no longer do.

Q. In what capacity were you handling these matters at that time?

A. I was an Assistant Deputy Public Advocate for the State of New

Jersey.

Q. What did you do?

A. I represented grown-ups and children in their commitment hearings and in special medical guardianships and if they had allegations of abuse or neglect.

Q. Is that what you did full-time?

A. That is correct.

Q. Have you ever served as a next friend in a lawsuit before?

A. Never.

Q. Have you ever been involved in a lawsuit before personally?

A. I was a plaintiff in a class action years ago when they had an ad on the TV, anybody who used the IUD Adalcon Shield. So I filled out my little postcard and received $725 in settlement for that.

A tenant sued me for a return of a deposit and I counterclaimed and we settled for half the amount. They sued me for $2000 and I counterclaimed

represented myself -- discussed it before our case was actually called for a trial, we settled.

Q. Ms. Maraziti, who do you represent in this lawsuit?

A. I represent Ricardo.

Q. Did you know Ricardo before the suit was filed?

A. I knew Ricardo -- I believe the suit -- the complaint was filed in August of 1999, if I remember correctly, and I believe I met him in July, July 7, 1999.

Q. How did you meet him?

A. I met him through Eric Thompson of Children's Rights. We went down to Ranch Hope, Burrlington, Southwest, New Jersey. I met him there. He was in a residential facility.

Q. How did you come in contact with Eric Thompson?

A. A former colleague and friend of mine, Carol Myers, was Assistant Deputy Public Advocate at the

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

| | |
|---|---|
| CHARLIE and NADINE H., et al., Plaintiffs, vs. CHRISTINE TODD WHITMAN, et al., Defendants. | : CIVIL ACTION : NO. 99-3678 (GEB) |

- - -

October 16, 2000

- - -

Oral deposition of SUSAN R. DARGAY, ESQUIRE held at ISSUES MANAGEMENT INC., 101 Poor Farm Road, Princeton, New Jersey 08540 at 1:45 p.m. on the above date, before Sandra B. Hutchison, a Professional Court Reporter, Notary Public for the State of New Jersey and Commissioner of Deeds in the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
90 Woodbridge Center Drive
Suite 520
Woodbridge, New Jersey 07095
(800) 247-8366

transcript.

A. I understand.

Q. Also, if at any time you don't understand a question that I've asked, please let me know. And if at any time you need to take a short break, please let me know and we will be able to accommodate that.

A. I understand.

Q. Do you have any questions at this time?

A. None.

Q. Please state your current address?

A. My home address?

Q. Yes.

A. 333 Oliver Street, Bordentown -- that's one word -- New Jersey 08505.

Q. What is your present occupation?

A. I'm an attorney.

Q. By whom are you employed?

A. Myself.

Q. What type of cases do you handle?
A. Family law.
Q. Would you please provide some examples of cases that you handle?
A. Divorce, custody, child support, domestic violence, adoption, annulment. I'm sure I'm missing something.
Q. How long have you been self-employed?
A. About seven-and-a-half years.
Q. Are you involved in any organizations related to services for children?
A. Yes. I'm vice president of the board of directors of an organization called Crossroads Programs, Inc. They're in Lumberton now -- they just moved -- they were in Mount Holly. Actually, I'm acting president right now because the president is away.
Q. What do you do with that organization?
A. On the board of directors, we

Q. When was the first time you recall hearing about this lawsuit?

A. I don't know exactly. I think it was sometime in 1999, I think. I know that I went to see the children involved in August of 1999, so it was sometime prior to that. I don't think the complaint had been filed as yet at that point.

Q. How did you first hear about the litigation?

A. I was contacted by Shirin Nothenberg from Children's Rights. We played phone tag for a while but when we finally talked, she told me about the suit and how she had gotten my name.

Q. How had she gotten your name?

MR. THOMPSON: Objection.

Q. Did you know Ms. Nothenberg before this lawsuit?

A. No.

Q. Have you met her?

A. Yes.

Q. How many times have you met

approximately a year ago or slightly over a year ago and you met the pre-adoptive family this past weekend?

A. Yes, and the children have been there since April, I think, April 19. And I have information about the interim family.

Q. What information do you have?

A. That was a short-term placement with a very -- with an elderly -- I was going to say elderly -- an older couple. And there were six -- with these two kids, there were six foster children in the household.

