UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SAM and TONY M., by Next Friend
Gregory C. Elliott; CAESAR S., by
Next Friend Kathleen J. Collins;
DAVID T., by Next Friend Mary
Melvin; BRIANA, ALEXIS, CLARE and
DEANNA H., by Next Friend Gregory
C. Elliott; and DANNY and MICHAEL B.,
by Next Friend Gregory C. Elliott;
for themselves and those similarly
situated,

     Plaintiffs,

v.                             C.A. No. 07-241L

DONALD L. CARCIERI, in his official
capacity as Governor of the State of
Rhode Island; JANE HAYWARD, in her
official capacity as Secretary of
the Executive Office of Health &
Human Services; and PATRICIA
MARTINEZ, in her official capacity
as Director of the Department of
Children, Youth and Families,

     Defendants.

## DECISION AND ORDER

Ronald R. Lagueux, Senior District Judge.

     This matter is before the Court on Defendants' Motion to
Dismiss Plaintiffs' Amended Complaint, based on Rule 12(b)(1) of
the Federal Rules of Civil Procedure.  Plaintiffs are ten minor
children who are (or were) in the legal custody of the State of
Rhode Island's child welfare agency, the Department of Children,
Youth and Families (hereinafter "DCYF").  The named plaintiffs,
suing by alleged "Next Friends," seek to be denominated as a
class, pursuant to Rule 23 of the Federal Rules of Civil

Procedure, in order to bring a class action lawsuit on behalf of all children who are or will be in DCYF custody as a result of a report of abuse or neglect.  The number of children currently in DCYF custody is approximately 3,000.

The architect of this lawsuit is the State's Child Advocate, who purports to represent these minor plaintiffs and has solicited the Next Friends to serve as their representatives. The Child Advocate is a statutorily-created position, whose duties are enumerated at Rhode Island Gen. Laws § 42-73-7. Defendants in the suit are the Governor of the State of Rhode Island, the head of the Office of Health and Human Services, and the director of DCYF, all named in their official capacities.

Plaintiffs allege that the state's child welfare system is underfunded, understaffed and mismanaged.  As a consequence, they allege that, while in DCYF custody, the minor Plaintiffs have been harmed and will continue to be harmed to such an extent that their constitutional and statutory rights are violated.  Because the minor Plaintiffs are within the jurisdiction of the Family Court, where guardians have been appointed to represent their interests, the Child Advocate and the Next Friends who have brought this lawsuit have no authority or standing to proceed in this case.  Therefore, for the reasons explained at greater length below, this case must be dismissed.

*Causes of action*

-2-

Plaintiffs' Complaint sets forth six causes of action. Count I alleges that, when Defendants take children into government custody because of abuse or neglect, they assume an affirmative duty to provide and care for the children and protect the children from further harm. Defendants' failure to exercise reasonable professional judgment in caring for children in their custody amounts to deliberate indifference and constitutes a deprivation of the children's substantive due process rights under the Fourteenth Amendment, such as, *inter alia*, the right to safe and secure foster placements and the right to adequate medical, educational and psychiatric services.

In Count II, Plaintiffs allege that Defendants' acts of removing them from their homes and placing them in foster facilities that Defendants know or should know pose an imminent risk of further harm to them amount to deliberate indifference to their substantive due process rights in violation of 42 U.S.C. § 1983. Likewise, when the children are subsequently returned to their homes, even when Defendants know, or should know, that the home environment is still not safe, the children are at continuing risk of harm in violation of their rights. Count III asserts that Defendants' policy and practice of deliberate indifference to Plaintiffs' welfare comprises a deprivation of the liberty interests, privacy interests and associational family relationship rights guaranteed by the First, Ninth and Fourteenth

Amendments.

In the fourth cause of action, Plaintiffs allege that
Defendants' actions constitute violations of the federal Adoption
Assistance Act, 42 U.S.C. §§ 621-629i, 670-679b, and the
regulations promulgated in connection with those sections, 45
C.F.R. §§ 1355-57.  These statutory sections provide for federal
financial support for child and family welfare services at the
state level, in conjunction with federal oversight of those
services.  According to Plaintiffs, Defendants have failed to
fulfill federal mandates, such as:

> ...the right to placement in foster homes or
> other settings that conform to reasonable
> professional standards and are subject to a
> uniformly applied set of standards; the right
> to have a petition to terminate parental
> rights filed, or have a compelling reason
> documented why such a petition has not been
> filed, in accordance with specified,
> statutory standards and time frames; the
> right of children whose permanency goal is
> adoption to planning and services to obtain
> permanent placement, including documentation
> of the steps taken to secure permanency; the
> right to services to facilitate the child's
> return to his family home or permanent
> placement of the child...

