# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

SAM and TONY M., by Next Friend
Gregory C. Elliott; CAESAR S., by Next
Friend Kathleen J. Collins; DAVID T., by
Next Friend Mary Melvin; DEANNA H., by
Next Friend Gregory C. Elliott; and
DANNY and MICHAEL B., by Next Friend
Gregory C. Elliott; for themselves and those
similarly situated,
        Plaintiffs

v.                            C.A. No. 07-241-ML

LINCOLN D. CHAFEE, in his official
capacity as Governor of the State of Rhode
Island; STEVEN M. COSTANTINO, in his
official capacity as Secretary of the
Executive Office of Health and Human
Services; and KEVIN J. AUCOIN,[1] in
his official capacity as Acting Director
of the Department of Children, Youth and
Families,
        Defendants.


## MEMORANDUM AND ORDER

### I.   Introduction

The plaintiffs in this litigation are, or were, at the inception of this case, ten minor children who had been taken into the legal custody of the Rhode Island Department of Children, Youth and Families ("DCYF") because of a report or suspicion of abuse or neglect. The case, which was initiated by "Next Friends" on behalf of the plaintiffs, is intended as a class action suit for "all

---

[1] On June 29, 2001, Janice E. DeFrances was confirmed as the new Director of the Department of Children, Youth and Families.

children who are or will be in the legal custody of the [DCYF] due to a report or suspicion of abuse or neglect."[2]  Amended Complaint ¶ 11.  Generally, the proposed class action seeks to "compel Defendants - the Governor of the State of Rhode Island, the Secretary of the Executive Office of Health and Human Services [EOHHS], and the Director of the [DCYF] - to meet their legal obligations to care for and protect Rhode Island's abused and neglected children in state custody by reforming the State's dysfunctional child welfare system."  Amended Complaint ¶ 7.

The defendants first sought dismissal of the case, *inter alia,* on the ground that the plaintiffs' "Next Friends" lacked standing to represent them in this litigation.  That motion was granted and the case was dismissed.  Sam M., et al. v. Carcieri, 610 F. Supp. 2d 171, 173 (D.R.I. 2009).  The plaintiffs appealed the dismissal. The First Circuit Court of Appeals reversed the order dismissing the amended complaint and remanded the case with directions to reinstate the complaint and to allow the "Next Friends" to proceed on behalf of the children.  Sam M. v. Carcieri, 608 F.3d 77, 94 (1st Cir. 2010).

At this time, the case is before the Court on the defendants' second motion to dismiss the amended complaint for (1) lack of

---

[2]

According to the plaintiffs, "[a]s of January 2007, approximately 3,000 children were in DCYF legal custody for foster care services due to reported or substantiated allegations of abuse or neglect."  Amended Complaint ¶ 11.

subject matter jurisdiction, pursuant to Federal Rule 12(b)(1) of the Federal Rules of Civil Procedure, and (2) failure to state a claim upon which relief can be granted, pursuant to Federal Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons discussed hereinafter, the defendants' motion is GRANTED, in part, and DENIED, in part.

## II.  Procedural History

On June 28, 2007, the "Next Friends" filed a complaint on behalf of the ten named minor plaintiffs.  An amended complaint was filed on September 7, 2007. On October 2, 2007, the defendants filed a motion to dismiss the amended complaint.  Specifically, the defendants argued that (1) the "Next Friends" lacked standing; (2) pursuant to Younger and Rooker-Feldman doctrines, the Court should abstain from rendering a decision that would invade the province of the Rhode Island Family Court; (3) the plaintiffs did not have a private right of action under the Adoption Assistance and Child Welfare Act ("AACWA") of 1980, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*; and (4) the claims of three of the named plaintiffs had become moot because they had been adopted and were no longer in DCYF custody.

The presiding judge[3] heard oral argument on the defendants' motion on January 16, 2008.  He conducted two subsequent

---

[3]
Senior Judge Ronald R. Lagueux, who has since recused himself from the case.

evidentiary hearings on January 23 and 24, 2008 regarding the suitability of the "Next Friends." Following the hearings, the Court requested that the parties submit post-hearing briefs. On April 29, 2009, the Court granted the defendants' motion to dismiss, holding that the Child Advocate[4] and "Next Friends" had no authority or standing to proceed in the case. <u>Sam M. et al. v. Carcieri</u>, 610 F. Supp. 2d at 184.

The plaintiffs appealed the dismissal of their claims. On June 18, 2010, the First Circuit Court of Appeals reversed and remanded the case with instructions to reinstate the complaint and to allow the three individuals to proceed as the plaintiffs' "Next Friends."

On November 1, 2010, the defendants filed the instant motion to dismiss the amended complaint, to which the plaintiffs responded with an objection on January 18, 2011. On February 7, 2011, the defendants filed a reply in further support of their motion.

This Court heard oral argument on May 6, 2011, after which it

---

[4]

The Child Advocate, who is appointed by the Governor with the advice and consent of the Senate, acts independently of the DCYF. The Child Advocate's duties include, *inter alia*, to insure that each child in protective care is apprised of his or her rights; to review DCYF procedures and placement facilities; and to "[r]ecommend changes in the procedures for dealing with juvenile problems and the systems for providing child care and treatment." R.I. Gen. Laws § 42-73-7 (1)-(5). To achieve these aims, the Child Advocate is authorized to "[t]ake all possible action including . . . formal legal action" to ensure the legal, civil and special rights of children. R.I. Gen. Laws § 42-73-7 (6).

took the motion under advisement.

### III. Factual Background

The background and life histories of seven[5] of the minor plaintiffs has been described in some detail in the decision and order of this Court, see Sam M. et al. v. Carcieri, 610 F. Supp. 2d at 174-180. The opinion of the First Circuit Court of Appeals also provides summaries for six of the plaintiffs[6], see Sam M. v. Carcieri, 608 F.3d at 84–85. Common to all plaintiffs is that the children were placed into DCYF custody after they had been removed from their families because they had been reported as abused and/or neglected. Since they entered DCYF custody, each of the children has been moved to a succession of foster care placements, many of which, the plaintiffs allege, have been inadequate, unlicensed, inappropriate, and not designed to provide a permanent home. In addition, all of the children are alleged to have suffered abuse during their respective placements and, as a result, several of the children have been institutionalized. As of May 6, 2011, eight of the ten named plaintiffs have been adopted, leaving only two of the

---

[5]

Prior to issuance of the Court's first order dismissing the case, three of the children were legally adopted, "rendering their cases moot." Sam M. et al. v. Carcieri, 610 F. Supp. 2d at 175.

[6]

The First Circuit noted that, although ten children were initially named as plaintiffs, four of them were no longer in DCYF custody because they had been adopted. Sam M. v. Carcieri, 608 F.3d at 81 n. 1.

children, David T. and Danny B.,[7] in the legal custody of DCYF. David T., who will reach the age of majority in 2011, currently lives in an out-of-state institution. Danny B., whose brother Michael was adopted in 2008, has been placed in a group home.

## IV. The Litigation

In bringing this action, the plaintiffs seek to compel the defendants "to meet their legal obligations to care for and protect Rhode Island's abused and neglected children in state custody by reforming the State's dysfunctional child welfare system." Amended Complaint ¶ 7. Some of the alleged shortcomings include: children staying in foster care for years; placement that is dictated by availability, not suitability; inadequate reimbursement rates for foster parents; decline in the numbers of licensed foster homes; unnecessary institutionalization of children; repeated moves between inappropriate DCYF placements; failure to meet federal standards; failures of caseworkers to make monthly visits; abuse in foster care; untenable caseloads of social workers; inadequate supervision; placements in unlicensed foster homes; lengthy application process for foster home licensing; separation from siblings; lack of timely reunification with families; pursuit of reunification with parents when not appropriate; failure to place children who cannot return home for adoption; and failure to meet

---

[7] Pseudonyms are used for all minor plaintiffs.

children's medical, dental, and mental health needs.   See e.g. Amended Complaint ¶¶ 5, 107-112, 115, 116, 129-186.

The amended complaint also alleges that the defendants forfeit millions in federal matching funds by failing to meet their obligations under so-called "State Plans,"[8] id. ¶ 211;  that they waste limited funds on institutional placements, id. ¶ 213; and that they do not provide adequate foster care maintenance payments to foster parents.  Id. ¶ 216-218.

The plaintiffs have put forward six separate causes of action.  In Count I, the plaintiffs assert that the State assumes an affirmative duty under the 14th Amendment of the U.S. Constitution to protect a child from harm when it takes the child into foster care custody.  The plaintiffs allege that the defendants' actions and inactions constitute a failure to protect the plaintiffs from harm.  The plaintiffs specify their substantive due process rights to include, *inter alia,* the right to a living environment that protects their physical, mental, and emotional safety and well-being; and the right to safe and secure foster care placement, appropriate monitoring, supervision, planning, and other

---

[8]

Title IV of the Social Security Act provides grants to states for aid and services to needy families with children, including children under foster care, and for child-welfare services.  42 U.S.C. § 601 *et seq.*  In order to qualify for such federal funding, a State is required to develop a State plan that meets Title IV standards and applicable regulations.  Lynch v. Dukakis, 719 F.2d 504, 507 (1st Cir. 1983).

services.

