**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

CASSIE M., by Next Friend Kymberli Irons;
ALEX and JARED C., by Next Friend
Gregory C. Elliott; TERRENCE T., by Next
Friend Gregory C. Elliott; TRACY L., by
Next Friend Kymberli Irons; DAVID T., by
Next Friend Mary Melvin; and DANNY B.,
by Next Friend Gregory C. Elliott; for
themselves and those similarly situated[1],

        Plaintiffs

v.                                                      C.A. No. 07-241-ML

LINCOLN D. CHAFEE, in his official
capacity as Governor of the State of Rhode
Island; STEVEN M. COSTANTINO, in his
official capacity as Secretary of the
Executive Office of Health & Human
Services; and JANICE E. DEFRANCES, in
her official capacity as Director of the
Department of Children, Youth & Families,

        Defendants.


**MEMORANDUM OF DECISION**

    This case was brought on behalf of several minors (the "Named

Plaintiffs" or "Plaintiffs") in custody of the Rhode Island

Department of Children, Youth & Families ("DCYF"), who had been

placed into foster care after they were removed from their

biological homes following allegations of abuse and/or neglect.[2]

---

[1]

Pseudonyms are used for all minor plaintiffs.

[2]

Plaintiffs have named as defendants the governor, the
secretary of the executive office of Health and Human Services
("HHS"), and the director of DCYF (together, the "Defendants" or

1

After the parties engaged in a lengthy discovery process and after settlement negotiations were unfruitful, the Plaintiffs' case was presented to this Court in the course of a sixteen-day bench trial. At the conclusion of the Plaintiffs' case, the Defendants filed a motion for judgment on the record pursuant to Fed. R. Civ. P. 52. For the reasons set forth herein, that motion is GRANTED.

## I. Procedural History[3]

This case was first filed in 2007 on behalf of ten minor children, who were, at the time, in legal custody of DCYF, Rhode Island's child welfare agency. The action was initiated by then Rhode Island child advocate,[4] Jametta O. Alston ("Alston"), and a number of individuals (the "Next Friends") whom Alston had identified as suited to vindicate the children's constitutional rights in federal court. Sam M. v. Carcieri, 608 F.3d 77, 82 (1st Cir. 2010). Prior to filing suit, Alston had sent an undisclosed number of DCYF case files to the New York-based child advocacy

_____

the "State"), all of whom are sued in their official capacities.

[3]
In light of the detailed recounting of this litigation's history provided in other decisions from the First Circuit Court of Appeals and this Court, this Memorandum of Decision contains only an abbreviated summary. See e.g., Sam M. v. Carcieri, 608 F.3d 77 (1st Cir. 2010); Sam M. v. Chafee, 800 F.Supp.2d 363 (D.R.I. Jul. 20, 2011); Sam M. v. Carcieri, 610 F.Supp.2d 171 (D.R.I. Apr. 29, 2009).

[4]
The office of the child advocate is created by state statute, R.I. Gen. Laws § 42-73-7, which sets forth the duties to be performed by the child advocate.

group "Children's Rights." Children's Rights, which has brought suits against a number of other states in similar foster care management disputes, filed this action on behalf of the ten minor children. See <u>Connor B. v. Patrick</u>, C.A. No. 10-30073-WGY, — F. Supp.2d —, 2013 WL 6181454 at *30 n. 2 (D.Mass. Nov. 22, 2013)(noting that more than a dozen other states have settled with Children's Rights and that Massachusetts was the first state to proceed to trial in a similar dispute). The action, which named the governor, the secretary of the Rhode Island Office of Health and Human Services, and the director of DCYF as defendants, was intended as a class action suit on behalf of "all children who are or will be in legal custody of [DCYF] due to a report or suspicion of abuse or neglect." Complaint at ¶ 11 (Dkt. No. 1). The Plaintiffs alleged, *inter alia*, that the Defendants' failure to exercise reasonable professional judgment deprived the Plaintiffs of their substantive due process rights, for which they sought declaratory and injunctive relief. <u>Sam M. v. Carcieri</u>, 610 F.Supp.2d at 173.

After the Plaintiffs filed an amended complaint on September 7, 2007, (Dkt. No. 12), the Defendants sought dismissal of the case (1) for lack of standing on part of the Next Friends; (2) based on <u>Younger</u> and <u>Rooker-Feldman</u> abstention principles; and (3) for lack of a private right of action under the Adoption Assistance and Child Welfare Act ("AACWA"), 42 U.S.C. § 670-676. (Dkt. No. 25).

On April 29, 2009, the case was dismissed for lack of standing on part of the child advocate and the Next Friends. Sam M. v. Carcieri, 610 F.Supp at 173, 184. Plaintiffs appealed the decision and, on June, 18, 2010, the First Circuit Court of Appeals reversed the dismissal and remanded the case to this Court with instructions to allow the Next Friends to represent the Plaintiffs. Sam M. v. Carcieri, 608 F.3d at 81. The First Circuit noted that, although the children were represented in Rhode Island Family Court proceedings by court-appointed guardians ad litem, also known as Court Appointed Special Advocates ("CASA attorneys"), such an arrangement did not preclude the Plaintiffs from filing suit by a Next Friend. Id. at 87. The First Circuit further concluded that "because these foster care children lack significant ties with their parents and have been placed under the state's legal custody and guardianship, a significant relationship need not be required as a prerequisite to Next Friend status." Id. at 91. "Important social interests are advanced by allowing minors access to a judicial forum to vindicate their constitutional rights through a Next Friend that the court finds has a good faith interest in pursuing a federal claim on the minor's behalf." Id. at 91-92.

In determining whether a proposed Next Friend is "'truly dedicated to the best interests'" of the child whose interest he or she seeks to represent, the trial court must consider "the individual's familiarity with the litigation, the reasons that move

[him or] her to pursue the litigation, and [his or her] ability to pursue the case on the child's behalf." Id. at 92 (quoting Coal. of Clergy, Lawyers, and Professors v. Bush, 310 F.3d 1153, 1162 (9th Cir. 2002))[5].

The First Circuit affirmed the dismissal of all claims brought by four of the Named Plaintiffs (Briana, Alexis, Clare, and Deanna H.) on the ground that legal adoption had rendered their claims moot. Sam M. v. Carcieri, 608 F.3d at 81 n. 1, 93 n. 14. Subsequently, four of the remaining Plaintiffs (Sam M., Tony M., Michael B., and Caesar S.) named in the amended complaint were adopted as well, leaving only two of the original Named Plaintiffs—David T. and Danny B.

Following remand of the case to this Court[6], the Defendants filed a second motion to dismiss (Dkt. No. 79) the amended complaint based on (1) mootness, on the ground that all but two of the original ten Named Plaintiffs had been adopted; (2) abstention under Younger, on the ground that certain relief requested by the Plaintiffs from this Court would invade the province of the Family

_____

[5]
The Next Friends of the remaining Named Plaintiffs in this case are Gregory C. Elliot, PhD, associate professor of sociology at Brown University, and Kymberli Irons. Ms. Irons worked as a behavioral specialist at Named Plaintiff Cassie M.'s school before Cassie entered DCYF care. Professor Elliot has not met any of the former or current Named Plaintiffs.

[6] Senior Judge Ronald R. Lagueux recused himself from the case on August 4, 2010. (Dkt. No. 73).

Court; (3) abstention under Rooker-Feldman, on the ground that some of the Plaintiffs' claims amounted to a request to review unfavorable state court judgments; and (4) lack of private enforceable rights under the AACWA and, relatedly, for breach of contract. In a July 20, 2011 Memorandum and Order, this Court denied, in part, and granted, in part, the Defendants' motion to dismiss. (Dkt. No. 101).

On February 24, 2012, the Plaintiffs filed a second amended complaint (the "Complaint")(Dkt. No. 115), which added five children then in DCYF care as Named Plaintiffs (Cassie M., Alex and Jared C., Terrence T., and Tracy L.). The asserted causes of action which survived the Defendants' motion to dismiss are as follows:

(1) Substantive due process under the United States Constitution—Plaintiffs assert that the actions and inactions of Defendants "constitute a failure to meet the affirmative duty to protect from harm all Named Plaintiffs and class members, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs and class members." Complaint ¶ 220.

(2) Substantive due process under the United States Constitution: State-Created Danger—Plaintiffs assert that "removing Plaintiff Children from their caretakers [or returning them to their parents] and placing them in placements that Defendants know

or should know pose an imminent risk of harm to these children constitute to [sic] a policy, pattern, practice, or custom that is inconsistent with the exercise of professional judgment and that amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and class members." Complaint ¶ 224.

(3) Violation of the First, Ninth, and Fourteenth Amendments to the United States Constitution—Plaintiffs assert that "[a]s a result of Defendants' conduct, all Named Plaintiffs and class members have been and are being severely harmed and deprived of the liberty interests, privacy interests, and associational rights not to be deprived of a child-parent or a child-sibling family relationship,..." Complaint ¶ 228.

(4) Claims under the AACWA—Plaintiffs assert that the "Defendants are engaging in a policy, pattern, practice, or custom of depriving all Named Plaintiffs and class members of rights conferred on them by the [AACWA]," including rights to timely written case plans and adequate foster care maintenance payments. Complaint ¶ 230.

The parties then engaged in extensive and frequently contentious discovery proceedings. In November 2011, the parties attempted, with assistance from this Court, to agree on settlement terms; such efforts continued into 2012, but were ultimately unsuccessful. In the course of discovery, several changes occurred

on the Plaintiffs' legal team, and Alston—who had continued as Plaintiffs' counsel after leaving her post as Rhode Island's child advocate—withdrew as counsel of record on September 7, 2012. The claims of four of the remaining seven Named Plaintiffs were dismissed by stipulation when two of the Plaintiffs were legally adopted (Alex and Jared C.) and two reached the age of majority (Terrence T. and David T.).

In April 2013, Plaintiffs sought leave to appeal under Fed. R. Civ. P. 23(f), or, in the alternative, to obtain a writ of mandamus, seeking to challenge this Court's decision to address the question of class certification after a determination of the claims asserted by the individual Named Plaintiffs. On June 7, 2013, the First Circuit Court of Appeals denied the Plaintiffs' petition. (Dkt. No. 330).

On July 24, 2013, the Court scheduled the case for trial to commence on October 15, 2013.[7] (Dkt. No. 343). On August 2, 2013, the Plaintiffs filed a motion for a decision on class certification prior to the trial (Dkt. No. 348), which the Court denied. (Docket entry from August 14, 2013). On August 29, 2013, the Plaintiffs filed a motion to compel[8] the Defendants to permit private meetings

---

[7]

The trial start date was extended to November 12, 2013 to give counsel more time to prepare.

[8]

A motion for access to the Named Plaintiffs had been previously filed by Plaintiffs' counsel on November 20, 2012 (Dkt. No. 205), but was subsequently withdrawn on January 14, 2013 (Dkt.

with the Named Plaintiffs, to be conducted by the Next Friends and/or by Plaintiffs' counsel "for the purpose of preparing for the trial." Pltfs' Mot. Compel Access at 1 (Dkt. No. 376). On September 24, 2013, the Court denied the motion—filed three months after the close of discovery—on the ground that the acknowledged purpose of the proposed meetings was to gain information for production at trial that would have been otherwise discoverable. Transcript of Telephone Conference Sept. 24, 2013 at 11:11-25.

The Court did, however, grant the Plaintiffs' second request (Dkt. No. 207) to have Cassie M., Tracy L., and Danny B. evaluated by the Plaintiffs' retained forensic psychologist, Dr. Adamakos. Id. at 2:14-24. Prior to granting this motion, the Court obtained assessments from the Plaintiffs' treating physicians and psychologists, to confirm that the proposed testing and evaluation by Dr. Adamakos would not have any deleterious effect on the children. Id. at 2:18-24. Moreover, Cassie, who was seventeen at the time, and Tracy, who turned eighteen prior to commencement of trial, consented to the evaluation.[9] Id. The Court made clear that

<hr>

No. 257).

[9] On December 10, 2013, the tenth day of trial, without explanation, the Plaintiffs sought (by letter and oral motion) to dismiss without prejudice all claims raised by Tracy L. The Court notes that, although Tracy had reached the age of majority four months earlier, the Plaintiffs included her in the testing and interviewing process by Dr. Adamakos. It is this Court's understanding that Tracy was still in DCYF care at the time the Plaintiffs asked to dismiss Tracy's claims. (To summarize: of the fifteen Named Plaintiffs in this case, ten were legally adopted,

Dr. Adamakos was to be instructed that he was to inform the children at the beginning of the evaluations that they could discontinue the evaluation at any time. Tr. Sept. 24, 2013 at 3:12-17. <u>See</u> Declaration of Dr. Harry Adamakos at 7 (Dkt. No. 208)("If during the course of an evaluation a child becomes overly agitated, shuts down, <u>or does not want to continue speaking with me</u>, or if I believe that the evaluation is causing excessive upset to the child, or harming the child in any way, I would end the session or the testing immediately.")(Emphasis added).

The Plaintiffs presented their case to this Court on sixteen days between November 12, 2013 and January 9, 2014. In the course of their presentation, the Plaintiffs called five expert witnesses:

(1)   Joseph P. Ryan, PhD ("Dr. Ryan"), associate professor at the University of Michigan School of Social Work, who conducted a literature review on the impact of non-adherence to national professional standards applicable to child welfare systems;

(2)   Thomas Ward ("Ward"), who worked in the administration of child social services for several decades between 1969 and 2002, and who testified regarding several child welfare issues, including maltreatment in care, caseloads, CPS investigations, visitation, and placement array;

three reached the age of majority in the course of this litigation, and two remained as Plaintiffs during the trial.)

(3)    Mary Hansen, PhD ("Dr. Hansen"), associate professor of economics at American University, who was tasked with performing an assessment of the cost of caring for children in Rhode Island foster care and evaluating whether Rhode Island met its obligations under the AACWA in paying foster care maintenance;

(4)    Harry Adamakos, PhD ("Dr. Adamakos"), a clinical and forensic psychologist, who was asked to perform forensic clinical evaluations of the Named Plaintiffs,[10] focusing his inquiry on what the Plaintiffs experienced in DCYF care and "how they may or may not have been harmed from that experience." Trial Transcript ("Tr.") at 7:4-9, 9:5-8; and

(5)    Ruth Chambers, PhD ("Dr. Chambers"), associate professor of social work at California State University Long Beach, who conducted a case study of Danny and Cassie by examining their case files for the time period the Plaintiffs were in DCYF custody.

Following sixteen days of testimony, the Plaintiffs introduced into evidence a number of documents in regard to which no direct testimony had been offered during trial; this submission of

----

[10]    As previously noted herein, Dr. Adamakos conducted personal interviews with, and administered tests to, Cassie, Danny, and Tracy; however, Tracy's claims were dismissed without prejudice prior to Dr. Adamakos's testimony, and no testimony was offered in regard to her evaluation.

documentary evidence completed the Plaintiffs' case. After the Plaintiffs rested, the Defendants asserted their motion for judgment on the record pursuant to Fed. R. Civ. P. 52(c). At that time, the Court inquired whether Plaintiffs intended to dismiss voluntarily the breach of contract claim. Tr. XVI at 123:21-124:18.[11] Counsel responded in the negative. Tr. XVI at 124:19-125:13. Because no evidence related to a contract claim had been submitted during trial, the Court dismissed that claim. Tr. XVI at 125:9-11. Pursuant to the Court's direction, the parties provided timely memoranda in support of their respective positions on the State's motion. (Dkt. No. 497-1, Dkt. No. 498).

## II. Standards of Review

### (A) Motion for Judgment on the Record

Pursuant to Federal Rule of Civil Procedure 52(c), "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed.R.Civ.P. 52(c). The Court's

---

[11]

Plaintiffs' claim of breach of federal contractual obligations to third party beneficiaries, asserted as the sixth cause of action in the amended complaint, (Dkt. 12 at 81), survived the State's motion to dismiss, see Memorandum and Order from July 20, 2011 (Dkt. No. 101 at 55-56, preserving breach of contract claim). However, it does not appear that Plaintiffs reasserted a separate breach of contract claim in their Second Amended Complaint (Dkt. No. 115).

"judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)[12]." Id.

A court should enter judgment pursuant to Rule 52(c) "[w]hen a party has finished presenting evidence and that evidence is deemed by the trier insufficient to sustain the party's position." Morales Feliciano v. Rullan, 378 F.3d 42, 59 (1st Cir. 2004); In re Mosher, 432 B.R. 472, 475 (Bkrtcy.D.N.H., June 8, 2010)(Rule 52(c) motion should be granted "where the plaintiff fails to make out a *prima facie* case, or despite a *prima facie* case, the court determines that the preponderance of evidence goes against the plaintiff's claim"). In ruling on a motion pursuant to Rule 52(c), the Court "need not consider the evidence in a light favorable to the plaintiff and may render judgment for the defendant if it believes the plaintiff's evidence is insufficient to make out a claim." Geddes v. Northwest Missouri State Univ., 49 F.3d 426, 429 n. 7 (8th Cir. 1995). Is it the Court's prerogative "to weigh the evidence, resolve any conflicts in it, and 'decide for itself where the preponderance lies.'" Morales Feliciano v. Rullan, 378 F.3d at 59 (citing 9C Wright & Miller Fed. Prac. & Proc. Civ. § 2573.1, at

---

[12]
Federal Rule 52(a) provides the following:
In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58. Fed. R. Civ.P. 52(a).

