UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

---

| | | |
|---|---|---|
| ANDREW C., *by Next Friend* Gregory C. Elliott; MATTHEW R. *by Next Friend* Elaine Macintosh; and SEAN M. *by Next Friend* Elaine Macintosh; *for themselves those similarly situated,* | ) ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | C.A. No. 1:07-cv-241-WES-PAS |
| DANIEL J. McKEE, *in his official capacity as Governor of the State of Rhode Island;* WOMAZETTA JONES, *in her official capacity as Secretary of the Executive Office of Health & Human Services; and* KEVIN AUCOIN, *in his official capacity as Acting Director of the Department of Children, Youth & Families,* | ) ) ) ) ) ) ) ) ) | |
| Defendants | ) | |

---

## STATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OBJECTION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

It is undisputed that the Department of Children, Youth and Families (hereinafter hereinafter "DCYF") satisfied the benchmarks in Sections 1, 2, 3 and 9 of the Settlement Agreement (ECF No. 586-1), these Sections should exit from monitoring and this Honorable Court's jurisdiction. Awarding Children's Rights $99,872.10 in attorneys' fees would be unreasonable and unjust given the undisputed factual underpinnings of this motion. Furthermore, the Court's decision on this motion and the factors it considers will be instructive on future fee endeavors in this

post-settlement period.

In 2019 the the Data Validator's issued reports finding that DCYF satisfied the Settlement Agreement's benchmarks for Sections 1, 2 and 3 for two consecutive Reporting Periods.  DCYF should have been permitted to exit Sections 1, 2, 3 and 9 from the Settlement Agreement as early as January, 2020.  However, in January 2020, the Data Validator's unexpectedly changed his methodology and required retroactive data review.   Since neither the Monitoring Team nor Children's Rights (hereinafter "CR") would acknowledge the Data Validator's 2019 findings, DCYF was ultimately forced to agree to a revised methodology.  Applying the new methodology to the data for Sections 1, 2 and 3, the Data Validator yet again confirmed that DCYF met the benchmarks for Sections 1, 2 and 3 for two consecutive Reporting Periods and these Sections should exit the Settlement Agreement. CR was not a party to the resolution of the new methodology between DCYF and the Data Validator.  CR did not clarify the Monitoring Team's misinterpretation of Section 1's  assessments at the outset.  CR cannot demonstrate that they materially altered the legal relationship with DCYF such that it caused DCYF to modify its behavior in its ability to exit Sections 1, 2 and 3 from the Settlement Agreement.  It would be inequitable, unjust and unreasonable to award CR attorneys' fees in the amount of  $99,872.10, or even a fraction of the requested fees.

Wherefore, Daniel J. McKee in his official capacity as Governor of the State of Rhode Island, Womazetta Jones, in her official capacity as Secretary of the Executive Office of Health and Human Services and Kevin Aucoin, in his official capacity as

Acting Director of the Department of Children, Youth and Families (hereinafter "State Defendants") pray that Children's Rights Motion for Award of Attorneys' Fees (ECF No. 613) is denied or, in the alternative, substantially reduced.

I.   Travel of the Case and Statement of Facts

Resolution of this motion is necessarily dependent on the factual history of this case.   Although not a complete recitation of the travel, the State Defendants set forth the relevant events.

A.   Pre-Settlement

On June 28, 2007, Children's Rights and then-Child Advocate Jametta Alston filed a complaint in this District Court in the name of ten children in the custody of DCYF. The Complaint alleged constitutional violations to the children and systemic deficiencies in the state's child welfare system. ECF No. 1.   The parties engaged in protracted discovery, the case travelled to the First Circuit Court of Appeals on two occasions, and  a sixteen day bench trial before being referred to Judge McConnell for mediation.  *See, Danny B. ex rel Elliot v. Raimondo*, 784 F.3d 825 (1st Cir. 2015); *Sam M. ex rel. Elliott v. Carcieri,* 608 F.3d 77 (1st Cir. 2010).

After eighteen (18) months of mediation, the parties reached agreement and reduced the terms to a Settlement Agreement ECF No. 586-1.  The parties filed a joint motion for approval of the Settlement Agreement. ECF No. 596.  On May 15, 2018, this Honorable Court entered an Order finding that having preliminary approving the Settlement Agreement of the parties and conducting a Fairness Hearing, the Settlement Agreement was approved  and entered. ECF No. 598. As part of this

negotiated resolution, an agreement was reached whereby Plaintiffs' counsel received $3,400,000.00 in attorneys' fees and costs.  The State did not concede that Plaintiffs were prevailing parties.

  B. <u>Settlement Agreement</u>

  There can be no dispute that the Settlement Agreement was a negotiated resolution of disputed claims.  It was never contemplated in either the mediation or the Settlement Agreement that CR would have an "active post-judgment role" in its implementation or monitoring.  Rather, the Settlement Agreement's terms straightforwardly reflect that the Data Validator, OCA and/or DCYF would implement the Settlement Agreement's terms.  *See* ECF No. 586-1.  The Settlement Agreement did not create a role for CR in the implementation or active monitoring.

  The Settlement Agreement recognized that a "Monitoring Team," composed of a "Data Validator" and  the Office of Child Advocate ("OCA") would collect, analyze the data to confirm whether DCYF had satisfied the Agreement's benchmarks.  ECF No. 586-1 at p. 4.  The Settlement Agreement neither identifies CR as a member of the Monitoring Team nor integral to the Monitoring Team's role in determining whether DCYF met the benchmarks of any particular section.   CR's role is limited and clearly articulated in the Settlement Agreement, as stated in pertinent part:

   (1) having met a commitment for the requisite time period in Sections 1-4, 6-10, individually, "DCYF shall notify the Monitoring Team, *with a copy to Plaintiffs' Attorneys*, of this achievement and supporting data;"

   (2) Under Section 5:
     a. This Agreement articulates targets for attainment of casework goals in the areas of visitation (Section 6) and case plans (Section 10). Should the Commitments set forth in Sections 6 and 10 not

be attained for two consecutive six- month Reporting Periods after the conclusion of the 6-month baseline-setting period in Section 10.1, DCYF shall undertake a workload study during the six- month corrective action period cited in Section C. DCYF will undertake a workload study in consultation with the Monitoring Team for purposes of determining the methodology for the workload study, and, in consultation with the Monitoring Team, will reasonably consider the results of the workload study and will exercise professional judgment with any implementation of a corrective action plan.

