# EXHIBIT 2

UNITED STATE DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ANDREW C., *by Next Friend* Gregory C. Elliott; MATTHEW R. *by Next Friend* Elaine Macintosh; and SEAN M. *by Next Friend* Elaine Macintosh; *for themselves those similarly situated,* | ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | C.A. No. 1:07-cv-241-WES-PAS |
| DANIEL J. McKEE, *in his official capacity as Governor of the State of Rhode Island;* WOMAZETTA JONES, *in her official capacity as Secretary of the Executive Office of Health & Human Services; and* KEVIN AUCOIN, *in his official capacity as Acting Director of the Department of Children, Youth & Families,* | ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) | |

## <u>DECLARATION OF ADMINISTRATOR OF PERFORMANCE IMPROVEMENT COLLEEN CARON</u>

I, Colleen Caron, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following facts are true and accurate to the best of my knowledge and belief.

1.  I hold the position of Administrator of Performance Improvement for the Rhode Island Department of Children, Youth and Families ("DCYF").

2.  I have held the position of Administrator of Data Analytics and Evaluation

that was expanded to Administrator of Performance Improvement for 15 years.

3. In my capacity as Administrator of Data Analytics and Evaluation and then Director of Performance Improvement with DCYF I was part of the State Defendants' team and attended and participated in some of the mediation sessions that resulted in the negotiated Settlement Agreement.  Of the mediation sessions I was not present, my supervisor attended and provided consultation in the negotiations.

4. As Administrator of Data Analytics and Evaluation and then Director of Performance Improvement, I participated with Associate Director Deborah Buffi in the Request for Proposal ("RFP") process for the engagement of a data validator under the Settlement Agreement.

5. The RFP contained the number of children in foster care to provide an estimate of the RI foster care population to potential vendors.

6. PCG was selected to serve as the data validator for the Settlement Agreement.

7. DCYF provided PCG the Settlement Agreement that proclaimed the data validator as the final arbiter of the methodology.

8. I participated in the contract process for PCG to serve as the data validator.

9. PCG identified the methodology and number of cases that it would review to confirm with DCYF met the benchmarks set in the Settlement Agreement.

10. It was PCG's determination on the number of cases it would sample from the from the quantitative data DCYF provided to PCG that contained all cases, universe of cases, applicable to the Settlement.

2

11. It was PCG's determination on the number of cases they would sample from the agreed upon number of qualitative reviews DCYF reviewed and provided to PCG.

12. PCG approved the syntax that were programmed into the DCYF computer system ("RICHIST") report pulls for both quantitative and qualitative measures.  PCG visually watches (in person or remotely) DCYF run the syntax to ensure the process is valid and PCG visually witnesses the data directly emailed (Send Secure) to PCG to ensure validity and transparency of the data.

13. For Reporting Periods 1 and 2, PCG accepted the method DCYF used to perform the first level of qualitative review.

14. PCG prepared and provided DCYF with a document entitled "Qualitative Assessment Review Methodology" dated January 11, 2019.  See Exhibit i.

15. Initially, during the first 2 reporting periods, PCG met on average weekly meetings with DCYF along with email communications as needed.  During the 3rd reporting period to the present, the meetings on average every other week and email communications as needed.

16. The Data Validator applied its methodology to the data supplied by DCYF for the First (July 1, 2018 – December 31, 2018) and Second (January 1, 2019 – June 30, 2019) Reporting Periods.  See Exhibit ii.

17. From the onset of its role as data validator up to January 2020 PCG did not inform DCYF that it was dissatisfied with the methodology it established or

that it would not confirm its data for Sections 1, 2 and 3 as it set forth in the reports given to DCYF.

18. The first time DCYF learned that PCG was dissatisfied with the methodology it established or that it would not confirm its data for Sections 1, 2 and 3 as it set forth in the reports given to DCYF was in January 2020 from the Child Advocate.

19. After January 2020, DCYF engaged in many discussions with PCG regarding the sample size, confidence levels and margin of error (statistical validity) for all qualitative and quantitative measures in the Settlement Agreement. From these discussions, PCG made the final decisions on the updated (changed) sample size, confidence levels and margin of error (statistical validity) from the methodology set forth in the original contract.

20. That on or around the mid to the end of 4th reporting period and implemented in the 5th reporting period, DCYF and PCG came to an understanding as to the PCG's amended statistical validity to be applied to the qualitative and quantitative measure.

21. DCYF provided PCG access to additional cases for Reporting Periods 1 and 2 for validation under the amended methodology.

22. DCYF had meetings with PCG explaining to PCG where it should look in the case file for the information that would permit it to determine whether DCYF satisfied the benchmarks for items 1, 2 and 3.

23. PCG reviewed the additional cases.  PCG and subsequently the Monitoring Team issued an amendment to Reporting Periods 1 and 2 in which they confirmed that all additional cases reviewed qualified under the terms of Sections 2 and 3.  See Exhibit iii.

24. That as of January 2020, the Monitoring Team did not accept the assessments designated by DCYF under Section 1 until July 2021.

25. That as part of the Settlement Agreement and discussions leading up to that the parties agreed that DCYF would have the discretion to select the assessments under Section 1.

26. During a virtual meeting between DCYF and PCG in May 2021, DCYF described in detail to PCG the assessments, location of supporting information, informing those assessments and the location there of in RICHIST as it relates to the designation for Section 1.

27. DCYF created a manual for PCG to further inform them of the locations where to confirm the assessment and provided to them in June 2021.

28. PCG reviewed the additional cases and confirmed that DCYF had conducted the assessment.

29. The Monitoring Team issued the attached amended report. Exhibit iv.


*Colleen Caron*
_____
Colleen Caron Ph.D,
Title, Administrator of Performance Improvement
RI Department of Children, Youth and
       Families


11/17/21_____
Date

# Exhibit i



# Data Validator Project

## Qualitative Case Review Methodology

**CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION**

Prepared for the Rhode Island Department of Children, Youth & Families



CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

Rhode Island Data Validator Project | Qualitative Case Review Methodology          1/11/2019

## TABLE OF CONTENTS

**Introduction** ..................................................................................................................................1

**Assessments Domain** ....................................................................................................................2

   Assessment Measure 1.1: Timeliness of Assessments ...............................................................2

   Assessment Measure 1.2: Assessment Exclusions ....................................................................3

**Assessment & Stabilization Center (ASC) Domain** ....................................................................4

   ASC Measure 2.2: Reason(s) for ASC Placements ...................................................................4

   ASC Measure 2.3.a: Fourteen-Day ASC Placements ................................................................5

   ASC Measure 2.3.b: Sixty-Day ASC Placements .....................................................................6

**Congregate Care Domain** .............................................................................................................7

   Congregate Care Measure 3.1: Reason(s) for Congregate Care Placement ................................7

   Congregate Care Measure 3.2a: Ninety-Day Congregate Care Placements ...............................8

   Congregate Care Measure 3.2b: Congregate Care Step-Down Delays ......................................9

**Sibling Placement Domain** .........................................................................................................10

   Sibling Placement Measure 4.1: Sibling Placements ...............................................................10

**Visitation Domain** ......................................................................................................................11

   Visitation Measure 6.1: Frequency of Caseworker Visitation ..................................................11

   Visitation Measure 6.2: Quality of Caseworker Visitation ......................................................12

   Visitation Measure 6.3: Frequency of Sibling Visitation .........................................................13

   Visitation Measure 6.4: Frequency of Parental Visitation .......................................................14

**Licensing Domain** .......................................................................................................................15

   Licensing Measure 7.1: Non-Kinship Placement Providers .....................................................15

   Licensing Measure 7.2: Pre-Licensure Background Checks .....................................................16

   Licensing Measure 7.3: Kinship Foster Home Licensure Approval Timeframe .......................17

   Licensing Measure 7.4: Background Checks & Home Inspections for Licensure Renewals............18

**CPS Domain** ...............................................................................................................................19

   CPS Measure 8.1: Timeliness of Screening Decision .............................................................19

   CPS Measure 8.2: Timeliness of Investigation Initiation ........................................................20

   CPS Measure 8.3: Timeliness of Investigation Completion .....................................................21

**Case Planning Domain** ...............................................................................................................22

   Case Planning Measure 10.2: Timeliness of Case Plans .........................................................22

   Case Planning Measure 10.3: Case Plan AACWA Compliance ...............................................23

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## INTRODUCTION

Public Consulting Group, Inc. (PCG), under contract with the Rhode Island Department of Children, Youth and Families (DCYF), will be evaluating the timeliness, accuracy, methodology, statistical validity and reliability of the data compiled by DCYF to demonstrate its progress toward meeting the benchmarks established in the Settlement Agreement that arose from the case of *Andrew C. v. Raimondo*.

In evaluating the timeliness, accuracy, methodology, statistical validity and reliability of the data, PCG will employ a two-pronged approach. On one track (the "quantitative track"), PCG will evaluate the syntax used by DCYF to identify the universe of cases for each measure and the number and percentage that meet the criteria for success to ensure the results demonstrate DCYF is meeting the requisite percentage of case outcomes as described in the Settlement Agreement. PCG will also review the syntax employed by DCYF to randomly identify a sample of cases that are reviewed by DCYF staff.

On the second track ("the qualitative track"), PCG will conduct qualitative reviews of cases to validate that DCYF are engaged in case-related activities at the frequency outlined in the Settlement Agreement, and consistent with what is reported by DCYF. Twenty-two sets of case reviews, each involving a random sample of 100 cases[1], across eight domains will be performed by PCG. These case reviews will consist of the verification of a number of indicators present in the case documentation and in RICHIST. The specific nature of those case reviews, the universe from which the random samples will be drawn, and the data that are needed and that will be gathered, are described below.

---

[1] For each qualitative case review for which PCG proposes to draw a random sample of 100 cases, if 100 or fewer cases exist in the universe of cases to be evaluated, PCG will conduct an evaluation of all applicable cases.

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## ASSESSMENTS DOMAIN

### Assessment Measure 1.1: Timeliness of Assessments

#### DESCRIPTION OF SAMPLING UNIVERSE:

All children removed from the home due to an allegation of abuse or neglect or who changed placements during the period while removed from the home due to an allegation of abuse or neglect, and for whom an assessment was conducted within 30 days following the child's removal; or in the window of 60 days prior to and 14 days after a placement change.

#### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will pull from the universe of eligible children a random sample of up to 100 children, plus a ranked oversample of 20 children.[2]

#### VALIDATING RELIABILITY OF THE DATA:

For each child in the sample, PCG will verify that an assessment was completed and that the date and type of assessment are accurately recorded in RICHIST. Where a child was removed or changed placements multiple times during the period, all assessments conducted pursuant to those removal/placement changes will be analyzed as part of the case review.

| Case Review documentation needed | Data to be collected |
| --- | --- |
| • Copies of assessments | • Dates of assessments<br>• Dates of removal<br>• Dates of placement changes |

#### ADDITIONAL RESPONSIBILITIES:

PCG, as part of the Monitoring Team, will also be responsible for reviewing and approving DCYF's requests to exclude specific children from this measure due to the unavailability of the child (due, for example, to being on runaway/AWOL status, placed in a psychiatric facility or placed out of state) to determine whether the exclusion is valid based on the criteria described in the Settlement Agreement.

---

[2]  Oversampling is being conducted in the event cases need to be excluded during the course of the case reviews for any reason. The oversample will be "ranked," meaning that the order in which the cases will be used from the oversample will be pre-determined.

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Assessment Measure 1.2: Assessment Exclusions

### DESCRIPTION OF SAMPLING UNIVERSE:

All children removed from the home due to an allegation of abuse or neglect or who changed placements during the period while removed from the home due to an allegation of abuse or neglect, and for whom an assessment was not conducted for one of the four reasons described in the Settlement Agreement.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will pull from the universe of eligible children a random sample of up to 100 children, plus a ranked oversample of 20 children, where an assessment was not performed, and the reason for the non-assessment was recorded in RICHIST.

### VALIDATING RELIABILITY OF THE DATA:

For each removal and placement change in the sample, PCG will verify that documentation exists in the case file justifying the exclusion reason recorded in RICHIST. Applicable exclusions include:

| Exclusion reason | Case Review documentation needed | Data to be collected |
|---|---|---|
| • Placement change is to a placement at an equivalent level of need | • Placement level determined clinically by RI DCYF Community Services and Behavioral Health | • Level of need served by old/new placement settings |
| • Placement is no longer available for reasons unrelated to the changing needs of the child | • Documentation to this effect: case notes, formal letters of request, notification of placement closure, etc. | • Reason for the placement change<br>• Reason for placement unavailability |
| • Placement is made pursuant to an order of the RI Family Court | • Copy of court order | • Date of court order |
| • Placement changes occurring to a child due to juvenile justice or behavioral health needs | • Case notes | • Whether the child is also open to DCYF for Juvenile Justice<br>• Reason placement change is occurring |

### ADDITIONAL RESPONSIBILITIES:

PCG, as part of the Monitoring Team, will also be responsible for reviewing and approving DCYF's requests to exclude specific children from this measure due to the unavailability of the child (due, for example, to being on runaway/AWOL status, placed in a psychiatric facility or placed out of state) to determine whether the exclusion is valid based on the criteria described in the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## ASSESSMENT & STABILIZATION CENTER (ASC) DOMAIN

### ASC Measure 2.2: Reason(s) for ASC Placements

#### DESCRIPTION OF SAMPLING UNIVERSE:

All placements of children who were removed due to abuse or neglect or suspicion of abuse or neglect into an ASC setting occurring during the period for which a reason for the placement was recorded in RICHIST.

#### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will pull from the universe of eligible children a random sample of up to 100 children placed into an ASC setting, plus a ranked oversample of 20 children placed into an ASC setting, occurring during the period.

#### VALIDATING RELIABILITY OF THE DATA:

For each placement into an ASC in the sample, PCG will verify that documentation exists in the case file justifying the exclusion reason recorded in RICHIST. Applicable exclusions include:

| Exclusion reason | Case Review documentation needed | Data to be collected |
|---|---|---|
| • Child has a demonstrated need for placement in an ASC for assessment and/or treatment | • Case notes | • Reason for placement<br>• Documentation of assessment and/or treatment need warranting ASC placement |
| • Placement is an emergency removal and immediate removal is necessary, and using professional judgment this placement is in the best interests of the child | • Documentation from qualified individual validating their professional judgment of the appropriateness of placement | • Reason for placement<br>• Existence of documentation that placement is in the best interest of the child |
| • Placement is made pursuant to an order of the RI Family Court | • Copy of court order | • Reason for placement<br>• Date of court order |

4

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## ASC Measure 2.3.a: Fourteen-Day ASC Placements

### DESCRIPTION OF SAMPLING UNIVERSE:

All ASC placements of children who were removed due to abuse or neglect or suspicion of abuse or neglect reaching their 14th day in length during the period.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will pull from the universe of eligible children a random sample of up to 100 children whose ASC placements reached their 14th day in duration, plus a ranked oversample of 20 children.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify that a review was conducted and approval was granted for continued ASC placement at least every 14 days following the date of placement, through the end of the ASC placement.[3]

| Case Review documentation needed | Data to be collected |
|---|---|
| • Copies of reviews and approvals | • Dates (start/end) of placement<br>• Dates of review and/or approval<br>• Name(s) and/or roles of staff conducting and approving each review |

---

[3] In cases where an ASC placement extends beyond the end of the period under review, PCG will evaluate whether assessments and approvals occurred at least every 14 days for up to 90 days following the end of the period.

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## ASC Measure 2.3.b: Sixty-Day ASC Placements

### DESCRIPTION OF SAMPLING UNIVERSE:

ASC placements of children who were removed due to abuse or neglect or suspicion of abuse or neglect reaching their 60th day in length during the period.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible children a random sample of up to 100 children whose ASC placements have reached their 60th day in duration, plus a ranked oversample of 20 children.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify whether written approval from the Director/designee exists in the case file and the date the approval was granted.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Copy of written approval from the Director/designee | • Dates (start/end) of placement<br>• Date of Director/designee approval<br>• Name/role of person approving the continued placement |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

# CONGREGATE CARE DOMAIN

## Congregate Care Measure 3.1: Reason(s) for Congregate Care Placement

### DESCRIPTION OF SAMPLING UNIVERSE:

All children in DCYF care of children who were removed from the home due to abuse or neglect or suspicion of abuse or neglect, and who were placed into a congregate care setting during the period for which a reason for the congregate placement was recorded in RICHIST.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible children a random sample of up to 100 children placed into a congregate care setting, plus a ranked oversample of 20 children, occurring during the period.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify through the information in the case file that an exclusion reason justifying the congregate placement is accurately recorded in RICHIST. Applicable exclusions are described below:

| Exclusion reason | Case Review documentation needed | Data to be collected |
|---|---|---|
| • The child has treatment needs as found in the assessment process which require congregate care placement OR<br>• The child has needs that cannot be addressed in their own home, with kin, or in another family-like setting as found in the assessment process | • Copy of assessment(s) where documentation of this determination was made | • Date of congregate placement<br>• Reason for the placement<br>• Date of the assessment that resulted in this determination |
| • The child is currently in congregate care awaiting step-down to an appropriate family-like setting within 30 days | • Documentation of step-down determination | • Date of congregate placement<br>• Reason for the placement<br>• Date of step-down determination |
| • The placement was an emergency removal and immediate removal was necessary, AND<br>• Using professional judgment, this placement is in the best interests of the child, AND<br>• DCYF is working to identify a placement in another family-like setting | • Copy of assessment documenting caseworker decision | • Reason for the placement<br>• Date of congregate placement<br>• Date of assessment<br>• Date of caseworker determination of "best interest" |
| • The placement was made pursuant to an order of the Rhode Island Family Court | • Copy of court order | • Reason for the placement<br>• Date of court order |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Congregate Care Measure 3.2a: Ninety-Day Congregate Care Placements

### DESCRIPTION OF SAMPLING UNIVERSE:

All placements in a congregate care setting of children in DCYF care of children who were removed from the home due to abuse or neglect or suspicion of abuse or neglect where the placement reached its 90th day in length during the period.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible placements a random sample of up to 100 placements, plus a ranked oversample of 20 placements.

