# EXHIBIT 4

**Monitoring Team Report and Recommendations**
**Response to Reporting Periods 1 and 2**
**March 16, 2020**

As outlined in the Settlement Agreement, the Monitoring Team is comprised of the Office of the Child Advocate (OCA) and the Data Validator. The Data Validator has since been hired by the Rhode Island Department of Children, Youth and Families (DCYF) and can be identified as Public Consulting Group, Inc. (PCG). As outlined in Section 2(d) of the Settlement Agreement, the Data Validator is the "…final arbiter of the timeliness, accuracy of the methodology, as well as the statistical validity and reliability of the DCYF data…" As outlined in Section 2(f) of the Settlement Agreement, the Office of the Child Advocate (OCA) shall provide oversight to the commitments in the Agreement. The OCA "…shall receive and review the progress reports that have been determined to be valid and reliable by the Data Validator." The OCA "…shall confirm whether the commitment has been met or not met."

The Monitoring Team is generating this report in compliance with the roles and responsibilities as set forth in the Settlement Agreement. During Reporting Periods 1 and 2, the Monitoring Team encountered issues, which impacted our ability to validate the data and confirm whether any commitments in the Settlement Agreement were met. First, for Reporting Period 1, PCG was not provided the data from DCYF in accordance with the timeline set in the Settlement Agreement. PCG received the data three (3) months late. This is an issue that the OCA attempted to bring to the attention of all parties in writing on May 9, 2019. Due to this issue, PCG was provided with a compressed period of time to perform their review, which impacted their ability to deliver a complete analysis of the number of cases set forth in their initial proposal. Initially, PCG drafted a response to the data received for Reporting Periods 1 and 2. However, in January 2019, it came to the attention of the OCA that the data provided by DCYF was not statistically significant or valid. Therefore, the Monitoring Team could not validate the data for Reporting Periods 1 and 2. Upon receiving this information the OCA notified DCYF. The Monitoring Team met with DCYF on January 23, 2020 and provided a draft report of our concerns. At the request of the parties, the Monitoring Team has finalized this report which provides further specifics of our response and recommendations to Reporting Periods 1 and 2.

In accordance with Section C(2)(e) of the Settlement Agreement, the Monitoring Team report will be released as a public document.

I. **Monitoring Team Sampling Recommendations**

In fulfillment of our role as the Monitoring Team, we have determined that the samples provided are not statistically significant or valid, therefore, we could not confirm whether any of the commitments in the Settlement Agreement were met for Reporting Periods 1 and 2. There were no standards included in the Settlement Agreement outlining statistical significance or statistical validity, which led to samples that were not representative of the universe of cases.

The Settlement Agreement resulting from the case of *Andrew C. v. Raimondo* describes a two-tiered approach for evaluating the extent to which the DCYF is achieving the outcomes described in the Settlement Agreement across twenty-one measures. The first step in measuring compliance on each measure is to calculate the **statewide outcome**; for those measures for which compliance can be calculated using data from the Rhode Island Children's Information System (RICHIST), outcomes are calculated programmatically (that is, using automated routines to parse and analyze the data for each case and categorize it as a "success" or "failure" on that measure). For sixteen of the 21 measures, this

approach is employed, and outcomes are calculated across the entire "universe" of cases to which the measure applies. For five measures, however, the Settlement Agreement describes a qualitative review process to identify outcomes on a case-by-case basis, DCYF is responsible for drawing a random sample of cases to be reviewed by the DCYF Quality Review team. The method by which statewide outcomes are calculated for each measure is described in Table 1, below.

| Measure | How Statewide Outcomes Calculated |
|---|---|
| Assessments 1.1 | Universe |
| Assessments 1.2 | Universe |
| ASC* Placements 2.2 | Universe |
| ASC* Placements 2.3a | Universe |
| ASC* Placements 2.3b | Universe |
| Congregate Care 3.1 | Universe |
| Congregate Care 3.2 | Universe |
| Sibling Placement 4.1 | **Sample** |
| Visitation 6.1 | Universe |
| Visitation 6.2 | **Sample** |
| Visitation 6.3b | **Sample** |
| Visitation 6.4b | **Sample** |
| Licensing 7.1 | Universe |
| Licensing 7.2 | Universe |
| Licensing 7.3 | Universe |
| Licensing 7.4 | Universe |
| CPS** 8.1 | Universe |
| CPS** 8.2 | Universe |
| CPS** 8.3 | Universe |
| Case Planning 10.2 | Universe |
| Case Planning 10.3 | **Sample** |

