# EXHIBIT 5



State of Rhode Island and Providence Plantations

**OFFICE OF THE ATTORNEY GENERAL**
150 South Main Street • Providence, RI 02903
(401) 274-4400

*Peter F. Neronha*
*Attorney General*

April 22, 2020

**Via e-mail**

Kevin Zacks
Public Consulting Group, Inc.
Data Validator
Monitoring Team
kzacks@pcgus.com

Jennifer Griffith, Child Advocate
Katelyn Medeiros, Assistant Child Advocate
Monitoring Team
Jennifer.Griffith@doa.ri.gov
Katelyn.Medeiros@doa.ri.gov

Monitoring Team

    This letter is in response to the *Monitoring Team Report and Recommendations Response to Reporting Periods 1 and 2* dated March 16, 2020. The Report raised concretely, for the first time, a number of issues involving the negotiated and agreed upon terms of the Settlement Agreement in the case of *Andrew C. v. DCYF, et al.* The Settlement Agreement in this case was hammered out over a year and a half with every term scrutinized by both sides. Specifically, with involvement of Judge McConnell as mediator, the parties negotiated and agreed upon areas subject to qualitative review, specific areas subject to quantitative review, and the defined roles of the Data Validator and Monitoring Team. The parties reached agreement in January of 2018. Following a Fairness Hearing conducted by United States District Court Judge William Smith the agreement of the parties was approved and entered by the Court on May 14, 2018 as the final Settlement Agreement. The first reporting period commenced on July 1, 2018.

    The changes proposed in the March 2020 *Report and Recommendation* implicate not only the terms of the Court-approved Settlement Agreement, but also the negotiations and contract entered between the Public Consulting Group, Inc. ("PCG" or the "Data Validator") and the Department of Children Youth and Families ("DCYF" or "Department"). Certainly, if there had been issues around the reliability of the data, they should have been appreciated and raised by PCG during the negotiations, surely prior to the contract being entered, and no later than the end of first reporting period, December 31, 2018.

    According to the *Report,* in January of 2019 that it came to the attention of the Office of the Child Advocate ("OCA") that data provided by DCYF was not statically significant or valid.

However, by the terms of the Court-approved Settlement Agreement it is solely within the role and expertise of the Data Validator to determine whether the data is statistically significant or valid. The Settlement Agreement defines the role of the Data Validator as "the independent and final arbiter of the timeliness, accuracy the methodology, as well as the statistical validity and reliability of the DCYF data . . . submitted to the Monitoring Team pursuant to this Agreement." Settlement Agreement, Section 2 (d). Importantly, at no time prior to January 2020 did the Data Validator question the agreed upon methodology or the statistical validity or reliability of the data or, request that the Data Validator increase the sample size for the quantitative items or DCYF for the qualitative items increase the sample size for any of the Settlement Agreement measures because the data was not statistically significant or reliable. For the quantitative items, DCYF submits to the Data Validator the universe of children and their results, not a sample. As the Data Validator would understand, the statistical significance and validity of data is in part based on sample size. The delay from the date when the Data Validator first raised the desire to increase the sample size to address the statistical significance and validity from January 2019 to January 2020 also overlooks the role of the Data Validator, the information provided during the negotiations, the State's Contract with the Data Validator, and the various analysis completed from December 31, 2018 to the present.

Commensurate with its role and expertise, on September 27, 2018, PCG provided DCYF with a draft of the methodology to arrive at the quantitative and qualitative Settlement Agreement measures. Specific to the quantitative Settlement Agreement measures, PCG provided DCYF the number of random cases DCYF would review. That number was 100 and ultimately became part of the Contract.

On October 26, 2018, a Kickoff Meeting was held between the DCYF, PCG, the OCA, and counsel for the State and Children's Rights, Inc. on the Data Validator Project. Several days later, on October 28, 2018, a Contract was entered by PCG and DCYF establishing PCG's role as the Data Validator. The Contact included PCG's proposed methodology and sample size to meet the measures agreed to in the Settlement Agreement. PCG did not request further information or to increase the sample size; instead it agreed upon the sample size to be utilized in its role as the Data Validator as part of the Contract. The Settlement Agreement was made part of the terms and conditions of the contract, which was to be complied with by the Data Validator.

