# EXHIBIT 6

Rhode Island Department of Children, Youth & Families
*Andrew C. v Raimondo* Monitoring Team Report
**Reporting Period #1 (July 1, 2018-December 31, 2018)**

TABLE OF CONTENTS

*Introduction* ............................................................................................ *1*

*Summary of Methodology & Activities* ........................................................ *3*

*Monitoring Team Sampling Recommendations* ........................................... *5*

*Monitoring Team's Assessment Recommendations* ..................................... *8*

*Monitoring Team's Recommendations for Process of the "Professional Judgment"* ............................................................................................... *11*

*The Monitoring Team's Request for Explanation* ...................................... *12*

*Section 1: Assessments* ......................................................................... *14*

*Section 2: Placement in Assessment & Stabilization Centers* ................... *17*

*Section 3: Placement in Congregate Care* ............................................. *21*

*Section 4: Sibling Placements* ............................................................... *24*

*Section 5: Case Management* ................................................................. *26*

*Section 6: Visitation* .............................................................................. *27*

*Section 7: Licensing* ............................................................................. *33*

*Section 8: Child Protective Services* ...................................................... *38*

*Section 9: Foster Care Maintenance Payments* ...................................... *42*

*Section 10: Case Planning* .................................................................... *43*

*Section 11: Maltreatment in Care* .......................................................... *46*

*Section 12: Foster Home Array* ............................................................. *47*

*Major Findings* ..................................................................................... *49*

*Closing* ................................................................................................ *52*

*Appendix A: Required Sample Size for Estimating Outcomes* .................. *53*

*Appendix B: Required Sample Size for Verifying Outcome Accuracy* ........ *55*

*Appendix C: Monitoring Team's Response to DCYF's FY 2019 Foster Care and Recruitment Plan* .................................................................................... *57*

As outlined in the Settlement Agreement described in the case of *Andrew C. v. Raimondo*, the Monitoring Team is comprised of the Office of the Child Advocate (OCA) and the Data Validator. The Data Validator has since been hired by the Rhode Island Department of Children, Youth and Families (DCYF) and can be identified as Public Consulting Group, Inc. (PCG). As outlined in Section 2(d) of the Settlement Agreement, the Data Validator is the "…final arbiter of the timeliness, accuracy of the methodology, as well as the statistical validity and reliability of the DCYF data…" As outlined in Section 2(f) of the Settlement Agreement, the Office of the Child Advocate (OCA) shall provide oversight to the commitments in the Agreement. The OCA "…shall receive and review the progress reports that have been determined to be valid and reliable by the Data Validator." The OCA "…shall confirm whether the commitment has been met or not met."

As part of the terms of the Settlement Agreement, DCYF must measure its performance on a number of outcomes designed to ensure that children in out-of-home care due to an allegation of abuse or neglect receive the highest possible level of care. These outcomes include measures designed to ensure that children are placed in the most appropriate placement setting; that steps are taken to ensure each child's connection to his or her family is maintained; that foster homes are properly licensed and that background checks are completed for all household members; that reports of abuse or neglect are screened in, investigated, and completed in a timely manner; and that case plans for children in out-of-home care are updated in a timely manner and contain the elements required by law.

The Monitoring Team is generating this report in compliance with the roles and responsibilities set forth in the Settlement Agreement. During the first Reporting Period, during which DCYF's performance was measured for the July 1, 2018-December 31, 2018 six-month period, the Monitoring Team encountered issues which impacted our ability to validate the data and confirm whether some of the commitments in the Settlement Agreement were met. First, for Reporting Period 1, PCG was not provided the data from DCYF in accordance with the timeline set in the Settlement Agreement. PCG received the data three (3) months late. This is an issue that the OCA brought to the attention of all parties in writing on May 9, 2019. Due to this issue, PCG was provided with a compressed period of time to perform their review, which impacted their ability to deliver a complete analysis of the number of cases set forth in their initial proposal.

PCG completed their review of cases and the statewide outcomes for the first Reporting Period and delivered a draft report to DCYF on June 30, 2019 that provided to DCYF the statewide outcomes as well as the levels of statistical significance achieved on each measure, based on the number of cases reviewed for each measure. Over the following months, PCG and OCA, in their joint role as the Monitoring Team, reviewed and discussed the data and the review process from Reporting Period 1. In January 2020, PCG vocalized their concerns regarding the statistical validity and reliability of the data provided. Based on the sample sizes, the Monitoring Team was unable to validate all of the data for the first Reporting Period. Subsequently, the Monitoring Team developed a draft report for DCYF leadership outlining the concerns with the sample sizes utilized during the first Reporting Period and presented the report to them on January 23, 2020. At the request of all parties, the Monitoring Team finalized this report which provided further specifics of our response and recommendations to the first Reporting Period. The final report outlining the

concerns and recommendations of the Monitoring Team was provided to all parties on March 16, 2020.

It was the intention of the Monitoring Team to work with the parties to resolve the issues identified in the report to ensure the statistical reliability and validity of the data for the Reporting Periods that had occurred, as well as all future Reporting Periods. The Monitoring Team also wanted to ensure the integrity of our reports. The Monitoring Team discussed these concerns and recommendations with all parties during two (2) conference calls on April 23, 2020 and May 12, 2020. The Monitoring Team was hopeful that our recommendations would be implemented timely to prevent the same deficiencies from occurring in future Reporting Periods, to achieve progress with the lawsuit and to prevent the State from enduring any additional litigation costs during a time of such fiscal uncertainty.

Unfortunately, after providing the time to collaborate on these issues, this effort was unsuccessful. Since the opportunity to resolve the identified issues was denied, the Monitoring Team had to proceed with our obligations under the Settlement Agreement and finalize the findings for Reporting Period 1 based on the data provided. In accordance with Section C(2)(e) of the Settlement Agreement, the Monitoring Team report is a public document.

## SUMMARY OF METHODOLOGY & ACTIVITIES

During the first Reporting Period, DCYF evaluated their performance across twenty measures in order to gauge compliance with the terms of the Settlement Agreement. PCG conducted two separate evaluations for each of those twenty measures: a quantitative analysis and a qualitative case review. A quantitative analysis of data provided by DCYF identified, for the entire statewide universe of applicable cases (for example, children entering care during a period), whether DCYF met the criteria described in the Settlement Agreement for that measure; the results of these analyses were used to identify whether DCYF met the threshold for compliance described in each section of the Settlement Agreement.

In addition to this quantitative analysis of statewide outcomes, many of the measures outlined in the Settlement Agreement require that a qualitative case review be conducted for validation of the measure. These qualitative case reviews were conducted using either a data validation process or a case review instrument, dependent upon the measure. The data validation process for each measure consisted of selecting a random sample of 100 cases from the universe of eligible cases and reviewing the original case documentation in order to verify the accuracy of the data as it is recorded in the Rhode Island Children's Information System (RICHIST) – Rhode Island's Statewide Automated Child Welfare Information System – to ensure that the data used to calculate the outcomes were valid. Case review instruments were used for validation of the measures where the data was not easily quantifiable or was not recorded electronically and were used for only six measures: Visitation 6.2 (quality of caseworker visitation), each of the four Licensing measures (7.1 through 7.4) and Case Planning 10.3 (case plan Adoption Assistance and Child Welfare Act (AACWA) of 1980 compliance). For these measures, PCG developed case review instruments to conduct the qualitative review of cases.

To facilitate these case reviews and the calculation of outcomes across each of the measures, DCYF supplied PCG with data files that were extracted and processed from RICHIST using syntax developed by DCYF. PCG conducted a review of the code used to derive the results in this report between January and April 2019. The syntax review consisted of an analysis of the database extraction code, the syntax used to derive case exclusions and evaluate outcomes, and the sample size and methodology used to calculate the percentages reported and whether they align with the criteria outlined in the Settlement Agreement. PCG's review did not uncover any irregularities in any of the syntax used to calculate the percentages for any of the measures. It should be noted however, that 'absence of evidence' is not 'evidence of absence,' and while PCG did not discover any irregularities or apparent errors with the syntax during the first Reporting Period, it will continue in future periods to validate the syntax utilized by DCYF to generate the samples and calculate statewide outcomes; in addition PCG will continue to conduct case reviews for each measure in order to validate the accuracy of the case-level outcomes. For those measures for which preliminary analysis indicated that DCYF might achieve the threshold for compliance described in the Settlement Agreement, PCG accompanied DCYF staff in generating and transmitting the data extracts in order to ensure that the data provided represented the true and complete extract of the processing scripts.

Following this syntax review, PCG identified a random sample of up to 100 cases for each of the outcome measures and conducted a case review to ensure that the activities indicated by DCYF in the data were appropriately recorded and documented. During this case review, PCG researched individual case records in RICHIST, and recorded the date(s) of the relevant case activity. These dates were then compared to the outcome calculated by the provided syntax to ensure that the results were concordant with one another. As outlined in the following section, however, the number of cases reviewed was insufficient to ensure an appropriate level of statistical validity of the results.

## Monitoring Team Sampling Recommendations

In fulfillment of our role as the Monitoring Team, we determined that some of the samples provided were not statistically significant or valid, therefore, we could not confirm whether some of the commitments in the Settlement Agreement were met for Reporting Period 1. There were no standards included in the Settlement Agreement outlining statistical significance or statistical validity, which led to samples that were not representative of the full population of cases (or "universe") included in the outcome measurement.

The Settlement Agreement resulting from the case of *Andrew C. v. Raimondo* describes a two-tiered approach for evaluating the extent to which DCYF is achieving the outcomes described in the Settlement Agreement across twenty-one measures. The first step in measuring compliance on each measure was to calculate the statewide outcome; for those measures for which compliance can be calculated using data from the RICHIST, outcomes were calculated programmatically (that is, using automated routines to parse and analyze the data for each case and categorize it as a "success" or "failure" on that measure). For sixteen of the 21 measures, this approach was employed, and outcomes were calculated across the entire "universe" of cases to which the measure applies. For five measures, however, the Settlement Agreement describes a qualitative review process to identify outcomes on a case-by-case basis, DCYF was responsible for drawing a random sample of cases to be reviewed by the DCYF Quality Review team. The method by which statewide outcomes were calculated for each measure is described in Table 1, below.

| Measure | How Statewide Outcomes Calculated |
|---|---|
| Assessments 1.1 | Universe |
| Assessments 1.2 | Universe |
| ASC[1] Placements 2.2 | Universe |
| ASC Placements 2.3a | Universe |
| ASC Placements 2.3b | Universe |
| Congregate Care 3.1 | Universe |
| Congregate Care 3.2 | Universe |
| Sibling Placement 4.1 | **Sample** |
| Visitation 6.1 | Universe |
| Visitation 6.2 | **Sample** |
| Visitation 6.3b | **Sample** |
| Visitation 6.4b | **Sample** |
| Licensing 7.1 | Universe |
| Licensing 7.2 | Universe |
| Licensing 7.3 | Universe |
| Licensing 7.4 | Universe |
| CPS[2] 8.1 | Universe |
| CPS 8.2 | Universe |

---

[1] Assessment and Stabilization Center
[2] Child Protective Services, the investigation division of DCYF

| Measure | How Statewide Outcomes Calculated |
|---|---|
| CPS 8.3 | Universe |
| Case Planning 10.2 | Universe |
| Case Planning 10.3 | **Sample** |

Table 1: Method for Calculating Statewide Outcomes

For the sixteen measures where outcomes can be measured for every eligible case statewide using data extracted from RICHIST, no sampling approach was required. However, for the five measures which a qualitative case review process must be utilized to measure success against a sample of cases, the Monitoring Team recommended that the number of cases reviewed by DCYF be sufficiently large to ensure 95 percent confidence with a three percent margin of error[3] across each measure. This sample size will vary depending on the size of the statewide universe for the measure being evaluated. Based on the number of cases in those universes during the first Reporting Period, the number of cases that should be reviewed by DCYF to ensure this level of statistical significance is described in Table 2, below.

| Measure | Universe | PCG Recommended Sample Size | Number of Cases Reviewed by DCYF |
|---|---|---|---|
| Sibling Placement 4.1 | 151 | 133 | 62 |
| Visitation 6.2 | 1,751 | 664 | 173 |
| Visitation 6.3b | 251 | 204 | 61 |
| Visitation 6.4b | 1,030 | 525 | 103 |
| Case Planning 10.3 | 1,751 | 664 | 175 |

Table 2: Recommended DCYF Sample Sizes, Reporting Period 1

In the first Reporting Period, the number of cases reviewed by DCYF for these five measures was insufficient to achieve 95% confidence in the results within a three percent margin of error.