Q. Did you speak to the children while they were there?

A. No.

Q. And you've only met the children on those two occasions that you've discussed today?

A. Yes, but I've kept tabs on them. See, I don't think it's really good, you know, for me to come in and have them get attached to me if I'm not going to be a

permanent part of their life. I think that's counterproductive in all kinds of cases, not just this one. It's another person coming in and being a friend and getting to know them and, you know, bonding with them and then disappearing again. I don't think that's fair.

Q. Did you explain to them that you were their next friend in this lawsuit?

A. I didn't, but their foster mother had -- I mean, to the extent one of them is two-and-a-half so she's blissfully oblivious to my role. But the other child understands that to the extent that she at five-and-a-half can understand that.

Q. How were you able to tell that her foster mother had explained that?

A. Because she told me what she had told the child and, you know, the child was there and the child was nodding her head. And, you know, the child is actually pretty excited, because part of her understanding is that as a result of the suit, her case, at least if she sees it as

A. The only personal knowledge that I have is my having personally observed both the demeanor and the physical problems of both children when I saw them in August.

The younger child had a clearly flattened part of her skull that is much improved and you can hardly see now because her hair is covering it, but at that point it was much more pronounced. And both children were significantly delayed in the switching process. That's why it's so exciting now that they've been declassified. These people, their pre-adoptive parents, have worked very hard with them.

Q. Did you meet these children before or after you reviewed the complaint?

A. I believe after. It was either after or right around the same time, I'm not sure. I really don't remember when the complaint was filed.

You asked me before if I had had any conversations with attorneys in

reference to this. The law guardian, does that count?

Q. I was actually going to ask you about the law guardian.

A. Okay, because, I mean, I've never met him. I did speak with him on the phone and he was actually supposed to go with us this past Saturday but he cancelled out Friday at the last minute, left a message and didn't say why he wasn't going, just that he wasn't going.

Q. That he wasn't going with you this weekend?

A. Yes.

Q. When was the first time you spoke to him?

A. About two weeks before that. He called and I gave him directions and we were talking about the meeting and meeting the kids and about the case itself.

Q. Did he explain to you what his role is in regards to representation of Dolores and Anna?

A. He didn't at the time, but I

kind of understand his role or I understood his role.

Q. What is his role?

A. His role, as I understand it, is he's the guardian basically for the individual-named plaintiffs in their respective cases, their separate cases in the system.

Q. Does he continue to represent them?

A. As their cases are still active, I believe he does. At least he should.

Q. Did he express to you whether or not he was willing to represent them in this lawsuit?

A. We didn't really talk about it.

Q. Do you know if he is?

A. I don't know.

Q. Going back to the allegations of the complaint for a moment, did you have an opportunity to determine whether or not the allegations in the complaint were true,

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

CHARLIE and NADINE H, :
et al. : CIVIL ACTION
:
V. :
:
CHRISTINE TODD :
WHITMAN, et al. : NO. 99-3678 (GEB)

- - -

October 13, 2000

- - -

Oral deposition of REV. DR. WARREN H. BOUTON, held in the Law Offices of Lowenstein Sandler, P.C., 65 Livingston Avenue, Roseland, New Jersey 07068, commencing at 9:35 a.m., on the above date, before Jeffry Desnick, a Professional Reporter and a Notary Public of the State of New Jersey

- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

address?
A. 79 Addison Drive in Short Hills, New Jersey.
Q. Are you married?
A. Yes, I am.
Q. Do you have any children?
A. Yes, I do.
Q. How many children do you have?
A. Two.
Q. How old are they?
A. My oldest, Sara, will be turning 19 on October 26th. My son Ben is 14.
Q. What is your present occupation?
A. I am the senior minister of Community Congregational Church in Short Hills, New Jersey, a clergy.
Q. How long have you been the senior minister of that church?
A. Five years.
Q. Are you currently involved in any organization that provides

A. I don't believe so.
Q. After speaking with Mr. Gracer what did you understand your role to be as a next friend?
A. To ensure that Kyle was appropriately represented by the lawsuit and if a resolution is forthcoming, that it be in his best interests.
Q. What did you understand appropriately represented to mean?
A. That there was someone who would be willing to look at his situation and make sure that in all fairness that his needs were appropriately met. His needs were met.
Q. Did you understand at that time what his needs were?
A. Without receiving all the information from the complaint at that time and the Interrogatories, no.
Q. You didn't know Kyle J before this lawsuit, did you?
A. No.
Q. You never represented any