Amended Complaint for Injunctive and Declaratory Relief and
Request for Class Action, p. 78, ¶ 231.

In the fifth cause of action, Plaintiffs aver that the
Defendants have deprived them of federal and state-created
liberty and property rights in violation of procedural due

process rights provided by the Constitution.   The federal-law
entitlements stem from the Adoption Assistance Act, as outlined
in Count IV.   The state-law entitlements are conferred by Rhode
Island General Laws §§ 42-72 et seq., and §§ 42-72.9 et seq., and
include, for example, the right to have DCYF "license, approve,
monitor, and evaluate all residential and non-residential child
care institutions, group homes, foster homes, and programs...;"
R.I.G.L. § 42-72-5 (b) (7), and the right for the child to have
his or her "health and safety ... be the paramount concern in
making reasonable efforts toward reunification with the
parent(s)." R.I.G.L. § 42-72-10 (b).

In the sixth and final cause of action, Plaintiffs allege
that Defendants have breached contracts made with the federal
government, to which Plaintiffs are third-party beneficiaries.
These contracts are State Plans prepared for and approved by the
United States Department of Health and Human Services, pursuant
to the Social Security Act.   Under the terms of the State Plans,
the State of Rhode Island agrees to provide child welfare
services in compliance with federal regulations, in order to
receive federal funds.

In their prayer for relief, Plaintiffs seek a declaration
that Defendants' actions violate the constitutional rights of the
class; a permanent injunction against further actions that
violate the rights of the class; remedial relief to ensure

-5-

Defendants' prospective compliance with their legal obligations
to the class; and costs and expenses of the lawsuit.

### The named Plaintiffs

The ten children named in this lawsuit are identified by
pseudonyms only.  They come from five families, and range in age
from two to sixteen years old, as of this writing.  Their stories
are heart wrenching and compelling.  As related in the Complaint,
these children have been subjected to neglect, physical and
sexual abuse, poverty and instability.  They have been exposed to
drug abuse, drug dealing, alcohol abuse, mental illness and
domestic violence.  Some come from families where these
conditions have persisted over generations, with children with
active DCYF files giving birth to babies who immediately are DCYF
'cases.'  Unfortunately, DCYF custody seldom seems to have
provided a safe haven for these children, who have frequently
been placed in the homes of relatives, where they have fared
little better than before.  Moreover, their foster placements
have been temporary, as the children are soon reunited with their
parents, pursuant to DCYF policy, where they are sometimes abused
or neglected again, only to be relocated at another, different
foster facility.  Culling from the detailed accounts provided by
Plaintiffs (as appropriate in reviewing a motion to dismiss), as
well as documents from the Rhode Island Family Court (of which
this Court takes judicial notice), the Court will briefly

summarize the case histories of the named Plaintiffs, including
the most recent information provided to the Court.

### Briana H., Alexis H., Clare H. and Deanna H.

Since this lawsuit was filed, Briana, Alexis and Clare were
legally adopted on September 24, 2007, rendering their cases
moot.  Only Deanna, her mother's ninth child, born in October
2006, remains in DCYF custody.  A so-called "cocaine baby,"
Deanna was taken into DCYF custody at birth, and placed with a
foster family.  DCYF filed a petition to terminate the parents'
rights as to all four girls in January 2007, after years of abuse
and neglect.  These petitions were ultimately granted by the
Family Court as to the older girls, resulting in their adoption.
However, the Family Court dismissed the petition filed on behalf
of Deanna on February 27, 2007.  During the proceedings in Family
Court, Deanna has been represented by a guardian *ad litem*,
Attorney John O'Brien from the Court-Appointed Special Advocate
program, known as "CASA."

On June 26, 2007, the Family Court approved DCYF's goal of
reuniting Deanna with her parents, but found her return home at
that time was not safe.  The Family Court determined further that
DCYF had made reasonable efforts towards reuniting Deanna with
her mother.  Later that summer, the Family Court made a finding
of neglect as to Deanna's mother, rescheduling the hearing on
their reunification until October 2007.  Neither Deanna's mother

-7-

or father have had their parental rights terminated.   During the course of these proceedings, it does not appear that either the present Next Friends or the Child Advocate have made any attempt to intervene in Deanna's case to aid the Family Court in arriving at a reasonable solution to her plight.