In Count II, titled Substantive Due Process under the U.S. Constitution - State-Created Danger, the plaintiffs allege that they are at a continuing risk of being deprived of their substantive due process rights (1) by being removed from their caretakers and put into placements that pose an imminent risk of harm; or (2) by being returned to their parents when such return poses a risk of harm. The plaintiffs assert that such policy and practice are inconsistent with the exercise of professional judgment and amount to deliberate indifference to the plaintiffs' liberty and privacy rights in violation of 42 U.S.C. § 1983.

In Count III, the plaintiffs allege that, as a result of the alleged actions and inactions of the defendants, the plaintiffs have been severely harmed and deprived of their liberty interests, privacy interests and "associational rights not to be deprived of a child-parent or a child-sibling family relationship, guaranteed by the First, Ninth, and Fourteenth Amendment." Amended Complaint ¶ 229.

In Count IV, the plaintiffs allege that the defendants are depriving the plaintiffs of certain rights under the Adoption Assistance and Child Welfare Act ("AACWA") [9] of 1980, as amended by

---

[9]

In general, the AACWA provides for federal reimbursement for certain expenses incurred by the states in administering foster care and adoption services if the State satisfies the requirements of the Act. To participate in the program, a State must submit a

the Adoption and Safe Families Act of 1997, 42 U.S.C. § 621-629i, 670-679b, including, *inter alia*, the following rights: timely written case plans; a case review system to ensure implementation; placement in foster homes that conform to reasonable professional standards; the filing of petitions to terminate parental rights; permanent placement for children whose permanency goal is adoption; services to protect children's safety and health, to facilitate return to the family home, and review of health and educational records; and the payment of foster care maintenance to foster parents that covers food, clothing, shelter, daily supervision, school supplies, reasonable travel to families, and other expenses.[10]

Count V is a procedural due process claim, in which the plaintiffs assert that the defendants' alleged actions and inactions cause the plaintiffs to suffer deprivations of federal-law entitlements under the AACWA and U.S. Department of Health and Human Services regulations, as well as state-law entitlements

plan for approval by the Secretary of Health and Human Services ("HHS") which includes several statutorily imposed requirements. Carson P. ex rel. Foreman v. Heineman, 240 F.R.D. 456 (D.Neb. 2007).

[10]

Following the defendants' motion for dismissal, the plaintiffs withdrew all claims under the AACWA except for: (1) the right to a case plan containing certain information, including child-specific recruitment efforts of steps taken to secure a permanent home for them (42 U.S.C § 671(a)(16)); and (2) the right to adequate foster care maintenance payments (42 U.S.C. §§ 671(a)(1), (a)(11), 672(a)(1), 675(4)(A)). Pltfs.' Obj. 45 n. 45.

provided them under Chapter 72 of Title 42 of Rhode Island General Laws.[11]

Finally, in Count VI, the plaintiffs assert that the defendants have breached their contractual obligations under the Rhode Island State Plans prepared for the U.S. Department of Health and Human Services pursuant to the Social Security Act. In order to establish their right to raise this claim, the plaintiffs suggest that they are the intended third-party beneficiaries to such State Plans.

The plaintiffs' requested remedies include, *inter alia*, (1) a declaration by this Court that the defendants' actions detailed in Counts I through VI are unconstitutional and unlawful; (2) an order permanently enjoining the defendants from subjecting the plaintiffs to practices that violate their rights; and (3) "appropriate remedial relief to ensure defendants' future compliance with their legal obligations to Plaintiff Children." Amended Complaint ¶ 239. In addition, the plaintiffs seek to maintain this case as a class action[12] pursuant to Federal Rule 23(b)(2) of the Federal Rules of Civil Procedure. The plaintiffs also seek costs and the expenses of

---

[11]

Chapter 72 of Title 42 of the Rhode Island General Laws addresses the establishment and responsibilities of DCYF. R.I. Gen. Laws §§ 42-72-1 *et seq.*

[12]

Although the motion for class certification was fully briefed in 2007, there is nothing to indicate that the issue was argued before the Court or that the motion was decided.

the litigation.

## V.    Standard of Review

A Court may dismiss a complaint, *inter alia*, for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) or for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6).  Because federal courts are courts of limited jurisdiction, "a court, when confronted with a colorable challenge to its subject-matter jurisdiction, should resolve that question before weighing the merits of a pending action." Morales Feliciano v. Rullan, 303 F.3d 1, 6 (1st Cir. 2002). The burden of proving federal court jurisdiction is on the party invoking it.  Pejepscot Indus. Park, Inc. v. Maine Cent. R. R. Co., 215 F.3d 195, 200 (1st Cir. 2000).

The standard of review for a motion to dismiss a complaint under either subsection of Rule 12(b) is identical.  McCloskey v. Mueller, 446 F.3d 262, 265-66 (1st Cir. 2006)("Although these rulings derive from different subsections of Rule 12(b), . . . our standard of review sounds the same familiar refrain."); Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 14 n.10 (1st Cir. 1999)("The standard of review . . . is the same for failure to state a claim and for lack of jurisdiction.").

A court, in reviewing a motion to dismiss, accepts as true the factual allegations of the complaint and draws all reasonable inferences in favor of the plaintiff.  Cook v. Gates, 528 F.3d 42,

48 (1st Cir. 2008); <u>McCloskey v. Mueller</u>, 446 F.3d at 266 (Plaintiffs' well-pleaded facts are accepted as true and court "indulge[s] all reasonable inferences to their behoof."). In order to withstand a motion to dismiss, "a complaint must allege 'a plausible entitlement to relief.'" <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 58 (1st Cir. 2008)(quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 1967-69, 167 L.Ed.2d 929 (2007); <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)(A complaint must be dismissed if it fails to state facts sufficient to establish a claim to relief that is "plausible on its face."))

**VI.   Discussion**

A.   Mootness

Three of the named plaintiffs, Briana, Alexis, and Clare H., were legally adopted on September 24, 2007.  Prior to oral argument on the defendants' first motion to dismiss the complaint, the plaintiffs agreed "to withdraw the claims of . . . Briana, Alexis, and Clare H. – since they have been adopted and are no longer members of the putative class."  Pltfs.' Obj. Defs.' First Mot. Dismiss. (Docket No. 35) at 3 n. 2; <u>see</u> Pltfs.' Obj. Def.'s Mot Dismiss (Docket No. 80) at 67 n. 53 ("Plaintiffs voluntarily withdrew the claims of Deanna's siblings.")  The presiding judge's declaration that the adoption rendered the claims of these three

plaintiffs moot was not appealed by the plaintiffs.[13]  The First
Circuit acknowledged this fact and noted that "after the district
court rendered its opinion, Plaintiff Deanna H. was adopted and thus
her claims are also moot."  <u>Sam M. v. Carcieri</u>, 608 F.3d at 81 n.1.
Since then, four more children have been legally adopted: Sam and
Tony M.[14], Michael B., and Caesar S., leaving only David T. and Danny
B. in the legal custody of DCYF.

    The defendants seek dismissal of the claims as they relate to
Deanna, Sam, Tony, Michael, and Caesar on the ground that they "no
longer satisfy the 'case or controversy' threshold requirement of a
federal court suit."  Defs.' Mem. 26.  Specifically, the defendants
assert that, following the adoptions of the five children, the
underlying petitions alleging abuse and neglect were closed and no
live case or controversy exists between those plaintiffs and the
defendants.  The defendants argue that, because the amended
complaint seeks only injunctive relief, the five adopted children
who are no longer in DCYF custody have no legally cognizable
interest in the outcome of the case.  <u>Id.</u> at 28.

---

[13]

The Court notes that the plaintiffs have sought to amend their
complaint to name additional plaintiffs as members of the putative
class.

[14]

Sam and Tony M.'s adoption is subject to a dependency petition
involving some continuing supervision and support from DCYF.  The
plaintiffs conceded at oral argument, however, that the dependency
petition involves no allegations of abuse or neglect and that Sam
and Tony M. are, by definition, no longer part of the putative
class.  Hearing Tr. 36:16-37:10 (May 6, 2011).

The plaintiffs, on their part, take the position that, "despite the fact that they are currently not in DCYF custody," the five adopted children "belong to a putative class of foster children whose claims are by their very nature transitory" and, therefore, should not be dismissed from this litigation. Pltfs.'s Obj. 71. Specifically, the plaintiffs assert that "it was reasonable to expect, given the temporary nature of foster care, that these five Named Plaintiffs might leave DCYF custody prior to a ruling on class certification," and that, therefore, an exception applies to the mootness doctrine as it relates to class actions. Id. at 67-68. The plaintiffs also point out that, even if the claims of the adopted children were to be dismissed, the action would survive because David T. and Danny B. are still in DCYF custody. Moreover, the plaintiffs state that they are prepared to file a "supplemental complaint" to add additional named plaintiffs following the resolution of the defendants' motion. Id. at 67.