497-99); <u>Int'l Union of Operating Eng'rs, Local Union 103 v. Indiana Constr. Corp.</u>, 13 F.3d 253, 257 (7th Cir. 1994)(citing <u>Von Zuckerstein v. Argonne Nat'l Lab</u>., 984 F.2d 1467, 1475 (7th Cir. 1993)).

### (B) Substantive Due Process Claims

Before addressing the Defendants' motion on the merits, the Court must make a determination that is critical to its analysis in this case: under what standard of review are the Plaintiffs' claims and the State's corresponding motion to be considered?

After the Plaintiffs rested and the State asserted its motion under Fed.R.Civ.P.52(c), the Court noted that, in the pretrial memoranda, the parties had indicated a distinct dispute over the standard of proof applicable to substantive due process claims asserted by children in foster care. For that reason, the Court expressly instructed the parties to present it with case law, particularly from the First Circuit, to support their respective positions. Tr. XVI 126:10-127:1.

The State, in its memorandum, asserts that "[t]he 'shock the conscience' standard must be applied to the facts of this case." State Mem. at 11 (Dkt. No. 497-1). More particularly, the State argues that the First Circuit Court of Appeals has consistently applied the "shock the conscience" standard to *all* substantive due process challenges to executive action. <u>Id.</u> at 7. The Court notes, however, that the cases on which the State relies for this

assertion are not related to children in foster care nor do they involve individuals in involuntary custody. See e.g., DePoutot v. Raffaelly, 424 F.3d 112 (1st Cir. 2005)(§ 1983 claim asserted against arresting officer by individual whose drivers' licence was suspended for refusing to submit to breath test); Martinez v. Cui, 608 F.3d 54 (1st Cir. 2010)(§ 1983 claim against medical resident at state medical facility for alleged sexual assault during emergency room examination); Hawkins v. Freeman, 195 F.3d 732 (4th Cir. 1999)(§ 2254 claim by parolee for re-arrest following erroneous early release); Mongeau v. City of Marlborough, 492 F.3d 14 (1st Cir. 2007)(§ 1983 action by developer against city following denial of building permit); Gonzales-Fuentes v. Molina, 607 F.3d 864 (1st Cir. 2010)(class of prisoners convicted of murder brought § 1983 claim following their re-incarceration).

The State does acknowledge that the First Circuit Court of Appeals concluded in J.R. v. Gloria, 593 F.3d 73 (1st Cir. 2010), a DCYF case, that "deliberate indifference" may rise to conscience-shocking conduct in the foster care context. Id. at 10. See J.R. v. Gloria, 593 F.3d at 80 (noting that "deliberately indifferent behavior does not per se shock the conscience . . . it is only '[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions' that 'deliberately indifferent behavior *may* suffice to shock the conscience.'")(quoting Rivera v. Rhode Island, 402 F.3d 27, 36 (1st

Cir. 2005)). The State also acknowledges that, in this Circuit, the application of the conscience-shocking standard "varies from context to context," Coyne v. Cronin, 386 F.3d 280, 288 (1st Cir. 2004), and that the "analysis will vary with the subject matter and the circumstances." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006).

Accordingly, the State's position is that "[a]t bottom, conduct must be conscience-shocking; nonetheless the State maintains that 'deliberate indifference' must be applied here" to gauge the Defendants' conduct. Defs' Mem. at 10. The State expressly rejects the suggestion that "a mere substantial departure from professional judgment without more establishes a cognizable substantive due process claim," noting that "this amounts to nothing more than a negligence standard." Id.

On their part, the Plaintiffs urge the Court to apply the "professional judgment" standard, which "does not require Plaintiffs to separately demonstrate conscience-shocking conduct." Pltfs.' Mem. at 10 (Dkt. No. 498). To support their argument, the Plaintiffs rely on a line of Supreme Court cases that establish an appropriate standard of review for substantive due process claims brought by, or on behalf of, parties "who are in the custody of the state through no fault of their own." Id. 10-12; Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)(applying "professional judgment" standard to an involuntarily committed

16

individual suffering from mental retardation, and acknowledging that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.")(internal quotation marks and citation omitted); County of Sacramento v. Lewis, 523 U.S. 833, 852 n. 12, 118 S.Ct. 1708, 1719 n.12, 140 L.Ed.2d 1043 (1998)(confirming that an involuntarily committed patient could "state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment" because "[t]he combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare").

The Plaintiffs also point to a series of cases from the First Circuit to support their position that the Youngberg professional judgment standard should be applied in this case. Pltfs.' Mem. at 11-14. See e.g. Santana v. Collazo, 793 F.2d 41, 43 (1st Cir. 1984)(acknowledging that "juveniles who have not been convicted of crimes have 'a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals'")(citation omitted); Doe v. Gaughan, 808 F.2d 871, 885

(1st Cir. 1986)(applying Youngberg standard to claims by involuntarily committed patient with mental retardation; noting, however, that "[i]n determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness.")(quoting Youngberg, 457 U.S. at 324, 102 S.Ct. at 2462-63); Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011)(in case of civilly committed plaintiff, application of Youngberg standard, defined as "whether the defendant failed to exercise a reasonable professional judgment"); Davis v. Rennie, 264 F.3d 86, 98 (affirming trial court's refusal to apply "shock the conscience" standard to § 1983 claims brought by involuntary committed mental patient against mental health personnel). It is noted that in Davis v. Rennie—which was decided after Sacramento v. Lewis—the First Circuit confirmed the distinction between criminals in confinement and persons in custody involuntarily and through no fault of their own. 264 F.3d at 99-100. Because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," the Davis Court concluded that a "shocks the conscience" jury instruction was not indicated.

Because there does not appear to be a clearly established standard under which to review substantive due process claims by children in state care, in the context of what amounts to

institutional reform litigation, the Court has reviewed both Supreme Court precedent and case law from this Circuit to discern the principles which must shape its analysis.

A review of decisions from courts which have considered due process claims in similar, if not identical, circumstances, leads this Court to conclude that the prevailing standards are not clearly delineated; rather, the appropriate standard for considering substantive due process claims falls somewhere on a continuum between the failure to exercise "professional judgment" and conduct that is clearly "conscience shocking." Factors that determine where on the continuum the standard lies include (1) the nature of the right alleged to be violated; (2) the characteristics of the plaintiffs who allege such a violation; (3) the existence of a special relationship between plaintiffs and defendants; (4) the acts or omissions of defendants and/or resulting harm suffered by the plaintiffs; and (5) the circumstances under which the complained of conduct occurred. Any variation in the facts of a case moves the fulcrum of the scale on which the substantive due rights of the individual are weighed against the necessity of officials' behavior.

It is well established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v.

Winnebago Cnty. Dept. of Social Serv., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989)(citing Youngberg v. Romeo, 457 U.S. at 317, 102 S.Ct. at 2458). The DeShaney Court also acknowledged that the removal of a child from his family and placement in a state-operated foster home created a situation "sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." Id. at 201 n. 9, 109 S.Ct. at 1006 n. 9.

Youngberg established that individuals in civil custody of the state generally enjoy broader liberty rights than those in criminal custody. 457 U.S. at 321, 102 S.Ct. at 2461 (holding that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish"). Accordingly, the standard appropriate in the civil commitment context is distinguishable from the "deliberate indifference" standard applicable in the prisoner context. See Estelle v. Gamble, 429 U.S. 97, 104, 97, S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)(concluding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment").

In Youngberg, the Court acknowledged the necessity for a "balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of

safety and freedom from unreasonable restraints." 457 U.S. at 322, 102 S.Ct. at 2461. The Court also noted that "courts must show deference to the judgment exercised by a qualified professional." 457 U.S. at 322, 102 S.Ct. at 2461. "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id.

The Court's subsequent statement in Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998), that "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," does not change its holding in Youngberg regarding the applicability of the "professional judgment" standard.    Lewis involved a high-speed pursuit of a motorcyclist by a sheriff's deputy, during which the motorcycle passenger was killed. The Court distinguished those circumstances from those of the typical pre-trial custody, concluding that "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" 523 U.S. at 853, 118 S.Ct. at

1720 (citation omitted).

From this line of Supreme Court cases, it is apparent that both the "professional judgment" standard and the "deliberate indifference" standard have a place in this type of analysis and that conduct that fails under either standard may or may not also implicate the "shock the conscience" test. Lewis, 523 U.S. at, 118 S.Ct. at 1719)("That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.")(quoting Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942)).

The First Circuit has acknowledged that "the 'shock the conscience' standard is imprecise," DePoutot v. Raffaelly, 424 F.3d at 118, and that decisions with respect to substantive due process claims "are almost always highly dependent on context and detail." Id. at 119. See Coyne v. Cronin, 386 F.3d at 288 ("The conscience-shocking standard is not a monolith; its rigorousness varies from context to context")(citing Lewis, 523 U.S. at 850). The First Circuit Court of Appeals has acknowledged that "in situations where a state creates a special relationship because of 'the limitation which [the state] has imposed on [an individual's] freedom to act on his own behalf,' its subsequent failure to protect an individual may amount to a substantive due process

violation." <u>J.R. v. Gloria</u>, 593 F.3d at 79(quoting <u>Rivera v. Rhode Island</u>, 402 F.3d at 34 (quoting <u>DeShaney</u>, 489 U.S. at 200, 109 S.Ct. 998)). In <u>J.R. v. Gloria</u>, the minor plaintiffs were removed from their mother's custody and placed into Rhode Island foster care, where they were alleged to have suffered physical and sexual abuse. The plaintiffs' claims were directed against a social worker and her supervisor individually for failing to comply with state law requirements. After the trial court granted the defendants judgment as a matter of law based on the defendants' qualified immunity, the Court of Appeals upheld the dismissal of the case.

The Court noted in <u>J.R.</u> that "[t]he mere creation of a special relationship, even if placing young children into foster care created such a relationship, is not enough to make out a due process claim for any harm that may follow." <u>J.R. v. Gloria</u>, 593 F.3d at 79. Rather, the plaintiff is required to establish that the conduct by state officials was "conscience-shocking." <u>Id.</u> The Court concluded that "state officials' negligence, <u>without more</u>, is simply insufficient to meet the conscience-shocking standard." <u>Id.</u> at 80 (emphasis added). <u>See also</u>, <u>Rivera v. Rhode Island</u>, 402 F.3d at 36 ("[I]n a state creation of risk situation, where the ultimate harm is caused by a third party, 'courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and

action.'")(quoting <u>Soto v. Flores</u>, 103 F.3d 1056 (1st Cir. 1997)).

The <u>J.R.</u> Court reiterated that "deliberately indifferent behavior does not <u>per se</u> shock the conscience." <u>Id.</u> at 80 (emphasis added). "[I]t is only '[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions' that "deliberately indifferent behavior may suffice to shock the conscience.'" <u>Id.</u> (quoting <u>Rivera v. Rhode Island</u>, 402 F.3d at 36).

The precedential value of <u>J.R. v. Gloria</u> to establish the applicable standard of review in the circumstances of the case now before this Court is limited, however. As pointed out by Judge Ponsor of the District Court for the District of Massachusetts, the parties in <u>J.R.</u> did not raise the applicability of the professional judgment standard under <u>Youngberg</u>; <u>J.R.</u> did not seek to address alleged systemic failures within the foster care system; and the plaintiffs in <u>J.R.</u> sought damages, not injunctive relief. <u>Connor B. v. Patrick</u>, C.A. No. 10-cv-30073-MAP, 771 F.Supp.2d at 162 n.5.

Another indication as to which standard of review is appropriate in the instant case is the First Circuit's pronouncement that "the shocks-the-conscience test, first articulated in <u>Rochin v. California</u>, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), governs <u>all</u> substantive due process claims based on executive, as opposed to legislative, action." <u>Martinez v. Cui</u>, 608 F.3d at 64 (emphasis added)(Plaintiff asserted claims of sexual assault by medical resident at state facility as violation of

substantive due process under § 1983). The Martinez Court noted, however, that "whether behavior is conscience-shocking may be informed in some cases by the nature of the right violated." Id. at 66. Moreover, unlike in the instant case, which seeks to address allegations of systemic shortcomings of the State's foster care system, the plaintiff's allegations in Martinez were more akin to those asserted in a negligence or medical malpractice tort claim. Martinez, 608 F.3d at 66-67 ("The Supreme Court has repeatedly emphasized that due process claims may not be used in that manner." See Lewis, 523 U.S. at 848-49, 118 S.Ct. 1708 (citing Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)).

Other courts that have addressed the issue in circumstances comparable to the instant case have sometimes elected to combine standards under which to review allegations of substantive due process violations. In Yvonne L. v. New Mexico Dept. of Human Serv., 959 F.2d 883 (10th Cir. 1992), the Tenth Circuit Court of Appeals reviewed two plaintiffs' civil rights action against state officials for injuries they suffered while in state custody and foster care. The Yvonne L. Court adopted the standard set forth in Youngberg, noting that "'[f]ailure to exercise professional judgment' does not mean mere negligence as we understand Youngberg; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements." Yvonne L. v. New Mexico Dept. of Human

Serv., 959 F.2d at 894. See also Schwartz v. Booker, 702 F.3d 573, 585-586 (10th Cir. 2010)(§ 1983 claim for violation of substantive due process rights brought against human services department after child died in foster care)("Whether the state official failed to exercise professional judgment requires more than mere negligence; the official must have abdicated her professional duty sufficient to shock the conscience.")

The Ninth Circuit Court of Appeals conducted a detailed review of the standards employed by other courts in cases involving foster care. Tamas v. Dept. of Social & Health Serv., 630 F.3d 833, 844-846 (9th Cir. 2010)(Plaintiffs brought claims of negligence and civil rights violations against department and nine of its employees, after suffering years of sexual abuse at hand of foster parent). The Tamas Court, persuaded by Ninth Circuit precedent and cases from other circuits, applied the "deliberate indifference" standard. Tamas v. Dept. of Soc. & Health Serv., 630 F.3d at 845. The Court further explained that the standard, "as applied to foster children, requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference." Id. The Court noted that "the subjective component may be inferred 'from the fact

that the risk of harm is obvious.'") Id. (citation omitted).

A similar two-element "deliberate indifference" standard was applied by the Seventh Circuit Court of Appeals in Waubanascum v. Shawano Cnty., 416 F.3d 658 (7th Cir. 2005)(Substantive due process claims asserted by foster child against counties and school district after child suffered sexual abuse by foster parent). The Waubanascum Court defined a "modified" deliberate indifference standard, under which "the state must have actual knowledge or suspicion of the risk of harm the child may suffer while in foster care." Waubanascum v. Shawano County, 416 F.3d at 666-667.

The Fourth Circuit Court of Appeals drew the distinction between "deliberate indifference" and "negligence" in the foster care context in Doe v. South Carolina Dept. of Soc. Serv., SCDSS, 597 F.3d 163 (4th Cir. 2010)(Claims brought by minor and her adoptive parents related to child's foster care placement and adoption process). The Court of Appeals concluded that the involuntary removal of a child from her home imposed a responsibility on the state for the child's safety and general well-being, which included "a duty not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security." Doe v. South Carolina Dept. of Soc. Serv., SCDSS, 597 F.3d at 175. The Court noted that a "'claim of deliberate indifference, unlike one of negligence . . . implies at a minimum that defendants were plainly placed on notice of a danger

and chose to ignore the danger notwithstanding the notice.'" Id. at 175 (quoting White v. Chambliss, 112 F.3d 731, 737 (4th Cir. 1997)).

Although the cases from other circuits are instructive on the issue of the appropriate standard of review, the applicability of those cases is limited because they all arose from claims asserted by foster children who had suffered severe abuses by foster parents or by third parties while the plaintiffs were in foster care. In contrast, the Plaintiffs in this case seek declaratory and injunctive relief in an effort to bring about systemic changes that, they believe, will improve the Rhode Island foster care system.

The Plaintiffs in the instant case clearly belong in a most vulnerable category. They are minors who have been removed from their homes after a finding of abuse and/or neglect. They find themselves in custody of the State involuntarily and through no fault on their part. The Court notes that the due process claims asserted by the Plaintiffs are not directed against individuals for alleged wrongdoings, and that the Plaintiffs do not seek compensation for the harm they allege to have suffered or the risk of harm they allege to have been exposed to. Instead, the Plaintiffs seek injunctive and declaratory relief to effect systemic reform to Rhode Island's child welfare services, particularly the State's foster care system. Complaint at 37 (Dkt.