Subsequent to the corrective action period, *the Parties* shall meet and confer regarding any disagreement on implementation. Should the *Parties* be unable to agree regarding the implementation of the workload study during the meet and confer period, then Section C(3) shall apply.

b. if DCYF failed to subsequent to the corrective action period, the *Parties* shall meet and confer regarding any disagreement on implementation. Should the Parties be unable to agree regarding the implementation of the workload study during the meet and confer period, then Section C(3) shall apply.

(3) Under Section C; Enforcement

- (C)(2)(c)The *Parties* shall have access, through the Monitoring Team, to all information made available by DCYF to the Monitoring Team under the terms of this Agreement.

- (C)(2)(d) DCYF shall prepare and submit to the Monitoring Team the data and reports referenced in Section C(2)(c) every six months after the first data transmission to occur within 30 days of the end of the relevant Reporting Period. Should the Data Validator need additional documents or information to validate the data, it shall send a letter to the State requesting such documents or information, and *the Data Validator shall provide a copy of the request to Plaintiffs' Attorneys.* Within six months from the close of each Reporting Period, the Monitoring Team shall determine and report facts with respect to the progress and/or completion of DCYF's Commitments as defined in this Agreement

- (C)(2)(g) The Monitoring Team shall be permitted to speak separately with *all Parties*, except that if any attorney for the *Parties* wishes to speak ex parte with the Monitoring Team, they must first give the other Parties notice. The Monitoring Team may meet internally without notice to the Parties or the Court.

- (C)(3) The Plaintiffs' attorneys receive a copy of DCYF's corrective action plan;

- Under (C)(4) "Meet and Confer;" (C)(5) "Court Intervention, and (C)(6) "Emergency Court Intervention," Plaintiffs' counsel has an active role.

CR's instant motion does not relate to attorneys' fees for activities associated with (C)(4) "Meet and Confer;" (C)(5) "Court Intervention or (C)(6) "Emergency Court Intervention.

II.   <u>Post Settlement</u>

To begin implementation of the Settlement Agreement, DCYF issued a Request for Proposals ("RFP"). *See* Exhibit 1 (Declaration of Deborah Buffi) and Exhibit 2 (Declaration of Colleen Caron). A tentative contract award was issued to the successful vendor, Public Consulting Group (PCG) on or about August 22, 2018. *See* Exhibit 1 (Declaration of Deborah Buffi Thereafter, DCYF and PCG engaged in negotiations for the purpose of agreeing to the terms and conditions of the final contract between the parties. *Id*. In contracting, DCYF understood the need to ensure compliance with the Settlement Agreement, that is, to engage the Data Validator to be the independent evaluator and final arbiter of the timeliness, accuracy of the methodology, as well as the statistical validity and reliability of the DCYF data (including the Rhode Island Children's Information System ("RICHIST") data, case sample logistics, and documentation in support of exceptions) submitted to the Monitoring Team. *Id*.

PCG (the "Data Validator") furnished the methodology and the number

of cases it would review to validate the data for the Settlement Agreement, which was incorporated in the contract for the State and the vehicle to pay PCG to serve as the Data Validator. *See* Exhibit 1 (Declaration of Deborah Buffi) and Exhibit 2 (Declaration of Colleen Caron).   The contract memorialized PCG's sampling size for each of the Settlement Agreement's sections. *See Exhibit 1.* PCG, as the Data Validator, set their methodology for review as "random sample[s] of 100 cases." *Id.* (*Scope of Work*).

At their request, a copy of the contract was emailed to CR on October 31, 2018.  *See* Exhibit C: Declaration of Brenda Baum

### A.  The Data Validator's Methodology document

The methodology PCG furnished to DCYF to memorialize in the contract was subsequently promulgated in a formal document entitled "The Qualitative Case Review Methodology", dated January 11, 2019. *See* Exhibit 2(i).  In this document PCG, formally serving as the Data Validator, detailed the "sampling universe," "sample selection for PCG case reviews," and "validating reliability of the data" for twenty-two (22) of the Settlement Agreement measures.

PCG, through its legal counsel, permitted the undersigned counsel to share the Qualitative Case Review Methodology with CR with the understanding that it be maintained confidential.  CR agreed to keep the confidentiality of the document.  A copy of the Qualitative Case Review Methodology was emailed to CR on February 27, 2019. *See* Exhibit C: Declaration of Brenda Baum

B. <u>The Data Validator's Review and Findings Based on his Original Methodology</u>

In or around June, 2019, the Data Validator provided DCYF with the report applying its methodology to the data for First Reporting Period (July 1, 2018 – December 31, 2018).  *See* Exhibit 2(ii).  In December 2019, the Data Validator provided DCYF with the report applying its methodology to the data for the Second (January 1, 2019 – June 30, 2019) Reporting Periods. *See* Exhibit 2(ii).  Although the reports had a notation of "preliminary," there was no notice to DCYF that PCG was dissatisfied with its methodology or application to the data. *See* Exhibit 2.

It is undisputed that DCYF satisfied the Settlement Agreement's benchmarks in Sections 1, 2 and 3  for Reporting Period 1 and 2 based on the Data Validator's original methodology.

i.    <u>Section 1</u>

On June 20, 2019, the Data Validator reported that in the First Reporting Period, DCYF met and exceeded the targeted outcome of 85% in Section 1.1 with a result of 89.13%.  On December 31, 2019, the Data Validator reported that in the Second Reporting Period, DCYF met and exceeded the targeting outcome of 85 with a result of 89.08%. *See* Exhibit 2(ii).

ii.    <u>Section 2</u>

In its First Period Monitoring Report, dated June 30, 2019, the Data Validator found that:

- In Section 2.2, DCYF met the targeted outcome of 100%;
- In Section 2.3(a), DCYF met and exceed the targeted outcome of 90% in with a result of 100%; and,

- In Section 2.3(b), DCYF met and exceeded the targeting outcome of 95% in with a result of 100%.