### VALIDATING RELIABILITY OF THE DATA:

For congregate care placements reaching their 90th day on or prior to July 8, 2018 (six months following the execution of the Settlement Agreement), PCG will verify that the initial re-assessment occurred within 60 days following that 90th day in congregate care and that subsequent re-assessments occurred at least every 45 days after that point. For congregate care placements reaching their 90th day after July 8, 2018, PCG will verify that re-assessments occurred at least every 45 days following that point.

| Case type | Case Review documentation needed | Data to be collected |
|---|---|---|
| • Congregate care placements reaching their 90th day during the period | • Copies of reviews | • Dates of congregate placement entry/exit<br>• Date(s) of review |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Congregate Care Measure 3.2b: Congregate Care Step-Down Delays

### DESCRIPTION OF SAMPLING UNIVERSE:

All children in DCYF care who were removed from the home due to abuse or neglect or suspicion of abuse or neglect who were placed in a congregate care setting where a step-down determination was made, but that step-down did not occur within 30 days.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible children a random sample of up to 100 children placed in a congregate care setting, plus a ranked oversample of 20 children.

### VALIDATING RELIABILITY OF THE DATA:

PCG will ensure that Associate Director/Designee approval exists for placements in a congregate care setting where a step-down determination was made but did not occur within 30 days. For these cases, PCG will conduct a qualitative review to verify that written approval for the continued placement exists at least every 15 days following the 30th day following the step-down determination.

| Case type | Case Review documentation needed | Data to be collected |
| --- | --- | --- |
| • Congregate care placements where a step-down determination was made but that step-down did not occur within 30 days | • Copies of Associate Director/designee approval | • Date of step-down determination<br>• Dates of review/approval |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## SIBLING PLACEMENT DOMAIN

### Sibling Placement Measure 4.1: Sibling Placements

#### DESCRIPTION OF SAMPLING UNIVERSE:

Cases during the reporting period previously reviewed by DCYF involving siblings who were removed from the home due to abuse or neglect or suspicion of abuse or neglect sharing a parent in common who within the past 30 days were newly removed or whose placement has changed, where the siblings were not placed together for one of the four reasons described in the Settlement Agreement.

#### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will randomly select up to 100 cases reviewed by DCYF from the universe of eligible cases, plus a ranked oversample of 20 cases.

#### VALIDATING RELIABILITY OF THE DATA:

PCG will perform a second-level review of the applicable documentation to verify that the reason for siblings being placed apart aligns with one of the five reasons indicated in the Settlement Agreement; and that these reasons are accurately recorded in RICHIST by performing a qualitative review of the following data:

| Reason for non-placement | Case Review documentation needed | Data to be collected |
|---|---|---|
| • DCYF determines that doing so would be harmful and/or not be in the best interest of one or more of the siblings | • Documentation of DCYF's determination | • Reason indicated for siblings not being placed together<br>• Date of determination |
| • One of the siblings has treatment needs that need to be met in a specialized placement or facility | • Documentation of treatment needs | • Reason indicated for siblings not being placed together<br>• Date of determination of treatment needs |
| • The size of the sibling group makes such placement impossible due to the licensing regulations restricting such placement to a single home based on the size of the sibling group not as a result of a lack of licensed capacity for a group of that size | • Documentation of sibling group characteristics<br>• DCYF licensing regulations describing maximum resource capacity | • Size of sibling group<br>• Reason indicated for siblings not being placed together<br>• None |
| • It is in the best interest of one or more of the siblings to be placed in a kinship placement in which the other siblings cannot be placed | • Documentation of determination of the unique needs of one or more siblings | • Reason indicated for siblings not being placed together<br>• Date of determination that differentiated placement is in the best interest of one or more of the siblings |
| • Specific placements are made by an order of the Rhode Island Family Court | • Copy of court order | • Reason indicated for siblings not being placed together<br>• Date of court order |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## VISITATION DOMAIN

### Visitation Measure 6.1: Frequency of Caseworker Visitation

**DESCRIPTION OF SAMPLING UNIVERSE:**

All children who were removed from the home due to abuse or neglect or suspicion of abuse or neglect served in out-of-home care at any point during the period.

**SAMPLE SELECTION FOR PCG CASE REVIEWS:**

PCG will identify from the universe of eligible children a random sample of up to 100 children, plus a ranked oversample of 20 children.

**VALIDATING RELIABILITY OF THE DATA:**

PCG will conduct a qualitative case review to verify that the date and location of each visit conducted by DCYF aligns with what is recorded in RICHIST.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Visitation notes | • Date(s) of visitation<br>• Location of visitation |

11

**CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION**

## Visitation Measure 6.2: Quality of Caseworker Visitation

### DESCRIPTION OF SAMPLING UNIVERSE:

All caseworker visitation records for children who were removed from the home due to abuse or neglect or suspicion of abuse or neglect for which DCYF reviewers conducted a review of visitation quality.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible cases a random sample of up to 100 cases reviewed by DCYF, plus a ranked oversample of 20 cases.

### VALIDATING RELIABILITY OF THE DATA:

PCG will perform a second-level review of the cases that were sampled to verify that the quality of visitation is correctly identified as a "Strength" or "Area Needing Improvement" based on the federal CFSR criteria. For this review, PCG will seek the following data for all visits occurring during the period:

| CFSR criterion | Case Review documentation needed | Data to be collected |
|---|---|---|
| • Frequency of visits | • Visitation plan<br>• Visitation notes | • Dates of visitation |
| • Length of visit | • Visitation notes | • Length of visits |
| • Location of visit | • Visitation notes | • Location of visit |
| • Whether child was alone with caseworker or was parent/foster parent present? | • Visitation notes | • Visitation participants<br>• Whether caseworker was able to be alone with child if older than 12 months |
| • Topics discussed | • Visitation notes | • Whether case planning was discussed<br>• Whether service delivery was discussed<br>• Whether goal achievement was discussed |
| • Visitation by qualified individual | • Visitation notes | • Name/role of DCYF representative(s) |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Visitation Measure 6.3: Frequency of Sibling Visitation

### DESCRIPTION OF SAMPLING UNIVERSE:

All sibling groups with at least one parent in common and who were removed within 30 days of one another who were removed from the home due to abuse or neglect or suspicion of abuse or neglect for whom DCYF conducted a review of sibling visitation frequency.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible sibling groups a random sample of up to 100 sibling groups, plus a ranked oversample of 20 groups, for whom DCYF reviewed sibling visitation.

### VALIDATING RELIABILITY OF THE DATA:

PCG will perform a second-level review to verify that visitation among siblings occurred for all children in the sample according to their visitation plan and that the dates of visitation are accurately recorded in RICHIST. The second-level review will focus on reviewing the following data:

| Criterion | Case Review documentation needed | Data to be collected |
|---|---|---|
| • For children placed in-state whose location is known | • Visitation plan <br> • Documentation of visit(s) | • Dates of sibling visitation <br> • Frequency of visits in visitation plan <br> • Visitation date(s) |
| • For children AWOL or placed out of state | • None | • Child AWOL status OR <br> • Location of placement |

13

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Visitation Measure 6.4: Frequency of Parental Visitation

**DESCRIPTION OF SAMPLING UNIVERSE:**

All children who were removed from the home due to abuse or neglect or suspicion of abuse or neglect with a goal of reunification where DCYF conducted a review of parental visitation.

**SAMPLE SELECTION FOR PCG CASE REVIEWS:**

PCG will identify from the universe of eligible children a random sample of up to 100 children with a goal of reunification, plus a ranked oversample of 20 children.

**VALIDATING RELIABILITY OF THE DATA:**

PCG will perform a second-level review to verify that the frequency of visitation between children and parents was consistent with the visitation plan based on the following data collected from qualitative case review:

| Case Review documentation needed | Data to be collected |
|---|---|
| • Visitation plan(s)<br>• Visitation notes | • Dates of removal and discharge<br>• Dates of parental visitation<br>• Frequency of visitation in visitation plan<br>• Date(s) of visits between parents and children |

14

**CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION**

# LICENSING DOMAIN

## Licensing Measure 7.1: Non-Kinship Placement Providers

### DESCRIPTION OF SAMPLING UNIVERSE:

All non-kinship placement providers active with at least one child removed from the home due to abuse or neglect or suspicion of abuse or neglect placed at the provider during the period.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible providers a random sample of up to 100 non-kinship placement providers, plus a ranked oversample of 20 providers.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify that the provider was licensed or had submitted a renewal application prior to license expiration during the entire time a child was placed. PCG will verify that the date of the licensure application or renewal application matches the date recorded in RICHIST.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Licenses or renewal applications | • Date of licensure expiration, if applicable<br>• Dates of licensure or renewal application<br>• Dates of child placements during the period |

15

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Licensing Measure 7.2: Pre-Licensure Background Checks

### DESCRIPTION OF SAMPLING UNIVERSE:

All prospective foster homes during the period at which a child was placed who was removed from the home due to abuse or neglect or suspicion of abuse or neglect prior to the licensure as a foster home being approved.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible homes a random sample of up to 100 prospective foster homes pending licensure, plus a ranked oversample of 20 homes.

### VALIDATING RELIABILITY OF THE DATA:

PCG will examine the licensure documentation to verify that background checks were conducted for all household members age 18 or older, and that the background check results were satisfactory. As part of this process, PCG will perform a qualitative case review to verify the following data:

| Case Review documentation needed | Data to be collected |
|---|---|
| • Licensure documentation<br>• Background check documentation | • Names and dates of birth for household members age 18+<br>• Dates and results of background check completion for all members of household 18 years of age or older OR<br>• Date of court order requiring this placement |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Licensing Measure 7.3: Kinship Foster Home Licensure Approval Timeframe

### DESCRIPTION OF SAMPLING UNIVERSE:

All kinship foster home license applications coming due during the period.

As this measure examines DCYF activity for six months <u>following</u> the submission of a license application, PCG proposes that the six-month review period for this measure lag two months behind the other six-month reviews; this would put the first period under review as May-October 2018 (rather than July-December 2018). This would allow case reviewers to examine the full six months of activity following the application, i.e., through April 2019 for the first period under review, as part of the semiannual case reviews.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible applications a random sample of up to 100 kinship foster home license applications, plus a ranked oversample of 20 applications.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify that the date of the application decision recorded in RICHIST is accurate or, for placements made pursuant to a court order, that the court order is correctly recorded in RICHIST and that background checks were conducted for all household members age 18 or older.

| Criterion | Case Review documentation needed | Data to be collected |
|---|---|---|
| • For homes with a complete license application | • Foster home license applications | • Foster home application date<br>• Date of application decision. |
| • For homes where a court order is present | • Court order<br>• Background checks for household members | • Date of court order<br>• Date(s) of background check completion |

17

**CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION**

## Licensing Measure 7.4: Background Checks & Home Inspections for Licensure Renewals

### DESCRIPTION OF SAMPLING UNIVERSE:

All licensed kinship and non-kinship providers with a renewal due date during the period.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible providers a random sample of up to 100 providers, plus a ranked oversample of 20 providers.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify whether a home inspection was conducted and that all requisite background checks were completed within 30 days of the renewal due date.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Home inspection report | • Date and result of home inspection |
| • National criminal records check | • Date and result of national criminal records check for anyone in the home |
| • DCYF clearances, Rhode Island BCI, and NCIC III checks | • Date and result of background checks for all household members age 18+ |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## CPS DOMAIN

### CPS Measure 8.1: Timeliness of Screening Decision

**DESCRIPTION OF SAMPLING UNIVERSE:**

All reports of abuse and neglect that were received during the period.

**SAMPLE SELECTION FOR PCG CASE REVIEWS:**

PCG will identify from the universe of eligible reports a random sample of 100 reports, plus a ranked oversample of 20 reports

**VALIDATING RELIABILITY OF THE DATA:**

PCG will verify the accuracy of the priority level, dates and times recorded in RICHIST.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Call report | • Date/time of report<br>• Date/time of screening decision<br>• Priority level |

19

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## CPS Measure 8.2: Timeliness of Investigation Initiation

**DESCRIPTION OF SAMPLING UNIVERSE:**

All reports of abuse and neglect screened in for investigation during the period.

**SAMPLE SELECTION FOR PCG CASE REVIEWS:**

PCG will identify from the universe of eligible reports a random sample of 100 screened-in reports of abuse/ neglect, plus a ranked oversample of 20 reports.

**VALIDATING RELIABILITY OF THE DATA:**

PCG will verify the accuracy of the dates and times recorded in RICHIST.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Call report<br>• Investigation notes | • Date/time of screening decision<br>• Date/time of initiation of investigation<br>• Priority level |

20

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## CPS Measure 8.3: Timeliness of Investigation Completion

**DESCRIPTION OF SAMPLING UNIVERSE:**

All investigations of reports of abuse/neglect initiated during the period.

**SAMPLE SELECTION FOR PCG CASE REVIEWS:**

PCG will identify from the universe of eligible investigations a random sample of up to 100 investigations, plus a ranked oversample of 20 investigations.

**VALIDATING RELIABILITY OF THE DATA:**

PCG will verify the accuracy of the dates recorded in RICHIST.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Investigation notes | • Date and time of initiation of investigation<br>• Date and time of completion of investigation |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

# CASE PLANNING DOMAIN

## Case Planning Measure 10.2: Timeliness of Case Plans

### DESCRIPTION OF SAMPLING UNIVERSE:

All children in out-of-home care who were removed from the home due to abuse or neglect or suspicion of abuse or neglect.

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible children a random sample of up to 100 children in out-of-home care, plus a ranked oversample of 20 children.

### VALIDATING RELIABILITY OF THE DATA:

PCG will verify that case plans were updated on the dates recorded in RICHIST.

| Case Review documentation needed | Data to be collected |
|---|---|
| • Case plans | • Dates of removal/discharge<br>• Date(s) of case plans and plan updates |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

## Case Planning Measure 10.3: Case Plan AACWA Compliance

### DESCRIPTION OF SAMPLING UNIVERSE:

All children in the legal custody of DCYF who were removed from the home due to abuse or neglect or suspicion of abuse or neglect for which DCYF reviewers conducted a qualitative review of case plan compliance with the elements enumerated in the Adoption Assistance and Child Welfare Act (AACWA).

### SAMPLE SELECTION FOR PCG CASE REVIEWS:

PCG will identify from the universe of eligible children a random sample of up to 100 children in the legal custody of DCYF due to a report or suspicion of abuse or neglect, plus a ranked oversample of 20 children.