**Table 1: Method for Calculating Statewide Outcomes**

*ASC is the acronym for Assessment and Stabilization Center.
**CPS is the acronym for Child Protective Services which is the investigation division of DCYF.

For the sixteen measures where outcomes can be measured for every eligible case statewide using data extracted from RICHIST, no sampling approach is required. However, for the five measures which a **qualitative case review** process must be utilized to measure success against a sample of cases, the Monitoring Team recommends that the number of cases reviewed by DCYF be sufficiently large to ensure 95 percent confidence with a three percent margin of error[1] across each measure. This sample size will vary depending on the size of the statewide universe for the measure being evaluated. Based on

---

[1] In lay terms, this means that there is a 95 percent likelihood that the aggregate outcomes calculated from the reviews conducted against the sample of cases will fall within three percent of the actual statewide outcome.

the number of cases in those universes during the first two Reporting Periods, the number of cases that should be reviewed by DCYF to ensure this level of statistical significance is described in Table 2, below.

| Measure | Universe | Reporting Period #1 (July-December 2018) Recommended Sample Size | Actual Sample Size | Universe | Reporting Period #2 (January-June 2019) Recommended Sample Size | Actual Sample Size |
|---|---|---|---|---|---|---|
| Sibling Placement 4.1 | 151 | 133 | 62 | 366 | 273 | 75 |
| Visitation 6.2 | 1,751 | 664 | 173 | 1,689 | 655 | 150 |
| Visitation 6.3b | 251 | 204 | 61 | 173 | 149 | 42 |
| Visitation 6.4b | 1,030 | 525 | 103 | 995 | 516 | 96 |
| Case Planning 10.3 | 1,751 | 664 | 175 | 1,689 | 655 | 191 |

Table 2: Recommended DCYF Sample Sizes

PCG, in its role as Data Validator, employs a second case review process on each measure that is intended to verify that the outcomes reported by DCYF (whether via an automated calculation or a case review process) are accurate, and that the processes which DCYF employs to evaluate statewide outcomes (whether algorithmically-derived or via a case review process are sound). In order to verify the validity of DCYF's findings, PCG conducts a second-level review of a random sample of cases on each of the twenty-one measures. PCG's initial proposal was to review 100 cases on each measure; this "static" sample size will result, however, in varying levels of statistical significance for each measure.

In order to ensure that PCG's case review findings have a consistent level of statistical validity, the Monitoring Team recommends that the number of cases reviewed by PCG on each measure be of sufficient size to ensure that if errors exist in only one percent of cases initially reviewed by DCYF, that there is a 99 percent probability of at least one erroneous case being identified in the sample. The sample sizes for each measure that will ensure that level of statistical validity is described in Table 3, below.

| Measure | How Statewide Outcomes Calculated | Reporting Period #1 (July-December 2018) Review Cohort Size[2] | Recommended PCG Sample Size | Reporting Period #2 (January-June 2019) Review Cohort Size | Recommended PCG Sample Size |
|---|---|---|---|---|---|
| Assessments 1.1 | Universe | 570 | 342 | 577 | 437 |
| Assessments 1.2[3] | Universe | - | - | - | - |

---

[2] For those measures where outcomes are calculated against the statewide **universe** of cases, the "Review Cohort Size" is the number of cases in that universe. For those measures where outcomes are calculated through a Quality Review process employed by DCYF against a random **sample** of cases, the "Review Cohort Size" is based on the recommended sample sizes described in Table 2.