Upon the hire of PCG as the Data Validator, the DCYF and PCG participated in weekly calls for the purpose of discussing and addressing any Settlement Agreement and data issues. During these weekly calls, when issues arose with the data system reports they were discussed, and agreed-upon solutions were implemented as quickly as possible. This occurred most often in Reporting Period 1 as the issues around providing data by DCYF and the Data Validator were addressed for the first time.

PCG and DCYF worked between September 27, 2018 and December 23, 2018 to create the Data Validator Qualitative Case Review Methodology ("Case Review Methodology"). Towards that end, the Data Validator and DCYF engaged in ongoing discussions and the exchange of drafts of this document. This plan provided the vetted and agreed-upon sample sizes for each of the Settlement Agreement measures. On January 11, 2019, the Data Validator's Case Review Methodology was finalized. (Attached).

DCYF sent the Data Validator the universe of children for Reporting Period 1 for the quantitative Settlement Agreement measures, which ended on December 31, 2018. The Data Validator issued a Project Preliminary Six Month Monitoring Report July 1, 2018 to December 31, 2018 that was issued on June 30, 2019. ("June 30, 2019 Report")(Attached). The Data Validator recognized in the June 30, 2019 Report that "the Settlement Agreement was filed on January 8, 2018, and describes not only the outcome measures on which DCYF is required to measure and report on an ongoing basis, but also the manner by which the accuracy, methodology, reliability and statistical validity of the measured outcomes can be verified by an independent Data Validator." *Id*. at 1.

The Data Validator made the same acknowledgements for the period of January 1, 2019 to June 30, 2019. *See*, Data Validator Project, Preliminary Six Month Monitoring Report for January 1, 2019 to June 30, 2019, dated December 31, 2019 (December 31, 2019 Report) at pages 1—2. (Attached). The Data Validator stated further in the June 30, 2019 Report that it "conducted an (sic) review of the code used to derive the results in this report in early 2019. The syntax review consisted of an analysis of the database extraction code, the syntax used to derive case exclusions and evaluate outcomes, and the sample size and methodology used to calculate the percentages reported and whether they align with the criteria outlined in the Settlement Agreement. PCG's review did not uncover any irregularities in any of the syntax used to calculate the percentages for any of the measures" *(id.* at 2) nor did its close analysis reveal the sample size to be inadequate.

For each reporting Period 1, 2, and 3, DCYF sent the Data Validator the universe of children. The universe of children would allow the Data Validator to determine the sample size to achieve statistical significance and validity. During neither the weekly calls nor in correspondence did the Data Validator make a request to increase the sample size from 100 to a larger sample during Reporting Period 1, Reporting Period 2, or Reporting Period 3.

The qualitative sample size was likewise discussed and vetted between the Data Validator and DCYF. The Data Validator approved the sample size during all three Reporting Periods. During the weekly calls covering Reporting Periods 2 and 3, DCYF and the Data Validator specifically discussed the qualitative sample size. However, at no time did the Data Validator request DCYF increase the sample size. The Data Validator knew the universe of children in care subject to the Settlement Agreement by the end of Reporting Period 1, (December 31, 2018) and at each subsequent Reporting Period. Importantly, the Data Validator confirmed in the June 30, 2019 Report that:

> "[m]any of the measures outlined in the Settlement Agreement require that a qualitative case review be conducted for validation of the measure. These qualitative case reviews were conducted using either a data validation process or a case review instrument, dependent upon the measure. The data validation process for each measure consisted of selecting a random sample of 100 cases from the universe of eligible cases and reviewing the original case documentation in order to verify the accuracy of the data as it is recorded in RICHIST – Rhode Island's Statewide Automated Child Welfare Information System – to ensure that the data used to calculate the outcomes were valid." Id. at 1.