PCG, in its role as Data Validator, employed a second case review process on each of these five measures, the intent of which was to verify that the outcomes reported by DCYF (whether via an automated calculation or a case review process) were accurate, and that the processes which DCYF employed to evaluate statewide outcomes (whether algorithmically-derived or via a case review process are sound). In order to verify the validity of DCYF's findings, PCG conducted a second-level review of a random sample of cases on each of the twenty-one measures. PCG's initial proposal was to review 100 cases on each measure; this "static" sample size resulted, however, in varying levels of statistical significance for each measure during the first Reporting Period. As the size of the applicable universe for each measure will vary each reporting Period, so too will the recommended sample sizes vary slightly in future Reporting Periods.

In order to ensure that PCG's case review findings have a consistent level of statistical validity, the Monitoring Team recommends that the number of cases reviewed by PCG on each measure be of sufficient size to ensure that if errors exist in only one percent of cases initially reviewed by

---

[3] In lay terms, this means that there is a 95 percent likelihood that the aggregate outcomes calculated from the reviews conducted against the sample of cases will fall within three percent of the actual statewide outcome. The approach by which these required sample sizes were derived is described in more detail in Appendix A, *Required Sample Size for Estimating Outcomes*.

DCYF, that there is a 99 percent probability of at least one erroneous case being identified in the sample. While PCG recommends that DCYF conduct a sufficient number of reviews for the five "DCYF-reviewed" measures in order to attain 95 percent confidence in the statewide outcome, PCG recommends a higher standard when PCG is verifying the case-level outcomes reported by DCYF in order to maximize the likelihood of identifying errors – whether systemic or case-specific – in how those outcomes were identified. As such, PCG recommends an approach that will be 99 percent likely to identify any errors, assuming those errors are made in one percent of cases.

The sample sizes for each measure that will ensure that level of statistical validity is described in Table 3, below.

| Measure | How Statewide Outcomes Calculated | Reporting Period #1 (July1, 2018-December 31, 2018) | |
|---|---|---|---|
| | | Universe Size[4] | Recommended PCG Sample Size |
| Assessments 1.1 | Universe | 570 | 342 |
| Assessments 1.2 | Universe | 0 | 0 |
| ASC Placements 2.2 | Universe | 68 | 68 |
| ASC Placements 2.3a | Universe | 68 | 68 |
| ASC Placements 2.3b | Universe | 30 | 30 |
| Congregate Care 3.1 | Universe | 48 | 48 |
| Congregate Care 3.2 | Universe | 83 | 83 |
| Sibling Placement 4.1 | **Sample** | 133 | 132 |
| Visitation 6.1 | Universe | 9,880 | 452 |
| Visitation 6.2 | **Sample** | 664 | 355 |
| Visitation 6.3b | **Sample** | 204 | 185 |
| Visitation 6.4b | **Sample** | 525 | 315 |
| Licensing 7.1 | Universe | 380 | 298 |
| Licensing 7.2 | Universe | 312 | 244 |
| Licensing 7.3 | Universe | 100 | 99 |
| Licensing 7.4 | Universe | 73 | 73 |
| CPS 8.1 | Universe | 3,924 | 435 |
| CPS 8.2 | Universe | 3,278 | 438 |
| CPS 8.3 | Universe | 3,278 | 438 |
| Case Planning 10.2 | Universe | 2,177 | 427 |
| Case Planning 10.3 | **Sample** | 664 | 355 |

*Table 3: Recommended Data Validator Sample Sizes, Reporting Period 1*

---

[4] For those measures where outcomes are calculated against the statewide universe of cases, the "Universe Size" is the number of cases statewide that are "eligible" to be evaluated on the measure. For those measures where outcomes are calculated through a Quality Review process employed by DCYF against a random sample of cases, the "Review Cohort Size" is based on the recommended sample sizes described in Table 2.

## MONITORING TEAM'S ASSESSMENT RECOMMENDATIONS

The Settlement Agreement resulting from the case of *Andrew C. v. Raimondo* describes a two-tiered approach for evaluating the extent to which DCYF is achieving the outcomes described in the Settlement Agreement across twenty-one measures. Section 1.1 of the Settlement Agreement describes the obligation of DCYF to conduct an assessment for all children entering out-of-home care due to a report or suspicion of abuse or neglect, as well as those changing a placement setting during a removal due to a report or suspicion of abuse or neglect.

The Settlement Agreement does not mandate a specific tool to be utilized when conducting these assessments, instead stating only that such assessments:

> *"[include] but [are] not limited to the assessments utilized by DCYF or the clinical opinion of a licensed health care professional in an Assessment and Stabilization Center, mental health impatient facility, or a facility of equivalent level and type."*

During the first three reporting periods under the Settlement Agreement, DCYF's statewide outcome on this measure was evaluated by considering whether any of five different tools were utilized to assess the needs of the child in or entering placement:

- Level of Need Assessment;
- Foster Care Rate Setting Assessment;
- Safety Assessment;
- Placement Request; and
- Risk and Protective Capacity Assessment

The context in which "assessments" are used in Section 1 of the Settlement Agreement suggests that the intent is to ensure that a timely Level of Need Assessment is completed for each child to better inform placement decisions and determine service needs. For example, Section 3.1(a) of the Settlement Agreement (regarding placements into a congregate care setting) indicates that a child should only be placed in congregate care if the child has treatment needs as found during the assessment process referenced in Section 1. This further suggests that the assessment completed pursuant to Section 1 should be evaluating the needs of the child.

Some of the assessments that DCYF "counted" as valid during the first Reporting Period, however, did not evaluate the needs of the child. The Monitoring Team recommends that DCYF re-examine the structure of the assessments currently being conducted of children entering care or changing placements to ensure that, at a minimum, the needs of the child are assessed across several different functional areas.

While it is not the intent of the Monitoring Team to prescribe to DCYF the specific assessment tool that must be used, the "domains" assessed in the Child and Adolescent Needs and Strengths (CANS), which, as of the end of the Reporting Period, was not being used by DCYF, reflects a holistic approach to evaluating the needs of children served by the state child welfare agency. The Monitoring Team therefore recommends that assessments conducted for children entering or changing out-of-home placement only be considered as meeting the requirements of the

Settlement Agreement if it is able to evaluate the needs and strengths of the child in the following areas:

- Life Domain Functioning, which may include (but not be limited to) the child's sleep function/habits, social functioning, sexual development, recreational activities, development, communication skills, judgement, acculturation, legal challenges, physical health needs, daily functioning, and where applicable, independent living skills.
- Child Strengths, which may include (but not be limited to) interpersonal skills, sense of optimism, educational achievement, vocational needs, talents and interests, spiritual or religious needs, community life, permanency of relationships, and natural supports.
- School Functioning, which may include (but not be limited to) behavior, attendance and achievement in school, or the child's current educational setting.
- Planned Permanent Caregiver Strengths and Needs, which may include (but not be limited to) supervision, involvement with care, parenting knowledge, organizational skills, social resources, residential stability, physical and mental health, substance use or misuse, development, access to care, family stressors, self-care, employment, educational achievement, legal challenges, financial resources, transportation arrangements, and safety.
- Child Behavioral/Emotional Needs, which may include (but not be limited to) psychosis, impulsivity/hyperactivity, depression, anxiety, oppositional behavioral, overall conduct, adjustment to trauma, anger control, substance use or misuse, and eating disturbances.
- Child Risk Behaviors, which may include (but not be limited to) suicide risk, self-mutilation, other self-harming behaviors, danger to others, sexual aggression, runaway tendencies, delinquent behavior, fire-setting, sexually reactive behavior, bullying, and overall social behavior.

Section 1 of the Settlement Agreement also stipulates that the clinical opinion of a licensed health care professional employed by an ASC, mental health inpatient facility, or facility of equivalent level or type may be utilized to assess the needs of the child entering care or changing placements. This clinical opinion, provided it is documented in the child's case file in RICHIST, will also be considered as a valid assessment, in lieu of a DCYF-administered assessment that meets the above minimum standards.

Additionally, in the initial proposal presented by PCG to DCYF in 2018, it was proposed that a qualitative review of the assessments be completed to ensure that assessments were not only performed efficiently but were completed with accurate information. This was denied by prior DCYF Administration; the scope of work was therefore limited to a review of the list of placements occurring during each Reporting Period, and the date of the assessment that fell within the timeline of Settlement Agreement. This case review entailed verifying that the assessments in each case occurred on the date indicated in that case list.

A qualitative review would ensure that in addition to providing timely assessments, the assessments are thoroughly completed and relay accurate and pertinent information. Furthermore, the qualitative review will ensure a specific process was followed with each assessment. For example, what documentation was reviewed to inform the placement and service needs assessment, did the individual completing the assessment personally meet with the child, what providers did DCYF speak with during the course of an assessment (e.g. medical providers, clinical staff, etc.). The Monitoring Team respectfully requests consideration for the

completion of a qualitative review of the assessments used to determine the placement decisions. In the absence of a qualitative review and a defined process for a thorough assessment, there is a missed opportunity to ensure that quality assessments are being performed and children in the care of the Department are being appropriately placed in settings that can best meet their needs.

The Monitoring Team also recommends that, when evaluating when an assessment of a child's service and/or treatment needs align with the spirit of the Settlement Agreement, PCG's case reviews indicate whether a face-to-face visit with the child occurred, and whether the needs of the child were discussed with the placement provider(s) or their clinical mental/behavioral health staff. In addition, the Monitoring Team recommends that PCG evaluate whether the assessment has been updated, by comparing the findings and language of the current assessment to the most recent assessment completed for that child within the last 12 months, in order to ensure that the evolving needs of the child are considered at the important touchpoints of a child's removal from the home, or change of placement while in the custody of the Department. The Monitoring Team also wants to ensure that the assessment process reviews a child's needs on an ongoing basis to ensure that they are placed in the most appropriate and least restrictive placement. A process should be carved out for the instances where a child is clinically ready to be discharged from a restrictive setting however, there are no placements available. The Monitoring Team recommends that these qualitative reviews be conducted against a statistically valid sample of cases from the first Reporting Period, as well as in subsequent reporting periods.

Furthermore, the Settlement Agreement does not clearly define which placements would be considered an "equivalent level of need". PCG was not given the opportunity to review cases where DCYF deemed a child's move to be a lateral one. The Monitoring Team requests that "equivalent level of need" be more clearly defined and the ability to review cases determined to meet this definition or the other exceptions as outlined in Section 1.2 of the Settlement Agreement. Otherwise, the Monitoring Team is unable to determine if cases did in fact meet these exceptions and whether the commitment was met.

Additionally, the Monitoring Team requests that each case that DCYF deems to meet one of the exceptions as outlined in the Settlement Agreement be provided to PCG for further qualitative review. PCG's review only verifies that the exception was documented in RICHIST. There is no second-level review to ensure that the case did in fact meet the exception criteria. The Monitoring Team does not believe this is sufficient information to confirm whether the commitment has been met.

Pursuant to Section 2.2(b) placement in an ASC is approved due to "…[a]n emergency removal and using professional judgement this placement is in the best interest of the child". The standard of "professional judgment" is utilized again in Section 3.1(c), which provides that a child can be placed in congregate care if there is an immediate or emergency removal and using "professional judgment" this placement is in the best interests of the child. The standard of "professional judgment" is a catch all clause. The process for using "professional judgment" should be succinctly outlined. This process should outline what the expectations are (i.e. meeting with the child, reviewing case history, reviewing/collecting the child's records and reports from past service and medical providers, thorough completion of a developed assessment tool, etc.), and what needs to be documented in writing throughout the process. Once this process has been defined, the Monitoring Team is requesting to review the cases, where "professional judgment" was exercised for the completion of a qualitative review. This will provide the Monitoring Team with the opportunity to ensure the process is followed and to verify whether cases met this exception and the commitment was met.

Furthermore, Section 3.1(c) notes that following the exercise of professional judgment as to whether placement in congregate care is in the best interest of a child, DCYF must also be "…working to identify a placement". There needs to be clarification regarding what steps must be taken and what needs to be documented in order to satisfy the requirement that DCYF is "working to identify a placement". Also, the required assessment process needs to be further defined including what type of assessment is required, who is completing the assessment, whether or not the worker completing the assessment needs to meet with the child, and what documents and information need to be reviewed as part of the assessment process. It is unclear what must be completed and/or documented in order for this requirement to be met. The Monitoring Team is unable to determine whether cases met this exception without this clarifying information.

## Section 6.3: Sibling Visitation

For Section 6.3, the Monitoring Team understands that for those cases where the intended frequency of visitation is not laid out in the case plans, that is being treated as a "non-compliant" case (that is a failure).

Initially, the Monitoring Team was seeking clarification on how cases that meet the frequency for sibling visitation in the case plan are being handled. For the first Reporting Period, there were only two cases that met the criteria to be a success. However, the two children counted as a success were siblings. After presenting this concern in our March 16, 2020 report, the Monitoring Team was advised in writing by one of the parties that the intent of the Settlement Agreement was not to have visits between siblings counted as multiple successes. Upon further discussion among PCG, OCA and the DCYF data evaluation team, however, it is agreed that the most appropriate unit of analysis for this measure is the child, rather than the case. While this does imply that multiple siblings from the same case may each be counted as a "success" on the measure, those two successes will be represented by two cases in the outcome denominator. This approach also allows for a more nuanced evaluation of outcomes for sibling groups of three or greater, in that a per-child analysis allows the agency to identify whether some (but not all) children in the sibling group had visitation at the intended frequency.