### Caesar S.

Caesar was born in 2001 to a 15-year-old mother, Rhonda, who herself had been in DCYF custody, as had her mother, Caesar's grandmother, when she was a little girl.   Rhonda's mother's house had been the target of 61 DCYF investigations since 1981. Caesar's father had a long criminal history at the time of Caesar's birth, including cocaine possession and possession of a stolen car.

In 2002, Rhonda and Caesar left her mother's house and moved to a rooming house with Caesar's father and her two sisters, both of whom had histories of drug abuse.   After it was reported that she frequently left Caesar unattended in the rooming house, DCYF filed an emergency motion to take him into protective custody, which was granted by the Family Court. Caesar stayed in an emergency shelter for two days, and then was placed in a foster home for one month.

In January 2003, Caesar was placed with his Aunt Laura, where he stayed for a year and a half.   Because of reports that she was using drugs, and her own complaints that she could not

-8-

care for Caesar, he was moved to the home of his great-aunt in September 2004. Nine days later, after receiving a report that the great-aunt was selling marijuana, Caesar was placed in another foster home for one month.

Throughout this time, DCYF continued to pursue the goal of reuniting Caesar with his mother. In May 2004, at a permanency hearing, the Family Court judge approved DCYF's case plan, including its goal of reunification, and determined that DCYF's efforts towards that goal had been reasonable.

In October 2004, Caesar was moved back with Aunt Laura, although he complained to his DCYF caseworker that she and her children punched and hit him. In September 2005, after a doctor determined that Caesar had been beaten with a belt with excessive force, he was removed to his paternal grandmother's house. This household had been previously rejected by DCYF as an unsuitable placement, due to the criminal records of its other inhabitants. Caesar complained of being beaten here.

In January 2005, DCYF filed its first petition to terminate his parents' rights. Between March 2005 and September 2005, the Family Court held thirteen days of hearings on the petition. In September 2005, the petition was dismissed without prejudice, and Caesar's parents waived their right to have DCYF continue to work towards their reunification with Caesar. In November 2005, DCYF changed its goal to adoption for Caesar. In August 2006, a new

-9-

petition to terminate parental rights was filed by DCYF.   During
the next several months, the Family Court held six hearings on
Caesar's case, ultimately granting the petition in June 2007.
DCYF is working with an adoption agency to find an "appropriate
adoptive resource" for Caesar.   The Family Court reviewed his
status in August 2007.   During these Family Court proceedings,
Caesar has been represented by various guardian *ad litems*, most
frequently by Attorney Joseph Palmieri.   A couple of times Caesar
was represented by Attorney Ellen Balasco of CASA, and more
recently he has been represented by Attorney Charles Greenwood.
In several of the Court's documents, it is noted that no guardian
was present to represent Caesar.   As of the time these documents
were submitted to this Court, another Family Court review was
scheduled for November 2007.   Again, nothing in the record
reflects that the Next Friends or the Child Advocate have
attempted to intervene in this case at any time.

### *David T.*

Born in 1993, David has been in DCYF custody since he was
two years old when he was removed from his mother's care because
of evidence of sexual and physical abuse.   His mother already had
six children who had been removed from her custody in
Massachusetts and Michigan.   Moreover, the Michigan Probate Court
- Juvenile Division had previously issued an order to take David
into custody.   In 1996, in Rhode Island, David was placed with a

foster mother, Mary Melvin, for approximately two years. During
this time, the Family Court granted DCYF's motion to suspend
visits between David and his mother. In November 1997, DCYF
filed a petition to terminate the parental rights of both David's
mother and father. This motion was granted by the Family Court
and, in April 1998, DCYF became David's legal guardian.

Although David and foster mother Mary Melvin had become
attached, this foster placement ended because Melvin retired from
foster parenting. During the next three months, David was moved
from shelter to shelter. In February 1999, the Family Court
approved a placement through an Interstate Compact, and he was
sent to live with an aunt in Massachusetts. Unfortunately, she
ran into problems with housing, or could not handle David, and he
was returned to Rhode Island to again live in a shelter.

At this point, David's behavior began to deteriorate
significantly. His school asked that DCYF provide him with
special services, but none were provided. Some days, DCYF did
not provide David with transportation to school and he ended up
spending the day in the shelter. Eventually, DCYF received
Family Court approval to transfer David to an institutional
facility. Then, at age six, he was hospitalized at a psychiatric
facility for five months.