Pursuant to Article III of the Constitution, federal courts are restricted to the resolution of actual cases and controversies. U.S. Const. art. III, § 2, cl. 1; Shelby v. Superformance Int'l, Inc., 435 F.3d 42, 45 (1st Cir. 2006); Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001)("This requirement must be satisfied at each and every stage of the litigation."). Because "those words limit the business of federal courts to questions presented in an adversary context," courts are precluded from rendering advisory

opinions. <u>Overseas Military Sales Corp., Ltd. v. Giralt-Armada</u>, 503 F.3d 12, 16-17 (1st Cir. 2007). A case becomes moot "'when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome.'" <u>Id.</u> at 17 (quoting <u>Cruz v. Farquharson</u>, 252 F.3d at 533). "'A case is moot and hence not justiciable, if the passage of time has caused it completely to lose its character as a present, live controversy of the kind that must exist if the court is to avoid advisory opinions on abstract propositions of law.'" <u>Thomas R.W., By and Through his next Friends Pamela R. et al. v Mass. Dep't of Educ.</u>, 130 F.3d 477, 479 (1st Cir. 1997)(Disabled student's graduation from private school and matriculation into public high school rendered student's claim for on-site services moot)(internal quotation omitted).

As the defendants recognize, they bear the burden of demonstrating that, "after the case's commencement, intervening events have blotted out the alleged injury and established that the conduct complained of cannot reasonably be expected to recur." <u>Ramirez v. Sanchez Ramos</u>, 438 F.3d 92, 100 (1st Cir. 2006); <u>see</u> Defs.' Reply 3.

With respect to class actions, the First Circuit has held that "if no decision on class action certification has occurred by the time that the individual claims of all named plaintiffs have been fully resolved," a putative class action must be dismissed. <u>Cruz v. Farquharson</u>, 252 F.3d at 534. "Only when a class is certified does

the class acquire a legal status independent of the interest asserted by the named plaintiffs." Id. The Cruz Court noted that the Third Circuit had taken a more expansive view in holding that "'[s]o long as a class representative has a live claim at the time he moves for class certification, neither a pending motion nor a certified class action need be dismissed if his individual claim subsequently becomes moot.'" Id. (quoting Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 135 (2d Cir. 2000)). However, because "no such motion was pending when the claims of the named plaintiffs in [the Cruz] case became moot," the First Circuit stated that it had "no occasion to consider the correctness of the Third Circuit's singular rule." Id. [15]

In the case now before the Court, the dismissal of the entire proposed class action on the ground of mootness does not arise, as both both parties agree that two of the named plaintiffs are still in DCYF custody and that their claims continue to be viable. With respect to three of the named plaintiffs, their claims were withdrawn voluntarily upon their adoption. Therefore, the question of mootness raised by the defendants relates to only five of the

---

[15]
The plaintiffs filed a motion for class certification together with their complaint, to which the defendants responded with an objection. Because Judge Lagueux dismissed the case for lack of standing, there is nothing to indicate that the plaintiffs' motion was considered. The case has now been remanded for further proceedings and this Court invites the parties to submit new briefs in support of their respective positions, taking into consideration the Supreme Court's recent decision in Wal-Mart Stores, Inc. v Dukes, 131 S.Ct. 2541, 2011 WL 2437012 (2011).

named plaintiffs.  These five children, who have most recently been adopted while the instant action has been pending, are no longer in DCYF custody and are no longer subject to the State's allegedly "dysfunctional child welfare system."  The plaintiffs' amended complaint seeks only injunctive relief for "all children who are or will be in the legal custody of the [DCYF] due to a report or suspicion of abuse or neglect," a group which no longer includes the five named plaintiffs.

The plaintiffs now urge this Court to follow other courts which have applied a more flexible approach to the mootness doctrine in the class action context.  Pltfs.' Obj. 69-70.  No class has yet been certified and the plaintiffs conceded at oral argument that the amended complaint relates only to children who are the subject of abuse or neglect petitions.   Hearing Tr. 36:16-22 (May 6, 2011). In other words, with the exception of David T. and Danny B., none of the other plaintiffs are representative of the putative class of children who are the subject of abuse or neglect petitions.

The plaintiffs also suggest that their claims are "inherently transitory" because "it was reasonable to expect, given the temporary nature of foster care, that these five named Plaintiffs might leave DCYF custody prior to a ruling on class certification." Pltfs.' Obj. 68.  It is undisputed, however, that two of the named plaintiffs, who have asserted identical claims and seek identical relief, are still in DCYF custody.  Moreover, the plaintiffs have

repeatedly stated that they are prepared to seek leave to supplement the amended complaint by adding other plaintiffs to this action. See e.g. Pltfs.' Obj. 4 n. 3. Therefore, as the plaintiffs rightly point out, a determination that the claims of the adopted plaintiff children are moot is not dispositive. However, because no live controversy exists between the adopted children and the defendants, the Court finds that the claims of these particular plaintiffs have been rendered moot. Therefore, the claims of Deanna H., Sam M., Tony M., Michael B., and Caesar S. are dismissed from the case.

B.    Abstention under the Younger Doctrine

1.    The Parties' Positions

In their motion to dismiss the amended complaint, the defendants urge this Court to abstain from "rendering a decision that would invade the province of the Rhode Island [Family Court] or its past and future decisions." Defs.' Mot. 30. The defendants suggest that to grant the injunctive relief requested by plaintiffs would require this Court to (1) declare that prior decisions by the Family Court violated the plaintiffs' constitutional rights; (2) enjoin the Family Court from performing its duties of protecting abused and/or neglected children; and (3) oversee the Family Court's performance with respect to orders issued for the best interest of those children. Defs.' Mot. 32-33. Generally, the defendants reject the plaintiffs' contention that the Family Court in Rhode Island has extremely limited authority over abused and/or neglected

children and that DCYF has the ultimate responsibility over such children.  Defs.' Reply 20.  The defendants also point out that, unlike in other states, *e.g.* Massachusetts, the Family Court in Rhode Island has authority under the Uniform Declaratory Judgment Act to issue a declaratory ruling if sought by the plaintiffs or other children.  Id. at 27.  Moreover, the defendants maintain that the Child Advocate is required to bring "formal legal action before the Family Court on behalf of an abused and/or neglected child" and that the children's guardians *ad litem* or CASA[16] attorneys "can bring issues of placement, services, visitation, treatment and welfare before the Family Court at any time."  Id. at 32, 34.

The plaintiffs reject the contention that this case involves issues of comity.  Instead, they state that the children challenge only their treatment by the responsible executive agency and have made no allegations against state courts.  Pltfs.' Obj. 21-22.  The plaintiffs further argue that (1) any concurrent actions in the Family Court regarding these plaintiffs are not the type of coercive enforcement proceedings that would implicate Younger; (2) the requested relief does not interfere with the state proceedings; and (3) the Family Court proceedings do not satisfy the three Middlesex[17]

---

[16]

Court Appointed Special Advocate.

[17]

Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)(holding that Younger abstention is appropriate in pending state disciplinary proceedings against federal plaintiffs).

factors required for abstention. Pltfs.' Obj. 22. The plaintiffs suggest that, by accepting federal funding under the AACWA, "Rhode Island has voluntarily agreed to federal oversight of its child welfare system." Id. at 23. The plaintiffs also suggest that, although Younger has been extended beyond criminal proceedings, abstention is not appropriate for "'judicial review of executive action, rather than an enforcement proceeding.'" Id. at 25 (quoting Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 70 (1st Cir. 2005)). Further, the plaintiffs maintain that this litigation seeks to address the alleged harm caused by structural or systemic shortcomings within the DCYF, not by action or inaction of the Family Court. Pltfs.' Obj. at 30-31.

With respect to the Middlesex factors, the plaintiffs argue that (1) the Family Court proceedings are not "ongoing" within the meaning of Younger; (2) the plaintiff children's claims do not involve predominately state interests which raise comity concerns; and (3) the periodic reviews conducted by the Family Court do not afford plaintiff children an adequate forum in which to litigate their federal claims. Id. at 37-39.

At oral argument, the plaintiffs clarified that they had not, and would not, request this Court to overrule, amend, modify, or otherwise change any ruling of the Family Court.[18] Hearing Tr.

---

[18]

As the defendants correctly point out, the plaintiffs' request for relief as set forth in the Amended Complaint, is very broadly

40:15-20.  Instead, the plaintiffs proposed that the Court issue an order that would provide for "caseload caps at a size that is within professional standards around the country for DCYF caseworkers, adequate training for DCYF caseworkers, . . . a requirement of an increase in the array and type of placements, . . . increasing foster homes, [including] very specialized foster homes, . . . increasing the rate of adoptions,. . . decreasing the number of placements per child . . . decreasing the length of time in foster care. " Hearing Tr. 41:11-43:20.