No. 115).

Under those circumstances, and after reviewing the relevant case law, the Court concludes that a straight application of the "shock the conscience" standard suggested by the State is inapplicable in this case, to the extent that the standard requires conduct that is "'extreme and egregious,'" Pagan v. Calderone, 448 F.3d 16, 32 (1st Cir. 2006) (quoting DePoutot, 424 F.3d at 118), "'truly outrageous, uncivilized, and intolerable,'" id. (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999), or "'stunning,'" id. (quoting Amsden v. Moran, 904 F.2d 748, 754 n. 5 (1st Cir.1990)).

Under the circumstances of this case, a substantial departure from accepted professional judgment, or a deliberate disregard (or complete absence) of a process established by the State for the protection of children in foster care may well constitute a degree of deliberate indifference that could also be said to shock the conscience. The question remains, however, against which accepted professional standard any such deviation should be measured and what degree of deviation from such a standard is required to result in a violation of the plaintiffs' due process rights.

In the course of the trial, the Plaintiffs frequently referred to the "Standards of Excellence" established by the Child Welfare League of America ("CWLA"), a membership-based child welfare organization. The CWLA standards, by their own description, "are

intended to be standards of excellence—goals for the continuing improvements of services for children and their families." 1999 CWLA Standards, Ex. 2004 at PLTF0032801. The CWLA standards provide "a vision to which we can aspire," id., and they "carry no implication of control or regulation." Id. at PLTF0032809. Accordingly, the CWLA standards present an ideal or goal to be achieved; they cannot serve to establish whether Rhode Island policies or conduct by state officials or employees falls short of professional judgment.

Another set of standards against which Plaintiffs sought to measure services provided by the State to children in foster care is set by the Council for Accreditation ("COA"). Tr. I at 134:1-14. The COA accredits child welfare agencies, and its standards are intended to guide practices in the delivery of foster care services. Rhode Island has officially acknowledged that "[the standards set by the Council on Accreditation (COA) are nationally recognized as best practices for protecting and providing services to abused and neglected children." R.I. Gen. Laws 42-72-5.3(a). Rhode Island has also declared its intent "to provide the resources for the department of children, youth, and families to meet, achieve and sustain accreditation by the Council on Accreditation." R.I. Gen. Laws 42-72-5.3(b). To the extent Rhode Island DCYF practices and policies have adopted or have been modeled after the COA standards, a significant deviation from COA standards may well

constitute a substantial departure from accepted professional judgment that, under certain circumstances, may give rise to a substantive due process claim by individuals for whose benefit such standards have been implemented.

The Court notes that, as is further detailed herein, the COA standards do not have the force of statutory regulations and they include some built-in flexibility in certain circumstances. The Court is also mindful that the State, although it is mandated to protect the health and safety of the children it takes into its custody and places into the foster care system, can control neither the volume of its intake, nor the characteristics and needs of its individual charges.

In consideration of the Plaintiffs' extreme vulnerability, the special relationship established by the State upon taking custody of the Plaintiffs, the nature of the due process rights asserted by the Plaintiffs, and the harm which the Plaintiffs allege to have suffered, the Court is of the opinion that official conduct which constitutes either a deliberate disregard of, or a substantial deviation from, a professional standard acknowledged and, at least in part, implemented by the State, may support the Plaintiffs' claim of a due process violation if such conduct can also be shown to have deprived the Plaintiffs of a constitutionally protected interest.

It is against this framework that the Court will proceed to

review the Plaintiffs' claims of due process violations and the evidence that they presented in support of their allegations at trial. The following constitutes the Court's findings of facts and conclusions of law in considering the State's motion for judgment on the record pursuant to Fed.R.Civ.P. 52(c).

## III. Findings of Facts and Conclusions of Law

### (A) The Named Plaintiffs

#### 1. Cassie M.

Cassie was born in 1996. Tr. XI at 24. After an investigation into allegations of abuse and neglect in her biological home, Cassie entered DYCF care in 2006, when she was nine years old. Tr. XI at 25. Although not every detail of Cassie's early years need be discussed herein, some of the undisputed facts establish that, while in her biological home, Cassie lived in circumstances that no child should have to experience. Tr. XII at 58-61. To summarize, Cassie suffered neglect and deprivations of the most extreme kind; she was also exposed to physical abuse, sexual abuse of her siblings, and incidents of domestic violence. Id. While still living in her biological home, Cassie was diagnosed with ADHD for which she was prescribed Adderall (although there was some question as to whether her mother was giving the medication to Cassie regularly). Tr. XII at 61.

Cassie's younger sister and two older half-sisters[13] entered into DCYF care at the same time; an older half-sister was no longer living at the house full-time. Tr. XI at 26-27. Initially, Cassie was placed in foster care on an emergency basis for less than a month, after which she was placed into specialized foster care with the DM family for about a year. Tr. XI at 30. During her stay at the DM home (where her half-sisters were also placed for a time, see Tr. XII at 107), Cassie exhibited certain disruptive behaviors that made her difficult to manage. Tr. XI at 34. A psychiatric evaluation performed seven weeks into foster care placement revealed that Cassie was grossly underweight, had minimal hygiene skills, was unfamiliar with the use of a knife and fork, and had to be redirected to limit her physical contact with others. Tr. XII 64, Ex. 2048. Cassie's treating psychiatrist stated that it was "unclear whether [Cassie] will be able to tolerate a more intimate setting without more intense and unstable effects," Tr. XII at 67:15-17, and included in his diagnoses "rule out language disorder" and "rule out reactive attachment disorder." Tr. XII at 68:20-25. While Cassie was at the DM home, she was provided with weekly therapy and other support from NAFI [North American Family Institute]. Tr. XII at 69. After the DM family requested camps or after-school dance activities for Cassie to assist with her

---

[13]

It is unclear how long the two half-sisters stayed in DCYF care; both of them were teenagers in 2006. Tr. XI at 28.

behaviors, they were provided. Tr. XII at 70. In early 2007, Cassie was referred for a sexual abuse evaluation because she was exhibiting certain sexualized behaviors. Tr. XII at 80.

Cassie was eventually removed from the DM home because both the foster family and DCYF considered the situation unworkable. Tr. XI at 35. Cassie's behaviors while in the DM home included hoarding of food, taking and destroying things, lying, temper tantrums, sexual and physical boundary issues, as well as enuresis and encopresis. Tr. XII at 70-71.

Cassie stayed less than six months in another specialized foster home (the J home); although Cassie initially did show improvement, there was some regression in her more difficult behaviors. Tr. XI at 36. In general, there was concern that Cassie had problems attaching to either of the two foster homes. Tr. XI at 38. While at the J home, Cassie was again provided with services by DCYF, including weekly counseling. Tr. XII at 72. As no third specialized foster home was available, and it was believed that Cassie needed more services than a specialized foster home could offer, Tr. XII at 73, Cassie was placed in the TH group home, where she remained for approximately three years. Tr. XI at 37. During that placement, Cassie demonstrated some success in terms of her behavior, although other behavioral problems remained. Tr. XI at 41.

In the interim, about two years after Cassie was first placed

into DCYF custody, her mother's parental rights were terminated. Tr. XI at 53-54. Prior to such termination, a clinical psychologist conducted a parent-child evaluation, in which the psychologist observed, *inter alia*, that Cassie's mother was "emotionally isolated" from her daughters, and that Cassie was "the most isolated" of the three girls.[14] Tr. XII at 77:5-21. Cassie's mother was diagnosed as bipolar; and it was noted that, rather than taking her medication, Cassie's mother would smoke marijuana in an attempt to alleviate her condition. Tr. XII at 84.

Although the Family Court allowed Cassie's mother continued contact with Cassie, the visits were inconsistent and sporadic, with long periods of time where there was no contact from the mother. Tr. XI at 55. Cassie appeared to be disturbed by the contact with her mother (and the infrequency of it), and Cassie's behavior became more difficult both before and after visits. Tr. XI at 55-56.

In April 2010, it was recommended that Cassie be placed in a specialized pre-adoptive foster home. Tr. XI at 42. In June 2010, Cassie was placed in the LH group home for about 19 months. Tr. XI at 42. During that placement, it was noted that there was an increase in the problematic behaviors; Cassie was described as oppositional and disruptive. Id. At times, Cassie threatened to

---

[14]

As previously noted herein, two of the five girls were older and their involvement with DCYF was brief.

harm herself, which resulted in several hospitalizations. Cassie never did harm herself, however; peer conflicts were usually verbal; and there was no record of physical altercations, although there was some sexual acting out between Cassie and other residents. Tr. XI at 43-45. In one particular incident, inappropriate contact between Cassie and another resident led to a two-day suspension of one of the staff members. Tr. XI 46. While she was at this second group home, Cassie maintained contact with visiting resources, a couple with whom Cassie formed a good bond of attachment.

In November 2011, the recommendation was made that Cassie be placed in a specialized foster home without younger children. Tr. XI 47. In early 2012, Cassie was placed in the AD home—another specialized foster home—where she stayed about eleven months. Tr. XI at 49. After leaving the AD home[15], Cassie was placed in another group home[16]. Tr. XII at 99. Around that time, Cassie's younger sister A. was legally adopted. Tr. XI at 87. At some point, A.'s adoptive parents requested that Cassie's communication with her sister be discontinued as it was having a negative effect on A. Tr.

---

[15]

According to the record, AD stopped fostering children because the agency she was working with closed its doors.

[16]

Apparently, Cassie was placed in two different group homes that both were abbreviated as "LH," which confuses understanding of her placement history; it does not affect a determination of the events that took place over the course of Cassie's time in DCYF care.

XII at 107.

Following a physical dispute at this group home, Cassie went to another foster home, but decided that she did not want to stay there. Tr. XII at 100. At the time of the trial, Cassie was residing at the G group home. Tr. XI at 53.

### 2. Danny B.

Danny was born in 2001. Danny's biological family had come to DCYF's attention in 2004, when police were called because Danny and his younger brother, M., were found wandering the streets. Tr. X at 144. In the course of a CPS [Child Protective Services] investigation, it was determined that the mother had left the boys with a caregiver who had become intoxicated. Tr. XI at 138. Danny and M. were removed from their biological home in April 2005—when Danny was four years old—for reasons of neglect, concerns about parental drug use and substance abuse, lack of parental supervision, and the occurrence of domestic violence requiring police intervention. Tr. X at 38, 39, 145. The home had also been found unfit for habitation. Tr. X at 145.

At the time Danny and M. came into DCYF care, Danny was described as "energetic, hyperactive, and impulsive." Tr. X at 41:2-5. He also had some speech and motor issues, Tr. X at 41; very limited verbal ability, Tr. XI at 153; and he was "undersocialized," with regard to hygiene, toileting, and other issues. Tr. XI at 41:6-8. After a very brief placement with their

maternal great-grandmother, the great-grandmother indicated that both Danny and his brother were exhibiting sexualized behaviors and that she could not handle their behavior.[17] Tr. XI at 151, 182. Danny was then placed in the LF foster home, where he remained for more than a year. Tr. X at 42. M. was placed in a different foster home. During Danny's stay at the LF home, the foster mother reported that Danny had problems with enuresis, encopresis, screaming, swearing, and aggressive behavior on a daily basis. Tr. XI at 176. Danny's psychiatrist diagnosed him with adjustment disorder, disturbance of conduct, and a rule-out diagnosis of ADHD. Tr. XI at 177. While in the LF home, Danny received weekly treatment by a clinician to assist the foster mother with Danny's behaviors. Tr. XI at 180-181. The foster mother also observed sexually explicit behavior on Danny's part and expressed her concern regarding that issue during an IEP [Individualized Education Program] meeting at Danny's school. Tr. XI at 186. Danny was removed from the LF foster home after there was an allegation of sexual abuse[18], which, after an investigation, was determined to be unsubstantiated. Tr. X at 47.

Following his removal from the LF home, Danny appeared to

---

[17]

M. was later referred for a sex abuse evaluation because of his sexualized behaviors. Tr. XI at 182.

[18]

The allegation was raised by an unidentified third party, not Danny himself. Tr. X at 48.

require more structure and direction. He was difficult to manage and he began to make allegations that his brother had touched him over his clothes. Tr. X at 49-50. After a brief return to his great-grandmother's house, where he was reunited with his brother, Danny was placed in a group home. Tr. X at 51. He showed some improvement in the group home setting and, by May 2007, an adoption placement was strongly recommended. Tr. X. at 52. Efforts to find a suitable pre-adoptive home were made by DCYF, and Danny began visiting with the J family. Tr. X at 52. The adoption did not come to fruition after Danny alleged that he had been hit by the pre-adoptive father during a visit, an allegation that the family denied. Tr. X at 53-54; Tr. XII at 38.

After additional efforts by DCYF, another potential pre-adoptive home was found, and Danny stayed with the T family for about seven months. Tr. X. at 54. After the T family found Danny's behavior too difficult to manage, Danny returned to the group home where he stayed for approximately eight months. Tr. X at 55. Again, Danny responded to the structure provided in the group home and his behavior improved. Tr. X at 56. During this placement, Danny was receiving regular weekend visits with his grandmother and with a visiting resource. Tr. XII at 17. Some time after he was removed from the T family, Danny alleged that the pre-adoptive mother had yelled at him and that the pre-adoptive father had twisted his arm. Tr. X at 57.

In February 2010, another pre-adoptive home was identified for Danny. Tr. X at 60. The adoption by AF, a single male, did not come to pass after AF withdrew from consideration. Tr. X at 67. Although the record shows that AF was given extensive information regarding Danny's evaluation, care, and treatment, it appears that AF conducted internet research on his own and then conveyed to DCYF that he thought Danny would benefit from services more targeted towards Danny's sexual acting out. Tr. XII at 33-34. After AF's withdrawal, Danny exhibited some decline in his functioning, which included the recurrence of sexual acting out. Tr. X at 70.

In December 2010, now at age nine, Danny received a placement at the SM residential treatment center. Tr. X at 70. Following that placement, Danny showed some improvement, but also an increase in sexual acting out. Tr. X at 73. According to a caseworker's note, Danny was punched during a physical altercation with another child at the home. Tr. X at 79. When Danny's social worker was advised that, following an incident with another resident, Danny was bruised, she met with Danny's clinician. Tr. XII at 45-46. The incident was investigated and, after it was concluded that staff could not have prevented what was a "spontaneous engagement between two residents," staff was advised to continue an "increased level of oversight." Tr. XII at 46:21-25.

On another occasion, Danny was restrained by staff, Tr. X at 79, and there was some indication in Danny's file that there had

been two investigations as to staff conduct for allegations of an incident involving inappropriate restraints. Tr. X at 84. That incident did not involve Danny; there was no evidence in the record that Danny was present or observed the incident; and, following a CPS investigation, the staff member at the SM home was terminated. Tr. XII at 43.

Although it had been previously recommended that Danny would benefit from a stable and secure adoptive home, it was noted in February 2012 that Danny was not ready to transition from the SM residential treatment home because he was not ready for a less restrictive environment. However, adoption remained the placement plan. Tr. X at 92. At the time of the trial, Danny was still residing at the SM home. Tr. X at 85. The current recommendation is to place him in a pre-adoptive home, Tr. X at 86, and since the 2012 evaluation, efforts have been made to find Danny an adoptive or foster home placement. Tr. X 94.

From the time Danny came into DCYF care, and throughout his various placements, Danny has received regular treatment and evaluations by healthcare professionals in different specialties to address behavioral issues. Tr. XII at 3-4, 7, 9, 10, 13. DCYF, Adoption Rhode Island, and his placement supports have been working towards finding Danny a pre-adoptive placement since the termination of parental rights to Danny. Tr. XII at 22.

## (B)  The Plaintiffs' Case

To establish a substantive due process claim, the Plaintiffs must first "show a deprivation of a protected interest in life, liberty, or property." Rivera v. Rhode Island, 402 F.3d at 33-34(citing Rhode Island Bhd. of Correctional Officers v. Rhode Island, 357 F.3d 42, 49 (1st Cir.2004); Macone v. Town of Wakefield, 277 F.3d 1, 9 (1st Cir.2002)). In addition, the Plaintiffs must establish that the deprivation of this protected right was caused by governmental conduct. Rivera v. Rhode Island, 402 F.3d at 34.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cnty. Dept. of Soc. Serv., 489 U.S. at 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249, (citing Youngberg v. Romeo, 457 U.S. at 317, 102 S.Ct. 2452, 73 L.Ed.2d 28).