*See* Exhibit 2(ii), ECF No. 601-1 at pp. 8-10.

In the Second Period Monitoring Report, dated December 31, 2019, the Data Validator reported that:

> In Section 2.2, DCYF met the targeted outcome of 100%;
> - In Section 2.3(a), DCYF met and exceed the targeting outcome of 90% in with a result of 100%; and,
> - In Section 2.3(b), DCYF met and exceeded the targeting outcome of 95% in with a result of 100%.

*See* Exhibit 2(ii), ECF No. 601-2 at pp. 10-13.

DCYF met and/or exceeded the benchmarks and should have been permitted to exit Section 2 of the Settlement Agreement.

iii.  <u>Section 3</u>

In its First Period Monitoring Report dated June 30, 2019, the Data Validator found that:

- In Section 3.1, DCYF met and exceeded the targeted outcome of 90% with a result of 95.56%; and
- In Section 3.2, DCYF met and exceed the targeted outcome of 90% with a result of 94.67%.

*See* Exhibit 2(ii), ECF No. 601-1 at pp. 11-12.

In its Second Period Monitoring Report dated December 31, 2019, the Data Validator found that:

- In Section 3.1, DCYF met and exceeded the targeted outcome of 90% with a result of 100%; and
- In Section 3.2, DCYF met and exceed the targeted outcome of 90% with a result of 95.19%.

*See* Exhibit 2(ii), ECF No. 601-2 at pp. 14-16.

DCYF met and/or exceeded the benchmarks and should have been permitted to exit Section 3 of the Settlement Agreement.

C. <u>The Monitoring Team's Refusal to Confirm that DCYF Met the Benchmarks in Sections 1, 2 and 3 for Reporting Periods 1 and 2</u>

In January 2020, DCYF learned for the first time that the Data Validator was dissatisfied with his methodology furnished to DCYF in 2018 (memorialized in the contract) and January 11, 2019 document entitled "The Qualitative Case Review Methodology." See Exhibit 2. DCYF initially learned this news from the OCA. The Data Validator's sudden change in its methodology position was shocking to DCYF since they met with with PCG on average weekly meetings with email communications since 2018 and a change in methodology was never identified. *See* Exhibit 2.

In February 2020, the OCA requested a telephone conference with CRI, DCYF and DCYF's counsel. On March 16, 2020, the day before the group call, the monitoring team issued a document entitled "Monitoring Team Report and Recommendations, Response to Reporting Periods 1 and 2." *See* Exhibit 4. The Monitoring Team sought to substantially revise the methodology that PCG established in 2018 and 2019 and infuse their interpretation of the Settlement Agreement that was plainly different than the terms negotiated in 2018. Rather than correct the Monitoring Team's

overreaching interpretation, CR supported it and now seek attorneys' fees for their actions[1].

On April 22, 2020, DCYF, through counsel, prepared a detail response to the Monitoring Team to move exit of Sections 1, 2 and 3 forward.[2] *See* Exhibit 5. The Monitoring Team, DCYF (and counsel) and CR engaged in two telephone discussions. DCYF thereafter gave great consideration was to whether it could agree with some of the Monitoring Team's proposals. In the interim, in May 2021, the OCA and CR[3] were provided with copies of the Data Validator Contract between PCG and DCYF.

---

[1] Specifically, as it pertains to Section 1, it was the Monitoring Team's contention that some of the assessments designated by DCYF would not count towards the evaluation of DCYF's achievement of the benchmarks. The Settlement Agreement was specifically negotiated and crafted to give DCYF the discretion to designate the Assessments in Section 1. CR was part of this understanding and agreement and yet did not correct the Monitoring Team in March 2020 or within a year thereafter. CR's failure to correct the Monitoring Team's misunderstanding of Section 1 "assessments" allowed this issue to be an obstacle to resolution; CR now asks this Court to approve its' billing for attorneys' fees related to Section 1.

[2] CR's claim that DCYF inordinately delayed during the resolution of Sections 1, 2 and 3 is without merit. CR fails to acknowledge that during this interchange, on March 9, 2020, Governor Raimondo issued Executive Order 20-02 declaring a state of emergency due to the dangers to health and life posed by COVID-19, and that Order has been extended until at least September 4, 2021. The impact on State Agencies' operations, including DCYF and the Office of Attorney General, during the Coronavirus Pandemic was immense. However, even during this time, DCYF and the Data Validator met to work towards a resolution. CR's insinuation that either DCYF or counsel caused inexcusable delay in the resolution of issues should be summarily dismissed.

[3] A copy of the contract had previously been emailed to CR on October 31, 2018. Exhibit 3.

D. <u>Notice to Exit</u>

On June 1, 2021 DCYF filed[4] its Notice to Exit Sections 1, 2, 3 and 9 of the Settlement Agreement.  ECF No. 601.    Thereafter, CRI moved to strike the Notice to Exit.  ECF No. 603.  DCYF filed its objection (ECF No. 608), and CRI filed a reply. ECF No. 609.

In the interim, on July 8, 2020, the Monitoring Team issued its "Final Report for Reporting Period 1.[5]"  *See* Exhibit 6.  On August 13, 2020, this Honorable Court convened a zoom chambers conference with DCYF, CRI, the Data Validator and the OCA.   On August 11, 2020, DCYF served its corrective action plan under the Settlement Agreement on the Monitoring Team and CR.  On August 20, 2020, the Monitoring Team issued its Report for the Second Reporting Period.  See Exhibit 7.

During these events, a DCYF team had several discussions with the Monitoring Team regarding methodology.  A second chambers conference was held with this Honorable Court on September 18, 2020 and thereafter, the case was referred to the original mediator of the Settlement Agreement, Chief Judge McConnell.