### VALIDATING RELIABILITY OF THE DATA:

PCG will perform a second-level review to verify that case plans include all elements enumerated in the AACWA and that RICHIST accurately reflects these data. In its review, PCG will verify the presence of the following criteria:

| AACWA criterion | Case Review documentation needed | Data to be collected |
|---|---|---|
| • A description of the services offered or provided which were intended to help the child remain with his or her family; | • Case plan | • Verification that each AACWA criterion is present in the case plan |
| • A description of the type of home or institution in which the child is to be placed; | | |
| • A justification of appropriateness of placement that discusses the child's best interests and any special needs, and whether the placement is in the least restrictive setting available and in the closest proximity to the parent(s)' home; | | |
| • A statement of all requirements of the court at the time of judicial determination or recommendations of the administrative review panel and a discussion of how the agency responsible for the child's care will meet the requirements and recommendations; | | |
| • An analysis of the circumstances that necessitated the placement and the improvements required for the child's return to his or her home; | | |
| • A statement of the goals, developed in consultation with the child and his or her family, to be achieved during the period of placement, a description of the services to be provided to the child, the child's parent(s) and family, and a discussion of the appropriateness of these services in meeting the goals and the child's special needs, if any; | | |
| • A statement of the agency's plan for assuring that the child receives proper care while in the foster home or institution including services to the foster parent(s) to facilitate and support the child's adjustment, and that services are provided to the parent(s) and child in order to improve the conditions in the parent(s)' home; | | |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

| AACWA criterion | Case Review documentation needed | Data to be collected |
|---|---|---|
| • An estimated date by which a decision will be made to return the child to his or her parent(s) or family, or to seek an alternative permanent placement including adoption; | | |
| • A description of the extent to which the child, if of appropriate age, the parent(s) or other relatives participated in the development of the case plan; | | |
| • Where long term foster care is determined to be the plan for the child's future, the responsible agency shall include a statement in the case plan of the special needs or circumstances that would not allow the child to be returned home or placed for adoption, and shall specify the efforts that were made to place the child with parent(s) or other family or in adoption; | | |
| • All parties to the development of the case plan, including the child, his/her parent(s) or other relative(s), shall receive a copy of the plan, which will include, whenever possible, signature(s) indicating that they have read and understood the plan; | | |
| • The case record shall contain a continuing, updated notation of the results of each court and administrative action or review affecting the child, and significant agency actions, services, or encounters relative to the case plan for the child, parent(s) and family, and the foster family. | | |

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION



www.publicconsultinggroup.com

CONFIDENTIAL WORKING DRAFT – NOT FOR EXTERNAL DISTRIBUTION

# Exhibit ii



# Data Validator Project

Preliminary Six-Month Monitoring Report
July 1, 2018 – December 31, 2018 Reporting Period

Prepared for the Rhode Island Department of Children, Youth & Families

June 30, 2019



## TABLE OF CONTENTS

Introduction and Summary ................................................................................................................ 1

Domain #1: Assessments ................................................................................................................... 4

Domain #2: Placement in Assessment & Stabilization Centers ......................................................... 6

Domain #3: Placement in Congregate Care ...................................................................................... 9

Domain #4: Sibling Placements ........................................................................................................ 11

Domain #5: Case Management ......................................................................................................... 13

Domain #6: Visitation ....................................................................................................................... 14

Domain #7: Licensing ....................................................................................................................... 18

Domain #8: Child Protective Services .............................................................................................. 21

Domain #10: Case Planning .............................................................................................................. 24

Domain #11: Maltreatment in Care .................................................................................................. 26

Domain #12: Foster Home Array ...................................................................................................... 27

## INTRODUCTION AND SUMMARY

As part of the terms of the Settlement Agreement described in the case of *Andrew C. v. Raimondo*, the Rhode Island Department of Children, Youth and Families) must measure its performance on a number of outcomes designed to ensure that children in out-of-home care due to an allegation of abuse or neglect are placed in the most appropriate placement setting; that steps are taken to ensure each child's connection to his or her family is maintained; that foster homes are properly licensed and that background checks are completed for all household members; that reports of abuse or neglect are screened in, investigated and completed in a timely manner; and that case plans for children in out-of-home care are updated in a timely manner and contain the elements required by law.

This Settlement Agreement was filed on January 8, 2018, and describes not only the outcome measures on which DCYF is required to measure and report on an ongoing basis, but also the manner by which the accuracy, methodology, reliability and statistical validity of the measured outcomes can be verified by an independent Data Validator. DCYF has contracted with the Public Consulting Group, Inc. (PCG) to serve in that Data Validator role, starting with the first Reporting Period, July-December 2018. In addition, PCG and the Rhode Island Office of the Child Advocate (OCA) jointly comprise the "Monitoring Team" mandated by the Settlement Agreement; the role of that Monitoring Team is to report on DCYF's progress each Reporting Period, and to verify the validity of cases to be excluded from individual outcome measures at the request of DCYF.

During that first Reporting Period, the Rhode Island Department of Children, Youth and Families (DCYF) evaluated their performance across twenty performance measures in order to gauge their compliance with the terms of the Settlement Agreement. PCG conducted two separate evaluations for each of those twenty measures. A quantitative analysis of data provided by DCYF identified for the entire statewide universe of applicable cases (for example, children entering care during a period) whether DCYF met the criteria described in the Settlement Agreement; the results of this analysis were used to identify whether DCYF has met the threshold for compliance described in each Section of the Settlement Agreement.

Many of the measures outlined in the Settlement Agreement require that a qualitative case review be conducted for validation of the measure. These qualitative case reviews were conducted using either a data validation process or a case review instrument, dependent upon the measure. The data validation process for each measure consisted of selecting a random sample of 100 cases from the universe of eligible cases  and reviewing the original case documentation in order to verify the accuracy of the data as it is recorded in RICHIST – Rhode Island's Statewide Automated Child Welfare Information System – to ensure that the data used to calculate the outcomes were valid. Case review instruments were used for validation of the measures where the data was not easily quantifiable or was not recorded electronically and were used for only six measures: Visitation 6.2 (quality of caseworker visitation), each of the four Licensing measures (7.1 through 7.4) and Case Planning 10.3 (case plan AACWA compliance). For these measures, PCG developed case review instruments to conduct the qualitative review of cases.

To facilitate these case reviews and the calculation of outcomes across each of the measures, DCYF supplied PCG with data files that were extracted and processed from the Rhode Island Children's Information System (RICHIST) using syntax developed by DCYF. The first Reporting Period over which

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

DCYF's performance was evaluated was July 1 – December 31, 2018; reviews of outcomes achieved during that period were conducted by DCYF and PCG between January and June 2019. DCYF provided both the processed extracts and the syntax used to generate those extracts; for those measures for which preliminary analysis indicated that DCYF might achieve the threshold for compliance described in the Settlement Agreement, PCG accompanied DCYF staff in generating and transmitting the data extracts in order to ensure that the represented the true and complete extract of the processing scripts.

A summary of each of the measures subject to PCG review is included as Figure 1, below.

| Outcome Measure | Target Outcome | Reporting Period 1 Outcome |
|---|---|---|
| **Assessments 1.1:** Assessments to be completed for children entering care or changing placements | 85.00% | |
| **ASC Placements 2.2:** No child to be placed in ASC | 100.00% | 100.00% |
| **ASC Placements 2.3a:** ASC placements 14+ days have QR every 14 days | 90.00% | 100.00% |
| **ASC Placements 2.3b:** ASC placements 60+ days have approval | 95.00% | 100.00% |
| **Congregate Care 3.1:** No child to be placed in congregate care | 90.00% | 95.56% |
| **Congregate Care 3.2:** Congregate placements 90+ days get reviews every 45 days, with step-down provisions. | 90.00% | 94.67% |
| **Sibling Placement 4.1:** Siblings placed together | 80.00% | 73.33% |
| **Visitation 6.1:** Monthly caseworker face-to-face visits | 95.00% | 94.13% |
| **Visitation 6.2:** Quality of face-to-face visits | 85.00% | 16.76% |
| **Visitation 6.3b:** Frequency of sibling visitation | 85.00% | 3.28% |
| **Visitation 6.4b:** Frequency of parent visitation (reunifications) | 85.00% | 12.62% |
| **Licensing 7.1:** Non-kinship placements must be licensed | 100.00% | 100.00% |
| **Licensing 7.2:** Background checks required for kinship homes | 100.00% | 70.83% |
| **Licensing 7.3:** Kinship applications completed within six months | 95.00% | 15.25% |
| **Licensing 7.4:** Background checks completed within 30 days of license renewal due date | 85.00% | 23.29% |
| **CPS 8.1:** Timely screening of reports of abuse/neglect | 90.00% | 96.48% |
| **CPS 8.2:** Response within designated timeframes | 90.00% | 77.76% |
| **CPS 8.3:** Investigations completed within designated timeframes | 85.00% | 84.35% |
| **Case Planning 10.2:** Case plans meet timeliness requirements | 80.00% | 12.86% |
| **Case Planning 10.3:** AACWA elements in case plan | 80.00% | 4.74% |

Figure 1: July-December 2018 Reporting Period Statewide Outcomes

PCG conducted an review of the code used to derive the results in this report in early 2019. The syntax review consisted of an analysis of the database extraction code, the syntax used to derive case exclusions and evaluate outcomes, and the sample size and methodology used to calculate the percentages reported and whether they align with the criteria outlined in the Settlement Agreement. PCG's review did not uncover any irregularities in any of the syntax used to calculate the percentages for any of the measures.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

This report details the results of PCG's analysis of each of the twenty measures across eight domains for the July-December 2018 Reporting Period which serve to measure DCYF's compliance with the terms of the settlement agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #1: ASSESSMENTS

### Summary of Domain

Under the terms of Section 1 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department conducts assessments for children entering out-of-home care due to a report of suspicion of abuse or neglect, or who change placement settings subsequent to a removal due to a report of suspicion of abuse or neglect. These assessments must be conducted within 30 days of the removal from the home; upon a change in placement, the assessment must be conducted between 60 days prior to the placement change and fourteen days following the placement change.

Four exceptions to this requirement are outlined in the Settlement Agreement:

a) the placement move is to a placement setting that serves an equivalent level of need;
b) the placement change occurs because the placement is no longer available for reasons unrelated to the changing needs of the child;
c) the placement change is occurring to a child not in DCYF legal custody due to a report or suspicion of abuse or neglect, or the child is open to DCYF as a juvenile justice case and the placement change occurs due to juvenile justice or behavioral health reasons; or
d) the placement change is occurring due to an order of the Rhode Island Family Court.

One outcome measure is described in the Settlement Agreement:

**Assessments 1.1:** Children entering care or changing placements during the Reporting Period, excepting entries or placement changes falling under one of the four "exceptions" described above, must receive an assessment within the designated timeframes. DCYF must achieve a successful outcome in 85 percent of removals and placement changes.

After attaining the goal described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 1 of the Settlement Agreement.

### Assessments 1.1: All children removed/changing placements will be assessed.

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 570 instances of a child being removed from the home or changing placement settings during the Reporting Period, excluding those placement changes between placements that serve equivalent levels of need. In 510 of those removals/placement changes, DCYF conducted an assessment of the child's needs.

Eighteen records involved a child experiencing more than one placement change within a short period of time, and a single assessment being conducted within the designated timeframes for each of the placement changes; those were "unduplicated" so that each assessment would only be counted as a single successful assessment, leaving 552 removals and placement changes in the statewide universe.

Of the 552 remaining removals and placement changes, DCYF conducted an assessment within the designated timeframe for 492 removals and placement changes, resulting in a statewide outcome of

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

89.13 percent. This exceeds the 85 percent threshold described in the Settlement Agreement; should DCYF exceed that 85 percent threshold during the second Reporting Period (January-June 2019), the Department will be able to exit from Section 1 of the Settlement Agreement.

## Case Reviews

PCG identified a random sample of 100 removals or placement changes, and conducted a case review in order to verify that assessments were conducted within the timeframes mandated in the Settlement Agreement. In each of the cases reviewed, PCG found that an assessment was conducted within the designated timeframe.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 552 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 removals/placement changes (representing 18.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.6 percent at a 95 percent confidence interval.

## Assessments 1.2: Exceptions to Section 1.1

Section 1.2 of the Settlement Agreement describes the exceptions to DCYF's obligations under Section 1.1 (as summarized in the previous section of this report), and does not include a requirement to calculate outcomes at the statewide level.

## Assessments 1.3: Children Unavailable for Assessment

Section 1.3 of the Settlement Agreement describes the circumstances under which the requirement to conduct an assessment may be waived if the child is unavailable – for example, due to the child's runaway status, placement in a psychiatric hospital, or placement out of state. DCYF did not identify any children during the Reporting Period whose assessment was delayed due to the unavailability of the child.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #2: PLACEMENT IN ASSESSMENT & STABILIZATION CENTERS

### Summary of Domain

Under the terms of Section 2 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department minimizes the number of children placed in shelters or "assessment and stabilization centers" (ASCs). As described in the Settlement Agreement, no child should be placed in an ASC unless:

a) the child has a demonstrated need for placement in an ASC;
b) the placement is an emergency removal, immediate removal from the home is necessary and the ASC placement is in the best interest of the child, per the professional judgement of the DCYF caseworker; or
c) the placement at an ASC is due to an order of the Rhode Island Family Court

For those children who are placed in an ASC, DCYF is responsible for conducting a review of the child's continued placement at least every 14 days until the child is discharged from the ASC; when a child is placed in an ASC longer than 60 days, DCYF must have documented approval for the continued placement from the DCYF Director or her designee.

Three outcome measures are described in the Settlement Agreement:

**ASC 2.2:** Placements during the Reporting Period into an ASC must be for one of the three "exception" reasons described above. DCYF must achieve a successful outcome in 100 percent of ASC placements (that is, all ASC placements must be for one of the three "exception" reasons.

**ASC 2.3a:** Children placed into an ASC must have the appropriateness of that continued placement reviewed by DCYF at least every 14 days. DCYF must achieve a successful outcome in 90 percent of ASC placements longer than fourteen days.

**ASC 2.3b:** Children placed into an ASC for longer than 60 days must have the written approval of the Director or her designee for the continued placement. DCYF must achieve a successful outcome in 95 percent of ASC placements longer than 60 days.

After attaining all three of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 2 of the Settlement Agreement.

### ASC 2.2: No placements in ASCs

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 68 children who were placed in an ASC during the Reporting Period. Of those, 21 ASC placements pre-dated the Reporting Period, and were excluded from the calculations. In each of the remaining 47 cases, DCYF had an "exception" reason documented for the placement, resulting in a statewide outcome of 100 percent. This meets the 100 percent threshold described in Section 2.2 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

### Case Reviews

PCG conducted a case review of each of the 47 placements into an ASC during the period in order to verify that the "exception" justifying the ASC placement was appropriately documented within RICHIST. In each of the 47 cases, PCG found that DCYF had appropriately documented the reason for the placement.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 47 ASC placements occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of cases, the statistical validity of PCG's case review did not need to be calculated.

## ASC 2.3a: Reviews for 14-day ASC placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 68 children who were placed in an ASC at any point during the Reporting Period, including 21 placements pre-dating the Reporting Period; since Section 2.3a of the Settlement Agreement described DCYF's obligations to continue reviewing the appropriateness of ASC placements on an underlined ongoing basis, these 21 ASC placements were not excluded on this measure.

Sixteen ASC placements did not last longer than 14 days, however, and those sixteen episodes were excluded from the statewide calculations. In each of the remaining 52 cases, DCYF conducted a review at least every 14 days, resulting in a statewide outcome of 100 percent. This exceeds the 90 percent threshold described in Section 2.3a of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of each of the 52 placements of longer than fourteen days in an ASC which overlapped any point of the Reporting Period in order to verify that DCYF conducted reviews of the appropriateness of the continued placement at least every fourteen days. In each of the 52 cases, PCG found that DCYF had conducted such a review and documented the review correctly.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 52 ASC placements of longer than fourteen days in an ASC which overlapped any point of the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of eligible cases, the statistical validity of PCG's case review did not need to be calculated.

## ASC 2.3b: Approval for 60-day ASC placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 30 children who reached their 61st day of placement in an ASC during the Reporting Period. Since DCYF's obligations under during the first Reporting Period did not take effect until July 1, 2019, that date represented the start of the 60-day timer to obtain Director approval for these ASC placements. Of the thirty ASC placements identified, ten discharged on or prior to August 29, 2019 (60 days after July 1, 2019) and were excluded from this measure. In each of the remaining twenty cases, DCYF obtained written approval from the Director or her designee on or prior to the later of August 29, 2019 or the child's 60th day of placement in the ASC. The statewide outcome on this measure during the

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

first Reporting Period is 100 percent, exceeding the 95 percent threshold described in Section 2.3a of the Settlement Agreement.

## Case Reviews

PCG conducted a case review of each of the 30 placements in an ASC reaching their 61st day during the Reporting Period in order to verify that written approval from the Director or her designee was documented. This case review included the ten cases where the child reached their 61st day in the ASC placement during the period, but discharged on or prior to August 29, 2019, and which were excluded from the calculation of the statewide outcomes. In each of the 30 cases (including all 20 cases evaluated as part of the statewide outcome), PCG found that DCYF had obtained the approval of the DCYF Director or her designee on or before the later of August 29, 2019 or the child's 60th day of placement in the ASC.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 20 ASC placements reaching their 61st day during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG conducted a case review on all eligible cases, the statistical validity of PCG's case review did not need to be calculated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #3: PLACEMENT IN CONGREGATE CARE

## Summary of Domain

Under the terms of Section 3 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department minimizes the number of children placed in congregate care settings. As described in the Settlement Agreement, no child should be placed in a congregate care setting unless:

    a) the child has treatment needs which necessitates placement in a congregate care setting; or the child has needs that cannot be addressed in a family-like setting;

    b) the child is awaiting step-down from congregate care to an appropriate family-like setting;

    c) the placement is an emergency removal, immediate removal from the home is necessary and the placement in a congregate care setting is in the best interest of the child, per the professional judgement of the DCYF caseworker and DCYF is working to identify a placement in an appropriate family-like setting; or

    d) the placement at a congregate care setting is due to an order of the Rhode Island Family Court.

For those children who are placed in a congregate care setting for 90 days or longer, DCYF is responsible for conducting a review of the child's continued placement at least every 45 days until the child is discharged from the congregate care setting. When a determination is made that a step-down to a more appropriate level of placement is warranted, DCYF will make that step-down within 30 days of the determination. Where the child is not placed in a family-like setting within that 30-day timeframe, the case must be reviewed by the Associate Director of the Permanency Division (or his/her designee) every fifteen days following the 45th day after which the step-down decision was made.