[3] In Reporting Periods 1 and 2 numerous cases were deemed to have met the exception outlined in 1.2 (a), which states that an assessment does not need to be performed if a child's placement is to "…a placement at an equivalent level of need." However, the Monitoring Team was not provided the list of cases, which DCYF determined to have met this exception. Therefore, PCG is unable to make a determination regarding a statistically significant and valid sample size.

| Measure | How Statewide Outcomes Calculated | Reporting Period #1 (July-December 2018) | | Reporting Period #2 (January-June 2019) | |
|---|---|---|---|---|---|
| | | Review Cohort Size[2] | Recommended PCG Sample Size | Review Cohort Size | Recommended PCG Sample Size |
| ASC Placements 2.2 | Universe | 68 | 68 | 52 | 52 |
| ASC Placements 2.3a | Universe | 68 | 68 | 41 | 41 |
| ASC Placements 2.3b | Universe | 30 | 30 | 5 | 5 |
| Congregate Care 3.1 | Universe | 48 | 48 | 66 | 66 |
| Congregate Care 3.2 | Universe | 83 | 83 | 104 | 103 |
| Sibling Placement 4.1 | **Sample** | 133 | 132 | 273 | 246 |
| Visitation 6.1 | Universe | 9,880 | 452 | 10,536 | 450 |
| Visitation 6.2 | **Sample** | 664 | 355 | 655 | 350 |
| Visitation 6.3b | **Sample** | 204 | 185 | 149 | 148 |
| Visitation 6.4b | **Sample** | 525 | 315 | 516 | 310 |
| Licensing 7.1 | Universe | 380 | 298 | 436 | 298 |
| Licensing 7.2 | Universe | 312 | 244 | 398 | 312 |
| Licensing 7.3 | Universe | 100 | 99 | 158 | 157 |
| Licensing 7.4 | Universe | 73 | 73 | 98 | 98 |
| CPS 8.1 | Universe | 3,924 | 435 | 4,477 | 443 |
| CPS 8.2 | Universe | 3,278 | 438 | 3,723 | 434 |
| CPS 8.3 | Universe | 3,278 | 438 | 3,723 | 434 |
| Case Planning 10.2 | Universe | 2,177 | 427 | 1,990 | 427 |
| Case Planning 10.3 | **Sample** | 664 | 355 | 655 | 350 |

Table 3: Recommended PCG Sample Sizes

## MONITORING TEAM SAMPLE SIZE RECOMMENDATIONS

For each of the twenty-one measures described in the Settlement Agreement, the recommendations of the Monitoring Team are described below.

**Assessments 1.1:** Based on the size of the statewide universe of children entering care or changing placements during the first two Reporting Periods where the move was not to an equivalent level of need (570 cases and 577 cases, respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 350 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods exceeded the 85 percent threshold described in the Settlement Agreement, the Monitoring Team recommends that these case reviews be retroactively conducted on cases from the first two Reporting Periods. This will ensure that the findings from those first two Reporting Periods are appropriately credited to DCYF.

**Assessments 1.2**: In Reporting Periods 1 and 2 numerous cases were deemed to have met the exception outlined in 1.2 (a), which states that an assessment does not need to be performed if a child's placement is to "…a placement at an equivalent level of need." However, the Monitoring Team was not provided the list of cases, which DCYF determined to have met this exception. Therefore, PCG is unable to make a determination regarding a statistically significant and valid sample size. Going forward, the

Monitoring Team is requesting the opportunity to review all cases that have been determined to meet this exception for a qualitative review. DCYF did not find that any cases met the exceptions outlined in 1.2(b) and 1.2(c). However, in future Reporting Periods, should any cases meet these exceptions the Monitoring Team would expect the opportunity to review these cases as well.

**ASC Placements 2.2:** During each of the first two Reporting Periods, the size of the universe of children entering into an ASC placement (68 and 52 respectively) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required.

**ASC Placements 2.3a:** During each of the first two Reporting Periods, the size of the universe of children whose placement in an ASC placement was 14 days or longer (68 and 41 respectively) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required.

**ASC Placements 2.3b:** During each of the first two Reporting Periods, the size of the universe of children whose placement in an ASC placement reached their 60th day (30 and five respectively) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required.

**Congregate Care 3.1:** During each of the first two Reporting Periods, the size of the universe of children entering into a congregate care setting (48 and 66 respectively) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required.