Yet, sample size was never raised by the Data Validator as an issue prior to January of 2020.

3

After all the negotiations, discussions, sharing of data on all of the measures, the issues raised by the March 16, 2020 *Report and Recommendation* arrive nearly two years and a half years after PGC was engaged as the Data Validator. These issues should have been raised and addressed before further time, energy and resources were expended on the Monitoring Periods.

In addition, the *Report and Recommendation* raises an issue related to the DCYF's Annual Report on Maltreatment in Foster Care, Settlement Agreement, Section 11. Since December 2017, DCYF has published an Annual Safety Analytic Report that contains a section on maltreatment in foster care. The report provides 3 years of data on maltreatment. The reports are disseminated internally and externally, presented the DCYF monthly analytic meeting and with other Rhode Island State Agencies. The report is also posted on the DCYF website.

In accordance with Settlement Agreement, Section 11, an annual report was developed and disseminated in February 2019 to cover the first Reporting Year (July 1, 2018—June 30, 2019). DCYF completed the Annual Safety Analytic Report and posted to the DCYF website in March 2020 (and it will be updated for recommendations as outlined in the Settlement Agreement). The March 2020 release and the updated expected date with recommendations April 2020, was understood to meet the annual report July 1, 2019—June 30, 2020 Reporting Period time frame.

**Response Recommendations**

Measures where sample size is met.

Even with respect to its new proposal for sample size, the *Report and Recommendation* is inconsistent. At page 1 the *Report* states that the Monitoring Team could not "confirm whether any of the commitments in the Settlement Agreement were met for Reporting Periods 1 and 2." However, the *Report and Recommendation* goes on to recognize that "the size of the universe" of Section 2.2, Placements; Section 2.3a, Placements; Section 2.3b, Placements; Section 3.1, Congregate Care; and Section 3.2, Congregate Care, and Section 7.4 Licensing were "sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first two Reporting Periods will be required." Contrary to what was stated, the Monitoring team had no issue with these measures. More to the point, these measures were met during those Reporting Periods.  The Settlement Agreement defines "[i]n the role of the Monitor, the OCA shall receive and review the progress reports that have been determined to be valid and reliable by the Data Validator. The OCA, in the role of the Monitor, shall confirm whether the Commitment has been met nor not. For Commitments for which a certain numerical percentage is required, the OCA shall make this determination based upon the information received from the Data Validator." Settlement Agreement, Section 2 (f). The OCA "shall confirm" that these "commitment(s)" have "been met . . . based upon the information . . . from the Data Validator." *Id.* DCYF should receive credit for meeting those measures.

Further, Section 1, Assessments 1.1 and 1.2 were both met during the relevant Reporting Periods.  The Data Validator found that for Reporting Periods 1 and 2 these measures were met and at no time sought further data. Since these measures were met under the terms of the Settlement Agreement, DCYF should likewise be given credit for these measures. Again, the parties agreed and the Court confirmed the areas of quantitative reviews and the measures that would be used for those reviews. Neither the Contract with the Data Monitor nor the Settlement

4

Agreement requires nor allows for a qualitative review of all cases under Section 1.2(b) or 1.2(c) or any other measure not identified in the Settlement Agreement.

Other Qualitative and Quantitative Measures

The *Report and Recommendation* categorizes the measures as follows:

| Quantitative | Qualitative |
|---|---|
| 1.1-1.4 Assessments | 4.1-4.2 Sibling Placement |
| 2.1-2.4 Placement in Shelters and Assessment and Stabilization Centers | 6.2b Qualitative Review of Face-to-Face Visits with Children |
| 3.1-3.3 Placement in Congregate Care | 6.3b Sibling Visitation |
| 6.1 Face-to-Face Visits with Children | 6.4b Parent-Child Visitation |
| 7.1-7.5 Licensing | 10.3 Case Plan Elements |
| 8.1-8.4 Child Protective Services | |
| 10.1-10.2 Case Plans | |