## Section 6.4: Parent-Child Visitation

As discussed above, the quality of visitation was considered for visitation between caseworker and child. This is reviewed utilizing the tool for the federal CFSR process. However, Section 6.4 states that,

> *"[a]s with other areas of casework, DCYF shall assure the quality of parent-child visits through the continuous quality improvement process and provide documentation of the results of the continuous quality improvement process to the Monitoring Team and Plaintiffs' Attorneys."*

First, this suggests that the Department should be conducting this quality improvement process for other areas of casework. However, this is not referenced in other sections of the Settlement Agreement. Specifically, for which other areas of casework should the Department be completing this quality improvement process. For example, in Section 6.3, a qualitative improvement of sibling visitation is not explicitly outlined, and it is unclear if this is an area of casework which would be subject to the quality improvement process. The Monitoring Team is seeking clarification on which sections and areas of casework would be subject to the aforementioned quality improvement process to ensure this has been completed.

Additionally, what is the quality improvement process? The Settlement Agreement does not define this process. Other sections refer to specific federal assessment tools however, this section refers to an undefined and unspecified "quality improvement process". Furthermore, this section requires that the Department provide the Monitoring Team with documentation from the results of the quality improvement process. The type of documentation to be provided is not specified. Also, the Monitoring Team has not received any documentation in response to a quality improvement

process, which has hindered our ability to review the documentation and determine whether this commitment has been met.

## Section 8.3 Child Protective Services

Under Section 8.3, the Department is mandated to complete investigations within the time frames set forth in DCYF policies. However, should the investigation be continued due to circumstances beyond the control of DCYF, the extension of the time frame must be approved by a supervisor and must be accompanied by a safety assessment of the child. The Monitoring Team is seeking clarification whether the required safety assessment must be a new safety assessment completed subsequent to the request for an extension or whether the safety assessment completed during the pendency of the investigation is acceptable.

Under the terms of Section 1 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department conducts assessments for children entering out-of-home care due to a report or suspicion of abuse or neglect, or who change placement settings subsequent to a removal due to a report or suspicion of abuse or neglect. These assessments must be conducted within 30 days of the removal from the home; upon a change in placement, the assessment must be conducted in the period between 60 days prior to the placement change and fourteen days following the placement change.

Four exceptions to this requirement are outlined in the Settlement Agreement:

a) the placement move is to a placement setting that serves an equivalent level of need;
b) the placement change occurs because the placement is no longer available for reasons unrelated to the changing needs of the child;
c) the placement change is occurring to a child not in DCYF legal custody due to a report or suspicion of abuse or neglect, or the child is open to DCYF as a juvenile justice case and the placement change occurs due to juvenile justice or behavioral health reasons; or
d) the placement change is occurring due to an order of the Rhode Island Family Court.

One outcome measure is described in the Settlement Agreement:

**Assessments 1.1:** Children entering care or changing placements during the Reporting Period, excepting entries or placement changes falling under one of the four "exceptions" described above, must receive an assessment within the designated timeframes. DCYF must achieve a successful outcome in 85 percent of removals and placement changes.

After attaining the goal described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 1 of the Settlement Agreement.

## Assessments 1.1: All children removed/changing placements will be assessed.

### Review of Universe Syntax and Statewide Outcome

DCYF identified 570 instances of a child being removed from the home or changing placement settings during the first Reporting Period, excluding those placement changes between placements that serve equivalent levels of need. In 510 of those removals/placement changes, DCYF documented in RICHIST that an assessment had been conducted.

Eighteen records involved a child experiencing more than one placement change within a short period of time and a single assessment being conducted within the designated timeframes for each of the placement changes; these records were "unduplicated" so that each assessment would only be counted as a single successful assessment, leaving 552 removals and placement changes in the statewide universe.

Of the 552 remaining removals and placement changes, DCYF documented an assessment being conducted within the designated timeframe for 492 removals and placement changes, resulting

in a statewide outcome of 89.13 percent. While this exceeds the 85 percent threshold described in the Settlement Agreement as previously noted, the number of cases reviewed by PCG did not allow the Data Validator to validate the results at a sufficient level of statistical significance. Therefore, the Monitoring Team was unable to confirm that the standard outlined in the Settlement Agreement was met.

In addition, the Monitoring Team reiterates its recommendation that DCYF re-examine the nature of assessment being conducted on behalf of children entering care or changing placements to ensure that in all cases, the needs of the child are assessed across all relevant functional areas.

### Case Reviews

PCG identified a random sample of 100 cases out of the universe of all removals or placement changes occurring during the first Reporting Period and conducted reviews of these cases in order to verify that assessments were conducted within the timeframes mandated in the Settlement Agreement. In each of the cases reviewed, PCG found that an assessment was conducted within the designated timeframe.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 552 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 removals/placement changes (representing 18.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.6 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of children entering care or changing placements during the first Reporting Period where the move was not to an equivalent level of need (570 cases), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 350 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period exceeded the 85 percent threshold described in the Settlement Agreement, the Monitoring Team recommends that these case reviews be retroactively conducted on cases from that period. This will ensure that the findings from the Reporting Period are appropriately credited to DCYF. Should this retroactive review not be conducted for the first Reporting Period, the Monitoring Team will be unable to validate that the standard described in the Settlement Agreement has been met. Additionally, the Monitoring Team will be unable to validate the statewide results in future periods, until a sufficiently large sample of cases is reviewed.

## Assessments 1.2: Exceptions to Section 1.1

Section 1.2 of the Settlement Agreement describes the exceptions to DCYF's obligations under Section 1.1 (as summarized in the previous section of this report) and does not include a requirement to calculate outcomes at the statewide level.

## Monitoring Team Recommendation

In the first Reporting Period numerous cases were deemed to have met the exception outlined in 1.2 (a), which states that an assessment does not need to be performed if a child's placement is to "…a placement at an equivalent level of need." However, the Monitoring Team was not provided the list of cases, which DCYF determined to have met this exception. Therefore, PCG was unable to make a determination regarding a statistically significant and valid sample size, nor could the Monitoring Team confirm whether exceptions underlying the exclusion of those cases were appropriately documented for each excluded case.

Going forward, the Monitoring Team has requested the opportunity to review all cases that have been determined to meet this exception for a qualitative review. DCYF did not find that any cases met the exceptions outlined in 1.2(b) and 1.2(c). However, in future Reporting Periods, should any cases meet these exceptions the Monitoring Team would expect the opportunity to review these cases as well.

## Assessments 1.3: Children Unavailable for Assessment

Section 1.3 of the Settlement Agreement describes the circumstances under which the requirement to conduct an assessment may be waived if the child is unavailable – for example, due to the child's runaway status, placement in a psychiatric hospital, or placement out of state. DCYF did not identify any children during the Reporting Period whose assessment was delayed due to the unavailability of the child.

## SECTION 2: PLACEMENT IN ASSESSMENT & STABILIZATION CENTERS

Under the terms of Section 2 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department minimizes the number of children placed in shelters or "assessment and stabilization centers" (ASC). As described in the Settlement Agreement, no child should be placed in an ASC unless:

a) the child has a demonstrated need for placement in an ASC;
b) the placement is an emergency removal, immediate removal from the home is necessary and the ASC placement is in the best interest of the child per the professional judgment of the DCYF caseworker; or
c) the placement at an ASC is due to an order of the Rhode Island Family Court.

For those children who are placed in an ASC, DCYF is responsible for conducting a review of the child's continued placement at least every 14 days until the child is discharged from the ASC; when a child is placed in an ASC longer than 60 days, DCYF must have documented approval for the continued placement from the DCYF Director or the Director's designee.

Three outcome measures are described in the Settlement Agreement:

**ASC 2.2:** Placements during the Reporting Period into an ASC must be for one of the three "exception" reasons described above. DCYF must achieve a successful outcome in 100 percent of ASC placements (that is, all ASC placements must be for one of the three "exception" reasons).

**ASC 2.3a:** Children placed into an ASC must have the appropriateness of that continued placement reviewed by DCYF at least every fourteen days. DCYF must achieve a successful outcome in 90 percent of ASC placements longer than fourteen days.

**ASC 2.3b:** Children placed into an ASC for longer than 60 days must have the written approval of the Director or the Director's designee for the continued placement. DCYF must achieve a successful outcome in 95 percent of ASC placements longer than 60 days.

After attaining all three of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 2 of the Settlement Agreement.

### ASC 2.2: No placements in ASCs

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 68 children who were placed in an ASC during the first Reporting Period. Of those, 21 ASC placements pre-dated the Reporting Period, and were excluded from the

calculations. In each of the remaining 47 cases, DCYF had an "exception" reason documented for the placement, resulting in a statewide outcome of 100 percent. This meets the 100 percent threshold described in Section 2.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of each of the 47 placements into an ASC during the period in order to verify that the "exception" justifying the ASC placement was appropriately documented within RICHIST. In each of the 47 cases, PCG found that DCYF had appropriately documented the reason for the placement

### Statistical Validity of Samples

DCYF evaluated outcomes for all 47 ASC placements occurring statewide during the first Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of cases, the statistical validity of PCG's case review did not need to be calculated, and no further changes to the sampling or case review process is recommended.

### Monitoring Team Recommendation

During the first Reporting Period, the size of the universe of children entering into an ASC placement (68 children) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first Reporting Period will be required, therefore the Monitoring Team has confirmed that this benchmark has been met for Reporting Period 1


## ASC 2.3a: Reviews for 14-day ASC placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 68 children who were placed in an ASC at any point during the first Reporting Period, including 21 placements pre-dating the Reporting Period; since Section 2.3a of the Settlement Agreement described DCYF's obligations to continue reviewing the appropriateness of ASC placements on an <u>ongoing</u> basis, these 21 ASC placements were not excluded from this measure.

Seventeen ASC placements did not last longer than fourteen days, however, and those seventeen episodes were excluded from the statewide calculations. In each of the remaining 51 cases, DCYF conducted a review at least every fourteen days, resulting in a statewide outcome of 100 percent. This exceeds the 90 percent threshold described in Section 2.3a of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of each of the 51 placements of longer than fourteen days in an ASC which overlapped any point of the Reporting Period in order to verify that DCYF conducted reviews of the appropriateness of the continued placement at least every fourteen days. In each of the 51 cases, PCG found that DCYF had conducted such a review and documented the review correctly.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 51 ASC placements of longer than fourteen days in an ASC which overlapped any point of the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG reviewed the full universe of eligible cases, the statistical validity of PCG's case review did not need to be calculated, and no further changes to the sampling or case review process is recommended.

### Monitoring Team Recommendation

During the first Reporting Period, the size of the universe of children whose placement in an ASC placement was 14 days or longer (68 children) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first Reporting Period will be required, therefore the Monitoring Team has confirmed that this benchmark has been met for Reporting Period 1.


## ASC 2.3b: Approval for 60-day ASC placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 30 children who reached their 61st day of placement in an ASC during the Reporting Period. Since DCYF's obligations under the first Reporting Period did not take effect until July 1, 2018, that date represented the start of the 60-day timer to obtain Director approval for these ASC placements. Of the thirty ASC placements identified, ten discharged on or prior to August 29, 2018 (60 days after July 1, 2018) and were excluded from this measure. In each of the remaining twenty cases, DCYF obtained written approval from the Director or their designee on or prior to the later of August 29, 2018 or the child's 60th day of placement in the ASC. The statewide outcome on this measure during the first Reporting Period is 100 percent, exceeding the 95 percent threshold described in Section 2.3a of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of each of the 30 placements in an ASC reaching their 61st day during the Reporting Period in order to verify that written approval from the Director or their designee was documented. This case review included the ten cases where the child reached their 61st day in the ASC placement during the period, but discharged on or prior to August 29, 2018, and which were excluded from the calculation of the statewide outcomes. In each of the 30 cases (including all 20 cases evaluated as part of the statewide outcome), PCG found that DCYF had obtained the approval of the DCYF Director or their designee on or before the later of August 29, 2018 or the child's 60th day of placement in the ASC.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 20 ASC placements reaching their 61st day during the first Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG conducted a case review on all eligible cases, the statistical validity of PCG's case review did not need to be calculated, and no further changes to the sampling or case review process is recommended.

## Monitoring Team Recommendation

During the first Reporting Period, the size of the universe of children whose placement in an ASC placement reached their 60th day (30 children) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first Reporting Period will be required, therefore, the Monitoring Team has confirmed that this benchmark has been met for Reporting Period 1.