From 2001 through 2003, David was housed at St. Vincent's
Home, a residential treatment facility. There he was sexually

-11-

abused by his roommate.  In October 2002, the Family Court
determined that DCYF had made reasonable efforts to finalize the
permanency goals of adoption, guardianship or "another planned
alternative living arrangement."  In 2003, he was moved to a
Massachusetts facility where he had one-on-one supervision.
During that year, he was restrained by facility staff 105 times.
Between 2001 and 2005, David met with five different DCYF
caseworkers a total of twelve times.  In 2004 and 2005, he had
only one caseworker visit per year.

In 2004, David met with adoption recruitment staff for the
first time, despite the fact that he had been registered for
adoption eight years before.  However, he was deemed to be "too
damaged for placement."  In November of 2004, the Family Court
approved DCYF's case plan, which recommended against adoption,
but determined that DCYF had not made "reasonable efforts to
finalize the permanency goal of another planned alternative
living arrangement."  This permanency plan was approved again in
November 2005 by the Family Court, which, on this occasion, found
that DCYF had made reasonable efforts to finalize David's living
arrangements.

In January 2006, the Family court ordered an immediate
independent assessment of David and ordered his CASA advocate to
investigate placing David at a facility called Center Point.
David has been represented in the Family Court by CASA advocate

Attorney Francis J. Pickett since 1996.  In March of 2006, at age 12, David was moved to the Merrimack Center, an out-of-state residential facility, where he rooms with an 18-year-old.  Since that time, he has reportedly engaged in sexual self-mutilation, and gained fifty pounds.  He is now considered to be suffering from bipolar disorder and mild mental retardation.  He has an older brother who has expressed interest in caring for him, but DCYF has not pursued this option.

On November 27, 2006, the Family Court again approved David's placement at the Merrimack Center.  Because the Merrimack Center has no educational component, the Family Court ordered DCYF to continue to investigate other placements.  In June 2007, David was moved to another facility.  Another review in Family Court was scheduled for November 2007.  The Child Advocate and the Next Friends have played no role in the Family Court proceedings on behalf of David.

### Sam and Tony M.

In May 1999, Sam, four, and his infant brother Tony were taken into DCYF protective custody after their mother attempted suicide.  Their mother had previously been reported to DCYF for neglecting the children during the previous winter, but the children were left in the home.  At this time they were placed with a family friend, who burned one of the boys with cigarettes.  In June 1999, Sam told his DCYF caseworker that his father had

abused him sexually.  It was recommended that Sam be evaluated, but, before this could take place, his father rescinded his consent to the evaluation in October 1999.

In January of 2000, the boys were returned to their parents. The following month, DCYF received a report that the boys were covered with bruises and that their father was drinking and had beaten their mother in their presence.  It was also reported that the father had threatened to kill Sam and his mother. Nonetheless, DCYF continued to monitor the home and the children remained there.  Around this time, the father left the home and the mother remarried.  In June 2000, the Family Court suspended visits between the boys and their father.

In December 2000, the Family Court judge determined that the mother was doing well.  Regular Family Court reviews ensued, and in November 2001, Family Court closed its file and awarded sole custody of the children to their mother.

In July 2002, DCYF received a report that the boys' stepfather had brutally beaten Tony and sexually abused him, while on home confinement on a charge of beating Tony's mother. Initially, the boys remained at home, with a Family Court order preventing the stepfather from being in the boys' presence. Plaintiffs report that the boys were moved to their grandparents' home.  In January 2003, DCYF investigated a report that their grandfather hit one of the boys with his cane.  However, it

-14-

appears from court records that the boys' Family Court case was again closed in January 2003.

However, in February 2003, Sam and his mother were in a car accident, due to her drunk driving. The boys were again taken into protective custody and placed in foster care. After one of the boys started to act out in a sexual manner, the foster parents requested that he be evaluated. The evaluation was not scheduled for six months, during which time the boys were moved to another foster home. Also during this time, Tony threatened his mother with a knife and spent some time at Butler Hospital.

In October 2003, the boys were returned to their mother's care. This situation lasted until May 2004, when the boys were removed from the mother because of her substance abuse and domestic violence. They were placed in a group facility. That month, the Family Court determined that DCYF's goal of reunification for the family was still appropriate, but that it was not yet safe to return the boys to their mother.

In February 2005, the Family Court ordered DCYF to file a petition to terminate the parents' rights and, simultaneously, to provide services to the mother that could help achieve the continued goal of reunification. In addition, the Family Court ordered that a therapist determine whether visits between the mother and the children should take place. The petition to terminate parental rights was filed in October 2005. In November

2005, the boys were moved to a residential treatment facility.
The following month, the boys, by now aged seven and ten, were
moved to separate out-of-state psychiatric hospitals.   In
February 2006, their father's parental rights were terminated.