### 2.  Abstention Principles

As a general rule, federal courts have a "'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 517 (1st Cir. 2009)(quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). The duty to exercise jurisdiction "rests on 'the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the

---

styled.  In essence, the plaintiffs seek a declaration that the DCYF's practices - as described in great detail throughout the Amended Complaint - violate the plaintiffs' rights under the U.S. Constitution and the AACWA.  The plaintiffs also request this Court to enjoin the defendants from subjecting the children to such practices and to "ensure [the defendants'] future compliance with their legal obligations" to the plaintiffs.  In addition, the plaintiffs seek reasonable costs and expenses of this litigation, "including reasonable attorneys' fees pursuant to [28 U.S.C. § 1920] and 42 U.S.C. § 1988."  Amended Complaint ¶ 239.

constitutionally permissible bounds.'" <u>Chico Serv. Station, Inc. v. Sol Puerto Rico</u>, 633 F.3d 20, 29 (1st Cir. 2011)(quoting <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)); <u>New Orleans Pub. Serv., Inc. (NOPSI) v. Council of City of New Orleans</u>, 491 U.S. 350, 359, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989)(reemphasizing that federal courts "'cannot abdicate their authority or duty in any case in favor of another jurisdiction.'")(citation omitted).

However, the Supreme Court has also advised that "federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest, . . . for example, where abstention is warranted by considerations of 'proper constitutional adjudication,' ' regard for federal-state relations,' or 'wise judicial administration.'" <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 716, 116 S.Ct. 1712, 1721, 135 L.Ed.2d 1 (1996))(citation omitted). Thus, abstention is permissible in "carefully defined" areas and "remains 'the exception, not the rule.'"[19] <u>NOPSI</u>, 491 U.S. at 359, 109 S.Ct. at 2513, 105 L.Ed.2d

---

[19] A "narrowly construed," limited exception to <u>Younger</u>, in "extraordinary" circumstances, <u>Malachowski v. City of Keene</u>, 787 F.2d 704, 709 (1986), may warrant federal intervention in state proceedings "brought to harass or in bad faith or to enforce a flagrantly unconstitutional statute." <u>Esso Standard Oil Co. v. Cotto</u>, 389 F.3d 212, 219 n. 6 (1st Cir. 2004). There is nothing to indicate that this narrow exception to <u>Younger</u> comes into play in this litigation.

298.   Abstention doctrines "call upon federal courts to decline to exercise their properly held jurisdiction in circumstances where the interests of comity and federalism predominate.  Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d at 517 (citing Quackenbush v. Allstate Ins. Co., 517 U.S. at 727-28, 116 S.Ct. 1712);  Fragoso v. Lopez, 991 F.2d 878, 883 (1st Cir. 1993)(holding that abstention should be "the exception, not the rule.").

   3.  Younger

Originally, abstention under the Younger doctrine was limited to cases in which "a plaintiff who was defending criminal charges in state court sought to get the federal court to enjoin the ongoing state criminal proceedings." Rio Grande Cmty.  Health Ctr., Inc. v. Rullan, 397 F.3d 56, 68-69 (1st Cir. 2005)(citing Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669)(1971)).  Under Younger, "considerations of federalism and comity demand that a federal court should abstain from asserting jurisdiction, at least as to claims for injunctive or declaratory relief, over a matter that is the subject of pending state criminal proceedings." Malachowski v. City of Keene, 787 F.2d at 708(holding that Younger principles applied to federal court action brought by parents under § 1983 for alleged violation of their constitutional rights in the course of juvenile delinquency proceedings against their daughter which resulted in the daughter's release into foster care outside the parents' custody).

Subsequently, Younger was extended to "quasi-criminal (or at

least 'coercive') state civil proceedings - brought by the state as enforcement actions against an individual." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d at 69 (listing cases involving, *inter alia*, state administrative disciplinary proceedings; state child removal proceedings for alleged child abuse; and state proceedings to recover fraudulently obtained welfare payments); Esso Standard Oil Co. v. Cotto, 389 F.3d at217-218 (noting that "Younger extension has been extended to "'coercive' civil cases involving the state and to comparable state administrative proceedings that are quasi-judicial in character and implicate important state interests.'")(citation omitted); Maymo-Melendez v. Alvarez-Ramirez, 364 F.3d 27, 31-32, n. 3 (1st Cir. 2004)(listing cases).

The First Circuit acknowledged that "[t]he Supreme Court has expanded the applicability of Younger to many categories of civil proceedings, including a state child custody action." Malachowski v. City of Keene, 787 F.2d 704, 708 (1986)(holding that Younger principles applied to federal court action brought by parents under § 1983 for alleged violation of their constitutional rights in the course of juvenile delinquency proceedings against their daughter that resulted in the daughter's release into foster care outside the parents' custody)(citing Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979)(Younger abstention warranted in application for temporary restraining order sought against child welfare agency

by parents deprived of custody upon allegations of child abuse.))

The First Circuit explained that, "whether the [state court] proceedings are characterized as quasi-criminal or as child custody proceedings . . . the propriety of federal interference with them must be judged by Younger standards." Malachowski v. City of Keene, 787 F.2d at 708. With respect to the constitutional claims raised by the plaintiffs in Malachowski, see supra, the court noted that "the injunctive aspects of the complaint while 'clothed . . . in the garb of a civil rights action, . . . boil down to a demand for custody of the child.'" Id. at 709 (citation omitted.)

In addition, Younger abstention was deemed appropriate in civil cases involving "situations uniquely in furtherance of the fundamental workings of a state's judicial system." Rio Grande, 397 F.3d at 69 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432-433, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)(federal abstention warranted in action filed to enjoin pending state attorney disciplinary proceedings); Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1(1987)(challenge by losing party in state proceedings to post-judgment appeal bond implied Younger abstention); Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977)(Younger applies to injunctive relief sought for civil contempt imposed in state court proceeding)). As noted by the First Circuit, although "[i]t is unclear exactly how far this [latter] rationale extends, . . . it

is related to the coercion/enforcement rationale." Rio Grande, 397 F.3d at 69. "[P]roceedings must be coercive, and in most cases, state-initiated, in order to warrant abstention." Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d at 522 (listing cases)(explaining that "'[f]or purposes of Younger abstention, administrative proceedings are "judicial in nature" when they are coercive - *i.e.,* state enforcement proceedings.'") (citation omitted).

With respect to circumstances involving the fundamental interests of the state's judicial system, the First Circuit pointed out that, "[e]ven the Supreme Court's furthest extension of the type of proceedings to which Younger applies . . . involved this sort of coercive contexts." Rio Grande, 397 F.3d at 69 n. 9. By contrast, "judicial review of executive action, rather than an enforcement proceeding" does not implicate Younger abstention. Id. at 70 (noting that, in NOPSI, the Supreme Court declared that application of Younger to "[s]tate judicial proceeding reviewing legislative or executive action . . . would make a mockery of the rule that only exceptional circumstances" justify abstention.)

A determination of whether abstention under the Younger doctrine is appropriate in a particular case involves application of the three factors established by the Supreme Court in Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). Abstention under Younger is

appropriate when (1) the requested relief would "interfere with . . . an ongoing state judicial proceedings;" (2) such proceedings "implicate important state interests;" and (3) there is "an adequate opportunity in the state proceedings to raise constitutional challenges." Rossi v. Gemma, 489 F.3d 26, 34-35 (1st Cir. 2007)(citing Middlesex County, 457 U.S. at 432, 102 S.Ct. at 2521).

    i.  Interference with Ongoing Judicial Proceedings

    The threshold issue in the defendants' Younger abstention argument is the alleged "interference" with ongoing judicial proceedings in Family Court. At the outset, it is not clear that the instant case is susceptible to such categorization. The cases on which the defendants rely, in their briefs and at oral argument, for the proposition that child custody issues are appropriate actions for Younger consideration are inapposite to the circumstances of this litigation. In McLeod v. State of Maine Dep't. of Human Serv., 1999 WL 3317123 (D. Me. Nov. 2, 1999), the plaintiff sought a federal injunction against child protective services after the State initiated proceedings against her to terminate her parental rights. In Malachowski v. City of Keene, see supra, the plaintiffs sought federal redress for alleged violations of their constitutional rights after their daughter was removed from their custody in connection with a juvenile delinquency petition instituted against her. In Coggeshall v. Massachusetts Bd. of Registration of Psychologists, 604 F.3d 658 (1st Cir. 2010), a

licensed psychologist (together with the father of one of her patients) brought a Section 1983 claim against the Massachusetts Board of Registration of Psychologists, which had previously placed the psychologist on probation for violations of the American Psychological Association's code of conduct. In <u>McKenna v. Powell</u>, 2010 WL 2474037 (D.R.I. April 28, 2010), the plaintiff sought an injunction against the enforcement of certain provisions of the Rhode Island Workers' Compensation Act in connection with a workers's compensation claim brought against him by a former employee. At the time plaintiff McKenna brought suit in federal court, he had already filed appeals in the Workers Compensation Appellate Division and in state court.[20]

The common denominator of these cases is that they relate to ongoing judicial coercive type proceedings initiated, primarily by the state, against the federal plaintiffs that have resulted in a forced deprivation of a right, *e.g.*, of the custody of their child(ren), or a judgment or disciplinary measure issued against them, *e.g.* a probationary sentence for a code of conduct violation.