Under such circumstances, the State is required to provide for the basic human needs of the individual in its custody, "*e.g.*, food, clothing, shelter, medical care, and reasonable safety," DeShaney v. Winnebago Cnty. Dept. of Soc. Serv., 489 U.S. at 200. The Plaintiffs assert in their Complaint what appears to be a number of additional rights to which they lay claim, including "appropriate planning and services directed toward ensuring that

the child can leave foster care and grow up in a permanent family," and the right "to be placed in the least restrictive placement according to a Plaintiff Child's needs." (Dkt. No. 115 at ¶ 222). However, to the extent that meeting such particular needs is essential to provide a child in DCYF custody with reasonable care and safety, the Court reviews the Plaintiffs' claims under the standard articulated herein. See Section III, *supra*; see also Connor B. v. Patrick, C.A. No. 10-30073-WGY, — F. Supp.2d —, 2013 WL 6181454 at *23.

In support of their due process claims and the claims brought under the AACWA, the Plaintiffs offered the testimony of five separate expert witnesses.

### 1. Dr. Ryan's Testimony

Dr. Ryan was asked by the Plaintiffs to review literature regarding national professional standards applicable to child welfare systems; to identify the standards; and to offer an opinion on the consequences if such standards were not met. Tr. I at 48. As Dr. Ryan acknowledged, his opinion was limited to assessing, according to the reviewed literature, what the general consequences of not meeting professional standards are; he did not look at the actual case records of the Named Plaintiffs. Tr. I at 49. Specifically, Dr. Ryan considered the areas of maltreatment in care; caseload size for child welfare workers; visitation between caseworkers and children in the foster care system; and placement

array, particularly congregate care placement. Tr. I at 49.

According to Dr. Ryan, based on the reviewed literature, maltreatment in care exposes children to additional trauma, and it compromises a child's ability to form strong attachments with adults in his or her life. Tr. I at 65. As a result of such maltreatment, a child is more likely to develop anxiety and depression. Tr. I at 70.

It was unclear to what extent some of the materials Dr. Ryan reviewed were applicable and/or relevant to the instant case. By example, Dr. Ryan discussed a 2003 GAO [U.S. General Accounting Office] report on the challenges of recruitment and retention in the child welfare workforce that was based on responses from 600 caseworkers who were retiring or leaving their positions. Tr. I at 72-74, 76-77. In forming his opinions, Dr. Ryan relied on the finding in the GAO report that such challenges, along with worker turnover, "imped[ed] progress toward the achievement of federal safety and permanency outcomes." Tr. I at 77:8-13; Ex. 679.  It is undisputed, however, that Cassie had the same caseworker for all but the first few months in DCYF care and that, with the exception of two maternity leaves, Danny had the same caseworker since he entered DCYF care.

With respect to maltreatment in congregate care, *i.e.* residential, non-family care, Dr. Ryan relied on a 1991 study, noting that the year of publication was not particularly important.

Tr. I at 83, 84:3-10; Ex. 85. Based on that study, Dr. Ryan concluded that the risk of physical abuse, neglect, and sexual abuse was significantly higher in congregate care facilities. However, no connection was drawn to the Named Plaintiffs; and no evidence was submitted to suggest that Cassie suffered physical abuse, neglect, and/or sexual abuse in the residential facilities in which she was placed. With respect to Danny, any allegations of physical abuse were limited to altercations with other children who lived at the same group home.

Dr. Ryan's assessment of the consequences of "high" caseloads for child welfare workers was based on the CWLA's recommendation that workers have "no more than 12 cases on their daily workload, whether for investigation or for foster care placements." Tr. I at 102:3-8. Dr. Ryan acknowledged, however, that the CWLA standards are considered aspirational. Tr. I at 102:9-18.

In sum, the studies on which Dr. Ryan relied for his opinions were, at least in part, outdated, Tr. I at 83-84, 118-119, Tr. II at 71; they were based on purely aspirational standards, Tr. I at 102; they lacked a uniform definition of a "best practices" professional standard, Tr. I at 109-110; they addressed the relationship between workplace conditions for child welfare workers and the impact on their charges only in a general manner, Tr. I at 110-115; or were primarily qualitative studies, Tr. 120-124, or personal interviews. Tr. I at 75. Moreover, Dr. Ryan failed to

establish any connection between those studies and the Plaintiffs' claim in this case: that the State's alleged violation of known professional standards caused the Plaintiffs to be exposed to unlawful risks of harm. Tr. I at 45.

Accordingly, Dr. Ryan's general conclusions, *e.g.*, that high caseloads impact workers' ability to do their jobs, Tr. I at 80; that the risk of abuse and/or neglect is higher in congregate care, Tr. I at 87; or that workers who are burnt out and emotionally exhausted are more likely to leave their jobs, Tr. I at 116; were inadequately supported and not specific to Rhode Island or the claims of the Named Plaintiffs. As Dr. Ryan acknowledged, none of the literature on which he relied addressed child welfare practices in Rhode Island, Tr. II at 113; he did not review the Plaintiffs' files, Tr. II at 111; and he was not familiar with the circumstances of their placement in DCYF care or the specific services they received while in DCYF care. Tr. I at 77. Dr. Ryan's testimony neither served to establish that Rhode Island caseworkers, generally, or the caseworkers of the Named Plaintiffs, specifically, were burnt out or unable to perform their job adequately, nor that Cassie or Danny suffered abuse or neglect during their placement in congregate care, or that they suffered harm or risk of harm as the result of high caseloads and/or caseworker burn-out.

### 2.  Ward's testimony

Ward's former occupations included, *inter alia*, (a) child care worker in a small residential treatment facility for children in Minnesota; (b) administrative supervisor and program director of that facility; (c) assistant director of the Catholic Charities agency; (d) field office supervisor for the Illinois Department of Children and Family Services ("ILDCFS") (for which he worked more than 24 years, primarily in administrative and/or supervisory positions); (e) regional administrator for ILDCFS; (f) administrator in the office of planning for family services; (g) manager for the regional (*i.e.*, outside of Cook County) quality assurance program; and (h) COA reviewer.  Following his retirement from ILDCFS in 2002, Ward continued to work as a consultant for the U.S. Department of Health and Human Services (HHS) in its Children and Family Services Review (CFSR) team.  In his capacity as a consultant, Ward conducted CFSR reviews for HHS with regard to a number of states (not including Rhode Island or any other New England state).

Ward was engaged by the Plaintiffs to offer opinions about the following six areas: (1) maltreatment of children while in care; (2) CPS [Child Protective Services] investigations into allegations of abuse and neglect, including allegations that abuse and neglect occurred in foster care; (3) child welfare services caseloads; (4) visitation and contact between a child and the

child's assigned caseworker; (5) in-service training; and (6) congregate care and placement array. Tr. IV at 51:23-52:13.

### (a) Maltreatment in Care

With regard to maltreatment of children in care, Ward pointed to a 2011 publication by the Children's Bureau section of HHS, which specifies a national standard for the absence of maltreatment in foster care as 99.68 percent. Tr. IV at 94-95, Ex. 590 at 24. Based on the chart provided in that publication, Ex. 590 at 55, Ward concluded that Rhode Island's rate of absence of maltreatment in care failed to meet the national standard in every year between 2007 and 2011. Tr. IV at 97.[19] According to the same chart, only 24 states (of 49 who reported this figure) met the national standard in 2011. Tr. IV at 101; Ex. 590 at 55. Ward also stated that—when compared to other reporting states—Rhode Island was among the six states with the highest reporting rate of maltreatment in care between 2006 and 2011. Tr. IV at 116.

Ward then addressed the State's contention raised in response to the data, which the State attributed to the presence of three factors:

(1) Rhode Island's broad statutory definition of maltreatment,

---

[19] Ward created a chart to represent the data visually after subtracting the rate of absence of maltreatment from 100 percent. Ex. 714; Tr. IV 102, 105. The same information for years 2007 and 2010 is also set forth in the Child Welfare Outcomes Report to Congress, Ex. 607.

see R.I. Gen. Laws § 40-11-2;

(2) Rhode Island's requirement that everyone report abuse and neglect, see R.I. Gen. Laws § 40-11-3; and

(3) Rhode Island's lower standard for a report of maltreatment to be substantiated, see R.I. Gen. Laws § 40-11-2. Tr. IV at 117.

In considering that response, Ward conducted a comparison of 2011 maltreatment rates between Rhode Island and five other states whose definition of abuse and neglect he considered "similar," Tr. IV at 125-127:1-5, specifically New Jersey, Ohio, South Carolina, West Virginia, and Wyoming. Tr. IV at 127:7-9. Ex. 715. Ward then conducted a separate comparison of Rhode Island's maltreatment numbers to several states which also have a universal mandated reporter law, Tr. IV at 131; Ex. 716. Finally, Ward conducted a third and separate comparison of Rhode Island's performance to states that apply the same preponderance standard for substantiating a maltreatment report. Tr. V at 14-19; Ex. 717.

Based on these three comparisons, Ward rejected the State's explanation for its malpractice rate. It is evident, however, that Ward's analysis was conceptually flawed. Rhode Island's broad definition, mandatory reporting requirement, and low standard of proof must be considered in the aggregate, not in separate comparisons in regard to each factor. When all three factors are included in the comparison, Wyoming is the only state (at least on

the surface) among those identified by Ward to have some commonality with Rhode Island on each of the three issues. Ex. 715, 716, 717. However, Ward had to concede that the definition of abuse in Wyoming required that any injury or harm be "other than by accidental means," which is not part of Rhode Island's broad definition. A review of the statutory definition of "abuse" in New Jersey, Ohio, South Carolina, and West Virginia also revealed that definitions in those states all differ significantly from that set forth in Rhode Island's statute. Tr. VIII at 96-97. Similarly, Rhode Island does not practice what is referred to as "differential response;" *i.e.*, a report of possible abuse or neglect in Rhode Island is always followed by an investigation, not just an assessment. Tr. VIII at 82. In states that do practice differential response, any allegations assessed as low- and moderate-risk would not be counted as substantiated matters. Tr. VIII at 83. Wyoming, the only state that appears comparable to Rhode Island on all three factors, is one of the states that practice differential response, Tr. VIII at 98. Ward did not review practices of other states to which he compared Rhode Island. Tr. VIII at 99-100.

Ward agreed that the Children's Bureau Report (Ex. 607), on which he relied for his conclusions, explicitly acknowledged that alternative response approaches and types of maltreatment reported are known factors that cause variation in child victim rates. Tr. VIII at 73-75. Ex. 607 at 6. Ward also acknowledged that state laws

and policies differ in regard to maltreatment and in defining of who is a mandatory reporter, but he conceded that he did not review policies or regulations of the states to which he compared Rhode Island. Tr. VIII at 77-78.

In sum, Ward's simplified analysis failed to support his assertion that Rhode Island's numbers were significantly unfavorable when viewed in comparison to other reporting states. More significantly, Ward's testimony and conclusions failed to connect Rhode Island's maltreatment statistics to any harm or injury alleged by the Named Plaintiffs.

**(b)  CPS Investigator Caseloads**

Regarding CPS investigator caseloads, Ward related that (in his prior role as administrator) if he learned that caseloads exceeded the limits suggested by CWLA or COA, Tr. V at 22, he would investigate further and possibly shift staff between teams or ask for help from outside the region. Tr. V at 26-27, 34-36. As explicitly stated in the COA, its suggested caseload limit of fifteen investigations per caseworker has some built-in flexibility. Although "[g]enerally, caseloads do not exceed 15 investigations or 15-30 open cases . . . there are circumstances under which caseloads may exceed these limits." COA Standards PA-CPS 14.05, Ex. 50.

Specific to Rhode Island, Ward reviewed provisions of the Rhode Island Code, R.I. Admin. Code §§ 14-1-500.0095 (Ex. 890), 14-

1-500.0060 (Ex. 891), 14-1-500.0110 (Ex. 892), 14-1-500-0055 (Ex. 893); 1995 CWLA provisions 5.9 (Ex. 31) and 1.19 (Ex. 27); and COA provisions PA-CPS 5.07 (Ex. 50A) and PA-CPS 14.05 (Ex. 50). Tr. V at 99-112. Against this background, Ward reviewed DCYF internal report 259 (Ex. 881B), which listed, *inter alia*, the number of investigations by a subset of DCYF caseworkers. Tr. V at 118. For each caseworker, Ward added the figures stated for the categories of investigations pending, investigations overdue, and investigations created, plus the category of augment assignments. Tr. V at 124. For each month, Ward then calculated how many caseworkers had investigations in excess of fifteen, the COA recommended number that Ward used as a baseline. Tr. V at 125. From this calculation, Ward concluded that the CPS investigative staff in Rhode Island was extremely overburdened, and he stated that his data "strongly suggests that there can be risk associated to individual children." Tr. V at 137:18-19.

When questioned how he determined the relationship between CPS caseloads and the impact on children, Ward explained the process as follows:

> The process is that in -- that would be from two points, two vantage points. Number one, that might be part of the -- one of the factors that we used in defining the cases that we would review.
> The second thing is that we could look at that and if I looked at cases, when we looked at cases, in other places where it didn't seem to be happening but we were just checking to make sure. Certainly the caseload ratio compared there to the other places that we reviewed would be a factor. And when you went back and looked based on

the times that we did that, when we went back and looked,
we saw pretty straight correlation between when that size
starts increasing, the ability to do all the work
decreases, and in the worst case scenario it's impacting
the safety of an individual child. Tr. V at 38:2-17.

Although Ward suggested that caseloads over fifteen per
investigator might be problematic, see Tr. V at 30, his testimony
was based entirely on his own experience in Illinois. Ward's
general conclusion that there was a correlation between increase of
case load and ability to do all the work lacked any kind of
quantitative analysis; it was also entirely unconnected to Rhode
Island practices or to Cassie and Danny or any of the other Named
Plaintiffs specifically.

### (c)  Timely Completion of CPS Investigations

Ward engaged in a similar exercise with regard to the
timeliness of investigations as he did for caseload size, Tr. V at
137, noting that the Rhode Island Code provides for completion of
an investigation within ten days (subject to additional, approved
extensions up to thirty days), see § 14-1-500-0055, whereas the COA
provision allows for thirty days. Tr. V at 139. For this analysis,
Ward defined as "overdue" any investigation that was not completed
within ten days, Tr. V at 142:7-11. He acknowledged, however, that
he did not know whether "investigations pending" included a time
limit of ten days, Tr. VIII at 111; he also acknowledged that he
did not subtract from the total number of investigations any
completed cases. Tr. VIII at 116. Ward then conducted a calculation

53

of what proportion of DCYF investigations was overdue, Tr. VI at 6, but drew no connection to any of the Named Plaintiffs or to the impact such alleged untimeliness might have had on them. Tr. VI at 7-16. Instead, based on his experience of evaluations of Illinois cases that took longer than thirty days to complete, Ward drew the connection between untimely completed investigations and child safety as follows:

> If the time that was -- if the investigations took longer than the 30 days and it was associated with that investigator having more investigations than what they should have, ideally the 15, there was a strong causation back to that issue of that's why it was not getting done, because a worker doesn't have enough time to do all the things that they need to do to complete all the investigations assigned to them. And in individual cases, that can certainly lead to the risk back to that child who was the subject of the investigation. Tr. V at 62:12-22.

As such, Ward's explanation was indistinguishable from the impact of a caseload in excess of the COA suggested limit; it was based entirely on Ward's own experience in Illinois; and it was unsupported by any kind of quantitative analysis or objective process that would have allowed him to arrive at such a conclusion. In addition, Ward did not review the activities of Rhode Island's CPS service, Tr. VIII at 105, and it was undisputed that he did not review Cassie's or Danny's case file.

**(d) Family Service Worker Caseloads**

Ward's testimony regarding the caseload of family service workers (in Rhode Island, "FSUs"), who are the primary caseworkers

for children in DCYF care, was in the same vein. Tr. VI at 17. Ward reviewed the COA provisions and CWLA standards of excellence on caseloads for family service workers, Tr. VI at 23-25; and he related his experience with monitoring caseloads in Illinois, Tr. VI at 25-41, and as a COA accreditation consultant for Missouri and Tennessee, Tr. VI at 42-47. Ward then reviewed R.I. Admin. Code §§ 14-1-700.0165 (Ex. 894), 14-1-700.020 (Ex. 895), 14-1-700.0030 (Ex. 896) and 14-1-700.0075 (Ex. 897), which describe the work duties of FSU workers. Tr. VI at 48-50.