---

[4] DCYF also filed a Motion to File Under Seal the Data Validator's methodology document.  Previously, counsel had been informed by PCG legal counsel that this document was confidential.  The undersigned counsel had to receive permission from PCG to share this document with CR, who also had to agree to keep it confidential. CRI agreed to keep the document confidential.  Yet CRI objected to the June 2020 filing of this document under seal.  ECF No. 602.  DCYF counsel subsequently received authorization from PCG counsel that they would not press confidentiality and removed the document from being filed under seal.  ECF No. 607.
[5] The Monitoring Team formally found that DCYF had met or exceeded the benchmarks in Section 2 and 3.

DCYF counsel and CR had several mediation sessions with Chief Judge McConnell.  Given the confidentiality, the undersigned refrains from commenting on the substance.  Although, as it pertains to this Motion for Attorneys' Fees, CR's fees associated with preparing for and attending the mediation conferences are unreasonable.  CR had 2-3 attorneys and a paralegal at the mediation sessions, billing for such is excessive and unreasonable.

    E.   <u>DCYF's Resolution of Sections 2 and 3</u>

Despite the acknowledgment by the Data Validator in 2019 that DCYF had satisfied Sections 2 and 3, the Monitoring Team refused to permit these Sections to exit unless it had an opportunity to review more than 100 cases identified in the original methodology.  The Monitoring Team maintained its dispute as to the Section 1 assessments designated by DCYF.

In April 2020, after many meetings, the DCYF team and the Data Validator reached an understanding as to the statistical validity that would be accorded to the Settlement Agreement's qualitative and quantitative measures.  The Data Validator conducted the additional case reviews for Sections 2 and 3 to achieve the statistical validity accorded to that measure.

On December 1, 2020, the Monitoring Team issued an Amendment to their reports for Reporting Periods 1 and 2 finding that DCYF again met or exceeded the benchmarks in Sections 2 and 3 and should exit the Settlement Agreement.  See

Exhibit 2(iii).  The Monitoring Team acknowledged in the amendment that not only had DCYF met or exceeded the benchmarks for Sections 2 and 3, but also:

> In each of those sixteen cases, the Data Validator reviewed the case activity surrounding the placement in an ASC or congregate care setting, including assessments conducted regarding the needs of the child and the case notes and case activities recorded in Rhode Island's RICHIST (the Rhode Island Children's Information System). In each of the sixteen cases, the Data Validator found sufficient documentation of the decision-making process which underlay the caseworker's exercise of professional judgment.
>
> The Monitoring Team is therefore able to consider as fully validated DCYF's performance during the first two Reporting Periods as it relates to Sections 2 and 3 of the Settlement Agreement, and will support DCYF Notice of Exit for those two sections, effective June 30, 2019 (at the conclusion of the second Reporting Period).

Exhibit 2(iii).

On March 19, 2021, DCYF filed the Notice to Exit Sections 2,3 and 9.  ECF No. 610.  CRI had no objection to the Notice.  This Court entered an Order confirming DCYF's exit from Sections 2, 3 and 9 of the Settlement Agreement.  ECF No. 611.

## F.  DCYF's Resolution of Section 1

To resolve the issues surrounding Section 1, DCYF and the Monitoring Team engaged in meetings to discuss the overall methodology and how a new methodology proposed would apply to the Data Validator's review of Section 1.  In the spring of 2021, the Monitoring Team was finally advised that under the Settlement Agreement the parties understood that DCYF would have the discretion to identify the assessments.  Thereafter, in May 2021, DCYF described in detail to PCG the assessments, location of supporting information, informing those assessments and the location there of in RICHIST as it relates to the designation for Section 1.  Exhibit

14

2.  DCYF also created a manual for PCG to further inform them of the locations where to confirm the assessment and provided to them in June 2021.  Exhibit 2.

On November 8, 2021, the Monitoring Team issued an amended report for Reporting Periods 1 and 2 finding that DCYF had meet the Section 1 benchmark for two consecutive Reporting Periods and should exit the Settlement Agreement.  *See Exhibit 2(iv)*.  DCYF filed the Notice to Exit on November 10, 2021. ECF No 618.

## II.   **ARGUMENT**

CR's motion asking this Honorable Court to order the State to pay it $99,872.10 in attorneys' fees should be denied.  The travel of this case creates the special circumstances that would render an award of attorneys' fees unjust.  Special circumstances exist given the Data Validator 's unexpected dissatisfaction and revision to his methodology after issuing reports in 2019 for the First and Second Reporting Periods finding that DCYF had met or exceeded the benchmarks for Sections 1, 2 and 3.  The Settlement Agreements expressly authorizes DCYF to exit from monitoring and this Court's jurisdiction if it has met the benchmarks for two consecutive Reporting Periods.   The Data Validator's unforeseen change in methodology after the First and Second Reporting Periods and the Monitoring Team's refusal to confirm this data without the retroactive application of the new methodology, establish special circumstances that would cause any attorneys' fee award against the State unjust.   Not only did DCYF act in good faith, but it also undisputedly met the benchmarks for Sections 1, 2 and 3 whether viewed under the

15

Data Validator's original or amended methodology.  The State should not be punished with an order of attorneys' fees for actions that are consistent with the Settlement Agreement and the Data Validator contract.   Should this Honorable Court contemplate awarding CR some amount of attorneys' fee, the State submits that there must be a substantial reduction based on the unreasonable overstaffing, work on unnecessary and/or unsuccessful  activities and proportionality.

A.   Standard on Attorneys' Fees Requests

"'In applying for judicial approval of a fee award, it is plaintiff's burden to furnish the evidence required, not the court's burden to seek it out.'"  *Rolland v. Cellucci*, 106 F.Supp. 2d 128, 133 (D.Mass 2000)(quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 527 n.11 (1st Cir. 1991)).  A defendant needs to articulate its objection with particularity and specificity. *Rolland*, 106 F. Supp. 2d at 133.  A court "should not necessarily compensate Plaintiffs' counsel 'for every legal undertaking, whether successful or not.'"  *Rosie D. ex rel. John D. v. Patrick*, 759 F. Supp.2d 146, 150 (D. Mass. 2011).