Two outcome measures are described in the Settlement Agreement:

    **Congregate Care 3.1:**  Placements during the Reporting Period into a congregate care setting must be for one of the four "exception" reasons described above. DCYF must achieve a successful outcome in 90 percent of ASC placements (that is, 90 percent of congregate placements must be for one of the four "exception" reasons.

    **Congregate Care 3.2**:  Children placed into a congregate care setting for 90 days or longer must have the appropriateness of that continued placement reviewed by DCYF at least every 45 days. DCYF must conduct these reviews in 90 percent of congregate care placements lasting 90 days or longer.

After attaining each of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 3 of the Settlement Agreement.

## Congregate Care 3.1: No children placed in congregate setting unless exception documented

### Review of Universe Syntax and Statewide Outcome

DCYF identified 45 children who were placed in a congregate care setting during the Reporting Period, excluding children placed into an Acute Residential Treatment Services (ARTS) setting. In 43 of those 45 cases, DCYF documented an "exception" reason for the placement, resulting in a statewide outcome of 95.56 percent. This exceeds the 90 percent threshold described in Section 3.1 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## Case Reviews

PCG conducted a case review of each of the 45 eligible placements into a congregate care setting during the period in order to verify that the "exception" justifying the placement was appropriately documented within RICHIST. In each of the 45 cases, PCG found that DCYF had appropriately documented the reason for the placement.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 45 placements into a congregate care setting occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

# Congregate Care 3.2: Reviews of 90+-Day Congregate Care Placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 75 children who reached their 90th day of placement in a congregate care setting during the Reporting Period, or who had been placed in a congregate care setting for at least 90 days as of the first day of the Reporting Period. In 71 of those 75 cases, DCYF conducted a review of the appropriateness of that continued placement at least every 45 days following the 90th day of placement. The statewide outcome for this measure is 94.67%, exceeding the 90 percent threshold described in Section 3.2 of the Settlement Agreement.

## Case Reviews

Of the 75 cases involving a child who reached their 90th day of placement in a congregate care setting during the Reporting Period, or who had been placed in a congregate care setting for at least 90 days as of the first day of the Reporting Period, PCG reviewed the 71 cases identified by DCYF as having achieved a successful outcome on this measure – that is, that DCYF had conducted a review of the appropriateness of the continued placement at least every 45 days following the 90th day in the congregate placement. PCG found that DCYF had conducted the reviews every 45 days as required in each of the 71 cases.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 75 placements into a congregate care setting occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #4: SIBLING PLACEMENTS

## Summary of Domain

Under the terms of Section 4 of the Settlement Agreement, DCYF is being evaluated on the extent to which siblings[1] who enter out-of-home care within 30 days of each other, or whose placement changes, are placed in the same placement setting. As described in the Settlement Agreement, siblings entering care or who change placements should be placed together unless:

a) DCYF determines that co-placement would be harmful and/or not in the best interest of at least one sibling;
b) at least one of the siblings has treatment needs that necessitate placement in a specialized facility;
c) the size of the sibling group makes co-placement impossible due to licensing regulations;
d) it is in the best interest of at least one sibling to be placed into a kinship setting in which the other siblings can not be placed; or
e) a specific placement is due to an order of the Rhode Island Family Court

One outcome measure is described in the Settlement Agreement:

**Sibling Placement 4.1:** Siblings removed or changing placements during the Reporting Period must be placed in the same setting unless one of the five "exception" reasons described above applies. DCYF must draw a random sample of eligible "events" to review (siblings entering care, or a change in placement for at least one member of a sibling group in care), and must achieve a successful outcome in 80 percent of reviewed cases.

After attaining the goal described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 4 of the Settlement Agreement.

## Sibling Placement 4.1: Siblings Placed Together

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 80 cases in which siblings entered care during the period, or were placed during the period and the placement setting of at least one sibling changed. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to identify (a) whether an "exception" to the Settlement Agreement requirements applied to the siblings; and if not (b) whether the siblings were placed together.

DCYF documented 35 cases in which a valid "exception" existed to the requirement that the siblings be placed together; of the remaining 45 cases, DCYF found that in 33 cases (73.33%) the siblings were placed together upon their entry into out-of-home care or the placement change of at least one sibling. This statewide outcome of 73.33 percent falls short of the 80 percent threshold described in Section 4.1 of the Settlement Agreement.

---

[1] For the purposes of this measure, "siblings" are defined as children who have at least one parent in common through birth or adoption, and who lived together immediately prior to placement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## Case Reviews

PCG conducted a case review of each of the 33 cases where DCYF (a) did not note that an "exception" to the requirements of the Settlement Agreement applied, and (b) found that the siblings had been placed together. In each of the 33 cases reviewed, PCG verified that the siblings were placed in the same setting upon their removal from the home or placement change.

## Statistical Validity of Samples

DCYF evaluated outcomes for 80 of 151 eligible cases statewide (representing 52.98 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±7.5 percent. PCG's second level review was conducted against each of the 33 "successful" cases; since PCG did not review a random sample of cases, the statistical validity of PCG's case review did not need to be calculated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #5: CASE MANAGEMENT

### Summary of Domain

Under the terms of Section 5 of the Settlement Agreement, DCYF is tasked with attaining casework goals as described in the areas of visitation (Section 6 of the Settlement Agreement) and case planning (Section 10).

No additional outcome measures – beyond those described in Sections 6 and 10 – are defined in Section 5 of the Settlement Agreement.

DCYF will utilize the results from the first Reporting Period to establish a baseline of current DCYF compliance with the case plan content and timeliness elements evaluated under the terms of Section 10 of the Settlement Agreement. Starting with the second Reporting Period (January-June 2019), should DCYF not attain the commitments outlined in Sections 6 and 10 in two consecutive periods, DCYF will be responsible for conducting a workload study in consultation with the Monitoring Team.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #6: VISITATION

## Summary of Domain

Under the terms of Section 6 the Settlement Agreement, DCYF is being evaluated on the extent to which children in out-of-home care are visited by caseworkers on a regular basis; that those visits appropriately assess issues pertaining to the safety, permanency and well-being of the children; and that visits between siblings in care, and between children in care and their parents for cases with a goal of reunification, occur as often as described in the case plan.

Four outcome measures are described in the Settlement Agreement:

**Visitation 6.1:**  Each full calendar month that a child is in out-of-home placement, they should experience at least one face-to-fact visit with a member of the DCYF Care Team. DCYF must achieve a successful outcome in 95 percent of full calendar months that children are in out-of-home care.

**Visitation 6.2:**  Children in out-of-home care during the Reporting Period must have visitation that meet the federal Child & Family Services Review (CFSR) criteria to be rated as a "strength" in terms of frequency and quality. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 85 percent of reviewed cases.

**Visitation 6.3b**:  Siblings in out-of-home care during the Reporting Period must have visitation between the siblings which occurs at the frequency indicated in their case plans. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 85 percent of reviewed cases.

**Visitation 6.4b**:  Children in out-of-home care during the Reporting Period for whom the case plan goal is reunification must have visitation with their parents that occurs at the frequency indicated in their case plans. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 85 percent of reviewed cases.

Upon attaining the goals described for Visitation 6.1 for two consecutive Reporting Periods, DCYF shall exit from the terms of the Settlement Agreement for that measure. Similarly, upon attaining the goals described for Visitation 6.2 for two consecutive Reporting Periods, DCYF shall exit from the terms of the Settlement Agreement for that measure.

The Visitation 6.3b and Visitation 6.4b are incorporated into Section 10 of the Settlement Agreement (Case Planning), and the criteria for DCYF's exit from the terms of the Settlement Agreement for those measures are described in the "Domain #10: Case Planning" section of this report.

## Visitation 6.1: Caseworker Face-to-Face Visits with Children

### Review of Universe Syntax and Statewide Outcome

DCYF identified 2,502 children who were in care at least one full calendar month during the Reporting Period, spanning 9,880 full calendar months. In 9,300 of those months, the child in care experienced at least one face-to-face visit with a member of the DCYF Care Team, resulting in a statewide outcome of

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

94.13 percent. This outcome falls short of the 95 percent threshold described in Section 6.1 of the Settlement Agreement.

### Case Reviews

PCG identified a random sample of 100 children placed for at least one full calendar month during the Reporting Period, and conducted a case review in order to verify that DCYF had appropriate documented that the face-to-face visit occurred with the child during each full calendar month that the child was in care during the Reporting Period. In each of the 100 cases reviewed, PCG found that visitation was appropriately documented.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 2,502 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 children in care for at least one full calendar month during the Reporting Period (representing 4.0 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.0 percent at a 95 percent confidence interval.

## Visitation 6.2: Quality of Face-to-Face Visits

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 173 cases of children in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether the quality of the visits meets the criteria used for the federal CFSR to rate as case as a "Strength."

This methodology excluded children entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those children who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all children served through the first four months of each Reporting Period, rather than the first three months.

Of the 173 cases, 29 cases (16.76%) were rated as a "strength." This outcome falls short of the 85 percent threshold described in Section 6.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a second-level review of 20 percent of the 173 cases reviewed by DCYF (35 cases), and evaluated the quality of visitation using the same federal CFSR instrument and case review criteria employed by the DCYF Quality Review Team. The purpose of this case review was to verify the findings of the DCYF review; of the 35 cases subject to this second-level review, eight had been rated as a "strength" by the DCYF Quality Review team, and 27 had been rated as an "area needing improvement." In each of the 35 cases reviewed, PCG agreed with the rating assigned by the DCYF Quality Review team.

### Statistical Validity of Samples

DCYF evaluated outcomes for 173 of the 1,751 eligible cases statewide (representing 9.88 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

error of ±7.8 percent. PCG's second-level review of 33 cases is statistically valid at a 95 percent confidence interval with a margin of error of ±16.9 percent

## Visitation 6.3b: Sibling Visitation

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 61 cases (of 251 total statewide) involving siblings in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether visitation between the siblings occurred at (at minimum) the frequency described in the siblings' case plan.

This methodology excluded siblings entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those sibling groups who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all sibling groups served through the first four months of each Reporting Period, rather than the first three months.

Of the 61 cases reviewed, two cases (3.28%) were found to have visitation that occurred at least as often as what was stipulated in the siblings' case plan. In addition to cases where visitation did not occur at the frequency recommended in the case plan, cases where the appropriate frequency of visits between siblings was not specified in the case plan were also counted as non-compliant on this measure. This outcome falls short of the 85 percent threshold described in Section 6.3b of the Settlement Agreement.

DCYF conducted an additional review of 25 non-compliant cases in order to identify the reasons for non-compliance; in 15 cases (60%), the required frequency of visitation was stipulated in the case plan. In the remaining 10 cases, the frequency of visitation was not described in the case plan; in two of those ten cases, reviewers found that frequency between/among the siblings did occur at a frequency that was consistent with the professional judgement of the reviewer.

### Case Reviews

PCG conducted a second-level review of the two cases where DCYF found that sibling visitation occurred at the frequency indicated in the case plan, and evaluated whether that visitation did occur; in both cases, PCG found that visits between the siblings occurred at the indicated frequency.

### Statistical Validity of Samples

DCYF evaluated outcomes for 61 of the 251 eligible cases statewide (representing 24.30 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±10.94 percent. PCG's second level review of the two "successful" cases was not statistically valid.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## Visitation 6.4b: Parent-Child Visitation

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 103 cases (of 1,030 total statewide) involving children in out-of-home case with a goal of reunification. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether visitation between the child and parent occurred at at least the frequency required in the child's case plan, excepting cases where parents are not attending visits despite DCYF employing measures to ensure the parents' ability to participate in the visit.

This methodology excluded children entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those children who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all children served through the first four months of each Reporting Period, rather than the first three months.

Of the 103 cases reviewed, thirteen cases (12.62%) were found to have visitation between the parent and the child that occurred at least as often as what was required by the case plan. Similar to measure 6.3b, cases where the appropriate frequency of visits between the parent and child was not specified in the case plan were also counted as non-compliant on this measure. This outcome falls short of the 85 percent threshold described in Section 6.4b of the Settlement Agreement.

DCYF conducted an additional review of the 90 non-compliant cases in order to identify the reasons for non-compliance; in 84 cases (93%), the required frequency of visitation was described in the case plan. In the remaining six cases, the frequency of visitation was not described in the case plan; in two of those six cases, reviewers found that frequency between the parent and child did occur at a frequency that was consistent with the professional judgement of the reviewer.

### Case Reviews

PCG conducted a second-level review of the thirteen cases where DCYF found that visits between the parents and the child occurred at the frequency indicated in the case plan, and evaluated whether that visitation did occur; in each of the thirteen cases, PCG verified that visits between the siblings occurred at the required frequency.

### Statistical Validity of Samples

DCYF evaluated outcomes for 103 of the 1,030 eligible cases statewide (representing ten percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±10.1 percent. PCG's second level review of the thirteen "successful" cases was not a random sample, and the statistical validity of that sample was not calculated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #7: LICENSING

## Summary of Domain

Under the terms of Section 7 of the Settlement Agreement, DCYF is being evaluated on the extent to non-kinship foster homes into which children are placed have been appropriately licensed; that background checks are conducted for all members of a prospective foster home who are age 18 or older; that kinship foster home license applications are completed in a timely manner; and that background checks are conducted in a timely manner for all foster homes for which a license is due for renewal and in which a child is placed during the Reporting Period.

Four outcome measures are described in the Settlement Agreement:

> **Licensing 7.1:** No child may be placed in a non-kinship home without an active license, unless the placement was made pursuant to an order of the Rhode Island Family Court. DCYF must achieve a successful outcome in 100 percent of placements into a non-kinship home during the Reporting Period.
>
> **Licensing 7.2:** No child may be placed into a prospective kinship foster home (that is, one where licensure is pending) unless background checks have been conducted for all household members age 18 or older, unless the placement was made pursuant to an order for the Rhode Island Family Court. DCYF must achieve a successful outcome in 100 percent of placements into a foster home during the Reporting Period where licensure is pending.
>
> **Licensing 7.3:** Kinship foster home licensing applications must be completed within six months of the date of application. DCYF must achieve a successful outcome in 95 percent of cases where a licensing application was submitted during the Reporting Period.
>
> **Licensing 7.4:** DCYF must conduct background checks for all household members age 18 or older in foster homes within 30 days of the date that the home's licensure renewal is due. DCYF must achieve a successful outcome in 85 percent of cases where a renewal was due during the Reporting Period.

After attaining the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 7 of the Settlement Agreement.

## Licensing 7.1: Licensing of Non-Kinship Placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 380 placements into a non-kinship foster home during the Reporting Period. In each of those 380 placements, DCYF identified that the non-kinship foster home was licensed during the entire time the child was placed there during the Reporting Period, resulting in a statewide outcome of 100 percent. This meets the 100 percent threshold described in the Settlement Agreement; as described in the next sections of this report, however, DCYF did not meet the threshold mandated by the Settlement Agreement on the other measures comprising this domain, and will not be subject to exit from Section 7 of the Settlement Agreement in the second Reporting Period, even if they again achieve a 100 percent success rate on this measure.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## Case Reviews

PCG identified a random sample of 100 placements into a non-kinship foster home occurring during the Reporting Period, and conducted a case review in order to verify that the foster home license was active the entire period the child was placed in that home during the Reporting Period. In each of the 100 cases reviewed, PCG found that the foster home license was active the entire timeframe under review.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 380 placements statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 removals/placement changes (representing 18.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±11.0 percent at a 95 percent confidence interval.

## Licensing 7.2: Background Checks for Kinship Homes

### Review of Universe Syntax and Statewide Outcome

DCYF identified 312 placements into a kinship foster home during the Reporting Period where the foster home was pending licensure. In 221 of those 312 placements, DCYF identified that background checks had been conducted for all household members age 18 or older, resulting in a statewide outcome of 70.83 percent. This outcome falls short of the 100 percent threshold described in Section 7.2 of the Settlement Agreement.

### Case Reviews

PCG identified a random sample of 100 placements into a foster home occurring during the Reporting Period where the foster home was pending licensure, and conducted a case review in order to identify whether backgrounds checks had been conducted on all household members age 18 or older. In each of the 100 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 312 applicable placements statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 placements (representing 32.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±11.2 percent at a 95 percent confidence interval.

## Licensing 7.3: Timely Completion of Kinship License Applications

### Review of Universe Syntax and Statewide Outcome

As this measure evaluates DCYF's compliance over a six-month timeframe, measured prospectively from the time each kinship home submits its application for licensure, DCYF and PCG were unable to review licensure applications submitted during the Reporting Period of July – December 2018, since DCYF's timeframe for completing those applications would extend through June 2019.

During the first Reporting Period, DCYF instead identified kinship license applications submitted in May and June 2019, in order to evaluate the successful completion of those applications through the end of the first Reporting Period on December 31, 2018. Future periods' analyses will "lag" one full Reporting Period behind other outcomes measured as a result; that is, when evaluating outcomes for the second

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Reporting Period (January-June 2019) DCYF and PCG will examine kinship licensing applications submitted between July-December 2018, which under the terms of the Settlement Agreement must each be completed by June 30, 2019 (the end of the second Reporting Period).