**Congregate Care 3.2:** During each of the first two Reporting Periods, the size of the universe of children whose placement in a congregate placement was 90 days or longer (83 and 104 respectively) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required.

**Sibling Placement 4.1:** Based on the size of the statewide universe of sibling groups entering out-of-home care or changing placements during the first two Reporting Periods (151 cases and 366 cases, respectively), the Monitoring Team recommends increasing the number of cases reviewed by DCYF to 273 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 246 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 80 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend

that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Visitation 6.1:** Based on the size of the statewide universe of children served in out-of-home care for at least one full calendar month during the first two Reporting Periods (2,524 children and 2,502 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 430 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

DCYF's performance on this measure did not meet the 95 percent threshold described in the Settlement Agreement in the first Reporting Period but did meet the threshold in the second Reporting Period. The Monitoring Team recommends that these case reviews be retroactively conducted on cases from the second Reporting Period. This will ensure that the findings from that Reporting Period are appropriately credited to DCYF.

**Visitation 6.2:** Based on the size of the statewide universe of children served in out-of-home care during the first two Reporting Periods (1,751 children and 1,689 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by DCYF from ten percent (approximately 170 cases) to 675 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 355 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Visitation 6.3b:** Based on the size of the statewide universe of sibling groups served in out-of-home care during the first two Reporting Periods (251 sibling groups and 173 sibling groups, respectively), the Monitoring Team recommends increasing the number of cases reviewed by DCYF to 204 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 185 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Visitation 6.4b:** Based on the size of the statewide universe of children served in out-of-home care with a goal of reunification during the first two Reporting Periods (1030 children and 995 children,

respectively), the Monitoring Team recommends increasing the number of cases reviewed by DCYF from ten percent (approximately 100 cases) to 516 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 315 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Licensing 7.1:** Based on the size of the statewide universe of children entering into a non-kinship placement during the first two Reporting Periods (380 children and 436 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 300 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 100 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Licensing 7.2:** Based on the size of the statewide universe of children entering into a prospective foster home whose licensure was pending during the first two Reporting Periods (312 children and 398 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 315 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 100 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Licensing 7.3:** Based on the size of the statewide universe of kinship foster home licensure applications submitted during the first two Reporting Periods (100 children and 158 applications, respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to the full statewide universe in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 95 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Licensing 7.4:** During each of the first two Reporting Periods, the size of the universe of licensure renewals coming due (73 and 98 respectively) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required.

**CPS 8.1:** Based on the size of the statewide universe of CPS reports received during the first two Reporting Periods (3,924 reports and 4,477 reports respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 450 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods exceeded the 90 percent threshold described in the Settlement Agreement, the Monitoring Team recommends that these case reviews be retroactively conducted on cases from the first two Reporting Periods. This will ensure that the findings from those first two Reporting Periods are appropriately credited to DCYF.

**CPS 8.2:** Based on the size of the statewide universe of CPS reports screened in during the first two Reporting Periods (3,278 reports and 3,723 reports respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 440 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure only exceeded the 90 percent threshold described in the Settlement Agreement during the second Reporting Period, the Monitoring Team recommends that these case reviews be retroactively conducted on cases from the second Reporting Period only. This will ensure that the findings from that period are appropriately credited to DCYF.

**CPS 8.3:** Based on the size of the statewide universe of CPS reports screened in during the first two Reporting Periods (3,278 reports and 3,723 reports respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 440 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure only exceeded the 85 percent threshold described in the Settlement Agreement during the second Reporting Period, the Monitoring Team recommends that these case reviews be retroactively conducted on cases from the second Reporting Period only. This will ensure that the findings from that period are appropriately credited to DCYF.

**Case Planning 10.2:** Based on the size of the statewide universe of children served in out-of-home care during the first two Reporting Periods (2,177 children and 1,990 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 430 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two reporting periods did not reach the 80 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend

that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

**Case Planning 10.3:** Based on the size of the statewide universe of children served in out-of-home care for at least 60 days during the first two Reporting Periods (1,751 children and 1,689 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by DCYF from ten percent (approximately 190 cases) to 665 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Further, the Monitoring Team recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 355 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first two Reporting Periods did not reach the 80 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first two Reporting Periods, but that the revised sampling criteria be applied starting with the third Reporting Period.