The Data Validator's June 30, 2019 Report did not find that the data was not statistically significant or otherwise invalid.  Except for Section 2.2, Placements; Section 2.3a, Placements; Section 2.3b, Placements; Section 3.1, Congregate Care; and Section 3.2, Congregate Care, and Section 7.4 Licensing because of the small number of cases involved, the Data Validator calculated statistical significance on the agreed upon 100 sample size of the both the qualitative and quantitative measures to achieve a 95% confidence level and provided the margin of error.  The Data Validator has not provided a rationale for increasing the confidence level for the measures from 95% to 99% nor with the calculations for the 99% confidence level.  The State will need the Data Validator to provide to DCYF with the rationale for the increase in the confidence level for the measures from 95% to 99% as well as the calculations for the 99% confidence level.

**Adequacy of Needs Assessments**

The terms of the Settlement Agreement set forth the requirements, in detail, that DCYF is to meet, as the Data Validator recognized in the June 30, 2019 Report and the December 31, 2019 Report. The Settlement Agreement was created for DCYF to have the flexibility to administer the Department and implement any needed changes to the program to meet the various measures set out in the Agreement.

The *Report and Recommendation* references needs assessments performed by DCYF in relation to Section 1.1 and 1.2.  The Monitoring Team's request represents a significant practice shift not contemplated or agreed upon by the parties under  Sections 1.1 and 1.2 of the Settlement Agreement.   DCYF's level of needs assessment consists of 26 items from the Child and Adolescent Needs and Strengths ("CANS").  In 2016 DCYF developed its assessments in consultation with the Annie E. Casey Foundation and other consultants, and developed and

5

implemented a Level of Need Assessment for children ages 5 to 20 requiring congregate care, specialized foster care, or a traditional foster care placement.

DCYF's Level of Need Assessment includes sections of the CANS instrument that assesses a child's day-to-day functioning across different life sub-scales. An algorithm was developed that reviews: a) youth risk areas; b) behavioral health; c) medical, and, d) developmental needs and generates five different levels of care necessary and the services appropriate for each of the five levels. This algorithm was developed through a collaboration with Jacob Tebes, MD of the Consultation Center, Yale University School of Medicine, Ted Marr, Rhode Island Care Management Network, and Benjamin Weiner and Rachel Small, Ocean State Network, DCYF's Data and Evaluation Unit. It was reviewed by John S. Lyons, PhD from the Praed Foundation, the developer of the Child and Adolescent Needs and Strengths Assessment (CANS).

In 2018, DCYF entered into a contract with the Praed Foundation to receive technical assistance for development of a Level of Need Assessment for children ages 0-5, utilizing the CANS for this age group. The 0-5 Level of Need Assessment was implemented in the spring of 2019 and is currently being used today. The Department's Level of Needs assessment was developed and tested specifically for the care of children in DCYF foster care..

Further, the Department's operating procedure for the Placement Referral Process (DOP Number: 700.0170) instructs workers to complete the Level of Need Assessment prior to any placement, except for emergency placements. In such instances, the Level of Need Assessment is completed within the next work day. **All** placements require a Level of Need assessment, including movements into lateral placements. Based on the above, DCYF will continue to use the Level of Need assessment.

### Other assessments done by DCYF

Once a family is assigned to the primary service worker, he or she assesses the child for risk and safety in accordance with DOP: 700.0050, Comprehensive Assessment and Service Planning.

### CANS Assessments by Providers

DCYF implemented a requirement in 2012 that all congregate care and specialized foster care providers complete a Child & Adolescent Needs and Strengths (CANS) assessment for each child in their care. The CANS is completed within the first thirty (30) days of placement and every ninety (90) days thereafter. These assessments continue to be performed for all children in congregate and specialized foster care.