## SECTION 3: PLACEMENT IN CONGREGATE CARE

Under the terms of Section 3 of the Settlement Agreement, DCYF is being evaluated on the extent to which the Department minimizes the number of children placed in congregate care settings. As described in the Settlement Agreement, no child should be placed in a congregate care setting unless:

a) the child has treatment needs which necessitate placement in a congregate care setting; or the child has needs that cannot be addressed in a family-like setting;
b) the child is awaiting step-down from congregate care to an appropriate family-like setting;
c) the placement is an emergency removal necessitating immediate removal from the home and the placement in a congregate care setting is in the best interest of the child per the professional judgment of the DCYF caseworker while DCYF works to identify a placement in an appropriate family-like setting; or
d) the placement in a congregate care setting is due to an order of the Rhode Island Family Court.

For those children who are placed in a congregate care setting for 90 days or longer, DCYF is responsible for conducting a review of the child's continued placement at least every 45 days until the child is discharged from the congregate care setting. When a determination is made that a step-down to a more appropriate level of placement is warranted, DCYF will make that step-down within 30 days of the determination. Where the child is not placed into a family-like setting within that 30-day timeframe, the case must be reviewed by the Associate Director of the Permanency Division (or Director's designee) every fifteen days following the 45th day after which the step-down decision was made.

Two outcome measures are described in the Settlement Agreement:

**Congregate Care 3.1:** Placements during the Reporting Period into a congregate care setting must be for one of the four "exception" reasons described above. DCYF must achieve a successful outcome in 90 percent of ASC placements (that is, 90 percent of congregate placements must be for one of the four "exception" reasons.

**Congregate Care 3.2:** Children placed into a congregate care setting for 90 days or longer must have the appropriateness of that continued placement reviewed by DCYF at least every 45 days. DCYF must conduct these reviews in 90 percent of congregate care placements lasting 90 days or longer.

After attaining each of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 3 of the Settlement Agreement.

## Congregate Care 3.1: No children placed in congregate setting unless exception documented

### Review of Universe Syntax and Statewide Outcome

DCYF identified 45 children who were placed in a congregate care setting during the first Reporting Period, excluding children placed into an Acute Residential Treatment Services setting. In 43 of those 45 cases, DCYF documented an "exception" reason for the placement, resulting in a statewide outcome of 95.56 percent. This exceeds the 90 percent threshold described in Section 3.1 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of each of the 45 eligible placements into a congregate care setting during the period in order to verify that the "exception" justifying the placement was appropriately documented within RICHIST. In each of the 45 cases, PCG found that DCYF had appropriately documented the reason for the placement.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 45 placements into a congregate care setting occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated, and no further changes to the sampling or case review process is recommended.

### Monitoring Team Recommendation

During the first Reporting Period, the size of the universe of children entering into a congregate care setting (48 children) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first Reporting Period will be required, therefore, the Monitoring Team has confirmed that this benchmark was met for Reporting Period 1.

## Congregate Care 3.2: Reviews of 90+-Day Congregate Care Placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 75 children who reached their 90th day of placement in a congregate care setting during the first Reporting Period, or who had been placed in a congregate care setting for at least 90 days as of the first day of the Reporting Period. In 71 of those 75 cases, DCYF conducted a review of the appropriateness of that continued placement at least every 45 days following the 90th day of placement. This review identified 94.67 percent of placements as continuing to be appropriate, exceeding the 90 percent threshold described in Section 3.2 of the Settlement Agreement.

### Case Reviews

Of the 75 cases involving a child who reached their 90th day of placement in a congregate care setting during the Reporting Period, or who had been placed in a congregate care setting for at least 90 days as of the first day of the Reporting Period, PCG reviewed the 71 cases identified by DCYF as having achieved a successful outcome on this measure – that is, that DCYF had conducted a review of the appropriateness of the continued placement at least every 45 days

following the 90th day in the congregate placement. PCG found that DCYF had conducted the reviews every 45 days as required in each of the 71 cases.

## Statistical Validity of Samples

DCYF evaluated outcomes for all 75 placements into a congregate care setting occurring statewide during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated, and no further changes to the sampling or case review process is recommended.

## Monitoring Team Recommendation

During the first Reporting Period, the size of the universe of children whose placement in a congregate placement was 90 days or longer (83 children) was sufficiently small that PCG conducted a case review of all cases. The Monitoring Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first Reporting Period will be required, therefore, the Monitoring Team has confirmed that this benchmark was met for Reporting Period 1.

Under the terms of Section 4 of the Settlement Agreement, DCYF is being evaluated on the extent to which siblings[5] who enter out-of-home care within 30 days of each other, or whose placement changes, are placed in the same placement setting. As described in the Settlement Agreement, siblings entering care or who change placements should be placed together unless:

a) DCYF determines that co-placement would be harmful and/or not in the best interest of at least one sibling;
b) at least one of the siblings has treatment needs that necessitate placement in a specialized facility;
c) the size of the sibling group makes co-placement impossible due to licensing regulations;
d) it is in the best interest of at least one sibling to be placed into a kinship setting in which the other siblings cannot be placed; or
e) a specific placement is due to an order of the Rhode Island Family Court.

One outcome measure is described in the Settlement Agreement:

**Sibling Placement 4.1:**   Siblings removed or changing placements during the Reporting Period must be placed in the same setting unless one of the five "exception" reasons described above applies. DCYF must draw a random sample of eligible "events" to review (siblings entering care, or a change in placement for at least one member of a sibling group in care), and must achieve a successful outcome in 80 percent of reviewed cases.

After attaining the goal described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 4 of the Settlement Agreement.

## Sibling Placement 4.1: Siblings Placed Together

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 80 cases in which siblings entered care during the period, or were placed during the period and the placement setting of at least one sibling changed. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review team in order to identify (a) whether an "exception" to the Settlement Agreement requirements applied to the siblings; and if not (b) whether the siblings were placed together.

DCYF documented 35 cases in which a valid "exception" existed to the requirement that the siblings be placed together; of the remaining 45 cases, DCYF found that in 33 cases (73.33%) the siblings were placed together upon their entry into out-of-home care or the placement change

---

[5] For the purposes of this measure, "siblings" are defined as children who have at least one parent in common through birth or adoption, who lived together immediately prior to placement and who entered placement within 30 days of one another.

of at least one sibling. This statewide outcome of 73.33 percent falls short of the 80 percent threshold described in Section 4.1 of the Settlement Agreement.

## Case Reviews

PCG conducted a case review of each of the 33 cases where DCYF (a) did not note that an "exception" to the requirements of the Settlement Agreement applied, and (b) found that the siblings had been placed together. In each of the 33 cases reviewed, PCG verified that the siblings were placed in the same setting upon their removal from the home or placement change.

## Statistical Validity of Samples

DCYF evaluated outcomes for 80 of 151 eligible cases statewide (representing 52.98 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±7.5 percent. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

## Monitoring Team Recommendation

Based on the size of the statewide universe of sibling groups entering out-of-home care or changing placements during the first Reporting Period (151 cases), the Monitoring Team recommends increasing the number of cases reviewed by DCYF to 273 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 246 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 80 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

Under the terms of Section 5 of the Settlement Agreement, DCYF is tasked with attaining casework goals as described in the areas of visitation (Section 6 of the Settlement Agreement) and case planning (Section 10).

No additional outcome measures – beyond those described in Sections 6 and 10 – are defined in Section 5 of the Settlement Agreement.

DCYF will utilize the results from the first Reporting Period to establish a baseline of current DCYF compliance with the case plan content and timeliness elements evaluated under the terms of Section 10 of the Settlement Agreement. Starting with the second Reporting Period (January 1, 2019–June 30, 2019), should DCYF not attain the commitments outlined in Sections 6 and 10 in two consecutive periods, DCYF will be responsible for conducting a workload study in consultation with the Monitoring Team.

Under the terms of Section 6 of the Settlement Agreement, DCYF is being evaluated on the extent to which children in out-of-home care are visited by caseworkers on a regular basis; that those visits appropriately assess issues pertaining to the safety, permanency and well-being of the children; and that visits between siblings in care, and between children in care and their parents for cases with a goal of reunification, occur as often as described in the case plan.

Four outcome measures are described in the Settlement Agreement:

**Visitation 6.1:** Each full calendar month that a child is in out-of-home placement, they should experience at least one face-to-fact visit with a member of the DCYF Care Team. DCYF must achieve a successful outcome in 95 percent of full calendar months that children are in out-of-home care.

**Visitation 6.2**: Children in out-of-home care during the Reporting Period must have visitation that meet the federal CFSR criteria to be rated as a "strength" in terms of frequency and quality. DCYF must draw a random sample of eligible cases to review and must achieve a successful outcome in 85 percent of reviewed cases.

**Visitation 6.3b**: Siblings in out-of-home care during the Reporting Period must have visitation between the siblings which occurs at the frequency indicated in their case plans. DCYF must draw a random sample of eligible cases to review and must achieve a successful outcome in 85 percent of reviewed cases.

**Visitation 6.4b**: Children in out-of-home care during the Reporting Period for whom the case plan goal is reunification must have visitation with their parents that occurs at the frequency indicated in their case plans. DCYF must draw a random sample of eligible cases to review and must achieve a successful outcome in 85 percent of reviewed cases.

Upon attaining the goals described for Visitation 6.1 for two consecutive Reporting Periods, DCYF shall exit from the terms of the Settlement Agreement for that measure. Similarly, upon attaining the goals described for Visitation 6.2 for two consecutive Reporting Periods, DCYF shall exit from the terms of the Settlement Agreement for that measure.

The Visitation 6.3b and Visitation 6.4b are incorporated into Section 10 of the Settlement Agreement (Case Planning), and the criteria for DCYF's exit from the terms of the Settlement Agreement for those measures are described in the "Section 10: Case Planning" section of this report.

## Visitation 6.1: Caseworker Face-to-Face Visits with Children

### Review of Universe Syntax and Statewide Outcome

DCYF identified 2,524 children who were in care at least one full calendar month during the first Reporting Period, spanning 9,880 full calendar months. In 9,300 of those months, the child in care

experienced at least one face-to-face visit with a member of the DCYF Care Team, resulting in a statewide outcome of 94.13 percent. This outcome falls short of the 95 percent threshold described in Section 6.1 of the Settlement Agreement.

### Case Reviews

PCG identified a random sample of 100 children placed for at least one full calendar month during the Reporting Period, and conducted a case review in order to verify that DCYF had appropriately documented that the face-to-face visit occurred with the child during each full calendar month that the child was in care during the Reporting Period. In each of the 100 cases reviewed, PCG found that visitation was appropriately documented.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 2,524 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 children in care for at least one full calendar month during the Reporting Period (representing 4.0 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±10.0 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of children served in out-of-home care for at least one full calendar month during the first Reporting Period (2,524 children), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 430 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

DCYF's performance on this measure did not meet the 95 percent threshold described in the Settlement Agreement in the first Reporting Period. The Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

## Visitation 6.2: Quality of Face-to-Face Visits

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 173 cases of children in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review team in order to evaluate whether the quality of the visits meets the criteria used for the federal CFSR to rate as case as a "strength."

This methodology excluded children entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those children who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all children served through the first four months of each Reporting Period, rather than the first three months.

Of the 173 cases, 29 cases (16.76%) were rated as a "strength." This outcome falls short of the 85 percent threshold described in Section 6.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a second-level review of 20 percent of the 173 cases reviewed by DCYF (35 cases), and evaluated the quality of visitation using the same federal CFSR instrument and case review criteria employed by the DCYF Quality Review Team. The purpose of this case review was to verify the findings of the DCYF review; of the 35 cases subject to this second-level review, eight had been rated as a "strength" by the DCYF Quality Review team, and 27 had been rated as an "area needing improvement." In each of the 35 cases reviewed, PCG agreed with the rating assigned by the DCYF Quality Review team.

### Statistical Validity of Samples

DCYF evaluated outcomes for 173 of the 1,751 eligible cases statewide (representing 9.88 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±7.8 percent. PCG's second-level review of 33 cases is statistically valid at a 95 percent confidence interval with a margin of error of ±16.9 percent. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of children served in out-of-home care during the first Reporting Period (1,751 children and 1,689 children, respectively), the Monitoring Team recommends increasing the number of cases reviewed by DCYF from ten percent (approximately 170 cases) to 675 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 355 in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

## Visitation 6.3b: Sibling Visitation

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 61 cases (of 251 total statewide) involving siblings in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review team in order to evaluate whether visitation between the siblings occurred at (at minimum) the frequency described in the siblings' case plans.

This methodology excluded siblings entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those sibling groups who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all sibling groups served through the first four months of each Reporting Period, rather than the first three months.

Of the 61 siblings reviewed, two[6] (3.28%) were found to have visitation that occurred at least as often as what was stipulated in the siblings' case plan. In addition to cases where visitation did not occur at the frequency recommended in the case plan, cases where the appropriate frequency of visits between siblings was not specified in the case plan were also counted as non-compliant on this measure. This outcome falls short of the 85 percent threshold described in Section 6.3b of the Settlement Agreement.