In July 2006, the Family Court withdrew the petition to
involuntarily terminate parental rights as to the mother, when
she agreed to consent to DCYF's revised goal of adoption or
guardianship for the boys.   The Family Court determined further
that DCYF had made reasonable efforts to finalize adoption or
guardianship.   At that time, the boys began to have overnight
visits with their maternal grandparents.

In October 2006, the hospital's staff noted that Tony's
roommates tried to involve him in sexual activity; however, he
was not subsequently separated from these roommates. In January
2007, it was noted in Tony's file that he was molested by his
roommate. Again, because of over-crowding at the facility, Tony's
room assignment was not changed.   The same month, the Family
Court found that DCYF was making appropriate efforts to find an
adoptive home or guardianship for the boys, including possibly
with the grandparents.   As of this writing, Sam and Tony remain
institutionalized and separated.   Their mother's parental rights
have not been terminated.   Both brothers have been represented in
Family Court by CASA attorney Jennifer Gates.   More recently,
Family Court documents indicate that they have been represented

by Attorney Jennifer Kelly.[1]   The next Family Court permanency hearing was scheduled for January 2008.   Neither the Child Advocate or the Next Friends have been involved in these Family Court proceedings.

### Danny and Michael B.

In April 2004, when the boys were just toddlers aged two and three, they were found wandering outside on their own at 6:00 a.m.   This was the second report of neglect that DCYF had received within a few-month period.   At this time, DCYF left the boys at home, and instructed their mother to get substance abuse counseling.   In January 2005, the boys were again found outside unsupervised.   The following month, DCYF visited the home and found the mother drunk, feces on the bedroom floor, and no beds. In March 2005, the boys were again found wandering in the streets.

In April 2005, the Family Court ordered that the boys be taken into protective custody.   They were removed from their mother and placed with their maternal great-grandmother, although no safety or background check had been conducted of her home. Because of their great-grandmother's ill health, the boys were soon moved to separate foster homes.   As of July 2005, Danny was with a foster mother who had a DCYF history of abuse complaints.

---

[1] The Court recognizes that this may be the same person, but has no way to determine this.

Danny was later sexually assaulted in this foster home. Michael
was back with great-grandmother, who by this time had received a
foster care license. However, she complained that she had no
medical card to enable her to seek treatment for Michael, who,
along with his brother, was suffering from untreated mental
health problems. In the meantime, the boys' mother was not
cooperating with her drug treatment program; she was arrested
twice and became homeless in August 2005.

In September 2005, the Family Court conducted a trial on
DCYF's neglect petition. Because their father failed to show up
at the trial and their mother admitted that she had neglected
them, DCYF took legal custody of the boys.

In December 2005, the Family Court directed DCYF to file a
petition to terminate the mother's rights unless they were able
to make progress towards reunification by March. In March 2006,
the Family Court conducted a permanency hearing and found that
the goal of reunification remained appropriate and that DCYF had
made reasonable efforts towards that goal. In June, DCYF filed
the petition to terminate the parents' rights, citing both
parents' chronic substance abuse problems.

In July 2006, Danny, now age five, was sexually assaulted by
his foster mother's fifteen-year old grandson. Danny was moved
to another temporary foster home, then moved to his great-
grandmother's with Michael. A month later, Danny was removed

from his great-grandmother's because he and his brother were
"exhibiting sexualized behaviors." Danny was sent to a group
home in Newport or Middletown. During the fall of 2006, the
Family Court conducted a multi-day trial on the termination of
parental rights petition, which was granted in November, after
the parents failed to appear throughout. In March 2007, at a
permanency hearing, the Family Court approved DCYF's plan of
adoption and found that DCYF had been making reasonable efforts
towards finding an adoptive home for both boys. The Family Court
again reviewed the boys' status on September 12, 2007. Both boys
are represented by Attorney Laurel Ferrelli in Family Court.

Currently, Danny remains at the group home, where he is
being treated for acute mental health problems. Michael remains
with his great-grandmother, although she cannot care for him
permanently because of her age and ill health. Another
permanency hearing was scheduled for March 2008.

As with the other Named Plaintiffs, the Child Advocate or
the Next Friends have made no attempt to intervene in the Family
Court proceedings on behalf of Danny or Michael. The Child
Advocate's pattern of conduct of boycotting the Family Court in
order to pursue another agenda can only be viewed as an
abdication of her statutory responsibilities.