---

[20]

The defendants also cite to <u>31 Foster Children v. Bush</u>, 329 F.3d 1255 (11th Cir. 2003) and <u>Carson P. v. Heineman</u>, 240 F.R.D. 456, 523 (D. Neb. 2007) which refers, *inter alia*, to <u>31 Foster Children</u> in deciding the issue of interference with ongoing state proceedings. However, in <u>31 Foster Children</u>, "the parties agreed" (as did the court) "that the continuing state dependency proceedings involving each of the plaintiffs are ongoing state proceedings for the purposes of Middlesex analysis." <u>31 Foster Children</u>, 329 F.3d at 1275.

As such, they are distinguishable, in part, from the instant litigation, in which the plaintiff children (or the Next Friends, on their behalf) neither seek to restore or obtain custody, nor do they challenge Family Court orders directing the termination of parental rights.  However, the plaintiffs do challenge the placement of the children while in DCYF custody and/or other aspects of the plaintiffs' care.  Specifically, the plaintiffs complain of the conditions and circumstances of the plaintiffs' custody and care once Family Court orders are implemented or executed by the DCYF, and they seek specific measures to change those conditions, e.g. the length of stay in foster care, the number of placements per child, and the rate of adoptions.

The defendants now assert that, with respect to the question of "interference," any remedy granted to the plaintiffs will necessarily interfere with the Family Court on issues of visitation and placement and will amount to oversight by this Court of Family Court decisions.  In particular, the defendants seek to distinguish the circumstances of this litigation from a recent case in Massachusetts in which the federal district court rejected the defendants' argument for abstention under Younger, in part, because "Massachusetts law greatly restricts the juvenile court's discretion once a child is placed in DCF's permanent custody."  Connor B. v . Patrick, – F.Supp.2d –, 2011 WL 31343 at *6 (D. Mass. Jan. 4, 2011). The defendants point out that, in contrast to Massachusetts, where

DCF has "*virtually free rein*" regarding the placement and care of children in its custody, subject only to "a petition for review which cannot be filed more than once every six months," id. at *7, the Family Court in Rhode Island "can address and enter orders of placement, services, visitation and adoption." Defs.' Reply at 37. In Rhode Island, at regularly scheduled Family Court review and/or permanency hearings regarding an abused or neglected child, DCYF is required to present a written reunification and/or permanency plan, which may be "approved and/or modified by a justice of the family court and incorporated into the orders of the court, at the discretion of the court." R.I. Gen. Laws § 40-11-12.2. With respect to children in foster care, the Family Court must conduct a permanency hearing "whenever it deems necessary or desirable, but at least every twelve (12) months." R.I. Gen. Laws § 40-11-12.1(f).

Pursuant to the Rhode Island Family Court Act, R.I. Gen. Laws §§ 14-1-1 *et seq.*, the Family Court has exclusive original jurisdiction in proceedings concerning abused and neglected children and adoption of children. R.I. Gen. Laws § 14-1-5 (1), (2). Once the Family Court grants DCYF's petition for involuntary termination of parental rights, DCYF "shall have exclusive right to place [the] child for adoption and to be sole party to give or withhold consent, . . . and [DCYF] is the guardian of said child for all purposes." Defs.' Ex. E-48, see also Decree, Defs.' Ex. E-49 ("[DCYF] is to be the exclusive agency to give or withhold consent for adoption of

said child . . . DCYF is to be the sole guardian of said child for all purposes."). However, the Family Court does not thereby surrender jurisdiction over the child. In re Joseph, 420 A.2d 85, 88 (R.I. 1980). Instead, the discretion conferred on an agency as a guardian to the adoption of a child placed in its custody "is not absolute; it remains subject to judicial review by the Family Court," id., "which may at any time for good cause revoke or modify" the decree. R.I. Gen. Laws § 14-1-34 (a). In the event the Family Court assigns custody of a child to DCYF, "the court shall authorize the provision of suitable treatment, rehabilitation and care for each child in the least restrictive and community-based setting." R.I. Gen. Laws § 14-1-36.2. The Family Court may also "make any further disposition that it may deem to be for the best interests of the child, except as otherwise provided in this chapter." R.I. Gen. Laws § 14-1-37.

From the voluminous record submitted by the defendants, it is apparent that the Family Court retains considerable authority and involvement in the placement and care of children who are in the same circumstances as the plaintiffs. In support of their assertion that the Family Court issues orders impacting "placement, services, and visitation," Defs.' Reply at 41, the defendants have submitted numerous exhibits documenting, *inter alia*, the Family Court's approval of David's residential placement in 2004 "by express terms or approving the case plan." Ex. E-36. In November 2005, the

31

Family Court then issued a "Permanency Hearing Decree" in which it approved the case plan and ordered DCYF to make a referral to the Case Management Team. Ex. E-39. Following a review in February 2006, the Family Court noted that DCYF was awaiting approval from Massachusetts to place David at a residential facility there. Ex. E-41. The process was repeated the following year. In November 2006, the Family Court issued another decree stating, again, that DCYF had made "reasonable efforts to finalize the permanency plan goal of another planned alternative living arrangement." Ex. E-43. The Family Court noted that David was still at the same residential facility which had no educational component, but that DCYF was seeking to place him at one of two other Massachusetts facilities. Ex. E-75.

On August 21, 2000, David's guardian *ad litem* sought a review by the Family Court while David (then age 6) was placed at Butler Hospital, a psychiatric facility for adults and children. The guardian *ad litem* informed the Family Court that Tanner Hill, David's prior residential facility, had requested DCYF for some time to seek a more appropriate placement for David. According to the guardian *ad litem* "[t]his request goes back several months and to date the Department has failed to secure such a placement." Ex. E-53. The Family Court disposition forms reflect that, on August 29, 2000, on September 12, 2000, on September 18, 2000, and again on October 10, 2000, the Family Court ordered a residential review.

Ex. E-54-57. An "Event Hearing Sheet" dated December 4, 2000 states that David is "showing signs of institutionalization - needs to be moved. Placement ordered as soon as possible. Court finds [illegible] of stable placement necessary." Ex. E-58. However, based on the allegations in the amended complaint, it appears that David remained at the psychiatric facility for five months because DCYF could provide no other placement. Amended Complaint ¶ 62. In other words, although the Family Court continued to exercise its authority in conducting frequent reviews of David's case, DCYF was unable to implement the ordered placement which the Family Court deemed necessary and urgent.

It is correct that, because the two remaining named plaintiffs are still in the custody of DYCF, they are subject to the continuing jurisdiction of the Family Court and the petitions for neglect and abuse remain pending. The amended complaint does not seek to appeal any particular decision by the Family Court or to vacate or amend any particular orders or directives the Family Court has issued with respect to the plaintiffs. Instead, the plaintiffs' amended complaint is directed primarily against the execution and implementation of Family Court orders, as performed by the DCYF.[21]

---

[21]

It is correct, as the defendants point out, that the plaintiffs have styled their request for relief very broadly. However, to withstand a motion to dismiss, the complaint need only "allege 'a plausible entitlement to relief.'" Thomas v. Rhode Island, 542 F.3d 944 , 948 (1st Cir. 2008)(quoting Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-1965 (2007)). "Specific facts are not necessary; the statements need only 'give

At oral argument, the plaintiffs stated unequivocally that they do not and will not seek to reverse, amend, modify, or otherwise change any ruling of the Family Court. However, the plaintiffs's requested relief for, *inter alia*, a decreased number of placements, increased rate of adoptions, and decreased length of time in foster care, implicate determinations that have been made, and orders that have been issued, by the Family Court.

Not all of the allegations raised in the amended complaint regarding, *inter alia*, the lack of safe and appropriate placement of children who have been abused and/or neglected automatically implicate a possible constraint on decisions of the Family Court. Rather, the plaintiffs, who do not seek to overturn any particular determination by the Family Court concerning any of the children, seek to ensure that the Family Court's orders and determinations can be carried out. The proposed remedies of caseload caps and adequate training for DCYF workers, as well as an increase in the array and types of available placements, are not within the province of the Family Court, although they would assist in implementing the Family Court's orders. With respect to those measures, "the mere possibility of inconsistent results in the future is insufficient to justify <u>Younger</u> abstention." <u>Rio Grande</u>, 397 F.3d at 71.

---

the defendants fair notice of what the . . . claim is and the ground upon which it rests.'" <u>Thomas v. Rhode Island</u>, 542 F.3d at 948 (quoting <u>Erickson v. Pardus</u>, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)).

Therefore, this Court is of the opinion that the requisite interference under Younger has not been established in this case with respect to the plaintiffs' suggested remedy of establishing caseload caps for DCYF workers, providing adequate training to DCYF workers, and increasing the array of placement options.

However, with respect to the requested increase in the rate of adoptions, the decrease in the number of placements per child, as well as the decrease in institutionalization and length of time in foster care, such proceedings and related determinations are subject to the continuing jurisdiction of the Family Court. Any remedy fashioned by this Court would constitute an interference with orders generally issued by the Family Court in consideration of the best interest of the child and would, therefore, implicate abstention under Younger.