The CWLA's aspirational standards call for a caseload between twelve and fifteen cases. Ex. 17. COA provision 19.06 states that "generally," caseloads do not exceed eighteen children, but the COA notes that "there are circumstances under which caseloads may exceed these limits." Ex. 55 at 55. As noted by Ward, the collective bargaining agreement ("CBA") between the State and the Rhode Island Alliance of Social Service Employees provides that the "state shall endeavor to achieve a caseload assignment not to exceed fourteen (14) families.[20]" (Ex. 482 at 18). The testimony of DCYF administrator Stephanie Fogli-Terry indicated that DCYF "strive[s]" to have a caseload of fourteen cases per worker. Tr. VI at 68. Ward reviewed FSU caseloads by supervisor and region, added the numbers, and provided visual summaries as to number and

[20]

It is noted that the CBA speaks in terms of "families," not "children;" Ward conceded that the CBA figure was "not as firm as a hard-and-fast caseload number." Tr. V at 63-64.

percentage of FSUs with caseloads of more than eighteen children. Tr. VI at 78-83; Ex. 724. Ward conceded that any conclusions he had formed on the impact of caseloads in excess of eighteen children were limited to his experience in Illinois and they were, essentially, anecdotal. Tr. VII at 19, 22-23. Ward suggested that, at some point, things would start to "slip," but he agreed that he could not quantify where that point was, in part because that depended on the experience of the caseworker and the complexity of the case. Tr. VII at 37:19-38:7. Ward also conceded that he did not review the deposition testimonies of Cassie's or Danny's social caseworker on that subject, Tr. XVI at 54, and he did not offer an opinion that either Cassie or Danny were harmed as the result of the caseloads of their respective social workers.

**(e) In-Service Training**

Regarding in-service training, the CWLA indicates that an in-service training program "should focus on the improvement of the practice competence of staff members." Tr. VII at 56-57, Ex. 36 at 70. Rhode Island law requires DCYF to "establish a minimum mandatory level of twenty (20) hours of training per year and provide ongoing staff development for all staff." R.I. Gen. Laws 42-72-5(b)(10). Rhode Island Admin. Code § 14-1-400.0000 has the same 20-hour requirement. Tr. VII at 58; Ex. 898. According to the September 2010 Rhode Island CFSR [Child and Family Services Review], ongoing training for staff was identified as an area

needing improvement because only 27.7 percent of 491 DCYF caseworkers had completed their ongoing training requirements. Tr. VII at 61; Ex. 616 at 102. Ward noted that his figures were based on data provided for 41 caseworkers only[21], which he described as a "very small sample," and not for DCYF's entire caseworker staff. Tr. VII at 85:5-8. Ward offered no opinion on the impact of a shortfall in training hours on children in DYCF care.

### (f) Face-to-Face Visits

The CWLA aspirational standard, on the premise that a social worker "is a vital constant in the life of a child in foster care," suggests that "[t]he family foster care social worker should visit the child at least monthly." Tr. VII at 96-97; Ex. 16 at 54. COA provision PA-FC 12.01 states that "the family foster care worker meets separately with the child and the parents at least once a month to: a. access safety and well-being; b. monitor service delivery; and c. support the achievement of permanency and other service plan goals." Tr. VII at 98-99; Ex. 55A. States that have developed a plan for child welfare, which renders them eligible for subsidies from the federal government, must meet certain requirements regarding caseworker visits. 42 U.S.C. §

---

[21]

As Plaintiffs' counsel explained, the 41 caseworkers whose training records Ward reviewed were assigned to the Named Plaintiffs in this litigation. It is unclear how many of them were actually assigned to Cassie and Danny.

624(f)(1)(A).[22]

The Rhode Island Administrative Code provides that it is DCYF's policy "to ensure that children in foster care are visited at least once per month, or more frequently as needed, to ensure their safety, well-being and attainment of their permanency goals." R.I. Admin. Code 14-1-700.0165 (Ex. 894); Tr. VII. at 100. The Code further explains that "[t]he worker must have face to face contact at least one time per month with each child in foster care and the majority of monthly visits must take place in the child's foster home or foster placement. The worker should speak with the child alone." R.I. Admin. Code 14-1-700.0165; Ex. 894 at 2.

The Children's Bureau Final Report for the September 2010 Rhode Island Child and Family Services Review reflects that, based on a random sample of 65 cases, caseworker visits was an area identified as needing improvement. Ex. 616A. Specifically, for 40 foster care cases included in the report, the required number of visits was at a 77.5 percent compliance rate (compared to the 90 percent required for federal funding).

---

[22]

Subsection 624(f)(1)(A) provides as follows:

Each State shall take such steps as are necessary to ensure that the total number of visits made by caseworkers on a monthly basis to children in foster care under the responsibility of the State during a fiscal year is not less than 90 percent (or, in the case of fiscal year 2015 or thereafter, 95 percent) of the total number of such visits that would occur during the fiscal year if each such child were so visited once every month while in such care. 42 U.S.C. § 624(f)(1)(A).

A DCYF report for March 2012 summarized the number of children without a documented face-to-face visit for that particular month. Ex. 881H at 31. The DCYF's 2011 Annual Progress and Services Report acknowledges that the percentage of face-to-face visitation has been "an ongoing challenge;" it also reflects that, although performance fell short of the projected increase, DCYF demonstrated "continued improvement" every year between 2007 and 2010. Ex. 622 at 76.

Ward reviewed this information; added up the number of children in four Rhode Island regions who had received a face-to-face contact each month between January 2010 and March 2012; calculated the percentage rate based on the total number of children in foster care; subtracted that percentage from 100 and created a summary chart. Tr. VIII at 119-122. Put another way, Ward took the percentage of children who had received monthly visits from the DCYF report and converted the information to depict the percentage of children who did not have visits. Ex. 728. Ward did not offer an opinion on whether the performance data in Rhode Island with regard to worker-child visitation creates a risk of harm to foster children. None of the submitted information was specific to Cassie and Danny.

### (g) Placement Arrays and Reentry

Federal regulations require DCYF to have procedures in place that "[p]rovide, for each child, a written case plan to be

59

developed jointly with the child's parent(s) that includes provisions: for placing the child in the least restrictive, most family-like placement appropriate to his/her needs, and in close proximity to the parents' home where such placement is in the child's best interests;..." 45 C.F.R. 1355.34(c)(2). COA provision PA-RTX 1 recommends that

> "[t]he agency make[] every effort to ensure residential treatment services are available only when a thorough assessment of current need and prior services indicate an individual requires, and will benefit from, a total milieu environment, active psycho-therapeutic and psycho-educational interventions, and around the clock care for a specified period of time." Ex. 62 at 3.

In addition, COA provision PA-FC 16.02, which addresses recruitment and retention of foster families, states that "[r]ecruitment efforts are planned, implemented, and evaluated to ensure a suitable family is available for each child entering care." Ex. 55B at 40. The CWLA adds that "[t]he goal of any residential care provider is to maintain the child for the shortest appropriate time frame, and successfully discharge each child to a less restrictive setting or level of care." Ex. 24 at 37.

Ward reviewed DCYF reports from January 2010 through April 2012, which documented the number of children placed by DCYF in various living arrangements, including foster care, independent living, group home, shelter, residential, psychiatric, medical, and RITS [Rhode Island Training School]. Ex. 396, 397, 398. Ward's defined category of "congregate care" included placement in a group

home, residential shelter, psychiatric, or medical hospital, Tr. VIII at 18:21-24. Ward created another summary chart to visually represent the percentage of children in congregate care between January 2010 and April 2012. Ex. 733; Tr. VIII at 19.

Ward then conducted a comparison between the percentage of children in Rhode Island placed in what he defined as "congregate care" with national data stated in the July 2012 AFCARS [Adoption and Foster Care Analysis and Reporting System] Report, Ex. 600, Tr. VIII at 28-30; and he summarized this comparison in a bar chart. Tr. VIII at 31-33; Ex. 735. According to Ward's summary chart, the rate of congregate care in Rhode Island is higher than the national rate; it is not discernible from Ward's chart, however, what the exact figures are. Ex. 735.

The final subject of Ward's testimony was "reentry" of children into DCYF care, which he defined as "when the child comes back into care . . . what options are available . . . to meet that child's individual needs and satisfy the least restrictive requirement from HHS." Tr. VIII 35:4-9. To discern the percentage of children reentering foster care in Rhode Island between 2008 and 2011, Ward first downloaded context data for Rhode Island from the HHS website. Ex. 881E at Section 4.2. For the 2012 year, Ward reviewed the "2013 Rhode Island Kids Count Factbook" Ex. 777, published by a children's policy organization. According to Ward's review, the percentage of children re-entering foster care between

2008 and 2012 ranged between 15.3 percent and 19 percent. Ex. 736; Tr. 38-40. Ward compared those figures to what he described as the "federal standard for reentry," 8.6 percent; however, it was unclear from his testimony what that number signified.

Upon question by the Court, Ward suggested that the 8.6 percent figure was part of a federal funding provision, but he could not explain how Rhode Island numbers would impact funding. Tr. 42 ("I can't speak to those percentages; but if you're above that 8.6, there's going to be--they're going to have some conversations, and it's going to be around funding."). Ward offered no opinion on why there might be a higher percentage of children reentering care in Rhode Island, or on the impact a higher rate might have on children in DCYF care. More significantly, however, neither Danny nor Cassie were ever returned to their biological homes; accordingly, the issue was not relevant to the Named Plaintiffs' claims.

Finally, at the request of Plaintiffs' counsel, Ward read into the record testimony by DCYF Director Dr. Janice DeFrances at a March 28, 2013 hearing before the Rhode Island House Committee on Finance:

> But we do have some children that we want to be able to step down, but access into more community-based services or support right now is not readily available. We also need desperately and we are doing a statewide recruitment for more foster homes. That clearly is something where we would want to be able to put a child in a foster home but also support those foster homes with appropriate training, education, financial support, mental health

support, crisis support and respite; and that is a
statewide initiative that all the state quarters
providing foster care in Rhode Island are working
together on. Tr. VIII at 56:10-21.

Plaintiffs sought to admit Dr. DeFrances's testimony as a party admission. Tr. VIII at 53. Although Ward explained that he relied on the testimony, he did not further discuss its relevance to the Named Plaintiffs' claims in this case. Tr. VIII at 57.

When viewed in its entirety, Ward's testimony established that DCYF has policies and procedures in place to address all the areas Ward discussed. It is also apparent that there is room for improvement in adhering to those policies and procedures, which DCYF recognizes and strives for. Nowhere in his testimony, however, did Ward draw a connection between shortcomings in DCYF's record of achieving certain established goals and any harm or risk of harm to Cassie or Danny, the other Named Plaintiffs, or to any other foster children in DCYF care.

Ward's review of Rhode Island statutes and regulations, and his related comparisons to legislative or administrative processes in other states were incomplete and, in significant part, erroneous. There can be no doubt that Ward has significant experience in the child welfare arena. However, Ward's experience was limited primarily to administrative positions; it was, in part, outdated; and it could not serve to replace an actual determination of what impact alleged under-performance by DCYF, *e.g.* large

caseloads or CPS investigations completed beyond set time limits, had on foster children in Rhode Island. Moreover, Ward's conclusions in the areas he addressed were based on flawed statistics, incomplete information, and arbitrarily chosen samples and/or categories. As such, Ward's testimony, although extensive, did little to support the Plaintiffs' efforts to withstand the State's Rule 52 motion.

### 3. Dr. Chambers' Testimony[23]

Dr. Chambers is an associate professor at California State University Long Beach School of Social Work, Tr. XIII at 27. She practiced as a licensed social worker for twenty years, Tr. XIII at 20, not, however, in a public child welfare agency. Tr. XIII at 43. Dr. Chambers conducted a review of Danny's and Cassie's DCYF case files with the aim to examine DCYF casework practices during the Plaintiffs' time in DCYF care. Tr. XIII at 17. Dr. Chambers did not seek to offer an expert opinion; rather, she described what she found in the case files. Tr. XIII at 56-57. Specifically, Dr. Chambers focused on the following areas: (1) entry into DCYF care, including investigations and reasons for removal; (2) case management and service planning; (3) visitations; (4) placement and

---

[23]

Although the Plaintiffs presented Dr. Chambers as an expert witness and the State was permitted to conduct a voir dire of this witness, following the voir dire, the Plaintiffs asserted that they would not seek to elicit an expert opinion from Dr. Chambers. Tr. XIII at 56:18-57:7.

safety incidents; (5) services for the child and family; and (6) permanency hearings, administrative reviews, and termination of parental rights. Tr. XIII at 59.

In order to conduct a review of Danny's and Cassie's DCYF files, Dr. Chambers constructed a "case reading tool," to assist her in organizing and/or quantifying the topic areas on which she directed her focus. Tr. XIII at 61:13-17. Dr. Chambers identified a number of federal statutes and/or regulations, as well as DCYF policies that addressed elements of DYCF care, *i.e.*, case plans, Tr. XIII at 68; caseworker visits, Tr. XIII at 68; sibling visits, Tr. XIII at 71-72; foster placements, Tr. XIII at 72-73; services for child and family, Tr. XIII at 73-74; and permanency hearings, Tr. XIII at 74. To verify the validity of the reading tool, one of Dr. Chambers' colleagues used the reading tool to review a sampling of another case file to verify whether she arrived at similar results as Dr. Chambers. Tr. XIII at 75, Tr. XIV at 96. Dr. Chambers acknowledged that she did not review any records from third parties outside DCYF case files[24] such as reports from mental health providers or the schools the Plaintiffs attended. Tr. XIII at 81.

Based on her review, Dr. Chambers came to a number of

---

[24]

Dr. Chambers acknowledged that she reviewed only hard copies and printed screen shots of the DCYF case files for Cassie and Danny; she did not view their electronic case files as they are maintained by DCYF. Tr. XIV at 67-68, 76.

conclusions regarding Danny's care in DCYF custody. She concluded that during his fifteen and a half month stay at the LF home, Danny did not receive a single visit from his social worker. Tr. XIII at 118-119. Dr. Chambers also noted that there was no indication in Danny's case file that DCYF conducted an investigation whether the SM group home exercised proper supervision over Danny. Tr. XIII at 133. According to Dr. Chambers, Danny was in DCYF care for four to five months before he received mental health treatment. Tr. XIII at 133. She also concluded that, according to the case file, Danny's first service plan was not developed until four months after Danny came into DCYF care, Tr. XIII at 173, and that his service plans were not promptly updated every six months. Tr. XIII at 174. [25]

With respect to Cassie, Dr. Chambers stated that she saw no documents indicating a kinship[26] search prior to Cassie's first placement, and that Cassie was never placed with any of her sisters while in DCYF care. Tr. XIV at 5, 7. Dr. Chambers also noted that Cassie apparently had no face-to-face visits with her caseworker during her eleven-months stay at the M home and during her six-

---

[25]

The record reflects that the Court reconsidered a ruling in which it sustained an objection by the State to Dr. Chambers' expected response that, according to her case file review, DYCF did not consider specialized foster care placement before placing Danny into a group home. Tr. XIV at 3.

[26]

In the context of Dr. Chambers' testimony, a "kinship search" appeared to refer to investigating the possibility of placing Cassie with biological family members. Tr. XIV at 5-6.

month stay at the J home. Tr. XIV at 13, 16. After Cassie was removed from her biological home, but prior to the termination of her parents' parental rights, the stated permanency goal was reunification. Tr. XIV at 57. Cassie's service plans from that time reflect that, in order for reunification to take place, Cassie's mother had to comply with a number of services, *e.g.* participate in treatment for domestic violence and substance abuse, parenting education classes, and mental health counseling. Tr. XIV at 58-59. With respect to Cassie's other service plans, Dr. Chambers indicated that seven of twelve service plans were unsigned, Tr. XIV at 61, and that nine of those plans were not updated within a six-month period. Tr. XIV at 62.

Dr. Chambers pointed out that Cassie's December 2001 service plan reflects that her present placement at the TH group home was not the least restrictive. Ex. 89-B at 2, Tr. XIV at 17-18. However, the plan further explains that "[Cassie] is in residential placement as two different foster homes were not able to provide for [Cassie's] needs due to her behaviors." Ex. 89-B at 2. Tr. XIV at 19. According to Chamber's review of the case file, Cassie was frequently restrained while at the TH home, Tr. XIV at 22-23, and she received psychotropic medications, two of them for sleep. Tr. XIV at 25. According to Dr. Chambers, although Cassie was under close supervision at the LH home, there were two recorded incidents

in which she acted out sexually.[27] Tr. XIV at 40-41.

As Dr. Chambers acknowledged, her review was limited to Danny's and Cassie's case files, e-mail correspondence by DCYF, and deposition testimony in this case; Dr. Chambers did not obtain full and complete records of the various placements, caregivers, or treating providers, nor did she conduct any personal interviews. Tr. XIV at 92-93. As a result, it became apparent in the course of her testimony that Dr. Chambers' review of the case files left her with a less-than-complete picture of the care and services Cassie and Danny received while in DCYF care.