CR's fee request of $99,872.10 is not reasonable.  Post settlement activities in this case should not be permitted to turn into a business funding source for CR that is borne by Rhode Island taxpayers.

i.   Prevailing Party

A party seeking an award of attorneys' fees under 42 U.S.C. § 1988 must demonstrate that they are a "prevailing party."  "The touchstone of the prevailing

party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Ass'n v. Garland independent School District*, 489 U.S. 782, 793 (1989); *See also, Buckhannon Board & Care Home Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598, 603 (2001). The *Buckhannon* Court identified a "prevailing party" to exist in 2 circumstances: (1) when a plaintiff has received a judgment on the merits or (2) settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees. *Id*. at 603-604. It determined that "enforceable judgments on the merits and court-ordered consent decrees create the "material alteration of the legal relationship of the parties" necessary to permit an award of attorney's fees." *Id*. at 604. The First Circuit, extrapolating from *Buckhannon*, reasoned that "a litigant who obtains a court-approved settlement, rather than a verdict or a formal consent decree, may achieve 'prevailing party' status and, thus become eligible for an award of attorneys' fees under a typical federal fee shifting statute" if the settlement agreement contains a sufficient judicial imprimatur. *Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 10 (1st Cir. 2011).

After eighteen months of mediation, the parties resolved this case through a settlement agreement. ECF No. 586-1. DCYF expressly denied liability associated with the allegations and claims in Plaintiffs' Complaint in the Settlement Agreement.[6] DCYF disputes that the Settlement Agreement materially altered the

---

[6] The Settlement Agreement provides:

legal relationship between the parties such that Plaintiffs' counsel would be cloaked with "prevailing party" status. However, as part of this resolution, the parties came to an agreement on the issue of attorneys' fees with Plaintiffs' counsel receiving $3,400,000.00 in attorneys' fees and costs.

CRI now comes before this Honorable Court seeking an award of $99,872.10 in attorneys' fees under 42 U.S.C. § 1988 for "ongoing monitoring and enforcement activities during the post-judgment period of January 1, 2020 through June 30, 2021." ECF No. 613 at p 1. The Settlement Agreement does not articulate a role for CR in the implementation or monitoring of the benchmarks. In fact, the Settlement Agreement establishes a "Monitoring Team" composed of a Data Validator and the Office of the Child Advocate ("OCA"). If CR took any "enforcement action," it would arguably be through the motion to strike; on which it did not succeed.

State Defendants understand that the First Circuit has determined that certain post-judgment services necessary for reasonable monitoring of a consent decree are permissible under 42 U.S.C. § 1988. *Garrity v. Sununu*, 752 F.2d 727 (1984).[7]  However, "[i]t is important to note that this reasonableness standard, while

---

It is expressly stated in the Settlement Agreement that:
   "*Whereas*, the State denies all claims of wrongdoing asserted in connection with the Complaint and no finding of liability has been made.
   *Whereas*, the Parties wish to avoid the expense and disruption of litigation on the issues presented in this litigation, and are prepared to settle their differences without admitting any fault, liability, or wrongdoing asserted in connection with Plaintiffs' Complaint." Ecf No. 596 at pp. 3-4.

[7] *Garrity v. Sununu*, supra.  was issued before the United States Supreme Court's decision in *Buckhannon Board & Care Home Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598, 603 (2001).

flexible up to a point, does not give a plaintiff's attorney *carte blanche* to expend whatever hours are deemed necessary, willy nilly, with confidence that the court will necessarily award fees to compensate them. A court must take seriously its responsibility to oversee post-judgment attorneys' fees requests and, in the blunt words of the Court of appeals, avoid creating 'a state-funded, open ended secure for counsel.'" *Rosie D. ex rel. John D.*, 759 F.Supp2d at 150 (quoting *Brewster v. Dukakis*, 786 F 2d 16, 18 (1st Cir. 1986). And when considering a request for fees for post-settlement activities, a distinction must be made between post-judgment monitoring and "enforcement." *Rolland v. Romney*, 151 F.Supp.2d 145, 153-54 (D. Mass. 2001); *Rolland v. Romney*, 292 F.Supp.2d 268, 272 (D. Mass. 2003). For "post-settlement 'enforcement' efforts to be compensable, had to be successful as well." *Rolland v. Romney*, 292 F. Supp. 2d at 272.

ii.     Lodestar Calculation

After determining that a party is entitle to consideration of an award of attorneys' fees, the court will first turn to a lodestar calculation. The court first looks to "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295-296 (1st Cir. 2001)(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). From this initial calculation, referred to as the lodestar, the court should then subtract duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved). *Gay Officers Action League,* 274 F.2d at 295.

*Citations omitted.  See also Block v. Mollis*, 2009 WL 2208107 *21 (DRI July 22, 2009)(quoting Torres -Rivera, 524 F.3d at 336)("In fashioning the lodestar, a district court may adjust the hours claimed to eliminate time that was unreasonably, unnecessarily, or inefficiently devoted to the case.'")

"'To determine a proper fee award, a court must necessarily "engage in a thoughtful analysis of the number of hours expended and the hourly rates charged to ensure both are reasonable.'" *Rolland v. Cellucci*, 106 F. Supp. 2d 128, 133-134 (D. Mass. 2000)(quoting *Guckenberger,* 8 F. Supp. 2d at 100). *See also King v. Greenblatt,* 560 F.2d 1024, 1026–27 (1st Cir. 1977)).  "The court, in its discretion, 'can segregate time spent on certain unsuccessful claims, eliminate excessive or unproductive hours, and assign more realistic rates to time spent' and, ultimately, 'may fashion a lodestar which differs substantially from the fee requested by the prevailing party.'" *Rolland*, 106 F. Supp. 2d at 134 (quoting *Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F. 3d 331, 337 (1st Cir. 1997)).