DCYF identified 100 kinship home applications filed in May and June 2018. In 41 of those 100 cases, an order of the Rhode Island Family Court mandated placement with the kinship provided, and were excluded from the analysis. Of the 59 remaining kinship licensing applications, DCYF completed the application within six months for nine applications, resulting in a statewide outcome of 15.25 percent. This falls short of the 95 percent threshold described in Section 7.3 of the Settlement Agreement.

### Case Reviews

PCG identified a random sample of 50 kinship home applications filed during May – June 2018, and conducted a case review in order to identify whether the application was completed within the six-month timeframe described in Section 7.3 of the Settlement Agreement. In each of the 50 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 59 applicable kinship home applications submitted statewide during May and June 2018, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

## Licensing 7.4: Background Checks within 30 Days of License Renewal

### Review of Universe Syntax and Statewide Outcome

DCYF identified 73 foster homes where the license was due for renewal during the Reporting Period, and a child was placed in the home during the Reporting Period. For seventeen of those 73 foster homes, DCYF identified that background checks were conducted for all household members age 18 or older within 30 days of the due date for the renewal, and that a home inspection was conducted within 30 days of that same due date. This statewide outcome of 23.29 percent falls short of the 85 percent threshold described in Section 7.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of all 73 applicable foster homes in order to identify whether backgrounds checks had been conducted on all household members age 18 or older, and whether a home inspection had been conducted within 30 days of the license due date. In each of the 73 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 73 applicable kinship home applications due during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #8: CHILD PROTECTIVE SERVICES

### Summary of Domain

Under the terms of Section 8 of the Settlement Agreement, DCYF is being evaluated on the extent to which DCYF screens in reports of abuse or neglect in a timely manner; whether they respond to screened-in reports in a timely manner; and whether they complete their investigation of screened-in reports in a timely manner.

Three outcome measures are described in the Settlement Agreement:

> **CPS 8.1:** DCYF must make a screening decision within timeframes consistent with Rhode Island statute – 30 minutes for reports designated as having an "emergency" priority level; two hours for reports designated as having an "immediate" priority level; and four hours for reports designated as having a "routine" priority level. DCYF must achieve a successful outcome in 90 percent of reports received during the Reporting Period.

> **CPS 8.2:** For reports of abuse or neglect that are screened in, DCYF must respond to the report by making contact or attempting to make contact with the victim or someone involved in the case within timeframes described by Rhode Island statute – two hours for reports designated as having an "emergency" priority level; twelve hours for reports designated as having an "immediate" priority level; and 48 hours for reports designated as having a "routine" priority level. DCYF must achieve a successful outcome in 90 percent of screened-in reports received during the Reporting Period.

> **CPS 8.3:** For reports of abuse or neglect that are screened in, DCYF must complete the investigation within 30 days of the report, or within 45 days if the investigation is continued due to circumstances beyond the control of DCYF; investigations completed in 31 to 45 days must have supervisor approval documented for the extension. DCYF must achieve a successful outcome in 85 percent of screened-in reports received during the Reporting Period.

After attaining each of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 8 of the Settlement Agreement.

### CPS 8.1: Timely Screening Decisions

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 3,924 reports of abuse or neglect that were received during the Reporting Period, excluding those calls that were classified as "Information & Referral." In 3,786 of those 3,924 reports (96.48%) , DCYF made a screening decision within the timeframes outlined by statute. This statewide outcome exceeds the 90 percent threshold described in Section 8.1 of the Settlement Agreement; as described in the next section of this report, however, DCYF did not meet the threshold mandated by the Settlement Agreement on the other measures comprising this domain, and DCYF will not be eligible to exit from Section 8 of the Settlement Agreement in the second Reporting Period, even if they again achieve successful outcomes in at least 90 percent of reports.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

### Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period in order to verify that the screening decision was made within the timeframe mandated by Rhode Island statute. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 3,924 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 reports (representing 2.5 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval.

## CPS 8.2: Timely Face-to-Face Contact within Child

### Review of Universe Syntax and Statewide Outcome

DCYF identified 3,278 reports of abuse or neglect that were received during the Reporting Period and subsequently screened in for investigation. In 2,549 of those 3,278 reports (77.76%) , DCYF made contact with the alleged victim or someone involved in the case or report within the timeframe mandated by DCYF statute. This statewide outcome falls short of the 90 percent threshold described in Section 8.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period which were screened in by DCYF in order to verify that contact was made within the mandated timeframe. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 3,278 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 screened-in reports (representing 3.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval.

## CPS 8.3: Timely Completion of Investigation

### Review of Universe Syntax and Statewide Outcome

As described in the previous section, DCYF identified 3,278 reports of abuse or neglect that were received during the Reporting Period and subsequently screened in for investigation. In 2,765 of those 3,278 reports (84.35%) , DCYF completed the investigation within the timeframe mandated by Rhode Island statute. Of the 2,765 investigations completed within a timely manner, 2,435 were completed within 30 days, and another 330 were completed within 45 days, and supervisor approval and reason for the extension of the investigation was documented. This statewide outcome of 84.35 percent falls short of the 85 percent threshold described in Section 8.3 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period which were screened in by DCYF in order to verify that the investigation was completed within the timeframe provided by DCYF. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 3,278 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 screened-in reports (representing 3.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #10: CASE PLANNING

## Summary of Domain

Under the terms of Section 10 of the Settlement Agreement, DCYF is being evaluated on the extent to which DCYF have case plans that meet the timeliness requirements outlined by federal statute, and include the elements that are required under the Adoption Assistance and Child Welfare Act (AACWA) of 1980.[2]

Two outcome measures are described in the Settlement Agreement:

**Case Planning 10.2:** DCYF must ensure that children in the legal custody of DCYF have case plans that meet the timeliness requirements enumerated in 42 U.S.C. §670 *et seq*. DCYF must achieve a successful outcome in 80 percent of children served in out-of-home care during the Reporting Period.

**Case Planning 10.3:** Children in out-of-home care during the Reporting Period must have in their case plans the elements required by AACWA. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 80 percent of reviewed cases.

After attaining the goals described above, as well as the goals described under Sections 6.3b and 6.4b, for two consecutive six-month periods, DCYF shall exit from monitoring under Section 10 of the Settlement Agreement.

## Case Planning 10.2: Timeliness of Case Plans

### Review of Universe Syntax and Statewide Outcome

DCYF identified 2,177 children served in out-of-home care during the Reporting Period. Of those, 124 children were not in care for at least sixty days during the Reporting Period, and were excluded from the measure. DCYF reviewed the remaining 2,053 cases and found that in 264 cases (12.86%), the child had a case plan that met the timeliness requirements dictated by statute – specifically, that the initial case plan was completed within 60 days of the child's removal from the home, or had been updated at least every six months following the initial plan. This falls short of the 80 percent threshold described in Section 4.1 of the Settlement Agreement.

---

[2] 42 U.S.C. §675(1) requires that case plans include a description of the type of setting in which a child will be placed, including a discussion of the safety and appropriateness of the placement; a plan for ensuring that the child receives safe and proper care and that the child, their parents and their foster parents receive appropriate services to facilitate reunification or permanent placement; the health and educational status of the child; a written description of transitional services to be provided to children 14 years of age or older; the steps being taken for children with a goal of adoption or placement in another permanent home to find a permanent living arrangement for the child; the steps taken on behalf of children with a goal of relative placement to determine the unsuitability of a reunification or adoption and why relative placement is in the child's best interest; and a plan for ensuring the educational stability of the child while in out-of-home care.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## Case Reviews

PCG identified a random sample of 100 children served during the period for whom DCYF found that the case plan had been updated in a timely manner (i.e., "successful" cases), and conducted a case review in order to verify that the case plan was created or updated within the timeframe described by DCYF. In each of the 100 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 2,053 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 case plans rated as a "success" (representing 37.9 percent of the statewide universe of successful cases) is concordant with DCYF's findings with a margin of error of ±10.0 percent at a 95 percent confidence interval.

# Case Planning 10.3: Case Plan Required Elements

## Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 190 cases of children in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether the case plan includes all of the elements required by AACWA.

This methodology excluded children entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those children who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all children served through the first four months of each Reporting Period, rather than the first three months.

Of the 190 cases, nine cases (4.74%) were found to include all elements required by AACWA This outcome falls short of the 80 percent threshold described in Section 6.2 of the Settlement Agreement.

## Case Reviews

PCG conducted a second-level review of each of the nine cases identified by the DCYF Quality Review team as having included all required elements in order to independently evaluate whether the case plans contained all of the required elements. In each of the nine cases reviewed, PCG arrived at the same case rating as the DCYF Quality Review team.

## Statistical Validity of Samples

DCYF evaluated outcomes for 190 of the 1,751 eligible cases statewide (representing 10.85 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±7.5 percent. PCG's second level review of the nine successful cases was not a random sample, and was not statistically valid.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #11: MALTREATMENT IN CARE

### Summary of Domain

Under the terms of Section 11 of the Settlement Agreement, DCYF is required to conduct an annual assessment of substantiated report of abuse or neglect occurring during the year, including those occurring to a child who was placed in an unlicensed kinship setting. The report will identify any systemic factors that may have contributed to the abuse/neglect, and DCYF is required to make this report publicly available, including the results of the assessment of substantiated reports, as well as recommendations for corrective actions recommended to ensure the safety of children in foster care.

DCYF's report summarizing its findings from federal fiscal year (FFY) 2018 has been published by DCYF on its website[3] as the *Annual Safety Analytic Report (FFY 18)*.

DCYF will continue to conduct and publish this annual assessment until it exits from the terms of Sections 1-10 of the Settlement Agreement.

---

[3] http://www.dcyf.ri.gov/data-evaluation/safety-data-reports.php

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #12: FOSTER HOME ARRAY

## Summary of Domain

Under the terms of Section 12 of the Settlement Agreement, DCYF is required to develop an annual recruitment and retention plan for foster homes. Under the terms of Section 12, this recruitment and retention plan must include specific targets regarding the number of foster homes to be recruited, including sub-targets for specific populations such as adolescents, as well as populations with special needs such as children with disabilities and medically fragile children. It will also include retention strategies geared toward reducing attrition among foster care providers, such as respite homes, enhanced training opportunities for foster parents and increased visitation with foster parents.

Following the publication of its first recruitment plan, DCYF must in subsequent years conduct an assessment of its implementation of the strategies outlined in the previous year's plan in order to gauge its progress in meeting the goals described in the report, and identify any systemic barriers that may have contributed to shortfalls in meeting the recruitment or retention goals. This assessment will also include recommendations for corrective actions that may be required to ensure sufficient recruitment and retention of foster homes under the terms of the plan.

DCYF's report summarizing its findings from state fiscal year (FY) 2018-2019 has been published by DCYF on its website[4] as the *FY 2019 Resource Family Recruitment Plan Reflection Summary.*

DCYF will continue to conduct and publish this annual report until it exits from the terms of Sections 1-10 of the Settlement Agreement.

---

[4] http://www.dcyf.ri.gov/news/

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION



# Data Validator Project

Preliminary Six-Month Monitoring Report
January 1, 2019–June 30, 2019 Reporting Period

Prepared for the Rhode Island Department of Children, Youth & Families

December 31, 2019



## TABLE OF CONTENTS

Table of Contents .............................................................................................................................2

Introduction and Summary .............................................................................................................1

Domain #1: Assessments ................................................................................................................5

Domain #2: Placement in Assessment & Stabilization Centers.......................................................8

Domain #3: Placement in Congregate Care ...................................................................................12

Domain #4: Sibling Placements .....................................................................................................15

Domain #5: Case Management ......................................................................................................17

Domain #6: Visitation ...................................................................................................................18

Domain #7: Licensing....................................................................................................................24

Domain #8: Child Protective Services ...........................................................................................30

Domain #10: Case Planning ..........................................................................................................34

Domain #11: Maltreatment in Care ..............................................................................................37

Domain #12: Foster Home Array ..................................................................................................38

## INTRODUCTION AND SUMMARY

As part of the terms of the Settlement Agreement described in the case of *Andrew C. v. Raimondo*, the Rhode Island Department of Children, Youth and Families (DCYF) must measure its performance on a number of outcomes designed to ensure that children in out-of-home care due to an allegation of abuse or neglect receive the highest possible level of care. These outcomes include measures designed to ensure that children are placed in the most appropriate placement setting; that steps are taken to ensure each child's connection to his or her family is maintained; that foster homes are properly licensed and that background checks are completed for all household members; that reports of abuse or neglect are screened in, investigated and completed in a timely manner; and that case plans for children in out-of-home care are updated in a timely manner and contain the elements required by law.

This Settlement Agreement was filed on January 8, 2018, and describes not only the outcome measures on which DCYF is required to measure and report on an ongoing basis, but also the manner by which the accuracy, methodology, reliability and statistical validity of the measured outcomes can be verified by an independent Data Validator. DCYF has contracted with Public Consulting Group, Inc. (PCG) to serve in that Data Validator role, starting with the first six-month Reporting Period, July–December 2018. In addition, PCG and the Rhode Island Office of the Child Advocate (OCA) jointly comprise the "Monitoring Team" mandated by the Settlement Agreement; the role of that Monitoring Team is to report on DCYF's progress each Reporting Period, and to verify the validity of cases to be excluded from individual outcome measures at the request of DCYF.

During the second Reporting Period, covering the period January–June 2019, DCYF evaluated their performance across twenty measures in order to gauge compliance with the terms of the Settlement Agreement. PCG conducted two separate evaluations for each of those twenty measures: a quantitative analysis and a qualitative case review. A quantitative analysis of data provided by DCYF identified, for the entire statewide universe of applicable cases (for example, children entering care during a period), whether DCYF met the criteria described in the Settlement Agreement for that measure; the results of these analyses were used to identify whether DCYF met the threshold for compliance described in each section of the Settlement Agreement.

Many of the measures outlined in the Settlement Agreement require that a qualitative case review be conducted for validation of the measure. These qualitative case reviews were conducted using either a data validation process or a case review instrument, dependent upon the measure. The data validation process for each measure consisted of selecting a random sample of 100 cases from the universe of eligible cases  and reviewing the original case documentation in order to verify the accuracy of the data as it is recorded in the Rhode Island Children's Information System (RICHIST) – Rhode Island's Statewide Automated Child Welfare Information System – to ensure that the data used to calculate the outcomes were valid. Case review instruments were used for validation of the measures where the data was not easily quantifiable or was not recorded electronically and were used for only six measures: Visitation 6.2 (quality of caseworker visitation), each of the four Licensing measures (7.1 through 7.4) and Case

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Planning 10.3 (case plan AACWA compliance). For these measures, PCG developed case review instruments to conduct the qualitative review of cases.

To facilitate these case reviews and the calculation of outcomes across each of the measures, DCYF supplied PCG with data files that were extracted and processed from RICHIST using syntax developed by DCYF. The second Reporting Period over which DCYF's performance was evaluated was January 1–June 30, 2019; reviews of outcomes achieved during that period were conducted by DCYF and PCG between July and December 2019. DCYF provided both the processed extracts and the syntax used to generate those extracts; for those measures for which preliminary analysis indicated that DCYF might achieve the threshold for compliance described in the Settlement Agreement, PCG observed DCYF staff in generating and transmitting the data extracts in order to ensure that the data provided represented the true and complete extract of the processing scripts.

A summary of each of the measures subject to PCG review is included below.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Rhode Island Data Validator Project

Final Six-Month Monitoring Report, July–December 2018

Prepared by Public Consulting Group, Inc.
December 31, 2019

| Outcome Measure | Target Outcome | Reporting Period 2 Outcome |
|---|---|---|
| *Assessments 1.1:* Assessments to be completed for children entering care or changing placements | 85.00% | 89.08% |
| *ASC Placements 2.2:* No child to be placed in ASC | 100.00% | 100.00% |
| *ASC Placements 2.3a:* ASC placements 14+ days have QR every 14 days | 90.00% | 100.00% |
| *ASC Placements 2.3b:* ASC placements 60+ days have approval | 95.00% | 100.00% |
| *Congregate Care 3.1:* No child to be placed in congregate care | 90.00% | 100.00% |
| *Congregate Care 3.2:* Congregate placements 90+ days get reviews every 45 days, with step-down provisions | 90.00% | 95.19% |
| *Sibling Placement 4.1:* Siblings placed together | 80.00% | 69.64% |
| *Visitation 6.1:* Monthly caseworker face-to-face visits | 95.00% | 95.31% |
| *Visitation 6.2:* Quality of face-to-face visits | 85.00% | 14.67% |
| *Visitation 6.3b:* Frequency of sibling visitation | 85.00% | 0.00% |
| *Visitation 6.4b:* Frequency of parent visitation (reunifications) | 85.00% | 10.20% |
| *Licensing 7.1:* Non-kinship placements must be licensed | 100.00% | 100.00% |
| *Licensing 7.2:* Background checks required for kinship homes | 100.00% | 69.40% |
| *Licensing 7.3:* Kinship applications completed within six months | 95.00% | 11.39% |
| *Licensing 7.4:* Background checks completed within 30 days of license renewal due date | 85.00% | 55.10% |
| *CPS 8.1:* Timely screening of reports of abuse/neglect | 90.00% | 95.26% |
| *CPS 8.2:* Response within designated timeframes | 90.00% | 90.89% |
| *CPS 8.3:* Investigations completed within designated timeframes | 85.00% | 87.13% |
| *Case Planning 10.2:* Case plans meet timeliness requirements | 80.00% | 31.26% |
| *Case Planning 10.3:* AACWA elements in case plan | 80.00% | 11.11% |

PCG conducted its initial review of the code used to derive the results in this report in early 2019. The syntax review consisted of an analysis of the database extraction code, the syntax used to derive case exclusions and evaluate outcomes, and the sample size and methodology used to calculate the percentages reported and whether they align with the criteria outlined in the Settlement Agreement. PCG's review did not uncover any irregularities in any of the syntax used to calculate the percentages for

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

any of the measures. As part of its review for the second reporting period, PCG verified that the syntax did not change from that used for calculating outcomes in the first Reporting Period, save for parameters used to generate the extracts (e.g., to filter on the start and end dates of the Reporting Period).