## II.     Monitoring Team Assessment Recommendations

The Settlement Agreement resulting from the case of *Andrew C. v. Raimondo* describes a two-tiered approach for evaluating the extent to which DCYF is achieving the outcomes described in the Settlement Agreement across twenty-one measures. Section 1.1 of the Settlement Agreement describes the obligation of DCYF to conduct an assessment for all children entering out-of-home care due to a report or suspicion of abuse or neglect, as well as those changing a placement setting during a removal due to a report or suspicion of abuse or neglect.

The Settlement Agreement does not mandate a specific tool to be utilized when conducting these assessments, instead stating only that such assessments:

> *"[include] but [are] not limited to the assessments utilized by DCYF or the clinical opinion of a licensed health care professional in an Assessment and Stabilization Center, mental health impatient facility, or a facility of equivalent level and type."*

During the first three reporting periods under the Settlement Agreement, DCYF's statewide outcome on this measure was evaluated by considering whether any of five different tools were utilized to assess the needs of the child in or entering placement:

- Level of Need Assessment
- Foster Care Rate Setting Assessment
- Safety Assessment
- Placement Request
- Risk and Protective Capacity Assessment

The context in which "assessments" are used in Section 1 of the Settlement Agreement suggests that the intent is to ensure that a timely **Level of Need Assessment** is completed for each child to better inform placement decisions and determine service needs. For example, Section 3.1(a) of the Settlement

9

Agreement (regarding placements into a congregate care setting) indicates that a child should only be placed in congregate care if the child has treatment needs as found during the assessment process referenced in Section 1. This further suggests that the assessment completed pursuant to Section 1 should be evaluating the needs of the child.

Some of the assessments that DCYF "counted" as valid during the first two reporting periods, however, did not evaluate the needs of the child. The Monitoring Team recommends that DCYF re-examine the structure of the assessments currently being conducted of children entering care or changing placements to ensure that, at a minimum, the needs of the child are assessed across several different functional areas.

While it is not the intent of the Monitoring Team to prescribe to DCYF the specific assessment tool that must be used, the "domains" assessed in the Child and Adolescent Needs and Strengths (CANS), which is not currently being used by DCYF, reflects a holistic approach to evaluating the needs of children served by the state child welfare agency. The Monitoring Team therefore recommends that assessments conducted for children entering or changing out-of-home placement only be considered as meeting the requirements of the Settlement Agreement if it is able to evaluate the needs and strengths of the child in the following areas:

- **Life Domain Functioning**, which may include (but not be limited to) the child's sleep function/habits, social functioning, sexual development, recreational activities, development, communication skills, judgement, acculturation, legal challenges, physical health needs, daily functioning, and where applicable, independent living skills.
- **Child Strengths**, which may include (but not be limited to) interpersonal skills, sense of optimism, educational achievement, vocational needs, talents and interests, spiritual or religious needs, community life, permanency of relationships, and natural supports.
- **School Functioning**, which may include (but not be limited to) behavior, attendance and achievement in school, or the child's current educational setting.
- **Planned Permanent Caregiver Strengths and Needs**, which may include (but not be limited to) supervision, involvement with care, parenting knowledge, organizational skills, social resources, residential stability, physical and mental health, substance use or misuse, development, access to care, family stressors, self-care, employment, educational achievement, legal challenges, financial resources, transportation arrangements, and safety.
- **Child Behavioral/Emotional Needs**, which may include (but not be limited to) psychosis, impulsivity/hyperactivity, depression, anxiety, oppositional behavioral, overall conduct, adjustment to trauma, anger control, substance use or misuse, and eating disturbances.
- **Child Risk Behaviors**, which may include (but not be limited to) suicide risk, self-mutilation, other self-harming behaviors, danger to others, sexual aggression, runaway tendencies, delinquent behavior, fire-setting, sexually reactive behavior, bullying, and overall social behavior.