In addition to the Level of Needs assessment administered by DCYF workers and the CANS administered by DCYF contracted providers, the Department completes a number of assessments across the lifecycle of the child and family beginning with the clients' involvement with Child Protective Services ("CPS") unit. CPS uses a Structured Decision Making ("SDM") process and tool to determine if a call meets the threshold for an investigation. Based on the SDM

tool, if the case meets the threshold for investigation, the investigation is assigned to a CPS investigator ("CPI"). The CPIs administer an assessment, the Family Functional Assessment ("FFA"), a comprehensive assessment that contains a range of domains. Highlights of the domains include: 1) Present Danger, 2) Present Danger Plan, 3) Child Functioning, 4) Adult Functioning, 5) Parent Disciplinary, and General Parenting, 5) Safety and Impending Danger Decision, 6) Safety Plan Determination, 7) Conditions for Return, and 8) Safety Plan.

If the child is assigned to a DCYF caseworker either for in-home services or out-of-home services, a DCYF caseworker administers the Ongoing Family Functional Assessment ("OFFA"). The OFFA was implemented in November 2019. The FFA and OFFA share domains as well as having unique domains. The OFFA is administered and completed within 30 days the child is assigned to the DCYF caseworker and every 90 days thereafter. The case plan is developed based on the OFFA findings and is updated every 6 months. The OFFA likewise contains a range of domains spanning safety, permanency, and well-being. Highlights of the OFFA include: 1) Caregiver and Child Engagement, 2) Child Needs, 3) Family Service Plan, 4) Caregiver and Child Progress, 5) Impending Danger, 6) Safety Decision, 7) Impending Danger Safety Plan Determination, 8) Impending Danger Safety Plan, and 9) Conditions for Return, 10) Present Danger Safety Plan.

DCYF will continue to utilize these tools to serve the children and their families.

The Report and Recommendations seeks to incorporate a requirement into the Settlement Agreement of "a process for utilizing professional judgment [which] should be succinctly outlined." Such a process was not negotiated and nor agreed upon. The parties agreed and the Court affirmed the use by DCYF of professional judgement. There is no authority in the Settlement Agreement where professional judgment is utilized to require a case review.

Furthermore, in regard to Section 3.1(c), the work to identify placements is documented in High Risk/High Need placement window in RICHIST, which is populated by placement staff as to what referrals have been sent out and the disposition of each.

Regarding the Foster Care Recruitment and Retention Plan to be developed in conjunction with the OCA, there have been administrative changes in the initial development of the recruitment plan. However, with the new DCYF recruitment team, all recommendations will be considered and appropriately implemented in the revised plan for FY 2021, in coordination with the OCA and other stakeholders. Governor Raimondo's FY 2021 budget proposal also includes additional resources specific to recruitment and retention, which should have an impact on the success of our recruitment goals.

The Report and Recommendation also sought clarification in Section 7.4, of a "home safety inspection." DCYF conducts a home visit by the assigned License worker, and is the basis for an update to the home study, not the fire/lead safety inspections. This home visit is a more wholistic view of the foster home and its operations, and focuses on how the child is doing in placement.

Further, the *Report* asks whether under Section 6.3 siblings in the same family should be a multiple count. No, the intention was not that visits between siblings in the same family be counted

as multiple successes. Furthermore, this section did not include a quality visit component in the Settlement Agreement.

We look forward to discussing these issues with you at the upcoming meeting.

                Sincerely,

                */s/ Neil F.X. Kelly*
                */s/ Brenda D. Baum*

                Neil F.X. Kelly
                Brenda D. Baum
                Assistant Attorneys General

Cc:    Samantha Bartosz, Children's Rights
       sbartosz@childrensrights.org

       Elissa Glucksman Hyne, Children's Rights
       ehyne@childrensrights.org

       Kevin Aucoin, DCYF
       kevin.aucoin@dcyf.ri.gov

       Patricia Hessler, DCYF
       Patricia.Hessler@dcyf.ri.gov

       Colleen Caron, DCYF
       colleen.caron@dcyf.ri.gov

       Kara Foley, DOA
       Kara.Foley@doa.ri.gov