DCYF conducted an additional review of 25 non-compliant cases in order to identify the reasons for non-compliance; in 15 cases (60%), the required frequency of visitation was stipulated in the case plan. In the remaining 10 cases, the frequency of visitation was not described in the case plan; in two of those ten cases, reviewers found that frequency between/among the siblings did occur at a frequency that was consistent with the professional judgment of the reviewer.

### Case Reviews

PCG conducted a second-level review of the two cases where DCYF found that sibling visitation occurred at the frequency indicated in the case plan and evaluated whether that visitation did occur; in both cases, PCG found that visits between the siblings occurred at the indicated frequency.

### Statistical Validity of Samples

DCYF evaluated outcomes for 61 of the 251 eligible cases statewide (representing 24.30 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±10.94 percent. PCG's second level review of the two "successful" cases was not statistically valid. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of sibling groups served in out-of-home care during the first Reporting Period (251 sibling groups), the Monitoring Team recommends increasing the number of cases reviewed by DCYF to 204 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 185 cases in order to ensure a 99

---

[6] The two siblings for whom visitation was found via case reviews to have occurred at the frequency indicated in the case plan were part of the same sibling group. As this measure is evaluated separately for each child (not each case as a whole), both siblings counted as a "success" on this measure; each sibling was also counted separately in the denominator.

percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

## Visitation 6.4b: Parent-Child Visitation

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 103 cases (of 1,030 total statewide) involving children in out-of-home placements with a goal of reunification. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review team in order to evaluate whether visitation between the child and parent occurred at least the frequency required in the child's case plan, excepting cases where parents are not attending visits despite DCYF employing measures to ensure the parents' ability to participate in the visit.

This methodology excluded children entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those children who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all children served through the first four months of each Reporting Period, rather than the first three months.

Of the 103 cases reviewed, thirteen cases (12.62%) were found to have visitation between the parent and the child that occurred at least as often as what was required by the case plan. Similar to measure 6.3b, cases where the appropriate frequency of visits between the parent and child was not specified in the case plan were also counted as non-compliant on this measure. This outcome falls short of the 85 percent threshold described in Section 6.4b of the Settlement Agreement.

DCYF conducted an additional review of the 90 non-compliant cases in order to identify the reasons for non-compliance; in 84 cases (93%), the required frequency of visitation was described in the case plan. In the remaining six cases, the frequency of visitation was not described in the case plan; in two of those six cases, reviewers found that frequency between the parent and child did occur at a frequency that was consistent with the professional judgment of the reviewer.

### Case Reviews

PCG conducted a second-level review of the thirteen cases where DCYF found that visits between the parents and the child occurred at the frequency indicated in the case plan, and evaluated whether that visitation did occur; in each of the thirteen cases, PCG verified that visits between the siblings occurred at the required frequency.

The Settlement Agreement also describes in Section 6.4(b) that:

> "…[a]s with other areas of casework, DCYF shall assure the quality of parent-child visits through the continuous quality improvement process and provide documentation of the

results of the continuous quality improvement process to the Monitoring Team and Plaintiffs' Attorneys."

To date, DCYF has not provided documentation of the results of this continuous quality improvement process. The type of documentation that DCYF should provide is not specified. This section also indicates that the quality improvement process should be applied in other areas of casework, however the other sections this may have been intended to apply is not specified.

## Statistical Validity of Samples

DCYF evaluated outcomes for 103 of the 1,030 eligible cases statewide (representing ten percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±10.1 percent. PCG's second level review of the thirteen "successful" cases was not a random sample, and the statistical validity of that sample was not calculated. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

## Monitoring Team Recommendation

Based on the size of the statewide universe of children served in out-of-home care with a goal of reunification during the first Reporting Period (1,030 children), the Monitoring Team recommends increasing the number of cases reviewed by DCYF from ten percent (approximately 100 cases) to 516 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Assuming that DCYF implements the above recommended sample size for their initial review, the Monitoring Team further recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 315 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first  Reporting Period did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

The Monitoring Team would also recommend that the appropriate documentation of the continuous quality improvement process be provided as required by the Settlement Agreement and guidance be provided on what other "areas of casework" the continuous quality improvement process applies. The Monitoring Team wants to ensure we are completing a thorough review.

Under the terms of Section 7 of the Settlement Agreement, DCYF is being evaluated on the extent to which non-kinship foster homes into which children have been placed are appropriately licensed; that background checks are conducted for all members of a prospective foster home who are age 18 or older; that kinship foster home license applications are completed in a timely manner; and that background checks are conducted in a timely manner for all foster homes for which a license is due for renewal and in which a child is placed during the Reporting Period.

Four outcome measures are described in the Settlement Agreement:

**Licensing 7.1:** No child may be placed in a non-kinship home without an active license, unless the placement was made pursuant to an order of the Rhode Island Family Court. DCYF must achieve a successful outcome in 100 percent of placements into a non-kinship home during the Reporting Period.

**Licensing 7.2:** No child may be placed into a prospective kinship foster home (that is, one where licensure is pending) unless background checks have been conducted for all household members age 18 or older, excepting those cases where the placement was made pursuant to an order of the Rhode Island Family Court. DCYF must achieve a successful outcome in 100 percent of placements into a foster home during the Reporting Period where licensure is pending.

**Licensing 7.3:** Kinship foster home licensing applications must be completed within six months of the date of application. DCYF must achieve a successful outcome in 95 percent of cases where a licensing application was submitted during the Reporting Period.

**Licensing 7.4:** DCYF must conduct background checks for all household members age 18 or older in foster homes within 30 days of the date that the home's licensure renewal is due. DCYF must achieve a successful outcome in 85 percent of cases where a renewal was due during the Reporting Period.

After attaining the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 7 of the Settlement Agreement.

## Licensing 7.1: Licensing of Non-Kinship Placements

### Review of Universe Syntax and Statewide Outcome

DCYF identified 380 placements into a non-kinship foster home during the Reporting Period. In each of those 380 placements, DCYF identified that the non-kinship foster home was licensed during the entire time the child was placed there during the first Reporting Period, resulting in a statewide outcome of 100 percent. This meets the 100 percent threshold described in the Settlement Agreement; as described in the next sections of this report, however, DCYF did not meet the threshold mandated by the Settlement Agreement on the other measures comprising this domain, and will not be subject to exit from Section 7 of the Settlement Agreement in the second Reporting Period, even if they again achieve a 100 percent success rate on this measure.

### Case Reviews

PCG identified a random sample of 100 placements into a non-kinship foster home occurring during the Reporting Period and conducted a case review in order to verify that the foster home license was active the entire period the child was placed in that home during the Reporting Period. In each of the 100 cases reviewed, PCG found that the foster home license was active the entire timeframe under review.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 380 placements statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 removals/placement changes (representing 18.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±11.0 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of children entering into a non-kinship placement during the first Reporting Period (380 children), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 300 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 100 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.


## Licensing 7.2: Background Checks for Kinship Homes

### Review of Universe Syntax and Statewide Outcome

DCYF identified 312 placements into a kinship foster home during the first Reporting Period where the foster home was pending licensure. In 221 of those 312 placements, DCYF identified that background checks had been conducted for all household members age 18 or older, resulting in a statewide outcome of 70.83 percent. This outcome falls short of the 100 percent threshold described in Section 7.2 of the Settlement Agreement.

### Case Reviews

PCG identified a random sample of 100 placements into a foster home occurring during the Reporting Period where the foster home was pending licensure and conducted a case review in order to identify whether backgrounds checks had been conducted on all household members age 18 or older. In each of the 100 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 312 applicable placements statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 placements (representing 32.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±11.2 percent at a 95 percent confidence interval. As described in the "Monitoring Team

Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of children entering into a prospective foster home whose licensure was pending during the first Reporting Period (312 children), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 315 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 100 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

## Licensing 7.3: Timely Completion of Kinship License Applications

### Review of Universe Syntax and Statewide Outcome

As this measure evaluates DCYF's compliance over a six-month timeframe, measured prospectively from the time each kinship home submits its application for licensure, DCYF and PCG were unable to review licensure applications submitted during the Reporting Period of July 1, 2018–December 31, 2018, since DCYF's timeframe for completing those applications would extend through June 30, 2019.

During the first Reporting Period, DCYF instead identified kinship license applications submitted between May 1, 2018 and June 30, 2018, in order to evaluate the successful completion of those applications through the end of the first Reporting Period on December 31, 2018. Future periods' analyses will "lag" one full Reporting Period behind other outcomes measured as a result; that is, when evaluating outcomes for the second Reporting Period (January 1, 2019–June 30, 2019) DCYF and PCG will examine kinship licensing applications submitted between July 1, 2018–December 31, 2018, which under the terms of the Settlement Agreement must each be completed by June 30, 2019 (the end of the second Reporting Period).

DCYF identified 100 kinship home applications filed between May 1, 2018 and June 30, 2018. In 41 of those 100 cases, an order of the Rhode Island Family Court mandated placement with the kinship provided and were excluded from the analysis. In 39 of the remaining 59 kinship licensing applications, the child was discharged prior to the expiration of the six-month deadline for completing the application, leaving twenty applications to be evaluated on this outcome. Of those twenty kinship licensing applications, DCYF completed the application within six months for nine applications, resulting in a statewide outcome of 45.00 percent. This falls short of the 95 percent threshold described in Section 7.3 of the Settlement Agreement.

### Case Reviews

PCG identified a random sample of 50 kinship home applications filed between May 1, 2018– June 30, 2018 and conducted a case review in order to identify whether the application was completed within the six-month timeframe described in Section 7.3 of the Settlement Agreement. In each of the 50 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 59 applicable kinship home applications submitted statewide between May 1, 2018 and June 30, 2018, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of kinship foster home licensure applications submitted during the first Reporting Period (100 children), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to the full statewide universe in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 95 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future periods.

## Licensing 7.4: Background Checks within 30 Days of License Renewal

### Review of Universe Syntax and Statewide Outcome

DCYF identified 73 foster homes where the license was due for renewal during the first Reporting Period, and a child was placed in the home during the Reporting Period. For seventeen of those 73 foster homes, DCYF identified that background checks were conducted for all household members age 18 or older within 30 days of the due date for the renewal, and that a home inspection was conducted within 30 days of that same due date. This statewide outcome of 23.29 percent falls short of the 85 percent threshold described in Section 7.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of all 73 applicable foster homes in order to identify whether background checks had been conducted on all household members age 18 or older, and whether a home inspection had been conducted within 30 days of the license due date. In each of the 73 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 73 applicable kinship home applications due during the Reporting Period, and the statistical validity of those results did not need to be calculated. Similarly, since PCG did not review a sample of cases, the statistical validity of PCG's case review did not need to be calculated.

### Monitoring Team Recommendation

During the first Reporting Period, the size of the universe of licensure renewals coming due (73 renewals) was sufficiently small that PCG conducted a case review of all cases. The Monitoring

Team recommends that this evaluation of all eligible cases continue in future Reporting Periods. No change to the case reviews conducted during the first Reporting Period will be required.

## SECTION 8: CHILD PROTECTIVE SERVICES

Under the terms of Section 8 of the Settlement Agreement, DCYF is being evaluated on the extent to which DCYF screens in reports of abuse or neglect in a timely manner; whether they respond to screened-in reports in a timely manner; and whether they complete their investigation of screened-in reports in a timely manner.

Three outcome measures are described in the Settlement Agreement:

**CPS 8.1:** DCYF must make a screening decision within timeframes consistent with Rhode Island statute – 30 minutes for reports designated as having an "emergency" priority level; two hours for reports designated as having an "immediate" priority level; and four hours for reports designated as having a "routine" priority level. DCYF must achieve a successful outcome in 90 percent of reports received during the Reporting Period.

**CPS 8.2:** For reports of abuse or neglect that are screened in, DCYF must respond to the report by making contact or attempting to make contact with the victim or someone involved in the case within timeframes described by Rhode Island statute – two hours for reports designated as having an "emergency" priority level; twelve hours for reports designated as having an "immediate" priority level; and 48 hours for reports designated as having a "routine" priority level. DCYF must achieve a successful outcome in 90 percent of screened-in reports received during the Reporting Period.

**CPS 8.3:** For reports of abuse or neglect that are screened in, DCYF must complete the investigation within 30 days of the report, or within 45 days if the investigation is continued due to circumstances beyond the control of DCYF; investigations completed in 31 to 45 days must have supervisor approval documented for the extension. DCYF must achieve a successful outcome in 85 percent of screened-in reports received during the Reporting Period.

After attaining each of the goals described above for two consecutive six-month periods, DCYF shall exit from monitoring under Section 8 of the Settlement Agreement.