### *Next Friends*

Rounding out the cast of characters participating in this

lawsuit are the proposed Next Friends.  Pursuant to Rule 17(c) of the Federal Rules of Civil Procedure, a minor may only sue or defend a lawsuit when represented by a next friend or guardian *ad litem*.  In this case, three adults seek to serve as Next Friends for the named Plaintiffs.  Pursuant to Rule 17(c)(2), they must be appointed by this Court.  In order to evaluate the Next Friends's suitability for this sensitive task, the Court held hearings on January 22 and 23, 2008.  All three Next Friends appeared and testified as to their relationships with the named Plaintiffs and their motivation in volunteering to represent them in this lawsuit.

### i) Mary Melvin

Mary Melvin, who was a foster mother for David T. from 1996 to 1998, seeks to serve as his Next Friend.  Melvin served as a foster parent for twenty years, caring for at least 25 children.  She was named Rhode Island Foster Mother of the Year in 1992 and 1997.  She worked for many years at a nursing home for elderly and handicapped people in Providence, and currently works as a Senior Companion for the Cranston, Rhode Island, Department of Elderly Affairs.  Melvin stopped working as a foster mother because of an illness in her own family.

She testified that she thought that, when David left her home, he was to be adopted by a family member.  However, that fell through, and he ended up in a shelter.  After David moved

from her house in 1998, Melvin continued to see him and visit with him from time to time during that year. She recalls taking him to church, doctors' appointments and counseling sessions. Eventually, they fell out of touch because he was moved around and she was unable to get information about his whereabouts from DCYF.

During cross examination by Rhode Island's assistant attorney general, Melvin revealed that she has not seen David for ten years. Moreover, she does not know where he has been since 1998 or where he is now. She is unaware of what, if any, services or education have been provided for David since 1998. She was also unaware that David is represented in Family Court by a CASA advocate. Melvin explained that she had never had any contact with the CASA advocate when David was in her care.

### ii) *Kathleen J. Collins*

Kathleen J. Collins seeks to appear as Next Friend for Caesar S. Collins has a master's degree in school psychology from the University of Rhode Island, and has worked as a school psychologist for the Providence School Department for seventeen years. She is currently the school psychologist for two Providence elementary schools.

During the school year 2006-2007, Collins was the psychologist for Caesar's kindergarten class, where she met with him three or four times a week. She has not seen him since June

2007, because he moved over the summer and did not return to her school. She attempted to find out where he was but was unable to get information about him.

On cross examination, Collins stated that she has had no interaction with Family Court and does not know the guardian *ad litem* who represents Caesar there. Although she has spoken with a DCYF staff person, she has not seen Caesar's DCYF or Family Court records and is unaware of his current situation.

### iii) *Gregory C. Elliott*

The remaining eight children (of whom three are no longer in DCYF custody, having been adopted) would be represented by Gregory Elliott, associate professor of sociology at Brown University. Elliott has taught at Brown for 24 years. He is a social psychologist, and has studied the issue of child maltreatment. He is currently writing a book on adolescents.

Elliott testified that he has never met any of the children, but he agreed to represent them because of what he knows about the state's child welfare system and its shortcomings, and "the dire circumstances" in which it places children. Elliott has reviewed the allegations in the Amended Complaint, but he has not seen the children's medical records, educational records or DCYF records.

### Capacity or standing of these Next Friends

This Court has many concerns about the capacity of the Next

Friends to sue on behalf the Named Plaintiffs.  One area of concern results from the minimal, to non-existent, relationships that exist between the proposed Next Friends and the children they seek to represent.   The Court is also reluctant to appoint these Next Friends because the Named Plaintiffs are all involved in active, ongoing proceedings in the Rhode Island Family Court. Moreover, the Family Court has already appointed representatives for the Named Plaintiffs, which representatives are currently serving as Special Advocates or guardians *ad litem* in those proceedings.

*"Duly appointed representative"*

The Federal Rules of Civil Procedure Rule 17(c), as noted above, provides for the representation of a minor or incompetent person as follows:

> (1) With a Representative.  The following representatives may sue or defend on behalf of a minor or an incompetent person:
> (A) a general guardian;
> (B) a committee;
> (C) a conservator;
> (D) a like fiduciary.
>
> (2) Without a Representative.  A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem.  The court must appoint a guardian ad litem - or issue another appropriate order - to protect a minor or incompetent person who is unrepresented in an action.