2. Important State Interest

Although the plaintiffs suggest that their claims "do not involve predominantly state interests which raise comity concerns," Plfts.' Mem. 37-38, it has long been established that the State has a compelling interest in ensuring proper care of children, including those in foster care. See e.g., Santosky v. Kramer, 455 U.S. 745, 766-767, 102 S.Ct. 1388, 1401-1402 (1982)("State has an urgent interest in the welfare of the child . . . the State's goal is to provide the child with a permanent home."); Ginsberg v. State of New York, 390 U.S. 629, 88 S.Ct. 1274 (1968)("State . . . has an

independent interest in the well-being of its youth."); Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438 (1944)(State acting to guard the interest in youth's well being). Notwithstanding the nation's interest in all children and the federal assistance programs implemented to support them, the fate and well-being of children in Rhode Island's foster care system remains primarily a state interest.

3. Adequate Opportunity for Constitutional Challenges

The third factor of the Middlesex test to determine whether abstention is warranted under Younger focuses on whether the plaintiffs were afforded "an adequate opportunity in the state proceedings to raise constitutional challenges." Middlesex Cnty. Ethics Comm. v. Garden State, 457 U.S. at 432, 102 S.Ct. at 2521 (emphasis added).

The defendants maintain that the plaintiffs have an adequate opportunity to advance their federal constitutional claims before the Family Court. Defs.' Reply at 60. They also suggest that the plaintiffs must prove that they could not have obtained a Family Court ruling protecting them from the alleged harms they attribute to DCYF's shortcomings "either because the ... [Family Court] had no jurisdiction to consider the federal questions raised in this case, had no authority to award a remedy, or because the plaintiffs lacked adequate representation in that forum." Id. Finally, the defendants point out that the Family Court is vested not only with

36

broad powers over matters affecting children, but that it also has the authority to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." Id. at 62.

The Family Court is a statutory court of limited jurisdiction. Waldeck v. Piner, 488 A.2d 1218, 1220 (R.I. 1985). As such, its powers "are limited to those expressly conferred upon it by statute; its jurisdiction cannot be extended by implication." Id. "The Family Court lacks general equitable powers and cannot take action unless specific jurisdictional authority to act can be found in the Family Court Act." Id.

Pursuant to the Uniform Declaratory Judgment Act ("UDJA"), R.I. Gen. Laws § 9-30-1,[22] the Family Court (or the superior court), "upon petition, following such procedure as the court by general or special rules may prescribe, shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." R.I. Gen. Laws § 9-30-1. The purpose of the UDJA is "to settle and afford relief from uncertainty and insecurity

---

[22] R.I. Gen. Laws § 9-30-1 provides:
The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree.

with respect to rights, status and other legal relations." Providence Teachers Union v. Napolitano, 690 A.2d 855, 856 (R.I. 1997). The existence of an actual justiciable controversy is a prerequisite to a determination by a court. Id. The Family Court's decision to grant a remedy under the UDJA is purely discretionary. See R.I. Gen. Laws § 9-30-6 ("The court may refuse to render or enter a declaratory judgment or decree where the judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding.")

There is nothing to indicate, however, that, under its statutorily conveyed jurisdiction, the Family Court has the authority to address the shortcomings that the plaintiffs have specifically asserted against the DCYF, which, they allege, have led to violations of their constitutional rights, e.g., lack of licensed foster homes or other appropriate placements, shortage of case workers, unreasonable caseloads, and inadequate training.

The difficulties in addressing the alleged inadequacies of the DCYF system in Family Court proceedings is exemplified in the case of David T. David, now 17 years old, was taken into custody at age 2 when he was removed from his mother due to neglect and abuse. With the exception of one initial placement in a foster home, David has since been placed in shelters, residential facilities and institutions, while his behavior, mental health, and emotional state were notably declining. The voluminous record submitted to this

Court reflects that David's case plan, numerous placements, and visitation schedule were approved and reviewed by the Family Court on a regular basis. However, oversight by the Family Court could not ensure that appropriate placement would be made available by DCYF. For example, although the Family Court promptly conducted hearings and instructed DCYF repeatedly to find a more appropriate placement for David in 2000, DCYF was unable to do so for many months, during which time the six year old child was kept in a psychiatric institution. In other words, while the Family Court had the jurisdiction to consider David's plight and ordered an appropriate remedy, DCYF fell short in implementing that remedy.

In sum, while the plaintiffs do not appear statutorily precluded from bringing claims in Family Court that may amount to constitutional violations, it does not appear, under the alleged circumstances of this case, that the Family Court would present an adequate forum to address those claims and to afford complete relief to the plaintiff children.[23]

---

[23]

The defendants suggest that "[t]he Family Court is also empowered to address issues implicating constitutional dimensions," see Defs.' Mem. at 63. However, the two cases on which they rely for support are not remotely comparable to the circumstances of this case. In re Destiny D., the Rhode Island Supreme Court held that, in a termination of parental rights proceeding, the Family Court was not precluded under the Fifth Amendment from considering the mother's prior statements to police or from considering her refusal to testify. In re Destiny D., 922 A.2d 168, 173-74 (R.I. 2007). In re Stephanie B., the Supreme Court held that Family Court orders enjoining a (non-party) private mental health hospital from discharging two juveniles and admitting one juvenile - all in temporary custody of DCFY - violated the hospital's due process

The Court concludes that, because the present case is not directed against any particular proceedings that may be pending in Family Court regarding the remaining plaintiffs and, although the welfare of children in foster care is an important state interest, in light of the difficulties in adequately raising the plaintiffs' claims in Family Court proceedings, abstention under <u>Younger</u> is not indicated with respect to the requested remedies of caseload caps for DCYF workers, adequate training of DCYF workers, and increase in the array of placement options. However, since increasing the number of adoptions, and decreasing the rate of institutionalization, the number of placements per child, and the length of time in foster care depend on determinations and orders within the jurisdiction of the Family Court, abstention under <u>Younger</u> is appropriate with respect to those requested remedies.

C. Abstention under the <u>Rooker-Feldman</u> Doctrine

The defendants also submit that this suit is barred by the <u>Rooker-Feldman</u> doctrine. Specifically, the defendants maintain that, although the plaintiffs are not asking this Court to review any Family Court proceedings, they seek a finding that they were, *inter alia*, placed into unstable and inappropriate placements pursuant to reviews, permanency hearings, or orders by the Family Court. Defs.' Mot. Dismiss 43. The defendants suggest that "[t]o the extent the Plaintiffs claim that they suffered a constitutional

rights. <u>In re Stephanie B.</u>, 826 A.2d 985 (R.I. 2003).

violation because of these inappropriate, judicially supervised placements, it is not unreasonable to characterize Plaintiff Children in such circumstances as 'losing parties' for purposes of the Rooker-Feldman Doctrine." Id. at 45.

In response, the plaintiffs point out that the plaintiff children "have never before been a party - let alone a losing party - to an action in the Family Court or any other related state court proceeding." Pltfs.' Obj. 42. Moreover, the plaintiffs assert that they only seek review of defendants' executive actions and "do not seek to overturn the Family Court orders," to which the defendants refer in their motion.

Under the Rooker-Feldman doctrine, a federal district court lacks subject matter "jurisdiction over 'federal complaints . . . [that] essentially invite[] federal courts of first instance to review and reverse unfavorable state-court judgments.'" Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico, 410 F.3d 17, 20 (1st Cir. 2005)(quoting Exxon Mobil Corp. v. Saudi Basic Indust. Corp., 544 U.S. 280, 283, 125 S. Ct. 1516, 1521, 161 L.Ed.2d 454 (2005)). In Exxon Mobil, the United States Supreme Court limited application of the Rooker-Feldman doctrine to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil, 544 U.S. at

284, 125 S. Ct. 1521-22.

In the case before the Court, the plaintiffs' requested remedy is limited to injunctive and prospective relief to address what they allege to be systemic shortcomings of the Rhode Island child welfare system. There is nothing to indicate that the plaintiffs in any way seek to reverse or modify existing judgments rendered by the Family Court or that the relief sought would serve to reverse such judgments. Amended Complaint ¶ 239.

To characterize the plaintiff children as "losing parties" in prior state proceeding would constitute an expansion of the <u>Rooker Feldman</u> doctrine that is neither indicated by case law precedent nor warranted under the circumstances of this case. Therefore, this Court is of the opinion that the doctrine is inapplicable and does not serve as a basis for abstention.

D. Individual Rights under the AACWA

The Adoption Assistance Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 621 *et seq.*, §§ 670 *et seq.* constitute Parts B and E of Title IV of the Social Security Act. The AACWA is a federal program that provides funding to a State for child welfare, foster care, and adoption assistance, provided the State has fashioned a State plan that meets certain requirements specified in the AACWA and that is approved by the Secretary of Health and Human Services. Under the AACWA, a State "will be reimbursed for a percentage of foster care and

adoption assistance payments when the State satisfies the requirements of the Act." <u>Suter v. Artist M.,</u> 503 U.S. 347, 112 S.Ct. 1360, 1362, 118 L.Ed.2d 1 (1992).