Based on the information at her disposal, Dr. Chambers concluded that Danny had not exhibited any sexualized behavior prior to leaving the LF home, Tr. XIII at 98. However, a deposition of Danny's caseworker—which Dr. Chambers had reviewed in the course of her work—made note that Danny exhibited such behavior during his initial placement with his great-grandmother. Tr. XIV at 109. According to the case files, DCYF also explored placement of Danny with his aunt and uncle, but their respective criminal histories precluded such a placement. Tr. XIV at 117. While Danny was placed at the LF home, he received counseling services from an LCSW [licensed clinical social worker] and additional educational support; he also had court-ordered bi-monthly visits with his

_____
[27]

These incidents actually took place at the TH group home. Tr. XV at 54-55.

parents. Tr. XIV at 118-119. On those occasions, Danny's social worker picked him up at the LF home and drove him to the visits with his parents. Tr. XIV at 119. In addition, documentation (other than case activity notes) indicated that the caseworker had numerous visits with Danny; Dr. Chambers, however, did not count these contacts as "face-to-face" visits. Tr. XV at 22, 27-35. Likewise, Dr. Chambers did not count a number of visits at the LF or the T home, although those visits were recorded as "FtF" in the case activity notes. Tr. XV at 36-43.

According to Dr. Chambers, she saw no indication in Danny's case file that DCYF offered services to the great-grandmother to assist her in fostering Danny, Tr. XIV at 121. However, the case file contains at least two authorizations for services, documenting that DCYF was authorizing funding for day care as well as other services for the great-grandmother. Tr. XIV at 122-123. After placement at the LF home was not successful, court letters from that period indicate that Danny's placement in a group home was based on his problematic behaviors. Tr. XIV at 125.

Dr. Chambers also related that there appeared to have been no formal CPS investigation into allegations by Danny that he had been punched by a prospective adoptive father of the J family. Tr. XIII at 123-124. Danny's case file documented that the DCYF supervisor was informed by an adoption worker of Danny's allegation and that the J family denied the allegations. The case file also indicated

that this placement was arranged by a private adoption agency in Connecticut, over which the Rhode Island DCYF had no jurisdiction. Tr. XIV at 127.

Regarding the second pre-adoptive family for Danny, Dr. Chambers indicated that Danny was placed with the family despite the family's position that the family did not want a child with learning disabilities or developmental delays and that they wanted a Caucasian child (Danny is of mixed race). Tr. XIII at 183-184. According to the case file, however, the family reviewed and signed a full disclosure document before agreeing to have Danny placed in the home. Tr. XIV at 128-129.

Dr. Chambers noted that, during Danny's first stay at a group home, he was "physically restrained multiple times." Tr. XIII at 149:3-4. Case activity notes from that time period documented that Danny was placed into a therapeutic hold after he was assaultive to staff and after charging at another child. Tr. XIV at 135-136. An incident involving inappropriate contact between Danny and another child at that home became the subject of a CPS investigation. Both children were interviewed and acknowledged the event, which was deemed consensual; a staff member was indicated for failure to supervise. Tr. XIV at 137-138. The record further revealed that, after Danny was tackled and punched by another child at the group

home, Danny's covering[28] social worker, JB, called the hotline to report this and another incident involving Danny. Tr. XV at 13. JB also followed up with Danny's clinician, as did Danny's regular social worker upon her return from maternity leave. Tr. XV at 6-7. As a result, the level of supervision for both Danny and the other child involved in the incident was increased. In addition, Danny was separated from the other child and moved to a different class room. Tr. XV at 11-12.

With regard to Cassie, Dr. Chambers was unaware that Cassie was placed with her two half-sisters at the DM home. Tr. XV at 50. The record also showed that Cassie was restrained at the TH home because she was hitting or kicking staff and because she engaged in unsafe behavior (including jumping from the headboard of her bed to the toy box and then running toward an open window.) Tr. XV at 51-52.

While Cassie was at the TH home, DCYF considered moving her to a specialized foster home; however, the Family Court, upon motion by Cassie's CASA, ordered Cassie to remain at the TH home until the end of the school year. Tr. XV at 52-53. Both documented incidents of sexual acting out by Cassie resulted in CPS investigations. Tr. XV at 54. As a result of one of the investigations, a staff member was terminated, Tr. XV at 54; the other investigation resulted in

---

[28] The social worker was covering for Danny's regular social worker, who was on maternity leave at that time. Tr. XV at 6.

an unsubstantiated finding. Tr. XV at 56.

In regard to face-to-face visits between Cassie and her social worker while Cassie was living in different homes, Dr. Chambers acknowledged that there were numerous occasions on which Cassie had meetings with her social worker that Dr. Chambers did not include as face-to-face visits in her tally, even when those meetings were noted as "FtF" in case activity notes. Tr. XV at 63-69. Dr. Chambers explained that she did not count those occasions because she believed that they did not meet the criteria of private, individualized meetings, Tr. XV at 87; she acknowledged, however, that she had no further information as to what occurred in those meetings. Tr. XV at 90, 91.

Regarding the completeness and timeliness of individualized service plans, Dr. Chambers acknowledged that such plans were created for both Cassie and Danny (although not always within the requisite six-month period), see Ex. 90 and Ex. 130, and that DCYF files the services plans with the Family Court for approval. Tr. XIV.

As acknowledged by Plaintiffs' counsel prior to Dr. Chambers' testimony, Dr. Chambers did not offer an expert opinion on the adequacy of DCYF casework practices during the time Danny and Cassie have been in DCYF care. Rather, Dr. Chambers discussed selected observations from her review of Danny's and Cassie's case files, which appeared to suggest that DCYF's responses to Danny's

and Cassie's individual needs and challenges were not always adequate. However, a closer look at the record revealed that DCYF did, in fact, have measures in place to identify and address issues Cassie and Danny encountered while in a particular placement. At most, Dr. Chambers' testimony raised a question of whether DCYF records were always timely and complete and whether they always reflected accurately what care or services had been provided; it did not support the Plaintiffs' contentions that either Cassie or Danny were harmed or subjected to an unreasonable risk of harm while in DCFY care. Moreover, the voluminous record on which Dr. Chambers relied was limited to print-outs of DCYF case files and did not provide a complete picture of DCYF practices. In sum, Dr. Chambers' testimony was insufficient to support the Plaintiffs' claims under the AACWA.

### 4(a) The Forensic Clinical Evaluation

Prior to considering the testimony offered by Dr. Adamakos, the Court finds it necessary to discuss the events that led to the evaluations and interviews Plaintiffs' expert witness conducted with Cassie and Danny and which caused this Court grave concern.

On July 27, 2012, Plaintiffs' counsel first sought an order compelling the State to allow the Named Plaintiffs to be evaluated by the licensed forensic psychologist Children's Rights had

retained as an expert witness,[29] such evaluation (including up to nine hours of interviews of each Plaintiff, as well as psychological testing) to be conducted by Dr. Adamakos, a psychologist who had not yet reviewed the Plaintiffs' case files at that time. (Dkt. No. 151-2). The State objected to the request and the Court conducted a hearing on the matter on September 10, 2012. At the hearing, Plaintiffs' counsel acknowledged that the each of the Plaintiffs already had undergone, and was continuing to undergo, psychological and psychiatric treatment, Tr. 09/10/12 at 5:1-5. Plaintiffs' counsel acknowledged that the Plaintiffs' treating providers had not been noticed for deposition, id. at 6:20-22, but suggested that the proposed examination by Dr. Adamakos was to be "focused on the harm that is caused, if any, by the actions or omissions of the Defendants." Id. at 7:3-5. Counsel also took the position that the examination would not be intrusive, id. at 9:2-3 and that Dr. Adamakos would be able to "tease out" the harm created by alleged injuries in DCYF care versus those the Plaintiffs had suffered in their biological families. Tr. XI at 13:12-17, 14:3-13. Plaintiffs' counsel also took the position that "it is the role of the Next Friends to determine what is in the best interest of the children," id. at 20:1-4; and counsel

---

[29]
Dr. Adamakos acknowledged on cross-examination that he was hired by Children's Rights, not by the Named Plaintiffs or their Next Friends, and that he obtained his license to practice in Rhode Island in 2013, in anticipation of testifying in this litigation. Tr. XI at 105-107.

acknowledged that neither the Plaintiffs' treatment providers, guardians *ad litem*, current foster families, or group home personnel had been contacted regarding the proposed evaluation. Id. at 12:5-13:9. The Court pointed out to Plaintiffs' counsel that the Named Plaintiffs (who had been in treatment throughout their time in DCYF care), had not asked to be part of this lawsuit and that they had not agreed to this most intrusive sort of evaluation. Id. at 10:13-17. In the absence of (1) more specific details in Plaintiffs' counsel's request regarding the proposed evaluation; (2) evidence that the Next Friends had been adequately informed before consenting to the evaluation; and (3) confirmation by the Named Plaintiffs' treating psychologists or psychiatrists whether further evaluation was even necessary or could be harmful, the motion was denied. Id. at 21:3-22:8.

On November 20, 2012, Plaintiffs' counsel renewed the motion requesting evaluation of the Named Plaintiffs. (Dkt. No. 207). In the memorandum supporting the motion, Plaintiffs' counsel represented that, in Dr. Adamakos's expert opinion, "the requested evaluations will be minimally intrusive, will not interfere with any ongoing treatment and will carry minimal risk of harm to the Named Plaintiffs." (Dkt. 207-1 at 2). Next Friends Professor Elliot and Ms. Irons provided nearly identical declarations in which each of them expressed a belief that the proposed psychological examinations were "in the best interests of [Cassie, Tracy, and

Danny] and are necessary in order to vindicate their rights in this litigation." (Dkt. No. 207-4 at ¶8, 207-5 at ¶8). Dr. Adamakos submitted a declaration pursuant to 28 U.S.C. §1746[30] in which he assured the Court that he would end the session or the testing immediately if a child did not want to continue speaking with him. Adamakos Declaration at 7 (Dkt. No. 208). On August 14, 2013, the Court conducted a telephonic hearing on Plaintiffs' counsel's renewed request for evaluation and the State's objection thereto. The Court suggested to the State that Tracy (who had turned eighteen) and Cassie (who was close to seventeen) should have a say in whether they wished to submit to the evaluation. Tr. 08/14/13 at 19:16-21. The Court also instructed Plaintiffs' counsel to ask the Plaintiff's treaters whether the testing would have any sort of deleterious effect on the current well-being of the Plaintiffs. Id. at 17:15-21.

At a second telephonic conference on September 10, 2013, the motion for evaluation by Dr. Adamakos was granted as to Danny B.; the parties also agreed that the interview with Danny should be videotaped.[31] Tr. 09/10/13 at 11:12-12:5. With regard to Cassie and

---

[30]

28 U.S.C.§ 1746 provides for unsworn declarations under penalty of perjury.

[31]

Subsequent to this hearing, the Court entered an order that placed all video recordings under the Court's protection, limited their dissemination, and provided for their eventual destruction. (Dkt. No. 408).

Tracy, the motion remained pending until both had given their consent to the evaluation. Id. at 12:17-24.

After both Tracy and Cassie had consented to undergo the evaluation and all the treating physicians and psychologists agreed that the proposed evaluation and testing would not have a deleterious effect on the Named Plaintiffs[32], the Court granted the request for evaluation in a further telephonic conference on September 24, 2013. Tr. 09/24/13 at 2:18-24. During that conference, Plaintiffs' counsel confirmed that "the children have all been told that they can discontinue the eval [sic] at any time." Id. at 3:12-17 ("And Dr. Adamakos has also said he will, of course, as he always would, inform the children of that as well at the beginning of the evaluation.")

As it turned out, Dr. Adamakos did not inform Danny or Cassie that they could terminate the evaluation at any time.[33] Tr. XI at 126. Dr. Adamakos conceded that he had represented in his declaration that he would terminate the evaluation and inform the Plaintiffs accordingly, but explained that he had been advised by Children's Rights that the Plaintiffs had been informed by somebody else. Id. at 127. As was revealed during trial, in the course of

[32]
Danny's clinician and psychiatrist both indicted that reviewing past traumatic experiences might take an emotional toll on Danny. Tr. XI at 135.

[33]
It is unknown whether Dr. Adamakos so informed Tracy before she submitted to the evaluation.

being interviewed, Danny indicated on at least five separate occasions that he wanted to leave and go home; yet, Dr. Adamakos did not terminate the interview. Id. at 128. Dr. Adamakos also conceded that he continued the interview after Danny became hyper-motoric, or fidgety (which, according to Dr. Adamakos, may have been reflective of Danny being uncomfortable in the interview), went into a downward spiral, and had a "meltdown." Id. at 133:13-135:3.

Dr. Adamakos acknowledged that he was well aware of the caveats expressed by Danny's clinician and his psychiatrist that reviewing past traumatic experiences might take an emotional toll on Danny and that he could only undergo the evaluations as long as the interview would be terminated if Danny became uncomfortable. Id. at 135. Nevertheless, Dr. Adamakos continued the interview after Danny explicitly told him that he "really want[ed] to leave," id. at 132:10-22, and for several minutes after Danny began to show a "visceral reaction" in the course of the interview. Id. at 134:20-135:3.

After this revelation in the course of Dr. Adamakos's testimony, the Court viewed the videotapes and read the transcripts of both interviews involving Danny. This Court went to great lengths in accommodating Plaintiffs' counsel's request for information, while putting measures in place (i.e., requiring informed consent from Cassie, obtaining the agreement from treating

psychologists, demanding assurances from Dr. Adamakos that he would terminate the interviews if Danny or Cassie became upset or wanted to discontinue the process) to protect Danny and Cassie from the potential harm that intrusive evaluation and testing might cause them. It is apparent to the Court that at least two of these measures were disregarded: (1) Cassie and Danny were not informed by Dr. Adamakos that they could terminate the interview if they so desired; and (2) Dr. Adamakos continued the interview with Danny after Danny indicated on five separate occasions that he no longer wanted to participate or explicitly stated that he wanted to leave. Even after Danny became visibly upset during the questions put to him, Dr. Adamakos continued the interview for several minutes.

After this information came to light, the Court indicated that it considered the way Dr. Adamakos had conducted the interview of Danny extremely disturbing and troubling. Tr. XI at 192:22-25. In response, Children's Rights acknowledged in a December 11, 2013 letter to the Court that it had informed Dr. Adamakos prior to the evaluations that both Cassie and Danny[34] had provided their consent to proceed with the evaluations. Children's Rights also suggested that (1) there may have been a "possible miscommunication between Dr. Adamakos and Plaintiffs' Counsel as to whether this consent

---

[34] The reference to Danny having provided his "consent" to the evaluation by Dr. Adamakos is clearly in error. Because of Danny's young age, the Court did not require his consent as a precondition to the evaluation by Dr. Adamakos.

obviated the need to tell each child at the beginning of each evaluation that the Named Plaintiffs could discontinue the evaluations at any time;" and (2) with respect to Danny's evaluation, that Dr. Adamakos had been "exercising his professional judgment and applying the process set forth in his Declaration of November 19, 2012."

Notwithstanding Children's Rights' assurances to the Court that Dr. Adamakos would inform Cassie and Danny at the beginning of the evaluation that they could discontinue the evaluation at any time, Dr. Adamakos neglected to do so, and he continued Danny's evaluation even after Danny had repeatedly indicated that he wanted to leave and showed signs of great emotional upset.

It is the opinion of this Court that, despite its best efforts to protect the rights and well-being of the Named Plaintiffs while accommodating Plaintiffs' counsel's asserted need for the evaluations by Dr. Adamakos, Named Plaintiffs' rights were compromised when counsel and their retained expert failed to adhere to the carefully constructed safeguards put in place by the Court. As a result, Danny was subjected to a lengthy interview during which he exhibited the emotional distress predicted by his treating clinician and psychiatrist.

When these transgressions came to light during trial, the Court advised the parties that it would take the matter up after the trial concluded. With the explication and publication of these

events as set forth in this Memorandum of Decision, the court now considers the issue closed. Danny and Cassie, however, retain the prerogative to take whatever action they deem appropriate to vindicate their rights.

### 4(b) Dr. Adamakos on Danny

Dr. Adamkos noted that Danny was seen as engaging, friendly, polite, and eager to have a home; although, at times, Danny was angry and engaged in inappropriate behavior. Tr. X at 87-88. In the course of the interview with Dr. Adamakos, Danny described feeling unsafe at the SM home at times and being mistreated at the LF and the T home, Tr. X at 98, 100, a recollection that caused Danny to become increasingly hyperactive, motoric, and visibly upset, and that turned into a "meltdown." Tr. X at 103. Danny also indicated that he wanted very much to be in a family and he expressed doubt as to whether he was a good enough person to be adopted, although he did maintain hope for such a placement. Tr. X at 114-115. Danny spoke about positive experiences with his current visiting resource, a couple identified as A and D, with whom he feels safe. Tr. X at 117.

Based on his interviews with Danny, Dr. Adamakos identified a level of depression and suicidal ideation (noting that Danny spoke of it in a way that "seemed very unlikely to succeed or that he even wanted to carry it out"). Tr. X at 119:14-18. Danny also expressed anger at his brother for having been adopted and being

happy, while Danny himself was still without a family. Tr. X at 119-120.