In support of its motion for $99,872.10, CR submitted a breakdown in hours expended and the hourly rate of the attorney or paralegal.  CR contends that, after a discount, they seek fees for 393.45 hours.  ECF No. 613-1 at p. 8.  CR seeks fees for three attorneys, ranging from $265.00 to $355.00 an hour and two paralegals at $125.00 an hour.  A review of the billing sheets (ECF No 613-2) reveals that there was an unreasonable overstaffing for meetings, internal and external, and mediations, work was unnecessarily performed, and billing associated with an unfiled motion and an unsuccessful motion.  Moreover, the regular meetings with the

Monitoring Team were unnecessary and the resolution of the methodology was achieved between the Data Validator and DCYF; not CR.  CR did not materially alter the resolution of Sections 1, 2 and 3's exit from the Settlement Agreement.

### iii.    Special Circumstances

The Data Validator's unexpected change in methodology after he issued his 2019 reports for the First and Second Reporting Periods and the Monitoring Team's subsequent refusal to support DCYF's exit of Sections 1, 2 and 3 unless they retroactively applied a new methodology support a finding of special circumstances that should defeat any claim for CR attorneys' fees associated with the resolution. Awarding DCYF to pay CR attorneys' fees related to this special circumstance, would be unjust.

"The Court has discretion to award reasonable attorneys' fees in a civil rights action 'unless special circumstances would render such an award unjust.'" *Block v. Mollis*, 2009 WL 2208107 * 1 (DRI July 22, 2009)(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)(internal citations omitted).  The Court views through a narrow lens whether special circumstances exist.[8]  *Cushing v. McKee*, 853 F. Supp 2d 123,

---

[8] The *Cushing* Court cited the following "categories of cases demonstrating the narrow lens for special circumstances: "*Williams v. Hanover Hous. Auth.,* 113 F.3d 1294, 1301 (1st Cir. 1997) ("outrageous" or "inexcusable" conduct on the part of the plaintiff or its counsel during litigation of the case can sometimes constitute 'special circumstances' warranting denial of attorney's fees); *Lewis v. Kendrick,* 944 F.2d 949, 955–56 (1st Cir. 1991) (finding it "inexcusable" that despite the fact that plaintiff had failed "entirely or largely in everything," her lawyers failed to adjust their billing accordingly); *Stefan v. Laurenitis,* 889 F. 2d 363, 371 (1st Cir. 1989) (suggesting that

171 (D. ME. 2012).  Admittedly, it is the defendant's burden to show that unusual conditions would make an award unjust or inappropriate." *Cushing*, 853 F. Supp. 2d at 171(citing *United States v. Cofield,* 215 F.3d 164, 171 (1st Cir. 2000)). *Footnote omitted.*

The First Circuit Court of Appeals in *Williams v. Hanover Housing Authority,* 113 F.3d 1294, 1301 (1st Cir. 1997), explained:

> [i]n this circuit, "special circumstances" warranting a denial of attorneys' fees under § 1988 ... exist where the fee application reflects "(1) no 'good faith' effort to exclude excessive, redundant, or otherwise unnecessary hours, (2) no reduction for time spent on unsuccessful claims, and (3) no allowance for the limited degree of success' achieved by the plaintiff."

*See also, McLaughlin by McLaughlin v. Boston School Committee*, 976 F.Supp. 53, 70 (D. Mass. 1997).

The State submits that special circumstances are demonstrated through combination of factors.  First, the Data Validator established a methodology to evaluate the data to determine whether benchmarks were met and memorialized it in a contract with DCYF in 2018.  A copy of the contract was emailed to CR on October 31, 2018.  The Data Validator further memorialized his methodology in a 2019 document entitled "Qualitative Case Review Methodology."  This document was emailed to CR on February 27, 2019.  Thereafter, the Data Validator applied this methodology and recorded his findings for Reporting Periods 1 and 2.  Exhibit 2(ii).  These reports demonstrate that based on the Data Validator's then methodology,

---

"bad faith or obdurate conduct" might also constitute special circumstances warranting denial of attorney's fees)."  *Cushing*, 853 F. Supp. 2d at 171.

DCYF met and/or exceeded the benchmarks for Reporting Periods 1 and 2 for Sections 1, 2 and 3. Admittedly, the reports have a "preliminary" designation on them; however, the Data Validator did not represent issues with the methodology or the data. Under the Settlement Agreement, DCYF should have exited from monitoring and Court jurisdiction on these measures.

Second, DCYF, despite having regular meetings with the Data Validator, was not aware until January 2020, after these two reports had issued, that the Data Validator was dissatisfied with and wanted to change his methodology retroactively. Thereafter, the Monitoring Team articulated its demands that it not only wanted to alter the methodology, but also took issue with DCYF's selection of assessments in Section 1 and incorporate qualitative analysis into measures where none existed in the Settlement Agreement nor agreed to by the parties. DCYF, through counsel, articulated its position in detail on April 22, 2020. Rather than reaffirm these positions as the parties mediated and reduced into the Settlement Agreement, CR joined the Monitoring Team in protesting DCYF's ability to exit Sections 1, 2 and 3.

Third, based on the Data Validator's methodology memorialized in the contract and the methodology document, and his application to the data, DCYF filed a Notice to Exit Sections 1, 2, 3 and 9 with this Court. ECF No. 601. Given that PCG legal counsel had previously asked that the methodology document remain confidential, it was filed under seal. ECF No. 600. Surprisingly, CR filed an Objection to motion to seal. ECF No. 602. The basis for the surprise being that when the methodology document had been provided to CR in February, 2019, they had been

advised that PCG wanted the document to be designated confidential and CR agreed to these terms.  Ultimately, in June 2020, PCG withdrew its request to keep the document confidential and the document was publicly filed.  CF No. 607.  Not only did CRI object to the seal, but they also filed an Opposition and Motion to Strike the Notice to Exit.  ECF No. 603.  The State objected (ECF No. 608) and CR filed a reply (ECF No. 609).  Ultimately, there was no decision on the Motion to Strike; CR cannot be deemed to have prevailed.

Fourth, the issues of methodology, sample size, location of the information to confirm the benchmarks were resolved not by the lawyers in this case, but by DCYF Administrator of Performance Improvement Colleen Caron and her team working with the Data Validator and his team.