This report details the results of PCG's analysis of each of the twenty measures across eight domains for the January–June 2019 Reporting Period which serve to measure DCYF's compliance with the terms of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #1: ASSESSMENTS

## Summary of Domain

Under the terms of Section 1 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department conducts assessments for children entering out-of-home care due to a report or suspicion of abuse or neglect, or who change placement settings subsequent to a removal due to a report or suspicion of abuse or neglect. These assessments must be conducted within 30 days of the removal from the home; upon a change in placement, the assessment must be conducted in the period between 60 days prior to the placement change and fourteen days following the placement change.

Four exceptions to this requirement are outlined in the Settlement Agreement:

a) the placement move is to a placement setting that serves an equivalent level of need;
b) the placement change occurs because the placement is no longer available for reasons unrelated to the changing needs of the child;
c) the placement change is occurring to a child not in DCYF legal custody due to a report or suspicion of abuse or neglect, or the child is open to DCYF as a juvenile justice case and the placement change occurs due to juvenile justice or behavioral health reasons; or
d) the placement change is occurring due to an order of the Rhode Island Family Court.

One outcome measure is described in the Settlement Agreement:

**Assessments 1.1:** Children entering care or changing placements during the Reporting Period, excepting entries or placement changes falling under one of the four "exceptions" described above, must receive an assessment within the designated timeframes. DCYF must achieve a successful outcome in 85 percent of removals and placement changes.

After attaining the goal described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 1 of the Settlement Agreement.

## Assessments 1.1: All children removed/changing placements will be assessed.

### Review of Universe Syntax and Statewide Outcome

DCYF identified 577 instances of a child being removed from the home or changing placement settings during the Reporting Period, excluding those placement changes between placements that serve equivalent levels of need.

Of the 577 removals and placement changes, DCYF conducted an assessment within the designated timeframe for 514 removals and placement changes, resulting in a statewide outcome of 89.08 percent.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG identified a random sample of 100 cases out of the universe of all removals or placement changes occurring during the Reporting Period, and conducted reviews of these cases in order to verify that assessments were conducted within the timeframes mandated in the Settlement Agreement. In each of the cases reviewed, PCG found that an assessment was conducted within the designated timeframe.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 577 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 removals/placement changes (representing 17.3 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.6 percent at a 95 percent confidence interval.

## Assessments 1.2: Exceptions to Section 1.1

Section 1.2 of the Settlement Agreement describes the exceptions to DCYF's obligations under Section 1.1 (as summarized in the previous section of this report), and does not include a requirement to calculate outcomes at the statewide level.

## Assessments 1.3: Children Unavailable for Assessment

Section 1.3 of the Settlement Agreement describes the circumstances under which the requirement to conduct an assessment may be waived if the child is unavailable – for example, due to the child's runaway status, placement in a psychiatric hospital, or placement out of state. DCYF did not identify any children during the Reporting Period whose assessment was delayed due to the unavailability of the child.

## Settlement Agreement Outcome Status

DCYF has exceeded in two consecutive periods the threshold described for the one applicable measure described in Section 1 of the Settlement Agreement, and is on track to exit from the terms of this Section.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

| Outcome Measure | Target Outcome | RP1 (Jul-Dec 2018) Outcome | RP2 (Jan-Jun 2019) Outcome |
|---|---|---|---|
| Assessments 1.1 | 85.00% | 89.13% | 89.08% |
| Assessments 1.2 | 100.00% | N/A | N/A |
| Assessments 1.3 | 90.00% | N/A | N/A |

7

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

## DOMAIN #2: PLACEMENT IN ASSESSMENT & STABILIZATION CENTERS

### Summary of Domain

Under the terms of Section 2 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department minimizes the number of children placed in shelters or "assessment and stabilization centers" (ASCs). As described in the Settlement Agreement, no child should be placed in an ASC unless:

   a) the child has a demonstrated need for placement in an ASC;
   b) the placement is an emergency removal, immediate removal from the home is necessary and the ASC placement is in the best interest of the child per the professional judgment of the DCYF caseworker; or
   c) the placement at an ASC is due to an order of the Rhode Island Family Court.

For those children who are placed in an ASC, DCYF is responsible for conducting a review of the child's continued placement at least every 14 days until the child is discharged from the ASC; when a child is placed in an ASC longer than 60 days, DCYF must have documented approval for the continued placement from the DCYF Director or his/her designee.

Three outcome measures are described in the Settlement Agreement:

   **ASC 2.2:** Placements during the Reporting Period into an ASC must be for one of the three "exception" reasons described above. DCYF must achieve a successful outcome in 100 percent of ASC placements (that is, all ASC placements must be for one of the three "exception" reasons).
   **ASC 2.3a:** Children placed into an ASC must have the appropriateness of that continued placement reviewed by DCYF at least every fourteen days. DCYF must achieve a successful outcome in 90 percent of ASC placements longer than fourteen days.
   **ASC 2.3b:** Children placed into an ASC for longer than 60 days must have the written approval of the Director or her designee for the continued placement. DCYF must achieve a successful outcome in 95 percent of ASC placements longer than 60 days.

After attaining all three of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 2 of the Settlement Agreement.

### ASC 2.2: No placements in ASCs

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 52 children who were placed in an ASC during the Reporting Period. In each of the 52 cases, DCYF had an "exception" reason documented for the placement, resulting in a statewide outcome of 100 percent. This meets the 100 percent threshold described in Section 2.2 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



### Case Reviews

PCG conducted a case review of each of the 52 placements into an ASC during the period in order to verify that the "exception" justifying the ASC placement was appropriately documented within RICHIST. In each of the 52 cases, PCG found that DCYF had appropriately documented the reason for the placement.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 52 ASC placements occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of cases, the statistical validity of PCG's case review did not need to be calculated.

## ASC 2.3a: Reviews for 14-day ASC placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 41 children whose placement in an ASC reached or exceeded the 14-day threshold during the Reporting Period. In each of the 41 cases, DCYF conducted a review at least every fourteen days, resulting in a statewide outcome of 100 percent. This exceeds the 90 percent threshold described in Section 2.3a of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG conducted a case review of each of the 41 placements of longer than fourteen days in an ASC which overlapped any point of the Reporting Period in order to verify that DCYF conducted reviews of the appropriateness of the continued placement at least every fourteen days. In each of the 41 cases, PCG found that DCYF had conducted such a review and documented the review correctly.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 41 ASC placements of longer than fourteen days in an ASC which overlapped any point of the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of eligible cases, the statistical validity of PCG's case review did not need to be calculated.

## ASC 2.3b: Approval for 60-day ASC placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified five children who reached their 61st day of placement in an ASC during the Reporting Period. Of the five placements so identified, DCYF obtained written approval from the Director or her designee on or prior to the child's 60th day of placement in the ASC. The statewide outcome on this measure during the first Reporting Period is 100 percent, exceeding the 95 percent threshold described in Section 2.3a of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION



## Case Reviews

PCG conducted a case review of each of the five placements in an ASC reaching their 61st day during the Reporting Period in order to verify that written approval from the Director or his/her designee was documented. In each of the five cases, PCG found that DCYF had obtained the approval of the DCYF Director or his/her designee on or before the child's 60th day of placement in the ASC.

## Statistical Validity of Samples

DCYF evaluated outcomes for all five ASC placements reaching their 61st day during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG conducted a case review on all eligible cases, the statistical validity of PCG's case review did not need to be calculated.

## Settlement Agreement Outcome Status

DCYF has exceeded in two consecutive periods the threshold described for the three measures described in Section 2 of the Settlement Agreement, and is on track to exit from the terms of this Section.

| Outcome Measure | Target Outcome | RP1 (Jul-Dec 2018) Outcome | RP2 (Jan-Jun 2019) Outcome |
|---|---|---|---|
| ASC Placements 2.2 | 100% | 100.00% | 100.00% |
| ASC Placements 2.3a | 90% | 100.00% | 100.00% |
| ASC Placements 2.3b | 95% | 100.00% | 100.00% |

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #3: PLACEMENT IN CONGREGATE CARE

## Summary of Domain

Under the terms of Section 3 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department minimizes the number of children placed in congregate care settings. As described in the Settlement Agreement, no child should be placed in a congregate care setting unless:

a) the child has treatment needs which necessitate placement in a congregate care setting; or the child has needs that cannot be addressed in a family-like setting;

b) the child is awaiting step-down from congregate care to an appropriate family-like setting;

c) the placement is an emergency removal necessitating immediate removal from the home and the placement in a congregate care setting is in the best interest of the child per the professional judgment of the DCYF caseworker while DCYF works to identify a placement in an appropriate family-like setting; or

d) the placement in a congregate care setting is due to an order of the Rhode Island Family Court.

For those children who are placed in a congregate care setting for 90 days or longer, DCYF is responsible for conducting a review of the child's continued placement at least every 45 days until the child is discharged from the congregate care setting. When a determination is made that a step-down to a more appropriate level of placement is warranted, DCYF will make that step-down within 30 days of the determination. Where the child is not placed into a family-like setting within that 30-day timeframe, the case must be reviewed by the Associate Director of the Permanency Division (or his/her designee) every fifteen days following the 45th day after which the step-down decision was made.

Two outcome measures are described in the Settlement Agreement:

**Congregate Care 3.1:** Placements during the Reporting Period into a congregate care setting must be for one of the four "exception" reasons described above. DCYF must achieve a successful outcome in 90 percent of ASC placements (that is, 90 percent of congregate placements must be for one of the four "exception" reasons.

**Congregate Care 3.2:** Children placed into a congregate care setting for 90 days or longer must have the appropriateness of that continued placement reviewed by DCYF at least every 45 days. DCYF must conduct these reviews in 90 percent of congregate care placements lasting 90 days or longer.

After attaining each of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 3 of the Settlement Agreement.

## Congregate Care 3.1: No children placed in congregate setting unless exception documented

### Review of Universe Syntax and Statewide Outcome

DCYF identified 66 children who were placed in a congregate care setting during the Reporting Period, excluding children placed into an Acute Residential Treatment Services (ARTS) setting. In each of those

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

66 cases, DCYF documented an "exception" reason for the placement, resulting in a statewide outcome of 100 percent. This exceeds the 90 percent threshold described in Section 3.1 of the Settlement Agreement.



### Case Reviews

PCG conducted a case review of each of the 66 eligible placements into a congregate care setting during the period in order to verify that the "exception" justifying the placement was appropriately documented within RICHIST. In each of the 66 cases, PCG found that DCYF had appropriately documented the reason for the placement.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 66 placements into a congregate care setting occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

## Congregate Care 3.2: Reviews of 90+-Day Congregate Care Placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 104 children who reached their 90th day of placement in a congregate care setting during the Reporting Period, or who had been placed in a congregate care setting for at least 90 days as of the first day of the Reporting Period. In 99 of those 104 cases, DCYF conducted a review of the appropriateness of that continued placement at least every 45 days following the 90th day of placement. This review identified 95.19 percent of placements having received timely reviews on an ongoing basis, exceeding the 90 percent threshold described in Section 3.2 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

Of the 104 cases involving a child who reached their 90th day of placement in a congregate care setting during the Reporting Period, or who had been placed in a congregate care setting for at least 90 days as of the first day of the Reporting Period, PCG reviewed the 99 cases identified by DCYF as having achieved a successful outcome on this measure – that is, that DCYF had conducted a review of the appropriateness of the continued placement at least every 45 days following the 90th day in the congregate placement. PCG found that DCYF had conducted the reviews every 45 days as required in each of the 99 cases.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 104 placements into a congregate care setting statewide that reached their 90th day during the Reporting Period or which exceeded 90 days in length as of the first day of the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of successful cases, the statistical validity of PCG's case review did not need to be calculated.

## Settlement Agreement Outcome Status

DCYF has exceeded in two consecutive periods the threshold described for both measures described in Section 3 of the Settlement Agreement, and is on track to exit from the terms of this Section.

| Outcome Measure | Target Outcome | RP1 (Jul-Dec 2018) Outcome | RP2 (Jan-Jun 2019) Outcome |
|---|---|---|---|
| Congregate Care 3.1 | 90% | 95.56% | 100.00% |
| Congregate Care 3.2 | 90% | 94.67% | 95.19% |

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #4: SIBLING PLACEMENTS

### Summary of Domain

Under the terms of Section 4 of the Settlement Agreement, DCYF is being evaluated on the extent to which siblings[1] who enter out-of-home care within 30 days of each other, or whose placement changes, are placed in the same placement setting. As described in the Settlement Agreement, siblings entering care or who change placements should be placed together unless:

a) DCYF determines that co-placement would be harmful and/or not in the best interest of at least one sibling;
b) at least one of the siblings has treatment needs that necessitate placement in a specialized facility;
c) the size of the sibling group makes co-placement impossible due to licensing regulations;
d) it is in the best interest of at least one sibling to be placed into a kinship setting in which the other siblings cannot be placed; or
e) a specific placement is due to an order of the Rhode Island Family Court.

One outcome measure is described in the Settlement Agreement:

**Sibling Placement 4.1:** Siblings removed or changing placements during the Reporting Period must be placed in the same setting unless one of the five "exception" reasons described above applies. DCYF must draw a random sample of eligible "events" to review (siblings entering care, or a change in placement for at least one member of a sibling group in care), and must achieve a successful outcome in 80 percent of reviewed cases.

After attaining the goal described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 4 of the Settlement Agreement.

### Sibling Placement 4.1: Siblings Placed Together

#### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 72 cases in which siblings entered care during the period, or were placed during the period and the placement setting of at least one sibling changed. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to identify (a) whether an "exception" to the Settlement Agreement requirements applied to the siblings; and if not (b) whether the siblings were placed together.

DCYF documented 16 cases in which a valid "exception" existed to the requirement that the siblings be placed together; of the remaining 56 cases, DCYF found that in 39 cases (69.64%) the siblings were placed together upon their entry into out-of-home care or the placement change of at least one sibling.

---

[1] For the purposes of this measure, "siblings" are defined as children who have at least one parent in common through birth or adoption, who lived together immediately prior to placement and who entered placement within 30 days of one another.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

This statewide outcome of 69.64 percent falls short of the 80 percent threshold described in Section 4.1 of the Settlement Agreement.



### Case Reviews

PCG conducted a case review of each of the 39 cases where DCYF (a) did not note that an "exception" to the requirements of the Settlement Agreement applied, and (b) found that the siblings had been placed together. In each of the 39 cases reviewed, PCG verified that the siblings were placed in the same setting upon their removal from the home or placement change.

### Statistical Validity of Samples

DCYF evaluated outcomes for 72 of 366 eligible cases statewide (representing 19.67 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±12.6 percent. PCG's second-level review was conducted against each of the 39 "successful" cases; since PCG did not review a random sample of cases, the statistical validity of PCG's case review did not need to be calculated.

### Settlement Agreement Outcome Status

DCYF has not yet attained the threshold described for the one measure described in Section 4 of the Settlement Agreement, and will continue under the terms of this Section through Reporting Period 3.

| Outcome Measure | Target Outcome | RP1 (Jul-Dec 2018) Outcome | RP2 (Jan-Jun 2019) Outcome |
|---|---|---|---|
| Sibling Placement 4.1 | 80.00% | 73.33% | 69.64% |

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

## DOMAIN #5: CASE MANAGEMENT

### Summary of Domain

Under the terms of Section 5 of the Settlement Agreement, DCYF is tasked with attaining casework goals as described in the areas of visitation (Section 6 of the Settlement Agreement) and case planning (Section 10).

No additional outcome measures – beyond those described in Sections 6 and 10 – are defined in Section 5 of the Settlement Agreement.