Section 1 of the Settlement Agreement also stipulates that the clinical opinion of a licensed health care professional employed by an ASC, mental health inpatient facility, or facility of equivalent level or type may be utilized to assess the needs of the child entering care or changing placements. This clinical opinion, provided it is documented in the child's case file in RICHIST, will also be considered as a valid assessment, in lieu of a DCYF-administered assessment that meets the above minimum standards.

Additionally, in the initial proposal presented by PCG to DCYF, it was proposed a qualitative review of the assessments be completed to ensure that assessments were not only performed efficiently but were completed with accurate information. The scope of work, however, was limited to a review of the list of placements occurring during each Reporting Period and the date of the assessment that fell within the timeline of Settlement Agreement; the case review entailed verifying that the assessments in each case occurred on the date indicated in that case list.

A qualitative review would ensure that in addition to providing timely assessments, the assessments are thoroughly completed and relay accurate and pertinent information. Furthermore, the qualitative review will ensure a specific process was followed with each assessment. For example, what documentation was reviewed to inform the placement and service needs assessment, did the individual completing the assessment personally meet with the child, what providers did DCYF speak with during the course of an assessment (e.g. medical providers, clinical staff, etc.). The Monitoring Team respectfully requests consideration for the completion of a qualitative review of the assessments used to determine the placement decisions. In the absence of a qualitative review and a defined process for a thorough assessment, there is a missed opportunity to ensure that quality assessments are being performed and children in the care of the Department are being appropriately placed in settings that can best meet their needs.

The Monitoring Team also recommends that, when evaluating when an assessment of a child's service and/or treatment needs align with the spirit of the Settlement Agreement, PCG's case reviews indicate whether a face-to-face visit with the child occurred, and whether the needs of the child were discussed with the placement provider(s) or their clinical mental/behavioral health staff. In addition, the Monitoring Team recommends that PCG evaluate whether the assessment has been updated, by comparing the findings and language of the current assessment to the most recent assessment completed for that child within the last 12 months, in order to ensure that the evolving needs of the child are considered at the important touchpoints of a child's removal from the home, or change of placement while in the custody of the Department. The Monitoring Team also wants to ensure that the assessment process reviews a child's needs on an ongoing basis to ensure that they are placed in the most appropriate and least restrictive placement. A process should be carved out for the instances where a child is clinically ready to be discharged from a restrictive setting however, there are no placements available.

Furthermore, the Settlement Agreement does not clearly define which placements would be considered an "equivalent level of need". PCG was not given the opportunity to review cases where DCYF deemed a child's move to be a lateral one. The Monitoring Team requests that "equivalent level of need" be more clearly defined and the ability to review cases determined to meet this definition or the other exceptions as outlined in Section 1.2 of the Settlement Agreement. Otherwise, the Monitoring Team is unable to determine if cases did in fact meet these exceptions and whether the commitment was met.

Additionally, the Monitoring Team requests that each case that DCYF deems to meet one of the exceptions as outlined in the Settlement Agreement be provided to PCG for further qualitative review. Presently PCG's review only verifies that the exception was documented in RICHIST.  There is no second-level review to ensure that the case did in fact meet the exception criteria.  The Monitoring Team does not believe this is sufficient information to confirm whether the commitment has been met.

### III. Monitoring Team's Recommendations for Process of the Professional Judgment

Pursuant to Section 2.2(b) placement in an ASC is approved due to "…[a]n emergency removal and using professional judgement this placement is in the best interest of the child". The standard of "professional judgment" is utilized again in Section 3.1(c), which provides that a child can be placed in congregate care if there is an immediate or emergency removal and using "professional judgment" this placement is in the best interests of the child. The standard of "professional judgment" is a catch all clause. The process for using "professional judgment" should be succinctly outlined. This process should outline what the expectations are (i.e. meeting with the child, reviewing case history, reviewing/collecting the child's records and reports from past service and medical providers, thorough completion of a developed assessment tool, etc.), and what needs to be documented in writing throughout the process. Once this process has been defined, the Monitoring Team is requesting to review the cases, where "professional judgment" was exercised for the completion of a qualitative review. This will provide the Monitoring Team with the opportunity to ensure the process is followed and to verify whether cases met this exception and the commitment was met.