### CPS 8.1: Timely Screening Decisions

#### Review of Universe Syntax and Statewide Outcome

DCYF identified 3,924 reports of abuse or neglect that were received during the first Reporting Period, excluding those calls that were classified as "Information & Referral." In 3,786 of those 3,924 reports (96.48%), DCYF made a screening decision within the timeframes outlined by statute. This statewide outcome exceeds the 90 percent threshold described in Section 8.1 of the Settlement Agreement; as described in the next section of this report, however, DCYF did not meet the threshold mandated by the Settlement Agreement on the other measures comprising this domain, and DCYF will not be eligible to exit from Section 8 of the Settlement Agreement in

the second Reporting Period, even if they again achieve successful outcomes in at least 90 percent of reports.

### Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period in order to verify that the screening decision was made within the timeframe mandated by Rhode Island statute. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 3,924 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 reports (representing 2.5 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of CPS reports received during the first Reporting Period (3,924 reports), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 450 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

While DCYF's performance on this measure during the first Reporting Period exceeded the 90 percent, threshold described in the Settlement Agreement, DCYF must achieve the benchmarks on all three CPS measures in order to exit Section 8 of the Settlement Agreement. The Monitoring Team therefore does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period.

## CPS 8.2: Timely Face-to-Face Contact within Child

### Review of Universe Syntax and Statewide Outcome

DCYF identified 3,278 reports of abuse or neglect that were received during the first Reporting Period and subsequently screened in for investigation. In 2,549 of those 3,278 reports (77.76%), DCYF made contact with the alleged victim or someone involved in the case or report within the timeframe mandated by DCYF statute. This statewide outcome falls short of the 90 percent threshold described in Section 8.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period which were screened in by DCYF in order to verify that contact was made within the mandated timeframe. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 3,278 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 screened-in reports (representing 3.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of CPS reports screened in during the first Reporting Period (3,278 reports), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 440 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 90 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future periods.

## CPS 8.3: Timely Completion of Investigation

### Review of Universe Syntax and Statewide Outcome

As described in the previous section, DCYF identified 3,278 reports of abuse or neglect that were received during the first Reporting Period and subsequently screened in for investigation. In 2,765 of those 3,278 reports (84.35%), DCYF completed the investigation within the timeframe mandated by Rhode Island statute. Of the 2,765 investigations completed within a timely manner, 2,435 were completed within 30 days, and another 330 were completed within 45 days with supervisor approval and a documented reason for the extension of the investigation. This statewide outcome of 84.35 percent falls short of the 85 percent threshold described in Section 8.3 of the Settlement Agreement.

### Case Reviews

PCG conducted a case review of 100 reports of abuse or neglect received during the Reporting Period which were screened in by DCYF in order to verify that the investigation was completed within the timeframe provided by DCYF. In each of the 100 reports reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 3,278 applicable reports of abuse or neglect received during the Reporting Period, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 screened-in reports (representing 3.1 percent of the statewide universe) is concordant with DCYF's findings with a margin of error of ±9.9 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

## Monitoring Team Recommendation

Based on the size of the statewide universe of CPS reports screened in during the first Reporting Period (3,278 reports), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 440 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 85 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future periods.

## SECTION 9: FOSTER CARE MAINTENANCE PAYMENTS

Under the terms of Section 9 of the Settlement Agreement, DCYF is tasked with assessing the base rates for foster care maintenance payments. Should that assessment indicate that a rate adjustment is needed, DCYF is responsible for advocating with the Rhode Island General Assembly for additional appropriations to cover the increase. DCYF is also required to amend the Rhode Island Administrative Code to reflect that this reassessment of foster care maintenance payments must occur every three years.

Once those two events occur, DCYF will notify the Monitoring Team in writing. Such notification has not yet occurred.

Under the terms of Section 10 of the Settlement Agreement, DCYF is being evaluated on the extent to which DCYF have case plans that meet the timeliness requirements outlined by federal statute, and include the elements that are required under the Adoption Assistance and Child Welfare Act (AACWA) of 1980.[7]

Two outcome measures are described in the Settlement Agreement:

**Case Planning 10.2:**  DCYF must ensure that children in the legal custody of DCYF have case plans that meet the timeliness requirements enumerated in 42 U.S.C. §670 *et seq*. DCYF must achieve a successful outcome in 80 percent of children served in out-of-home care during the Reporting Period.

**Case Planning 10.3:**  Children in out-of-home care during the Reporting Period must have in their case plans the elements required by AACWA. DCYF must draw a random sample of eligible cases to review and must achieve a successful outcome in 80 percent of reviewed cases.

After attaining the goals described above, as well as the goals described under Sections 6.3b and 6.4b, for two consecutive six-month periods, DCYF shall exit from monitoring under Section 10 of the Settlement Agreement.

## Case Planning 10.2: Timeliness of Case Plans
### Review of Universe Syntax and Statewide Outcome
DCYF identified 2,177 children served in out-of-home care during the first Reporting Period. Of those, 124 children were not in care for at least sixty days during the Reporting Period and were excluded from the measure. DCYF reviewed the remaining 2,053 cases and found that in 264 cases (12.86%), the child had a case plan that met the timeliness requirements dictated by statute – specifically, that the initial case plan was completed within 60 days of the child's removal from the home, or had been updated at least every six months following the initial plan. This falls short of the 80 percent threshold described in Section 4.1 of the Settlement Agreement.

### Case Reviews
PCG identified a random sample of 100 children served during the period for whom DCYF found that the case plan had been updated in a timely manner (i.e., "successful" cases) and conducted a case review in order to verify that the case plan was created or updated within the timeframe

---

[7] 42 U.S.C. §675(1) requires that case plans include a description of the type of setting in which a child will be placed, including a discussion of the safety and appropriateness of the placement; a plan for ensuring that the child receives safe and proper care and that the child, their parents and their foster parents receive appropriate services to facilitate reunification or permanent placement; the health and educational status of the child; a written description of transitional services to be provided to children 14 years of age or older; the steps being taken for children with a goal of adoption or placement in another permanent home to find a permanent living arrangement for the child; the steps taken on behalf of children with a goal of relative placement to determine the unsuitability of a reunification or adoption and why relative placement is in the child's best interest; and a plan for ensuring the educational stability of the child while in out-of-home care.

described by DCYF. In each of the 100 cases reviewed, PCG found that the outcome reported by DCYF (whether it indicated a successful case or a non-compliant case) was accurate.

### Statistical Validity of Samples

DCYF evaluated outcomes for all 2,053 eligible cases statewide, and the statistical validity of those results did not need to be calculated. PCG's case review of 100 case plans rated as a "success" (representing 37.9 percent of the statewide universe of successful cases) is concordant with DCYF's findings with a margin of error of ±10.0 percent at a 95 percent confidence interval. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

### Monitoring Team Recommendation

Based on the size of the statewide universe of children served in out-of-home care during the first Reporting Period (2,177 children), the Monitoring Team recommends increasing the number of cases reviewed by PCG from 100 cases per Reporting Period to 430 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period[' did not reach the 80 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

## Case Planning 10.3: Case Plan Required Elements

### Review of Sampling Syntax and Statewide Sample

DCYF pulled a random sample of 190 cases of children in care at any point during the first three months of the period. This random sample was stratified by DCYF Region, and each case was reviewed by a member of the DCYF Quality Review team in order to evaluate whether the case plan included all of the elements required by AACWA.

This methodology excluded children entering care during the final three months of the period; while PCG agrees with DCYF's decision to exclude from the sample those children who were not in care long enough for a case plan to be developed during the period, the timeframe for developing that case plan is sixty days. DCYF has agreed in future Reporting Periods to include all children served through the first four months of each Reporting Period, rather than the first three months.

Of the 190 cases, nine (4.74%) were found to include all elements required by AACWA. This outcome falls short of the 80 percent threshold described in Section 6.2 of the Settlement Agreement.

### Case Reviews

PCG conducted a second-level review of each of the nine cases identified by the DCYF Quality Review team as having included all required elements in order to independently evaluate success on this measure. In each of the nine cases reviewed, PCG arrived at the same case rating as the DCYF Quality Review team.

## Statistical Validity of Samples

DCYF evaluated outcomes for 190 of the 1,751 eligible cases statewide (representing 10.85 percent of the statewide universe); this sample is statistically valid at a 95 percent confidence interval with a margin of error of ±7.5 percent. PCG's second level review of the nine successful cases was not a random sample and was not statistically valid. As described in the "Monitoring Team Sample Size Recommendations" section, the number of cases reviewed were insufficient to ensure the three percent margin of error recommended by the Data Validator.

## Monitoring Team Recommendation

Based on the size of the statewide universe of children served in out-of-home care for at least 60 days during the first Reporting Period (1,751 children), the Monitoring Team recommends increasing the number of cases reviewed by DCYF from ten percent (approximately 190 cases) to 665 cases in order to ensure 95% confidence in the results, with a margin of error of no more than three percent.

Further, the Monitoring Team recommends increasing the size of the sample of cases for which a second-level review is conducted by PCG from 100 cases to 355 cases in order to ensure a 99 percent chance of identifying any errors in the statewide outcomes, assuming those errors occur in one percent of cases.

Since DCYF's performance on this measure during the first Reporting Period did not reach the 80 percent threshold described in the Settlement Agreement, the Monitoring Team does not recommend that these case reviews be retroactively conducted on cases from the first Reporting Period, but that the revised sampling criteria be applied in future Reporting Periods.

Under the terms of Section 11 of the Settlement Agreement, DCYF is required to conduct an annual assessment of substantiated reports of abuse or neglect occurring during the preceding twelve (12) months, including those occurring to a child who was placed in an unlicensed kinship setting. The report will identify any systemic factors that may have contributed to the abuse/neglect, and DCYF is required to make this report publicly available, including the results of the assessment of substantiated reports, as well as recommendations for corrective actions recommended to ensure the safety of children in foster care.

Upon review of DCYF's website there is a report entitled "Annual Safety Analytic Report (FFY 18)". Section 3 of this report reviews maltreatment in foster care for Federal Fiscal Years 2015, 2016 and 2017. At the conclusion of Reporting Period 1, there was no assessment of maltreatment in foster care for federal Fiscal Year 2018, which concluded on September 30, 2018. This report notes that data is current through October 1, 2018 however, there was no analysis of the data regarding maltreatment in foster care from federal Fiscal Year 2018 in this report at the conclusion of the first Reporting Period.  Section 11 requires an annual assessment, of the substantiated events of abuse or neglect occurring to a child in DCYF foster care over the **_preceding twelve months_**. Therefore, since the report did not include data from FFY 2018 regarding maltreatment in foster care, this commitment has not been met for Reporting Period 1.

DCYF will continue to conduct and publish this annual assessment until it exits from the terms of Sections 1-10 of the Settlement Agreement.

Under the terms of Section 12 of the Settlement Agreement, DCYF is required to develop an annual recruitment and retention plan for foster homes. Under the terms of Section 12, this recruitment and retention plan must include specific targets regarding the number of foster homes to be recruited, including sub-targets for specific populations such as adolescents, as well as populations with special needs such as children with disabilities and medically fragile children. It will also include retention strategies geared toward reducing attrition among foster care providers, such as respite homes, enhanced training opportunities for foster parents, and increased visitation with foster parents.

The Settlement Agreement requires that a Foster Care Recruitment and Retention Plan be developed in conjunction with the OCA. This plan should be done annually. First, although a plan has been developed and posted on DCYF's website, this plan was not developed in conjunction with the OCA. The OCA was invited to one meeting in the early stages of DCYF's development of the Foster Care Recruitment and Retention Plan. During this meeting, the OCA was presented with some initial information, however, the OCA was provided no opportunity to review a draft plan or provide meaningful feedback which would constitute the development of this plan together. During this meeting, a single request was made of the OCA to try to get the Director to support their plan for the use of a new software, which would operate as a Customer Relationship Management system to be used by the staff at the Department working on recruitment of foster parents. Therefore, this element of the Settlement Agreement was not satisfied.

Upon receipt of the final Foster Care Recruitment and Retention plan, both the Data Validator and the OCA determined that there were many areas requiring improvement to ensure that the plan was effective. In August 2019, the Monitoring Team provided DCYF with an outline of recommended changes; to date the Monitoring Team has not received a response from DCYF regarding the recommended changes and none of the recommended changes were incorporated into the Department's Foster Care Recruitment and Retention Plan for Reporting Period 1. Additionally, the Settlement Agreement requires that a new plan be provided each year. The Settlement Agreement does not define whether this is calendar year or fiscal year however, for the first Foster Care Recruitment and Retention Plan the Department entitled the report "FY 2019 RI DCYF Resource Family Recruitment & Retention Plan Effective July 1, 2018 – June 30, 2019." Therefore, the Monitoring Team believed that the Department interpreted the Settlement Agreement to mean, fiscal year. Fiscal Year 2020 started on July 1, 2019. Attached to the FY 2019 RI DCYF Resource Family Recruitment Plan Reflection Summary, which is published on DCYF's website, is a recruitment and retention plan for FY 2020. However, this plan does not reflect any of the changes proposed by the Monitoring Team.