It cannot be said that our seven Named Plaintiffs do not

have "a duly appointed representative," because just such a representative has been designated by the Family Court - the guardian *ad litem* or CASA advocate.  The advocates for these seven children have been appointed by the Family Court and are independent of Defendants.  They are attorneys and members of the Rhode Island Bar.  Furthermore, they have, for the most part, consistently attended the proceedings in Family Court on behalf of their clients.  The Family Court records indicate that from time to time substitute attorneys enter appearances on behalf of the children, and from time to time, no attorney is present or, at least, their presence is not noted on the forms that memorialize the proceedings.

This Court's reservations about the appointment of these particular Next Friends are corroborated by the Seventh Circuit appellate court in T.W. by Enk v. Brophy, 124 F.3d 893 (7th Cir. 1997).  In that case, Enk, a children's rights advocate, sued various officials from Milwaukee's social service agency, alleging that the agency had conspired, for racist reasons, to transfer two black children from their white foster home to the home of their black aunt.  A lawyer, who followed the custody battle between the foster parents and the aunt, asked Enk to serve as Next Friend in the $120 million lawsuit, which named as defendants both the children's aunt, who had been designated as their custodian, and the guardian *ad litem* who had represented

-24-

their interests in the custody proceedings.  After the district
court held that Enk was not a proper next friend and dismissed
the suit with prejudice, Chief Judge Posner of the appellate
court held that,

> As a general rule, a federal court cannot
> appoint a guardian ad litem in an action in
> which the infant or incompetent already is
> represented by someone who is considered
> appropriate under the law of the forum state.
> It is a sensible general rule because the
> management of the affairs of infants, like
> other matters relating to domestic relations,
> is the primary responsibility of the states
> rather than of the federal government.

124 F.3d at 896 (internal quotations and citations omitted).

Judge Posner went on to discuss the issue of standing.

> The question who shall represent the children
> because of their incapacity to sue on their
> own is not a separate issue of standing.
> Even allowing a complete stranger to bring
> suit in their name as their next friend
> because they cannot sue on their own behalf
> would not violate Article III.  But it might
> well offend the policy behind the requirement
> of standing, which is to confine the right to
> initiate and control federal court litigation
> to persons who have a concrete stake, rather
> than merely an ideological interest -
> passionate and motivating as such interests
> can be - in the litigation.

124 F.3d at 897.

Judge Posner continues, voicing his suspicion that Enk is
using the children as "pawns" to make "an end run" around the
state's family court in order to get to federal court.  124 F.3d

-25-

at 897. He suggests that this could be avoided if the children's general representative sought appointment from the family court to represent the children in the federal lawsuit: "If the state court has the power under state law to appoint a guardian ad litem in a federal suit but decides not to do so because it is satisfied that the children are being adequately represented by their aunt or by the existing guardian ad litem, that judgment would bind the federal district court as a matter of res judicata." 124 F.3d at 897.

In a similar vein, in <u>Garrick v. Weaver</u>, 888 F.2d 687 (10th Cir. 1989), the Tenth Circuit held that an injured child's mother could not serve as next friend to the child in a fee dispute that followed litigation in which the child had been represented by a court-appointed guardian *ad litem*. The Court cited the language of Rule 17(c) which states that a lawsuit may be brought on behalf of a minor by a representative, "or other like fiduciary," or may be brought by a next friend for a child "who does not have a duly appointed representative...," and stated,

> The narrow question before this court is
> whether a guardian ad litem appointed
> pursuant to Rule 17(c) is an "other like
> fiduciary" that would bar Garrick from
> proceeding as next friend for her children on
> the matter for which the guardian ad litem
> was appointed. We hold that a court-
> appointed guardian ad litem is such a
> fiduciary, and that Garrick has no standing
> to raise claims on appeal on behalf of her
> children.

888 F.2d at 693.   The Court went on to suggest that Garrick apply

to the district court to have the guardian *ad litem* removed,

prior to pursuing the fee dispute.   <u>Id.</u> at 693.

In <u>M.K. v. Harter</u>, 716 F. Supp. 1333 (E.D. Cal. 1989), the

Court reached the similar conclusion – that the federal court

could not appoint a representative under Rule 17(c) in a civil

rights lawsuit involving the state's child welfare system because

the child was already represented by a guardian *ad litem* in state

juvenile proceedings.   716 F. Supp. at 1335.   *See also*

<u>Developmental Disabilities Advocacy Center v. Melton</u>, 689 F.2d

281 (1st Cir. 1982).