In their objection to the defendants' motion to dismiss the complaint, the plaintiffs voluntarily limit their claims under the AACWA to the following: "(i) the right to a case plan containing documentation, including child specific recruitment efforts, of steps taken to secure a permanent home for them, as provided in 42 U.S.C. § 671(a)(16); and (ii) the right to adequate foster care maintenance payments as provided in 42 U.S.C. §§ 671(a)(1), (a)(11), 672(a)(1), and 675(4)(A)." Pltfs.' Obj. 45 n. 45. With respect to the latter, counsel for the plaintiffs stated at oral argument that maintenance payments to foster parents are made from a combination of state and federal monies, but that the State sets the rates for such payments. The plaintiffs also expressed that they seek an order from this Court requiring the State to abide by the AACWA and to increase foster care maintenance rates.[24]

In their motion to dismiss, the defendants generally assert that the provisions of the AACWA under which the plaintiffs bring

_____

[24]

The Court notes that, in their amended complaint, the plaintiffs do not request or propose specific remedies for the alleged violation of the two AACWA provisions or for any of their other claims. Instead, they seek to "[p]ermanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights" and they ask this Court to order "appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiff Children." Amended Complaint ¶ 239.

their claims do not create private enforceable rights but, instead, "speak to items to be included in a state plan and not rights of an individual." Defs.' Reply 46. Regarding the foster care maintenance payment provision, 42 U.S.C. §§ 671(a)(1), 672(a)-(c), and 675(4)(A), the defendants argue that the provisions do not "manifest a Congressional intent to create privately enforceable rights" because they only set forth general information to be included in a State plan and do not "enunciate a specific formula for arriving at the payment." Defs.' Mem. Mot. Dismiss 90.[25]

With respect to the plaintiffs' asserted rights to case plans containing specific documentation regarding recruitment plans and permanent placements, the defendants maintain that the AACWA provisions do not "(1) contain 'rights-creating' language that is individually focused or (2) address the needs of individual persons." Defs.' Reply 46. [26]

Plaintiff's cause of action is brought pursuant to 42 U.S.C. § 1983. Section 1983 "provides a remedy for deprivations of rights

---

[25]

The defendants acknowledge that a majority of courts that have addressed this issue have concluded that the AACWA creates a privately enforceable right to foster care maintenance payments. Defs.' Mem. Mot. Dismiss 88 n. 21.

[26]

The defendants acknowledge that the First Circuit concluded in Lynch v. Dukakis, 719 F.2d 504 (1st Cir. 1983), that the case plan provision is enforceable under 42 U.S.C. § 1983, based on the rationale that the provision, otherwise, lacked a remedy available to the individual. Defs.' Reply 47-48. The defendants suggest, however, that Lynch is of questionable precedential value, given controlling case law that has developed since. Id.

secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" Rockwell v. Cape Cod Hosp., 26, F.3d 254, 256 (1st Cir. 1994); 42 U.S.C. § 1983; Lynch v. Dukakis, 719 F.2d 504, 509-510.

However, "[n]ot all violations of federal law give rise to § 1983 actions: '[t]he plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.'" Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 72-73 (1st Cir. 2005)(quoting Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)(emphasis in original)); Gonzaga Univ. v Doe, 536 U.S. 273, 274, 122 S.Ct. 2268, 2270 2275, 153 L.Ed.2d 309 (2002)("[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [Section 1983].")). Such a federal right "must be 'unambiguously conferred' by the statutory provision at issue." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d at 72-73 (quoting Gonzaga Univ. v. Doe, 536 U.S. at 283, 122 S.Ct. 2268, 153 L.Ed.2d 309).

In Lynch v. Dukakis, the First Circuit concluded that the AACWA allows private enforcement actions for a case plan under § 671(a)(16) that is consistent with the provisions required by § 675(1). Lynch v. Dukakis, 719 F.2d 504 (1st Cir. 1983)(Section 1983 action brought by children in the Massachusetts foster care system for alleged violations of the AACWA). The First Circuit

acknowledged that "[t]here will be no section 1983 remedy when (1) the federal law confers no enforceable right, or (2) Congress has foreclosed the 1983 remedy through the act under consideration." Lynch v. Dukakis, 719 F.2d at 510. The First Circuit noted, however, that "[s]ince at least 1968 the Supreme Court has implicitly and explicitly held that rights under various provisions of the Social Security Act are enforceable under section 1983," id. at 510 (listing cases), and that the Supreme Court "has found remedies under the SSA to be exclusive only when the Act expresses such an intent." Id. The First Circuit reasoned that, although section 671(b) of the AACWA authorizes the Secretary to withhold funds from noncomplying states, this "in no way purports to limit the availability of relief under any other provision." Lynch, 791 F.2d at 510-511. Based on the language and structure of the AACWA, the First Circuit concluded that nothing "suggests that Congress meant section 671(b) to be an exclusive remedy" and it upheld the district court's determination that a private cause of action under the AACWA was available to the plaintiffs. Id. at 514-515.

In 1992, the Supreme Court held that § 671(a)(15)[27] of the AACWA did not create a private right of action enforceable under that section. Suter v. Artist M., 503 U.S. at 359, 112 S.Ct. 1360

---

[27]

Section 672(a)(15) relates to "reasonable efforts" to preserve and reunify families of foster children, and details the circumstances in which such an effort would, or would not be, appropriate. 42 U.S.C. § 671 (a)(15).

(class action for injunctive relief brought by Illinois foster children who alleged that the State failed to make reasonable efforts to preserve or reunify families).  In Suter, the Court concluded that Congress did not intend to create a private remedy and that the AACWA did not confer an implied cause of action. Suter, 503 U.S. at 364, 112 S.Ct. 1360; see Johnson ex. re. Estate of Cano v. Holmes, 377 F. Supp. 2d 1084, 1092-1093 (D.N.M., 2004). Specifically, the Supreme Court determined that the AACWA only required a State to have an approved State plan in order to be eligible for reimbursements; the provision at issue lacked "statutory guidance as to how [the state's] 'reasonable efforts' were to be measured;" and the Secretary could enforce the act by withholding or reducing payments to a State.  Suter, 503 U.S. 359-362.  See also Carson P. ex rel. Foreman v. Heineman, 240 F.R.D. 456, 537 (D.Neb., Jan. 19, 2007).

In response to Suter, Congress enacted an amendment to the AACWA, generally referred to as the "Suter fix."   Section 1320a-2 provides as follows:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in [Suter], but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that such section is not intended to alter the holding in [Suter] that section 671(a)(15) of this title is not

47

enforceable in a private right of action. 42 U.S.C. §1320d-2.

Following <u>Suter</u> and this Congressional amendment to the AACWA, courts that addressed the issue have come to different conclusions regarding the availability of a private action for alleged violations of various AACWA provisions. <u>See e.g.</u>, <u>Johnson ex. re. Estate of Cano v. Holmes</u>, 377 F. Supp. 2d at 1093-1094 (listing cases). The majority of courts concluded that § 1320a-2 overruled, at most, "that portion of the opinion identifying and allowing a court to rely exclusively on the 'state plan' criteria in determining the existence of a federal right." <u>Carson P. ex rel. Foreman v. Heineman</u>, 240 F.R.D. at 538 (listing cases). In other words, a statutory provision was not rendered "unenforceable by an individual merely because the provision contains state plan requirements." <u>Id.</u> (quoting <u>Watson v. Weeks</u>, 436 F.3d 1152, 1158 (9th Cir. 2006)).

In 1997, the Supreme Court fashioned a three-prong test in <u>Blessing</u> to aid in the determination whether a federal statutory provision creates a "right" enforceable under Section 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. . . Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. <u>Blessing v. Freestone</u>, 520 U.S. at 340-341, 117 S.Ct. at 1360, 137 L.Ed.2d 569 ("In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms."); <u>see also</u> <u>Rio Grande</u>, 397 F.3d at 73.

Subsequently, the Supreme Court clarified and tightened the test in Gonzaga, 536 U.S. 273, 282, 122 S.Ct. 2268, 2275, 153 L.Ed.2d 309 (2002) (stating that first prong of the Blessing test requires an "unambiguously conferred right."). Following Gonzaga, the relevant inquiry includes (1) "whether the provision contains 'rights-creating language,'" (2) "whether the provision has an aggregate as opposed to an individualized focus;" and (3) "the other sorts of enforcement provisions that Congress has provided." Rio Grande, 397 F.3d at 73 (citing Gonzaga, 536 U.S. at 287-90, 122 S.Ct. 2268). As noted by the First Circuit: "This test is merely a guide, however, as the ultimate inquiry is one of congressional intent." Id.; Gonzaga Univ. v. Doe, 536 U.S. at 280, 122 S.Ct. at 2273, 153 L.Ed.2d 309 ("[U]nless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to create individual enforceable rights, federal funding provisions provide no basis for private enforcement by § 1983.").

In the case now before the Court, after the plaintiffs have voluntarily withdrawn the majority of their claims under the AACWA, the plaintiffs' asserted rights are limited to (1) a case plan containing documentation, including child specific recruitment efforts, of steps taken to secure a permanent home for them, pursuant to 42 U.S.C. §§ 671(a)(16) and 675 (1)(E); and (2) adequate foster care maintenance payments, pursuant to 42 U.S.C. §§

49

671(a)(1), 671(a)(11), 672(a)(11), 672(a)(1), and 675(4)(A).