Dr. Adamakos administered several psychometric instruments in the form of questionnaires to Danny, including the BASC-2 [Behavior Assessment System for Children], the M-PACI [Millon Pre-Adolescent Clinical Inventory], the TSCC [Traumatic Symptom Checklist for Children], and the TABS [Trauma and Attachment Belief Scale]. Tr. X at 123. Dr. Adamakos did not give Danny the MWES [My Worst Experience Scale] because Danny became emotionally upset during the second interview. Tr. X at 124. In reviewing the tests, Dr. Adamakos acknowledged that the BASC-scales were all within average range, but suggested that "there was a sense of some defensiveness" on Danny's part. Tr. X at 124:20-22, 125:23-24. Likewise, the TSCC results were in the normal range. The results of the M-PACI appeared to be less than definitive. According to Dr. Adamakos's interpretation, Danny "likely has a strong need for attention and approval;" "likely actively solicits praise and tries to be entertaining as a way to create [a] connection;" "it's likely that [Danny] pays a good deal attention to the cues of people . . . ;" "[t]here was some indication that [Danny] may experience obsessions and compulsions . . . which is likely a symptom of anxiety." Tr. X at 126:3-127:3. The results of two of the TABS scales were described as being in the "high average" range, indicating that "Danny, when unsure or anxious, will likely engage – according to

these results, will likely engage in behaviors trying to control a situation that's creating anxiety for him." Tr. X at 128:7-11.

Dr. Adamakos offered an opinion that Danny had been "harmed over the years by his experiences since being taken into DCYF custody." Tr. X at 129:23-24. Dr. Adamakos based this opinion as what he described as "the deterioration in his overall functioning as indicated by the record." Tr. X at 130:1-2. Dr. Adamakos also pointed out that "the overall trend has been for more institutionalized or group, congregate care type living arrangements." Tr. X at 130:11-13. Dr. Adamakos noted that Danny's adjustment during the first year of DCYF care was "reasonably good" which he described as "an important baseline." Tr. X at 130:22-23. He also noted that "[v]ery importantly, there was no indication of any kind of sexual acting out until the disruption of the first foster home, a totally new behavior that has no correlator or isn't typically found with children who have just ADHD." Tr. X at 131:8-12; Tr. X at 150:1-5 (Danny's "functioning became worse and, importantly, became different in that there was now the inclusion of sexual acting out, which was a new symptom and not at all indicated prior to the first - in the first 14 months of time he was in DCYF care.")

As Dr. Adamakos acknowledged, however, he had not talked to any of Danny's treating providers, clinicians, or his psychiatrist; he also agreed that Danny was diagnosed with mood disorder and PTSD

[post traumatic stress disorder]. Moreover, it was established during trial that Danny's sexualized behavior was observed during the first five days after he was taken into DCYF care and was, in fact, the reason his maternal great-grandmother felt unable to care for him and his younger brother. Likewise, Danny's developmental delay, aggressiveness, anxiety, non-compliance and a number of other troublesome behaviors were identified and diagnosed shortly after he was removed from his biological home.

### 4(c) Dr. Adamakos on Cassie M.

In addition to reviewing Cassie's DCYF case file, Dr. Adamakos conducted two separate two-hour interviews with Cassie, both of which were videotaped. Tr. XI at 23, 57. Dr. Adamakos also gave Cassie a number of self-administered tests from which he drew various conclusions. Tr. XI at 64-65. Specifically, Dr. Adamakos noted that the tests confirmed Cassie's ADHD diagnosis; that Cassie showed a clinically significant score on the "Sensation Seeking" scale; and that she did not show a clinically significant score on the "Interpersonal Relations" or the overall "Anxiety" scale. Tr. XI at 66:22-25 ("[S]he feels judged or she feels as though she has to perform. She's anxious about that."). Dr. Adamakos suggested that Cassie may have been "somewhat defensive" in responding to the self-administered tests, Tr. XI at 67:16, which led him to surmise that "the only risk here is that her under-endorsement of items might have resulted in some lowered elevations." Id. at 67:22-24.

Based on the results of the tests, Dr. Adamakos suggested that "the impressions are that [Cassie] has an inflated sense of self combined with an insecure sense of worth." Tr. XI at 67:25-68:2. He further suggested that, *inter alia*, Cassie lacks insights into herself; "anticipates criticism; and because of that, she likely has an edgy, irritable personality," id. at 68:14-15; she expects there to be interpersonal problems, is suspicious of other people's intentions, fears dependence on other people, and disregards social conventions. Tr. XI at 68-69.

According to Dr. Adamakos, Cassie was "at high risk for substance abuse tendencies." Tr. XI at 70:9-10. Dr. Adamakos administered the "My Worst Experience Scale," in which Cassie identified her worst experience as entering DCYF care. Tr. XI at 71. "[Cassie] connects that to being moved house to house, not seeing my family, not stay [sic] in one school, being picked on because I am in foster care." Tr. XI at 71:15-17. According to Dr. Adamakos, "[o]ppositional conduct seems to be her response to being traumatized. It's one of the many styles that people who have been traumatized, especially children, engage in. [Cassie] shows oppositionality as a response, as a likely response to having been traumatized." Id. at 71:21-25. Cassie reported some difficulty sleeping, but "[n]ot like it was when she was younger." Tr. XI at 72:14-16. Dr. Adamakos suggested that "while you can't take it by itself, the results from the My Worst Experience Scale is very

consistent with what is used to make a diagnosis of PTSD." Tr. XI at 73:15-18 ("Again, you don't use one test or one questionnaire to judge that, but how she responded on the questionnaire is highly consistent with that.") Id. at 73:19-20.

Based on his review of Cassie's DCYF records, the two two-hour interviews, and the self-administered tests, Dr. Adamakos offered the opinion that Cassie remained at high risk for a variety of problems growing up, "especially where she's transitioning from adolescence to young adulthood in the next few years." Tr. XI at 74:12-16. Among those problems for which Dr. Adamakos considered Cassie to be high risk were "sexually acting out . . . drug abuse or substance abuse issues, dropping out of school, legal problems," and "entering into relationships that are harmful to her." Tr. XI at 74:23-75:14, 103.

In his final conclusion, Dr. Adamakos suggested that Cassie experienced "an incremental sort of harm" while in DCYF care. Tr. XI at 76:3-4. Dr. Adamakos acknowledged that Cassie "entered into DCYF care very vulnerable based on her pre-DCYF history, her history with her family, with her biological family, an extremely vulnerable child coming in." Tr. XI at 76:4-7. He further stated that "on top of that, there's been an ongoing sense of being – she's had repetitive experience of being let down." Id. at 76:8-10. Cassie expressed to him that "adults mess up, and she cited both examples from her biological family as well as from DCYF." Id. at

76:17-20. Nevertheless, Cassie also "spoke positively" about the TH group home, id. at 76:24, and there had been what Dr. Adamakos described as "episodes of . . . a corrective experience." Tr. XI at 77:11-12. Dr. Adamakos concluded that "there wasn't consistent harm. There were times that her experience has been damaging to her, and there's been times that her experience has been somewhat better." Tr. XI at 81:13-16. Specifically, Dr. Adamakos noted that "[t]he difficulty sustaining a constant family experience for her . . . impacted her ability to have a foundation in which to develop with." Tr. XI at 81:5-8. "Attempts were made, but there was lacking success; . . . we have an instance where there was some successful stability and during that time there actually was some benefit." Id. at 81:9-12.

With respect to Cassie's relationship with her younger sister, A., Dr. Adamakos noted that both came from a home that was "marked by neglect" and "very chaotic," and in which the "children were left to fend for themselves." Tr. XI at 82:20-83:5. Dr. Adamakos did not know how much contact Cassie had with A. after both were taken into DCYF care, but noted that there was a higher level of contact between Cassie and A. than between Cassie and her mother because DCYF could control only the contact with Cassie's sister. Tr. XI at 85. The contact between Cassie and A. was diminished after A. was adopted in 2012. Tr. XI at 85-86.

Although Dr. Adamakos had some difficulty recollecting the

circumstances in which Cassie was living while still in her biological home, Tr. XII at 58-61, he agreed that the early childhood trauma Cassie experienced in her biological home could have affected (1) her relationship with others later in life; (2) her brain development; and (3) her ability to attach to people and form relationships. Tr. XII at 62. He further acknowledged that the disruptive behaviors Cassie exhibited in all foster care placements had also been present in her biological home. Tr. XII at 81-83. After Cassie was taken into DCYF care, she was eventually diagnosed with reactive attachment disorder and as an adolescent with bipolar disorder. Tr. XII 83-84. A July 1, 2010 clinical evaluation concluded that sexualized behaviors Cassie had been exhibiting in foster care were related to trauma in her biological home. Tr. XII at 90.

It is noted that a considerable portion of Dr. Adamakos's testimony regarding Cassie's progress proved to be inconsistent with the record introduced into evidence. According to Dr. Adamakos, the placement with AD went very well, Cassie's behavioral issues declined significantly, Tr. XI at 49, and she displayed no sexualized behaviors. Tr. XII at 93. Dr. Adamakos explained that Cassie's improved behavior was "a dramatic break in terms of it being an improvement for Cassie," that it "marks a period of time where she is thriving," and that it was a "corrective experience" for her. Tr. XI at 50:7-9, 7-18, 22-25. He also testified that it

was his understanding that Cassie had to leave the home when her foster parent required space for an adult child returning back to the home, Tr. XI at 51, that Cassie was unhappy to leave, and that her behavior deteriorated. Tr. XI at 52.

However, a Key Program report generated shortly after Cassie moved into the AD home establishes that Cassie still exhibited sexualized behavior, as a result of which she was precluded from returning to high school for the following academic year. Tr. XII at 95-96. AD discontinued providing a foster home for Cassie because CFS, the agency AD was working with, was closing its foster care services. Tr. XII at 99. In her interview with Dr. Adamakos, Cassie stated that she did not miss being in the home and that she did not talk to AD while she was in the AD home. Tr. XII at 97-99. Subsequently, Cassie went to the LH group home by order of the Rhode Island Family Court. Tr. XII at 99.

In forming his opinion about Cassie's relationship with her caseworker, Dr. Adamakos noted that Cassie was annoyed with her DCYF caseworker and that she requested a different caseworker because "she wasn't being attended to enough and that the worker wasn't responsive enough." Tr. XI at 53:13-19. A report from Cassie's current placement revealed that Cassie was annoyed with her caseworker because she had not yet received permission to attend a tattoo party for her boyfriend. Tr. XII at 101. During the interview conducted by Dr. Adamakos, Cassie told him that her

social worker, HP—who has been her caseworker almost the entire time Cassie has been in DCYF care—watched her grow up, knew her likes and dislikes, and that nothing gets past her. Tr. XII at 102-103. Cassie also told Dr. Adamakos that she gets angry at HP sometimes and that she lets her know that. Tr. XII at 102. Dr. Adamakos acknowledged that Cassie described HP as a good social worker and he agreed that there was a connection between Cassie and HP. Tr. XII at 103.

The Court notes that Dr. Adamakos did not speak to any of Cassie's current or former treating professionals, clinicians, placements, social worker, or other resources provided to Cassie by DCYF. Tr. XII at 104-105.

At least one of the tests Dr. Adamakos administered to Cassie, the BASC-2 (which showed results in the normal range for all five validity scales) had already been administered to Cassie on May 22, 2008, and December 9, 2008, during Cassie's stay at the TH home. Tr. XII at 108. Although Dr. Adamakos did not do an "active comparison" between those tests and the one he administered, Tr. XII at 109:4-5, he acknowledged that the clinician reports related to the earlier tests reflected that Cassie's behavior in 2008 was rated as clinically significant or at risk. Tr. XII at 115. In other words, the tests appear to reflect that there has been some improvement.

With respect to Dr. Adamkos's prognosis for Cassie, including

his stated concern that Cassie might drop out of school, become involved in abusive relationships, engage in substance abuse, or exhibit sexual acting out, Dr. Adamakos conceded that, during his interview, Cassie expressed that she was excited about her senior year in high school; she was completing school on time; and she had talked to him about going on to college or beauty school. Tr. XII at 117-118. There was no evidence that Cassie had been involved in an abusive boyfriend-girlfriend relationship in five years or that she had been abusing substances. With respect to her sexual acting out, such behavior had been documented since Cassie first entered DCYF care; it was also established that she had witnessed such behavior in her biological home. Tr. XII at 119.

### 4(d) Dr. Adamakos's Opinions on Cassie and Danny

At the hearing on Children's Rights's first motion to have the Plaintiffs evaluated by Dr. Adamakos, counsel represented that Dr. Adamakos would be able to "tease out" the harm suffered by Cassie and Danny as a result of inadequate care provided to them by the State. September 10, 2012 Hearing Transcript at 7:14-8:3, 13:18-14:13 (Dkt. No. 168). At the beginning of his testimony, Dr. Adamakos explained that he was tasked with undertaking a forensic investigation as to "what types of treatment and harm have occurred to the children since they've been in the care of DCYF." Tr. X at 8:23-25. To answer that question, he engaged with Cassie and Danny in individual interviews, used psychometric scales in the form of

self-administered questionnaires, and reviewed the records in the
DCYF case files, Tr. X at 30-32, including psychiatric and
psychological evaluations and caseworker notes. Id. at 35.

However, Dr. Adamakos never provided any explanation of any
methodology that would allow him to conclude whether Cassie's or
Danny's continuing challenges were due to harm suffered as a result
of deficiencies in how their cases were managed by DCYF, rather
than the consequences of the severe neglect and abuse suffered in
their respective biological homes or manifestations of genetically
inherited disorders.

Dr. Adamakos reviewed the information in the record about
Cassie's and Danny's biological families—which presumably served as
a baseline to determine whether the Named Plaintiffs suffered any
additional harm during DCYF care, Tr. X at 40. See Tr. XI at
157:10-14 (Q: "And based on your understanding and establishment of
that baseline, it's your position that you can separate Danny's
pre- versus post-DCYF behaviors or harm, if you will; correct?" A.
"To some degree, yes.") However, Dr. Adamakos appeared to
discount, or appeared to be unclear with regard to, the severity of
neglect and abuse Cassie and Danny had already suffered at the time
of their removal from their biological homes and the problematic
behaviors they displayed at the time they came into DCYF care.

When the self-administered psychometric measures, which Dr.
Adamakos gave to the Named Plaintiffs, appeared to show results

that fell within the normal range for both Cassie and Danny, Dr. Adamakos suggested—without any reference to scientific method—that both Cassie and Danny may have responded defensively and that the actual results of the tests might have been higher. With respect to Cassie, Dr. Adamakos conducted no direct comparison to the same earlier psychometric measures, at least two of which appeared to indicate that Cassie had, in fact, improved over time.

In light of the details in Cassie's and Danny's individual backgrounds when they were removed from their biological home, both the DCYF records and Cassie's and Danny's conduct during the interview with Dr. Adamakos reveal that they each have made remarkable progress. This does not diminish the fact that both will face continuing challenges in the future or that, in an ideal world, they might have found permanent families by now.

None of the evidence presented during trial, however, supports Plaintiffs' contention that any of Cassie's and/or Danny's difficulties were solely, if at all, attributable to harms they suffered in DCYF care. Nor did the Plaintiffs offer any instance in which Cassie or Danny were exposed to unreasonable risks. At any time the services provided to Cassie or Danny appeared insufficient to address their very considerable needs, the situation was appropriately addressed and, to the extent that was possible, the problems were remedied. Danny's history during DCYF care shows that he was provided services whenever a need for such services was

indicated. It also reflects that, every time Danny was placed into a more structured setting, his behavior improved.

For both Cassie and Danny, it was also established that their more difficult behaviors were already present when they were placed in DCYF care and could well be attributed to family history and/or the circumstances that Cassie and Danny experienced in their biological homes. Repeated efforts by DCYF to find adoptive homes for both Cassie and Danny are well documented, as is the acknowledgment by DCFY that more pre-adoptive and foster homes are critical to address the needs of children in DCYF care.

In sum, after reviewing the record, Dr. Adamakos's testimony and the transcripts of Dr. Adamakos's interview with Danny, the Court is of the opinion that the Plaintiffs have failed to establish that Cassie and/or Danny were harmed or were subjected to risk of harm during DCYF care as a result of DCYF policies, or any acts or omissions based on such policies and procedures.

### 5. Dr. Hansen's Testimony

Dr. Hansen was asked by Children's Rights to evaluate the cost of caring for children in Rhode Island foster care and to determine whether the State made payments on behalf of those children, as required by the AACWA, Title IV-E of the Social Security Act, 42 U.S.C. §671(a)(1)[35], 42 U.S.C. § 672(a)(1) and (a)(2)[36], 42 U.S.C.