And fifth, CR's billing entries are rife with entries demonstrating overstaffing, unsuccessful and unfiled motions and duplicative and unnecessary work.

To order the State to pay CR's attorneys' fees associated with the exit of Sections 1, 2, and 3 would be unjust and inequitable.  DCYF accepted and relied on the methodology set by PCG in 2018, provided the data, received reports acknowledging that Sections 1, 2 and 3 had met or exceeded the benchmarks for two consecutive Reporting Periods and yet a confirmation was withheld by the Monitoring Team.  During this process, CR did not correct the Monitoring Team's misinterpretation  on DCYF's ability to designate the assessments referred to in

24

Section 1 until the Spring of 2021. CR did not inform the Monitoring Team of the error in their belief that Section 1 was more than a quantitative measure.

Given the foregoing, DCYF submits that special circumstances exist such that CR should not be awarded fees associated with Sections 1, 2 and 3 of the Settlement Agreement and the Data Validator's desire to amend his methodology.

iv.    Over Staffing and Duplication

Should this Honorable Court determine that special circumstances do not exist, and CR may have some degree of entitlement to attorneys' fees for post-settlement actions, the requested fee amount should be significantly reduced based on overstaffing, duplication of work, unproductive activities, and/or excessive hours. CR's timesheets are replete with occasions where three attorneys or three attorneys and a paralegal attend conferences or meetings, numerous internal discussions amongst the group, unnecessary regular meetings with the Monitoring Team and time spent on research or a motion that was never filed.

The First Circuit, in *Lipsett v. Bianco*, 975 F.2d 934, 938-939 (1st Cir. 1992), explained:

> As a general matter, "the time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.' " *Hart v. Bourque,* 798 F.2d 519, 523 (1st Cir. 1986) (quoting *King,* 560 F.2d at 1027); *accord Grendel's Den,* 749 F.2d at 953. Fee-shifting statutes are designed to "ensure effective access to the judicial process for persons with civil rights grievances," *Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937 (citation and internal quotation marks omitted), not to serve as full employment or continuing education programs for lawyers and paralegals. A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy

skepticism. *See   United Nuclear Corp. v. Cannon,* 564 F.Supp. 581, 590 (D.R.I.1983) (suggesting that, in fee-shifting milieu, district courts "must zealously guard against any propensity to over-staff litigation"). In the last analysis, however, staffing issues are often best resolved by the trial court's application of its intimate, first-hand knowledge of a particular case's nuances and idiosyncrasies. *See, e.g., Wagenmann v. Adams,* 829 F.2d 196, 224–25 (1st Cir. 1987).

*See also,  Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297-298 (1st Cir. 2001)(" Even so, we remain skeptical about the use of four attorneys to litigate a single claim—particularly a claim that did not necessitate a trial. Where tag teams of attorneys are involved, fee applications should be scrutinized with especial care. Moreover, the level of scrutiny should increase in direct proportion to the number of lawyers employed. Despite these concerns, however, three things make us reluctant to interfere with the trial court's considered judgment in the peculiar circumstances of this case."); *Rolland v. Cellucci*, 106 F.Supp. 2d 128, 141 (D. Mass. 2000)(" While the court has found that the number of individuals representing Plaintiffs was appropriate, that same number created some inefficiencies, particularly given the attorneys' varying levels of experience. For example, it appears that, at times, more than the necessary number of attorneys participated in conferences. At other times, the coordination among Plaintiffs' representatives required excessive consultations. At still other times, more time than necessary was spent on research, redrafting and analysis. Accordingly, it is incumbent upon the court to pare redundant hours.")

In this case, there are numerous instances where multiple attorneys and a paralegal attend a meeting or mediation session and do not actively participate. Multiple instances of internal group meetings or call.  Multiple attorneys reviewing

and preparing for the same mediation or meeting. The issues presented and procedural nature of the case do not support a need or award for the fees for multiple attorneys and a paralegal.

By way of examples:

- On March 24, 2020 Attorneys Bartosz, Gretter and Taykham and Paralegal Magrid convened an internal call – everyone billed for this internal meeting, and they ask the Court to order DCYF to pay them $903.20.

- Two days later, on March 26, 2020, Attorneys Bartosz, Gretter and Taykham and Paralegal Magrid record that they attended conference with "RI Team" and again, everyone billed for their time and now ask that DCYF be ordered to pay $823.90 for a meeting that lasted less than an hour.

- There are billing entries where attorneys or a paralegal attend a meeting or conference and merely take notes; yet billing at a rate of $265.00 or $125.00 an hour (see 32/26/20 Rebecca Magrid entry, 5/12/20 Nicole Taykham, Esq. entry, 12/3/20 Makena Mugambi, 3/24/21 Makena Mugambi entry, 3/24/21 Makena Mugambi entry).

- To prepare for and attend the August 13, 2020 chambers conference with this Court, Attorneys Bartosz, Gretter and Taykhman ask this Court to order DCYF to pay them $3,597.80.

- Attorneys Bartosz and Gretter and Paralegal Mugambi participated in a call with The Monitoring Team on October 15,

2020 and ask this Court to order DCYF to pay their fees of $838.50.

- Attorneys Bartosz, Gretter, Taykham and Paralegal Mugambi participated in a call with The Monitoring team on December 3, 2020 and ask this Court to order DCYF to pay their fees of $ 412.55 for an approximately 35-39 minute call.

- Attorneys Bartosz, Gretter and Taykham and Paralegal Mugambi all attended a March 25, 2021 mediation conference with Chief Judge McConnell and ask this Court to order DCYF to pay them $764.55 to attend the conference and $2,282.85 for their preparation for the conference.