DCYF will utilize the results from the first Reporting Period to establish a baseline of current DCYF compliance with the case plan content and timeliness elements evaluated under the terms of Section 10 of the Settlement Agreement. Starting with the second Reporting Period (January–June 2019), should DCYF not attain the commitments outlined in Sections 6 and 10 in two consecutive periods, DCYF will be responsible for conducting a workload study in consultation with the Monitoring Team.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #6: VISITATION

## Summary of Domain

Under the terms of Section 6 of the Settlement Agreement, DCYF is being evaluated on the extent to which children in out-of-home care are visited by caseworkers on a regular basis; that those visits appropriately assess issues pertaining to the safety, permanency and well-being of the children; and that visits between siblings in care, and between children in care and their parents for cases with a goal of reunification, occur as often as described in the case plan.

Four outcome measures are described in the Settlement Agreement:

**Visitation 6.1:** Each full calendar month that a child is in out-of-home placement, they should experience at least one face-to-fact visit with a member of the DCYF Care Team. DCYF must achieve a successful outcome in 95 percent of full calendar months that children are in out-of-home care.

**Visitation 6.2:** Children in out-of-home care during the Reporting Period must have visitation that meet the federal Child & Family Services Review (CFSR) criteria to be rated as a "strength" in terms of frequency and quality. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 85 percent of reviewed cases.

**Visitation 6.3b:** Siblings in out-of-home care during the Reporting Period must have visitation between the siblings which occurs at the frequency indicated in their case plans. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 85 percent of reviewed cases.

**Visitation 6.4b:** Children in out-of-home care during the Reporting Period for whom the case plan goal is reunification must have visitation with their parents that occurs at the frequency indicated in their case plans. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 85 percent of reviewed cases.

Upon attaining the goals described for Visitation 6.1 for two consecutive Reporting Periods, DCYF shall exit from the terms of the Settlement Agreement for that measure. Similarly, upon attaining the goals described for Visitation 6.2 for two consecutive Reporting Periods, DCYF shall exit from the terms of the Settlement Agreement for that measure.

The Visitation 6.3b and Visitation 6.4b are incorporated into Section 10 of the Settlement Agreement (Case Planning), and the criteria for DCYF's exit from the terms of the Settlement Agreement for those measures are described in the "Domain #10: Case Planning" section of this report.

## Visitation 6.1: Caseworker Face-to-Face Visits with Children

### Review of Universe Syntax and Statewide Outcome

DCYF identified 2,074 children who were in care at least one full calendar month during the Reporting Period, spanning 10,536 full calendar months. In 10,042 of those months, the child in care experienced

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

at least one face-to-face visit with a member of the DCYF Care Team, resulting in a statewide outcome of 95.31 percent. This outcome exceeds the 95 percent threshold described in Section 6.1 of the Settlement Agreement.



## Case Reviews

PCG identified a random sample of 100 children placed for at least one full calendar month during the Reporting Period, and conducted a case review in order to verify that DCYF had appropriately documented that the face-to-face visit occurred with the child during each full calendar month that the child was in care during the Reporting Period. In each of the 100 cases reviewed, PCG found that visitation was appropriately documented.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 2,074 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 children in care for at least one full calendar month during the Reporting Period (representing 4.8 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.0 percent at a 95 percent confidence interval.

## Visitation 6.2: Quality of Face-to-Face Visits

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 150 cases of children in care at any point during the first four months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether the quality of the visits meets the criteria used for the federal CFSR to rate as case as a "strength."

This methodology excluded children entering care during the final sixty days of the period since the timeframe for developing a child's case plan on entering out-of-home care is sixty days. Children entering out-of-home care during those final sixty days of the Reporting Period will either exit prior to the end of

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Rhode Island Data Validator Project
Final Six-Month Monitoring Report, July–December 2018

Prepared by Public Consulting Group, Inc.
December 31, 2019

the period (and prior to the elapsing of the sixty-day timeframe for the creation of a case plan), or will remain in care into the next Reporting Period, during which visitation will be evaluated on this measure.

Of the 150 cases reviewed by DCYF, 22 cases (14.67%) were rated as a "strength." This outcome falls short of the 85 percent threshold described in Section 6.2 of the Settlement Agreement.



### Case Reviews
PCG conducted a second-level review of 100 of the 150 cases reviewed by DCYF, and evaluated the quality of visitation using the same federal CFSR instrument and case review criteria employed by the DCYF Quality Review Team. The purpose of this case review was to verify the findings of the DCYF review; of the 100 cases subject to this second-level review, fourteen had been rated as a "strength" by the DCYF Quality Review team, and 86 had been rated as an "area needing improvement." In each of the 100 cases reviewed, PCG agreed with the rating assigned by the DCYF Quality Review team.

### Statistical Validity of Samples
DCYF evaluated outcomes for 150 of the 1,689 eligible cases statewide (representing 8.88 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±8.3 percent. PCG's second-level review of 100 cases is statistically valid at a 95 percent confidence interval with a margin of error of ±12.6 percent

## Visitation 6.3b: Sibling Visitation

### Review of Sampling Syntax and Statewide Sample
DCYF pulled a random sample of 42 cases (of 173 cases statewide) involving siblings in care at any point during the first four months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether visitation between the siblings occurred at (at minimum) the frequency described in the siblings' case plans.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

This methodology excluded sibling groups entering care during the final sixty days of the period since the timeframe for developing a child's case plan on entering out-of-home care is sixty days. Children entering out-of-home care during those final sixty days of the Reporting Period will either exit prior to the end of the period (and prior to the elapsing of the sixty-day timeframe for the creation of a case plan), or will remain in care into the next Reporting Period, during which visitation will be evaluated on this measure.

Of the 42 cases reviewed, no cases (0.00%) were found to have visitation that occurred at least as often as what was stipulated in the siblings' case plan. In addition to cases where visitation did not occur at the frequency recommended in the case plan, cases where the appropriate frequency of visits between siblings was not specified in the case plan were also counted as non-compliant on this measure. This outcome falls short of the 85 percent threshold described in Section 6.3b of the Settlement Agreement.

## Case Reviews

PCG conducted a second-level review of each of the forty-two cases reviewed by DCYF, and evaluated whether DCYF's findings were consistent with the intended frequency of visitation described in the case plan and the number of visits occurring during the Reporting Period; in all cases, PCG found DCYF's findings to be accurate.



## Statistical Validity of Samples

DCYF evaluated outcomes for 42 of the 173 eligible cases statewide (representing 24.28 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±16.8 percent. PCG's second-level review was conducted against each of the 42 cases; since PCG did not review a random sample of cases, the statistical validity of PCG's case review did not need to be calculated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

## Visitation 6.4b: Parent-Child Visitation

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 98 cases (of 995 cases statewide) involving children in out-of-home placements with a goal of reunification. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether visitation between the child and parent occurred at at least the frequency required in the child's case plan, excepting cases where parents are not attending visits despite DCYF employing measures to ensure the parents' ability to participate in the visit.

This methodology excluded sibling groups entering care during the final sixty days of the period since the timeframe for developing a child's case plan on entering out-of-home care is sixty days. Children entering out-of-home care during those final sixty days of the Reporting Period will either exit prior to the end of the period (and prior to the elapsing of the sixty-day timeframe for the creation of a case plan), or will remain in care into the next Reporting Period, during which visitation will be evaluated on this measure.

Of the 98 cases reviewed, ten cases (10.20%) were found to have visitation between the parent and the child that occurred at least as often as what was required by the case plan. Similar to measure 6.3b, cases where the appropriate frequency of visits between the parent and child was not specified in the case plan were also counted as non-compliant on this measure. This outcome falls short of the 85 percent threshold described in Section 6.4b of the Settlement Agreement.



### Case Reviews

PCG conducted a second-level review of each of the 98 cases reviewed by DCYF, and evaluated whether DCYF's findings were consistent with the intended frequency of parent-child visitation described in the case plan and the number of visits occurring during the Reporting Period; in all cases, PCG found DCYF's findings to be accurate.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

### Statistical Validity of Samples

DCYF evaluated outcomes for 98 of the 995 eligible cases statewide (representing 9.85 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±10.4 percent. PCG's second-level review was conducted against each of the 98 cases; since PCG did not review a random sample of cases, the statistical validity of PCG's case review did not need to be calculated.

### Settlement Agreement Outcome Status

Although DCYF attained the threshold described in the Settlement Agreement for measure 6.1 for the first time during the Reporting Period, the Department has not yet attained the threshold described for each of the four measures described in Section 6 of the Settlement Agreement, and will continue under the terms of this Section through Reporting Period 3.

| Outcome Measure | Target Outcome | RP1 (Jul-Dec 2018) Outcome | RP2 (Jan-Jun 2019) Outcome |
|---|---|---|---|
| Visitation 6.1 | 95% | 94.13% | 95.31% |
| Visitation 6.2 | 85% | 16.76% | 14.67% |
| Visitation 6.3b | 85% | 3.28% | 0.00% |
| Visitation 6.4b | 85% | 12.62% | 10.20% |

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #7: LICENSING

## Summary of Domain

Under the terms of Section 7 of the Settlement Agreement, DCYF is being evaluated on the extent to which non-kinship foster homes into which children have been placed are appropriately licensed; that background checks are conducted for all members of a prospective foster home who are age 18 or older; that kinship foster home license applications are completed in a timely manner; and that background checks are conducted in a timely manner for all foster homes for which a license is due for renewal and in which a child is placed during the Reporting Period.

Four outcome measures are described in the Settlement Agreement:

**Licensing 7.1:** No child may be placed in a non-kinship home without an active license, unless the placement was made pursuant to an order of the Rhode Island Family Court. DCYF must achieve a successful outcome in 100 percent of placements into a non-kinship home during the Reporting Period.

**Licensing 7.2:** No child may be placed into a prospective kinship foster home (that is, one where licensure is pending) unless background checks have been conducted for all household members age 18 or older, excepting those cases where the placement was made pursuant to an order of the Rhode Island Family Court. DCYF must achieve a successful outcome in 100 percent of placements into a foster home during the Reporting Period where licensure is pending.

**Licensing 7.3:** Kinship foster home licensing applications must be completed within six months of the date of application. DCYF must achieve a successful outcome in 95 percent of cases where a licensing application was submitted during the Reporting Period.

**Licensing 7.4:** DCYF must conduct background checks for all household members age 18 or older in foster homes within 30 days of the date that the home's licensure renewal is due. DCYF must achieve a successful outcome in 85 percent of cases where a renewal was due during the Reporting Period.

After attaining the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 7 of the Settlement Agreement.

## Licensing 7.1: Licensing of Non-Kinship Placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 436 placements into a non-kinship foster home during the Reporting Period. In each of those 436 placements, DCYF identified that the non-kinship foster home was licensed during the entire time the child was placed there during the Reporting Period, resulting in a statewide outcome of 100 percent. This meets the 100 percent threshold described in the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG identified a random sample of 100 placements into a non-kinship foster home occurring during the Reporting Period, and conducted a case review in order to verify that the foster home license was active the entire period the child was placed in that home during the Reporting Period. In each of the 100 cases reviewed, PCG found that the foster home license was active the entire timeframe under review.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 436 placements statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 removals/placement changes (representing 22.9 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.9 percent at a 95 percent confidence interval.

## Licensing 7.2: Background Checks for Kinship Homes

### Review of Universe Syntax and Statewide Outcome

DCYF identified 399 placements into a kinship foster home during the Reporting Period where the foster home was pending licensure. In 277 of those 399 placements, DCYF identified that background checks had been conducted for all household members age 18 or older, resulting in a statewide outcome of 69.42 percent. This outcome falls short of the 100 percent threshold described in Section 7.2 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG identified a random sample of 100 placements into a foster home occurring during the Reporting Period where the foster home was pending licensure, and conducted a case review in order to identify whether backgrounds checks had been conducted on all household members age 18 or older. In each of the 100 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 399 applicable placements statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 placements (representing 25.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.9 percent at a 95 percent confidence interval.

## Licensing 7.3: Timely Completion of Kinship License Applications

### Review of Universe Syntax and Statewide Outcome

As this measure evaluates DCYF's compliance over a six-month timeframe, measured prospectively from the time each kinship home submits its application for licensure, compliance on this measure is being evaluated based on applications submitted during the <u>prior</u> Reporting Period.

DCYF identified 254 kinship home applications filed during the prior Reporting Period. In 40 of those 254 cases, an order of the Rhode Island Family Court mandated placement with the kinship provider, and were excluded from the analysis. In 56 of the remaining 214 kinship licensing applications, the child was discharged prior to the expiration of the six-month deadline for completing the application, leaving 158 applications to be evaluated on this outcome.[2] Of those 158 kinship licensing applications, DCYF completed the application within six months for eighteen applications, resulting in a statewide outcome

---

[2] Although the initial draft of the report from Reporting Period #1 did not reflect these exclusions, those exclusions are reflected in the outcomes presented in this report for both Reporting Periods.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

of 11.39 percent. This falls short of the 95 percent threshold described in Section 7.3 of the Settlement Agreement.



### Case Reviews

PCG conducted a case review on each of the eighteen compliant cases in order to identify whether the application was completed within the six-month timeframe described in Section 7.3 of the Settlement Agreement. In each of the eighteen cases reviewed, PCG found that the outcome reported by DCYF was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 158 applicable kinship home applications submitted statewide during May and June 2018, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

## Licensing 7.4: Background Checks within 30 Days of License Renewal

### Review of Universe Syntax and Statewide Outcome

DCYF identified 90 foster homes where the license was due for renewal during the Reporting Period, and a child was placed in the home during the Reporting Period. For 46 of those 90 foster homes, DCYF identified that background checks were conducted for all household members age 18 or older within 30 days of the due date for the renewal, and that a home inspection was conducted within 30 days of that same due date. This statewide outcome of 51.11 percent falls short of the 85 percent threshold described in Section 7.4 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG conducted a case review of the 46 foster homes where DCYF's performance was evaluated as a "success" on this measure in order to identify whether background checks had been conducted on all household members age 18 or older, and whether a home inspection had been conducted within 30 days of the license due date. In each of the 46 cases reviewed, PCG found that the requisite inspections and background checks had been conducted during the required timeframe.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 90 applicable kinship home applications due during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

## Settlement Agreement Outcome Status

Although DCYF has attained the threshold described in the Settlement Agreement for measure 7.1 for each of the last two Reporting Periods, the Department has not yet attained the threshold described for each of the four measures described in Section 7 of the Settlement Agreement, and will continue under the terms of this Section through Reporting Period 3.

| Outcome Measure | Target Outcome | RP1 (Jul-Dec 2018) Outcome | RP2 (Jan-Jun 2019) Outcome |
|---|---|---|---|
| Licensing 7.1 | 100% | 100.00% | 100.00% |
| Licensing 7.2 | 100% | 70.83% | 69.40% |
| Licensing 7.3 | 95% | 45.00% | 11.39% |
| Licensing 7.4 | 85% | 23.29% | 55.10% |

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# DOMAIN #8: CHILD PROTECTIVE SERVICES

## Summary of Domain

Under the terms of Section 8 of the Settlement Agreement, DCYF is being evaluated on the extent to which DCYF screens in reports of abuse or neglect in a timely manner; whether they respond to screened-in reports in a timely manner; and whether they complete their investigation of screened-in reports in a timely manner.

Three outcome measures are described in the Settlement Agreement:

**CPS 8.1:** DCYF must make a screening decision within timeframes consistent with Rhode Island statute – 30 minutes for reports designated as having an "emergency" priority level; two hours for reports designated as having an "immediate" priority level; and four hours for reports designated as having a "routine" priority level. DCYF must achieve a successful outcome in 90 percent of reports received during the Reporting Period.

**CPS 8.2:** For reports of abuse or neglect that are screened in, DCYF must respond to the report by making contact or attempting to make contact with the victim or someone involved in the case within timeframes described by Rhode Island statute – two hours for reports designated as having an "emergency" priority level; twelve hours for reports designated as having an "immediate" priority level; and 48 hours for reports designated as having a "routine" priority level. DCYF must achieve a successful outcome in 90 percent of screened-in reports received during the Reporting Period.

**CPS 8.3:** For reports of abuse or neglect that are screened in, DCYF must complete the investigation within 30 days of the report, or within 45 days if the investigation is continued due to circumstances beyond the control of DCYF; investigations completed in 31 to 45 days must have supervisor approval documented for the extension. DCYF must achieve a successful outcome in 85 percent of screened-in reports received during the Reporting Period.

After attaining each of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 8 of the Settlement Agreement.

## CPS 8.1: Timely Screening Decisions

### Review of Universe Syntax and Statewide Outcome

DCYF identified 4,477 reports of abuse or neglect that were received during the Reporting Period, excluding those calls that were classified as "Information & Referral." In 4,265 of those 4,477 reports (95.26%), DCYF made a screening decision within the timeframes outlined by statute. This statewide outcome exceeds the 90 percent threshold described in Section 8.1 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Rhode Island Data Validator Project

Final Six-Month Monitoring Report, July–December 2018

Prepared by Public Consulting Group, Inc.
December 31, 2019



## Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period in order to verify that the screening decision was made within the timeframe mandated by Rhode Island statute. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 4,477 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 reports (representing 2.2 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval.