Furthermore, Section 3.1(c) notes that following the exercise of professional judgment as to whether placement in congregate care is in the best interest of a child, DCYF must also be "…working to identify a placement". There needs to be clarification regarding what steps must be taken and what needs to be documented in order to satisfy the requirement that DCYF is "working to identify a placement". Also, the required assessment process needs to be further defined including what type of assessment is required, who is completing the assessment, whether or not the worker completing the assessment needs to meet with the child, and what documents and information need to be reviewed as part of the assessment process. What must be completed and/or documented in order for this requirement to be met? The Monitoring Team is unable to determine whether cases met this exception without this clarifying information.

### IV. Additional Response to Reporting Periods 1 and 2

**Section 11. Maltreatment in Care**

Section 11 requires an "annual assessment of the substantiated events of abuse or neglect occurring to a child in DCYF foster care custody". This is to be a public report and is to set forth findings and recommendations for corrective action. Upon review of DCYF's website there is a report entitled "Annual Safety Analytic Report (FFY 18)". Section 3 of this report reviews maltreatment in foster care for Federal Fiscal Years 2015, 2016 and 2017. There was no assessment of maltreatment in foster care for federal Fiscal Year 2018, which concluded on September 30, 2018.  This report notes that data is current through October 1, 2018 however, there is no analysis of the data from federal Fiscal Year 2018 in this report. There has been no subsequent report published reviewing this data.  Since Section 11 requires an annual assessment, this commitment has not been met for Reporting Period 1 or 2.

As mentioned, Section 11 also requires the Department to provide recommendations for corrective action as part of their annual assessment. The Monitoring Team is seeking clarification on whether the Department would be required to submit annual updates regarding the steps taken or progress made towards their plan for corrective action. This is not clearly outlined in Section 11. Is publicly identifying a need for corrective action enough to satisfy this requirement?

**Section 12. Foster Home Array**

The Settlement Agreement requires that a Foster Care Recruitment and Retention Plan be developed in conjunction with the OCA. This plan should be done annually. First, although a plan has been developed and posted on DCYF's website, this plan was not developed in conjunction with the OCA. The OCA was invited to one meeting in the early stages of DCYF's development of the Foster Care Recruitment and Retention Plan. During this one meeting, the OCA was presented with some initial information, the OCA was provided no opportunity to review a draft plan or provide meaningful feedback, which would constitute the development of this plan together. During this meeting, the only thing that was requested of the OCA was to try to get the Director to support their plan for the use of a new software, which would operate as a Customer Relationship Management system to be used by the staff at the Department working on recruitment of foster parents. Therefore, this element of the Settlement Agreement was not satisfied.

Upon receipt of the final Foster Care Recruitment and Retention plan, both the Data Validator and the OCA determined that there were many areas requiring improvement to ensure that the plan was effective. The Monitoring Team provided DCYF with an outline of recommended changes; to date the Monitoring Team has received no response from DCYF regarding the recommended changes and none of the recommended changes were incorporated into the Department's Foster Care Recruitment and Retention Plan. Additionally, the Settlement Agreement requires that a new plan be provided each year. The Settlement Agreement does not define whether this is calendar year or fiscal year however, for the first Foster Care Recruitment and Retention Plan the Department entitled the report "FY 2019 RI DCYF Resource Family Recruitment & Retention Plan Effective July 1, 2018 – June 30, 2019." Therefore, the Monitoring Team believes that the Department interpreted the Settlement Agreement to mean, fiscal year. Fiscal Year 2020 started on July 1, 2019. Attached to the FY 2019 RI DCYF Resource Family Recruitment Plan Reflection Summary, which is published on DCYF's website, is a recruitment and retention plan for FY 2020. However, this plan still does not reflect any of the changes proposed by the Monitoring Team.

The Monitoring Team has enclosed with this report a copy of the original changes requested with respect to the first Foster Care Retention and Recruitment Plan. The Monitoring Team is still requesting that these changes be implemented.