The Monitoring Team has enclosed the initial recommendations regarding the first Foster Care Retention and Recruitment Plan in Appendix C. Although the initial recommendations were for the FY 2019 Foster Care Recruitment and Retention Plan, the Monitoring Team is still requesting that these changes be implemented as they are applicable to the current plan as well.

The Settlement Agreement also requires that the Department draft an annual, public report assessing the implementation of the plan over the previous twelve (12) months and identify any

systemic factors that may have contributed to any shortfall in recruitment. The annual report should provide the number of homes recruited and retained by category, the number of homes recruited in each category during the implementation period, and the total number of homes available for child placement in each of the categories at the beginning and end of the 12-month period. The report should also include recommendations for corrective action. This report has been published on the DCYF website. However, this report did not discuss systemic factors that may have contributed to the shortfall in recruitment and did not provide a meaningful plan for corrective action to increase the recruitment and retention of foster families.

DCYF will continue to conduct and publish this annual report until it exits from the terms of Sections 1-10 of the Settlement Agreement.

**Section 1: Assessments** – The Department appears to have achieved the required threshold for this measure (Assessments to be completed for children entering care or changing placements: Target - 85%, Unvalidated Performance - 89.13%), however, an insufficient number of cases were reviewed as it relates to statistical significance. The Monitoring Team recommends that the number of case reviews be expanded in order to allow the Department to claim achievement of the benchmark for this section during the period of review. Without a sufficient number of cases for review, the results cannot be validated.

**Section 2: Placement in Assessment and Stabilization Centers (ASC)** – The Department achieved the required thresholds (2.2 – No Child to be placed in ASC, Target-100%, Actual Performance-100%; ASC placements 14+ days have Quality Review every 14 days, Target-90%, Actual Performance-100%; ASC placements 60+ days have approval,Target-95%, Actual Performance-100%). All cases in the statewide universe were reviewed, therefore the Monitoring Team is validating the results. Continued high performance and statistically valid cases reviews in Report Period 2 will allow the Department to exit those sections of the Settlement Agreement.

**Section 3: Placement in Congregate Care** – The Department achieved the required threshold (No child to be placed in congregate care, Target-90%, Actual Performance 95.56%). All cases in the statewide universe were reviewed, therefore the Monitoring Team is validating the results. Continued high performance and statistically valid cases reviews in Report Period 2 will allow the Department to exit those sections of the Settlement Agreement.

**Section 4: Sibling Placements** – The Department did not achieve the threshold (Siblings placed together, 80%, Unvalidated Performance 73.33%). An insufficient number of cases were reviewed as it relates to statistical significance. The Monitoring Team recommends reviewing a statistically valid sample for future review periods. Without a sufficient number of cases for review, the statewide results cannot be validated.

**Section 5: Case Management** – No additional outcome measures – beyond those described in Sections 6 and 10 – are defined in Section 5 of the Settlement Agreement. The Monitoring Team anticipates, however, that DCYF will be mindful that in subsequent review periods, failure to achieve the benchmarks described in the Settlement Agreement will invoke a requirement via which DCYF must conduct a workload study in consultation with the Monitoring Team.

**Section 6: Visitation** – The Department did not achieve the threshold (Monthly caseworker face-to-face visits, Target-95%, Unvalidated Performance -94.13%; Quality of face-to-face visits, Target 85%, Unvalidated Performance – 16.76%; Frequency of sibling visitation, Target-85%, Unvalidated Performance-3.28%; Frequency of parent visitation (reunifications), Target-85%, Unvalidated Performance-12.62%). Neither the Department nor PCG reviewed a sufficient number of cases as it relates to statistical significance. For the Department this is reflected in measures 6.2, 6.3 and 6.4; for PCG – 6.1.   The Monitoring Team recommends reviewing a statistically valid sample for future review periods. Without a sufficient number of cases for review, the statewide results cannot be validated.

Section 7: Licensing – The Department did not fully achieve the threshold (Non-kinship placements must be licensed, Tareget-100%, Unvalidated Performance-100%; Background checks required for kinship homes, Target-100%, Unvalidated Performance-70.83%; Kinship applications completed within six months, Target-95%, Unvalidated Performance-45%; Background checks completed within 30 days of license renewal date, Target 85%, Unvalidated Performance-23.29%). An insufficient number of cases were reviewed as it relates to statistical significance. The Monitoring Team recommends reviewing a statistically valid sample for future review periods. Without a sufficient number of cases for review, the statewide results cannot be validated.

Section 8: Child Protective Services – The Department did not fully achieve the threshold (Timely screening of reports of abuse/neglect, Target-90%, Unvalidated Performance-96.48%; Response within designated timeframes, Target-90%, Unvalidated Performance-77.76%; Investigations completed within designated timeframes, Target-85%, Unvalidated Performance-84.35%). An insufficient number of cases were reviewed as it relates to statistical significance. The Monitoring Team recommends reviewing a statistically valid sample for future review periods. Without a sufficient number of cases for review, the statewide results cannot be validated.

Section 9: Foster Care Maintenance Payments – No outcome measures are defined in Section 9 of the Settlement Agreement. As part of their commitment under this section of the Settlement Agreement, DCYF will reassess the base rate for foster care maintenance payments, advocate (if necessary) for appropriations to increase that base rate, and amend the Rhode Island Administrative Code to include a regulation requirement such a reassessment every three years. The Monitoring Team anticipates receiving written notice from DCYF when that occurs.

Section 10: Case Planning – The Department did not achieve the threshold (Case plans meet timeliness requirements, Target-80%, Unvalidated Performance-12.86%; AACWA elements in case plan, Target-80%, Unvalidated Performance-4.74%). Neither the Department nor PCG reviewed a sufficient number of cases as it relates to statistical significance. For the Department this is reflected in measures 10.3 and for PCG – 10.2.   The Monitoring Team recommends reviewing a statistically valid sample for future review periods. Without a sufficient number of cases for review, the statewide results cannot be validated.

Section 11: Maltreatment in Care – Upon review of DCYF's website there is a report entitled "Annual Safety Analytic Report (FFY 18)". Section 3 of this report reviews maltreatment in foster care for Federal Fiscal Years 2015, 2016 and 2017. There was no assessment of maltreatment in foster care for federal Fiscal Year 2018, which concluded on September 30, 2018. This report notes that data is current through October 1, 2018 however, there is no analysis of the data from federal Fiscal Year 2018 in this report. There has been no subsequent report published reviewing this data. Since Section 11 requires an annual assessment, this commitment has not been met for Reporting Period 1.

Section 12: Foster Home Array – DCYF's report summarizing its findings from state fiscal year (FY) 2018–2019 has been published by DCYF on its website as the *FY 2019 Resource Family Recruitment Plan Reflection Summary.* However, this plan does not reflect any of the changes proposed by the Monitoring Team. Additionally, the Settlement Agreement requires the

Department to publish a public report assessing the implementation of the plan over the previous twelve (12) months and identify any systemic factors that may have contributed to any shortfall in recruitment. The report, published on the DCYF website, did not discuss systemic factors that may have contributed to the shortfall in recruitment and did not provide a meaningful plan for corrective action to increase the recruitment and retention of foster families. Therefore, this commitment has not been met for Reporting Period 1.

## CLOSING

The Monitoring Team is presenting this report in compliance with their role and responsibilities outlined in the Settlement Agreement. The Monitoring Team is requesting that the outlined recommendations be implemented forthwith to ensure that past and future reporting periods yield data that is reliable and valid. The Monitoring Team is also requesting that any documentation or information requested in this report be promptly provided to prevent any further delay in our analysis of the data and the subsequent reports regarding the Monitoring Team's findings.

## APPENDIX A: REQUIRED SAMPLE SIZE FOR ESTIMATING OUTCOMES

In five of the twenty-one measures described in the Settlement Agreement, in order to estimate the overall statewide outcome, DCYF conducts a "quality review" of a random sample of cases in order to make an inference about the overall statewide outcome. In order to achieve a sufficiently high level of confidence in the validity of the results, a sufficiently large sample of cases must be drawn in order to ensure that the sample has a high likelihood of reflecting the composition and outcomes achieved by the full universe of evaluated cases. Low sample sizes will result in a low level of confidence in the results, while increasing the sample size will increase the statistical validity of the sample.

The formula used to identify the number of cases that must be included in a random sample in order to achieve a certain level of statistical significance of the results at a specified margin of error is:

$$Sample\ Size = \frac{\frac{z^2 * p(1-p)}{e^2}}{1 + \frac{z^2 * p(1-p)}{e^2 N}}$$

Where:

- $N$ represents the size of the overall universe of cases;
- $e$ represents the margin of error as a percentage in decimal form;
- $z$ represents the "z-score," representing the number of standard deviations from the mean (average). A z-score of 1.96 standard deviations from the mean represents a 95% confidence interval; and
- $p$ represents the estimated sample proportion; an estimate of 50% (0.5) represents the most conservative value (that is, the one that will most likely result in a sample proportion commensurate with that of the full universe)

Table 4 illustrates for a range of potential universe sizes the sample size necessary to achieve a 95% confidence interval with a margin of error of three percent – that is, by fixing the values of $e$ and $z$ in the equation above respectively to 0.03 (three percent) and 1.96 (95% confidence interval), and scaling the value of N:

| N (universe size) | Sample Size Required |
|---|---|
| 50 | 48 |
| 100 | 92 |
| 200 | 169 |
| 300 | 235 |
| 400 | 292 |
| 500 | 341 |
| 1,000 | 517 |
| 2,000 | 697 |
| 3,000 | 788 |
| 4,000 | 843 |

| N (universe size) | Sample Size Required |
|---|---|
| 5,000 | 880 |

*Table 4: Sample Size to Estimate Proportion*

## APPENDIX B: REQUIRED SAMPLE SIZE FOR VERIFYING OUTCOME ACCURACY

In each of the twenty-one measures described in the Settlement Agreement, the Data Validator is tasked with verifying the accuracy of the data compiled by DCYF. As described in Appendix A and elsewhere in this report, for five of the measures the Data Validator is verifying the findings from "quality reviews" conducted by DCYF. For the remaining sixteen measures, the Data Validator is verifying outcomes that were calculated programmatically by DCYF via database queries run against RICHIST.

In a scenario such as this one, where the case-level findings have been identified across the full statewide universe, the operative sampling mechanism is not one that will estimate the overall statewide proportion as described in Appendix A, but one that will, to a certain degree of confidence, identify the likelihood that any errors in the original syntax or methodology are identified during a follow-up review.

The formula used to identify the likelihood of identifying an error from a sample of a certain size, known as the hypergeometric distribution, is:

$$Chance\ of\ Finding\ Error = 1 - \frac{\frac{K!}{(K-k)!\,k!} * \frac{(N-K)!}{((N-K)-(n-k))!\,(n-k)!}}{\frac{N!}{(N-n)!\,n!}}$$

Where:

- $N$ represents the size of the overall universe of cases;
- $n$ represents the number of cases in the sample;
- $K$ represents the number of cases in the universe where a methodological error occurred (assumed to be one percent of the universe of cases); and
- $k$ represents the number of methodological errors in the sample (assumed to be zero[8]).

Table 5 illustrates for a range of potential universe sizes the number of cases that must be reviewed – assuming a one percent error rate – in order to be 99 percent confident that at least one case with a methodological error will be included in the sample.

| N (universe size) | Sample Size Required |
| --- | --- |
| 50 | 50 |
| 100 | 99 |

[8] The hypergeometric distribution, as applied in this scenario, returns the likelihood that a sample of size $n$ will include at least one case with at least $k$ methodological errors. Strictly speaking, the hypergeometric distribution will indicate in the examples that follow that there is a one percent chance of the sample identifying no erroneous cases (i.e., $k$=0). Our operative calculation, however, is the inverse of that, in that we're interested in the inverse – that there is a 99 percent chance of the sample not identifying no erroneous cases (i.e., at least one erroneous case).

| N (universe size) | Sample Size Required |
|---|---|
| 200 | 180 |
| 300 | 235 |
| 400 | 273 |
| 500 | 300 |
| 1,000 | 368 |
| 2,000 | 410 |
| 3,000 | 425 |
| 4,000 | 433 |
| 5,000 | 438 |

*Table 5: Sample Size Required to Achieve 99% Chance of Finding at Least One Error*

# APPENDIX C: MONITORING TEAM'S RESPONSE TO DCYF'S FY 2019 FOSTER CARE AND RECRUITMENT PLAN

Specific comments are below, but broadly it would be very helpful to know more specifics about what steps, goals, and evaluation measures DCYF will be employing as this process unfolds, beyond a total number of homes. How will we know that success has been achieved, and how will we know what to fix if it isn't?