### *Whitmore v. Arkansas*

Ultimate authority for this Court's position on the Next

Friends comes from the Supreme Court's decision in <u>Whitmore v.</u>

<u>Arkansas</u>, 495 U.S. 149 (1990).   In that case, death row inmate

Simmons had previously waived his right to appeal his conviction

and sentence.   The Arkansas Supreme Court reviewed and affirmed

the trial court's ruling that Simmons was competent to make the

waiver.   Whitmore, another death row inmate, sought to intervene

in the competency determination both individually and,

alternatively, as Simmons' next friend.   The U.S. Supreme Court

rejected Whitmore's bid to serve as next friend for Simmons.   495

U.S. at 166.   The Court reviewed its criteria for Next Friend

standing: 1) inaccessibility or incompetence of the real party in

interest; 2) the Next Friend must be fully dedicated to the best interests of the real party in interest; and 3) the Next Friend must have "some significant relationship with the real party in interest." 495 U.S. at 164. The Court stated that, "The burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court." 495 U.S. at 164.

In the present case, as in <u>Whitmore</u>, the proposed Next Friends have not fulfilled their burden of convincing this Court of the "propriety" of their status, particularly as to the third prong articulated by the Supreme Court: a significant relationship with the person they seek to represent. Mary Melvin seeks to represent David T. as next friend although she has not seen him or been aware of his status or circumstances for over eleven years, since he was around six years old. Likewise, Kathleen Collins seeks to serve as Next Friend for Caesar S. She was his school psychologist for a year, and has not seen him at all for almost two years. She also testified that she knew nothing of his current status or circumstances. Gregory Elliott, who seeks to serve as Next Friend for the remaining five children, has never met any of them. He has not reviewed files from Family Court or DCYF; nor has he reviewed medical or school files for any of the children. His only knowledge of the circumstances of the children has been through his reading of the

Complaint, and his general professional knowledge of children like these children.

The Court recognizes the significant burden that participating in a federal lawsuit would impose on these very young children, including the likely possibility that they would have to testify in open court about how they have been abused by their own family members. Given the rigors of a federal trial, the Court is extremely hesitant to determine that the proposed Next Friends are sufficiently close and connected to the children to make the decision to prosecute the lawsuit on their behalf.

*Rhode Island law*

In addition to these concerns, the Court also notes that all the Named Plaintiffs are already represented by attorneys from the Court-Appointed Special Advocates program, who have been duly appointed by the Rhode Island Family Court. Their representation of the children is continuing, as all the children are subject to the ongoing jurisdiction of the Family Court. The Rhode Island Supreme Court has asserted that matters of parental fitness and child custody are the proper jurisdiction of the Family Court.

> Only Family Court has the statutory power to make such findings of parental unfitness. Moreover, the Family Court possesses the particularized expertise and resources that make it well suited for this task.

Carr v. Prader, 725 A.2d 291, 294 (R.I. 1999). The Rhode Island Supreme Court clarified the role of the CASA attorney in In re

-29-

<u>Christina D.</u>, 525 A.2d 1306 (R.I. 1987), when it held that the
CASA attorney appointed to represent a child in a custody hearing
continued to represent the child even after the parents' rights
were terminated, up to the time that the child is adopted.  525
A.2d at 1308.  The Court wrote, "It is inconceivable that the
guardian ad litem, appointed to represent the child's interests,
would be denied the opportunity to convey those interests to the
trial justice in a proceeding in which the ultimate focus is the
best interests of the child." 525 A.2d at 1308.

This Court concludes that the CASA attorneys appointed by
the Family Court to represent the seven Named Plaintiffs
constitute "duly appointed representative[s]," as that phrase is
used in Rule 17 of the Federal Rules of Civil Procedure.
Consequently, this Court will not invade the jurisdiction of the
Rhode Island Family Court and appoint Next Friends for children
who are already represented by counsel.  That this course of
action falls clearly within this Court's powers has been
established by the First Circuit in <u>Developmental Disabilities
Advocacy Center v. Melton</u>, where the Court stated, "The decision
as to whether or not to appoint such a special representative
rests with the sound discretion of the district court and will
not be disturbed unless there has been an abuse of its
authority."  689 F.2d 281, 285 (1st Cir. 1982).

## Conclusion

The long and short of it is that the Child Advocate and the Next Friends have no power, authority, or standing to represent the minor Plaintiffs and thus the motion to dismiss Plaintiffs' Complaint must be granted.  The Clerk shall enter judgment forthwith for all defendants.

It is so ordered.


*Ronald R. Lagueux*

Ronald R. Lagueux
Senior United States District Judge
April 29 , 2009