Amended Complaint ¶ 231; Pltfs.' Obj. 45 n. 36.

Section 671 sets forth the "[r]equisite features of a State plan" for foster care and adoption assistance which a State must develop in order to be eligible for federal payments under the AACWA. Subsection 671(a)(16) provides "for the development of a case plan (as defined in section 671(1) of this title) for each child receiving foster care maintenance payments under the State plan and . . . a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child." Section 675 further defines "case plan" and includes the following provision in subsection 675 (1)(E):

> In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems to facilitate orderly and timely in-State and interstate placements. 42 U.S.C. § 675(1)(E).

To retain eligibility for federal payments under the AACWA, each State with an approved State plan "shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative . . . into foster care." 42 U.S.C. § 672(a)(1). Subsection 675(4)(A) further defines "foster care

50

maintenance payments" as:

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence. 42 U.S.C. § 675(4)(A).

As recognized by the District Court of Massachusetts in a recent challenge of the Massachusetts foster care system, "[f]ederal courts are divided as to whether the AACWA creates privately enforceable rights to either a case plan or foster care maintenance payments." Connor B. v. Patrick, – F. Supp.2d –, 2011 WL 31343 * 20 n. 13, n. 14 (D.Mass. Jan. 4, 2011)(Ponsor, J.)(listing cases, a majority of which recognize rights to both). The Massachusetts district court concluded that the AACWA provisions at issue satisfied all three Gonzaga factors and, therefore, create privately enforceable rights to case plans and foster care maintenance payments. Connor B. v. Patrick, 2011 WL 31343 at *20-22 ("[A]pplication of the Gonzaga factors makes it clear that Congress intended to create privately enforceable rights to individualized case plans and foster care maintenance payments under the AACWA.").

This Court agrees. With respect to these two provisions of the AACWA, neither their mandatory character nor the intended benefit to each child in the foster care system are ambiguous. An application

51

of the _Blessing_ factors (as refined by _Gonzaga_) to the AACWA sections at issue leads the Court to conclude that those specific provisions do confer a privately enforceable right on the plaintiffs. First, the requirements for a case plan with respect to "each child" and for foster care maintenance payments on behalf of "each child" who has been removed from his or her family, indicate that the plaintiff children are the intended beneficiaries of these provisions. 42 U.S.C. §§ 671(a)(16), 675(a)(1). These requirements demonstrate a focus on the specific needs of each child rather than a systemwide or aggregate focus. Moreover, the AACWA language regarding both provisions is explicitly mandatory, requiring that "a State . . . _shall_ have a plan approved by the Secretary which -- (1) provides for foster care maintenance payments" and – (16) provides for the development of a case plan," 42 U.S.C. §§ 751 (a) (1), (16), and that each State with an approved State plan "_shall_ make foster care maintenance payments on behalf of each child." 42 U.S.C. §§ 672(a)(1).

Second, the AACWA contains very specific requirements for an individualized case plan for each eligible child "that includes at least the following [elements]," 42 U.S.C. § 675 (1) (listing required numerous and detailed elements of case plan), and for foster care maintenance payments that "cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance

with respect to the child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. § 675(4)(A). As such, these provisions cannot be said to be so "'vague and amorphous' that [their] enforcement would strain judicial competence." <u>Blessing</u>, 520 U.S. at 340-341.

In addition, while it is correct that, in order to receive federal funding, a State is primarily required to <u>have</u> an approved plan which provides, *inter alia*, for foster care maintenance payments, the plain language of § 672(a)(1) also requires that each State with an approved plan "<u>shall</u> make foster care maintenance payments on behalf of each child" who has been removed into foster care. 42 U.S.C. § 672(a)(1)(emphasis added).

Third, regarding other types of enforcement provisions, it is undisputed that the AACWA does not contain private enforcement remedies for a State's non-compliance with the provisions on which the plaintiffs rely in their action. <u>See e.g.</u> <u>31 Foster Children v. Bush</u>, 329 F.3d 1255, 1272. Under the AACWA, the Secretary of Health and Human Services is tasked with overseeing the child welfare programs and is authorized to withhold funding for noncompliance with federal mandates. 42 U.S.C. § 1320a-2a. However, there is nothing in the AACWA to indicate that Congress intended to preclude private causes of action. In fact, although the ruling in <u>Suter</u> regarding the unavailability of private

enforcement of § 671(a)(15) was unaltered by the "Suter fix," the amendment also expressed Congress's intent not to preclude courts from determining whether other provisions of the AACWA allowed private enforcement actions.

The First Circuit's analysis and conclusion in Lynch, while it precedes Blessing and Gonzaga, is not inconsistent with either of those cases or their required examination of Congressional intent. In light of the AACWA's mandatory requirements to provide benefits to each child in the same circumstances as the plaintiffs, and the unavailability of other means to seek relief against alleged violations of the specific AACWA provisions raised in this case, this Court is of the opinion that the plaintiffs are not precluded from proceeding with their Section 1983 claims for alleged violations of their rights under the AACWA.

E. Breach of Contract Claims

The plaintiffs allege in their amended complaint that the State Plan required for federal reimbursement under the AACWA is a "legal contract[] between the federal government and the State" and that the plaintiffs, "as the intended direct third-party beneficiaries to these State Plan contracts are (i) being denied their rights under law to the services and benefits that the State of Rhode Island is obligated to proved to them under such contracts, and (ii) being harmed thereby." Amended Complaint ¶ 237, 238. The defendants initially assert that, because the plaintiffs have failed to

demonstrate an enforceable right under the AACWA, their contract claim should be dismissed as well. Defs.' Mot. 103. Additionally, the defendants argue that the plaintiffs have not established the existence of a contract. Defs.' Reply 50. In response, the plaintiffs suggest that the allegations in their amended complaint are sufficient to establish a contract. Pltfs. Obj. 65.

In light of the Court's earlier determination that the AACWA confers a private right of action on the plaintiffs with respect to two particular provisions therein, protracted discussion of the plaintiffs' breach of contract claim is unnecessary. As noted by another district court addressing a breach of State Plan claim, "the third party beneficiary issue is inextricably linked with the question of whether the AACWA creates a private right of action." D.G. ex. rel. Stricklin v. Henry, 594 F. Supp. 2d 1273, 1281 (N.D. Okla. 2009). Therefore, courts that have had occasion to consider this issue have generally dismissed or preserved a related breach of contract claim depending on their conclusion regarding the viability of a private action under the AACWA. See, e.g., D.G. ex. rel. Stricklin v. Henry, 594 F. Supp. 2d at 1281 (concluding that third party beneficiary claim failed because no private right of action under AACWA); Charlie H. v. Whitman, 83 F. Supp.2d 476 (D.N.J. 2000)(rejecting plaintiffs' intended beneficiary claims under either theory); Kenny A. ex. rel. Winn v. Perdue, 218 F.R.D. 277, 279 (N.D.Ga. 2003)(concluding that AACWA creates federal rights

enforceable under 42 U.S.C. § 1983 and that State Plans are contracts enforceable by plaintiffs as intended third-party beneficiaries.)

The Court expresses some doubt as to the plaintiffs' ability to establish that the State Plan at issue is a binding contract; however, because the plaintiffs' claims for the State's alleged non-compliance with the State Plan remains viable in their § 1983 claim pursuant to the AACWA, the Court is of the opinion that dismissal of the plaintiffs' breach of contract claim would be premature at this juncture.

### Conclusion

For the reasons set forth above, the Court DENIES the defendants' request to abstain from this case pursuant to the <u>Younger</u> doctrine with respect to the requested relief of (1) caseload caps for DCYF workers; (2) adequate training of DCYF workers; and (3) increase in the array and type of placements, including foster homes.

The Court GRANTS the defendants' request to abstain from this case pursuant to the <u>Younger</u> doctrine with respect to the requested relief of (1) decreasing the rate of institutionalization; (2) increasing the rate of adoptions; (3) decreasing the number of placements per child; and (4) decreasing the length of time in foster care.

The Court DENIES the defendants' request to abstain from this

case pursuant to the <u>Rooker-Feldman</u> doctrine.

The Court GRANTS the defendants' motion to dismiss the amended complaint as it relates to named plaintiffs Deanna H., Sam M., Tony M., Caesar S., and Michael B., on the ground that the claims became moot upon each child's adoption.

The Court DENIES the defendants' motion to dismiss the remaining plaintiffs' claims with respect to (i) the right to a case plan containing documentation, including child specific recruitment efforts, of steps taken to secure a permanent home for them, as provided in 42 U.S.C. § 671(a)(16); and (ii) the right to adequate foster care maintenance payments as provided in 42 U.S.C. §§ 671(a)(1), (a)(11), 672(a)(1), and 675(4)(A). All other claims raised under the AACWA are herewith DISMISSED.

The Court DENIES the defendants' motion to dismiss the remaining plaintiffs' claims for breach of contract.


SO ORDERED.


<u>/s/ Mary M. Lisi</u>

Mary M. Lisi

Chief United States District Judge


July 20, 2011