_____

[35]

42 U.S.C. §671 (a) requires that, with respect to federal payments for foster care and adoption assistance,

§675(4)(A)[37] and 45 C.F.R. 1355.20[38]. Tr. IX at 4. To make that

[i]n order for a State to be eligible for payments under
this part, it shall have a plan approved by the Secretary
which--
(1) provides for foster care maintenance payments in
accordance with section 672 of this title and for
adoption assistance in accordance with section 673 of
this title;... 42 U.S.C. §671 (a)(1).

[36]

42 U.S.C. § 672 (a) (1) and (2) address eligibility as well as
removal and foster care placement requirements of the foster care
maintenance payments program.

[37]

42 U.S.C. § 675(4)(A) defines foster care maintenance payments
as follows:

    The term "foster care maintenance payments" means
payments to cover the cost of (and the cost of providing)
food, clothing, shelter, daily supervision, school
supplies, a child's personal incidentals, liability
insurance with respect to a child, reasonable travel to
the child's home for visitation, and reasonable travel
for the child to remain in the school in which the child
is enrolled at the time of placement. In the case of
institutional care, such term shall include the
reasonable costs of administration and operation of such
institution as are necessarily required to provide the
items described in the preceding sentence. 42 U.S.C. §
675(4)(A).

[38]

  45 C.F.R. § 1355.20 further defines foster care
maintenance payments as follows:

    Foster care maintenance payments are payments made
on behalf of a child eligible for title IV-E foster care
to cover the cost of (and the cost of providing) food,
clothing, shelter, daily supervision, school supplies, a
child's personal incidentals, liability insurance with
respect to a child, and reasonable travel for a child's
visitation with family, or other caretakers. Local travel
associated with providing the items listed above is also
an allowable expense. In the case of child care
institutions, such term must include the reasonable costs
of administration and operation of such institutions as

determination, Dr. Hansen first estimated the cost of providing the items intended to be covered by foster care maintenance payments "for a typical child in a typical family." Tr. IX at 6:19-22. The items include the cost of providing food, clothing, shelter, daily supervision, school supplies, personal incidentals, liability insurance, reasonable travel (for visitation and any other purpose). Tr. IX at 6. Dr. Hansen then calculated the value of benefits provided to foster parents in specific categories, such as food and clothing. Tr. IX at 6-7. Finally, Dr. Hansen calculated the difference between the estimated costs incurred by foster parents and the actual benefits paid by the State. Tr. IX at 7.

To determine the cost incurred by families in providing care to foster children, Dr. Hansen used data from the United States

---

are necessarily required to provide the items described in the preceding sentences. "Daily supervision" for which foster care maintenance payments may be made includes:

(1) Foster family care--licensed child care, when work responsibilities preclude foster parents from being at home when the child for whom they have care and responsibility in foster care is not in school, licensed child care when the foster parent is required to participate, without the child, in activities associated with parenting a child in foster care that are beyond the scope of ordinary parental duties, such as attendance at administrative or judicial reviews, case conferences, or foster parent training. Payments to cover these costs may be: included in the basic foster care maintenance payment; a separate payment to the foster parent, or a separate payment to the child care provider; and

(2) Child care institutions--routine day-to-day direction and arrangements to ensure the well-being and safety of the child. 45 C.F.R. § 1355.20.

Consumer Expenditure Survey ("CE") and the 2011 United States Department of Agriculture ("USDA") report on expenditures by families on their children. Tr. IX at 16. The CE includes a quarterly interview administered to thousands of households regarding large purchases over a three-month period, plus a diary in which families record every single expenditure for a couple of weeks out of every quarter. Tr. IX at 16-17. With respect to the USDA data, Dr. Hansen used the income category for a middle income family in a two-parent, two-child household located in the urban Northeast. Tr. IX at 19:16-20:10. Dr. Hansen did not explain, however, how this baseline income category relates, if at all, to Rhode Island.

For the cost of food (depending on age, assessed at $1,470-$2,690 annually) and clothing ($680-$1,040 annually), Dr. Hansen relied on the USDA report's child-specific estimate of average expenditure per child "in the typical family for the typical child." Tr. IX at 22; Ex. 712. The cost of liability insurance for a foster child was left out of the calculation because the State pays the insurer directly. Tr. IX at 22:16-19. In regard to daily supervision, Dr. Hansen used both the CE and the USDA report (which does not distinguish between daycare and education); she also differentiated between younger children who required daily supervision ($638-$3,850 annually) and older children who did not ($0.0). Tr. IX at 23. A similar calculation was undertaken for

school supplies ($0.0-$804 annually). Tr. IX at 24-25. Because the USDA report does not inquire for which individual household member miscellaneous expenditures are incurred, Dr. Hansen based her calculation on the assumption that families spend the same amount on incidentals for each family member ($900-$1,190 annually). Tr. IX at 25. For travel expenses, the USDA report includes trips away from home, but federal regulations only include local travel as an allowable cost. See 45 C.F.R. § 1355.20. Accordingly, Dr. Hansen relied on the CE which concludes that 97 percent of all travel expenses are for local travel and used that figure for her calculation ($1,581-$2,037 annually). Tr. IX at 26. Finally, with respect to housing, Dr. Hansen relied on the USDA report's estimation of the average cost for an additional bedroom in which to house one additional child ($4,680 annually). Tr. IX at 27.

Having calculated the annual costs of foster care ($11,131-$13,339 per child), Ex. 712, Dr. Hansen then reviewed payments the State makes on behalf of children who are placed in family foster care (excluding from her assessment children placed in group homes or institutional care). Tr. IX at 29. In addition to basic foster care maintenance payments, supplemental payments are made to families that care for foster children with special needs. Tr. IX at 30. Families also receive benefits that go to specific costs, such as free lunch programs and clothing. Tr. IX at 29, 43.

Based on information provided by DCYF, Ex. 488, current daily

board rates in Rhode Island range from $13.64/day to $15.79/day. According to Dr. Hansen, the rates were set in 2001, and she could not locate any information that explained how those rates were set by DCYF. Tr. IX at 33-35. Initially, payments are made at the basic rate, which may be supplemented to account for special needs of a foster child. Tr. IX at 36. Additional benefits include birthday and Christmas checks ($25 and $40, respectively) and the availability of clothing vouchers[39]. Tr. IX at 43. Dr. Hansen also assumed that foster families would undertake at least one local trip per week in the care of a foster child, for which they would receive reimbursement of $20 per trip; she noted, however, that she had no quantitative information on the actual frequency of transportation. Tr. IX at 50-52.

In the final step of her analysis, Dr. Hansen credited board costs and the value of additional benefits against the estimated expenditures derived from CE data and the USDA report. Tr. IX at 54-56. Ex. 713. Dr. Hansen concluded that the difference between the estimated expenditures and the actual State-provided payments and benefits, "is the amount of costs that we could expect foster parents to pay out of their own pockets," Tr. IX at 55:20-24, ranging from $1,650 to $4,542 per year. Ex. 713. Based on that

---

[39]

Dr. Hansen did not include clothing vouchers in her analysis because vouchers are limited to first time placement or extenuating circumstances and are given to social workers directly. Tr. IX at 48; Ex. 488.

conclusion, Dr. Hansen offered as her expert opinion that, "in order to cover all of the costs that foster parents incur in connection with the cost categories required under federal law," Tr. IX at 60:19-24, foster care board rates in Rhode Island needed to be increased between 31 percent and 96 percent, depending on the age of the child involved. Ex. 710, Tr. IX at 61. For a child at Danny's age, the rate required an increase of 73 percent, for a child at Cassie's age, the necessary increase was calculated at 79 percent. Tr. IX at 62-63.

In arriving at a conclusion that foster care maintenance payments in Rhode Island are inadequate and result in a budgetary shortfall for which foster families have to compensate, Dr. Hansen's analysis assumed that a foster family in Rhode Island incurs the same average expenditures for each child as a two-parent, two-child, middle-income family does. Plaintiffs offered no empirical support for such an assumption. It is also noted that the largest budgetary item in Dr. Hansen's proposed family expenditure account is based on the cost of an additional bedroom for each child; there is, however, no federal requirement that each foster child be provided with a separate bedroom (with some exception for children of different genders over certain ages). Tr. IX at 75, 125, 130. Likewise, there is no federal minimum foster care payment rate and no specifically required methodology to set such a rate. Tr. IX at 104. Rather, states are allowed to determine their own

rates for foster care maintenance payments. Tr. IX at 105.

As established at trial, foster care maintenance payments for generic homes are established when children first come into care. Thereafter, an agreement is reached between the foster parents and the State for a supplemental rate based on the individual needs of a particular child going to a particular home. Tr. IX at 103, 105. Subsequently, the rates are assessed with a rate-setting tool every six months. Tr. IX at 104. In addition, casework supervisors have the authority to supplement the daily board rate up to $21.43; a regional director can further increase the rate to $32.15. Tr. IX at 97, 99. Additional increases to the supplemental rate are decided by the Rate Setting Committee. Tr. IX at 99-100.

To the extent Dr. Hansen's testimony was intended to establish that the State deprived the Named Plaintiffs of rights conferred on them by the AACWA, specifically adequate foster care maintenance payments, it failed to do so. Dr. Hansen's analysis was based on expenditures incurred by a "typical" two-parent, two-children family with a middle-class annual income between $59,000 and $103,000 in the North-East. The estimated expenditures relative to an individual foster child was based on the average expense a family would incur per one of two children living in the home; the calculation did not allow for the principle of economy of scale, pursuant to which the cost for each additional child is likely to be less than the calculated average. Tr. IX at 122-123.

No information was included on the actual expenditures pertaining to Cassie and Danny, or the supplemental rates that may have been established for them. Dr. Hansen did not have information regarding where Cassie or Danny were placed while they were in DCYF care. Tr. IX at 82-83. However, based on the record, both Cassie and Danny were placed either in specialized foster homes or they lived in various residential settings.

Dr. Hansen's report of foster care maintenance rates in Rhode Island was limited to DCYF-licensed "generic" family foster homes and did not include an assessment of negotiated, contractual rates for children in specialized foster care. Tr. IX at 79-80. In essence, Dr. Hansen's analysis was based on averages, not on the actual payments made by the State on behalf of the individual Named Plaintiffs; Dr. Hansen did not know whether Danny's and/or Cassie's foster parents received an increase in the board rate. Tr. IX at 89-90, 100, 103.

In sum, none of Dr. Hansen's analysis was specific to Rhode Island, actual foster families in the state, or expenditures and payments relative to the Named Plaintiffs. It gives the Court some pause to learn that foster care maintenance rates have been unchanged since 2001. However, in light of the availability of additional benefits and the presence of a mechanism to negotiate supplemental payments based on an individual child's needs, the Court concludes that the Plaintiffs have failed to establish a

deprivation of rights under the AACWA with respect to foster care maintenance payments on behalf of the Named Plaintiffs.

## IV. Conclusions

### (A) Substantive Due Process Claims (Counts I and II)

The Complaint asserts that the State has failed to protect Cassie and Danny from harm, Complaint ¶ 220, and, after removing them from their biological homes, has put them in placements that posed an imminent risk of harm to them, Complaint ¶ 224, all of which has resulted in a violation of their constitutionally protected liberty and privacy interests.

After reviewing the evidence submitted by the Plaintiffs in this case, the testimony of all the witnesses, and in consideration of the standard this Court deems appropriate for considering the Plaintiffs' claims, the Court is of the opinion that the Plaintiffs have failed to establish that DCYF's care of Danny and Cassie was in deliberate disregard of, or a substantial deviation from, DCYF's standards based on Rhode Island statutory law, Rhode Island's administrative code, and the provisions of the COA. Moreover, the Plaintiffs have failed to establish that Danny or Cassie were deprived of a constitutionally protected interest while in DCYF's care.

There was nothing to suggest that the decisions made by DCYF (to the extent such decisions were not subject to orders by the Family Court) regarding Danny's and Cassie's placement and services

were inappropriate, unfounded, in contravention of DCYF regulations or state law, or that they resulted in harming Cassie or Danny or subjected them to an unreasonable risk of harm.

DCYF made several attempts to find an adoptive home for Danny; however, Danny's needs and behavioral challenges made those attempts unsuccessful. Danny's file reveals that he was determined to be in need of a more structured environment and, every time he was placed in a group home, his behavior improved. After an allegation was raised of inappropriate conduct towards Danny at a specialized foster home, he was promptly removed and an investigation was launched (which resulted in a finding that the allegation was unfounded). Danny has had the same caseworker since he was taken into DCFY care (with the exception of two maternity leaves, when another caseworker was assigned to Danny.) When Danny was observed to have sustained bruises while he was living in a group home, an investigation was conducted and Danny was placed into a different classroom as the child with whom he had an altercation.

Cassie's extreme needs resulted in her placement in a group home only after two specialized foster homes could not address those needs. Cassie's history indicates that she, like Danny, required and benefitted from a more structured environment, as her behavioral problems improved with such placement. DCYF made repeated efforts to find a permanent adoptive home for Cassie, but

it was apparent that Cassie's needs could not be met even in a specialized foster home, notwithstanding the additional services provided by DCYC. As with Danny, the record established that DCYF promptly took action and conducted an investigation into allegations of lack of supervision at the group home in which Cassie was placed.

Some of the evidence submitted by the Plaintiffs can be interpreted to indicate that DCYF could benefit from additional resources, *e.g.*, to hire additional caseworkers and to lower CPS investigators' caseloads. Such additional resources might also result in more exact record keeping and improved timeliness of individualized service plans, an area where improvement has been identified as necessary.

The testimony of Dr. DeFrances before the Finance Committee made clear that DCYF recognizes the need for more foster homes and for providing appropriate services to those homes. The testimony also showed that DCYF has taken action to meet those needs and is seeking financial support in that regard. Likewise, DCYF's internal reports document that DCYF is making efforts to bring its performance into compliance with federal requirements, Rhode Island statutes and regulations and/or the provisions set out by the COA. There was, however, no evidence to establish that DCYF's current policies and practices—or any deliberate disregard of such policies and practices—resulted in harm to the Named Plaintiffs or that the

Plaintiffs were subjected to unreasonable risk while in DCYF's care.

In sum, a review of the circumstances of Danny's and Cassie's history, placements, treatments, and services does not support the Named Plaintiffs' claims that DCYF's acts or omissions caused any harm to either Danny or Cassie, that DCYF subjected them to unreasonable risks, or that it deprived them of their constitutional rights.

Accordingly, the Plaintiffs' substantive due process claims in Counts I and II must be dismissed.

**(B) Familial Association (Count III)**

The Plaintiffs' claims regarding alleged deprivation of familial relationships were entirely unsupported by the record. Instead, the evidence established that DCYF—in accordance with orders from the Family Court, when applicable—made efforts to support a continuing relationship between Cassie and her mother and sisters, and between Danny and his parents, his brother, his great-grandmother, and his grandmother.

Cassie was initially placed with two half-siblings and she continued to have visitation with her mother. Although it appears that those visits were upsetting to Cassie at times, they were court-ordered and not at DCYF's discretion. Contact with Cassie's sister ceased only after the sister's adoptive parents decided that the contact was too disruptive for the time being.

Danny was initially placed with his sibling in their great-grandmother's home, where Danny was provided with specialized services. Only after Danny's great-grandmother declared that she could no longer care for Danny because of his behavioral issues, DCYF placed him in a specialized foster home. During that placement, Danny's caseworker transported him to regular visits with his parents; however, the parents did not always keep the appointments. Danny's relationship with his grandmother has been continued with regular visitation.

### (C) AACWA Claims (Count IV)

Although the State now raises the question of whether the Named Plaintiffs have standing to pursue their claims under the AACWA, there is no need for a lengthy discussion of this point. This Court has previously determined that "[i]n light of the AACWA's mandatory requirements to provide benefits to each child in the same circumstances as the plaintiffs, and the unavailability of other means to seek relief against alleged violations of the specific AACWA provisions raised in this case," Sam M. v. Chafee, 800 F.Supp.2d at 388, the Plaintiffs are not precluded to proceed with their claims to timely written case plans and adequate foster care maintenance payments. However, because the evidence submitted at trial was insufficient to support the Plaintiffs' contentions regarding inadequate foster care maintenance payments, the AACWA claims cannot withstand the State's Rule 52 motion.

With regard to the case plans, it is apparent that individualized service plans for both Danny and Cassie were regularly provided, although not always within the requisite time frame. The Plaintiffs submitted those service plans into evidence as Ex. 90, Ex. 130, each of which consists of a three-inch stack of paper. The fact that the plans were not always timely and may have lacked signatures, while indicating that some improvement in record keeping may be needed, does not constitute a denial of the Named Plaintiffs' rights to individual service plans under the AACWA.

For the foregoing reasons, the Defendants' motion pursuant to Fed. R. Civ. P. 52(c) is GRANTED. The clerk is directed to enter judgment in favor of the Defendants.


SO ORDERED.


/s/ Mary M. Lisi

Mary M. Lisi

United States District Judge


April 30, 2014