A review of the billing entries reveals numerous other instances of overstaffing for which CR should not be compensated at the expense of DCYF.   Multiple attorneys reviewing the same document or email and seeking payment for it,  State Defendants pray that should this Honorable Court find it appropriate to award attorneys' fees, given the extent of the overstaffing evident in CR's entries where 2-3 attorneys and a paralegal convene numerous internal meetings to prepare for calls or conferences or strategize, attend regular and unnecessary meetings with the Monitoring Team, and attend Court conferences, any awarded should be significantly reduced.

    v.    <u>Non-Compensable Work</u>

Hours billed for unnecessary and non-compensable should be deducted from CR's requested attorneys' fees.  CR seeks this Court to order DCYF to pay $2,144.40 in attorneys' fees for work related to "motion for enforcement of settlement

28

agreement" that CR never filed.[9] CR's fees associated with their objection (ECF No 606) to the State's motion for extension of time (ECF No. 604) should similarly be denied because CR did not prevail, and this Court granted the extension in a June 18, 2020 Text Order.  CR's Motion to Strike the State's Notice to Exit, its reply and any work connected therewith should be stricken from the lodestar calculation because CR did not prevail on the Motion.  CR's fee sought for work on their Objection to the State's Motion to file PCG's methodology report under seal should be denied based on CR's acknowledgment that it would maintain the confidentiality of the report of a condition of their receipt in February 2019.   This work and other work was unnecessary and/or unsuccessful and, therefore, CR is not entitled to a fee award for the time invested in these pursuits.

"'[W]ork on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved ... and therefore no fee may be awarded for services on the unsuccessful claim.'"  *Bogan v. City of Boston*, 489 F.3d 417, 428-29 (1st Cir. 2007)(quoting *Hensley*, 461 U.S. at 435). Wherefore, any attorneys' fee award must be reduced for CR's unsuccessful pursuits.

vi.   Proportionality

As it pertains to any attorneys' fees sought for "enforcement" related acts, CR did not achieve a level of success or results that would support the significant award

---

[9] 5/12/20 entry by Samantha Bartosz ($167.50), 5/13/20 entry by Nicole Taykham ($103.35), 5/13/20 entry by Nicole Taykham ($455.80), 5/14/20 entry by Nicole Taykham ($548.55), 5/15/20 entry by Nicole Taykham ($286.20), 5/20/20 entry by Nicole Taykham ($7.95), 5/20/20 entry by Nicole Taykham ($13.25), 5/20/20 entry by Nicole Taykham ($556.50), and 5/21/20 entry by Nicole Taykham ($5.30)

of attorneys' fees that they seek in this motion.  CR did not prevail on its Motion to Strike.  In fact, the issues surrounding DCYF's exit of Sections 1, 2 and 3 were resolved through collaboration of DCYF Administrator of Performance Improvement Colleen Caron and her team and the Data Validator and his team.  The Monitoring Team recognized that it was the collaboration of the Data Validator and DCYF that resolved the Section 1 issues in August 2021.  *See* Exhibit 2(iv)

As the District of Maine explained in *Cushing v. McKee*, 853 F. Supp. 2d 123, 170 (D. ME. 2012):

> The Court "has the discretion to adjust the lodestar itself upwards or downwards based on several different factors, including the results obtained, and the time and labor required for the efficacious handling of the matter." *De Jesus Nazario,* 554 F.3d at 207 (citing *Torres–Rivera v. O'Neill–Cancel,* 524 F. 3d 331, 336 (1st Cir. 2008)). Accordingly, the Court may eliminate hours billed that were "unreasonably, unnecessarily, or inefficiently devoted to the case," *Torres–Rivera,* 524 F.3d at 336, and discount time the Court considers "duplicative, unproductive, or excessive." *Gay Officers Action League,* 247 F.3d at 295.
>
> Where a prevailing party achieves only limited success on his or her claims, the Court "may reduce the fee request to an amount that reasonably reflects that circumstance." *United States v. One Star Class Sloop Sailboat Built in 1930 with Hull no. 721, Named "Flash II",* 546 F.3d 26, 38 (1st Cir. 2008) (citing *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933). When a Court's fee adjustment is intended to reflect the success or failure of claims that are separate and distinct, the Court "may simply exclude time spent in litigating the unsuccessful claims." *Id.* at 39 (citing *Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F.3d 331, 338 (1st Cir. 1997)); *see also De Jesus Nazario,* 554 F.3d at 207 (1st Cir. 2009) ("subject to principles of interconnectedness, the trial court may disallow time spent litigating failed claims") (citing *Lipsett v. Blanco,* 975 F.2d 934, 940–41 (1st Cir. 1992)). Even when a party prevails on a particular claim, however, he or she is only entitled to recover fees for time productively spent—"time invested in issues that are litigated profligately, unnecessarily, or without benefit to the prevailing party may be disallowed." *One Star Sloop,* 546 F.3d at 39 (internal citations omitted). Finally, the Court notes that "[t]he essential goal in shifting

fees (to either party) is to do rough justice, not to achieve auditing perfection." *See Fox,* —— U.S. ——, 131 S.Ct. at 2216.

The *Henley* Court was so bold as to characterize the moving party's success or failure to prevail on a claim "a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983). There are no actions taken by CR during January 1, 2020 through June 30, 2021 that justify an award of $99,872.10 in attorneys' fees.

## III. CONCLUSION

DCYF sought to exit Sections 1, 2 and 3 of the Settlement Agreement based on data that established that it met or exceeded the benchmarks for two consecutive Reporting Periods. It would be unjust to order the State to pay Children's Rights attorneys' fees associated with DCYF's vindication of its right to exit Sections 1, 2 and 3 of the Settlement Agreement. Moreover, should this Honorable Court contemplate an award of attorneys' fees, CR's overstaffing, unsuccessful or unnecessary work and a proportionality analysis compel that it be nominal.

Respectfully submitted,

STATE DEFENDANTS

By Their Attorney,

PETER F. NERONHA
ATTORNEY GENERAL


*/s/ Brenda D. Baum*

_____
BRENDA D. BAUM (5184)
Assistant Attorney General
R.I. Department of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2294
Fax: (401) 222-3016
bbaum@riag.ri.gov


<u>CERTIFICATION</u>

I, the undersigned, hereby certify that I filed the within document via the ECF filing system and that a copy is available for viewing and downloading.  I have also caused a copy to be sent via the ECF system to the following attorneys of record on this 17th day of November 2021.

*/s/ Brenda D. Baum*