## CPS 8.2: Timely Face-to-Face Contact within Child

### Review of Universe Syntax and Statewide Outcome

DCYF identified 3,723 reports of abuse or neglect that were received during the Reporting Period and subsequently screened in for investigation. In 3,384 of those 3,723 reports (90.89%), DCYF made contact with the alleged victim or someone involved in the case or report within the timeframe mandated by DCYF statute. This statewide outcome exceeds the 90 percent threshold described in Section 8.2 of the Settlement Agreement.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period which were screened in by DCYF in order to verify that contact was made within the mandated timeframe. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 3,723 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 screened-in reports (representing 2.7 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval.

## CPS 8.3: Timely Completion of Investigation

### Review of Universe Syntax and Statewide Outcome

As described in the previous section, DCYF identified 3,723 reports of abuse or neglect that were received during the Reporting Period and subsequently screened in for investigation. In 3,244 of those 3,723 reports (87.13%), DCYF completed the investigation within the timeframe mandated by Rhode Island statute. Of the 3,244 investigations completed within a timely manner, 2,801 were completed within 30 days, and another 443 were completed within 45 days with supervisor approval and a documented reason for the extension of the investigation. This statewide outcome of 87.13 percent exceeds the 85 percent threshold described in Section 8.3 of the Settlement Agreement.

## Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period which were screened in by DCYF in order to verify that the investigation was completed within the timeframe provided by DCYF. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018

## Statistical Validity of Samples

DCYF evaluated outcomes for all 3,723 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 screened-in reports (representing 2.7 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #10: CASE PLANNING

### Summary of Domain

Under the terms of Section 10 of the Settlement Agreement, DCYF is being evaluated on the extent to which DCYF have case plans that meet the timeliness requirements outlined by federal statute, and include the elements that are required under the Adoption Assistance and Child Welfare Act (AACWA) of 1980.[3]

Two outcome measures are described in the Settlement Agreement:

**Case Planning 10.2:** DCYF must ensure that children in the legal custody of DCYF have case plans that meet the timeliness requirements enumerated in 42 U.S.C. §670 *et seq*. DCYF must achieve a successful outcome in 80 percent of children served in out-of-home care during the Reporting Period.

**Case Planning 10.3:** Children in out-of-home care during the Reporting Period must have in their case plans the elements required by AACWA. DCYF must draw a random sample of eligible cases to review, and must achieve a successful outcome in 80 percent of reviewed cases.

After attaining the goals described above, as well as the goals described under Sections 6.3b and 6.4b, for two consecutive six-month periods, DCYF shall exit from monitoring under Section 10 of the Settlement Agreement.

### Case Planning 10.2: Timeliness of Case Plans

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 1,990 children served in out-of-home care during the Reporting Period. Of those, 152 children were not in care for at least sixty days during the Reporting Period, and were excluded from the measure. DCYF reviewed the remaining 1,990 cases and found that in 622 cases (31.26%), the child had a case plan that met the timeliness requirements dictated by statute – specifically, that the initial case plan was completed within 60 days of the child's removal from the home, or had been updated at least every six months following the initial plan. This falls short of the 80 percent threshold described in Section 10.2 of the Settlement Agreement.

---

[3] 42 U.S.C. §675(1) requires that case plans include a description of the type of setting in which a child will be placed, including a discussion of the safety and appropriateness of the placement; a plan for ensuring that the child receives safe and proper care and that the child, their parents and their foster parents receive appropriate services to facilitate reunification or permanent placement; the health and educational status of the child; a written description of transitional services to be provided to children 14 years of age or older; the steps being taken for children with a goal of adoption or placement in another permanent home to find a permanent living arrangement for the child; the steps taken on behalf of children with a goal of relative placement to determine the unsuitability of a reunification or adoption and why relative placement is in the child's best interest; and a plan for ensuring the educational stability of the child while in out-of-home care.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Final Six-Month Monitoring Report, July–December 2018



## Case Reviews

PCG identified a random sample of 100 children served during the period for whom DCYF found that the case plan had been updated in a timely manner (i.e., "successful" cases) and conducted a case review in order to verify that the case plan was created or updated within the timeframe described by DCYF. In each of the 100 cases reviewed, PCG found that the outcome reported by DCYF was accurate.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 1,990 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 case plans rated as a "success" (representing 16.1 percent of the statewide universe of 622 successful cases) is concordant with DCYF's findings with a margin of error of ±10.6 percent at a 95 percent confidence interval.

## Case Planning 10.3: Case Plan Required Elements

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 63 cases of children in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review (QR) team in order to evaluate whether the case plan included all of the elements required by AACWA.

This methodology excluded children entering care during the final sixty days of the period since the timeframe for developing a child's case plan on entering out-of-home care is sixty days. Children entering out-of-home care during those final sixty days of the Reporting Period will either exit prior to the end of the period (and prior to the elapsing of the sixty-day timeframe for the creation of a case plan), or will remain in care into the next Reporting Period, during which case planning will be evaluated on this measure.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

Of the 63 cases, seven (11.11%) were found to include all elements required by AACWA.[4] This outcome falls short of the 80 percent threshold described in Section 6.2 of the Settlement Agreement.



### Case Reviews

PCG's review of DCYF's findings is pending while the Department researches a potential issue with the data extract.

### Statistical Validity of Samples

DCYF evaluated outcomes for 63 of the 1,689 eligible cases statewide (representing 3.73 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±12.6 percent. PCG's second level review of the seven successful cases was not a random sample, and does not require a calculation of statistical validity.

---

[4] As described in the Introduction, these results should be considered preliminary while a potential issue involving the data extract underlying this measure is investigated.

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #11: MALTREATMENT IN CARE

### Summary of Domain

Under the terms of Section 11 of the Settlement Agreement, DCYF is required to conduct an annual assessment of substantiated reports of abuse or neglect occurring during the year, including those occurring to a child who was placed in an unlicensed kinship setting. The report will identify any systemic factors that may have contributed to the abuse/neglect, and DCYF is required to make this report publicly available, including the results of the assessment of substantiated reports, as well as recommendations for corrective actions recommended to ensure the safety of children in foster care.

DCYF's report summarizing its findings from federal fiscal year (FFY) 2018 has been published by DCYF on its website[5] as the *Annual Safety Analytic Report (FFY 18)*.

DCYF will continue to conduct and publish this annual assessment until it exits from the terms of Sections 1-10 of the Settlement Agreement.

---

[5] http://www.dcyf.ri.gov/data-evaluation/safety-data-reports.php

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

## DOMAIN #12: FOSTER HOME ARRAY

### Summary of Domain

Under the terms of Section 12 of the Settlement Agreement, DCYF is required to develop an annual recruitment and retention plan for foster homes. Under the terms of Section 12, this recruitment and retention plan must include specific targets regarding the number of foster homes to be recruited, including sub-targets for specific populations such as adolescents, as well as populations with special needs such as children with disabilities and medically fragile children. It will also include retention strategies geared toward reducing attrition among foster care providers, such as respite homes, enhanced training opportunities for foster parents and increased visitation with foster parents.

Following the publication of its first recruitment plan, DCYF must in subsequent years conduct an assessment of its implementation of the strategies outlined in the previous year's plan in order to gauge its progress in meeting the goals described in the report, and identify any systemic barriers that may have contributed to shortfalls in meeting the recruitment or retention goals. This assessment will also include recommendations for corrective actions that may be required to ensure sufficient recruitment and retention of foster homes under the terms of the plan.

DCYF's report summarizing its findings from state fiscal year (FY) 2018–2019 has been published by DCYF on its website[6] as the *FY 2019 Resource Family Recruitment Plan Reflection Summary.*

DCYF will continue to conduct and publish this annual report until it exits from the terms of Sections 1-10 of the Settlement Agreement.

---

[6] http://www.dcyf.ri.gov/news/

CONFIDENTIAL WORKING DRAFT – NOT FOR DISTRIBUTION

# Exhibit iii

# Rhode Island Department of Children, Youth & Families
## *Andrew C. v Raimondo* Monitoring Team Report
### Amendment to Reports from Reporting Periods #1 and #2

As outlined in the Settlement Agreement described in the case of Andrew C. v. Raimondo, the Monitoring Team is comprised of the Office of the Child Advocate (OCA) and the Data Validator. The Data Validator has since been hired by the Rhode Island Department of Children, Youth and Families (DCYF) and can be identified as Public Consulting Group, Inc. (PCG). As outlined in Section 2(d) of the Settlement Agreement, the Data Validator is the "…final arbiter of the timeliness, accuracy of the methodology, as well as the statistical validity and reliability of the DCYF data…." As outlined in Section 2(f) of the Settlement Agreement, the Office of the Child Advocate (OCA) shall provide oversight to the commitments in the Agreement. The OCA "…shall receive and review the progress reports that have been determined to be valid and reliable by the Data Validator." The OCA "…shall confirm whether the commitment has been met or not met."

As part of its responsibility under the terms of the Settlement Agreement, the Monitoring Team produced reports summarizing DCYF's performance on a series of outcomes during the six-month reporting periods of July 1, 2018–December 31, 2018 (Reporting Period #1) and January 1, 2019–June 30, 2019 (Reporting Period #2).

Section 2 of the Settlement Agreement describes the commitment of DCYF to not place any children in an Assessment and Stabilization Center (ASC), unless a permitted "exception" applies, one of which is that:

> *… The placement is an emergency removal and immediate removal is necessary, and using professional judgment this placement is in the best interest of the child."*

Similarly, Section 3 of the Settlement Agreement describes the commitment of DCYF to minimize the number of children placed in a congregate setting, unless a permitted "exception" applies. Similar to Section 2, Section 3 indicates that a valid reason for such an exception is that

> *… The placement is an emergency removal and immediate removal is necessary, and using professional judgment this placement is in the best interest of the child, and DCYF is working to identify a placement in another family-like setting…."*

In its reports from each of those first two reporting periods, the Monitoring Team requested that the Data Validator have the opportunity to review the cases for which this "professional judgment" exception was noted, providing an "opportunity to ensure [that] the process is followed and to verify whether cases met this exception…." The Monitoring Team has been given the opportunity to review all cases for which the "professional judgment" exception was noted.

- One case reflected the exception for Section 2 (Assessment & Stabilization Centers) for the July 1, 2018-December 31, 2018 Reporting Period #1.
- Eight cases reflected the exception for Section 2 (Assessment & Stabilization Centers) for the January 1, 2019–June 30, 2019 Reporting Period #2.
- Two cases reflected the exception for Section 3 (Congregate Care) for the July1, 2018–December 31, 2018 Reporting Period #1.
- Eight cases reflected the exception for Section 3 (Congregate Care) for the January 1, 2019–June 30, 2019 Reporting Period #2.

# Rhode Island Department of Children, Youth & Families
## *Andrew C. v Raimondo* Monitoring Team Report
### Amendment to Reports from Reporting Periods #1 and #2

In each of those sixteen cases, the Data Validator reviewed the case activity surrounding the placement in an ASC or congregate care setting, including assessments conducted regarding the needs of the child and the case notes and case activities recorded in Rhode Island's RICHIST (the Rhode Island Children's Information System). In each of the sixteen cases, the Data Validator found sufficient documentation of the decision-making process which underlay the caseworker's exercise of professional judgment.

The Monitoring Team is therefore able to consider as fully validated DCYF's performance during the first two Reporting Periods as it relates to Sections 2 and 3 of the Settlement Agreement, and will support DCYF Notice of Exit for those two sections, effective June 30, 2019 (at the conclusion of the second Reporting Period).

# Exhibit iv

# Rhode Island Department of Children, Youth & Families
## *Andrew C. v. McKee* Monitoring Team Report
### Amendment to Monitoring Team Reports for Reporting Periods #1 and #2

As outlined in the Settlement Agreement described in the case of *Andrew C. v. McKee*,[1] the Monitoring Team is comprised of the Office of the Child Advocate (OCA) and the Data Validator. The Data Validator has since been hired by the Rhode Island Department of Children, Youth and Families (DCYF) and can be identified as Public Consulting Group LLC (PCG). As outlined in Section 2(d) of the Settlement Agreement, the Data Validator is the "…final arbiter of the timeliness, accuracy of the methodology, as well as the statistical validity and reliability of the DCYF data…." As outlined in Section 2(f) of the Settlement Agreement, the Office of the Child Advocate (OCA) shall provide oversight to the commitments in the Agreement. The OCA "…shall receive and review the progress reports that have been determined to be valid and reliable by the Data Validator." The OCA "…shall confirm whether the commitment has been met or not met."

As part of its responsibility under the terms of the Settlement Agreement, the Monitoring Team has produced reports summarizing DCYF's performance on a series of outcomes during the six-month reporting periods of July 1, 2018–December 31, 2018 (Reporting Period #1) through July 1, 2020–December 31, 2020 (Reporting Period #5). One of the outcomes summarized in those reports was that described in Section 1 of the Settlement Agreement, which was that:

> *Children entering care or changing placements during the Reporting Period, excepting entries or placement changes falling under one of the four "exceptions" described above, must receive an assessment within the designated timeframes. DCYF must achieve a successful outcome in 85 percent of removals and placement changes.*

As with each Section in the Settlement Agreement, after attaining the required benchmark for two consecutive six-month periods, DCYF shall be able to exit from monitoring under Section 1 of the Settlement Agreement. During each of the first two Reporting Periods, DCYF performance exceeded the benchmark described in Section 1.1 that at least 85 percent of children entering out-of-home care or changing placements would be assessed:

- **Reporting Period 1:** Of 552 applicable cases involving a child removed from the home or changing placements where an exception was not noted, 492 saw an assessment being conducted within the designated timeframe (89.13% of cases).

- **Reporting Period 2:** Of the 577 applicable cases involving a child removed from the home or changing placements where an exception was not noted, 514 saw an assessment being conducted within the designated timeframe (89.08% of cases).

During each of those first two Reporting Periods, the Data Validator conducted a review of a random sample of 100 cases in order to validate the findings reported by OCYF. For the reviews conducted to evaluate performance under Section 1.1, the Data Validator verified that the

---

[1] Originally filed in 2007 as *Andrew C. v. Chafee*, the name of the case was amended in January 2015 to *Andrew C. v. Raimondo* upon Gina Raimondo's inauguration as Governor of Rhode Island. In March 2021, the name of the case was again amended when Daniel McKee was sworn in as Governor of Rhode Island, to *Andrew C. vs. McKee*.

# Rhode Island Department of Children, Youth & Families
## *Andrew C. v. McKee* Monitoring Team Report
### Amendment to Monitoring Team Reports for Reporting Periods #1 and #2

assessments listed in RICHIST were administered on the date recorded, and that the assessments were administered within the required timeframe of (i) 30 days of the removal for removals; and (ii) within 60 days prior to 14 days after the placement change for placements. While the reviews conducted by the Data Validator found no discrepancies between the outcome reported by DCYF and the case activity, the 100 cases reviewed was insufficient to achieve an acceptable level of statistical confidence in the results, and the Monitoring Team was unable to validate the results.

The Monitoring Team and DCYF came to an agreement in August 2021 that the Data Validator will conduct case reviews in sufficient quantity to achieve 95 percent confidence that any systematic errors that occur in at least 2.5 percent of cases will be identified during the review. In addition, the Monitoring Team and DCYF have agreed that the Data Validator will re-evaluate the findings reported under Section 1 during the first two Reporting Periods, and review additional cases to bring the level of statistical confidence in the results up to that level.

Based on the size of the universe of applicable cases during each of the first two Reporting Periods (552 and 577 cases), the Data Validator will review a total of 110 cases from each Reporting Period in order to attain 95 percent confidence in finding errors that occur in at least 2.5 percent of cases. Since the Data Validator reviewed 100 cases during the initial review periods, an additional ten randomly-selected cases would therefore be reviewed from each of the first two Reporting Periods.

The Data Validator reviewed those additional cases in September 2021, and the updated results are presented below.

## Reporting Period #1 (July 1, 2018–December 31, 2018)
During the first Reporting Period, 552 cases were applicable to Section 1. The Data Validator has now reviewed 110 of those cases (19.9% of cases), and found that in all cases, the outcome reported by DCYF was consistent with the activity on the case. This review of 110 cases is sufficient to ensure 95 percent confidence in finding at least one error, assuming that error occurs in at least 2.5 percent of cases.

## Reporting Period #2 (January 1, 2019–June 30, 2019)
During the second Reporting Period, 577 cases were applicable to Section 1. The Data Validator has now reviewed 110 of those cases (19.1% of cases), and found that in all cases, the outcome reported by DCYF was consistent with the activity on the case. This review of 110 cases is sufficient to ensure 95 percent confidence in finding at least one error, assuming that error occurs in at least 2.5 percent of cases.

## Monitoring Team Recommendation
The Monitoring Team can now confirm that the required 85 percent benchmark has been met for each of the first two Reporting Periods, and that the results have been appropriately validated. With DCYF having exceeded the required Section 1 benchmark for two consecutive

# Rhode Island Department of Children, Youth & Families
## *Andrew C. v. McKee* Monitoring Team Report
### Amendment to Monitoring Team Reports for Reporting Periods #1 and #2

reporting periods, the Monitoring Team recommends and will support the Department's filing a Notice of Exit from Section 1 of the Settlement Agreement.