The Settlement Agreement also requires that the Department draft an annual, public report assessing the implementation of the plan over the previous twelve (12) months and identify and identify any systemic factors that may have contributed to any shortfall in recruitment. The annual report should provide the number of homes recruited and retained by category, the number of homes recruited in each category during the implementation period, and the total number of homes available for child placement in each of the categories at the beginning and end of the 12-month period. The report should also include recommendations for corrective action. This report has been published on the DCYF website. However, this report did not discuss systemic factors that may have contributed to the shortfall in recruitment and did not provide a meaningful plan for corrective action to increase the recruitment and retention of foster families.

### V. The Monitoring Team's Request for Explanation

*Section 6.3: Sibling Visitation*

For Section 6.3, the Monitoring Team understands that for those cases where the intended frequency of visitation is not laid out in the case plans, that is being treated as a "non-compliant" case (that is a failure).

However, the Monitoring Team is seeking clarification on how cases that meet the frequency for sibling visitation in the case plan are being handled. For the first Reporting Period, there were only two cases that met the criteria to be a success. However, the two children counted as a success are siblings. Was it the intention that visits between siblings within the same family be counted as multiple successes? The Settlement Agreement is not clear on this.

Pursuant to Section 6.2, the quality of visitation was considered for visitation between caseworker and child. This is reviewed utilizing the tool for the federal Child and Family Services Review (CFSR) process. However, the Settlement Agreement does not explicitly carve out a qualitative review for sibling visitation. A qualitative review of sibling visitation is required as part of the federal CFSR process. Therefore, if utilizing the federal CFSR process as the guideline for visitation review, is it the intention that a qualitative review of sibling visitation be completed or is the CFSR process only being followed in part?

*Section 6.4: Parent-Child Visitation*

As discussed above, the quality of visitation was considered for visitation between caseworker and child. This is reviewed utilizing the tool for the federal CFSR process. However, Section 6.4 states, "[a]s with other areas of casework, DCYF shall assure the quality of parent-child visits through the continuous quality improvement process and provide documentation of the results of the continuous quality improvement process to the Monitoring Team and Plaintiffs' Attorneys." First, this suggests that the Department should be conducting this quality improvement process for other areas of casework. However, this is not referenced in other sections of the Settlement Agreement. Specifically, which other areas of casework should the Department be completing this quality improvement process for? For example, in Section 6.3, a qualitative improvement of sibling visitation is not explicitly outlined. Is this an area of casework which would be subject to the quality improvement process? The Monitoring Team is seeking clarification on which sections and areas of casework would be subject to the aforementioned quality improvement process to ensure this has been completed.

Additionally, what is the quality improvement process? The Settlement Agreement does not define this process. Other sections refer to specific federal assessment tools however, this section refers to an undefined and unspecified "quality improvement process". Furthermore, this section requires that the Department provide the Monitoring Team with documentation from the results of the quality improvement process. The type of documentation to be provided is not specified. Also, the Monitoring Team has not received any documentation in response to a quality improvement process, which has hindered our ability to review the documentation and determine whether this commitment has been met.

**Section 7. Licensing**

For Section 7, the Monitoring Team is only seeking one clarification. In Section 7.4, what is meant by "home safety inspection"? Does this mean a home study, a fire/safety inspection, or lead inspection?

**Section 8.3 Child Protective Services**

Under Section 8.3, the Department is mandated to complete investigations within the time frames set forth in DCYF policies. However, should the investigation be continued due to circumstances beyond the control of DCYF, the extension of the time frame must be approved by a supervisor and must be accompanied by a safety assessment of the child. The Monitoring Team is seeking clarification whether the required safety assessment must be a new safety assessment completed subsequent to the request for an extension or is the safety assessment completed during the pendency of the investigation acceptable?

The Monitoring Team is presenting this report in compliance with their role and responsibilities outlined in the Settlement Agreement. The Monitoring Team is requesting that the outlined recommendations be implemented forthwith to ensure that past and future reporting periods yield data that is reliable and valid. The Monitoring Team is also requesting that any documentation or information requested in this report be promptly provided to prevent any further delay in our analysis of the data and the subsequent reports regarding the Monitoring Team's findings.