It would also be very helpful to know how the different pieces of this recruitment plan integrate. For example, how will social media be managed, since it will be used in so many contexts? Where do one measure's efforts piggyback on another's, and how can the different measures enhance one another? Who will develop the materials needed, and how will they be disseminated among the various resource families, through the Internet, and at events and meetings?

In the section labeled "About this Recruitment Plan" it is noted that the recruitment plan was developed in consultation with the Office of the Child Advocate; we would disagree with this statement. On April 24, 2018, the Office of the Child Advocate met with several members of the Licensing Staff. During this meeting several members of the licensing staff presented a PowerPoint, which explained some of the ideas/goals they had for a foster care recruitment plan as well as some data they had pulled. At no time was a formal recruitment plan ever presented to the Office of the Child Advocate for our "consultation" or feedback. It was not until February 4, 2019, the Office of the Child Advocate received the "Resource Family Recruitment and Retention Plan" after it was requested to be sent by the Data Validator.

## I.    RECRUITMENT GOALS AND OUTCOMES

## GOAL 1: NON-KINSHIP RESOURCE FAMILY TARGETS

- Include a measure of the bed-child ratio to measure the extent to which there are sufficient homes to care for children.
- Include the number of families that are currently open and available to DCYF, as well as the percentage increase that the targets represent.
- Since this report was written there are new DCYF policies regarding foster homes in response to a recent child fatality. Specifically, foster homes will not consist of more than 5 children without Director approval or the approval of the Director's designee AND the mandate that children who are not related shall not be placed together in the same foster home without Director approval or the approval of the Director's designee. Due to these changes, has DCYF factored the potential increase in licensed foster homes to their targets in response?
- The targets should include homes that are trained specifically to work with children who are members of the LQBTQ community.
- Include detail about specific steps to be taken for recruitment of new foster homes
- Provide a detailed and specific plan of which staff are responsible for each step of the recruitment plan

## GOAL 2: INFRASTRUCTURE

- Identify the specific means by which DCYF intends to implement the system for tracking prospective resource families progressing toward licensure.  In other states, for example, they incorporate the tracking into their case management system (i.e., RICHIST).
- What process is DCYF undertaking to identify a tracking system that will meet the needs to accomplish the goals outlined? Has a funding source already been identified to effectively carry out this initiative?
- What staff are specifically working on the implementation of each of these infrastructure goals and provide the anticipated date of completion?
- Provide specifics on what steps are to be taken each month to achieve these goals in time for the anticipated date of completion (need more specifics).
- Presently there is a backlog of unlicensed kinship foster homes. In some cases, children have been placed in these homes for well over a year without many components of the licensing process being completed, including home studies. In response, the Department has brought in five (5) contract-based employees to focus solely on home studies. Even with this temporary addition to the staff it is being reported that it could take up to seven (7) months to clear this backlog. Recruiting additional foster homes is important to meet the needs of children but properly vetting and reviewing these homes to ensure the safety of the children placed there is vital. Due to this:
    - o Are there plans to permanently hire additional staff to prevent a backlog of this magnitude from occurring in the future?
    - o Have considerations been made as to what additional front-line staffing may be necessary to license and adequately support the increased number of foster families? If so, specifically what was done to review this need and what determination was made?
    - o What measures have been taken to review performance and outcomes of the current licensing staff to determine whether policy and protocol changes are necessary to increase efficiency?
- Recent contract changes have resulted in DCYF taking more of the licensing, recruitment and retention process on internally away from providers previously tasked with this. What measures have been taken to assess the staffing and resource needs of the Department to ensure that this Unit has the capacity to handle these changes when already experiencing a backlog?
- Consider assigning a staff member who is available for foster parents to connect with about the current status of their application.
- Identify specific targets for increasing the web presence of DCYF.  Will recruitment videos be created? If so, how many, by when, and how will they be disseminated (YouTube, Social Media, DCYF website)? What social media presence will DCYF have (Twitter, Facebook, . . .)?  What changes or additions to DCYF's web presence will be initiated?

## GOAL 3: SUPPORT AND RETENTION

- What is the current percentage of non-kinship resource families who close their licenses annually, and what percentage is the retention goal per year?  Ideally, this would line up with the recruitment goals so the number of homes that are being recruited replace the number lost.
- Activities and groups for foster parents can be helpful to help them feel supported and increase their sense of pride and community for what they do.  Maybe include goals for connecting with local community organizations such as churches and YMCA's to host a "Foster Parent Night Out" where parents can bring their kids who would have supervision while they take a moment to relax and connect with other foster parents.
- Please also include a section on the recruitment and retention of kinship foster homes.
- Provide specifics:
  - Which staff members will be responsible for achieving the two goals set out in this section?
  - What is the timeline for completion? Provide specifics on steps to be taken each month to achieve these goals?

## II.    RECRUITMENT & RETENTION STRATEGIES AND SUB-STRATEGIES

## STRATEGY 1. STRENGTHEN ENGAGEMENT WITH CURRENT RESOURCE PARENTS

### A. Develop families into recruitment ambassadors.

- Identify the plan specifics for the resources and specific targets for the number of families and referrals received from recruitment ambassadors. What will be the financial incentives? How frequently, where, and how many meetings and events will be held? What materials will be developed and how will they be disseminated?
  - For example:
    - *DCYF will increase the number of families participating as recruitment ambassadors to ##, an increase of ##%, by July 1, 2019.  In order to achieve this goal, DCYF will engage the following strategies by [DATE]:*
    - *A $## gift card will be offered to any current foster or adoptive parent who refer a prospective resource parent who goes on to attain a home license.*
    - *## recruitment events will be held: # in Region 1, # in Region 2, # in Region 3, and # in Region 4, with at least one event happening per month per region.  These events will be promoted through social media, mailings, flyers, phone contacts, and on the DCYF Website.  ##% of these events will be held in areas that typify the characteristics of the homes from which children in DCYF's care originate.*
    - *Recruitment efforts will be further enhanced by the creation of educational materials that can be handed out to potential recruitment ambassadors at the meetings, at in-service trainings, during caseworker visits, and through engagement on social media. These materials will be created by DCYF/other agency and will focus on the need for recruitment ambassadors, the importance to children of foster care recruitment, and*

*the power of current resource parents in communicating the "story" of foster care to potential resource parents.  These materials will be completed, and dissemination will begin by March 2019.*

**B. Soliciting advice from our families around application, licensing, support and matching processes.**

o   What groups will be created, how many, and where will the groups be located?
o   How many surveys will be sent out to families?
o    What other methods of feedback will be provided to families?
o   How will participation be measured, and how will the results be used to improve the foster care system?
o   How will surveys be provided (i.e. via email, mail, calls directly to foster parents?)
o   What staff members will be responsible for this "quality assurance" role?
o   If negative feedback is provided, what will be the process required to ensure that this feedback initiates positive changes? What is the chain of command this will be reported to? Who will tasked with the responsibility of improving the individual foster parent's experience? Who will be responsible for policy and process review to see if additional changes need to be made?

## STRATEGY 2: USE COMMUNITY OUTREACH TO ARTICULATE SPECIFIC NEEDS

**A. Design and execute a teen-focused statewide campaign**

o   What are the specifics surrounding the implementation of the teen-focused statewide campaign?  How will storytelling and teen-focused marketing be conducted?  Will materials be sent to schools or athletic programs?  How will youth involved in The Voice develop and communicate their message?
o   What is the target number or percentage increase of families who express interest in fostering teenagers at the time of being licensed?
o   What staff members will be tasked with the responsibility of developing the teen-focused campaign, including the written materials?
o   What is the anticipated date of initiation of the campaign?
o   Are there any additional supports or services that will be provided to families who are taking in teens and will these be part of the resource materials or campaigns as the needs of a teen may be more extensive?
o   Consider specific support groups and community connections for foster families with teens.

**B. Organize specific community engagement tactics in minority and professional communities**

o   How will minority and professional communities be engaged?
o    Will materials be developed, or events held?  How many and where? Has the Department identified the community-based partners they will be partnering with? If so,

who? What is the plan to work with these groups for marketing, events, recruitment, etc.?
- o How will success be measured for this outcome – a percentage or number increase?
- o Could this include religious organizations as well?
- o What staff members will be responsible for the marketing campaign?
- o What is the plan to target the identified groups specifically?

**C. "Re-recruit" our current resource parents to identify families in the array who might be ideal for placement of large sibling groups**

- o What form will this marketing and communication take?  Discussions with DCYF staff, dissemination of materials, or some other means?
- o What is the expected number/percentage of "re-recruited" families that will be the measure of success on this measure?
- o Develop a plan for recruitment, support and retention of kinship foster families who may be willing to take in large sibling groups with additional support and resources.
- o Has there been a review of additional services, resources and supports that may be needed to further support families willing to take larger sibling groups?
- o Has there been a study of foster families who have taken larger sibling groups in the past to determine what supports/services were the best means of support? What needs may have been unfulfilled? What if anything could have been done differently to better support the family? Was there a disruption due to lack of support?
- o What are the number of families needed to meet this need?

## STRATEGY 3. BROADEN DEVELOPMENT AND SUPPORT PROGRAMMING

**A. Support services available to all families.**

- How will the "connection" of all families to support organizations, respite, and wraparound services be measured (i.e., will this be the dissemination of flyers at intake, ongoing engagement at trainings and caseworker visits, outreach, etc.)?
- Rather than measuring service utilization after connection to the support services, consider measuring family satisfaction with the supports they receive (for example, through the survey process included in the recruitment and retention strategies section).
- If the Department planning to utilize outside providers to assist with support and retention what is the specific timeline for RFPs and the awarding of contracts?
  - o If planning to use providers, which providers will be used and how will they assist with the support and retention of foster parents?
  - o Will providers received increased funding to be able to meet the increased capacity of foster families and provide resources and services necessary to support and retain foster families?
- There is a need for an increase in intensive community-based services to support children in foster homes opposed to having to resort to group care. What has been done to assess the additional need for services to support the increase in foster families?
- Has an in-depth review been completed of the gaps in services?
  - o What are the needs for increased services?

- o How is this review being completed? Is the Department obtaining feedback from the provider community and foster families to determine what services may be necessary?
  - o Has the Department looked to see what other states are doing in this area? If so, are there supports and services that we may need to develop here?
- Develop a plan/process/protocol to ensure a smoother transition for kids into a foster home. Ensure that all necessary information is provided right up front (where does the child go to school, logistics of transportation to school, have they been appropriately registered-this should all be done in advance of moving the child). Does the child have allergies? Medical needs? Are there past behaviors, fears, issues, concerns, that the foster parent should be aware of to assist them in better caring for the child? What are the child's service needs? Where/when will they have to go each day? Who is the child's doctor? Etc. Does the foster parent have the necessary authorizations to care for the child? Feedback often received is that many times a foster parent is receiving a child, but they do not get all necessary information right away!

**B. Implement in-service training opportunities**

- o What is the target for the number/percent of families taking advantage of in-service training opportunities?
- o There were additional topics identified (i.e. self-care, connections to birth families, grief process). Are these topics that DCYF staff will need to be trained on in order to provide appropriate training?

**C**. Promote to private sector ways they can support RI resource families

- o What specific materials will be developed to solicit businesses and community groups and how will they be disseminated?
- o What specific number/percentage increase will be considered a success on this measure?
- o What staff members will be responsible for managing and maintaining this campaign?
- o What is the specific plan to recruit community supports?
- o How will this information then be disseminated to foster families to make them aware of these resources?
- o Consider adding an item D. that focuses on better matching families to the needs of youth.
  - o Develop a better assessment tool to better determine the needs of the child, match the child with a family who is well-equipped to meet the needs of the child and to identify right up front the potential supports and services needed to provide ensure the child's stability in the placement and ensure those needs are met upon the child's transition in to the home.

**STRATEGY 4. LEVERAGE TECHNOLOGIES TO IMPROVE EFFICIENCY AND REACH**

**A. An application and tracking system to support prospective resource families as they progress toward licensure**

- What is the target date by which the CRM tool will be implemented?  How will it be introduced, and when will measurement begin?  What is the goal for the percentage and number of prospective families utilizing the system?
- How is the CRM being identified? Has the system been identified? How long will it take to implement the system? What type of staff training will be provided to achieve the most effective results from the use of the CRM? Who will be providing this training? Has the Department looked to the use of a CRM by other states to better understand their success or failures with the use of the system to better inform our state's use?
- What staff member will be tasked with monitoring the CRM?

**B. A Web presence that allows families to get more information and easier access to application materials**

- Provide specifics regarding by whom, by when, and what types of material are being developed. What will be done to utilize and engage families in social media?
- What is the target for the number of inquiries received via the DCYF website?
- What staff members will be responsible for all of this and responsible for the continuous update of these materials?
- What is the anticipated date of completion for these goals? What is the timeline/plan for completion?